**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW HAMPSHIRE**

| | |
|---|---|
| OCADO INNOVATION LTD. and OCADO SOLUTIONS LTD., <br><br> Plaintiffs, <br><br> v. <br><br> AUTOSTORE AS and AUTOSTORE SYSTEM INC., <br><br> Defendants. | Case No. 1:21-cv-00041-JL <br><br> **Hon. Joseph N. LaPlante** |

**AUTOSTORE'S OPENING CLAIM CONSTRUCTION BRIEF**

**TABLE OF CONTENTS**

I.      INTRODUCTION ................................................................................................ 1

II.     LEGAL PRINCIPLES ....................................................................................... 3

        A.      General Principles of Claim Construction ............................................. 3

        B.      Indefiniteness ........................................................................................ 3

III.    TECHNOLOGY OVERVIEW .......................................................................... 4

        A.      '080 Patent ............................................................................................ 4

        B.      '602 And '051 Patents .......................................................................... 5

        C.      '404 And '770 Patents .......................................................................... 6

IV.     U.S. PATENT NO. 9,796,080 .......................................................................... 8

        A.      "mechanism" (Claims 9–12, 21) ........................................................... 8

        B.      "nestable" / "nested" (Claims 8, 17, 23) .............................................. 8

        C.      "delivery container" (Claims 1–6, 8–11, 13–16, 18–23) ..................... 11

        D.      "delivery container containing at least one picked item" (Claim 15) ................... 14

        E.      "at least one of a lip, a handle, and an aperture" (Claim 11) ............... 15

        F.      "a structural framework defining a grid of storage locations" (Claims 1, 23)
                ............................................................................................................ 16

        G.      "exclusively within the storage and retrieval system" (Claims 1, 13) ................ 17

V.      U.S. PATENT NO. 10,913,602 ........................................................................ 19

        A.      "A load handling device … will occupy a grid space" (Claim 1) / "load
                handling device … occupying a grid space" (Claim 12) ...................... 19

        B.      "Load handling devices … will not obstruct a load handling device …
                occupying or traversing an adjacent grid space in the X-direction and will
                not obstruct a load handling device … occupying or traversing an adjacent
                grid space in the Y-direction" (Claim 1) / "the load handling device will not
                obstruct a load handling device occupying or traversing an adjacent grid
                space in the X-direction and will not obstruct a load handling device
                occupying or traversing an adjacent grid space in the Y-direction" (Claim
                12) ........................................................................................................ 22

C. "wheel hub motor" (Claims 6, 10, 17) ................................................................... 24

VI. U.S. PATENT NO. 10,961,051 ............................................................................... 25

A. "A housing footprint" (Claims 1, 13) ................................................................ 25

B. "The second housing has a housing footprint that occupies less than twice the area of the grid space" (Claim 1) / "the second load handling device has a housing footprint that occupies less than twice the area of the grid space" (Claim 13) ................................................................................................ 26

C. "The first set of rails is part of a first set of tracks, and the second set of rails is part of a second set of tracks" (Claims 9 and 18) ....................................... 26

VII. U.S. PATENT NO. 10,901,404 ............................................................................... 28

A. "Clearance instruction" ('404 Patent Claim 1) / "Clearance command" ('770 Patent Claims 1, 29) ..................................................................................... 28

1. *The claim language suggests "clearance" is a permission.* ...................... 29

2. *The specification confirms that "clearance" is a permission.* ................. 30

3. *The file history also confirms that "clearance" is a permission.* ............. 31

B. "For execution at a future time" (Claim 20) ............................................................ 33

C. "Route" (Claim 20) .................................................................................................... 36

VIII. U.S. PATENT NO. 11,079,770 ............................................................................... 37

A. "One of more processors configured to" (Claim 1) ............................................. 37

1. *The term is subject to 35 U.S.C. § 112(f).* .................................................... 38

2. *The term is indefinite because the '770 patent does not disclose any algorithm or steps to perform the claimed functions of the "processors."* ................................................................................................... 41

B. "Potential for [a/the] collision" (Claims 1, 8–10, 12, 27, 29) ............................... 45

C. "[T]he one or more processors are configured to determine from an attribute of the first transporting device that there is the potential for the collision" (Claim 9) ....................................................................................................................... 47

D. "[T]he predetermined processors are configured to determine from one or more of (i) a missed message, (ii) a processing time, (iii) a clock sync, or (iv) a transporting device discrepancy with a physics model, that there is the potential for the collision" (Claim 10) ................................................................... 47

E.   "Real time" (Claim 21) ....................................................................... 48

F.   "[G]enerating, by the one or more processors, a plurality of clearance commands … / "[D]etermining, by the one or more processors, there is a potential for a collision …" (Claims 29 and 30).................................... 49

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*AbbVie Inc. v. Mathilda & Terrence Kennedy Ins. of Rheumatology Tr.*,
764 F.3d 1366 (Fed. Cir. 2014)...................................................................................................21

*Adams Respiratory Therapeutics, Inc. v. Perrigo Co.*,
616 F.3d 1283 (Fed. Cir. 2010).................................................................................................16

*Advanced Ground Info. Sys., Inc. v. Life360, Inc.*,
830 F.3d 1341 (Fed. Cir. 2016).................................................................................................38

*Apple Inc. v. Motorola, Inc.*,
757 F.3d 1286 (Fed. Cir. 2014).................................................................................................32

*Aristocrat Techs. Australia Pty Ltd. v. Int'l Game Tech.*,
521 F.3d 1328 (Fed. Cir. 2008).................................................................................................41

*AstraZeneca AB v. Mylan Pharms. Inc.*,
19 F.4th 1325 (Fed. Cir. 2021) .................................................................................................31

*AutoStore Sys. Inc. v. Ocado Innovation Ltd.*,
IPR2021-00798, Paper 15 (P.T.A.B. Nov. 8, 2021) .................................................................16

*Bicon, Inc. v. Straumann Co.*,
441 F.3d 945 (Fed. Cir. 2006)............................................................................................34, 45

*Blackboard, Inc. v. Desire2Learn, Inc.*,
574 F.3d 1371 (Fed. Cir. 2009)..........................................................................................41, 43

*Brown v. Baylor Healthcare Sys.*,
381 F. App'x 981 (Fed. Cir. 2010) ...........................................................................................35

*Chrimar Holding Co., LLC v. ALE USA Inc.*,
732 F. App'x. 876 (Fed. Cir. 2018) *as amended* (Jun. 1, 2018) ..............................................45

*Cordis Corp. v. Medtronic Ave, Inc.*,
511 F.3d 1157 (Fed. Cir. 2008)..................................................................................................11

*Curtiss-Wright Flow Control Corp. v. Velan, Inc.*,
438 F.3d 1374 (Fed. Cir. 2006)..................................................................................................27

*Digene Corp. v. Third Wave Techs., Inc.*,
323 F. App'x 902 (Fed. Cir. 2009) .............................................................................................30

*Egenera, Inc. v. Cisco Sys., Inc.*
    972 F.3d 1367 (Fed. Cir. 2020)..................................................................................38, 39, 40

*EON Corp. IP Holdings LLC v. AT&T Mobility LLC*,
    785 F.3d 616 (Fed. Cir. 2015)......................................................................................42, 45, 48

*Ergo Licensing, LLC v. CareFusion 303, Inc.*,
    673 F.3d 1361 (Fed. Cir. 2012).........................................................................................41, 42

*Ex parte Jung*,
    Appeal No. 2016-008290, 2017 WL 1130560 (P.T.A.B. Mar. 20, 2017) ...............................15

*Gillette Co. v. Energizer Holdings, Inc.*,
    405 F.3d 1367 (Fed. Cir. 2005)....................................................................................................32

*GoDaddy.com, LLC v. RPost Commc'ns Ltd.*,
    No. CV-14-00126-PHX-JAT, 2016 WL 212676 (D. Ariz. Jan. 19, 2016),
    *aff'd*, 685 F. App'x 992 (Fed. Cir. 2017).................................................................................40

*Halliburton Energy Servs., Inc. v. M-I LLC*,
    514 F.3d 1244 (Fed. Cir. 2008)....................................................................................................49

*HIP, Inc. v. Hormel Foods Corp.*,
    No. CV 18-615-CFC, 2019 WL 2579266 (D. Del. June 24, 2019),
    *aff'd*, 796 F. App'x 748 (Fed. Cir. 2020)..................................................................................46

*HTC Corp. v. IPCom GmbH & Co., KG*,
    667 F.3d 1270 (Fed. Cir. 2012)....................................................................................................41

*Ibormeith IP, LLC v. Mercedes-Benz USA, LLC*,
    732 F.3d 1376 (Fed. Cir. 2013)....................................................................................................41

*Interval Licensing LLC v. AOL, Inc.*,
    766 F.3d 1364 (Fed. Cir. 2014)......................................................................................................4

*In re Katz Interactive Call Processing Patent Litig.*,
    639 F.3d 1303 (Fed. Cir. 2011)....................................................................................................42

*Koki Holdings Co. v. Kyocera Senco Indus. Tools, Inc.*,
    No. 18-313-CFC, 2021 WL 1092579 (D. Del. Mar. 22, 2021) ...............................................18

*Lightforce U.S., Inc. v. Leupold & Stevens, Inc.*,
    Case No. 3:17-cv-01153-AC, 2019 WL 2146245 (D. Or. May. 15, 2019) ............................26

*Mantissa Corp. v. FiServ Solutions, LLC*,
    No. 19-C-3204, 2022 WL 2439938 (N.D. Ill. Jul. 5, 2022) ...................................................49

*Markman v. Westview Instruments, Inc.*,
517 U.S. 370 (1996)........................................................................................................3

*Media Digital, Inc. v. Toshiba Am. Info. Sys., Inc.*,
No. 12-cv-313-JL, 2015 WL 1867864 (D.N.H. Apr. 23, 2015) ........................................41, 42

*MicroStrategy Inc. v. Bus. Objects, S.A.*,
429 F.3d 1344 (Fed. Cir. 2005)......................................................................................34

*Nautilus, Inc. v. Biosig Instruments, Inc.*,
572 U.S. 898 (2014)......................................................................................3, 4, 37, 49

*Net MoneyIN, Inc. v. Verisign, Inc.*,
545 F.3d 1359 (Fed. Cir. 2008)......................................................................................41

*Netgear, Inc. v. Ruckus Wireless, Inc.*,
5 F. Supp. 3d 592 (D. Del. 2013)....................................................................................44

*Niz-Chavez v. Garland*,
141 S.Ct. 1474 (2021)....................................................................................................21

*Novo Nordisk A/S v. Caraco Pharm. Labs., Ltd.*,
719 F.3d 1346 (Fed. Cir. 2013)................................................................................ 35-36

*NPC, Inc. v. Int'l Precast Supply, Inc.*,
337 F. Supp. 2d 378 (D.N.H. 2004).................................................................................13

*NTP, Inc. v. Research In Motion, Ltd.*,
418 F.3d 1282, 1294 (Fed. Cir. 2005).............................................................................26

*O2 Micro Int'l Ltd. v. Beyond Innovation Tech. Co.*,
521 F.3d 1351 (Fed. Cir. 2008)....................................................................................8, 9

*Omega Engineering, Inc. v. Raytek Corp.*,
334 F.3d 1314 (Fed. Cir. 2003).......................................................................................12

*Pfizer, Inc. v. Ranbaxy Labs. Ltd.*,
457 F.3d 1284 (Fed. Cir. 2006).......................................................................................27

*Phil-Insul Corp. v. AirLite Plastics Co.*,
854 F.3d 1344 (Fed. Cir. 2017).......................................................................................25

*Phillips v. AWH Corp.*,
415 F.3d 1303 (Fed. Cir. 2005) (en banc)......................................................................3, 29

*Power Integrations, Inc. v. ON Semiconductor Corp.*,
No. 16-cv-06371, 2018 WL 5603631 (N.D. Cal. Oct. 26, 2018) .........................................34

*Profectus Tech. LLC v. Huawei Techs. Co.*,
     823 F.3d 1375 (Fed. Cir. 2016)......................................................................3

*ProMOS Techs. v. Samsung Elecs. Co.*,
     809 F. App'x. 825 (Fed. Cir. 2020) ...............................................................9

*Regents of Univ. of Minn. v. AGA Med. Corp.*,
     717 F.3d 929 (2013).......................................................................................32

*RideApp Inc. v. Lyft, Inc.*,
     845 F. App'x 959 (Fed. Cir. 2021) ...............................................................43

*Sensor Elec. Tech., Inc. v. Bolb, Inc.*,
     No. 18-CV-05194-LHK, 2019 WL 4645338 (N.D. Cal. Sept. 24, 2019)...............46

*Siemens Gamesa Renewable Energy A/S v. Gen. Elec. Co.*,
     No. CV 21-10216-WGY, 2021 WL 5040409 (D. Mass. Oct. 28, 2021)...............32

*SIMO Holdings Inc. v. Hong Kong uCloudlink Network Tech. Ltd.*,
     983 F.3d 1367 (Fed. Cir. 2021).....................................................................15

*SimpleAir, Inc. v. Google LLC*,
     884 F.3d 1160 (Fed. Cir. 2018).....................................................................32

*SIPCO, LLC v. Emerson Elec. Co.*,
     794 F. App'x 946 (Fed. Cir. 2019) ...............................................................36

*Skyhook Wireless, Inc. v. Google, Inc.*,
     No. CIV.A. 10-11571-RWZ, 2012 WL 4076180 (D. Mass. Sept. 14, 2012) ...........37

*St. Isidore Rsch., LLC v. Comerica Inc.*,
     No. 2:15-CV-1390-JRG-RSP, 2016 WL 4988246 (E.D. Tex. Sept. 19, 2016).............40

*SuperGuide Corp. v. DirecTV Enters., Inc.*,
     358 F.3d 870 (Fed. Cir. 2004).......................................................................15

*Synchronoss Techs., Inc. v. Dropbox, Inc.*,
     987 F.3d 1358 (Fed. Cir. 2021).....................................................................17

*Syneron Med. Ltd. v. Invasix, Inc.*,
     No. 816CV00143DOCKES, 2018 WL 4696971 (C.D. Cal. Sept. 5, 2018),
     *report and recommendation adopted*, No. SACV160143DOCKESX, 2018
     WL 11351325 (C.D. Cal. Sept. 28, 2018) .....................................................39

