**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF NEW HAMPSHIRE**

|  |  |
|---|---|
| OCADO INNOVATION LTD. and OCADO SOLUTIONS LTD., | |
| *Plaintiffs*, | Case No. 21 Civ. 41 (JL) |
| v. | |
| AUTOSTORE AS and AUTOSTORE SYSTEM INC., | **Hon. Joseph N. Laplante** |
| *Defendants*. | |

**OCADO'S OPENING CLAIM CONSTRUCTION BRIEF**

**TABLE OF CONTENTS**

TABLE OF AUTHORITIES ............................................................................................ iii

GLOSSARY OF TERMS .............................................................................................. viii

TABLE OF DISPUTED CLAIM TERMS ...................................................................... xi

INTRODUCTION .............................................................................................................. 1

BACKGROUND ................................................................................................................ 2

    I.      TECHNOLOGY BACKGROUND ......................................................... 2

    II.     RELEVANT LEGAL PRINCIPLES ...................................................... 6

         A.      Claim Construction and Disavowal of Claim Scope ................................. 6

         B.      Indefiniteness ........................................................................................... 8

         C.      "Means Plus Function" Limitations:  Section 112(f) ................................ 9

    III.    LEVEL OF ORDINARY SKILL IN THE ART ..................................... 9

ARGUMENT ...................................................................................................................... 9

    I.      U.S. PATENT NO. 9,796,080 ................................................................ 9

         A.      "mechanism" .............................................................................................. 9

         B.      "nested" / "nestable" .............................................................................. 11

         C.      "delivery container" ............................................................................... 15

         D.      "delivery container containing at least one picked item" ........................ 16

         E.      "at least one of a lip, a handle, and an aperture" ..................................... 16

         F.      "a structural framework defining a grid of storage locations" ................. 17

         G.      "exclusively within the storage and retrieval system" ............................. 19

    II.     U.S. PATENT NO. 10,913,602 ............................................................ 20

         A.      "occupy a grid space" ............................................................................. 20

              1.      The Claim Term "Occupy a Grid Space"
                   Should  Be Given Its Plain and Ordinary Meaning ...................... 20

              2.      AutoStore Fails to Prove Disavowal ............................................ 22

         B.      "the load handling device will not obstruct a load
             handling device occupying or traversing an adjacent
             grid space in the X-direction and will not obstruct a
             load handling device occupying or traversing an
             adjacent grid space in the Y-direction" ................................................... 26

         C.      "wheel hub motor" .................................................................................. 27

III.   U.S. PATENT NO. 10,961,051 ............................................................................ 29

    A.   "housing footprint" ...................................................................... 29

    B.   "a housing footprint that occupies less than twice
the area of the grid space" .......................................................... 30

    C.   "the first set of rails is part of the first set of tracks,
and the second set of rails is part of a second set of tracks" ...... 31

IV.   U.S. PATENT NOS. 10,901,404 AND 11,079,770 ............................................ 32

    A.   "route" ('404 Patent) ................................................................... 32

    B.   "clearance instruction" ('404 Patent) /
"clearance command" ('770 Patent) ........................................... 34

    C.   "execution . . . at a future time" ('404 Patent) .......................... 37

    D.   "one or more processors configured to . . ." ('770 Patent) ....... 39

    E.   "potential for a collision" ('770 Patent) ..................................... 45

    F.   "wherein the one or more processors are configured
to control operations of the plurality of transporting
devices in real time" ('770 Patent) ............................................ 47

CONCLUSION ........................................................................................................... 50

# TABLE OF AUTHORITIES

*Page(s)*

**Cases**

*3M Innovative Props. Co.* v. *Tredegar Corp.*,
725 F.3d 1315 (Fed. Cir. 2013)..........................................................................6

*Absolute Software, Inc.* v. *Stealth Signal, Inc.*,
659 F.3d 1121 (Fed. Cir. 2011)..........................................................................23

*AIA Eng'g Ltd.* v. *Magotteaux Int'l S/A*,
657 F.3d 1264 (Fed. Cir. 2011)..........................................................................25

*Amazon.com, Inc.* v. *Barnesandnoble.com, Inc.*,
239 F.3d 1343 (Fed. Cir. 2001)..........................................................................14

*Amgen, Inc.* v. *Hoechst Marion Roussel, Inc.*,
314 F.3d 1313 (Fed. Cir. 2003)..........................................................................31

*Aventis Pharms. Inc.* v. *Amino Chems. Ltd.*,
715 F.3d 1363 (Fed. Cir. 2013)......................................................................6, 10

*BASF Corp.* v. *Johnson Matthey Inc.*,
875 F.3d 1360 (Fed. Cir. 2017)............................................................................8

*Blue Spike LLC* v. *Grande Comms. Inc.*,
2021 WL 5094911 (E.D. Tex. Nov. 2, 2021) ....................................................42

*Brookhill-Wilk 1, LLC* v. *Intuitive Surgical, Inc.*,
334 F.3d 1294 (Fed. Cir. 2003)..........................................................................11

*CA, Inc.* v. *Netflix, Inc.*,
2021 WL 5323413 (E.D. Tex. Nov. 16, 2021) ..................................................42

*CAE Screenplates Inc.* v. *Heinrich Fiedler GmbH & Co.*,
224 F.3d 1308 (Fed. Cir. 2000)..........................................................................33

*Cellular Comms. Equip. LLC* v. *AT&T, Inc.*,
2016 WL 7364266 (E.D. Tex. Dec. 19, 2018)...................................................42

*Crystal Semiconductor Corp.* v. *TriTech Microelecs. Int'l, Inc.*,
246 F.3d 1336 (Fed. Cir. 2001)......................................................................20, 26

*Digital-Vending Servs. Int'l, LLC* v. *University of Phx., Inc.*,
672 F.3d 1270 (Fed. Cir. 2012)..........................................................................25

*Dyfan, LLC* v. *Target Corp.*,
    28 F.4th 1360 (Fed. Cir. 2022) ................................................................ *passim*

*Enzo Biochem, Inc.* v. *Applera Corp.*,
    599 F.3d 1325 (Fed. Cir. 2010)........................................................................8

*Epistar Corp.* v. *ITC*,
    566 F.3d 1321 (Fed. Cir. 2009)...................................................................8, 23

*Finisar Corp.* v. *DirecTV Grp., Inc.*,
    523 F.3d 1323 (Fed. Cir. 2008).......................................................................39

*Geneva Pharms., Inc.* v. *GlaxoSmithKline plc*,
    349 F.3d 1373 (Fed. Cir. 2003).......................................................................14

*Genuine Enabling Tech., LLC* v. *Sony Corp.*,
    2020 WL 1140910 (D. Del. Mar. 9, 2020) ......................................................18

*Goldenberg* v. *Cytogen, Inc.*,
    373 F.3d 1158 (Fed. Cir. 2004).......................................................................28

*Greenberg* v. *Ethicon Endo-Surgery, Inc.*,
    91 F.3d 1580 (Fed. Cir. 1996).........................................................................40

*Hill-Rom Servs., Inc.* v. *Stryker Corp.*,
    755 F.3d 1367 (Fed. Cir. 2014)...................................................................13, 14

*Hoganas AB* v. *Dresser Indus., Inc.*,
    9 F.3d 948 (Fed Cir. 1993)..............................................................................26

*Homeland Housewares, LLC* v. *Whirlpool Corp.*,
    865 F.3d 1372 (Fed. Cir. 2017).........................................................................6

*Intel Corp.* v. *Qualcomm Inc.*,
    21 F.4th 801 (Fed. Cir. 2021) ...........................................................................8

*InterDigital Comms., LLC* v. *ITC*,
    690 F.3d 1318 (Fed. Cir. 2012).......................................................................36

*IP Holdings* v. *Silver Spring Networks*,
    815 F.3d 1314 (Fed. Cir. 2016).......................................................................30

*Kaufman* v. *Microsoft Corp.*,
    34 F.4th 1360 (Fed. Cir. 2022) .......................................................................17

*KSR Int'l Co.* v. *Teleflex Inc.*,
    550 U.S. 398 (2007).........................................................................................9

*Linear Tech. Corp.* v. *Impala Linear Corp.*,
   379 F.3d 1311 (Fed. Cir. 2004)..................................................................................42

*Linear Tech. Corp.* v. *ITC*,
   566 F.3d 1049 (Fed. Cir. 2009)..................................................................................24

*Littelfuse, Inc.* v. *Mersen USA EP Corp.*,
   29 F.4th 1376 (Fed. Cir. 2022) ....................................................................................7

*MasterMine Software, Inc.* v. *Microsoft Corp.*,
   874 F.3d 1307 (Fed. Cir. 2017)..................................................................................36

*Media Rts. Techs., Inc.* v. *Capital One Fin. Corp.*,
   800 F.3d 1366 (Fed. Cir. 2015)..................................................................................41

*MediaCom Corp.* v. *Rates Tech., Inc.*,
   4 F. Supp. 2d 17 (D. Mass. 1998) ..............................................................................30

*Medrad, Inc.* v. *MRI Devices Corp.*,
   401 F.3d 1313 (Fed. Cir. 2005)..................................................................................11

*Microsoft Corp.* v. *i4i L.P.*,
   564 U.S. 91 (2011).......................................................................................................1

*MySpace, Inc.* v. *GraphOn Corp.*,
   672 F.3d 1250 (Fed. Cir. 2012)....................................................................................7

*Nautilus, Inc.* v. *Biosig Instruments, Inc.*,
   572 U.S. 898 (2014).....................................................................................................8

*Nomadix, Inc.* v. *Hospitality Core Servs. LLC*,
   2016 WL 344461 (C.D. Cal. Jan. 27, 2016) ..............................................................42

*Nystrom* v. *TREX Co.*,
   424 F.3d 1136 (Fed. Cir. 2005)..................................................................................34

*Odyssey Wireless, Inc.* v. *Apple Inc.*,
   2016 WL 3055900 (S.D. Cal. Mar. 30, 2016) ...........................................................42

*Openwave Sys., Inc.* v. *Apple Inc.*,
   808 F.3d 509 (Fed. Cir. 2015).......................................................................................8

*Paragon Sols., LLC* v. *Timex Corp.*,
   566 F.3d 1075 (Fed. Cir. 2009)..................................................................................50

*Perfect Co.* v. *Adaptics Ltd.*,
   2017 WL 5068333 (W.D. Wash. Nov. 2, 2017) .........................................................50

*Phillips* v. *AWH Corp.*,
415 F.3d 1303 (Fed. Cir. 2005) (en banc).............................................................................. *passim*

*Poly-Am., L.P.* v. *API Indus, Inc.*,
839 F.3d 1131 (Fed. Cir. 2016)...........................................................................6, 7, 8, 22

*Quanergy Sys., Inc.* v. *Velodyne Lidar, Inc.*,
2017 WL 4410174 (N.D. Cal. Oct. 4, 2017)..........................................................................42

*Razor USA LLC* v. *DGL Grp., Ltd.*,
2021 WL 651257 (D.N.J. Feb. 19, 2021) ..............................................................................44

*Realtime Adaptive Streaming LLC* v. *Adobe Sys.*,
2019 WL 13039644 (C.D. Cal. July 25, 2019).......................................................................42

*Samsung Elecs. Am., Inc.* v. *Prisua Eng'g Corp.*,
948 F.3d 1342 (Fed. Cir. 2020)............................................................................................42

*Savvy Dog Sys., LLC* v. *Pennsylvania Coins, LLC*,
2020 WL 7488878 (M.D. Penn. Dec. 21, 2020).....................................................................42

*Starhome GmbH* v. *AT&T Mobility LLC*,
743 F.3d 849 (Fed. Cir. 2014)..............................................................................................16

*Thorner* v. *Sony Comput. Ent. Am. LLC*,
669 F.3d 1362 (Fed. Cir. 2012).................................................................................7, 10, 22

*Treehouse Avatar LLC* v. *Valve Corp.*,
2019 WL 6310647 (W.D. Wash. Nov. 25, 2019)...................................................................50

*Trustees of Columbia Univ.* v. *Symantec Corp.*,
811 F.3d 1359 (Fed. Cir. 2016).............................................................................................28

*Uniloc USA Inc.* v. *Autodesk, Inc.*,
2016 WL 3647977 (E.D. Tex. July 7, 2016) .........................................................................43

*Unwired Planet, LLC* v. *Apple Inc.*,
829 F.3d 1353 (Fed. Cir. 2016).......................................................................................16, 22

*VDPP LLC* v. *Vizio, Inc.*,
2022 WL 885771 (Fed. Cir. Mar. 25, 2022)..............................................................41, 42, 44

*VetStem BioPharma, Inc.* v. *California Stem Cell Treatment Ctr., Inc.*,
2022 WL 1601387 (C.D. Cal. Mar. 17, 2022)........................................................................14

*Voda* v. *Cordis Corp.*,
536 F.3d 1311 (Fed. Cir. 2008).............................................................................................23

*XR Comm. LLC* v. *D-Link Sys., Inc.*,
   2022 WL 2291747 (C.D. Cal. Apr. 18, 2022) ..........................................................................42

*Zeroclick, LLC* v. *Apple Inc.*,
   891 F.3d 1003 (Fed. Cir. 2018)................................................................................................41

**Statutes**

35 U.S.C. § 112(f)..................................................................................................... *passim*

**Other Authorities**

MPEP § 2111.03 (E.9-R.10 2020) ............................................................................................28

## GLOSSARY OF TERMS

### Common Abbreviations and Acronyms

| Term | Definition |
|---|---|
| AS/RS | Automated storage and retrieval system(s) |
| IPR | *Inter partes* review |
| ITC | U.S. International Trade Commission |
| MPF | Means-plus-function claim limitation, construed under 35 U.S.C. § 112(f) |
| POSITA | Person of ordinary skill in the art |
| PTAB | Patent Trial and Appeal Board |

### Patents

| Term | Definition | Ex. Number |
|---|---|---|
| '080 Patent | U.S. Patent No. 9,796,080, owned by Ocado | 1 |
| '602 Patent | U.S. Patent No. 10,913,602, owned by Ocado | 2 |
| '051 Patent | U.S. Patent No. 10,961,051, owned by Ocado | 3 |
| '404 Patent | U.S. Patent No. 10,901,404, owned by Ocado | 4 |
| '770 Patent | U.S. Patent No. 11,079,770, owned by Ocado | 5 |
| '337 Patent | U.S. Patent No. 10,000,337, a family member of the '602 and '051 Patents | N/A |
| '302 Patent | U.S. Patent No. 10,829,302, a family member of the '602 and '051 Patents | N/A |
| '140 Patent | U.S. Patent No. 10,474,140, owned by AutoStore | 6 |
| Asserted Patents | The '080, '602, '051, '404, and '770 Patents | N/A |

## Experts

| Term | Definition |
|---|---|
| Dr. Raffaello D'Andrea | Ocado's expert on the disputed terms in the '404 and '770 Patents |
| Dr. Stephen Derby | AutoStore's expert on the disputed terms in the '602 Patent |
| Dr. Petros Ioannou | AutoStore's expert on the disputed terms in the '404 and '770 Patents |
| Dr. Brian Pfeifer | Ocado's expert on the disputed terms in the '080, '602, and '051 Patents |
| Dr. Matthew Spenko | AutoStore's expert on a disputed term in the '080 Patent |

