**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF NEW HAMPSHIRE**

| | |
|---|---|
| OCADO INNOVATION LTD. and OCADO SOLUTIONS LTD., | ) Case No. 1:21-cv-00041 ) ) |
| Plaintiffs, | ) **JURY TRIAL DEMANDED** ) ) |
| v. | ) ) |
| AUTOSTORE AS and AUTOSTORE SYSTEM INC., | ) ) ) |
| Defendants. | ) ) ) |

**DECLARATION OF RAFFAELLO D'ANDREA, PH.D., IN SUPPORT OF PLAINTIFFS' PROPOSED CLAIM CONSTRUCTIONS**

I, Raffaello D'Andrea, Ph.D., declare as follows:

1.      I submit this declaration at the request of Plaintiffs Ocado Innovation Ltd. and Ocado Solutions Ltd. (together, "Ocado") in the above-captioned action to provide expert opinions and testimony on claim construction with respect to United States Patent Nos. 10,901,404 (the "'404 Patent") and 11,079,770 (the "'770 Patent") (collectively, the "Asserted Patents"). I make this declaration in support of Ocado's proposed claim constructions. Unless otherwise noted, the statements made herein are based on my personal knowledge, and if called to testify in Court, I could and would testify competently and truthfully with regards to this matter.

2.      I am being compensated for my work in this matter at my standard hourly rate of CHF1250 for consulting services. My compensation in no way depends on the outcome of this proceeding or the content of my testimony.

3.      I have been asked to opine about the meaning of certain claim terms in the '404 and '770 Patents as well as contentions of Defendants AutoStore AS and AutoStore System Inc. (together, "AutoStore") that certain terms are indefinite.

4.      In forming the opinions set forth in this declaration, I have considered, in addition to my knowledge and expertise in the relevant field, various sources, which are cited herein and listed in the attached Appendix I (Materials Considered).

5.      I understand that Ocado will cite and rely on significant portions of my opinions and analysis set forth in this declaration in support of its claim construction briefing.  I have not been provided with or reviewed Ocado's claim construction briefing or any drafts of it. Accordingly, it has not influenced my opinions or analysis as set forth in this declaration.

6.      My opinions and analysis are based upon the information that I have considered to date.  I reserve the right to amend or supplement the opinions set out herein to take into account new information that becomes available to me.

7.      I also reserve the right to amend or supplement my declaration to respond to any opinions or testimony of experts retained by AutoStore in connection with the construction of any claim term at issue in this action, as well as any arguments raised by AutoStore in its claim construction briefing.

8.      I understand that the parties presently dispute the timeliness and propriety of a number of claim construction arguments that AutoStore seeks to present, including through expert testimony.  I reserve the right, if AutoStore is permitted to make these arguments, to formulate additional opinions addressing them, and to present those opinions in a declaration or at deposition.

## QUALIFICATIONS

9.      Information concerning my professional qualifications, experience, and publications, and the matters in which I have served as an expert, are set forth in my current curriculum vitae, which is attached as Appendix II (Curriculum Vitae), and my profile downloaded from Google Scholar, attached as Appendix III (Google Scholar).

10.      I am a citizen of Canada currently residing in Wollerau, Switzerland, where I am a Professor of Dynamic Systems and Control at ETH Zurich.  I have more than 30 years of experience in developing robots and the control systems that allow robots to interact and coordinate to perform tasks.

11.      I received a Bachelor of Science degree from the University of Toronto in Engineering Science in 1991, and a Master of Science in Electrical Engineering from the California Institute of Technology in 1992.  After receiving my Ph.D. in Electrical Engineering from the California Institute of Technology in 1997, I became an assistant professor in mechanical and aerospace engineering at Cornell University.  In 2003, I was promoted to associate professor at Cornell University.  My research at Cornell was directed to the design and control of autonomous, multi-agent and multi-robot systems.  Since 2007, I have been a full professor at ETH Zurich, where my research is directed to the same.