*Teva Pharm. USA, Inc. v. Sandoz, Inc.*,
     574 U.S. 318 (2015).........................................................................................3

*Typhoon Touch Techs., Inc. v. Dell, Inc.*,
    659 F.3d 1376 (Fed. Cir. 2011)..................................................................................42

*Uniloc USA, Inc. v. Samsung Elecs. Am., Inc.*,
    809 F. App'x 863 (Fed. Cir. 2020) ......................................................................43, 44

*Velocity Pat. LLC v. FCA US LLC*,
    No. 13 C 8419, 2018 WL 4214161 (N.D. Ill. Sept. 4, 2018),
    *aff'd*, 784 F. App'x 787 (Fed. Cir. 2019)......................................................................39

*Ventrudo v. U.S.*,
    No. 3:13-cv-00862-MMH-MCR, Dkt. No. 54 (M.D. Fla. Jul. 24, 2015)...............................25

*Verint Sys. Inc. v. Red Box Recorders Ltd.*,
    No. 14-cv-5403, 166 F. Supp. 3d 364 (S.D.N.Y. Jan. 4, 2016)................................................44

*Verizon Servs. Corp. v. Vonage Holdings Corp.*,
    503 F.3d 1295 (Fed. Cir. 2007)....................................................................................19

*Wastow Enterprises, LLC v. Truckmovers.com, Inc.*,
    855 F. App'x. 748 (Fed. Cir. 2021) ...........................................................................19, 20

*Williamson v. Citrix Online, LLC*,
    792 F.3d 1339 (Fed. Cir. 2015).....................................................................................38

*XR Commc'ns, LLC v. Ruckus Wireless, Inc.*,
    No. 18-CV-01992-WHO, 2021 WL 3918136 (N.D. Cal. Sept. 1, 2021) .......................... 40-41

**Statutes**

35 U.S.C. § 101......................................................................................................21

35 U.S.C. § 112...................................................................................................27, 28

35 U.S.C. § 112(b) ....................................................................................................4

35 U.S.C. § 112(f)............................................................................................. *passim*

**Other Authorities**

37 C.F.R. § 1.321(b) ...............................................................................................32

**TABLE OF EXHIBITS**

| Ex.[1] No. | Description | Bates Range |
|---|---|---|
| 1 | U.S. Patent No. 9,796,080 | |
| 2 | U.S. Patent No. 10,913,602 | |
| 3 | U.S. Patent No. 10,961,051 | |
| 4 | U.S. Patent No. 10,901,404 | AS-NH_00211497 |
| 5 | U.S. Patent No. 11,079,770 | AS-NH_00211471 |
| 6 | Excerpts from Transcript of the Deposition Lars Sverker Ture Lindbo (April 30, 2021), in Inv. No. 337-TA-1228 (U.S.I.T.C.) **(filed under seal)** | |
| 7 | *Thomas Ventrudo v. United States of America*, Case No. 3:13-CV-00862, Dkt. No. 54 (M.D. Fla. Jul. 24, 2015) | |
| 8 | Excerpts from the Transcript of the Deposition of Raffaello D'Andrea, Ph.D. (July 20, 2022) | |
| 9 | Excerpts from the Transcript of the Deposition of Brian George Pfeifer, Ph.D. (July 21, 2022) | |
| 10 | Excerpts from the Transcript of the Deposition of Petros Ioannou, Ph.D. (July 22, 2022) | |
| 11 | Declaration of Matthew Spenko, Ph.D. (May 27, 2022) | |
| 12 | Rebuttal Declaration of Matthew Spenko, Ph.D. (June 24, 2022) | |
| 13 | Rebuttal Declaration of Stephen Derby Regarding Claim Construction, Ph.D. (June 24, 2022) | |
| 14 | Declaration of Brian Pfeifer, Ph.D. (April 25, 2022), submitted as Exhibit 2020 in Case No. IPR2022-00443 | |
| 15 | Declaration of Brian Pfeifer, Ph.D. (December 11, 2020), submitted as Exhibit 1015 in Case No. IPR2021-00311 | |
| 16 | Declaration of Professor Raffaello D'Andrea (Case No. 1:21-cv-00041-JL (D.N.H.), Dkt. No. 35-22) | |
| 17 | Declaration of Raffaello D'Andrea, Ph.D., in Support of Plaintiffs' Proposed Claim Constructions (served May 27, 2022) | |

---

[1]  Unless noted otherwise, "Ex." refers to exhibits attached to the Declaration of Ali-Reza Boloori in Support of AutoStore's Opening Claim Construction Brief ("Boloori Decl."), filed concurrently with this brief.

| Ex.[1] No. | Description | Bates Range |
|---|---|---|
| 18 | Rebuttal Declaration of Raffaello D'Andrea, Ph.D., in Further Support of Plaintiffs' Proposed Claim Constructions (served June 24, 2022) | |
| 19 | Sur-Rebuttal Declaration of Raffaello D'Andrea, Ph.D., in Further Support of Plaintiffs' Proposed Claim Constructions (served July 12, 2022) | |
| 20 | Declaration of Petros Ioannou, Ph.D. (served May 27, 2022) | |
| 21 | Rebuttal Declaration of Petros Ioannou, Ph.D. (served June 24, 2022) | |
| 22 | Sur-Rebuttal Declaration of Petros Ioannou, Ph.D. (served July 12, 2022) | |
| 23 | Excerpts from the File History of U.S. Patent No. 9,796,080 | |
| 24 | Excerpts from the File History of U.S. Patent No. 10,901,404 | AS-NH_00216216–227 |
| 25 | Excerpts from the File History of U.S. Patent No. 11,079,770 | AS-NH_00208993–999 |
| 26 | Excerpts from the File History of U.S. Patent No. 10,474,141 | AS-NH_00207451–57 |
| 27 | Excerpts from the File History of European Patent No. 3376450 | AS-NH_00209330, AS-NH_00209627–674 |
| 28 | Email from Josh Glucoft to Laurie Stempler on May 24, 2022 at 6:27 p.m. E.D.T. | |
| 29 | Patent Trial & Appeal Board decision, Case No. IPR2022-00443 (July 20, 2022) | |
| 30 | Excerpts from the Oxford English Dictionary | OC-DNH_000008741–751 |
| 31 | Excerpts from The American Heritage Dictionary | OC-DNH_000008722–740 |
| 32 | Excerpts from the Webster's New World College Dictionary | AS-NH_00217322–324 |
| 33 | Excerpts from the American Heritage Dictionary | AS-NH_00217319–321 |
| 34 | Excerpts from the Webster's Third New International Dictionary | AS-NH_00217302–304 |
| 35 | The AutoStore System brochure (2010) (color version of AS-ITC_00452501–512) | |

**TABLE OF ABBREVIATIONS**

| Abbreviation | Description |
|---|---|
| AutoStore | Defendants AutoStore AS and AutoStore System Inc. |
| Ocado | Plaintiffs Ocado Innovation Ltd. and Ocado Solutions Ltd. |
| D'Andrea #1 | Declaration of Professor Raffaello D'Andrea (Case No. 1:21-cv-00041-JL (D.N.H.), Dkt. No. 35-22) (Ex. 16) |
| D'Andrea #2 | Declaration of Raffaello D'Andrea, Ph.D., in Support of Plaintiffs' Proposed Claim Constructions (served May 27, 2022) (Ex. 17) |
| D'Andrea #3 | Rebuttal Declaration of Raffaello D'Andrea, Ph.D., in Further Support of Plaintiffs' Proposed Claim Constructions (served June 24, 2022) (Ex. 18) |
| D'Andrea #4 | Sur-Rebuttal Declaration of Raffaello D'Andrea, Ph.D., in Further Support of Plaintiffs' Proposed Claim Constructions (served July 12, 2022) (Ex. 19) |
| D'Andrea Tr. | Transcript of the Deposition of Raffaello D'Andrea, Ph.D. (July 20, 2022) (Ex. 8) |
| Ioannou #1 | Declaration of Petros Ioannou, Ph.D. (served May 27, 2022) (Ex. 20) |
| Ioannou #2 | Rebuttal Declaration of Petros Ioannou, Ph.D. (served June 24, 2022) (Ex. 21) |
| Ioannou #3 | Sur-Rebuttal Declaration of Petros Ioannou, Ph.D. (served July 12, 2022) (Ex. 22) |
| Ioannou Tr. | Excerpts from the Transcript of the Deposition of Petros Ioannou, Ph.D. (July 22, 2022) (Ex. 10) |
| POSITA | Person of Ordinary Skill In The Art |
| USPTO | United States Patent and Trademark Office |
| '080 patent | U.S. Patent No. 9,796,080 (Ex. 1) |
| '602 patent | U.S. Patent No. 10,913,602 (Ex. 2) |

| Abbreviation | Description |
|---|---|
| '051 patent | U.S. Patent No. 10,961,051 (Ex. 3) |
| '404 patent | U.S. Patent No. 10,901,404 (Ex. 4) |
| '770 patent | U.S. Patent No. 11,079,770 (Ex. 5) |

*\* All emphases are supplied unless otherwise noted.*

AutoStore hereby respectfully submits its opening claim construction brief regarding the proper construction of 23 disputed terms in the asserted patents. The originally disputed terms and the parties' respective constructions were previously set forth at Dkt. No. 107, but certain terms are no longer in dispute. The parties expect to file an amended joint claim construction statement reflecting the up-to-date disputed terms prior to filing opposition briefs.

## I.    INTRODUCTION

In traditional warehouses, goods are stored on shelves and handled by humans. *See, e.g.*, Ex. 2 ('602 patent) at 1:14–22. In the 1990s, AutoStore invented a groundbreaking storage system that yielded significant space and cost savings by storing items in a dense cubic structure, with items arranged in bins stacked on top of each other vertically. *Id.* at 2:23–4:45. In these "cubic" structures, goods are retrieved from the top of the grid using robotic load handling devices. *Id*. at 2:23–4:45. Because the process of storing and retrieving items is automated, these systems are commonly called cubic automated storage and retrieval systems, or cubic AS/RSs. Ocado's patents actually discuss and illustrate AutoStore's invention, where robotic load handlers (elements 30) move on a grid (element 14) on the top of a frame structure in which stacks of containers (elements 10) are arranged (*id.* at 2:32–4:31, Fig. 4).[2]



FIG. 4

Almost a decade before Ocado even applied for the patents-in-suit, AutoStore developed

---

[2] *See also* https://www.youtube.com/watch?v=iHC9ec591lI (showing operation of an AS/RS).

and commercialized the world's first cubic storage AS/RS, sold under the Red Line brand. The Red Line system included robotic vehicles that moved on a grid on top of the structure to lift and move storage containers from one location to another. It also had a control system that determined robot routes and controlled their movements on the grid. Ocado itself bought and operated a Red Line system in 2012–13, before the patents-in-suit were filed.




*Robot fetching a BIN.*

Ex. 35 at 2, 5.

The five patents-in-suit follow AutoStore's pioneering Red Line system. Indeed, the patents recognize AutoStore's inventions as having come first, and even praise them. *See, e.g.*, Ex. 2 ('602 patent) at 2:32–37, 4:32–38. Given AutoStore's prior innovation, Ocado had to define its purported inventions narrowly to secure its patents. But with AutoStore as its target, Ocado no longer respects the narrow, limited scope of its patents. To the contrary, Ocado proposes broad claim constructions unsupported by the plain meaning of the claims and the specification that often contradict its own representations to various patent offices worldwide when Ocado was trying to convince them to grant its patents. And other of its asserted claims fail to define with reasonable

clarity the full scope of the alleged invention.

Ocado should not now be permitted to expand the scope of its claims, nor resuscitate those it failed to define with clarity.

## II. LEGAL PRINCIPLES

### A. General Principles of Claim Construction

"It is a bedrock principle of patent law that the claims of a patent define the invention to which the patentee is entitled the right to exclude." *Phillips v. AWH Corp.*, 415 F.3d 1303, 1312 (Fed. Cir. 2005) (en banc) (citations and quotation marks omitted). The proper construction of a patent's claims is a question of law that falls "exclusively within the province of the court." *Teva Pharm. USA, Inc. v. Sandoz, Inc.*, 574 U.S. 318, 325 (2015) (quoting *Markman v. Westview Instruments, Inc.*, 517 U.S. 370, 372 (1996)). The words of a claim are generally given their ordinary meaning, which is the meaning that the term would have to a person of ordinary skill in the art at the time of the invention. *Phillips*, 415 F.3d at 1312–13. Claims must be construed in light of the specification, which is the "single best guide to the meaning of a disputed term," and the prosecution history. *Id.* at 1315.

In construing a claim, the Court may also refer to extrinsic evidence, such as dictionaries or expert testimony, "to better understand the underlying technology and the way in which one of skill in the art might use the claim terms." *Philips*, 415 F.3d at 1317–18 (internal quotation omitted). But such extrinsic evidence may not contradict or override the intrinsic evidence. *Profectus Tech. LLC v. Huawei Techs. Co.*, 823 F.3d 1375, 1380 (Fed. Cir. 2016).

### B. Indefiniteness

"[A] patent is invalid for indefiniteness if its claims, read in light of the specification delineating the patent, and the prosecution history, fail to inform, with reasonable certainty, those skilled in the art about the scope of the invention." *Nautilus, Inc. v. Biosig Instruments, Inc.*, 572

U.S. 898, 901 (2014); *see also* 35 U.S.C. § 112(b) (the specification must "conclude with one or more claims particularly pointing out and distinctly claiming the subject matter which the inventor or a joint inventor regards as the invention."). The claims must be "precise enough to afford clear notice of what is claimed, thereby apprising the public of what is still open to them." *Nautilus*, 572 U.S. at 909 (citation and alterations omitted). The indefiniteness inquiry is not whether "a court can ascribe some meaning to a patent's claims"—it is whether the claims provide "objective boundaries." *Interval Licensing LLC v. AOL, Inc.*, 766 F.3d 1364, 1371 (Fed. Cir. 2014).