## Expert Materials

| Term | Definition | Ex. Number |
|---|---|---|
| D'Andrea Decl. | Declaration of Raffaello D'Andrea, Ph.D., in Support of Plaintiffs' Proposed Claim Constructions, dated May 27, 2022 | 7 |
| D'Andrea Rebuttal | Rebuttal Declaration of Raffaello D'Andrea, Ph.D., in Further Support of Plaintiffs' Proposed Claim Constructions, dated June 24, 2022 | 8 |
| D'Andrea Sur-rebuttal | Sur-rebuttal Declaration of Raffaello D'Andrea, Ph.D., in Further Support of Plaintiffs' Proposed Claim Constructions, dated July 12, 2022 | 9 |
| Derby Rebuttal | Rebuttal Declaration of Stephen Derby, Ph.D., Regarding Claim Construction, dated June 24, 2022 | 10 |
| Ioannou Decl. | Declaration of Petros Ioannou, Ph.D., dated May 27, 2022 | 11 |
| Ioannou Rebuttal | Rebuttal Declaration of Petros Ioannou, Ph.D., dated June 24, 2022 | 12 |

| Term | Definition | Ex. Number |
|---|---|---|
| Ioannou Sur-rebuttal | Sur-rebuttal Declaration of Petros Ioannou, Ph.D., dated July 12, 2022 | 13 |
| Pfeifer Decl. | Declaration of Brian Pfeifer, Ph.D., P.E., in Support of Plaintiffs' Proposed Claim Constructions, dated May 27, 2022 | 14 |
| Pfeifer Rebuttal | Rebuttal Declaration of Brian Pfeifer, Ph.D., P.E., in Further Support of Plaintiffs' Proposed Claim Constructions, dated June 24, 2022 | 15 |
| Pfeifer Sur-rebuttal | Sur-rebuttal Declaration of Brian Pfeifer, Ph.D., P.E., in Further Support of Plaintiffs' Proposed Claim Constructions, dated July 12, 2022 | 16 |
| Spenko Decl. | Declaration of Matthew Spenko, Ph.D., in Support of Defendants' Proposed Claim Constructions, dated May 27, 2022 | 17 |
| Spenko Rebuttal | Rebuttal Declaration of Matthew Spenko, Ph.D., dated June 24, 2022 | 18 |
| D'Andrea Tr. | Transcript of July 20, 2022 Deposition of Dr. Raffaello D'Andrea (excerpted) | 19 |
| Derby Tr. | Transcript of July 19, 2022 Deposition of Dr. Stephen Derby (excerpted) | 20 |
| Ioannou Tr. | Transcript of July 22, 2022 Deposition of Dr. Petros Ioannou (excerpted) | 21 |
| Pfeifer Tr. | Transcript of July 21, 2022 Deposition of Dr. Brian Pfeifer (excerpted) | 22 |
| Spenko Tr. | Transcript of July 14, 2022 Deposition of Dr. Matthew Spenko (excerpted) | 23 |

**TABLE OF DISPUTED CLAIM TERMS**

| Claim(s) | Disputed Term(s) |
|---|---|
| '080 Patent:  Claims 9, 10, 11, 12, 21 | mechanism |
| '080 Patent:  Claims 8, 17, 23 | nested / nestable |
| '080 Patent:  Claims 1-6, 8-11, 13-16, 18-23 | delivery container |
| '080 Patent:  Claims 1, 5 | delivery container containing at least one picked item |
| '080 Patent:  Claim 11 | at least one of a lip, a handle, and an aperture |
| '080 Patent:  Claims 1, 23 | a structural framework defining a grid of storage locations |
| '080 Patent:  Claims 1, 13 | exclusively within the storage and retrieval system |
| '080 Patent:  Claims 13, 20, 23 | storing . . . in at least one of a plurality of storage locations . . . a plurality of storage containers<br><br>/<br><br>retrieving . . . from at least one of a plurality of storage locations a plurality of storage containers |
| '602 Patent:  Claims 1, 12 | occupy a grid space / occupying a grid space |
| '602 Patent:  Claims 1, 12 | will not obstruct a load handling device of the multiplicity of load handling devices occupying or traversing an adjacent grid space in the X-direction and will not obstruct a load handling device of the multiplicity of load handling devices occupying or traversing an adjacent grid space in the Y-direction<br><br>/<br><br>will not obstruct a load handling device occupying or traversing an adjacent grid space in the X-direction and will not obstruct a load handling device occupying or traversing an adjacent grid space in the Y-direction |
| '602 Patent:  Claims 6, 10, 17 | wheel hub motor |
| '051 Patent:  Claims 1, 13 | housing footprint |

-xi-

| Claim(s) | Disputed Term(s) |
|---|---|
| '051 Patent:  Claims 1, 13 | a housing footprint that occupies less than twice the area of the grid space |
| '051 Patent:  Claims 9, 18 | the first set of rails is part of a first set of tracks, and the second set of rails is part of a second set of tracks |
| '404 Patent:  Claim 20 | wherein the clearance instruction is provided for execution by a control unit on each transporting device at a future time<br><br>/<br><br>wherein the clearance instruction is provided for execution by each transporting device at a future time |
| '404 Patent:  Claim 20 | a route of a transporting device from one location on the grid-like structure to another location on the grid-like structure<br><br>/<br><br>a route from one location on the grid-like structure to another location on the grid-like structure for each transporting device |
| '404 Patent:  Claims 20<br>'770 Patent:  Claims 1-4, 6-7, 13, 23, 25, 29-30 | clearance instruction / clearance command |
| '770 Patent:  Claims 1, 3, 7-13, 15, 17-19, 21-22, 27, 29-30 | one or more processors configured to<br><br>/<br>by the one or more processors |
| '770 Patent:  Claims 1, 8-10, 12, 27, 29 | potential for a collision<br><br>/<br>potential for the collision |

**INTRODUCTION**

Although a court should not construe claim terms to avoid or create infringement or validity, it is a truism that claim construction does not happen in a vacuum. In every patent case, claim construction foreshadows future arguments, and defendants often ask the court to "construe" claims to create non-infringement and invalidity defenses. That certainly is the case here, as AutoStore rarely asks the Court actually to interpret claim terms; instead, it seeks to create defenses by asking the Court to ignore the widely understood meaning of common words or to rewrite the claims with words that differ from the ones chosen by the patentee. That is not proper claim construction, and the Court should reject AutoStore's misguided "constructions."

For example, despite the fact that U.S. patent claims are presumed valid and AutoStore bears a clear-and-convincing-evidence burden on invalidity, *Microsoft Corp.* v. *i4i L.P.*, 564 U.S. 91, 95 (2011), AutoStore asks on "claim construction" for the Court to hold that seven claim terms are indefinite and thus that numerous claims using those terms are invalid. That includes a request to wipe out every single asserted claim from the '404 and '770 Patents. In doing so, AutoStore tells the Court that common English words such as "rails," "tracks," "route," and "path" are hopelessly confusing. This is all meritless.

Apart from invalidity, many of AutoStore's proposed constructions simply replace the actual words of the claim with different words so that AutoStore can argue that its systems do not do what that "construction" says (even if they do what the claim says). A prime example is the dispute regarding the phrase "less than twice the area of the grid space." For the claim terms of the '051 Patent that use this phrase, AutoStore asks the Court to replace the words "less than twice the area of" with "only a single" so that it can later argue that its robots, which occupy "less than twice the area of the grid space," do not meet the limitations of the claims because they are larger than "only a single grid space." That is not consistent with the words of the claim.

-2-

Another common theme is that AutoStore asks the Court to adopt constructions that not even its experts endorse.  For example, AutoStore asks the Court to construe the term "potential for a collision" as requiring a defined "probability" threshold, and to construe the term "real time" as requiring a defined "latency period."  Then, having adopted these incorrect constructions, AutoStore asks the Court to declare the terms indefinite.  But during deposition, AutoStore's own expert, Dr. Petros Ioannou, abandoned AutoStore on these issues:  He admitted that, in his own published works (available to a POSITA), he used terms like "collision possibility" or "potential" *without* any "probability threshold" and used the term "real time" *without* any "latency period."

AutoStore's proposed "constructions" are meritless.  Patent claims mean what they say, read in light of the specification and relevant prosecution history (if any), and Ocado respectfully requests that the Court reject AutoStore's numerous attempts to declare common words confusing and to rewrite the claims to support its future non-infringement and invalidity defenses.

## BACKGROUND

### I.    TECHNOLOGY BACKGROUND

The Asserted Patents relate to cubic automated storage and retrieval systems ("AS/RS"), which are high-density cubic storage grids typically comprised of vertical support columns, the tops of which are connected by horizontal beams to form a grid structure, creating columns in which stacks of containers (also called bins or totes) are stored.  Robots move on the beams on top of the storage grid to retrieve containers and move them to a location where human or robotic operators add goods to or remove goods from the container.  A control system directs the robots' movement by determining travel paths and preventing collisions of the robots.[1]  An advantage of

---

[1] AutoStore's expert, Dr. Ioannou, testified that Ocado's complex control system is "attractive" and genius because it combines what he believes were "known" elements into a system that "works" (Ioannou Tr. at 51:17-52:16), much as the invention of the light bulb combined known elements into a device that "works."  Dr. Ioannou said he was

cubic AS/RS is that it "allows very dense storage of product[s], and it provides a very economical way of storing a huge range of different items in the bins [], while allowing reasonably economical access to all of the bins [] when required for picking." ('602 Patent 4:34-38.) Figure 4 of the '602 and '051 Patents shows the system with prior-art robots operating on top of the storage grid:



FIG. 4

As a general matter, AS/RS have been in the prior art since the late-1990s. Prior-art systems, like AutoStore's Red Line system, however, suffer several disadvantages that limit their usefulness in commercial applications requiring high item throughput like online grocery. For example, AutoStore's Red Line system uses cantilevered robots, *i.e.*, robots with a vehicle body that covers one grid space and a cantilever arm, extending from the vehicle body to another grid space, to lift bins from an adjacent grid space and hold them above the grid during transport. (*See*, *e.g.*, '602 Patent, figs. 3-4.) That design comes with a number of problems: (i) the wheels on the side of the robot from which the cantilever arm extends create a fulcrum, such that the robot tends to tip over when lifting heavy bins; and (ii) because the cantilevered robot covers two full grid spaces, the robot's size (a) limits the maximum number of robots that can operate on the grid at one time and (b) makes it more difficult to plan the route of robots in motion because the larger

---

impressed by Ocado's robot control system—as shown in the video at https://www.youtube.com/watch?v= 4DKrcpa8Z_E (*see* Ioannou Tr. at 53:15-55:2)—which reflects the control system described and claimed in the Asserted Patents.

robots are more likely to obstruct one another's path during travel. (*See, e.g., id.* 4:3-5, 5:32-47, 9:54-56.) The inventions in the Asserted Patents make a number of improvements to (i) the ***robots*** used in cubic AS/RS, (ii) the ***handling*** of fully or partially completed orders, and (iii) the ***coordination of movement*** of robots on the grid, which is critical to an efficient AS/RS.

The '080 Patent relates to "tote-in-tote" technology for an AS/RS that (i) allows for storage of customer orders until they are ready for delivery in a more efficient and cost-effective manner, and (ii) eliminates the equipment, cost, and delay associated with a separate dispatch processing, sorting, and storing system in the warehouse.[2] ('080 Patent 2:39-46, 6:26-31.) Specifically, the '080 Patent claims systems and methods in which the cubic AS/RS utilizes at least two types of containers: containers for the storage of goods ("storage containers") and containers that can be used to deliver customer orders ("delivery containers"). A delivery container—containing a fully or partially completed customer order—can be placed within a storage container, and the nested/combined container can be stored within the grid until additional goods are ready to be added to a partially completed order or until the fully completed order is ready to be delivered to the customer. (*See id.* 9:7-25.) This invention eliminates the need for a separate buffering system in the warehouse for partially and fully completed orders and significantly improves efficiency.[3] (*See id.* 5:32-40, 6:19-31.)

Turning to robots, the '602 and '051 Patents provide improvements to the robotic load-handling device: namely, a more compact robot (as compared to the prior art design described

---

[2] AutoStore sought to invalidate the claims of the '080 Patent in an *inter partes* review ("IPR") proceeding before the Patent Trial and Appeal Board ("PTAB"). The PTAB found, however, that AutoStore could not show a reasonable likelihood of success on even one patent claim, and dismissed the petition. (Ex. 24, IPR2021-00798, PTAB Decision Denying Institution at 21.)

[3] The '080 Patent also claims systems and methods for placing delivery containers within storage containers and removing delivery containers from storage containers. (*See* '080 Patent claims 9-11, 21-22.)

above) that "occupies **substantially** only a single grid space in the storage system."  ('602 Patent

5:5-6 (emphasis added); '051 Patent 5:5-6.)[4]  The reduced size is made possible by locating bulky

robot components, like motors, above the robot's cavity (or within the wheels), rather than in a

separate compartment to the side of the container-receiving space, as prior art robots did.  (*See*

'602 Patent 5:32-47, 6:1-6.)  The more compact size means that the robots are less likely to obstruct

one another as they move across the storage grid, giving the system higher throughput.

Turning to control of robot movement, the '404 and '770 Patents are directed to control

systems and methods to coordinate the movements of robots (potentially thousands) on the grid.

('404 Patent abstract; '770 Patent abstract.)  The '404 Patent employs a novel three-step approach

to controlling robot movement in this context:  (i) plan a route for each robot—a series of grid

locations that will be traversed as the robot performs its assigned task (*e.g.*, retrieving a bin)

('404 Patent 2:55-57, 14:33-36); (ii) reserve a path for each planned route that will not lead to a

collision (*i.e.*, two robots within the same space at the same time) (*id*. 2:57-62); and

(iii) instruct/command the robots to move along a portion of the reserved paths, but only after

checking that the robots will not collide in light of changing conditions on the grid (*e.g.*, the robot

moving less quickly than expected when the path was reserved) (*id*. 2:63-64; 18:38-45).  By using

this three-step process, the system efficiently avoids collisions without the use of *ad hoc* measures

such as proximity sensors on each robot that put on the brakes if a robot senses it is too close to

another robot.  (Dkt. 35-22 at 9.)  The system also can determine "multiple, high-performance,

collision-free paths for hundreds of robots in real time."  (*Id*. at 7-8; *see* Ioannou Tr. at 200:11-14

("Here, in this invention . . . they are talking about 10,000, even a hundred thousand robots.").)

---

[4] AutoStore also sought to invalidate the claims of the '602 Patent in IPR, but the PTAB again rejected the petition, finding AutoStore did not have a reasonable likelihood of success on even one patent claim.  (Ex. 25, IPR2022-00443, PTAB Decision Denying Institution at 24-25.)  AutoStore's near-identical petition regarding the '051 Patent will be addressed by the PTAB within the next two months.

The '770 Patent claims the use of physical hardware—specifically, one or more processors with a memory device—in systems and methods to coordinate and control robot movement. (*E.g.*, '770 Patent 10:19-23, 12:47-51, 21:19-47.) The processors are configured to plan non-colliding paths for each robot and to issue commands for the robots to move along portions of those paths. If there is the potential for a collision, the processors may withhold a command (*e.g.*, *id.* 18:29-31), and then re-plan that robot's path to resolve the conflict (*e.g.*, *id.* 18:32-35). These improvements enhance "the overall efficiency and scalability of [the] system." (*Id.* 1:62-64; 8:13-18.)

## II.    RELEVANT LEGAL PRINCIPLES

### A.    Claim Construction and Disavowal of Claim Scope

Claim construction is a legal question that "begins and ends . . . with the actual words of the claim." *Homeland Housewares, LLC* v. *Whirlpool Corp.*, 865 F.3d 1372, 1374-75 (Fed. Cir. 2017). Courts generally give claim terms "their ordinary and customary meaning,"[5] which is "the meaning that the term would have to a [POSITA] . . . at the time of the invention." *Phillips* v. *AWH Corp.*, 415 F.3d 1303, 1312-13 (Fed. Cir. 2005) (en banc); *see also Aventis Pharms. Inc.* v. *Amino Chems. Ltd.*, 715 F.3d 1363, 1373 (Fed. Cir. 2013) ("There is a heavy presumption that claim terms are to be given their ordinary and customary meaning."). Where a claim term uses common, non-technical words with an "ordinary meaning" that would be "readily apparent" to a POSITA, the analysis "involves little more than the application of the widely accepted meaning of commonly understood words." *Phillips*, 415 F.3d at 1314.