12.      In 2003, while on sabbatical from Cornell, I co-founded Kiva Systems ("Kiva")—now Amazon Robotics—a company that designs and manufactures robotic order fulfillment systems for use in warehouses.  I served as the Chief Technical Advisor for Kiva from 2007—when I joined ETH Zurich as full professor—until 2012.  In addition to my current position at ETH Zurich, I also founded and serve as CEO for a robotics company, Verity AG, and co-founded and serve as advisor for an index, advisory and research company, Robo Global Investments and

Exchange Traded Funds, which is focused on robotics, artificial intelligence and healthcare technologies.

13.     At Kiva, I directed the mechatronic design and development of robots and their control software for materials handling applications, specifically for use in retail order fulfillment applications.  Perhaps more relevant here, I was also responsible for designing and implementing software solutions to coordinate the movement of large numbers (dozens to hundreds) of robots on the "virtual" grid system used in the Kiva warehouse.  My work in this area led to numerous patents around the world including, for example, U.S. Patent No. 7,912,574, which describes the robot movement system we developed and implemented.

14.     Based on my experience, I have personal knowledge of and am intimately familiar with the use and coordination of robots in warehouse environments, as the technology has developed.  This includes the technology to which the '404 and '770 Patents are directed.

15.     I have received numerous awards for my work and research in the field of robotics, as listed in my CV attached hereto as Appendix II.  For example, I received the IEEE-IFR Invention and Entrepreneurship Award in Robotics and Automation from the Institute of Electrical and Electronics Engineers in 2008 for my work at Kiva, and was named an IEEE fellow in 2010. I have received the Engelberger Robotics Award (2015) and the IEEE Robotics and Automation Award (2016), the two most prestigious awards in the robotics community.  I was inducted into the U.S. National Inventors Hall of Fame in 2020 for my work at Kiva, and specifically for the invention of U.S. Patent No. 8,649,899, directed to "Mobile Robotic Material Handling for Order Fulfillment."  I was subsequently elected to the U.S. National Academy of Engineering in 2020 in recognition of my "contributions to the design and implementation of distributed automation systems for commercial applications."

16.     I am the author of hundreds of peer-reviewed publications, and numerous presentations, in the field of robotics and control systems.  A complete list of my publications is provided in Appendix III.  Among other relevant publications, I am a co-author, with P.R. Wurman and M. Mountz, of the article "Coordinating Hundreds of Cooperative, Autonomous Vehicles in Warehouses," published in AI magazine in 2008; this article describes the system we developed at Kiva.

17.     I am named as an inventor in more than 80 patents around the world, including more than 50 U.S. patents, as listed in Appendix III.

18.     I previously provided a declaration on behalf of Ocado in this case related to whether the claims of the '404 Patent are directed to patentable subject matter under 35 U.S.C. § 101.  In addition, I provided an expert report and witness statement on behalf of Ocado in the International Trade Commission Investigation No. 337-TA-1228, as well as an expert report and deposition on behalf of Parrot Group in the U.S. Patent and Trademark Office *inter partes* review IPR2014-00732 (U.S. Patent No. 8,106,748).  I have not provided testimony as an expert witness in any other litigation or proceeding.

**RELEVANT LEGAL STANDARDS**

19.     The opinions that I set forth in this declaration involve the application of my knowledge and experience to the evaluation of the Asserted Patents.  I have applied the following legal principles provided to me by counsel in arriving at the opinions set forth in this declaration.