## III.    TECHNOLOGY OVERVIEW

### A.    '080 Patent

In prior art AS/RSs, a customer might purchase multiple items stored in different containers in the AS/RS. As a result, after the first purchased item was picked from a storage container in the AS/RS, it was not necessarily ready for immediate delivery; rather, it had to wait until the other items in that customer's order were also picked from their respective bins. *See* Ex. 1 ('080 patent) at 1:33–55. In warehouses with large AS/RSs, there may not be enough floor space to temporarily hold all the delivery containers that were being prepared until they were ready for delivery. *See id*.

The '080 patent proposed storing delivery containers containing picked items back in the AS/RS until the delivery containers were ready for delivery, instead of temporarily storing the delivery containers on the floor. *See* '080 patent at 5:66–6:2. The '080 patent teaches that delivery containers containing picked items can either be stored back into the AS/RS (*see, e.g.*, '080 patent at 5:66–6:2) or placed inside of another storage container that is placed in the AS/RS (*see, e.g.*, '080 patent at Fig. 6). The '080 patent teaches the purported benefits of this approach as follows ('080 patent at 2:39-46):

> By storing both types of containers within the grid or racking, significant efficiencies can be realized in a number of ways, including for example more efficient use of floor space….

### B.    '602 And '051 Patents

Prior art AS/RS included large load handling robots, where the robot's wheels, electronics, and certain mechanical components occupied at least one space on the grid and a cantilever arm used to raise and lower containers would protrude into a second space. '602 patent at 3:6–45. These multi-space load handling devices are depicted, for example, in Figures 3A–C of the '602 patent. By virtue of their size, these robots reduce the number of robots that can operate within the AS/RS, at least in part because they obstruct other robots traveling through adjacent spaces.

The '602 patent and the '051 continuation patent that shares the same specification describe a ***single-space robot*** in which storage containers are raised into a central space directly beneath the robot, as shown here in Figure 5, as contrasted with Figure 3A of the prior art:

| Prior Art Robotic Load Handler (Fig. 3A) | Single-Space Robotic Load Handler (Excerpt of Fig. 5) |
|---|---|



This single-space load handling device addresses some of the issues caused by a two-space robot ('602 patent at 5:38–47):

> Advantageously, **the load handling device of the invention occupies the space above only one stack of containers** in the frame, in contrast to the cantilever design shown in FIGS. 3A to 3C which occupies the space above two stacks. This means that, by virtue of the invention, the efficiency of operation of the storage system can be improved, because the reduced footprint allows more load handling devices to be accommodated and reduces the likelihood of one device obstructing the optimum path of another.

5

### C.    '404 And '770 Patents

The '404 and '770, both titled "Methods, Systems, and Apparatus for Controlling Movement of Transporting Devices," claim methods and systems for determining robot paths and controlling movements of robots on a cubic AS/RS grid. The patents have overlapping claims, share inventors and a specification,[3] and claim priority to the same original application.

The '404 patent states that AS/RS systems have a "need…for systems and processes for coordinating and controlling product movement." Ex. 4 ('404 patent) at 2:29–30. Per the patent, this requires "co-ordination of the movement of the one or more robot[s]." *Id.* at 1:62–67; *see also* 2:31–33. The specification describes a "Robot Control System" that communicate with robotic vehicles on the grid via radio.[4] The Robot Control System includes several components, which the patents describe as generic "modules." *See* '404 patent at Fig. 3, 12:19–25, 13:24–40. These modules include: a "Movement Optimisation Module" (MOU) (shaded blue in the figure below); a "Reservation Module" (shaded orange); a "Clearance Module" (shaded green); and a "Command Generation and Schedule[r] Module" (shaded purple).

---

[3] The '404 and '770 patents have nearly identical specifications; for simplicity, this section cites to the '404 patent specification. The '770 patent specification has the same disclosure.

[4] Long before Ocado filed the application that led to the '404 and '770 patents, AutoStore had developed and was selling the world's first cubic AS/RS system in which robotic vehicles moved on a grid on top of a cubic storage structure. *See, e.g.*, Dkt. No. 49 at 80. Known as the "Red Line," this system included a controller that, among other things, determined robot paths on the grid and controlled their movements from one location on the grid to another location. *See* '404 patent at Fig. 7, 10:35–39. Ocado bought and operated a Red Line System before it filed the patent application in June 2014 that led to the '404 and '770 patents. *See* Ex. 6 at 114:20–115:22.



The MOU *determines routes* for each robot from one grid location to another. *Id.* at 14:33–37, 15:43–49. The Reservation Module *reserves paths* for each robot so that other robots cannot take paths that would cause collisions with the robot. *See id.* at 19:30–3. According to Ocado, use of the MOU and the reservation module "may not result in perfect routes suitable for traversal … because transporting devices may be marginally off route due to tolerances in the transmission of communication messages and tolerances for clock discrepancies." Ex. 26 at AS-NH_00207453. To address this, the "clearance module checks that it will not be possible" for one robot to collide with other robots based on several factors, such as "grid dimensions, grid positions, move commands generated by planning, cancellation of move commands …, the current positions and speeds of robots, braking ability of robots as well as where they have been cleared to visit." '404 patent at 18:38–45. The clearance module "issue[s] clearance 'just in time', and may [] grant permissions to robots to continue along their planned paths." *Id.* at 18:46–48. The "Command Generation and Schedule[r] Module" (shaded purple) is "configured to provide a command set

comprising a single path, or one or more paths, and/or a number of operations to be performed at various locations." *Id.* at 20:4–7. This module provides the commands to the robot communications module, which provides it to robots. *Id.* at 7:10.

## IV.    U.S. PATENT NO. 9,796,080

### A.    "mechanism" (Claims 9–12, 21)

| AutoStore's Proposed Construction | Ocado's Proposed Construction |
|---|---|
| Plain and ordinary meaning: "a piece of machinery" | No construction necessary / plain and ordinary meaning |

The parties agree that "mechanism" should be given its plain and ordinary meaning, but dispute what that plain and ordinary meaning is—an issue that must be resolved by the Court. *See O2 Micro Int'l Ltd. v. Beyond Innovation Tech. Co.*, 521 F.3d 1351, 1361 (Fed. Cir. 2008). AutoStore's proposed meaning is identical to the first definition provided in the Oxford English Dictionary that *Ocado* cites as extrinsic evidence. Dkt. No. 107-1 at 3; Ex. 30 at OC-DNH_000008741. AutoStore's proposal also aligns with the first American Heritage Dictionary definition that, again, *Ocado* cites as extrinsic evidence (and which AutoStore would accept as an alternative construction of the term). Dkt. No. 107-1 at 2–3 ("mechanism": "1a. A machine or mechanical appliance."); Ex. 31 at OC-DNH_000008732.

But Ocado refuses to accept that the claimed "mechanism" is (as its name implies) mechanical. Specifically, Ocado contends that the term is broad enough to include other dictionary definitions, such as "[a] means or process by which something is done or comes into being." *See* Dkt. No. 107-1 at 3. Such unbounded definitions would improperly encompass a human working alone, which even Ocado itself recognizes does not make sense. *See* Ex. 28 at 2.

### B.    "nestable" / "nested" (Claims 8, 17, 23)

| AutoStore's Proposed Construction | Ocado's Proposed Construction |
|---|---|
| Plain and ordinary meaning: "designed to fit snugly" / "fitting snugly as designed" | No construction necessary / plain and ordinary meaning |

8

|  | In the alternative: "place within" / "capable of being placed within" |
|---|---|

The parties agree that the term "nestable" / "nested" should carry its plain and ordinary meaning but disagree as to what that meaning is, creating a dispute for the Court to resolve. *See O2 Micro*, 521 F.3d at 1361. Both the intrinsic and the extrinsic evidence support AutoStore.

Starting with the claims, Claim 23 recites a "delivery container ***nested within*** a storage container." *See,* Ex. 1. Because the claim already recites that the delivery container is "within" the storage container, "nested" must mean more than "placed within." Otherwise "nested" would be superfluous and the claim would read "delivery container ~~nested~~ within a storage container." *See ProMOS Techs. v. Samsung Elecs. Co.*, 809 F. App'x. 825, 834 (Fed. Cir. 2020) ("[W]e have determined that it is generally improper to construe a patent claim so that express claim limitations or elements are rendered superfluous."). The same applies to Claim 8, which recites that a "delivery container is ***nestable within*** a storage container"; again, "nestable" must mean something more than "capable of being placed within," otherwise "nestable" would be superfluous and the claim could simply have read "delivery container is ~~nestable~~ within a storage container."

The specification confirms that "nestable" refers to more than mere capability of being placed within something. Specifically, the '080 patent teaches "a lighter, cheaper, and ***optionally*** nestable or collapsible [delivery[5]] container is placed within storage bins." *See* '080 patent at 9:8–10. This makes clear that a delivery container can be placed within a storage container while being only "optionally" but not necessarily nestable. *See id.*

---

[5] "Order containers" are delivery containers in the context of the '080 patent. Ex. 1 at 58:17-19.

The specification teaches that "nestable" means "designed to fit snugly." To begin, the '080 patent states that a "nestable configuration[]" is shown in Figure 6 ('080 patent at 9:28–30); Figure 6, shown here with annotations, displays a "nestable" configuration wherein a delivery container fits snugly as designed in the storage container.



A POSITA would recognize that there is a very important reason that a "nested" container is designed to fit this way. The '080 patent teaches different automated mechanisms to remove nested delivery containers from storage containers. *See, e.g.*, '080 patent at 10:55–57, Figure 15. As Dr. Spenko, Professor of Mechanical and Aerospace Engineering at the Illinois Institute of Technology, explains:

> If the delivery container were not designed to fit snugly within the storage bin, then the system could not ensure that the [removal mechanism] would apply [*i.e.*, attach] as expected to the deliver container, because the delivery container might otherwise have shifted around [within the storage container] or fallen over during its movement within the system.

Ex. 11, Spenko Decl. ¶ 47. The snug fit of a "nested" delivery container ensures that the delivery container stays in place within the storage container, so that the delivery container does not fall over during transit and is in the expected location to facilitate its removal from the storage container by the automated mechanisms disclosed in the '080 patent. *See* Ex. 11 ¶¶ 44–50; Ex. 12, Spenko Rebuttal Decl.¶ 12.

AutoStore's construction also aligns with a dictionary definition that *Ocado* cited for the meaning of the term, specifically the American Heritage Dictionary's definition of "[t]o fit or stack *snugly* together." Dkt. No. 107-1 at 4; Ex. 31 at OC-DNH_000008734. Ocado's expert, Dr. Pfeifer,

10

admitted that this dictionary is at least as good as any other that Ocado may rely upon. *See* Ex. 9 (Pfeifer Tr.) at 99:11–17. Dr. Pfeifer further admitted that he was not aware of ***any*** technical documents that used the term "nestable" or "nested" as Ocado proposes. *See* Ex. 9 at 91:3–16. Therefore, the most authoritative extrinsic evidence—in addition to the intrinsic evidence— supports AutoStore's construction, not Ocado's.

### C.    "delivery container" (Claims 1–6, 8–11, 13–16, 18–23)

| AutoStore's Proposed Construction | Ocado's Proposed Construction |
|---|---|
| "Container suitable for engagement by the robotic load handlers for dispatch" | "Container for delivery to customers that is configured to contain at least one picked item" |

The parties agree that the claimed "delivery containers" must be used for delivery (*i.e.*, dispatch[6]) to customers but disagree in two other respects. First, Ocado tries to recapture claim scope it disavowed during prosecution. Second, Ocado ignores a fundamental aspect of the claimed "delivery containers," namely that they must be suitable for engagement by robotic load handlers.

Taking each dispute in turn, Ocado first proposes that the "delivery container" be "configured to contain at least one picked item." This proposal, however, impermissibly tries to recapture claim scope that Ocado disavowed during prosecution to overcome prior art. *See Cordis Corp. v. Medtronic Ave, Inc.*, 511 F.3d 1157, 1177 (Fed. Cir. 2008) ("[A]n applicant can make a binding disavowal of claim scope in the course of prosecuting the patent, through arguments made to distinguish prior art references."). Specifically, Ocado distinguished the claimed delivery containers from prior art delivery containers by stating: "one of ordinary skill in the art would have understood that the [prior art] case units are pre-packaged items that are not used to store items picked from a pallet, ***as is Applicant's claimed delivery containers***." Ex. 23 at OC-

---

[6] AutoStore does not oppose the Court using the term "delivery" in lieu of the synonym "dispatch" in its proposed construction.  *See, e.g.*, Claims 6 and 20 (Delivery containers are "for dispatch" to customers).

DNH_000004599. Ocado's vague proposed construction that delivery containers are "configured to contain at least one picked item" is broader than its disclaimer during prosecution that the delivery containers are specifically not "pre-packaged items" and must "store items picked from a pallet." Any construction by the Court addressing picked items[7] must be congruent with the actual scope of disclaimer. *See Omega Engineering, Inc. v. Raytek Corp.*, 334 F.3d 1314, 1324 (Fed. Cir. 2003) (Claim construction as a result of disavowal should be "congruent with the scope of the surrender.").

Ocado next disputes that the "delivery container" must be "suitable for engagement by the robotic load handlers." But that is expressly required by the claims. For example, Claim 1 of '080 patent recites: "generate signals for instructing or controlling at least one of the plurality of ***robotic load handlers to store at least one delivery container*** in the storage and retrieval system." This makes clear that the robotic load handlers engage the delivery containers. *See also id*. at cl. 1 (claiming "delivery containers … for transport … within the storage and retrieval system ***by at least one of the robotic handlers***…."). The same is true in Claim 13 which states: "storing, ***via the at least one robotic load handler*** … a plurality of delivery containers." *See also id*. at cl. 13 (claiming "transporting the plurality of delivery containers … ***by at least one of the robotic handlers***….").