In addition to the claim language, the specification and prosecution history can provide guidance, especially if the claim uses technical terms that require additional construction. *3M Innovative Props. Co.* v. *Tredegar Corp.*, 725 F.3d 1315, 1321 (Fed. Cir. 2013) ("Idiosyncratic

---

[5] Also known as a claim term's "plain and ordinary meaning." *See Poly-Am., L.P.* v. *API Indus., Inc.*, 839 F.3d 1131, 1136 (Fed. Cir. 2016) (using the terms interchangeably).

language, highly technical terms, or terms coined by the inventor are best understood by reference to the specification."). Where a claim term does not have a "widely accepted meaning" or is susceptible to differing interpretations, the specification "is the single best guide to [its] meaning." *Phillips*, 415 F.3d at 1314-15; *see also Littelfuse, Inc.* v. *Mersen USA EP Corp.*, 29 F.4th 1376, 1379 (Fed. Cir. 2022) (how words are used in the specification is "strong evidence" of how a POSITA "would understand the term" under construction). A specification often describes preferred embodiments of the invention with features not required by the claims, and a critical rule of claim construction is that a court may not "read into the claims" "limitations from parts of the written description, such as the details of the preferred embodiment." *MySpace, Inc.* v. *GraphOn Corp.*, 672 F.3d 1250, 1255 (Fed. Cir. 2012).

In addition to intrinsic evidence (*i.e.*, the claim language, specification, and prosecution history), courts may also consider "extrinsic" evidence to elucidate plain and ordinary meaning, including dictionary definitions and expert opinions, which can help illuminate how a POSITA would have understood the intrinsic record, including the disputed claim terms, at the time of the patented invention. *Phillips*, 415 F.3d at 1317. Extrinsic evidence, however, cannot be "used to contradict claim meaning that is unambiguous in light of the intrinsic evidence." *Id.* at 1324.

Finally, a court may depart from the plain and ordinary meaning of the claim language only in two narrow circumstances: (i) when the patentee "acts as his own lexicographer," *i.e.*, expressly defines a claim term idiosyncratically in the specification; and (ii) when the patentee "disavows the full scope of the claim term in the specification or during prosecution." *Poly-Am., L.P.* v. *API Indus., Inc.*, 839 F.3d 1131, 1136 (Fed. Cir. 2016). To act as his own lexicographer, a patentee must "clearly express an intent" to use "a definition of the disputed claim term other than its plain and ordinary meaning." *Thorner* v. *Sony Comput. Ent. Am. LLC*, 669 F.3d 1362, 1365 (Fed. Cir.

-7-

2012) (quotations omitted). Similarly, the Federal Circuit has emphasized that "the standard for disavowal is exacting, requiring **clear and unequivocal** evidence that the claimed invention includes or does not include a particular feature." *Poly-Am.*, 839 F.3d at 1136 (emphasis added); *see also Openwave Sys., Inc.* v. *Apple Inc.*, 808 F.3d 509, 513 (Fed. Cir. 2015) (to find disavowal, the evidence must be "so clear as to show" that the patentee acted "deliberate[ly]" and "so unmistakable as to be unambiguous"). Mere "criticism" of a feature in the prior art "does not rise to the level of a disavowal" where the claim language otherwise encompasses that feature. *Epistar Corp.* v. *ITC*, 566 F.3d 1321, 1335 (Fed. Cir. 2009). Only a patentee's "expressions of manifest exclusion or restriction" can give rise to a "clear disavowal of claim scope." *Id.*

## B. Indefiniteness

"[A] patent is invalid for indefiniteness if its claims, read in light of the specification delineating the patent, and the prosecution history, fail to inform, with reasonable certainty, those skilled in the art about the scope of the invention." *Nautilus, Inc.* v. *Biosig Instruments, Inc.*, 572 U.S. 898, 901 (2014). The party challenging the validity of a claim bears the burden of establishing indefiniteness by clear and convincing evidence. *BASF Corp.* v. *Johnson Matthey Inc.*, 875 F.3d 1360, 1365 (Fed. Cir. 2017). Moreover, as the Supreme Court has recognized, "absolute precision" in claim drafting is "unattainable," and the indefiniteness inquiry tolerates "[s]ome . . . uncertainty" to preserve "the appropriate incentives for innovation." *Nautilus*, 572 U.S. at 909-10. A party's ability to offer a reasonable construction for a disputed term shows that the term is not indefinite because a claim that "is indefinite . . . by definition, cannot be construed." *Enzo Biochem, Inc.* v. *Applera Corp.*, 599 F.3d 1325, 1332 (Fed. Cir. 2010). Conversely, "constru[ing] terms in a way that renders them void [or] meaningless" is "highly disfavored," *Intel Corp.* v. *Qualcomm Inc.*, 21 F.4th 801, 810 (Fed. Cir. 2021), and thus courts should avoid adopting a construction that renders a claim indefinite.

### C.     "Means Plus Function" Limitations:  Section 112(f)

An inventor may elect to express a claim limitation as "means plus function" ("MPF") under 35 U.S.C. § 112(f).  MPF limitations are interpreted to cover the corresponding structure described in the specification and equivalents thereof.  *Dyfan, LLC* v. *Target Corp.*, 28 F.4th 1360, 1365 (Fed. Cir. 2022).  A claim limitation that does not use the phrase "means for" is presumed by law not to be MPF, and such a limitation should not be construed as MPF unless a POSITA would not have understood the limitation to connote structure.  *Id.* at 1365-67.

## III.     LEVEL OF ORDINARY SKILL IN THE ART

A POSITA is "a person of ordinary creativity," who is capable of understanding and applying the scientific and engineering principles applicable to the pertinent art at the time of the invention. *KSR Int'l Co.* v. *Teleflex Inc.*, 550 U.S. 398, 420-21 (2007).  Here, the parties' disagreement about a POSITA's level of skill is immaterial for the task at hand, and all agree that it would not impact the claim construction disputes before the Court.[6]  For the Court's reference, **Appendix A** summarizes the opinions of each party's experts as to the ordinary level of skill in the art, and **Appendix B** summarizes the qualifications of Ocado's experts.

### ARGUMENT

## I.     U.S. PATENT NO. 9,796,080

### A.     "mechanism"

| Ocado's Construction | AutoStore's Construction |
|---|---|
| plain and ordinary meaning | a piece of machinery |

Claims 9-12 and 21 recite a "mechanism" for removal of delivery containers from a storage container.  The term "mechanism" is a common English word that is widely used and understood. *See Phillips*, 415 F.3d at 1314 ("In some cases, the ordinary meaning of claim language . . . may

---

[6] *See* Pfeifer Rebuttal ¶ 6; Spenko Rebuttal ¶ 8; Derby Rebuttal ¶ 39; Ioannou Rebuttal ¶ 10; Pfeifer Sur-rebuttal ¶ 15; D'Andrea Sur-rebuttal ¶ 13.

be readily apparent even to lay judges, and claim construction in such cases involves little more than the application of the widely accepted meaning of commonly understood words."). In construing the claim language, there is a "heavy presumption" that a patent's disputed claim terms carry "their ordinary and customary meaning," *e.g.*, *Aventis Pharms.*, 715 F.3d at 1373, and AutoStore cannot overcome that presumption here.

AutoStore's proposed construction unnecessarily replaces one commonly understood word ("mechanism") with four different words ("a piece of machinery"), which connote an apparatus composed of multiple elements to perform a task or to obtain a desired result, and is narrower than the plain and ordinary meaning of the term chosen by the inventor: "mechanism." Unlike the word "mechanism," which is used repeatedly throughout the '080 Patent (*e.g.*, 10:25-30, 11:60-65, 13:31-36, claims 9-12, 21), the word "machinery" is not used once, nor is the phrase "a piece of machinery." If the inventors had intended to limit "mechanism" to "a piece of machinery," they could have said so. That they did not indicates that "mechanism" was meant to cover more than just "a piece of machinery." *Thorner*, 669 F.3d at 1367 ("The patentee is free to choose a broad term and expect to obtain the full scope of its plain and ordinary meaning unless the patentee explicitly redefines the term or disavows its full scope."). Instead, the specification does just the opposite, explaining that the claimed "[s]torage and retrieval (sub)system(s) [] can include ***any machines(s), device(s), infrastructure or arrangement(s) suitable for*** fully or semi-automatically storing and retrieving containers . . . in accordance with the disclosure herein." ('080 Patent 4:53-57 (emphasis added).)[7] As such, the Court should hold that the term "mechanism" has its plain and ordinary meaning, without AutoStore's proposed narrowing changes.

---

[7] AutoStore's proposed construction comports with one dictionary definition of "mechanism" (*see* Ex. 26, The Oxford English Dictionary 449 (7th ed. 2012) ("a piece of machinery")), but there are broader definitions (Ex. 27, Am. Heritage Dictionary 521 (5th ed. 2012) ("[a] means or process by which something is done or comes into being")). In

B.      "nested" / "nestable"

| Ocado's Construction | AutoStore's Construction |
|---|---|
| placed within / capable of being placed within | fitting snugly as designed / designed to fit snugly[8] |

The terms "nested" and "nestable" appear in claims 8, 17, and 23 of the '080 Patent. The specification consistently uses the terms "nested" and "nestable" to describe delivery containers that are or can be "placed within" storage containers. (*E.g.*, '080 Patent 8:55-59, 9:7-10; *see also* Pfeifer Decl. ¶ 30.) And the specification equates "combined" and "nested," when it refers to "combined/nested" containers without any qualifiers regarding their design or fit. (*See* '080 Patent 13:3-4.) By equating "combined" containers with "nested" containers, the specification indicates that a nestable delivery container need only be able to be combined with (*i.e.*, placed within) a storage container. (*See* Pfeifer Rebuttal ¶ 11.)

The specification also describes the advantages offered by "nesting" containers, which are realized when delivery containers can be placed within a storage container, regardless of their relative dimensions or "fit." *See Medrad, Inc.* v. *MRI Devices Corp.*, 401 F.3d 1313, 1319 (Fed. Cir. 2005) ("It is . . . entirely proper to consider the functions of an invention in seeking to determine the meaning of particular claim language."). The benefits of the nestable delivery containers as described in the '080 Patent include (i) allowing for the carrying and transport of multiple delivery containers at one time, and (ii) the efficient use of storage space and simultaneous handling of multiple containers. (*See* '080 Patent 9:1-2, 10-12, 30-38, 56-61.) The

---

any event, this extrinsic evidence cannot contradict the intrinsic evidence, which does not limit the term "mechanism" to machinery. *E.g.*, *Brookhill-Wilk 1, LLC* v. *Intuitive Surgical, Inc.*, 334 F.3d 1294, 1300 (Fed. Cir. 2003) ("In construing claim terms, the general meanings gleaned from reference sources, such as dictionaries, must always be compared against the use of the terms in context, and the intrinsic record must always be consulted to identify which of the different possible dictionary meanings is most consistent with the use of the words by the inventor.").

[8] This is one of several instances in which AutoStore is simply changing the claim language to manufacture a non-infringement argument. AutoStore will argue that its systems use combined delivery/storage containers, but then create any number of convoluted arguments as to why they are not "designed for" that purpose or why the fit between the two is not "snug," which is a strangely subjective term.

parties' experts agree that all of these benefits are realized if the delivery containers are "placed within" the storage containers, regardless of whether they fit snugly (whatever that might mean). (Pfeifer Rebuttal ¶ 22; Spenko Tr. at 257:5-17, 258:11-24.)   Thus, as Dr. Pfeifer explains, a POSITA reviewing the '080 Patent's specification would give "nested" and "nestable" the full breadth of their plain and ordinary meaning (*i.e.*, placed within and capable of being placed within).  (Pfeifer Decl. ¶ 31.)[9]

AutoStore's confusing and narrower construction violates several canons of claim construction by reading into the claims a limitation that is not even found in the specification, and by improperly relying on an alleged infringer's subjective intent in designing a product.  (*See* Pfeifer Rebuttal ¶ 12.)  As AutoStore's expert, Dr. Matthew Spenko,[10] admitted during deposition, neither the word "snug," nor any variation of that word, appears in the specification or prosecution history.  (Spenko Tr. at 120:10-13, 122:2-17, 123:12-15.)  Instead, AutoStore's construction is based on Dr. Spenko's purported understanding of (i) Figure 6, (ii) purported additional benefits of the invention that are not even mentioned in the specification, and (iii) the specification's description of a single embodiment utilizing an automated transfer mechanism.  (Spenko Decl. ¶¶ 42-47.)  None support AutoStore's proposed construction, and each violates a black-letter rule of claim construction.

---

[9] This construction is also consistent with dictionary definitions of "nest."  (*See*, *e.g.*, Ex. 26, The Oxford English Dictionary 483 (7th ed. 2012) ("fit (an object or objects) inside a larger one"); *see also* Pfeifer Decl. ¶ 30.)  The definitions identified by Dr. Spenko (Spenko Rebuttal ¶ 10) are also consistent with the plain and ordinary meaning of "nest" and "nestable" to the extent that they reference "fit or stack . . . together" or "fit inside each other."  (Ex. 27, Am. Heritage Dictionary 565 (5th ed. 2012) ("2. To fit or stack snugly together.").)  However, while the definition with "snugly" may be appropriate in different circumstances, the additional proposed adverb and verb ("snugly" and "designed to") are not consistent with how the term is used in the '080 Patent.  (*See* Pfeifer Sur-rebuttal ¶ 10.)

[10] In addition to the deficiencies in his opinion discussed below, Dr. Spenko **is not a POSITA**.  According to Dr. Spenko, a POSITA would have a masters' degree in mechanical engineering and three to four years' experience "working as an engineer in the field of" AS/RS or a bachelors' degree and four to five years' experience.  (Spenko Decl. ¶ 32.)  Dr. Spenko admitted that he is an academic and "ha[s]n't worked in industry since . . . [19]99 [or] 2000," when he worked on cell phone technology, not AS/RS.  (Spenko Tr. at 93:19-24; *see also id.* at 85:11-19, 90:12-91, 103:12-104:10.)

*First*, Figure 6 is silent on whether the depicted fit is "snug" (Pfeifer Rebuttal ¶ 20), and embodiment 90 shown in Figure 6 is merely referred to in the specification as "nestable configurations" or "***combined*** delivery and storage containers" ('080 Patent 9:28-30, 10:60-66). As explained above, this description supports Ocado's construction, not AutoStore's.  But even assuming Figure 6 hypothetically depicted a delivery container that fits snugly in a storage container (whatever that may mean), the claims should not be limited to the embodiment shown in Figure 6.  (Pfeifer Rebuttal ¶¶ 20-21.)  *See Hill-Rom Servs., Inc.* v. *Stryker Corp*., 755 F.3d 1367, 1371 (Fed. Cir. 2014) ("While we read claims in view of the specification, of which they are a part, we do not read limitations from the embodiments in the specification into the claims.").

*Second*, according to Dr. Spenko, a delivery container fits "snugly" if it prevents the delivery container from tipping over (an issue not addressed in the patent).  (Spenko Rebuttal ¶¶ 43-47; Spenko Tr. at 127:10-22.)  But Dr. Spenko admitted that there are several ways to ensure that the delivery container does not tip over without it fitting "snugly" (Spenko Tr. at 269:13-270:1), showing that the additional limitation that AutoStore seeks to impose is not even necessary to resolve this unaddressed issue.