20.     I understand that the claim terms must be given their plain and ordinary and meaning, as they would have been understood by a person of ordinary skill in the art ("POSITA") as of the effective filing date in view of the intrinsic record (patent specification and file history).  However, I understand that the inventors may, in the patent specification, expressly define a claim

term to have a meaning that differs from the term's plain and ordinary meaning. I also understand that the inventors may disavow or disclaim certain claim scope, thereby departing from the plain and ordinary meaning, when the intrinsic record demonstrates that a clear and unambiguous disavowal or disclaimer has occurred. I understand that extrinsic evidence, such as relevant technical literature and dictionaries, may be useful in ascertaining how a POSITA would have understood a claim term, but the intrinsic record is the primary source for determining the meaning of claim terms. I understand that when interpreting a claim, all terms in the claim should be given effect and that it is improper to construe a term in a way that would render other terms superfluous. For the purposes of this declaration, and to the extent necessary, I have interpreted each claim term in accordance with the principles set forth in this paragraph.

21.     I have been informed that claims must also meet the definiteness requirement to particularly point out and distinctly claim the subject matter that the inventor regards as the invention. I understand that a claim may be indefinite if that claim, when read in light of the specification and prosecution history, fails to inform a POSITA with reasonable certainty about the full scope of the invention.

22.     I also have been informed that a claim limitation may be expressed as a "means plus function" limitation under 35 U.S.C. § 112(f). These types of terms and limitations should be interpreted to cover the corresponding structure described in the specification, and equivalents thereof. A limitation is presumed to be a means plus function limitation if (a) the claim limitation uses the phrase "means for"; (b) the "means for" is modified by functional language; and (c) the phrase "means for" is not modified by sufficient structure for achieving the specified function. I understand that the absence of "means for" in the claim language does not mean 35 U.S.C. § 112(f) does not apply.

## CLAIM CONSTRUCTION TESTIMONY

### I.    The Field of the Inventions and the Level of Ordinary Skill in the Art

23.    I was asked by Ocado's counsel in this action to assess the field of the inventions of the '404 and '770 Patents, and the level of ordinary skill in the art.  Based on my review of the patents and understanding of the technology they describe, it is my view that the field of the inventions is the coordination and control of automated warehouse storage systems.  In my opinion, a person of ordinary skill in the art at the time of the inventions of the '404 and '770 Patents would have had a Bachelor's degree in Electrical Engineering, Computer Science, Mechanical Engineering, Robotics, or a related field, and three to five years of experience in the design or operation of robot control systems, or a Master's degree in one of these fields, or a related field, and one to three years of experience.

24.    As of the effective filing date and presently, I did and do have more training, expertise, and knowledge than a POSITA.  However, I understand what a POSITA would have known and understood as of the effective filing date and my testimony herein is from the perspective of a POSITA at the relevant time.

### II.    The '404 Patent

#### A.    "movement optimisation unit"

25.    The term "movement optimisation unit" is recited in claims 1 and 9 of the '404 Patent.  In light of the claim language and specification, in my opinion, a POSITA would understand the function and structure associated with this term.

26.    Based on the claim language, a POSITA would understand that the function of the "movement optimisation unit" is to "determine a route of a transporting device from one location on a grid-like structure to another location on the grid-like structure for each transporting device." ('404 Pat., Claim 1.)  A POSITA would understand that at least one structure disclosed in the

specification to perform this function is "[a] suitably configured computer device, and associated communications networks, devices, software and firmware," configured to use:

> branch and bound algorithms, constraint programming, local search, heuristics, graph-traversal, dynamic path learning advisor techniques, pruning techniques and Bayesian graph searching techniques, Dijikstra's algorithm, . . . Johnson's algorithm, breadth-first recursive searches and depth-first recursive searches, weighted paths, A* search algorithm, and variants on A* search algorithm (e.g. D*, Field D*, IDA*, Fringe, Fringe Saving A*, Generalized Adaptive A*, Lifelong Planning A*, Simplified Memory Bounded A*, Jump Point Search, Theta*).

(*Id*., 21:15-18, 22:12-24.)

27.     I reserve the right to expand, amend, or revise my opinions on this topic, in response to any new information, additional discovery, or arguments offered by AutoStore's expert.

### B.     "reservation unit"

28.     The term "reservation unit" is recited in claim 1 of the '404 Patent.  In light of the claim language and specification, in my opinion, a POSITA would understand the function and structure associated with this term.