These claims cannot be satisfied by a robotic load handler only ever engaging a storage container with a delivery container inside of it, as Ocado appears to contend, for at least two reasons. ***First***, Claim 2 recites: "The system according to claim 1, wherein each of the at least one

---

[7] AutoStore's proposed construction does not expressly address the relationship between picked items and the claimed delivery containers. AutoStore does not oppose the full scope of the prosecution disclaimer being added to AutoStore's construction in order to address that relationship, should the Court find that helpful for the jury.

delivery container is stored in a storage container for storage in at least one of the storage locations." This dependent (and necessarily narrower) claim makes clear that at least some of the delivery containers claimed in Claim 1 are *not* stored in a storage container, otherwise Claim 2 would not be narrower than Claim 1. *See NPC, Inc. v. Int'l Precast Supply, Inc.*, 337 F. Supp. 2d 378, 385 n.4 (D.N.H. 2004) ("A dependent claim is necessarily narrower than the independent claim upon which it relies.").[8]

    *Second*, the '080 patent expressly indicates when a storage container has a delivery container inside of it, such as by using the term "combined container." *See, e.g.*, '080 patent at Fig. 21 ("Place delivery container in storage container [2210] → Store *combined containers* in storage-and-retrieval system [2220]"); *id*. at 2:48–50 ("storing one or more *delivery containers within storage containers*"). Thus, if the elements of Claims 1 and 13 regarding the storage/retrieval of a delivery container could be satisfied by a robotic load handler actually storing/retrieving a storage container with a delivery container inside, Claims 1 and 13 would have instead recited that the robotic load handler store/retrieve "combined containers" or "delivery containers within storage containers. *Compare* '080 patent at 13:27–31 ( "generating signals for controlling or instructing at least one mechanism (such as conveyor(s) and/or load handler(s)) for retrieving *combined container* unit(s) from the storage-and-retrieval grid"). But the claims do not say that. Thus, when Claim 1 claims "controlling at least one of the plurality of robotic load handlers to store at least one *delivery container*," it refers to just that—a robot handling a *delivery container*, not handling a storage container with a delivery container inside of it.

---

[8] The same applies to dependent Claim 14, which recites: "The method according to claim 13, comprising: storing each of the plurality of delivery containers into a storage container for storage in at least one of the plurality of storage locations." Again, this dependent claim makes it clear that at least some of the delivery containers stored in Claim 13 are not stored within a storage container, and thus must be stored and retrieved on their own, not within another storage container.

AutoStore's construction is not only dictated by the claim language but it is also supported by the specification. The specification says that delivery containers can be "*engaged by the same or another moveable overhead load handler*," in accordance with AutoStore's construction. *See* '080 patent at 7:17–24. In fact, the specification is replete with teachings that the robotic load handlers engage the delivery containers for storage and retrieval. *See, e.g.*, '080 patent at 7:49–54 ("*[A]ll delivery containers 10, 80* required for fulfillment of the order *may be retrieved*, *using one or more load handlers*…."); *see also id*. at 5:42–45 ("[L]oad handlers or other robots can access all parts of the storage-and-retrieval system (and thereby all storage containers *and delivery containers*)…."); *see also id*. at 6:38–40 ("Specific container(s) 10 required for fulfillment of orders *may be accessed by automated devices such as robotic overhead load handlers* 40," where delivery containers are containers 10 (*see id*. at, *e.g.*, 6:20–21) that are "required for fulfillment of [the] order[s]" (*see id*. at 7:50–51)). Once again, none of these teachings state that the robotic load handlers are merely engaging a storage container with a delivery container inside, nor that the robotic load handlers are engaging a "combined container"; rather, they plainly state that the robotic load handlers are storing and retrieving *the delivery container*, so the delivery containers must be suitable for engagement by the robotic load handlers.

### D.    "delivery container containing at least one picked item" (Claim 15)

| AutoStore's Proposed Construction | Ocado's Proposed Construction |
|---|---|
| Plain and ordinary meaning: "A delivery container containing at least one picked item from a retrieved storage container" | No additional construction necessary / plain and ordinary meaning of "containing at least one picked item" |

AutoStore's construction clarifies that the "picked item" in Claim 15 must come from a retrieved storage container. This construction aligns Claim 15 with Claim 1, which expressly recites "delivery container containing at least one picked item *from the retrieved at least one storage container*." AutoStore's proposal reduces confusion as to whether there are multiple types

of "picked items" in the claims—there are not. Ocado oddly did not agree to AutoStore's construction but refuses to explain what a "picked item" in Claim 15 would be if such item is not picked "from a retrieved storage container" as required in Claim 1. Ocado's proposal that no construction is necessary would therefore cause more jury confusion by rendering it unclear what a "picked item" is in the context of Claim 15.

E.    **"at least one of a lip, a handle, and an aperture" (Claim 11)**

| AutoStore's Proposed Construction | Ocado's Proposed Construction |
|---|---|
| Plain and ordinary meaning: "at least one lip, at least one handle, and at least one aperture" | No construction necessary / plain and ordinary meaning |

The parties agree that this term carries its plain and ordinary but Ocado refuses to acknowledge that, as a matter of law, "the plain meaning of 'at least one of A and B' is the conjunctive phrase 'at least one of A and at least one of B.'" *See Ex parte Jung*, Appeal No. 2016-008290, 2017 WL 1130560, at *2 (P.T.A.B. Mar. 20, 2017) (quoting *SuperGuide Corp. v. DirecTV Enters., Inc.*, 358 F.3d 870, 885–86 (Fed. Cir. 2004)). As the Federal Circuit explained in *SIMO Holdings Inc. v. Hong Kong uCloudlink Network Tech. Ltd.*, 983 F.3d 1367, 1376 (Fed. Cir. 2021) (citations omitted, emphasis in original):

> [W]e recognized that, as a matter of ordinary and customary meaning, … a list of items joined together by "and" applied to each item in the list, not to the list considered as a whole. The phrase in *SuperGuide* was "at least one of"—followed by "a desired program start time, a desired program end time, a desired program service, *and* a desired program type." The court … concluded that the use of "and" in the list meant that there had to be one or more of *each* item.

That is exactly the meaning proposed here by AutoStore.

15

### F.    "a structural framework defining a grid of storage locations" (Claims 1, 23)[9]

| AutoStore's Proposed Construction | Ocado's Proposed Construction |
|---|---|
| Plain and ordinary meaning: "A structural framework defining a grid of storage locations" | "A structural framework in which crossed structural elements define a two-dimensional array of storage locations" |

A "structural framework defining a grid of storage locations" should be given its plain and ordinary meaning. These words mean exactly what they say: "a structural framework defining a grid of storage locations."

Ocado's construction is unsupported and unexplained. For example, there is nothing in the intrinsic record requiring that the claimed "grid" is limited to an "array." Additionally, Ocado is unable to explain what "crossed" means in its construction, such as whether it requires actual overlap of the structural elements or if it refers to the layout of the structural elements without regard to whether they overlap (*i.e.*, if the structural elements are laid out in the orientation of a plus sign, meeting at a point in middle but not necessarily overlapping). Indeed, the specification actually teaches embodiments that do ***not*** require "crossed" elements. In particular, the specification states that the "rails" that are used to define the gird can include "***single*** rails … or any other structure along which the load handlers 40 can operate." '080 patent at 6:42–49. The specification thus discloses that "single" rails—which would not cross—can define the grid, so Ocado's proposed construction improperly excludes embodiments from the specification. *See Adams Respiratory Therapeutics, Inc. v. Perrigo Co.*, 616 F.3d 1283, 1290 (Fed. Cir. 2010) ("A claim construction that excludes the preferred embodiment is rarely, if ever, correct…." (quotation marks excluded)).

---

[9] This term has been construed by the Patent Trial and Appeal Board in the context of an *inter partes* review of the '080 patent. The Board rejected both parties' constructions, and the Board's preliminary construction is the subject of a pending request for hearing. *See AutoStore Sys. Inc. v. Ocado Innovation Ltd.*, IPR2021-00798, Paper 15 at 4 (P.T.A.B. Nov. 8, 2021).

### G.    "exclusively within the storage and retrieval system" (Claims 1, 13)

| AutoStore's Proposed Construction | Ocado's Proposed Construction |
|---|---|
| Indefinite | No construction necessary / plain and ordinary meaning<br><br>In the alternative: "not for delivery" |

The term "*exclusively* within [the] storage and retrieval system" is indefinite because it renders the claim nonsensical and impossible. *See Synchronoss Techs., Inc. v. Dropbox, Inc.*, 987 F.3d 1358, 1366–67 (Fed. Cir. 2021) (Terms that "are nonsensical and require an impossibility" are "indefinite as a matter of law under § 112.").

The internal contradiction of this limitation stems from the plain claim language. Claim 1, for example,[10] first requires that the robotic load handlers "deliver[] the retrieved at least one storage container to an order picking station." But then Claim 1 requires that those same storage containers are "for transport by at least one of the robotic handlers *exclusively within the storage and retrieval system*," which excludes the order picking station. The robotic load handlers cannot *both* "exclusively" transport the storage bins within the storage and retrieval system *and* deliver those same bins to the separate order picking station, as the claims require.

The claims cannot be saved by drawing the box of the claimed "storage and retrieval system" to encompass the "order picking station," for at least two reasons. *First*, Claim 1 requires that the robotic load handler "*retrieve from* the storage and retrieval system at least one storage container … for *delivering* the retrieved at least one storage container *to* an order picking station"; if the storage container stayed within the storage and retrieval system because the order picking station were subsumed within the storage and retrieval system, then the storage container would

---

[10] Claim 13 contains substantially identical limitations in relevant respect, and therefore this analysis applies equally to Claim 13.

17

never be "retrieve[d] from" the storage and retrieval system nor "***deliver[ed] … to***" anywhere. And ***second***, as the patent states, the storage and retrieval system is, as expected, where "items may be stored within, and retrieved from" ('080 patent at 1:24–28), while the order picking station is where "picking of items from the containers" occurs ('080 patent at 1:24–28). These are two conceptually distinct locations, as shown throughout the figures. *See, e.g.*, Figure 1 ("Storage and Retrieval System" is element 2 while the "Order Picking Station" is element 4 in a separate box). The "storage and retrieval system" ends where the functions of storage and retrieval no longer occur, and the "order picking station" begins where the function of picking occurs. The '080 patent therefore does not permit drawing the box of the claimed "storage and retrieval system" arbitrarily broadly so as to include the location where picking occurs, because the patent refers to that location as something different (namely, the "order picking station"). In fact, Claim 1 also specifies what is included in the "storage and retrieval system," and it does ***not*** include an "order picking station."

It is simply impossible for the robotic load handlers to deliver the storage containers "to an order picking station" that is outside of the storage and retrieval system if they are also required to transport the storage containers" exclusively within the storage and retrieval system." In an effort to save the claim from impossibility, Ocado proposes an "alternative" meaning for this claim term as "not for delivery." Ocado asks the Court to rewrite the plain wording of the claims to try to render the nonsensical claims intelligible, which is improper. *See Koki Holdings Co. v. Kyocera Senco Indus. Tools, Inc.*, No. 18-313-CFC, 2021 WL 1092579, at *2 (D. Del. Mar. 22, 2021) ("[I]t is improper to rewrite claim language to save a patent from impossibility.").

18

## V.    U.S. PATENT NO. 10,913,602

### A.    "A load handling device … will occupy a grid space" (Claim 1) / "load handling device … occupying a grid space" (Claim 12)

| AutoStore's Construction | Ocado's Construction |
|---|---|
| The load handling device will occupy only a single grid space in the storage system | No construction necessary / plain and ordinary meaning |

The crux of the dispute regarding this term is whether it limits the claimed load handling device to "only a single grid space," as AutoStore contends (*see* Ex. 13 ¶ 49), or whether the term does not place any limits on the amount of grid space occupied by a load handling device, as Ocado contends (*see* Ex. 9 at 120:22–121:3).

The Federal Circuit has consistently held that "[w]hen a patent ... describes the features of the 'present invention' as a whole, this description limits the scope of the invention." *Wastow Enterprises, LLC v. Truckmovers.com, Inc.*, 855 F. App'x. 748, 750 (Fed. Cir. 2021) (quoting *Verizon Servs. Corp. v. Vonage Holdings Corp.*, 503 F.3d 1295, 1308 (Fed. Cir. 2007)) (alterations in original.). That is precisely what this patent does. In a section titled "SUMMARY OF THE INVENTION," the '602 patent repeatedly states that "***the present invention***" comprises a "load handling device [that] ***occupies substantially only a single grid space***…." '602 patent at 4:63–5:6; *see also id.* at 5:7–21 ("Accordingly, ***the present invention*** provides a load handling device … wherein the load handling device has a footprint that, in use, ***occupies substantially only a single grid space***."); *id.*, 7:3–8 ("***[T]he invention*** resides in … one or more load handling devices as described above... Each load handling device ***occupies substantially a single grid space***…."); *id.*, 7:9–24 ("***[T]he present invention*** provides a storage system comprising … a load handling device … wherein the load handling device has a footprint that ***occupies substantially only a single grid space***…."); *id.*, 7:25–35 ("***[T]he invention*** comprises a … handling device [] of the type described above, and ***occupies a space corresponding substantially to only one stack of containers***."); *id.*

19

at Abstract ("The load handling device has a footprint that, in use, ***occupies only a single grid space*** in the storage system.").[11]

This single-space requirement is the heart of the alleged invention and is the source of its purported benefits. Specifically, the '602 patent teaches that it is "desirable to reduce the size of the load handling devices in order to minimi[z]e instances in which the optimum movement path for one device is hindered by the presence of other devices." '602 patent at 4:57–60. In contrast to prior art two-space robots, the '602 patent touts its claimed single-space load handler as follows:

> Advantageously, the load handling device of ***the invention occupies the space above only one stack of containers*** in the frame, in contrast to the cantilever design shown in FIGS. 3A to 3C which occupies the space above two stacks. This means that, by virtue of the invention, the efficiency of operation of the storage system can be improved, because the reduced footprint allows more load handling devices to be accommodates and reduces the likelihood of one device obstructing the optimum path of another. …

> One benefit of ***the present invention*** is that, because the load handling devices ***occupy the space above only one stack***, the efficiency of a multiple-device system can be improved compared to prior art load handling device designed which occupy two or more stack spaces. The gain in efficiency may arise from being able to accommodate more load handling devices in a given system, from optimizing the routing of the device using the space gained by the reduced device footprints, or from a combination of these factors.