*Third*, Dr. Spenko justifies his use of the word "snug" by contending that a "snug fit" also ensures that the delivery container "is in the expected location to facilitate automated removal from the storage container [by the transfer mechanism]" (another issue not addressed in the patent). (Spenko Rebuttal ¶ 12; *see* Spenko Tr. 127:10-22.)  But the '080 Patent does not require the use of an automated transfer mechanism—which is merely "a *possible* implementation of a machine to place delivery containers [] into storage containers" ('080 Patent 10:47-51(emphasis added))—and expressly suggests other mechanisms, a fact of which Dr. Spenko was unaware until his deposition. (*See* '080 Patent 9:26-30, claim 23, figs. 9-15; Pfeifer Sur-rebuttal ¶ 14; Spenko Tr. at

-13-

133:25-135:18.) *See also Hill-Rom Servs.*, 755 F.3d at 1371 (limitations from embodiments should not be read into the claims).

AutoStore's construction also should be rejected because it violates additional claim construction principles. At deposition, Dr. Spenko was unable to articulate an objective measure by which to determine whether a container fits "snugly," thus essentially leaving the term in the eye of the beholder. (Spenko Tr. at 132:20-134:16; *see also id.* at 153:2-9; *see also* Pfeifer Rebuttal ¶¶ 11-13.) AutoStore's construction, therefore, introduces unnecessary ambiguity and renders the claims indefinite. *See Geneva Pharms., Inc.* v. *GlaxoSmithKline plc*, 349 F.3d 1373, 1384 (Fed. Cir. 2003) (rejecting a construction because it would render the claim term indefinite).[11] And beyond that legal principle, there is the practical elephant in the room: What exactly does "snug" mean, and how would the jury make that determination during deliberations? Snug is a nonsense word that allows AutoStore to make convoluted non-infringement arguments.

Finally, AutoStore's construction requires that the delivery container be "designed" to fit snugly within a storage container. But determining whether a delivery container was "designed" for a particular purpose would improperly require inquiry into the mental state of the designer. *See VetStem BioPharma, Inc.* v. *California Stem Cell Treatment Ctr., Inc.*, 2022 WL 1601387, at *3 (C.D. Cal. Mar. 17, 2022) (recognizing "Federal Circuit authority cautioning against construing claims to consider intent") (citing *Amazon.com, Inc.* v. *Barnesandnoble.com, Inc.*, 239 F.3d 1343, 1353 (Fed. Cir. 2001)). And Dr. Spenko's logic for requiring "designed" is circular: Dr. Spenko *assumed* that delivery totes could not fit snugly "by happenstance" and, therefore, that they must be designed to fit snugly. (Spenko Tr. at 145:23-146:5, 193:21-195:11.) There is no logic to this

---

[11] Dr. Spenko admitted that AutoStore's counsel did not instruct him on the legal principle that a claim construction should not render a term indefinite. (Spenko Tr. at 49:3-6.)

at all and off-the-shelf delivery and storage containers could nest—and achieve all the benefits of the '080 invention—even if the designer did not have that specific intent in mind.

### C.    "delivery container"

| Ocado's Construction | AutoStore's Construction |
|---|---|
| container for delivery to customers that is configured to contain at least one picked item | container suitable for engagement by the robotic load handlers for dispatch |

Every asserted claim of the '080 Patent contains the term "delivery container."  Ocado's proposed construction is fully consistent with the intrinsic evidence, including (i) the claim language, (ii) the specification, and (iii) the prosecution history of the '080 Patent.  *First*, Ocado's proposed construction is derived from the claim language itself, which provides that the delivery container is a container "for transport outside of the storage and retrieval system for delivery" that "contain[s] at least one picked item" and is "configured to store products at least partially fulfilling an order."  ('080 Patent claims 1, 13, 23.)  *Second*, Ocado's construction is consistent with the specification, which repeatedly states that the delivery container (i) contains at least one picked item (*see*, *e.g.*, *id.* 1:34-38, 2:24-27, 4:65-67, 6:3-12, 7:37-49, 9:61-66), and (ii) is for "delivery of the items to customers who have ordered them" (*id.* 2:35-39).  *Third*, Ocado's construction is supported by the prosecution history.  During prosecution, the examiner stated that the delivery containers "contain[] the items required for filling an order or for further packaging."  (Ex. 28, '080 Patent Sept. 22, 2016 Non-Final Rejection at 11-12.)  In response to a rejection of certain claims, Ocado distinguished the at-issue prior art by explaining that, unlike prior art containers that stored "pre-packaged items," a POSITA would have understood that the "claimed delivery containers" are "used to store [] picked" items.  (Ex. 29, '080 Patent Mar. 22, 2017 Amend. at 11.)

Nothing in the claim language, specification, or prosecution history requires that the delivery containers be "suitable for engagement by the robotic load handlers for dispatch"—which,

yet again, are foreign words AutoStore wants to add to the claims—and the Court therefore should adopt Ocado's construction.

### D. "delivery container containing at least one picked item"

| Ocado's Construction | AutoStore's Construction |
|---|---|
| plain and ordinary meaning | a delivery container containing at least one picked item from a retrieved storage container |

Ocado respectfully submits that this dispute is frivolous. The term "delivery container containing at least one picked item" (*e.g.*, a delivery container containing a bunch of bananas) would be understood by a POSITA—and a lay juror—without putting additional words into the claim that improperly narrow it. *Starhome GmbH* v. *AT&T Mobility LLC*, 743 F.3d 849, 857 (Fed. Cir. 2014). AutoStore is setting up another convoluted non-infringement defense, and the bid should be rejected out of hand. If legal analysis is necessary, AutoStore's proposed construction impermissibly imports an express limitation from claim 1 into different claim 15, which would render the difference between the claims meaningless. That is legal error. *See Unwired Planet, LLC* v. *Apple Inc.*, 829 F.3d 1353, 1358-59 (Fed. Cir. 2016) (declining to import a limitation recited in other claims into the at-issue claims because "[i]f the patentee intended to restrict the claims-at issue . . . it could have included that same limitation").

### E. "at least one of a lip, a handle, and an aperture"

| Ocado's Construction | AutoStore's Construction |
|---|---|
| plain and ordinary meaning | at least one lip, at least one handle, and at least one aperture |

Claim 9 describes the removal of delivery containers from a storage container within the AS/RS using "at least one mechanism." Claim 11, which depends from claim 9, limits "at least one mechanism" to "at least one lifter mechanism . . . using at least one of a lip, a handle, and an aperture of the delivery container." The parties dispute the construction of the latter phrase.

The plain and ordinary meaning of "at least one of" a list of items is any *one* of the listed items—not at least one of each and every listed feature, as AutoStore contends. *See Kaufman* v. *Microsoft Corp.*, 34 F.4th 1360, 1372 (Fed. Cir. 2022) ("[T]he word 'and' can reasonably be understood to denote alternatives, rather than conjunctive requirements."). Ocado's construction thus is consistent with the plain meaning of the claim language (and common sense). It also is consistent with the specification, which describes delivery containers having "one or more handles . . . which can be engaged by one or more mechanisms for placing or removing the delivery containers into/from a storage container," but states that such a mechanism "may be used *alternatively* or in addition to the aperture-enabled [embodiment] or *any other mechanism*." ('080 Patent 10:25-30 (emphasis added).) Thus, the specification makes clear that *only one* of a lip, a handle, *or* another mechanism (*e.g.*, an aperture) is required.[12] Requiring all three features as AutoStore requests would lead to redundant features and eliminate the design flexibility contemplated by the "at least one of" claim language and the related description in the specification.

### F.    "a structural framework defining a grid of storage locations"

| Ocado's Construction | AutoStore's Construction |
|---|---|
| a structural framework in which crossed structural elements define a two-dimensional array of storage locations | a structural framework defining a grid of storage locations |

Claims 1 and 23 recite "a structural framework defining a grid of storage locations." The crux of the parties' dispute is whether containers laid out on the floor of a warehouse in a grid pattern (*e.g.*, a rectangle), without structural members between the containers, would satisfy this

---

[12] AutoStore's proposed construction departs from the phrase's plain and ordinary meaning and asks the Court to rewrite claim 11 to require that the delivery container includes "at least one lip, at least one handle, and at least one aperture." By (i) removing "of" from "at least one of" and (ii) repeating "at least one" multiple times, AutoStore's proposed construction construes the "at least one of . . . and" selection criteria language to require all three of a lip, handle, and aperture be simultaneously present. But the plain and ordinary meaning of "at least one of" is not "all."

claim limitation.  As the '080 Patent relates to cubic AS/RS, which is much more than boxes arranged in a rectangle, AutoStore's construction would lead to an absurd result that (as the PTAB concluded in its decision denying AutoStore's request to institute IPR of the '080 Patent) is inconsistent with the claim's plain language.

The claim language requires a "structural framework"—not an arrangement of containers—to "*defin*[*e*]" the "grid of storage locations."  Thus, the claim language indicates that a structure other than the storage containers creates the "grid."  (Pfeifer Decl. ¶ 26.)  The specification makes clear that the "structural framework" is comprised of crossed structural elements, consistent with the ordinary meaning of "grid."  (*Id.*; *see also* Ex. 30, Webster's College Dictionary 577 (2000) (defining "grid" as "a grating of crossed bars").)

This construction also is consistent with the PTAB's decision in response to AutoStore's IPR petition, AutoStore argued that this term merely required that "the structural framework provide[] open areas within which storage containers could be arranged in a grid-like pattern." (Ex. 24, IPR2021-00798, PTAB Decision Denying Institution at 9.)  The three PTAB judges rejected that argument, concluding that this limitation "require[s] that a structural framework define the grid of storage locations, as opposed to these locations being defined merely by the orientation or location of stacked containers."  (*Id.* at 9-11; *see also* Pfeifer Decl. ¶ 25.)  While the Court is not legally required to adopt the PTAB's construction, the Court should nevertheless "take the PTAB's claim construction into consideration" and treat it as "persuasive authority."  *See Genuine Enabling Tech., LLC* v. *Sony Corp.*, 2020 WL 1140910, at *7 (D. Del. Mar. 9, 2020) (noting that "where the [PTAB's] construction is similar to that of a district court's review, it is appropriate for [the court] to take the PTAB's claim construction into consideration") (quotations omitted).

### G.    "exclusively within the storage and retrieval system"

| Ocado's Construction | AutoStore's Construction |
| --- | --- |
| no construction necessary / plain and ordinary meaning | indefinite |

The term "exclusively within the storage and retrieval system" appears in claims 1 and 13 of the '080 Patent.  AutoStore argues that this limitation is indefinite, although it fails to provide any basis.  The term is not indefinite because a POSITA would reasonably understand, based on the claim language and specification, that "exclusively within the storage and retrieval system" means that the storage containers are for storage purposes only and not for customer delivery outside the system.

Contrary to what AutoStore appears to argue, the "exclusively within" language does *not* mean that storage containers can never leave the cube/grid storage system in which they are handled by robots.  Rather, the specification makes clear that storage containers often have to be transported outside of the cube/grid to other parts of the warehouse, such as order-picking stations ('080 Patent 2:19-24, 3:22-26, 7:25-36) and bin-filling stations (*id.* 6:13-18), but in those cases the storage containers may be transported by conveyors (*id.* 10:53-66), shuttles (*id.* 12:42-50), or other equipment.  Reading "exclusively within" appropriately in the context of the '080 Patent, a POSITA would understand that storage containers are moved by robotic load handlers when they are within the cube/grid, but may be moved by other means elsewhere in the warehouse.  The "exclusively within" language merely distinguishes between (i) an embodiment in which the storage containers may be used for both storage and delivery, and (ii) an embodiment in which the storage containers are exclusively used for storage purposes.  That is not indefinite.

## II.    U.S. PATENT NO. 10,913,602

### A.    "occupy a grid space"

| Ocado's Construction | AutoStore's Construction |
| --- | --- |
| plain and ordinary meaning | will occupy / occupying only a single grid space in the storage system |

Instead of giving this simple language its plain and ordinary meaning, AutoStore takes on the mighty legal task of proving disavowal of claim scope and fails.  Although the claim language states that the robot will "occupy a grid space," AutoStore argues that it should be amended to read "occupy ***only a single*** grid space"—such that Ocado disavowed configurations in which the entirety of the robot does not fit in only a single space.  This fails for several reasons.

### 1.    The Claim Term "Occupy a Grid Space" Should Be Given Its Plain and Ordinary Meaning.

Where the "ordinary meaning of claim language" is "readily apparent," claim construction "involves little more than the application of the widely accepted meaning of commonly understood words."  *Phillips*, 415 F.3d at 1314.  Here, as Dr. Brian Pfeifer testified, the "occupy a grid space" limitation uses "common English words" with no "specialized technical meaning."  (Pfeifer Decl. ¶ 36.)  Construing this limitation thus requires "little more" than applying the "widely accepted meaning[s]" of each word.[13]  *Phillips*, 415 F.3d at 1314.  Occupying a grid space does not preclude occupying more than one space, particularly in view of the "conventional rule" that the indefinite article "a" means "at least one."  *Crystal Semiconductor Corp.* v. *TriTech Microelecs. Int'l, Inc.*, 246 F.3d 1336, 1347 (Fed. Cir. 2001) (emphasis removed).[14]  Thus, a POSITA would understand the "occupy a grid space" limitation to require a robot that occupies at least one grid space, but not

---

[13] To "occupy" commonly means to "fill up . . . [a] space."  (Ex. 27, Am. Heritage Dictionary 581 (5th ed. 2012); *accord* Derby Tr. at 106:24-25 (using "occupy" and "take up" interchangeably).)

[14] *See also* Pfeifer Tr. at 127:23-128:1 ("I'm reading ['a grid space'] to say that the load-handling device . . . will occupy a grid space, so it may be one grid space, may be more, but at least a grid space.").

limit the robot's size to only one space. Indeed, AutoStore's expert, Dr. Stephen Derby, conceded as much at deposition, agreeing that, ordinarily, "the phrase 'occupy a grid space' does not mean that a robot only occupies one grid space." (Derby Tr. at 105:11-17.)[15]

The specification does not give the phrase "[to] occupy a grid space" a contrary definition. Rather, it repeatedly refers to embodiments of the invention in which the load-handling device (*i.e.*, robot) "occup[ies] **substantially** a single grid space," which necessarily encompasses robots that occupy more than only one space. ('602 Patent 7:6-7 (emphasis added); *see also id.* 5:5-6, 5:19-21.) As Dr. Pfeifer testified, this text would indicate to a POSITA—at a minimum—that the '602 Patent "contemplates" not only "a robot that occupies only a single grid space," but also one that "encroach[es] on one adjacent grid space" (Pfeifer Sur-rebuttal ¶ 21). Again, AutoStore's expert Dr. Derby conceded as much at his deposition, testifying that the word "substantially" indicates that the specification contemplates a "load-handling device [that] is larger than a single grid space." (Derby Tr. at 116:15-117:4.)

The language of claims 1 and 12 of the '602 Patent underscores the correctness of Ocado's position. Claims 1 and 12 specify that each "stack" of containers must fit "within" a "**single** grid space." (Emphasis added.) Thus, when the patentees intended to limit a claim term to a "single grid space," they knew how to do so and did so expressly.[16]

---

[15] Although AutoStore seems to recognize this plain meaning, it nonetheless contends that the phrase "occupy a grid space" *must* carry some size constraint. Not so. As Dr. Pfeifer explained at his deposition, by describing the load-handling as "occupying" at least one space on the grid, the claim language provides a necessary reference for the additional limitation of claims 1 and 12 that the load-handling device "will not obstruct [another] device occupying or traversing an *adjacent grid space* in the X direction and . . . an *adjacent grid space* in the Y direction." ('602 Patent claim 1 (emphasis added); *see* Pfeifer Tr. at 121:4-124:4.) In other words, the claim specifies that the robot (i) occupies a grid space and (ii) does not obstruct a robot in an X and Y space adjacent to that occupied space.