29.     Based on the claim language, the function of the "reservation unit" is to "reserve a path on the grid-like structure for each transporting device based on the determined route, wherein the path reserved for each transporting device is provided such that no two transporting devices have locations on the grid-like structure which would cause transporting devices to overlap at a same time."  ('404 Pat., Claim 1.)  A POSITA would understand that at least one structure disclosed in the specification to perform this function is "[a] suitably configured computer device, and associated communications networks, devices, software and firmware," configured to "reserve various paths on the grid" and in particular to "provide reservations for a robot for a grid location for a span of time where no two robots may be given overlapping reservations."  (*Id*., 19:30-33, 19:38-43, 21:15-18.)

30.     I reserve the right to expand, amend, or revise my opinions on this topic, in response to any new information, additional discovery, or arguments offered by AutoStore's expert.

### C.     "clearance unit"

31.     The term "clearance unit" is recited in claims 1, 3, 6-9, and 11-14 of the '404 Patent. In light of the claim language and specification, in my opinion, a POSITA would understand the function and structure associated with this term.

32.     Based on the claim language, the function of the "clearance unit" is to "provide a clearance instruction for each transporting device to traverse a portion of the reserved path." ('404 Pat., Claim 1.)  A POSITA would understand that the structure of the "clearance unit" is, among others, "[a] suitably configured computer device, and associated communications networks, devices, software and firmware," that "provid[es] a robot with a new instruction" indicating that "a path is clear for a robot to traverse" based on "check[ing] that it will not be possible to collide with another robot, based upon, for example, grid dimensions, grid positions, move commands generated by planning, cancellation of move commands (generated on events such as a controlled stop), the current positions and speeds of robots, braking ability of robots as well as where [the robots] have been cleared to visit" (*id.*, 18:31-45, 21:15-18), as well as, or in addition to, "a set of tolerances, including missed messages, processing time, clock sync and robot discrepancies with [a] physics model" (*id.*, 18:64-66), or robot speed and/or position updates (*id.*, 19:2-4).

33.     I reserve the right to expand, amend, or revise my opinions on this topic, in response to any new information, additional discovery, or arguments offered by AutoStore's expert.

### D.     "wherein the clearance instruction is provided for execution by a control unit on each transporting device at a future time" / "wherein the clearance instruction is provided for execution by each transporting device at a future time"

34.     Each of claims 1 and 20 of the '404 Patent recites "wherein the clearance instruction is provided for execution by a control unit on each transporting device at a future time" or "wherein

the clearance instruction is provided for execution by each transporting device at a future time" (the "Future Execution" limitation). In my opinion, this limitation should be given its plain and ordinary meaning.

35.    I understand that AutoStore contends that the term "future time" in the Future Execution limitation is indefinite. (AutoStore's SPR 6.1(b) Updated Disclosure of Preliminary Claim Constructions and Evidence dated May 24, 2022 ("AutoStore's Proposed Constructions") at 138.) I disagree. In my opinion, in light of the claim language and specification, a POSITA would understand, with reasonable certainty, the scope of this term. All of the terms in the Future Execution limitation are common English words, and none of them has a specialized technical meaning in the field of the invention. The Oxford English Dictionary defines the term "future" to mean "[t]ime that is still to come." (*Future*, Oxford English Dictionary 294 (7th ed. 2012).)

36.    This ordinary meaning is consistent with the specification's use of the words "future" and "future time" in the context of providing clearance instructions to control the movement of a robot. The specification discloses that the control strategies implemented by the system may include, for example, "[p]re-processing of tasks and actions to schedule future tasks and actions." ('404 Pat., 9:34-35.) The specification explains that "instruction sets may be sent for the coordination of future movements." (*Id*., 20:21-23.) It also explains that instructions or commands may be "pre-populate[d] . . . [and] then be provided to the robot . . . to be executed at a future time," such that certain of the pre-populated instructions are executed sequentially—in the future—after the receipt of the instruction by the robot, in conjunction with the movement of the robot. (*Id*., 20:10-15.) As the specification states, the system "may also be configured to process and/or send control messages to the one or more robots in anticipation of future movements." (*Id*., 10:53-56.)