'602 patent at 5:38–47, 7:61–8:3. The claims therefore must be limited to "the present invention" where "the load handling devices occupy the space above only one stack," otherwise the full purported benefits over the prior art would not be achieved. *See Wastow*, 855 F. App'x. at 751 ("The specification also ties the stated benefits of the invention over prior art to the use of a

---

[11] By contrast, the patentee expressly delineated what aspects of the purported invention were just part of "an embodiment" / "preferred embodiment" and what aspects were integral to "the present invention," clearly supporting the understanding that statements about "the present invention" are, as expected, part of the claimed invention. *Compare* '602 patent at, *e.g.*, 5:28 (discussing "preferred embodiments"), 5:60 (discussing "an embodiment").

universal folding boom trailer…. That aspect of the specification reinforces the conclusion of disavowal.") (citations omitted). Indeed, in a parallel IPR proceeding of the '602 patent, the PTAB expressly recognized that this single-space requirement was key to obtaining the full purported benefits of the patent. *See* Ex. 29 at 3 ("To achieve this goal, the '602 patent discloses a load handling vehicle that 'occupies the space above *only one* stack of containers in the frame'….").

AutoStore's construction not only aligns with the expressly stated limits of the invention and the purpose of the patent, it also reflects the plain and ordinary meaning of "a" as found in the limitation "occupy *a* grid space." The plain and ordinary meaning of "a" is one discrete, countable thing—in this case, one single grid space. *See Niz-Chavez v. Garland*, 141 S.Ct. 1474, 1481 (2021) (Plain meaning of "a" thing is "a discrete, countable thing" requiring "a single" thing); *AbbVie Inc. v. Mathilda & Terrence Kennedy Ins. of Rheumatology Tr.,* 764 F.3d 1366, 1372 (Fed. Cir. 2014) ("Section 101 reads: 'Whoever invents or discovers any new and useful process, machine, manufacture, or composition of matter, ... may obtain *a* patent therefor.'  Thus, § 101 forbids an individual from obtaining more than *one* patent on the same invention….") (citations omitted). The plain meaning of "occupy *a* grid space" is not occupy one or more than one grid space, as Ocado implicitly contends. Tellingly, the patentee repeatedly used the phrases "at least one" and "one or more" elsewhere in the claims (*see, e.g.*, '602 patent at cls. 7, 10, 15, 17, 18) but did not do so here, which is consistent with the understanding that "a" means one single thing (*i.e.*, one grid space in this context).

In sum, the specification is express that "the present invention" occupies only a single grid space, and that description of "the present invention" aligns both with the purpose of the invention and the plain and ordinary meaning of "a" in the term "occupy *a* grid space."

21

**B.      "Load handling devices … will not obstruct a load handling device … occupying or traversing an adjacent grid space in the X-direction and will not obstruct a load handling device … occupying or traversing an adjacent grid space in the Y-direction" (Claim 1) / "the load handling device will not obstruct a load handling device occupying or traversing an adjacent grid space in the X-direction and will not obstruct a load handling device occupying or traversing an adjacent grid space in the Y-direction" (Claim 12)**

| AutoStore's Construction | Ocado's Construction |
|---|---|
| Plain and ordinary meaning: the load handling device will not obstruct a load handling device occupying or traversing any of the four adjacent grid spaces | No construction necessary / plain and ordinary meaning |

AutoStore's construction of this term aligns with the plain wording of this limitation, while Ocado's implied construction of this term does not.

Ocado's expert, Dr. Pfeifer, created the following diagram (which does not come from any asserted patent) of two load handlers on a grid that he asserts satisfy this limitation, which he refers to as the "No-Obstruction" limitation (Ex. 14 ¶ 110, annotations in original):



Focusing on the bottom load handler among the two that Dr. Pfeifer says "extends into a second

grid space on two sides," this load handler would satisfy the No-Obstruction limitation according to Ocado because, on the top side, another load handler could pass unobstructed in the X-direction (blue arrow), and on the left side, another load handler could pass unobstructed in the Y-direction (green arrow). But this does not satisfy the plain wording of

the term, because the red X on the bottom is "an adjacent grid space in the X-direction" that is

obstructed, and the red X on the right is "an adjacent grid space in the Y-direction" that is also

obstructed. Any of the four adjacent grid spaces are "an adjacent grid space," and the claim requires

that "an adjacent grid space" must not be obstructed. AutoStore's construction reflects that

requirement that another load handling device traversing any of the four adjacent grid spaces is

not obstructed, as opposed to Ocado's apparent construction which only addresses an arbitrary

subset of grid spaces.

Ocado implicitly contends that the requirement that there is no obstruction of another load

handling device "traversing *an* adjacent grid space in the X-direction" is satisfied as long as there

is no obstruction of *one* grid space in the X-direction (and the same in the Y-direction).  That

position starkly contrasts with Ocado's apparent argument with respect to the indefinite article "a"

within the term "occupying a grid space" discussed above, where Ocado implicitly insists that the

use of the indefinite article encompasses "one or more" (*i.e.*, that the load handling device can

occupy one or more grid spaces). Ocado offers no principled reason why the indefinite article

should be treated differently in the two phrases. And Dr. Pfeifer admitted that he has not even "looked at" whether "an" in this claim term means one versus one or more adjacent grid spaces, indicating that Ocado has not attempted to reconcile its contention regarding this limitation with its contention regarding the previous limitation. *See* Ex. 9 at 149:14–22.

### C.    "wheel hub motor" (Claims 6, 10, 17)

| AutoStore's Construction | Ocado's Construction |
| --- | --- |
| Plain and ordinary meaning: an electric motor situated at or at least partly within the wheels of the vehicle | No construction necessary / plain and ordinary meaning<br><br>In the alternative: "a motor that is integrated within a hub of a wheel" |

AutoStore's construction of this term aligns with how Ocado's expert, Dr. Pfeifer, previously described this term. In an IPR proceeding of another patent (the "'140 patent"), Dr. Pfeifer stated:

> [T]he structure associated with the driving means in the specification of the '140 Patent is "an electric motor" that is "situated at or at least partly within" the wheels of the vehicle. In my opinion, this describes an "in-wheel" or "wheel-hub" motor. …
>
> [A] structure of "electric motors situated at or at least partly within the wheels of the vehicle," [is] *otherwise known as* "in-wheel" or "wheel hub" motors.

Ex. 15 ¶¶ 78, 80 (citations omitted). In no uncertain terms, Dr. Pfeifer equated these two concepts. Dr. Pfeiffer's prior statements about "wheel hub motors" were not limited to the '140 patent, they were general statements about all wheel hub motors in the field. *See* Ex. 15 ¶¶ 78, 80. Moreover, Dr. Pfeifer admitted that the '140 Patent at issue in that prior IPR proceeding is "certainly in the same area" of technology as the '602 patent, so there is no reason the term should be construed differently given that the parties agree that the term carries its plain and ordinary meaning. Ex. 9

24

at 152:25–153:5. Although Dr. Pfeifer is known to improperly change his opinion,[12] the Court should hold Dr. Pfeifer to his prior opinion here. AutoStore's proposal adopts this construction, which AutoStore's expert, Dr. Derby, agrees would be how a POSITA understood this term. Ex. 13 ¶¶ 53, 55, 57.

## VI.    U.S. PATENT NO. 10,961,051
### A.    "A housing footprint" (Claims 1, 13)

| AutoStore's Construction | Ocado's Construction |
|---|---|
| Plain and ordinary meaning: The footprint of the load handling device's housing and not extensions from the housing | No construction necessary / plain and ordinary meaning |

The parties agree that this term carries its plain and ordinary meaning, yet Ocado refuses to accept the plain wording of the claims. The claimed "housing footprint" is limited to just that— the footprint of the housing. That does not include portions of the load handling device that are expressly recited in the claims as *separate* from the housing, such as the claimed "crane device comprising a cantilever arm and a gripper plate" that extend outward from the housing. Ocado does not want to limit the claimed "housing footprint" to just the footprint of the housing, instead insisting that such footprint should include extensions that are not part of the housing; that can hardly be considered the plain and ordinary meaning of a "*housing* footprint."

Claim 13 does not recite a "housing," but the "housing footprint" of the first load handling device in Claim 13 should be construed consistently with the "housing footprint" of the first load handling device in Claim 1. *See Phil-Insul Corp. v. AirLite Plastics Co.*, 854 F.3d 1344, 1359 (Fed. Cir. 2017) ("It is well-established, however, that claim terms are to be construed consistently throughout a patent.").

---

[12] *See, e.g.*, *Ventrudo v. U.S.*, No. 3:13-cv-00862-MMH-MCR, Dkt. No. 54 at 14-15 (M.D. Fla. Jul. 24, 2015) (Ex. 7) (excluding Dr. Pfeifer's declaration "in light of Dr. Pfeifer's prior testimony contradicting the opinions contained in his affidavit").

B.    **"The second housing has a housing footprint that occupies less than twice the area of the grid space" (Claim 1) / "the second load handling device has a housing footprint that occupies less than twice the area of the grid space" (Claim 13)**

| AutoStore's Construction | Ocado's Construction |
|---|---|
| The second housing will occupy only a single grid space in the storage system | No construction necessary / plain and ordinary meaning |

The second housing occupies only a single grid space for effectively the same reason as to why the "occupy a grid space" term in the '602 patent (which shares the same specification) is so limited: The specification expressly states that this *is* "the present invention." *See, e.g.*, Ex. 3 ('051 patent) at Abstract, 4:63–5:21, 5:38–47, 7:3–35, 7:61–8:3; *see also* Section V.A, *supra*.[13] As Ocado's expert admitted, other than the single-space device, there is no disclosure in the specification of a load handling device with a footprint of any arbitrary amount less than two grid spaces. *See* Ex. 9 at 136:8–19 ("Q. And so does the '602 patent teach a robotic load-handling device that has a footprint of 1.3 grid spaces? A. Well, as I said, it doesn't – it doesn't teach any specific ratio.") (objection omitted). This claim term should therefore be construed in accordance with the description of the invention in the specification and limited to only a single grid space. *See Lightforce U.S., Inc. v. Leupold & Stevens, Inc.*, Case No. 3:17-cv-01153-AC, 2019 WL 2146245 at *5 (D. Or. May. 15, 2019) ("Generally, patents generated from the same parent application should be construed in a consistent manner.") (citing *NTP, Inc. v. Research In Motion, Ltd.*, 418 F.3d 1282, 1294 (Fed. Cir. 2005)).

C.    **"The first set of rails is part of a first set of tracks, and the second set of rails is part of a second set of tracks" (Claims 9 and 18)**

| AutoStore's Construction | Ocado's Construction |
|---|---|
| Indefinite | No construction necessary / plain and ordinary meaning |

---

[13] The '051 patent is a continuation of the '602 patent and has an identical specification.

Claims 9 and 18 are indefinite because they fail to narrow the scope of the claims from which they depend, as is required of dependent claims. *See Curtiss-Wright Flow Control Corp. v. Velan, Inc.*, 438 F.3d 1374, 1380 (Fed. Cir. 2006) ("[A] dependent claim *must* add a limitation to those recited in the independent claim."); *Pfizer, Inc. v. Ranbaxy Labs. Ltd.*, 457 F.3d 1284, 1292 (Fed. Cir. 2006) (holding a dependent claim invalid under § 112 where it failed to "specify a further limitation of the subject matter… of the claim to which it refers") (internal quotations omitted).

Claim 1 recites that the "first set of rails" are used "to guide movement of the first housing in a first direction"; in other words, Claim 1 already recites that the first set of rails are part of a set of tracks, because rails that "guide movement" are tracks. The same applies to the claimed "second set of rails," which "guide movement of the second housing in the first direction." Again, the "second set of rails" are already part of a second set of tracks because they guide movement as recited in Claim 1. As a result, Claim 9's recitation that "the first set of rails is part of a first set of tracks, and the second set of rails is part of a second set of tracks" does not narrow Claim 1 at all— those sets of rails were already required to be part of the sets of tracks.

The same is true for Claim 13. That claim recites that the wheels of the load handling device are "engaged with" the sets of rails and move in the direction of those rails, thus acting as tracks. Because the sets of rails in Claim 13 are already tracks, Claim 18 does not narrow Claim 13 and Claim 18 is therefore indefinite.

Ocado's expert, Dr. Pfeifer, could not identify any portion of the '051 patent that taught rails that were not part of tracks. *See* Ex. 9 at 182:2–9 ("Does the '051 patent teach any sets of rails that are not part of tracks? A. … I haven't looked through the entire patent to – with that in mind to see if there's any description someplace that talks about that."). That is because all the sets of rails taught by the '051 patent (including those in the claims) "guide movement" and are therefore

27

necessarily part of sets of tracks. Since Claims 9 and 18 do not narrow Claims 1 and 13 from which they respectively depend, Claims 9 and 18 are invalid under § 112.

## VII.   U.S. PATENT NO. 10,901,404[14]

### A.   "Clearance instruction" ('404 Patent Claim 1) / "Clearance command" ('770 Patent Claims 1, 29)[15]

|  | AutoStore's Proposed Construction | Ocado's Proposed Construction |
|---|---|---|
| Clearance Instruction ('404 patent, Claim 20) | Permission instruction issued when the clearance unit checks that the robot will not collide with another robot. | No construction necessary / ordinary meaning<br><br>In the alternative:<br><br>"an instruction for a robot to traverse a portion of a reserved path, issued when the clearance module checks that the robot will not collide with another robot." |
| Clearance Command ('770 patent, Claims 1, 29) | Permission issued after checking that the robot will not collide with another robot. | No construction necessary / ordinary meaning<br><br>In the alternative:<br><br>"a command for a robot to traverse a portion of a reserved path, issued when the clearance module checks that the robot will not collide with another robot." |

Independent Claim 20 of the '404 patent recites "a *clearance instruction* for each transporting device to traverse a portion of the reserved path." Ex. 4 ('404 patent) at 28:28–29. Independent Claims 1 and 29 of the '770 patent recite "*clearance commands* for the plurality of

---

[14] On July 25, 2022, Ocado's counsel stated that Ocado will dismiss with prejudice asserted Claims 1–3, 6–9, 11–15, and 17–19 of the '404 patent (leaving Claim 20 as the only asserted claim from the '404 patent). AutoStore expects that the parties will file a stipulation of dismissal with the Court soon. In view of this dismissal, the parties' dispute over the following terms from the '404 patent is moot: (1) "movement optimization unit," "reservation unit," and "clearance unit" in Claim 1; (2) "clearance unit" in Claims 3, 7–9, and 11–13; and (3) "control unit" in Claim 14.