[16] See also pages 24-25, below, contrasting the language that the patentee chose in claims 1 and 12 of the '602 Patent with the language of claims of other patents in the same family.

### 2.    AutoStore Fails to Prove Disavowal.

AutoStore's construction improperly narrows the claims and necessarily advocates that Ocado disavowed a broader claim scope.   In his declaration and at deposition, Dr. Derby acknowledged that AutoStore's construction departs from the plain and ordinary meaning of "occupy a grid space."  (Derby Rebuttal ¶ 34; Derby Tr. at 105:11-22.)  Thus, under well-settled law, AutoStore must show either that Ocado (i) acted as its "own lexicographer"—which AutoStore does not contend (*see* Derby Tr. at 147:8-13)—or (ii) "disavow[ed] the full scope of the claim term in the specification or during prosecution." *Poly-Am*, 839 F.3d at 1136.  As the Federal Circuit has warned, however, "the standard for disavowal is exacting, requiring clear and unequivocal evidence that the claimed invention includes or does not include a particular feature." *Id*.  AutoStore's supposed evidence for disavowal does not clear this high bar.[17]

*First*, AutoStore is wrong that the specification of the '602 Patent disavows a robot larger than one single grid space.  For starters, the specification affirmatively *supports* giving the phrase "[to] occupy a grid space" "the full scope of its plain and ordinary meaning" for the reasons Ocado explained above relating to use of the word "substantially." *See Thorner*, 669 F.3d at 1367.  But even setting that aside, AutoStore cannot meet its burden to show that Ocado "clearly and unmistakably" disavowed the "full scope" of its patent claims. *Unwired Planet*, 829 F.3d at 1358.

Dr. Derby points to (i) an isolated statement in the abstract that refers to an embodiment with a robot that "occupies only a single grid space" and (ii) portions of the specification that disclose devices that "occupy the space above only one stack" of bins.  (Derby Rebuttal ¶¶ 44-45.)  As Dr. Pfeifer explained, however, a POSITA would understand that these statements refer only to embodiments of the invention, while there are other "descriptions [in the specification]

---

[17] Notably, Dr. Derby testified that he is "not offering an opinion on disclaimer of the scope of the 'occupy[] a grid space' limitation." (Derby Tr. at 147:22-148:5.)

indicat[ing] that" other embodiments of the robot "can occupy more than a single grid space." (*See* Pfeifer Sur-rebuttal ¶¶ 20-21.)   The Federal Circuit has held that disavowal does not apply in circumstances like these where the specification describes a feature of one embodiment but also discloses embodiments indicating that the feature is not required.  *E.g.*, *Absolute Software, Inc.* v. *Stealth Signal, Inc.*, 659 F.3d 1121, 1136-37 (Fed. Cir. 2011) (no disavowal where the specification did not uniformly refer to the invention as being limited to the features of a specific embodiment) (collecting cases); *Voda* v. *Cordis Corp.*, 536 F.3d 1311, 1320-22 (Fed. Cir. 2008) (same).

AutoStore's argument that robots "that occupy more than one grid space . . . would not achieve the[] stated benefits" of the invention (Derby Rebuttal ¶ 44) is similarly unavailing. Dr. Derby conceded that the "benefits [of the invention] can be achieved by a robot that occupies about 50 percent greater than a single grid space in one direction."  (Derby Tr. at 135:18-138:2, 138:14-24; *see also* Pfeifer Tr. at 135:6-136:7.)  The specification explains, for instance, that one aim of the '602 Patent is to "improve[]" the "efficiency of operation of the storage system" by both "accommodat[ing]" "more load handling devices" on the storage grid and "reduc[ing] the likelihood of one device obstructing the optimum path of another."  ('602 Patent 5:42-47; *see also* Pfeifer Sur-rebuttal ¶¶ 22-23.)   As Dr. Pfeifer testified, and Dr. Derby conceded, "a robot that occupies more than one but substantially less than two grid spaces still has a smaller footprint" than prior-art cantilever robots and thus achieves this benefit.  (*Id.*; Derby Tr. at 137:20-138:1 ("Q. [A] robot that occupies a space about 20 percent greater than a single grid space in one direction has a reduced likelihood of obstructing the optimum path of another robot compared to the prior-art robots, correct? . . . A. Yes.").)[18]

---

[18] Regardless, the Federal Circuit has made clear that even where the specification "discuss[es] . . . the shortcomings of certain [features]," "this criticism does not rise to the level of a disavowal."  *Epistar*, 566 F.3d at 1335.  Here, however, AutoStore does not point to *any* criticism of a load-handling device that occupies more than one but less

*Second*, contrary to AutoStore's argument, the '602 Patent's prosecution history does not suggest that Ocado disclaimed a robot larger than a single grid space. Dr. Derby focuses on two statements during the prosecution of earlier patents in the same patent family (the '337 and '302 Patents). (*See* Derby Rebuttal ¶ 46.) But the '337 and '302 Patents, unlike the '602 Patent, **expressly claim** a robot that occupies **only a single** grid space—showing that when the patentees of all three patents intended to claim such a single-space-only robot they knew how to do so **expressly**. (*See* Pfeifer Sur-rebuttal ¶ 24.) Dr. Derby conceded in deposition that the difference between the claim language of the '337 and '302 Patents, on the one hand, and language of the '602 Patent, on the other, demonstrated that "the inventors of the '602 Patent knew how to say explicitly in the claims that a robot [may] occup[y] only a single grid space" if that was indeed what they meant to say.[19] (Derby Tr. at 129:6-11.)

Thus, Ocado's statements to the PTO in connection with the '337 and '302 Patents—distinguishing narrower single-space-only robots from the prior art—are irrelevant because they say nothing about the '602 Patent's broader claims. And in any event, the distinction that Ocado's statements drew between AutoStore's bulky, two-space cantilever robot and one that occupies less than two grid spaces (*see* Ex. 31, '337 Patent Feb. 7, 2018 Resp. to Office Action at 11; Ex. 32, '302 Patent July 9, 2020 Notice of Allowance at 2) applies in equal measure to the robot claimed in the '602 Patent (*i.e.*, that can occupy one grid space and part of a second space) (*see* Pfeifer Sur-rebuttal ¶¶ 22-23). AutoStore cannot meet the strict standard for disavowal based on the prosecution history of the '602 Patent. *See Linear Tech. Corp.* v. *ITC*, 566 F.3d 1049, 1058-59

---

than two grid spaces, much less meet its burden to show the sort of unequivocal statement sufficient to trigger disavowal.

[19] Dr. Derby also notably admitted that, in reaching his opinions, he did not notice that the "occupy a grid space" limitation in the '602 Patent used different language than the "occupy only a single grid space" limitations of the '337 and '302 Patents. (Derby Tr. at 129:22-130:6.)

-24-

(Fed. Cir. 2009) (no disavowal where statements during prosecution of a related patent addressed different claim language) (collecting cases).

*Third*, to the extent that AutoStore rests its disavowal argument on foreign patent materials, these documents cannot establish disavowal that is not supported by the intrinsic record. Indeed, the Federal Circuit has cautioned lower courts against using such materials, which often depend on "theories and laws of patentability" differing from U.S. patent law. *AIA Eng'g Ltd.* v. *Magotteaux Int'l S/A*, 657 F.3d 1264, 1279 (Fed. Cir. 2011). Moreover, even setting aside the foreign law issue, AutoStore has not shown that Ocado's statements constitute a clear and unmistakable disavowal of claim scope in the context of the '602 and '051 Patents.

Even setting aside disavowal, AutoStore's proposed construction violates canons of claim construction because it would render a claim limitation redundant. The relevant claims recite that the robot also "will not obstruct [another] device occupying or traversing an adjacent grid space in the X direction and . . . an adjacent grid space in the Y direction" (the "non-obstruction limitation"). ('602 Patent claims 1, 12.) As Dr. Pfeifer observed, and as Dr. Derby conceded at deposition, a robot with a size limited to a single grid space necessarily satisfies the non-obstruction limitation, which means that separate limitation would have no meaning. (*See* Pfeifer Decl. ¶¶ 38-40; Derby Tr. at 110:1-7 ("Q. So under your reading of the [non-]obstruction limitation, a robot that meets the [non-]obstruction limitation would also meet the 'occupy a grid space' limitation, correct? A. Yes. Q. And the same is true vice versa, correct? A. Yes.").) Adopting AutoStore's construction thus would violate the "well-established rule" that claims must be interpreted "such that words in a claim are not rendered superfluous." *Digital-Vending Servs. Int'l, LLC* v. *University of Phx., Inc.*, 672 F.3d 1270, 1275 (Fed. Cir. 2012).

-25-

**B.    "the load handling device will not obstruct a load handling device occupying or traversing an adjacent grid space in the X-direction and will not obstruct a load handling device occupying or traversing an adjacent grid space in the Y-direction"**

| Ocado's Construction | AutoStore's Construction |
|---|---|
| plain and ordinary meaning | the load handling device will not obstruct a load handling device occupying or traversing any of the four adjacent grid spaces |

Claims 1 and 12 provide that the load-handling device (*i.e.*, robot) must "not obstruct [another] device occupying or traversing an adjacent grid space in the X-direction" or "traversing an adjacent grid space in the Y-direction." The crux of the dispute concerns what it means for a second robot to be able to traverse "an adjacent grid space" in the X direction and in the Y direction. Like the phrase "[to] occupy a grid space," the non-obstruction limitation is written in plain English, and thus requires no construction. *See Phillips*, 415 F.3d at 1314. The indefinite article "a" or "an" means "at least one." *Crystal Semiconductor*, 246 F.3d at 1347 (emphasis removed). Thus, the plain and ordinary meaning of this term is that the robots must be able to pass one another on at least one side in the X-direction and on at least one side in the Y-direction. By contrast, AutoStore's construction "improper[ly]" rewrites the limitation to add a new requirement, not present in the claim language, *see Hoganas AB* v. *Dresser Indus., Inc.*, 9 F.3d 948, 950 (Fed. Cir. 1993), that the devices are able to pass one another on ***all four*** sides. AutoStore's rewriting of the claim language is starkly illustrated below:

| Claim Language<br>(Claim 12) | AutoStore's Construction |
|---|---|
| the load handling device will not obstruct a load handling device occupying or traversing an adjacent grid space in the X-direction and will not obstruct a load handling device occupying or traversing an adjacent grid space in the Y-direction | the load handling device will not obstruct a load handling device occupying or traversing ~~an adjacent grid space in the X-direction and will not obstruct a load handling device occupying or traversing an adjacent grid space in the Y-direction~~ **any of the four adjacent grid spaces** |

AutoStore apparently contends—without any supporting expert testimony—that disavowal justifies changing what the claims require, effectively repeating the only-single-space argument above (*i.e.*, such a single space robot allows passing on all four sides). This all-four-sides disavowal argument fails for the same reasons provided above in connection with AutoStore's only-single-space disavowal argument. *See* pages 22-25, *supra*. AutoStore's two disavowal arguments should fall together.

### C. "wheel hub motor"

| Ocado's Construction | AutoStore's Construction |
|---|---|
| plain and ordinary meaning: a motor that is integrated within a hub of a wheel | an electric motor situated at or at least partly within the wheels of the vehicle |

Claims 6, 10, and 17 require the load-handling device (*i.e.*, robot) to include a "wheel hub motor." The parties' dispute hinges on the appropriate source from which to draw the claim term's meaning: the specification of the '602 Patent, as Ocado contends, or the construction of a different term in an IPR proceeding concerning an unrelated patent, as AutoStore proposes.

The Federal Circuit's answer is clear: The patentee's choice of words in the claims and specification is the "single best guide" to a claim term's meaning. *Phillips*, 415 F.3d at 1314-15. Here, the specification describes a robot with "motors integrated within the wheel hubs" ('602 Patent 6:1-2) and "motorised hub wheels, with each wheel having a motor integrated within a hub of the wheel" (*id.* 11:52-54). (*See* Pfeifer Decl. ¶ 42; Pfeifer Sur-rebuttal ¶¶ 32.) Moreover, as Dr. Pfeifer testified and Dr. Derby conceded, a "wheel hub motor" is distinct from "a motor 'located adjacent the wheel' (*i.e.*, a motor 'situated at' the wheel)." (Pfeifer Sur-rebuttal ¶¶ 32 (citing '602 Patent 11:45-47, 11:52-54); Derby Tr. at 36:10-18, 45:19-22 (conceding that "wheel hub motor[s]" and "motor[s] adjacent to the wheel" are distinct "sort[s] of motors").) The former

helps to "reduce[] the size of the load-handling device," a key objective of the invention; the latter does not.  ('602 Patent 6:4-6; *see* Pfeifer Decl. ¶ 42.)

AutoStore's expert, Dr. Derby, dismisses the above-noted specification language as mere embodiments of a wheel hub motor.  (Derby Rebuttal ¶¶ 53-55.)  That misses the point.  Although the very specific designs for a wheel hub motor in the specification (*e.g.*, Figure 17) are indeed embodiments, that does not alter the fundamental characteristic of a wheel hub motor—*i.e.*, that the motor is integrated within the hub of the wheel (no matter the particular design or embodiment).

The claim language itself also demonstrates that a "wheel hub motor" is a motor integrated within a hub of a wheel.  Claims 6, 10, and 17 state that "one or more" of the robot's "set[s] of wheels" "*comprises* a wheel hub motor."  ('602 Patent, claims 6, 10, 17.)  As Dr. Derby agreed, the term "'comprise[s]'" is synonymous with 'include[s].'"  (Derby Tr. at 86:24-87:2.)  *See also* MPEP § 2111.03 (June 2020) ("The transitional term 'comprising' . . . is synonymous with 'including,' 'containing', or 'characterized by.'").  By logic, if the "set[s] of wheels" include or contain the motor, the motor necessarily is integrated within the wheel.

AutoStore swims far away from the '602 and '051 Patents and urges the Court to study a very different patent owned by AutoStore, U.S. Patent No. 10,474,140 ("'140 Patent").  The claims in that patent used very different language:  "driving means situated at or at least partly within" the "vehicle rolling means."  (*See* '140 Patent claim 1.)  But the Federal Circuit's precedent rejects AutoStore's argument because "an unrelated patent sheds no light on the claims in the patent at issue."  *Goldenberg* v. *Cytogen, Inc.*, 373 F.3d 1158, 1167-68 (Fed. Cir. 2004) (quotations omitted); *see also Trustees of Columbia Univ.* v. *Symantec Corp.*, 811 F.3d 1359, 1369-71 (Fed. Cir. 2016) (holding it is reversible error to construe a term based on how it was used in a "separate

[patent] famil[y]" claiming a "different invention[]," even where both patents had an "inventor in common").

Moreover, even if the law allowed the '602 and '051 Patents to be construed based on the '140 Patent (it does not), AutoStore's sole argument is unavailing. In his declaration, Dr. Derby argued Dr. Pfeifer's IPR testimony regarding the '140 Patent equated "wheel hub motor" with "an electric motor that is situated at or at least partly within the wheels of the vehicle." (Derby Rebuttal ¶ 56.) But, at deposition, Dr. Derby walked away from that opinion, admitting Dr. Pfeifer had only explained that "driving means situated at or at least partly within the . . . vehicle rolling means"—AutoStore's very different claim language in the '140 Patent—described a motor that is "part of the wheel itself," *i.e.*, an "'in-wheel' or 'wheel-hub' motor." (Derby Tr. at 73:7-74:20; *see* Ex. 33, Derby Dep. Ex. 7 ¶¶ 78-80.)[20] With Dr. Derby being unwilling to endorse under oath the statements in his declaration, AutoStore has no argument.