-10-

37.     Accordingly, the plain and ordinary meaning of this limitation reflects, and a POSITA would understand based on the patent specification, that a clearance instruction may be pre-processed and provided such that it is executed to coordinate the robot's movement at a time that is "still to come."

38.     AutoStore's contention that the term is indefinite is undermined by the prosecution history of the '404 Patent.  During the prosecution of the application which became the '404 Patent, the examiner rejected claims containing the phrase "future start time" as indefinite because "the specification does not provide any context for clearance being provided for execution at a *future start time*."  In doing so, the examiner acknowledged that the specification did inform a POSITA regarding the scope of "instructions . . . to be executed at a future time," and the claims were amended to reflect the examiner's determination.  (Appl. No. 16/575,906, Non-Final Rejection dated June 19, 2020 at 2-3; Amendment and Reply dated Sept. 16, 2020 at 7-8.)

**E.     "wherein the clearance unit is configured as a passive collision avoidance system, wherein each transporting device is operated in a manner without impacting system performance"**

39.     Claim 7 of the '404 Patent recites "wherein the clearance unit is configured as a passive collision avoidance system, wherein each transporting device is operated in a manner without impacting system performance" (the "Passive Collision Avoidance" limitation).

40.     In my opinion, no construction is needed and this limitation should be given its plain and ordinary meaning.  I understand that AutoStore contends that the phrases "passive collision avoidance" and "without impacting system performance" in the Passive Collision Avoidance limitation are indefinite.  (*See, e.g.*, AutoStore's Proposed Constructions at 156.)  I disagree.  In my opinion, in light of both the extrinsic evidence and the claim language and specification, a POSITA would understand, with reasonable certainty, the scope of these terms.

41.     The Oxford English Dictionary defines "passive" as "accepting or allowing what happens." (*Passive*, Oxford English Dictionary 524 (7th ed. 2012).) A POSITA would understand that a "passive collision avoidance system" is one in which collisions between robots are avoided through "passive" behavior of the controller with respect to the robot, such as by its withholding of a clearance instruction to the robot. (This is in contrast to an "active" collision avoidance system in which the controller actively issues instructions to the robots to move or stop to avoid a collision.) In a passive collision avoidance system, robots that do not receive a clearance instruction will come to a stop on their own without colliding with other robots.

42.     The specification discloses an embodiment in which clearances are provided only "for a predetermined period of time," "such that the period of time is sufficient for the robot to come to rest without risking a collision" if no additional clearance is provided. (*Id*., 19:6-11.) In view of these disclosures, and in light of his or her knowledge and experience, a POSITA would readily understand the meaning and scope of the term "passive collision avoidance system" as one in which robots are controlled such that robots that do not receive instructions or commands will come to a stop on their own without colliding with other robots.

43.     Furthermore, the Patent also describes "a passive collision avoidance system wherein robots are only given the smallest amount of work possible without impacting performance." ('404 Pat., 18:31-37.) A POSITA would also understand the scope of the phrase "without impacting system performance." As the specification explains, there is a tradeoff "between the efficiency gains of planning far into the future; against the efficiency loss of having higher probabilities of having to re-plan when robots fail to maintain their plan." (*Id*., 16:34-40.) In the context of clearance and collision avoidance, a POSITA would understand that the paths available for robots to traverse on the grid are a resource that is both limited and shared by all of

the robots on the grid.  If the path cleared for one robot is longer than necessary, that resource is less available for other robots; thus shorter clearance time periods/distances generally improve overall system performance.