[15] Given the similarity between "clearance instruction" (in the '404 patent) and "clearance command" (in the '770 patent), AutoStore addresses both terms in this section.

transporting devices to cause the plurality of transporting devices to travel on the pathways along portions of the plurality of paths." Ex. 5 ('770 patent) at 26:4–7, 28:46–49. The parties agree that the clearance instruction/command is issued based on "check[ing] that the robot will not collide with another robot." The crux of the dispute is whether "clearance" is limited to a "permission" for a robot to traverse a portion of its reserved path, as AutoStore contends, or whether it is an instruction/command for the robot to traverse a portion of its reserved path, as Ocado asserts. Intrinsic and extrinsic evidence confirm AutoStore's construction.

### 1.    *The claim language suggests "clearance" is a permission.*

Claim construction begins with the ordinary meaning of a claim term. *Phillips*, 415 F.3d at 1312–13. Here, the claim language uses "clearance" in its ordinary sense, as a "permission." The system "determine[s] a route of a transporting device ...," and then "reserve[s] a path … for each [robot] based on the determined route." Finally, the "clearance unit" provides a clearance instruction—*i.e.*, a permission—for each robot "to traverse a portion of the reserved path." Dictionaries confirm that the ordinary meaning of "clearance" is a "permission" (*see* Ex. 20, Ioannou #1 ¶ 60):

- "Permission, usually from a control tower, to take off, land, etc." Ex. 32 at ASNH_00217324.

- "Permission to proceed." Ex. 33 at AS-NH_00217321.

- "Permission to proceed without objection, check or reservation." Ex. 34 at AS-NH_00217304.

Other claims confirm that "clearance [instruction/command]" is a permission and nothing more (*e.g.*, not a move command). Claim 23 of the '770 patent recites "travel commands to instruct the plurality of transporting devices to travel … along the plurality of paths" that are "different from" the "clearance commands." '770 patent at 27:57–62. Thus, a "clearance [instruction/ command]" is not a "travel command[]" that "instruct[s] the plurality of transporting devices to

travel on the pathways." *See, e.g.*, *Digene Corp. v. Third Wave Techs., Inc.*, 323 F. App'x 902, 908 (Fed. Cir. 2009) (affirming construction of term "HPV 52" to type 52 HPV and not including other HPV types, where one claim recited both "HPV 52 DNA" and "DNA or RNA of at least one other HPV type," indicating that the claim language distinguished "HPV 52 DNA" from other HPV types); *see also* Ioannou #1 ¶¶ 151–52.

2.    *The specification confirms that "clearance" is a permission.*

The specification confirms that "clearance" is a permission:  It only describes "clearance" that way, and never refers to "clearance" as instructions/commands for the robot to travel.

For example, the patent states that the invention includes: "one or more utilities providing ***a clearance system for permitting or stopping*** movement of the one or more transporting devices to avoid collisions." '404 patent at 3:8–10. *See* Ioannou #1 ¶ 154. Elsewhere the specification states that "[u]pon providing a robot with a new instruction, the clearance module 312 checks that it will not be possible to collide with another robot, based upon, for example, grid dimensions, grid positions, ***move commands generated by planning***, cancellation of move commands (generated on events such as a controlled stop)[.]"  '404 patent at 18:38–45. The reference to "move commands," as opposed to "clearance [instructions/commands]" (which are what the clearance module issues) indicates that a clearance instruction/command is distinct from a move command. "Move commands" are not even generated by the clearance module: the specification states that they are generated by "planning," which is not performed by the clearance module/unit. *See* Ioannou #1 ¶ 155 (quoting '404 patent at 18:38–45). In fact, the specification states that the "clearance module" does not do "planning," but instead provides clearances to the "control interface" and notifies "the planning system" when a clearance is issued to trigger dynamic re-planning by ***the movement optimization module***. *See* '404 patent at 18:55–61; D'Andrea #3 ¶¶ 64, 81. The clearance module has only a checking function: Per the specification, "after a robot is

30

provided with a new instruction, the clearance module subsequently checks whether the robot, moving according to that instruction, might collide with another robot based on a number of factors." Ioannou #1 ¶ 155.

Still further, the specification reiterates that clearances are permissions: "The clearance module 312 may be configured to issue clearance 'just in time', and may be used ***to grant permissions to robots to continue along their planned paths***." '404 patent at 18:46–48. This teaches a POSITA that a clearance is a permission given to a robot to continue along its planned path. Ioannou #1 ¶ 156. Ocado's expert concedes that the clearance instruction comes only ***after*** checking the possibility of collision.

Nor does the specification expressly state that the clearance instruction/command includes information about the planned path. *See* Ioannou #1 ¶ 156. Ocado's expert, Dr. D'Andrea can identify ***nothing*** in the specification equating "clearance [instruction/command]" with a command to move. *See* Ex. 17, D'Andrea #2 ¶¶ 45–48; Ex. 18, D'Andrea #3 ¶¶ 56–58; Ex. 8, D'Andrea Tr. at 162:3–23, 165:1–167:2. The specification makes clear that the move commands are being sent by the Command Generation and Scheduler Module. '404 patent at 20:4–10.

>   3.    *The file history also confirms that "clearance" is a permission.*

Ocado's statements to the USPTO and European Patent Office ("EPO") during prosecution of '404 and '770 patents' family members further confirm that "clearance" instruction/command is a "permission" instruction/command. *See* Ioannou #1 ¶¶ 158–59. Statements during prosecution of related patents may be considered in determining how a POSITA would understand a claim term. *AstraZeneca AB v. Mylan Pharms. Inc.*, 19 F.4th 1325, 1335 (Fed. Cir. 2021) ("Accordingly, even in the absence of a clear and unmistakable disavowal, ... the prosecution history can be evaluated to determine how a person of ordinary skill would understand a given claim term."). This includes statements before a foreign patent office when, as here, the statements are factual

31

and do not depend on foreign law. *E.g.*, *Apple Inc. v. Motorola, Inc.*, 757 F.3d 1286, 1312–13 (Fed. Cir. 2014); *Regents of Univ. of Minn. v. AGA Med. Corp.*, 717 F.3d 929, 937 n.5 (2013) (using statements in the prosecution of European counterpart to the patents-in-suit); *Gillette Co. v. Energizer Holdings, Inc.*, 405 F.3d 1367, 1374 (Fed. Cir. 2005) (using party's admission before the EPO in arriving at the court's construction); *Siemens Gamesa Renewable Energy A/S v. Gen. Elec. Co.*, No. CV 21-10216-WGY, 2021 WL 5040409, at *5 (D. Mass. Oct. 28, 2021) (construing "rotor hub" narrowly in part due to what patentee told the EPO).

Ocado emphasized to the USPTO that a clearance unit is used to issue "permissions." During the prosecution of U.S. Patent No. 10,474,141 ("the '141 patent")—a parent to both the '404 and '770—Ocado stated:

> "The use of [Movement Optimization Unit] and [Reservation Unit] … may not result in perfect routes suitable for traversal … because [the robot] may be marginally off route due to tolerances in the transmission of communication messages and tolerances for clock discrepancies …. Accordingly, ***a clearance unit can be used to issue*** 'just in time' ***permissions for a transporting device to continue along a planned route*** once the tolerances have been sufficiently resolved. In this way, the clearance unit can operate as a path resolver."

Ex. 26 at AS-NH_00207453; *see also* Ioannou # 1 ¶ 157. This statement is particularly relevant as the '141 claims are like those of the '404 and '770 patents: Both the '404 and '770 patents claim priority to the '141 patent, and at least the '770 patent issued after Ocado filed a terminal disclaimer over the '141 patent. Ex. 25 at AS-NH_00208993–94, AS-NH_00208997.[16] The '404 patent also claims nearly identical subject matter to the '141 patent; the USPTO recognized the '404 patent has "nearly identical claims" to those of "the parent case," *i.e.*, the '141 patent examined earlier

---

[16]  With the terminal disclaimer, Ocado disclaimed the life of the '770 patent extending beyond the '141 patent. *See* 37 C.F.R. § 1.321(b). A terminal disclaimer can provide "a strong clue that … the applicant, thought the claims in the continuation lacked a patentable distinction over the parent." *SimpleAir, Inc. v. Google LLC*, 884 F.3d 1160, 1168 (Fed. Cir. 2018).

by the USPTO. Ex. 24 at AS-NH_00216218.

Ocado made analogous statements to the EPO during the prosecution of a related European application (the EP '450), only describing the "clearance module" as issuing "permissions":

> "*a clearance module* is provided which selectively grants *permissions to robots* to continue along their reserved paths. The clearance module checks, based on current position and speed data, whether a collision between robots is actually possible."

Ex. 27 at AS-NH_00209631.

> "[t]he system also includes a second component (namely *a clearance module*) which acts during movement of the robots along their reserved paths, granting *permissions* for the robots to continue along their paths, and stopping a robot if it is determined … that a collision is possible."

*Id.* at AS-NH_00209631.

> "Therefore, the system achieves the realisation of the reserved path but moderated by *the clearance module* which only grants *permission* for a robot along the reserved path when it is deemed safe so as to avoid potential collisions[.]"

Ex. 27 at AS-NH_00209631–32. Ocado states without support that these statements are consistent with his position, but does not explain how. *See* D'Andrea #3 ¶ 57.

### B.    "For execution at a future time" (Claim 20)

| AutoStore's Construction | Ocado's Construction |
| --- | --- |
| Indefinite | No construction necessary / ordinary meaning |

The plain meaning of "execution at a future time" includes execution at *any* future time, even one arbitrarily close to the present. *See* Ioannou #2 ¶ 14. This reading gives no independent meaning to the claim language "at a future time," because all physical systems obey this constraint (nothing is done instantaneously). According to AutoStore's technical expert, "*any* command sent from a control system for execution by a control unit of a robot must be 'for execution at a future time.'" Ioannou #1 ¶ 130 (emphasis in original). As Dr. Ioannou explained using the following schematic, there is always a time delay between when the clearance instruction is provided by the

"clearance unit" and when it is received by the robot ($\Delta_1$ in figure below). Ioannou #2 ¶ 16. Likewise, there is always a delay between when the robot receives the clearance instruction and when the robot executes the instruction ($\Delta_2$ in figure below). *Id.* Ocado's expert agrees. Ex. 8, D'Andrea Tr. at 110:11–20.



Because the literal reading of "at a future time" adds no independent meaning, it is wrong. *See Bicon, Inc. v. Straumann Co.*, 441 F.3d 945, 950–52 (Fed. Cir. 2006) (reading limitations out of a claim would "be contrary to the principle that claim language should not be treated as meaningless"); *MicroStrategy Inc. v. Bus. Objects, S.A.*, 429 F.3d 1344, 1352 (Fed. Cir. 2005) (construing term in a way that avoids rendering it meaningless). To ensure "execution at a future time" has meaning, a POSITA would read it as requiring some delay between providing the clearance instruction and its execution—*i.e.*, a minimum value for time $t_2$ in the above schematic. *See* Ioannou #2 ¶ 16. But the specification gives no objective measure for ascertaining what the minimum delay is. *Id.* The specification therefore fails to give reasonable certainty about the scope of "at a future time." *See, e.g., Power Integrations, Inc. v. ON Semiconductor Corp.*, No. 16-cv-06371, 2018 WL 5603631, at *11–*13 (N.D. Cal. Oct. 26, 2018) (holding the claim term "less than a maximum period of time" indefinite because "the specification and prosecution history do not provide an upper bound for 'maximum period of time'").

Ocado contends that "execution at a future time" refers to "execution at a time after the

34

instruction is received by the robot," as distinguished from execution "immediately after receipt by the robot." Ex. 19, D'Andrea #4 ¶ 21; *see also* D'Andrea #3 ¶¶ 38, 39. The patent does not support this reading. "Execution at a future time" is found only once in the specification: "In some embodiments, the command generation and scheduler module 316 pre-populates instructions for a particular robot—these instructions may then be provided to the robot through the robot communications module 318 to be executed at a future time." '440 patent at 20:10–14. In this context, "future time" is relative to when the instructions are "pre-populate[d]" in the command generation and scheduler module—not, as Ocado contends, relative to the "immediate" execution of some other instructions.

Ocado also relies on references in the specification to the "current instruction set[]" or "current clearance." D'Andrea #3 ¶ 38. Those refer to instructions or clearances being executed at the current time (*see* D'Andrea Tr. at 112:3–7, 112:14–23)—the specification does not state that they were sent for immediate execution (they could have been sent at any time earlier). *See also* Ex. 23, Ioannou #3 ¶ 26. Nowhere else does the specification describe "current clearance" as an instruction that is received for immediate execution. *See* D'Andrea #4 ¶ 21.

Ocado contends also that because the USPTO examiner proposed the "for execution … at a future time" language to address an indefiniteness problem in the original pending claims, the examiner's review and conclusion are entitled to deference. *See* D'Andrea #3 ¶ 39. Not so. ***First,*** proper deference is ***already*** given via the presumption of validity—no more is due. *See Brown v. Baylor Healthcare Sys.*, 381 F. App'x 981, 984 (Fed. Cir. 2010) (affirming ruling that § 112(f) limitations suggested by the examiner were indefinite for lack of disclosure of algorithm, refusing to give additional deference merely because the examiner had suggested the relevant language to a *pro se* patent applicant); *Novo Nordisk A/S v. Caraco Pharm. Labs., Ltd.*, 719 F.3d 1346, 1357

35

(Fed. Cir. 2013) (stating that the court "treat[s] the issued patent as having a presumption of validity that must be overcome by clear and convincing evidence" but does not give deference to the initial determinations by the USPTO). **Second,** the examiner did not consider the indefiniteness issue at bar. Ioannou #1 ¶ 146.

### C.    "Route" (Claim 20)

| AutoStore's Construction | Ocado's Construction |
|---|---|
| Indefinite | No construction necessary / ordinary meaning |

Claim 20 recites: "a route from one location … to another location … for each transporting device." Although the claims distinguish between "route" and "path," the specification treats them as interchangeable. This renders "route" indefinite because a POSITA cannot discern its distinction with "path" with reasonable certainty.