## III.   U.S. PATENT NO. 10,961,051

### A.   "housing footprint"

The parties agree that the Court should give the term "housing footprint" in claims 1 and 13 of the '051 Patent should be given its plain and ordinary meaning, but AutoStore again advocates re-writing the claims, as shown in the below table:

| Claim Language | AutoStore's Construction |
|---|---|
| housing footprint | ~~housing~~ footprint **of the load handling device's housing and not extensions from the housing** |

AutoStore improperly attempts to draw a distinction between the housing and what it calls an "extension from the housing"—a term appearing nowhere in the claims or specification.

---

[20] In fact, as Dr. Pfeifer pointed out, this reading is consistent with what AutoStore itself told foreign patent authorities: namely, that the words "'situated *at*' should be interpreted as 'situated *in*' and that [motors 'situated *at*' the 'rolling means'] therefore refers to *in*-wheel motors." (Ex. 34, Derby Dep. Ex. 6 at 6 (emphasis altered); *see* Derby Tr. at 73:7-74:17.)

Undoubtedly, this will lead to a convoluted non-infringement argument in which AutoStore tries to distinguish a housing from a housing extension (whatever that may mean)—a distinction foreign to the '051 Patent's claims and specification.  Whether part of the robot is within the "housing footprint" is "an argument properly addressed to factual questions of infringement, and not claim construction." *MediaCom Corp.* v. *Rates Tech., Inc.*, 4 F. Supp. 2d 17, 32 (D. Mass. 1998).  Thus, consistent with the Federal Circuit's admonition "not [to] resolve questions that do not go to claim scope, but instead go to infringement," *see IP Holdings* v. *Silver Spring Networks*, 815 F.3d 1314, 1319 (Fed. Cir. 2016), the Court should reject AutoStore's proposed rewrite of the claims.

**B.    "a housing footprint that occupies less than twice the area of the grid space"**

| Ocado's Construction | AutoStore's Construction |
|---|---|
| plain and ordinary meaning | the second housing will occupy only a single grid space in the storage system |

AutoStore once again proposes a significant re-writing of the claim, as illustrated below:

| Claim Language (Claim 1) | AutoStore's Construction |
|---|---|
| the second housing has a housing footprint that occupies less than twice the area of the grid space | the second housing ~~has a housing footprint that occupies less than twice~~ **will occupy only a single** ~~the area of the~~ grid space **in the storage system** |

The parties' dispute here—regarding the "less than twice the area" limitation in claims 1 and 13 of the '051 Patent—tracks their dispute with respect to the "occupy a grid space" limitation in claims 1 and 12 of the '602 Patent. *See* pages 20-25, *supra*.  The Court should reject AutoStore's attempt to narrow claims 1 and 13 of the '051 Patent for substantially the same reasons that it should reject AutoStore's attempt to narrow the "occupy a grid space" limitation:  A POSITA would understand the plain claim language, and AutoStore has not shown clear and unequivocal disavowal of claim scope.

-30-

The Court also should reject AutoStore's argument here because "less than two" plainly does not mean "only one." "[L]ess than two" clearly encompasses, for example, one and a half or one and a quarter. The phrase thus cannot be the equivalent of "one." Ocado respectfully requests that the Court heed the Federal Circuit's warning to "take extreme care" before "import[ing] . . . limitations that were unintended by the patentee." *Amgen, Inc.* v. *Hoechst Marion Roussel, Inc.*, 314 F.3d 1313, 1325 (Fed. Cir. 2003). AutoStore plainly is attempting to redraft the claims to mean something different from what they say—to manufacture a non-infringement argument— and that is not a proper role for claim construction.

### C. "the first set of rails is part of the first set of tracks, and the second set of rails is part of a second set of tracks"

| Ocado's Construction | AutoStore's Construction |
|---|---|
| no construction necessary / plain and ordinary meaning | indefinite |

Claims 9 and 18 provide that each of the two "set[s] of rails" that define the grid space and guide the movement of robots along the grid is part of a "set of tracks." As construing the individual claim terms themselves requires "little more than the application of the widely accepted meaning of commonly understood words," *Philips*, 415 F.3d at 1314, the Court should give these terms their plain and ordinary meaning in the context of the patent as a whole: namely, that "a 'set of rails' comprises a series of paired rails for guiding the movement of the robots' wheels in one direction, and that the paired rails are 'part of' the 'set of tracks' used to construct the grid structure" (Pfeifer Decl. ¶ 48; *see also id.* ¶¶ 49-52 (explaining how the claim language and specification "provide[] support for how a POSITA would understand the at-issue limitation[s]").) AutoStore has provided no expert testimony or other evidence to support its bald assertion that these terms are indefinite—and that the Court should invalidate the claims—and it is very difficult to see how the common terms "tracks" and "rails," as described in the '051 Patent would be

confusing to a POSITA (and difficult to see how AutoStore will carry its clear and convincing burden with no expert testimony).

## IV.   U.S. PATENT NOS. 10,901,404 AND 11,079,770[21]

### A.   "route" ('404 Patent)

| Ocado's Construction | AutoStore's Construction |
|---|---|
| plain and ordinary meaning | indefinite |

In the warehouse system of the '404 Patent, transporting devices move from one location to another on a two-dimensional grid to carry out their assigned tasks. (*E.g.*, '404 Patent 2:55-57.) The grid comprises "the potential pathways for the movement of [robots] to traverse." (*Id.* at 5:21-25, 6:10-19.) The control method claimed in claim 20 of the '404 Patent directs the movement of the robots on these pathways while avoiding collisions. Among other operations, the method includes (1) "determin[ing] a route from one location on the grid-like structure to another . . . for each transporting device," and then (2) "reserv[ing] a path on the grid-like structure for each of the transporting devices" based on the determined route, . . . such that no two transporting devices have locations . . . which would cause transporting devices to overlap at a same time." (*Id.* claim 20; *see also id.* at 2:55-62, 19:33-40.) In other words, claim 20 recites that a "route" is determined for each robot between two locations on the grid, and then "paths" are reserved such that two robots never overlap (*i.e.*, collide).

Ocado contends that the term "route," as used in claim 20, has the plain and ordinary meaning of that word, which is synonymous with "path." Common English dictionaries include "route" as one of the definitions of "path." Both terms refer to the "pathways" on the grid—a series of grid coordinates for a robot to traverse. (D'Andrea Rebuttal ¶¶ 66-67.) Although

---

[21] The '404 and '770 Patents share a common specification. Although the numbering is slightly different for each patent, the content is the same.

AutoStore acknowledges that the specification of the '404 Patent uses the words "route" and "path" interchangeably, in order to manufacture an invalidity argument, it argues that the use of both terms in claim 20 is hopelessly confusing such that the Court should find claim 20 indefinite and thus invalid.

AutoStore's invalidity argument—which was meritless to start—cannot withstand its own expert's deposition testimony.  Dr. Ioannou testified at his deposition that "in robotics and . . . in many other areas" the terms "route" and "path" are used interchangeably, and as a result he "accept[ed] that the words could be used synonymously." (Ioannou Tr. at 139:12-18.)  He also agreed that the specification of the '404 Patent itself uses "route" and "path" interchangeably, such that a POSITA "would not understand the two terms to be different."[22]  (Ioannou Decl. ¶ 163; *see also* D'Andrea Rebuttal ¶¶ 69-70; D'Andrea Tr. at 30:23-31:15.)  He also testified that a POSITA would understand that "route" and "path" are synonymous because both terms encompass a time-dependent and time-independent path (Ioannou Tr. at 159:2-160:12), such that the scope of the claims would be clear.  Dr. Ioannou's deposition testimony comports with the declarations of Ocado's expert, Dr. Rafaello D'Andrea.  (D'Andrea Rebuttal ¶¶ 66-70.)  Thus, AutoStore cannot reasonably dispute that a POSITA would understand with reasonably certainty the scope of claim 20.  A POSITA would understand that "route" and "path" refer to the same thing (generally and in the context of the '404 Patent).

AutoStore nevertheless argues that the two terms must have a different meaning because of a presumption that "different terms in the claims connotes different meanings."  *See CAE Screenplates Inc.* v. *Heinrich Fiedler GmbH & Co.*, 224 F.3d 1308, 1317 (Fed. Cir. 2000).  But that is not a strong presumption, and it may be overcome by "evidence to the contrary," *see id.*,

---

[22] To take just two examples, the specification (1) describes the use of "path" finding algorithms to determine preferred routes and (2) explains that "the reservation module" in the system both reserves "various paths on the grid" and also "reserve[s] routes in advance."  ('404 Patent 19:30-45; 22:12-14.)

including evidence that the terms are used interchangeably in the specification. *See Nystrom* v. *TREX Co.*, 424 F.3d 1136, 1143 (Fed. Cir. 2005). Here, the expert testimony combined with the specification is more than enough to rebut the weak presumption, and AutoStore fails to carry its ultimate clear and convincing burden to show that the Court should invalidate the claim.[23]

**B.      "clearance instruction" ('404 Patent) / "clearance command" ('770 Patent)**

| Ocado's Construction | AutoStore's Construction |
|---|---|
| plain and ordinary meaning / alternatively, an [instruction/command] for a robot to traverse a portion of a reserved path, issued when the clearance module checks that the robot will not collide with another robot | permission [instruction] issued when the clearance unit checks that the robot will not collide with another robot |

Claim 20 of the '404 Patent recites the term "clearance instruction," and claims 1-4, 6-7, 13, 23, 25, and 29-30 of the '770 Patent recite the term "clearance command."[24] In the claimed invention, the controller issues clearance instructions or commands to ensure the robots do not collide, based on their actual (as opposed to planned or reserved) movements on the grid. As Dr. D'Andrea explained, the controller "'generat[es]' or 'provid[es]' an instruction to direct the robot to 'continue along [a] planned path[],' and by withholding an instruction . . . directs the robot not to continue along that path." (D'Andrea Rebuttal ¶ 23.) To determine whether to issue or withhold the clearance instruction "as the conditions on the grid change," the controller first "checks whether it will be possible for the [] robot to collide with another robot" by determining whether "it is possible that [the] two robots would be within the same portion of a path during some period." (*Id.* ¶¶ 25, 27 (citing '404 Patent 9:7-8; 18:39-40, 18:46-48; 19:1-5; 21:1-3).)

---

[23] Dr. Ioannou also points to the prosecution of a foreign counterpart of the '404 Patent in which Ocado swapped the terms "path" and "route" in certain claims. (Ioannou Sur-rebuttal ¶ 43.) But, if anything, Ocado's willingness to do this to advance prosecution of the foreign application shows that it understood the terms to have the same meaning.

[24] This section will use "clearance instruction" as a shorthand to refer to both terms.

Ocado contends that the terms "clearance instruction" and "clearance command" should be given their plain and ordinary meaning: an "instruction [or command] for a robot to traverse a portion of a reserved path, issued when the clearance module checks that the robot will not collide with another robot." AutoStore contends that the Court should change the claim language, such that the claims are limited to a "permission." As a preliminary matter, the dispute between the parties no longer is clear. Dr. Ioannou testified at deposition that a "permission" encompasses move commands, such as a control tower instructing an airplane pilot to "go to 36,000 feet" or "start landing [the plane] now." (Ioannou Tr. at 118:7-119:7.) If "permission" encompasses move commands—as Dr. Ioannou testified—there is no material dispute between the parties.

Although Dr. Ioannou's deposition seems to have mooted the issue, AutoStore originally contended that a "permission" is something narrower than a "clearance instruction" or "clearance command." To the extent that remains an argument, it should be rejected. The claim language recites (i) an instruction "for each transporting device to traverse a portion of the reserved path," or (ii) a command to "cause the plurality of transporting devices to travel on the pathways." The claim language is clear on its own (*see* D'Andrea Rebuttal ¶¶ 47, 49), and there is no reason to narrow the claims or replace one word (*e.g.*, command) with another word (*i.e.*, permission) as AutoStore requests.

The contrast between independent claim 1 of the '770 Patent and dependent claim 2 (copied below) also establishes that a "clearance command" legally cannot be limited to a "permission." Claim 2 recites:

> The system of claim 1, wherein the plurality of *clearance commands indicate a permission* for the plurality of transporting devices to travel on the pathways only along the portions of the plurality of paths.

Claim 2 describes a system in which clearance commands "indicate a permission," which logically means that clearance commands cannot be limited to permissions. That also is true as a matter of

-35-

U.S. patent law:  Where "a dependent claim [] adds a particular limitation," courts presume that the same limitation "is not present in the independent claim." *Phillips*, 415 F.3d at 1314-15.  *See also InterDigital Comms., LLC* v. *ITC*, 690 F.3d 1318, 1324 (Fed. Cir. 2012).

Ocado's broader construction is also supported by the specification, which states that "commands" or "command sets" may be provided to the robots to perform various tasks and operations, including to move along the "one or more paths."  ('404 Patent 19:51-54, 20:4-7, 20:21-27.)  It further explains that, "[u]pon providing a robot with a new instruction, the clearance module [in the controller] . . . checks that it will not be possible to collide with another robot" (*id.* at 18:38-40), but that portion of the specification never mentions, must less requires, a separate movement instruction, which necessarily would be required if a clearance instruction was limited to a "permission" as AutoStore argues.

Additionally, the specification describes an embodiment of the invention as including a clearance system that "***may be used*** to grant permissions to robots to continue along their planned paths."  (*Id.* at 18:47-48 (emphasis added).)  Although AutoStore previously pointed to this portion of the specification as support, it cuts sharply against AutoStore's proposal to narrow the claims.  As Dr. Ioannou testified, "may" gives "wider functionality" to the clearance system, such that the system is not limited to granting "permissions."  (Ioannou Tr. at 107:1-5.)  And it is well-settled law that a court should not "read limitations from the embodiments . . . into the claims." *MasterMine Software, Inc.* v. *Microsoft Corp.*, 874 F.3d 1307, 1310 (Fed. Cir. 2017).  Yet that is exactly what AutoStore seeks to do—*i.e.*, take optional functionality of the clearance system (granting "permissions") and impose that limitation on broader claims language.  That is clear legal error.

### C.    "execution . . . at a future time" ('404 Patent)

| Ocado's Construction | AutoStore's Construction |
|---|---|
| plain and ordinary meaning | indefinite |

The '404 patent discloses the benefits of "send[ing] control messages to the one or more robots in anticipation of future movements," including "reducing the processor load, and also proactively managing the traffic load with respect to the communications link[]." ('404 Patent 10:53-58; *see id*. 9:34-35, 20:10-14, 20:20-22.) Claim 20 of the '404 Patent recites a method that achieves those benefits by providing clearance instructions "for execution . . . at a future time." Ocado contends that the claim language is clear as written. AutoStore contends that the Court should find the claim invalid as indefinite because, it asserts, a POSITA would not know how much delay between the provision and execution of the clearance instruction constitutes "at a future time." (*See*, *e.g.*, Ioannou Decl. ¶ 134.) This is wrong, for several reasons.

First, the specification of the '404 Patent provides substantial guidance on what "execution . . . at a future time" means. The specification describes that "instruction sets may be sent for the coordination of future [robot] movements" by "pre-populat[ing]," instructions for future movements, and "these instructions may then be provided to the robot . . . to be executed at a future time." ('404 Patent 20:10-15, 20:21-23; *see also id*. at 9:34-35, 10:53-56.)

Going further, the specification contrasts instructions to be executed "at a future time" to control the robot's *future* movement with those directed to its *current* movement—that is, the robot's "current clearance." ('404 Patent 10:49-53, 18:57-59, 21:1-3; *see also id*. at 18:44-45, 20:56-58 (describing "a command sequence number").) Based on these disclosures, a POSITA would understand that clearance instructions can be provided either for (i) execution immediately upon receipt by the robot (*e.g.*, a command for a robot at rest to move forward immediately upon receipt of the instruction), or (ii) execution at a future time to coordinate anticipated future

movement (*e.g.*, a command that in t plus 10 seconds, the robot should move left).  (D'Andrea Rebuttal ¶ 38; D'Andrea Sur-rebuttal ¶ 22; *see also* Ioannou Tr. at 80:8-25 (agreeing that a command may direct a vehicle to move as soon as possible after the command is received), 82:4-22 (agreeing that a command also may be sent to instruct the vehicle to move only after a delay).)