44.    However, the clearance distance/period must also be long enough such that the robot can stop within that distance/period; if the clearance distance is shorter than that, the speed of the robot must be reduced to meet that requirement.  As the applicant explained in the prosecution history of the '404 Patent, collision avoidance techniques that require "stopping or slowing transporting devices" decrease system performance because they "cause a loss in productivity of the transporting devices which [] should be avoided."  (Appl. 15/992,899, Remarks/Amendment dated June 3, 2019 at 8-9.)  For example, the '404 Patent discloses an embodiment in which the passive collision avoidance system is operated so that "robots are only given the smallest amount of work possible [the period or time between clearance instructions] without impacting performance." (*Id*., 18:31-37.)  A POSITA would understand, based on these disclosures, that the scope of the limitation "wherein the clearance unit is configured as a passive collision avoidance system, wherein each transporting device is operated in a manner without impacting system performance" means a clearance system that provides passive collision avoidance without requiring the robots to operate at reduced speed.

**F.    "clearance instruction"**

45.    The term "clearance instruction" is recited in claims 1-3, 6, 8, 11-14, and 17-20 of the '404 Patent.  In light of the claim language and specification, it is my opinion that the plain and ordinary meaning of this term is "an instruction for a robot to traverse a portion of a reserved path, issued when the clearance module checks that it will not be possible for the robot to collide with another robot."

46.    The plain language of the claims discloses that a "clearance instruction" is provided for a transporting device "to traverse a portion of the reserved path."  ('404 Pat., Claim 1.)  The specification discloses that the clearance module "checks that it will not be possible to collide with another robot" when the clearance instruction is provided.  (*Id.*, 18:39-40.)  In my opinion, these disclosures are consistent with, and demonstrate, the plain and ordinary meaning of "clearance instruction."

47.    I understand that AutoStore proposes that the Court construe this term to mean "[p]ermission instruction, issued when the clearance unit checks that the robot will not collide with another robot."  (AutoStore's Proposed Constructions at 141-42.)  I disagree with AutoStore's proposed construction because it improperly limits the claim scope to a "permission instruction," a term which is undefined and not used in the '404 Patent.  Construing the limitation using this phrase thus would make it less understandable, and would not be consistent with its plain and ordinary meaning to a POSITA.

48.    I reserve the right to expand, amend, or revise my opinions on this topic, in response to any new information, additional discovery, or arguments offered by AutoStore's expert.

### G.    "wherein at least one of the clearance unit, and the movement optimisation unit is configured to dynamically re-plan a route"

49.    The term "wherein at least one of the clearance unit, and the movement optimisation unit is configured to dynamically re-plan a route" is recited in claim 9 of the '404 Patent.  In my opinion, no construction is needed and this limitation should be given its plain and ordinary meaning.

50.    I understand that AutoStore contends that this term is indefinite.  (AutoStore's Proposed Constructions at 158.)  I disagree.  In my opinion, in light of the claim language and specification, a POSITA would understand, with reasonable certainty, the scope of the claims and

of this term. In particular, a POSITA would understand that a system that is configured to "dynamically re-plan a route" is one in which the system is configured to recalculate preferential paths during the course of a robot's journey.

51. The specification states that "the clearance module 312 may interact with the movement optimisation module 304 to dynamically re-plan routes to resolve or avoid conflicts." ('404 Pat., 18:51-54.) It also states that "[i]n some embodiments, the movement optimisation module 304 may dynamically recalculate preferential paths during the course of a robot's journey to potentially determine an updated set of paths as conditions and constraints change over time." (*Id.*, 15:20-24; *see also id.*, 12:53-56, 19:4-5.) A POSITA would understand that the system could use the same techniques and algorithms to "re-plan" a path that were disclosed in the specification for use in planning the original path. (*See, e.g.*, *id.*, 21:15-18, 22:12-24.)