"Route" and "path" have different meanings in Claim 20:  The claim recites "determining *a route*," and then "reserving *a path* … *based on* the determined route …." '404 patent at 28:19–27. *See, e.g.*, *SIPCO, LLC v. Emerson Elec. Co.*, 794 F. App'x 946, 949 (Fed. Cir. 2019) (overruling a construction of "receiver address" and "scalable address" as the same "address," on the ground that the claim language required separate addresses). The specification, however, describes "route" and "path" as synonyms. There is no dispute in that. *See* Ioannou #1 ¶ 168; D'Andrea #3 ¶¶ 68–69; D'Andrea Tr. at 30:23–31:21, 228:18–21. For example, while Claim 20 recites "determining a route," the specification often refers to determining "paths" ('404 patent at 9:6–16, 12:50–53, 16:4–5, 22:12–25) but other times to determining "routes" (*id.* at 14:33–36). Likewise, whereas the claims describe reserving a "path … based on the determined route," the specification sometimes refers to reserving "routes," (*id.* at 3:5–7, 3:49–51, 19:44–46) and sometimes to reserving a "path[,]" ('404 patent at 19:52–53).

36

The terms "route" and "path" cannot at once be the same (as required by the specification) and distinct (as required by the claims). Because the scope of the "route" (and for that matter, "path") varies between the claims and the specification, "route" is indefinite. *See Skyhook Wireless, Inc. v. Google, Inc.*, No. CIV.A. 10-11571-RWZ, 2012 WL 4076180, at *11 (D. Mass. Sept. 14, 2012) (under the more stringent pre-*Nautilus* standard for proving indefiniteness, ruling claim term was indefinite when the specification and file history described the term inconsistently).

## VIII.   U.S. PATENT NO. 11,079,770

### A.      "One of more processors configured to" (Claim 1)

| AutoStore's Construction | Ocado's Construction |
|---|---|
| Construe under 35 U.S.C. § 112(f) / Indefinite[17] | N/A |

Claim 1 of the '770 patent recites a system for controlling movement of robots, including "one or more processors configured to" (the "Processors" term) perform functions including:

1. **Determining paths:** "determine a plurality of paths for a plurality of transporting devices to travel … so that no two of the plurality of transporting devices have locations while traveling along the plurality of paths that would cause the plurality of transporting devices to overlap at a same time …" ('770 patent at 25:46–51);

2. **Generating clearances:** "generate a plurality of clearance commands for the plurality of transporting devices to cause the plurality of transporting devices to travel on the pathways along portions of the plurality of paths" (*id.* at 26:4–7); and

3. **Determining potential for a collision:** "determine there is a potential for a collision between the first transporting device traveling along the first path and the second transporting device traveling along the second path" (*id.* at 26:10–14).

The Processors term refers to general-purpose computers programmed to perform the

---

[17] *See* Dkt. No. 107-1 at 62–65.

recited functions. As used in '770 patent Claim 1, it is indefinite. The Processors term is governed by § 112(f) because Claim 1 does not denote sufficiently definite structure to perform the recited functions generating clearances and determining potential for a collision. Under § 112(f), the corresponding structure described in the specification for the term must include an algorithm for performing the function, which is entirely lacking in the '770 patent.

1.    *The term is subject to 35 U.S.C. § 112(f).*

The "one or more processors" term in Claim 1 of the '770 patent is subject to § 112(f). Because the term does not recite "means," there is a rebuttable presumption that it does not invoke § 112(f). *Williamson v. Citrix Online, LLC*, 792 F.3d 1339, 1349 (Fed. Cir. 2015). This presumption is not "strong" and is overcome by showing[18] *either* "that the claim term fails to recite sufficiently definite structure *or else* [that the claim] recites function without reciting sufficient structure for performing that function." *Id.* (internal quotation and citation omitted). For example, in *Egenera, Inc. v. Cisco Sys., Inc.*, although the court credited the patentee's argument that the claim term "logic to modify" "connotes some possible structure in the general sense of software, firmware, or circuitry," it ruled that the term is subject to § 112(f) because the term did not recite sufficient structure to perform the claimed functions. *Egenera*, 972 F.3d 1367, 1374–75 (Fed. Cir. 2020). The question is not whether a claim term recites *any* structure—it is: "whether the claim term recites sufficient structure to perform the claimed functions." *Id.* at 1374.

Here, the presumption is overcome because Claim 1 recites the functions of the "one or more processors" without reciting the structure to perform those functions. The claim recites that the "one or more processors [are] configured to": (a) "generate a plurality of clearance commands

---

[18]  This showing need be made with a preponderance of evidence. *Advanced Ground Info. Sys., Inc. v. Life360, Inc.*, 830 F.3d 1341, 1347 (Fed. Cir. 2016).

for the plurality of transporting devices to cause the plurality of transporting devices to travel …" (*id.* at 26:4–7); and (b) "determine there is a potential for a collision between the first transporting device traveling along the first path and the second transporting device traveling along the second path" (*id.* at 26:10–13). But the claim does not recite ***how*** the "one or more processors" carry out functions (a) and (b). *See, e.g.*, *Syneron Med. Ltd. v. Invasix, Inc.*, No. 816CV00143DOCKES, 2018 WL 4696971 (C.D. Cal. Sept. 5, 2018), *report and recommendation adopted*, No. SACV160143DOCKESX, 2018 WL 11351325 (C.D. Cal. Sept. 28, 2018). In *Syneron*, the court distinguished between the "objective" of a claim limitation (*i.e.*, its recited function) and its "operation" (*i.e.*, the structure for performing the operation) and ruled that ***the claim*** lacked any structure for performing the recited function. *Syneron*, 2018 WL 4696971 at *13–*14; *see also Egenera*, 972 F.3d at 1375; *Velocity Pat. LLC v. FCA US LLC*, No. 13 C 8419, 2018 WL 4214161, at *7–*8 (N.D. Ill. Sept. 4, 2018), *aff'd*, 784 F. App'x 787 (Fed. Cir. 2019) ("processor subsystem" was subject to § 112(f) in part "because it [was] defined only by the function it performs, without providing additional structure" and because although the claim recited the input and output of "processor subsystem," it did not describe "*how* to get from the input to the output"). Here, there is no dispute that the claimed functions cannot be performed with a processor without special programming. Ioannou #3 ¶ 49(a); D'Andrea Tr. at 226:15–227:11. Claim 1 treats "processors" as a black box, not reciting no detail about how they perform their function. Nor is this information provided in the specification.

Ocado contends that a "clearance command" means "a command for a robot to traverse a portion of a reserved path, issued when the clearance unit checks that the robot will not collide with another robot." *See supra* § VII.A. Although Ocado's expert contends Claim 1 "describe[s] how the processors operate to achieve the claimed invention," he merely repeats the claim

language without reference to the specification. D'Andrea #3 ¶ 86. This is not nearly enough. Claim 1 does not recite ***how*** the clearance unit checks for collision, and based on that, issues a clearance instruction. It merely states that the clearance commands "cause the plurality of [robots] to travel on the pathways …." The claim also does not explain ***how*** the "one or more processors" determine there is "a potential for collision." Ioannou #3 ¶ 49(a); *see also* Ioannou #1 ¶¶ 175–184.

Ocado appears to contend through its expert that "one or more processors" intrinsically provides sufficient structure because a "POSITA would readily understand that 'processor' … as used in the '770 Patent connotes a specific structure, for example the central processing unit (CPU) of a computer that processes data." D'Andrea #3 ¶ 85; *see also id.* ¶ 84. That is legally irrelevant: There is no dispute that a POSITA understands what a "processor" is. The dispositive point is that a POSITA does not recognize "processor" to automatically represent the claimed functions—"generat[ing] a plurality of clearance commands for the plurality of transporting devices to cause the plurality of transporting devices to travel on the pathways along portions of the plurality of paths" and "determin[ing] there is a potential for a collision between the first transporting device traveling along the first path and the second transporting device traveling along the second path"—without specialized programming. *See Egenera*, 972 F.3d at 1375; *GoDaddy.com, LLC v. RPost Commc'ns Ltd.*, No. CV-14-00126-PHX-JAT, 2016 WL 212676, at *56 (D. Ariz. Jan. 19, 2016), *aff'd*, 685 F. App'x 992 (Fed. Cir. 2017) (the term "processor" was subject to § 112(f) because a POSITA would not recognize it as a name of a sufficiently definite structure ***for the claimed function***); *St. Isidore Rsch., LLC v. Comerica Inc.*, No. 2:15-CV-1390-JRG-RSP, 2016 WL 4988246, at *14–*15 (E.D. Tex. Sept. 19, 2016) ("processor configured to" was subject to § 112(f) because the claim did not describe how the processors achieved their objectives of associating two sets of data to generate a third data set); *XR Commc'ns, LLC v. Ruckus Wireless, Inc.*, No. 18-CV-

40

01992-WHO, 2021 WL 3918136, at *5–*6 (N.D. Cal. Sept. 1, 2021) (ruling that the term "search receiver logic," despite being a "known class of circuit structures for the general purpose of detecting and processing signals," was still subject to § 112(f) because it did not recite sufficient structure to perform the claimed functions).

2.    <u>*The term is indefinite because the '770 patent does not disclose any algorithm or steps to perform the claimed functions of the "processors."*</u>

A "mean-plus-function" term under § 112(f) is construed to cover only the corresponding structure disclosed in the specification and its equivalents. 35 U.S.C. § 112(f); *Blackboard, Inc. v. Desire2Learn, Inc.*, 574 F.3d 1371, 1382 (Fed. Cir. 2009). To construe a § 112(f) term, the court first "identif[ies] the particular claimed function," and second, "look[s] to the specification [to] identif[y] the corresponding structure, material, or acts that perform that function." *HTC Corp. v. IPCom GmbH & Co., KG*, 667 F.3d 1270, 1278 (Fed. Cir. 2012).

A means-plus-function term lacking adequate disclosure of "structure" in the specification is indefinite. *Blackboard*, 574 F.3d at 1382. For computer-implemented inventions, unless the claimed functions are achievable by general-purpose computers without special programming, the structure disclosed in the specification **must** be an algorithm. *E.g.*, *Aristocrat Techs. Australia Pty Ltd. v. Int'l Game Tech.*, 521 F.3d 1328, 1333 (Fed. Cir. 2008); *Net MoneyIN, Inc. v. Verisign, Inc.*, 545 F.3d 1359, 1367 (Fed. Cir. 2008); *Ibormeith IP, LLC v. Mercedes-Benz USA, LLC*, 732 F.3d 1376, 1378–82 (Fed. Cir. 2013); *Media Digital, Inc. v. Toshiba Am. Info. Sys., Inc.*, No. 12-cv-313-JL, 2015 WL 1867864, at *15–*16 (D.N.H. Apr. 23, 2015). Failure to disclose the corresponding algorithm for a computer-implemented means-plus-function term renders the claim indefinite. *Ergo Licensing, LLC v. CareFusion 303, Inc.*, 673 F.3d 1361, 1363 (Fed. Cir. 2012); *Net MoneyIN*, 545 F.3d at 1367.

Here, "one or more processors configured to" is indefinite because the '770 patent

41

specification fails the algorithm requirement.

### Step (1):  the function of "one or more processors configured to"

Claim 1 of the '770 patent recites at least two functions for the "one or more processors." Specifically, they are "configure to": (A) "generate a plurality of clearance commands for the plurality of transporting devices to cause the plurality of transporting devices to travel on the pathways along portions of the plurality of paths" (*id.* at 26:4–7); and (B) "determine there is a potential for a collision between the first transporting device traveling along the first path and the second transporting device traveling along the second path" (*id.* at 26:10–13).

### Step (2): "one or more processors" lacks structure/algorithm

The specification must include "a series of instructions for the computer to follow," expressed "as a mathematical formula, in prose, or as a flow chart, or in any other manner that provides sufficient structure ... for a [POSITA] to provide an operative software program for the specified function." *Typhoon Touch Techs., Inc. v. Dell, Inc.*, 659 F.3d 1376, 1384–85 (Fed. Cir. 2011); *Media Digital*, 2015 WL 1867864, at *15–*16.

A "processor" may provide sufficient structure for a § 112(f) term only when the patent claim recites the processor performing **general** functions. *See In re Katz Interactive Call Processing Patent Litig.*, 639 F.3d 1303, 1316 (Fed. Cir. 2011). But this is a "narrow exception"— inapplicable here. *Ergo Licensing*, 673 F.3d at 1364–65. When the claim recites that the "processor" performs more than a general function, an algorithm is required. *EON Corp. IP Holdings LLC v. AT&T Mobility LLC*, 785 F.3d 616, 623 (Fed. Cir. 2015). This is the case here: Both sides' experts agree that the claimed functions (A) and (B) cannot be done by a general-purpose computer without programming. Ioannou #3 ¶ 49(a); D'Andrea Tr. at 226:15–227:11.

Yet the '770 patent specification does not include any algorithm or steps for performing

42

functions (A) and (B) of the "one or more processors." The patent states that the "clearance module 312 may be configured to store and provide clearances for various robots, and that a system of clearances may be accessed to determine whether a path is clear for a robot to traverse." '770 patent at 18:9–12. This only "describes an outcome, not a means for achieving that outcome," which is insufficient. *Blackboard*, 574 F.3d at 1383–84; *Uniloc USA, Inc. v. Samsung Elecs. Am., Inc.*, 809 F. App'x 863, 865 (Fed. Cir. 2020) ("Merely describing the results of an unspecified algorithm … is not sufficient to satisfy the requirements of § 112 ¶ 6."); *RideApp Inc. v. Lyft, Inc.*, 845 F. App'x 959, 963 (Fed. Cir. 2021) (stating that "[a] computer-implemented, means-plus-function claim element is, by definition, limited to the disclosed algorithm and equivalents thereof," and ruling that means-plus-function was term indefinite because the patent failed to disclose *how* to perform the recited function ("detecting the proximity of the passenger")).

Likewise, when the specification states that "[u]pon providing a robot with a new instruction, the clearance module 312 checks that it will not be possible to collide with another robot" based on upon a number of parameters ('770 patent at 18:19–26), it does not describe the requisite algorithm, only restating the function and identifying parameters used by the clearance module. Ioannou #1 ¶¶ 69, 70; Ioannou #3 ¶ 10.