Dr. D'Andrea provided an example:  a robot receiving and executing instructions at a time $t_0$ to control current movement ("clearance instruction 0") as well as "prepopulated" instructions to control future movements ("clearance instruction 1" through "clearance instruction n"). (D'Andrea Sur-rebuttal ¶ 24.)   In this example, the prepopulated instructions are intended for execution "at a future time" ($t_1$), only after the current movement instruction is completed.  (*See Id.* ¶¶ 24-25; D'Andrea Tr. at 109:8-15.)  Of course, the time interval between receipt by the robot of a future-movement instruction and execution will vary from system to system, but the duration of the delay is not relevant.  As Dr. Ioannou acknowledged at his deposition, regardless of whether the interval is "two weeks" or "50 milliseconds," both are at a "future time."   (Ioannou Tr. at 97:23-98:14.)

In short, AutoStore's attempt to invalidate claim 20 as indefinite is based on a red herring. It does not matter "how much" delay constitutes "execution . . . at a future time" because a POSITA would understand that the claim language distinguishes between (i) a current movement instruction for execution immediately upon receipt by the robot, and (ii) a future movement instruction for execution at a future time, whether .005 milliseconds or two minutes after receipt.[25]

---

[25] At his deposition, Dr. Ioannou admitted that he reads "for execution . . . at a future time" as "intended for" execution at a future time.  (Ioannou Tr. at 88:13-20.)  This brings additional certainty to the scope of the claim because a POSITA readily could distinguish between an instruction programmed and intended for immediate execution and one programmed and intended for execution at some time delay after receipt.

D.      "one or more processors configured to . . ." ('770 Patent)

| Ocado's Construction | AutoStore's Construction |
| --- | --- |
| plain and ordinary meaning | indefinite |

The control systems claimed in the '770 Patent include "one or more processors configured to" perform operations recited in the claims that control the movement of the robots and avoid collisions. (*See* '770 Patent, claims 1, 3, 7-13, 15, 17-19, 21-22, 27.)[26]  The term "one or more processors" describes a structural component of the claimed system, configured to perform defined operations, and the claim language is clear without modification.  AutoStore contends that these limitations should be construed as MPF terms pursuant to 35 U.S.C. § 112(f), and that, as a result, the claims are indefinite because the specification fails to provide a specific "algorithm" corresponding to each "function."

As an initial matter, even if the Court were to conclude that the "one or more processors" limitation should be construed as an MPF limitation, the claims are not indefinite.  As Dr. D'Andrea explained in his declarations, the specification of the '770 Patent discloses corresponding structure for the claims:  the process steps for generating or withholding the clearance commands.  (*See* D'Andrea Decl. ¶¶ 31-32; D'Andrea Rebuttal ¶¶ 24-26; D'Andrea Sur-rebuttal ¶¶ 16-19.)  *See also Finisar Corp.* v. *DirecTV Grp., Inc.*, 523 F.3d 1323, 1340 (Fed. Cir. 2008) (structure of computer implemented invention may be disclosed "in any understandable terms including . . . in prose").

However, the Court need not even reach that issue because the "one or more processors" limitation is not an MPF limitation because the term "processor" connotes a class of known

---

[26] Claims 29 and 30 of the '770 Patent are directed to methods carried out "by the one or more processors."  AutoStore contends that these claims should be construed as "means plus step" claims under § 112(f).  For the same reasons provided below, these claims recite sufficient structure to avoid construction under § 112(f), and should be given their ordinary meaning.

structures.  A "claim is not drafted in means-plus-function format," even if it recites some function, if the claim itself also recites a structure for performing that function.  *Dyfan, LLC* v. *Target Corp.*, 28 F.4th 1360, 1365 (Fed. Cir. 2022); *see also Greenberg* v. *Ethicon Endo-Surgery, Inc.*, 91 F.3d 1580, 1583 (Fed. Cir. 1996) ("What is important [in avoiding construction as an MPF term] is . . . that the term, as the name for structure, has a reasonably well understood meaning in the art.").

There is no dispute that the term "processor" describes a class of structures that was well known to a POSITA as of the priority date of the '770 Patent (June 3, 2014).  *See Dyfan*, 28 F.4th at 1366 (term may "describe a class of structures" and still recite "sufficiently definite structure" to avoid MPF treatment.)  As Dr. D'Andrea testified, "a POSITA would readily understand this claim term to refer to a class of physical structures."  (D'Andrea Rebuttal ¶ 84; *see also id.* ¶ 85 ("processor" is defined by the Authoritative Dictionary of IEEE Standard Terms as a structure: "A device that interprets and executes instructions, consisting of at least an instruction control unit and an arithmetic unit.").)  AutoStore's expert Dr. Ioannou also testified at deposition that a processor "is a physical structure."  (Ioannou Tr. at 167:22-25; *see also id.* at 167:10-11 (a processor is "a piece of hardware . . . some chip"), 169:24-170:8 (agreeing that Intel i7 processor is "one example of many commercially-available processors around the priority date")).)  The specification also confirms the structural nature of a "processor" by describing particular processors or processor-containing hardware structures on which the controller may be implemented, such as a "central processing unit" or "CPU" (*see* '770 Patent fig. 1), a "server" (*see id.* fig. 2), and "a desktop computer, laptop computer, table computer or wireless handheld."  (*Id.* 20:57-67; 21:26-29; figs. 1 & 2; *see also id.* 10:19-23 ("The robot control system 202 may be implemented using one or more servers each containing one or more processors.").)

-40-

Despite Dr. Ioannou's admission that the term "processor" recites well-known structure, AutoStore takes a contrary position and argues that the claims recite nothing more than "means" to perform a "function."  But this argument encounters several insurmountable hurdles.  *First*, the claims do not use the word "means," and thus the law requires the presumption "that [the] claim limitation is not drafted in means plus function format." *Dyfan*, 28 F.4th at 1365.  To overcome that presumption, AutoStore needs something it lacks, especially in light of its expert's deposition admissions:  "compelling" evidence that a POSITA would not understand the term processor "to have a sufficiently definite meaning as the name for structure." *Id*. at 1365-66.

*Second*, less than four months ago a Federal Circuit panel confirmed that "processor" recites sufficient structure to avoid MPF construction.[27]  In *VDPP LLC* v. *Vizio, Inc.*, 2022 WL 885771 (Fed. Cir. Mar. 25, 2022) (unpublished), the defendant argued, just as AutoStore argues here, that claim language reciting a "processor adapted to" carry out operations recited in the claims described no more than a "means" for performing functions. *Id.* at *2.  The panel rejected the argument, holding that to a POSITA, the term "processor" describes a "structure" that "existed in the prior art at the time of the invention." *Id.* at *3-4 (quotations and alterations omitted).  While acknowledging that "processor" inherently connotes **some** function, the panel found that a POSITA would still understand "processors" to be more than "black boxes for performance of a function."  *Id.* at *3-4 (quotations and alterations omitted) ("The mere fact that the disputed limitations incorporate functional language does not automatically convert them into means for performing such functions." (quoting *Zeroclick, LLC* v. *Apple Inc.*, 891 F.3d 1003, 1008 (Fed. Cir.

___

[27] It is worth noting that MPF construction is a drafting choice, not a punishment.  *Media Rts. Techs., Inc.* v. *Capital One Fin. Corp.*, 800 F.3d 1366, 1371 (Fed. Cir. 2015).  Drafting claims as MPF under § 112(f) gives a patentee certain advantages and flexibility in drafting claims, but whether to take advantage of that provision is entirely up to the patentee.  Here, Ocado chose not to take advantage of § 112(f) and claimed a system limited to known structural components (*i.e.*, processors configured to perform defined operations).

2018) (alteration omitted)).  And when it came to the operations that the claimed processor was "adapted to" perform, the Federal Circuit said it was irrelevant whether the specification disclosed specific algorithms to perform those operations because the claim was not drafted in MPF form. *Id*. at *3.  *VDPP* should be dispositive here.  *See XR Comm. LLC* v. *D-Link Sys., Inc.*, 2022 WL 2291747, at *4-5 (C.D. Cal. Apr. 18, 2022) (relying on *VDPP* to find that "the term 'processor' connotes structure" and holding that limitation reciting "a processor configured to" was not an MPF limitation).  The *VDPP* panel's holding follows the Federal Circuit's published decision in *Samsung Electronics America, Inc.* v. *Prisua Engineering Corp.*, 948 F.3d 1342, 1354 (Fed. Cir. 2020), holding that the similar term "digital processing unit" sufficiently describes a "class of known structures" to avoid MPF treatment.  The panel's holding in *VDPP* is also consistent with numerous earlier district court decisions holding limitations using that the term "processor" recited sufficient structure to avoid MPF construction.[28]

Moreover, the claims of the '770 patent also recite additional structure beyond the term "processor."  For example, claim 1 provides details on the structure of the overall system, specifying that the "one or more processors" are connected to another well-known structure, a "memory device" for storing the output ("clearance commands") of the processors.  The claims also recite additional structure by reciting how the "processor" operates to achieve the objectives of the claim.  *See*, *e.g.*, *Linear Tech. Corp.* v. *Impala Linear Corp.*, 379 F.3d 1311, 1321

---

[28] *See*, *e.g.*, *CA, Inc.* v. *Netflix, Inc.*, 2021 WL 5323413, at *21 (E.D. Tex. Nov. 16, 2021); ("processor operable to" should not be construed as MPF term); *Blue Spike LLC* v. *Grande Comms. Inc.*, 2021 WL 5094911, at *26 (E.D. Tex. Nov. 2, 2021) ("processor" describes "a broad class of structures" and is not a "means plus function term"); *Cellular Comms. Equip. LLC* v. *AT&T, Inc.*, 2016 WL 7364266, at *15 (E.D. Tex. Dec. 19, 2018) ("'processor' . . . connotes a class of structures"); *Savvy Dog Sys., LLC* v. *Pennsylvania Coins, LLC*, 2020 WL 7488878, at *9-10 (M.D. Penn. Dec. 21, 2020) ("[T]he court finds that 'game processor' provides sufficiently definite structure such that Defendants have not overcome the presumption of a non-'means' term."); *Realtime Adaptive Streaming LLC* v. *Adobe Sys.*, 2019 WL 13039644, at *16-17 (C.D. Cal. July 25, 2019); *Quanergy Sys., Inc.* v. *Velodyne Lidar, Inc.*, 2017 WL 4410174, at *16-19 (N.D. Cal. Oct. 4, 2017); *Nomadix, Inc.* v. *Hospitality Core Servs. LLC*, 2016 WL 344461, at *5-8 (C.D. Cal. Jan. 27, 2016); *Odyssey Wireless, Inc.* v. *Apple Inc.*, 2016 WL 3055900, at *11-12 (S.D. Cal. Mar. 30, 2016).

(Fed. Cir. 2004); *Uniloc USA Inc.* v. *Autodesk, Inc.*, 2016 WL 3647977, at *19-20 (E.D. Tex. July 7, 2016) ("The claims connote that the 'add-on computer software code' is structural by describing how [it] operates within the claimed invention to achieve its objectives."). In *Uniloc*, for example, the court rejected MPF construction of the term "add-on computer software code" where the claim limitations recited that the code:

> runs within the software design tool, inserts specific symbols into a drawing provided by the software design tool, transmits specific symbol data from the local computer to the pricing-data database, receives specific pricing data based on the symbols from the database, and generates a specific pricing schedule using the received pricing data.

*Uniloc*, 2016 WL 3647977, at *19. Here, as in *Uniloc*, the claims describe how the processors operate within the claimed invention to achieve the objectives of each limitation. (D'Andrea Rebuttal ¶ 86.) For example, claim 1 recites that the processors are configured to perform specific operations described in the claim, *e.g.*, to "***determine*** [calculate] a plurality of [non-overlapping] paths" for a plurality of robots, "***generate*** a plurality of clearance commands" for those robots, and "***determine*** there is a potential for a collision" between two of those robots. ('770 Patent claim 1 (emphasis added).) Then, ***in response to that determination***, the processors are configured to "***withhold*** a second clearance command" for one of the robots, "***determine*** a revised path" for that robot, and "***generate*** a third clearance command for that robot. (*Id.* (emphasis added).)[29]

---

[29] Dr. D'Andrea testified that, based on the descriptions in the specification, it would have been "straight forward" for a POSITA to write any code needed to direct the processors to perform the operations recited in claim 1. (D'Andrea Tr. at 64:2-21, 78:3-20, 216:8-16.) Dr. Ioannou did not dispute this. He testified at deposition that processors available as of the priority date of the '770 Patent could perform the generic operations necessary to carry out the claimed operations, including receiving input data and generating outputs (such as commands or instructions to other devices), using data to perform calculations and determine results, comparing data, and issuing commands in response to such comparisons. (Ioannou Tr. at 178:6-179:11, 182:6-183:15; Ex. 35, Ioannou Dep. Ex. 20.) He also admitted that a POSITA would understand that processors available as of the priority date could be configured, with software, to operate as recited in claim 1. (Ioannou Tr. at 195:9-196:15, 210:7-211:12.) Dr. Ioannou also testified that a POSITA would be able to write such software using "software packages" available since the 1980s, such as the MATLAB library. (*Id.* at 14:24-15:13, 26:4-27:10 (admitting that MATLAB library could be used to generate code to solve equations relating to robot movement, *e.g.*, to calculate the positions of the robots (as would be required to issue clearance commands)).)

Despite the extensive recitation of structure in the claims themselves, AutoStore contends that the claims are indefinite because the specification does not disclose specific "algorithms" to write software to perform each operation that the "one or more processors" are "configured" to carry out.  (*See* Ioannou Decl. ¶¶ 175-79.)  This puts the cart before the horse, because the question of a disclosed algorithm arises only if a claim term is first determined to be MPF.  *Dyfan*, 28 F.4th at 1365.  When the limitation itself recites structure, as is the case here, "it is not drafted in [MPF] format" and whether or not the specification discloses "algorithms" corresponding to the claim limitations is entirely irrelevant.  *Id.*; *see Razor USA LLC* v. *DGL Grp., Ltd.*, 2021 WL 651257, at *18 (D.N.J. Feb. 19, 2021) (rejecting argument that specification failed to describe "an algorithm for performing the claimed functions" because "[d]efendant must first prove that the presumption (that Plaintiff did not invoke [MPF] claiming) has been overcome.)").  Indeed, AutoStore's argument is exactly the one that the Federal Circuit rejected in *VDPP*.  2022 WL 885771, at *3.

AutoStore has presented no evidence that a POSITA would *not* recognize "one or more processors" as a reference to structure and, accordingly, it has failed to rebut the presumption that the limitations of the '770 Patent are not MPF.  To the contrary, there is overwhelming evidence showing that the term "processor" itself recites structure, and that the claim limitations recite additional structure such as the specific operation of the processors as part of the claimed invention. Where the evidence establishes that "a claim term itself connotes some structure to a [POSITA], the presumption that [Section 112(f)] does not apply is determinative."  *Dyfan*, 28 F.4th at 1366 (quotations omitted).

E.      "potential for a collision" ('770 Patent)

| Ocado's Construction | AutoStore's Construction |
|---|---|
| no construction necessary / plain and ordinary meaning | indefinite |

The invention of the '770 Patent avoids collisions by withholding a clearance command after "determin[ing] there is a potential for a collision" between two robots if it were to issue the command. (*See* '770 Patent claims 1, 8-10, 12, 27, 29.) Ocado contends that the term "potential for collision" is clear—there either is or is not the potential for a collision based on the available information. AutoStore contends, yet again, that the claim term is hopelessly confusing and thus that the Court should invalidate all of the patent claims.