## III.    The '770 Patent

### A.    "clearance command"

52. The term "clearance command" is recited in claims 1-4, 6-7, 13, 23, 25, and 29-30 of the '770 Patent. In light of the claim language and specification, it is my opinion that a POSITA would understand the plain and ordinary meaning of this term to be "a command for a robot to traverse a portion of a reserved path, issued when the clearance module checks that it will not be possible for the robot to collide with another robot."

53. This construction is consistent with the construction of "clearance instruction" as discussed above, as well as with the plain language of the claims and the specification of the '770 Patent. The specification explains that "commands" to perform various operations may be provided "to the robot." ('770 Pat., 20:21-27.) Claim 1 of the '770 Patent specifies that "clearance commands" are provided for a plurality of transporting devices "to travel on the pathways along portions of the plurality of paths." (*Id.*, Claim 1.) The specification discloses that the clearance

module "checks that it will not be possible to collide with another robot" before providing a clearance instruction or command.  (*Id.*, 18:19-21; *see also id.* 2:65-67.)  In my opinion, these claim language and specification disclosures are consistent with, and demonstrate, the plain and ordinary meaning of "clearance command."

54.    I understand that AutoStore proposes that the Court construe this term to mean "[p]ermission issued when the clearance unit checks that the robot will not collide with another robot."  (AutoStore's Proposed Constructions at 167.)  I disagree with AutoStore's proposed construction because it improperly limits the scope of the claim to a "permission," a term which has no ordinary meaning in the context of a "command."  I reserve the right to expand, amend, or revise my opinions on this topic, in response to any new information, additional discovery, or arguments offered by AutoStore's expert.

### B.    "potential for [a/the] collision"

55.    The term "potential for [a/the] collision" is recited in claims 1, 8-10, 12, 27, and 29 of the '770 Patent.  In light of the claim language and specification, I am of the opinion that a POSITA would understand the plain and ordinary meaning of this term and that no construction is needed.

56.    I understand that AutoStore contends that this term is indefinite.  (AutoStore's Proposed Constructions at 169.)  I disagree.  In my opinion, in light of the claim language and specification, a POSITA would understand, with reasonable certainty, the scope of the claims and of this term.

57.    All of the terms in this limitation are common English words, and none of them has a specialized technical meaning in the field of the invention.  The dictionary definition of the term "potential" is "capable of becoming or developing into something."  (*Potential*, Oxford English Dictionary 561 (7th ed. 2012).)  A collision is defined as "an instance of colliding with someone

or something." (*Collision*, Oxford English Dictionary 135 (7th ed. 2012); *see also Collide*, Oxford English Dictionary 135 (7th ed. 2012) ("hit by accident when moving" or "come into conflict").) Thus, the ordinary meaning of "potential for a collision" is a conflict of two objects that is capable of occurring. A POSITA would understand that such a conflict can occur when two robots may attempt to occupy the same position on the grid at the same time.

58.    Both independent claim 1 and claim 29 of the '770 Patent require "determining . . . there is a potential for a collision" between two robots. ('770 Pat., Claims 1, 29.) Thus, far from being indefinite, the scope of the limitation is readily apparent to a POSITA because it is met when a determination is made that two robots have conflicting paths in that they may attempt to occupy the same position on the grid at the same time.

59.    The claim language and specification of the '770 Patent support this understanding of the scope of the limitation by describing when and how embodiments of the invention may determine whether two robots may attempt to occupy the same position on the grid at the same time. For example, the specification discusses the need to "determin[e] priority when robots are engaged in potentially conflicting paths." (*Id.*, 15:52-54.) It also describes how to determine whether or not a potential for collision exists by checking

> that it will not be possible [for a robot] to collide with another robot, based upon, for example, grid dimensions, grid positions, move commands generated by planning, cancellation of move commands (generated on events such as a controlled stop), the current positions and speeds of robots, braking ability of robots as well as where they have been cleared to visit.

(*Id.*, 18:19-26.)