Ocado appears to contend this discloses the "method" by which determination of the possible collision will be made by "determin[ing] and stor[ing] the possible positions of other robots on the gird during some period." D'Andrea #3 ¶ 26 (citing to '404 patent at 18:40–45, corresponding to '770 patent at 18:19–26); *see also id.* ¶ 25. This is demonstrably wrong. The '770 patent specification at 18:19–26 restates the function of the "clearance unit" ("check[ing] that it will not be possible to collide with another robot") and lists parameters that may be used ("grid dimensions, grid positions," *etc.*). None suffices to disclose the requisite algorithm for the claimed

43

"check[ing]." *Uniloc USA*, 809 F. App'x at 865 (insufficient that the specification merely restated the function); *Verint Sys. Inc. v. Red Box Recorders Ltd.*, No. 14-cv-5403, 166 F. Supp. 3d 364, 384 (S.D.N.Y. Jan. 4, 2016) (mere identification of parameters to be used is insufficient); *Netgear, Inc. v. Ruckus Wireless, Inc.*, 5 F. Supp. 3d 592, 611 (D. Del. 2013) (means-plus-function term was indefinite because the specification did not disclose an algorithm but only stated the function and suggested potential parameters to be used).

The specification at 18:19–26 does not describe any method by which the clearance unit determines whether there would be a possible collision using the listed information. Ioannou #3 ¶¶ 10–12. ***First,*** the specification does not even state that the clearance unit "determines and stores the possible positions of other robots." *Id.* at ¶ 11. ***Second,*** there is no dispute that the specification does not describe ***how*** such determination and storage of the possible positions of other robots is to be done, and how that information is used to determine (predict) whether there may be a collision. *See id.* at ¶ 11; Ex. 10, Ioannou Tr. at 250:2–252:2; D'Andrea Tr. at 178:24–180:19.

Also contrary to Ocado's expert (D'Andrea #3 ¶ 27), the statement that "[t]he clearance module 312 may provide a set of safe entry times for one or many position on the grid, based upon robot position and speed updates, and clearances given/withheld" does not provide any algorithm by which the "set of safe entry times" are determined from the listed parameters (robot position and speed updates; clearances given/withheld). *See* Ioannou #3 ¶ 15.

Indeed, Ocado's expert agrees the specification lacks any step-by-step description or algorithm showing how the clearance module checks whether a planned path is clear for traversal based on the factors identified in the specification. *See* D'Andrea #3 ¶¶ 24–28 (citing to excerpts in the specification that allegedly describe how the system implements a clearance module); D'Andrea Tr. at 71:5–73:14, 73:17–75:11, 77:8–79:15, 81:18–84:11, 85:12–88:1 (admitting that

44

the '404/'770 specifications, including portions cited in D'Andrea #3 ¶¶ 24–28, do not disclose any step-by-step algorithm for implementing a clearance module).

Ocado appears to contend that a POSITA would have known how to implement the relevant functions on the computer based on his own knowledge. D'Andrea #3 ¶¶ 23–28; D'Andrea Tr. at 235:15–259:25. But where, as here, the specification does not describe any algorithm or steps to perform the claimed functions, the knowledge of a POSITA is irrelevant. *EON*, 785 F.3d at 624 ("The question … is whether the specification contains a sufficiently precise description of the corresponding structure to satisfy [§ 112(f)], not whether a [POSITA] could devise some means to carry out the recited function.").

B.    **"Potential for [a/the] collision" (Claims 1, 8–10, 12, 27, 29)**

| AutoStore's Construction | Ocado's Construction |
| --- | --- |
| Indefinite | No construction necessary / ordinary meaning |

Claim 1 recites "determine there is ***a potential for a collision*** between the first transporting device traveling along the first path and the second transporting device traveling along the second path." This term is indefinite because the specification does not allow a POSITA to determine the scope of "potential for a collision" with reasonable certainty. As Dr. Ioannou explained, a POSITA would understand "potential for a collision" to refer to the chance for a collision. Ioannou #1 ¶ 198. But the specification does not explain how high the probability of collision must be for there to be "a potential for a collision." *Id.* Without such a minimum, any determination of a chance for collision—including when probability of collision is near zero—meets the "determine there is a potential for a collision" limitation. Ioannou #3 ¶ 53. A POSITA would not understand the limitation this way, as it would render it meaningless. *Id.*; *Chrimar Holding Co., LLC v. ALE USA Inc.*, 732 F. App'x. 876, 884 (Fed. Cir. 2018) *as amended* (Jun. 1, 2018) (non-precedential) (not construing term according to its plain meaning, as that would render it meaningless); *Bicon*, 441

45

F.3d at 950–52 (reading limitations out of a claim is impermissible because it would make claim language meaningless). Finally, the specification comports with "potential for a collision" requiring a minimum threshold. *See* Ioannou #1 ¶¶ 201–203; Ioannou #3 ¶¶ 54, 55.

Ocado's expert disputes neither that the specification provides no such minimum probability of collision, nor that without an objective measure, any determination of a chance for collision would potentially meet the "determine there is a potential for a collision" limitation. *See* D'Andrea #3 ¶¶ 89–91. He contends a POSITA would understand the term as "***any*** determination that either there is potential for a collision or there is not …"[19] D'Andrea #3 ¶ 89.

Ocado's position amounts to contending that no objective measure is needed to determine if there is a potential for a collision (since "*any* determination" would work). This is legally incorrect. *See, e.g.*, *HIP, Inc. v. Hormel Foods Corp.*, No. CV 18-615-CFC, 2019 WL 2579266, at *3–*6 (D. Del. June 24, 2019), *aff'd*, 796 F. App'x 748 (Fed. Cir. 2020) ("[a] process … to produce a pre-cooked sliced bacon resembling a pan-fried bacon product" held indefinite due to lack of objective criteria for determining the resemblance); *Sensor Elec. Tech., Inc. v. Bolb, Inc.*, No. 18-CV-05194-LHK, 2019 WL 4645338, at *30 (N.D. Cal. Sept. 24, 2019) (the term "the difference in the molar fractions is selected based on a thickness of at least one of the first layer or the second layer" held indefinite due to lack of objective boundaries for the factors used in the selection). Here, the specification gives no objective way to identify a "potential for a collision." Ioannou #1 ¶¶ 199–200. Indeed, Ocado's expert acknowledges that "any determination" based on data available to the system would qualify. "Potential for a collision" is thus indefinite.

---

[19] As explained for Claim 1, the specification does not describe ***how*** this determination is made.

46

**C.    "[T]he one or more processors are configured to determine from an attribute of the first transporting device that there is the potential for the collision" (Claim 9)**

| AutoStore's Construction | Ocado's Construction |
|---|---|
| Construe under 35 U.S.C. § 112(f) / Indefinite[20] | No construction necessary / ordinary meaning |

Claim 9 is indefinite for lack of disclosure of a sufficient "structure" (algorithm) for the "one or more processors" term. It recites "the one or more processors are configured to determine from an attribute of the first transporting device that there is the potential for the collision." Reference to "*the* one or more processors" makes clear that it comes from Claim 1 and is therefore subject to § 112(f) for the reasons explained above, and also because the claim does not provide any structure for how the processors "determine from an attribute of the first transporting device that there is the potential for the collision." The term is indefinite because the specification fails to provide any algorithm or steps for how the processors perform the claimed function— "determin[ing] from an attribute of the first transporting device that there is the potential for the collision." *See* Ioannou #1 ¶¶ 180–181; Ioannou #3 ¶ 50.

Ocado's expert does not dispute that the specification does not provide any algorithm for how to determine the probability of a collision. *See* D'Andrea #3 ¶¶ 91–92. According to Ocado, "determine … that there is the potential for the collision" refers to a deterministic assessment. *Id.* at ¶ 90. Ocado misses the point, since there is no algorithm to make the deterministic assessment.

**D.    "[T]he predetermined processors are configured to determine from one or more of (i) a missed message, (ii) a processing time, (iii) a clock sync, or (iv) a transporting device discrepancy with a physics model, that there is the potential for the collision" (Claim 10)**

| AutoStore's Construction | Ocado's Construction |
|---|---|
| Construe under 35 U.S.C. § 112(f) / Indefinite[21] | No construction necessary / ordinary |

[20] *See* Dkt. No. 107-1 at 66–67.

[21] *See* Dkt. No. 107-1 at 68–69.

47

| | meaning |
|---|---|

Claim 10 recites that "the predetermined processors are configured to determine from one or more of (i) a missed message, (ii) a processing time, (iii) a clock sync, or (iv) a transporting device discrepancy with a physics model, that there is the potential for the collision." Reference to "*the* one or more processors" confirms that the processors are those recited in Claim 1. Thus, the term is subject to § 112(f) for the reasons explained above, and also because the claim does not provide any structure for how the processors perform the recited function. The term is indefinite because the specification fails to provide any algorithm or steps for how the processors perform the claimed function. *See* Ioannou #1 ¶¶ 180, 182; Ioannou #3 ¶ 50.

Ocado's expert contends that a POSITA could write source code to implement the function. D'Andrea Tr. at 253:23–257:22.[22] That again misses the point—*i.e.*, whether the specification provides an algorithm for doing so. *EON*, 785 F.3d at 624. Ocado's expert agrees the specification does not provide an algorithm, *see* D'Andrea Tr. at 178:17–180:19, 253:23–254:15, rending the claim term indefinite.

### E.    "Real time" (Claim 21)

| AutoStore's Construction | Ocado's Construction |
|---|---|
| Indefinite | "wherein the one or more processors are configured to receive data from the plurality of robots, process the data, and issue instructions or commands to the plurality of robots sufficiently quickly to affect their movement" |

Claim 21 recites "the one or more processors are configured to control operations of the plurality of transporting devices in real time." This claim is indefinite because the specification does not inform a POSITA of the scope of "real time" with reasonable certainty.

---

[22] AutoStore does not waive its deposition objections to this line of questioning.

The specification distinguishes between control of robotic vehicles in "real time," "near-real time," and "in advance of their movement." *See* '770 patent at 13:4–7, 13:21–24, 3:61–65; Ioannou #1 ¶¶ 187–188; D'Andrea Tr. at 208:1–5. But the specification does not explain the objective distinction between "real time" and "near-real time." Ioannou #1 ¶ 189; Ioannou #2 ¶ 38. Ocado's expert does not dispute this point. *See* D'Andrea #3 ¶ 96; D'Andrea Tr. at 202:5–16, 202:22–203:2, 203:7–18, 207:14–25. He distinguishes between "real time" and "near-real time" on the ground that "real time" denotes a system that must process all data and issue commands to robots sufficiently quickly, whereas "near-real time" indicates a system that can act that quickly without guarantee that it will. D'Andrea Tr. at 208:23–210:16. This only adds to the confusion: With these definitions, at any time a "real time" and a "near-real time" system may be indistinguishable. *See Halliburton Energy Servs., Inc. v. M-I LLC*, 514 F.3d 1244, 1254 (Fed. Cir. 2008) (claim term "fragile gel" held indefinite because patentee's proposed definition would result in a product infringing or not, depending on environmental conditions); *see also Mantissa Corp. v. FiServ Solutions, LLC*, No. 19-C-3204, 2022 WL 2439938, at *9–*10 (N.D. Ill. Jul. 5, 2022) (rejecting a construction of the term "network" as "real-time computer network" because the specification did not clarify how fast a "real-time" network must operate).[23]

F.    **"[G]enerating, by the one or more processors, a plurality of clearance commands … / "[D]etermining, by the one or more processors, there is a potential for a collision …" (Claims 29 and 30)**

| AutoStore's Construction | Ocado's Construction |
| --- | --- |
| Construe under 35 U.S.C. § 112(f) / Indefinite[24] | N/A |

Method Claim 29 recites "one or more processors" performing the same functions recited in Claim 1. For the reasons discussed for Claim 1 of the '770 patent, the term "one or more

---

[23]  The court found indefiniteness under a stricter standard than that in *Nautilus*.

[24]  *See* Dkt. No. 107-1 at 72–75.

processors" is indefinite in Claim 29. *See* § VIII.A *supra*; Ioannou #1 ¶¶ 183–184.

Dated: August 1, 2022

Respectfully submitted,

AUTOSTORE SYSTEM INC. and
AUTOSTORE AS,

By their attorneys,

*/s/ Robert R. Lucic*

Robert R. Lucic (NH Bar #9062)
Bryanna K. Devonshire (NH Bar #269462)
SHEEHAN PHINNEY BASS & GREEN PA
1000 Elm Street, PO Box 3701
Manchester, NH 03105
Telephone:  (603) 627-8188
rlucic@sheehan.com
bdevonshire@sheehan.com

Gregg F. LoCascio, P.C. (admitted *pro hac vice*)
Emily M. Scott (admitted *pro hac vice*)
KIRKLAND & ELLIS LLP
1301 Pennsylvania Avenue, N.W.
Washington, D.C. 20004
Telephone:  (202) 389-5000
glocascio@kirkland.com
emily.scott@kirkland.com

Joseph A. Loy, P.C. (admitted *pro hac vice*)
Nathaniel DeLucia (admitted *pro hac vice*)
KIRKLAND & ELLIS LLP
601 Lexington Avenue
New York, NY 10022
Telephone:  (212) 446-4800
jloy@kirkland.com
nathaniel.delucia@kirkland.com

Ali-Reza Boloori (admitted *pro hac vice*)
Josh Glucoft (admitted *pro hac vice*)
KIRKLAND & ELLIS LLP
2049 Century Park East, Suite 3700
Los Angeles, CA 90067
Telephone:  (310) 552-4200

50

ali-reza.boloori@kirkland.com
josh.glucoft@kirkland.com

Kristina R. Cary (admitted *pro hac vice*)
Tiffany Knapp (admitted *pro hac vice*)
KIRKLAND & ELLIS LLP
200 Clarendon Street
Boston, MA 02116
Telephone:  (617) 385-7500
kristina.cary@kirkland.com

*Attorneys for Defendants AutoStore AS and
AutoStore System Inc.*

51

**<u>CERTIFICATE OF SERVICE</u>**

I hereby certify that all counsel of record are being served with a copy of the foregoing document via electronic mail on August 1, 2022.

/s/ *Robert R. Lucic*
Robert R. Lucic