AutoStore's proposed construction is inconsistent with the '770 Patent's description of what the control system does prior to issuing or withholding a clearance command. The specification discloses that the controller "checks that *it will not be possible* to collide with another robot" based on, for example, the grid dimensions and current positions and speed of other robots on the grid. (*Id.* 18:19-26 (emphasis added); *see also* D'Andrea Tr. at 184:25-185:8).) It further explains that a "conflict[]" can occur whenever two robots can "overlap[]" at a particular grid location during a given "span of time." ('770 Patent 19:18-26.)

AutoStore asserts that "potential for collision" is indefinite because the '770 Patent does not disclose what "probability of a collision reaches to the level of being considered to be a 'potential for a collision.'" (Ioannou Decl. ¶ 198.) But this is another manufactured issue that conflates "probability" (*i.e.*, AutoStore's argument) with "potential" / "possibility" (*i.e.*, what the claims and specification say). Determining that there is "*potential* for collision" or "that it will not be *possible*" for two robots to collide is entirely different from an assessment of the *probability*

that a collision will occur.[30]  That patent claims concern the first concept, not the second, and the first concept does not involve probabilities.

As Dr. D'Andrea explained in his declaration, a controller "determin[es] the potential for collision" when it determines that either (1) a conflict is capable of occurring because two robots may attempt to occupy the same position on the grid at the same time (based on the information available to the control system), or (2) such a conflict "will not be possible" as described in the specification of the '770 Patent.  (D'Andrea Decl. ¶¶ 57-59.)  A POSITA would understand that this determination is a binary, "yes or no" decision "regarding whether a collision might occur based on the information available to it."  (D'Andrea Rebuttal ¶ 90; see also D'Andrea Sur-rebuttal ¶ 40.)  Calculating a particular numeric probability is unnecessary because any probability of collision above zero (i.e., a potential or possibility) is not allowed by the system.  As Dr. D'Andrea testified at his deposition, "'determin[ing] there's a potential for a collision' means you cannot guarantee that there won't be a collision," i.e., "that you cannot exclude that [a collision] won't occur."  (D'Andrea Tr. at 182:1-184:8.)

AutoStore's own expert agrees with Ocado and all but abandoned AutoStore during his deposition.  Dr. Ioannou had to admit that a POSITA would understand that a system controller could check for potential collisions in exactly the manner claimed in the '770 Patent—"as a binary token choice, possible collision or no collision."  (Ioannou Tr. at 226:20-23.)  In fact, Dr. Ioannou wrote a paper in 2002 describing how that might be done for trucks merging on a road, where the trucks are allowed to move into the road only after checking that there is no "collision possibility."

---

[30] The claimed invention does not play dice with robot collisions and withhold a clearance command, for example, only if the probability of collision is greater than 95%.  The claimed invention withholds a clearance command if there is *any* potential or possibility for a collision based on all of the available information.  Those are two different approaches to a control system, and the claimed invention is not indefinite; rather, it concerns the latter approach to robot control.

(*Id.* at 213:17-214:17 (identifying paper (Ioannou Dep. Ex. 20) as his own work).)  The system described in this paper, like the one claimed in the '770 Patent, did not "comput[e] actual probabilities" and instead made a binary, yes/no choice:  "no collision possibility" or "collision possibility exists."  (*See id.* at 231:4-232:21.)  And Dr. Ioannou eventually admitted that there was no reason the "yes or no" system that he described in his paper could not be implemented as described in the specification of the '770 Patent—*i.e.*, checking "that it will not be *possible*" for two robots to collide.  (Ioannou Tr. at 252:22-254:5)

Because "determining there is a potential for a collision" is a binary decision, a POSITA would have no trouble ascertaining whether a control system fell within or outside of the claims. The claimed invention is not concerned with probabilities, and this is yet another manufactured dispute so that AutoStore can argue that the Court should invalidate all of Ocado's patent claims. The claims are not indefinite, and the Court should reject AutoStore's argument.

**F.    "wherein the one or more processors are configured to control operations of the plurality of transporting devices in real time" ('770 Patent)**

| Ocado's Construction | AutoStore's Construction |
|---|---|
| wherein the one or more processors are configured to receive data from the plurality of robots, process the data, and issue instructions or commands to the plurality of robots sufficiently quickly to affect their movement | indefinite |

The control system described in claim 21 of the '770 Patent includes "one or more processors [that] are configured to control operations of the plurality of transporting devices in real time."  Ocado proposes to construe the term "real time" consistent with the specification, extrinsic evidence, and the way other courts have construed that term:  The processors receive and process data, and issue instructions to the robots, in sufficient time to control their current activities. AutoStore yet again contends that the claim term is hopelessly confusing and thus the Court should

-47-

invalidate the claim as indefinite.  This time, AutoStore contends that the term is indefinite because the specification does not disclose a specific time limit, or "latency period," that would constitute "real time."  AutoStore's bid to invalidate Ocado's patent claims again fails.

The specification explains that the controller uses a "real time" protocol to "send control messages to one or more robots, receive one or more updates from one or more robots, and communicate with one or more robots."  ('770 Patent 10:14-28, *see also id*. 19:43-46.)  Because it operates in "real time," the system is "configured to control the navigation/routing of robots, including, but not limited to, moving [the robots] from one location to another," preventing or avoiding collisions, and controlling activities to be performed by the robots.  (*Id.*)  The specification also explains that "real time" control of the "allocation of work, workstation operations, [and] the movement of robots and/or the placement of containers" allows the system to respond to changes in "activities within a warehouse" environment, "such as the fulfillment of orders, the redistribution of containers . . . , estimated dispatch sequences, maintenance operations, . . . anticipation of future orders, etc." (*Id*. at 13:21-31.)  A POSITA would understand from these disclosures that "real time" control requires the system to issue instructions quickly enough to affect the robot current movement, while avoiding collisions and responding to operational changes on the grid.  (D'Andrea Rebuttal ¶¶ 98-99; *see also* D'Andrea Decl. ¶ 64.)

Ocado's proposed construction also is supported by extrinsic evidence.  Relevant technical publications describe a real-time control system, for example, as "one which controls an environment by receiving data, processing them and returning the results sufficiently quickly to affect the functioning of the environment at that time." (Ex. 36, James Martin, *Programming Real-Time Computer Systems* 4 (1965); *see also* Ex. 37 at 3, Adrian Gambier, *Real-time Control Systems: A Tutorial, in* 2 2004 5th Asian Control Conference 1024, 1025 (2004) ("[A] real-time

task must be able to keep up with external events, with which it is concerned."); D'Andrea Decl. ¶ 63.)  Likewise, technical dictionaries in the field of the invention define "real time" as "[t]he performance of a computation during the actual time that the related physical process transpires in order that results of the computations are useful in guiding the physical process" (Ex. 38, Rudolf F. Graf, *Modern Dictionary of Electronics* 627 (7th ed. 1999)), or "[p]ertaining to a system or mode of operation in which computation is performed during the actual time that an external process occurs, in order that the computation results can be used to control, monitor, or respond in a timely manner to an external process" (Ex. 39, IEEE 100:  The Authoritative Dictionary of IEEE Standards Terms 933 (7th ed. 2000); *see also* D'Andrea Decl. ¶ 63.)[31]

The extrinsic evidence is consistent with the general knowledge of a POSITA at the time of the invention.  As Dr. D'Andrea explained, "a POSITA would be deeply familiar with the concept of a control system operating in 'real time'" and would understand that the amount of latency or delay associated with "real time" operations is based on the amount of time it takes the processors "to receive data from the plurality of robots, process the data, and issue instructions or commands to the plurality of robots sufficiently quickly to affect their movement.'"  (D'Andrea Decl. ¶¶ 66; *see also* D'Andrea Rebuttal ¶ 99.)

Thus, the concept of real-time control is the same across all control systems—regardless of the specifications of any particular system—and "real time" captures the concept of a control

---

[31] Dr. Ioannou's own publications are consistent with this extrinsic evidence.  At his deposition he discussed "Intelligent Freight Transportation," a book he edited, which defined a system operating in "real time" as one in which "the dynamics of adaptations is as fast as the dynamics of the plant."  (Ioannou Tr. at 262:1-6 (discussing Ex. 40, Ioannou Dep. Ex. 14).)  He explained that this meant that "your controller . . . should be faster than the speed of the plant.  Otherwise you never catch up." (*Id.* at 263:12-21.)  A second book he edited characterized "real time" operation as:  "the solution algorithm [*i.e.*, the controller] should be dynamic in the sense that, as the vehicle proceeds to the next destination, the algorithm should update the route assigned to the vehicle in response to . . . new information." (*Id.* at 266:25-267:9.)  Contrary to AutoStore's contrived argument, neither source defines "real time" in terms of a defined latency period.  Instead, both recognize that the term "real time" means processing data and issuing instructions quickly enough to affect current operations, as Ocado proposes.  Real time can be contrasted with a system that can only guide future operation because it is not quick enough to affect current operations.

system operating quickly enough to affect the current operations of a particular system. It does not matter that the specific time tolerances required for real-time control vary from system to system. (*See* D'Andrea Sur-rebuttal ¶ 45.)

Other courts have recognized that the term "real time" has a definite meaning in other patent claims, and those courts have rejected indefiniteness challenges (like AutoStore's) based on an alleged failure to disclose specific measures of latency. *See*, *e.g.*, *Paragon Sols., LLC* v. *Timex Corp.*, 566 F.3d 1075, 1088-94 (Fed. Cir. 2009) (recognizing that "real time" simply accounts for "some amount of time to pass to allow for both the processing limitations of the system and the time required to accurately measure the data that is to be displayed"); *Treehouse Avatar LLC* v. *Valve Corp.*, 2019 WL 6310647, at *5 (W.D. Wash. Nov. 25, 2019) ("The Court finds that the term 'real time' is not indefinite. [Defendant's] suggestion that the patent must describe the precise amount of delay . . . in order for the claim to be definite is incorrect."); *Perfect Co.* v. *Adaptics Ltd.*, 2017 WL 5068333, at *3 (W.D. Wash. Nov. 2, 2017) (rejecting defendant's argument that claim was indefinite because the term "real time" had "no upper limit"). There is no reason that the Court should not reach the same result here applying similar reasoning.

In short, the term "real time" would have a well-understood meaning to a POSITA that does not require a defined latency. Like many of AutoStore's other indefiniteness challenges, AutoStore sets up a strawman to knock it down by including additional requirements in the claim language that do not exist (*e.g.*, latency period). The Court should reject AutoStore's bid to invalidate Ocado's patent claim, and adopt Ocado's proposed construction of "real time," which is consistent with the way a POSITA would understand that term in the ordinary course.

## CONCLUSION

For the foregoing reasons, the Court should adopt Ocado's proposed constructions.

-50-

Date:  August 1, 2022

Respectfully submitted,

/s/  Henry C. Quillen
Henry C. Quillen
New Hampshire Bar No. 265420
WHATLEY KALLAS, LLP
159 Middle Street, Suite 2C
Portsmouth, New Hampshire 03801
Tel.:  (603) 294-1591
Fax:  (800) 922-4851
Email: hquillen@whatleykallas.com

Garrard R. Beeney
Marc De Leeuw
Dustin F. Guzior
Stephen J. Elliott
Laurie Stempler
Alexander N. Gross
Austin P. Mayron
Navraj S. Dhillon
*Admitted pro hac vice*
SULLIVAN & CROMWELL LLP
125 Broad Street
New York, New York 10004
Tel.:  (212) 558-4000
Fax:  (212) 558-3588
Email:  Ocado-DNH@sullcrom.com

-2-

# APPENDIX A

**Appendix A – Opinions as to Ordinary Level of Skill in the Art**

1.      **U.S. Patent No. 9,796,080**

*Ocado*:  Master's degree in mechanical engineering or robotics with at least one year of experience working as an engineer in the field of automated storage and retrieval systems, or a bachelor's degree in mechanical engineering with at least three years of experience working as an engineer in the field of automated storage and retrieval systems.  (Pfeifer Decl. ¶ 21.)

*AutoStore*:  Master's degree in mechanical engineering or robotics with at least three to four years of experience working as an engineer in the field of automated storage and retrieval systems, or a bachelor's degree in mechanical engineering with at least four to five years of experience working as an engineer in the field of automated storage and retrieval systems. (Spenko Decl. ¶ 32.)

2.      **U.S. Patent No. 10,913,602**

*Ocado*:  Bachelor's degree in mechanical engineering and at least two to three years' experience working in the field of the design of robotic vehicles for material handling systems. (Pfeifer Decl. ¶ 34.)

*AutoStore*:  Master's degree in mechanical engineering or robotics and at least three to four years of experience working as an engineer in the field of automated storage and retrieval systems, or a bachelor's degree in mechanical engineering with at least four to five years of experience working as an engineer in the field of automated storage and retrieval systems.  (Derby Rebuttal ¶ 37.)

3.      **U.S. Patent No. 10,961,051**

*Ocado*:  Bachelor's degree in mechanical engineering and at least two to three years' experience working in the field of the design of robotic vehicles for material handling systems. (Pfeifer Decl. ¶ 46.)

*AutoStore*:  No opinion.

4.      **U.S. Patent Nos. 10,901,404 and 11,079,770**

*Ocado*:   Bachelor's degree in electrical engineering, computer science, mechanical engineering, robotics, or a related field, and three to five years of experience in the design or operation of robot control systems, or a master's degree in one of those fields, or a related field, and one to three years of experience.  (D'Andrea Decl. ¶ 23.)

*AutoStore*:  Masters' degree in computer science, electrical engineering, or robotics, with a focus on path planning for automated guided vehicles, and at least two years of experience or academic research in those fields.  Additional education might compensate for less experience, and vice-versa. (Ioannou Decl. ¶ 61.)

# APPENDIX B

**Appendix B – Qualifications of Ocado's Experts**

**1.      Dr. Brian Pfeifer**

Dr. Pfeifer is a licensed Professional Engineer with more than 30 patents and pending patent applications worldwide, including for work in the design and development of robotic material handling systems.  (Pfeifer Decl. ¶¶ 14-15.)  He holds a Ph.D. in Civil Engineering from the University of Nebraska, and has more than 25 years of industry experience.  (*Id*. ¶¶ 9-13.)  He has spent most of his career working on robotic material handling systems, and is the author of numerous publications and presentations in the field.  (*Id*. ¶ 10.)

**2.      Dr. Raffaello D'Andrea**

Dr. D'Andrea is a Professor of Dynamic Systems and Control at ETH Zurich, with over 30 years of experience in developing robots and robot control systems.  (D'Andrea Decl. ¶ 10.)  He has received numerous awards for his work and research in the field of robotics, including the IEEE-IFR Invention and Entrepreneurship Award in Robotics and Automation, the Engelberger Robotics Award, and the IEEE Robotics and Automation Award.  He also has been named an IEEE fellow, inducted into the U.S. National Inventors Hall of Fame, and elected to the U.S. National Academy of Engineering.  (*Id*. ¶ 15.)

Dr. D'Andrea also is the co-founder of Kiva Systems, now Amazon Robots—a company that designs and manufactures robotic order fulfilment systems for use in warehouses.  (*Id*. at ¶ 12.)  At Kiva, Dr. D'Andrea was responsible for designing and implementing software solutions to coordinate the movement of large numbers of robots on a "virtual" grid system.  (*Id*. at ¶ 13.)  His work led to patents around the world, including U.S. Patent No. 7,912,574, which describes a system and method for coordinating the movements of large numbers of robots.  (*Id*.)