60.    The claims also provide other factors that can be considered in determining the potential for a collision, including "a position of the first transporting device on the grid-like structure or a position of the second transporting device on the grid-like structure" (Claim 8), "an attribute of the first transporting device" (Claim 9), "one or more of (i) a missed message, (ii) a

-17-

processing time, (iii) a clock sync, or (iv) a transporting device discrepancy with a physics model" (Claim 10), "dimensions of the grid-like structure" (Claim 11), "a status report" (Claim 12), "a position and a speed of at least one of the first transporting device or the second transporting device" (Claim 16), "a measurement associated with the first transporting device" (Claim 27), or a "measurement [associated with the first transporting device] compris[ing] a speed of the first transporting device" (Claim 28).

61.     For these reasons, a POSITA would understand the scope and meaning of the phrase "potential for a collision" in light of the specification and claim language.

### C.     "wherein the one or more processors are configured to control operations of the plurality of transporting devices in real time"

62.     Claim 21 of the '770 Patent recites "wherein the one or more processors are configured to control operations of the plurality of transporting devices in real time" (the "Real Time Execution" limitation).   In my opinion, the Real Time Execution limitation should be construed to mean that the one or more processors are configured to receive data from the plurality of robots, process the data, and issue instructions or commands to the plurality of robots sufficiently quickly to affect their movement.

63.     A POSITA would understand a real time control system as "one which controls an environment by receiving data, processing them and returning the results sufficiently quickly to affect the functioning of the environment at that time."   James Martin, *Programming Real-Time Computer Systems* 4 (1965); *see also* Adrian Gambier, *Real-time Control Systems: A Tutorial*, *in* 2 2004 5th Asian Control Conference 1024, 1025 (2004) ("[A] real-time task must be able to keep up with external events, with which it is concerned.").   This understanding was widely shared in the field of the invention.  For example, specialized dictionaries defined "real time" to mean "[t]he performance of a computation during the actual time that the related physical process transpires in

order that results of the computations are useful in guiding the physical process," Rudolf F. Graf, *Modern Dictionary of Electronics* 627 (7th ed. 1999), or "[p]ertaining to a system or mode of operation in which computation is performed during the actual time that an external process occurs, in order that the computation results can be used to control, monitor, or respond in a timely manner to an external process," *IEEE 100: The Authoritative Dictionary of IEEE Standards Terms* 933 (7th ed. 2000).

64.     This construction also is supported by the specification.  The specification provides that the robot control system must respond quickly enough to affect the activities of the robots and avoid collisions—it states that the system is "configured to control the navigation/routing of robots, including, but not limited to, moving from one location to another, collision avoidance, . . . [and] control of activities to be performed" by "send[ing] control messages to one or more robots, receiv[ing] one or more updates from one or more robots, and communicat[ing] with one or more robots using a real or near-real time protocol."  ('770 Pat., 10:14-28; *see also id.*, 13:4-7, 19:43-46.)

65.     I understand that AutoStore contends that the Real Time Execution limitation is indefinite.  (AutoStore's Proposed Constructions at 174-75.)  I disagree.  In my opinion, a POSITA would understand, with reasonable certainty, the scope of the claims and of this term from his or her knowledge of the art.  In particular, a POSITA would be deeply familiar with the concept of a control system operating in "real time" and would not need further clarification of this term to understand the claimed configuration of the claimed processors.

66.     Therefore, this term should be construed to mean "wherein the one or more processors are configured to receive data from the plurality of robots, process the data, and issue instructions or commands to the plurality of robots sufficiently quickly to affect their movement."

-20-

## DECLARATION

67.    I declare that all statements made herein on my own knowledge are true and that all statements made on information and belief are believed to be true, and further, that these statements were made with the knowledge that willful false statements and the like so made are punishable by fine or imprisonment, or both, under Section 1001 of Title 18 of the United States Code.

Executed on May 27, 2022 at Wollerau, Switzerland

_____
Raffaello D'Andrea, Ph.D.