**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW HAMPSHIRE**

| | |
|---|---|
| OCADO INNOVATION LTD. and OCADO SOLUTIONS LTD., ) ) ) ) Plaintiffs, ) v. ) ) AUTOSTORE AS and ) AUTOSTORE SYSTEM INC., ) ) ) Defendants. ) | Case No. 1:21-cv-00041 |

**SUR-REBUTTAL DECLARATION OF RAFFAELLO D'ANDREA, PH.D.,
IN FURTHER SUPPORT OF PLAINTIFFS' PROPOSED CLAIM CONSTRUCTIONS**

I, Raffaello D'Andrea, Ph.D., declare as follows:

1.       I submit this declaration at the request of Plaintiffs Ocado Innovation Ltd. and Ocado Solutions Ltd. (together, "Ocado") in the above-captioned action to provide additional expert opinions and testimony on claim construction with respect to United States Patent Nos. 10,901,404 (the "'404 Pat.") and 11,079,770 (the "'770 Pat.") (collectively, the "Asserted Patents"), in response to the June 24, 2022 Rebuttal Declaration of Dr. Petros Ioannou ("Ioannou Reb. Decl."). Unless otherwise noted, the statements made herein are based on my personal knowledge, and if called to testify in Court, I could and would testify competently and truthfully with regards to this matter.

2.       I am being compensated for my work in this matter at my standard hourly rate of CHF1250 for consulting services. My compensation in no way depends on the outcome of this proceeding or the content of my testimony.

3.       In forming the opinions set forth in this declaration, I have considered, in addition to my knowledge and expertise in the relevant field, the relevant legal standards set out in my

opening ("Opening Decl.") and rebuttal ("Rebuttal Decl.") claim construction declarations, dated May 27, 2022 and June 24, 2022, respectively, and the materials cited in those declarations, as well as various other sources which are cited herein and listed in the attached Appendix I (Materials Considered).

4.    My opinions and analysis are based upon the information that I have considered to date. I reserve the right to amend or supplement the opinions set out herein to take into account new information that becomes available to me.

5.    I also reserve the right to amend or supplement my declaration to respond to any opinions or testimony of experts retained by AutoStore in connection with the construction of any claim term at issue in this action, as well as any arguments raised by AutoStore in its claim construction briefing.

6.    My background and qualifications are set forth in my Opening Declaration and curriculum vitae attached thereto.

**CLAIM CONSTRUCTION TESTIMONY**

**I.    The Field of the Inventions and the Level of Ordinary Skill in the Art**

7.    I have reviewed Dr. Ioannou's identification of the field of the Asserted Patents as "path planning for automated guided vehicles." (Ioannou Reb. Decl. ¶ 8.) I disagree with Dr. Ioannou because, as I explained in my Opening Declaration, the inventions of the Asserted Patents are more specifically directed to "the coordination and control of automated warehouse storage systems." (Opening Decl. ¶ 23; *see* '404 Pat., 2:31-37, 4:66-5:11 (discussing control of "[f]ully- and semi-automatic goods storage and retrieval systems"); *see also id*. at 13:27-36, 14:58-15:2, 16:41-52 (disclosing use of control system in the context of an automated warehouse storage system).) The common specification also states that the Asserted Patents are directed to

"methods[,] systems and apparatus for controlling the movement of transporting devices" to engage in activities that a person of ordinary skill in the art ("POSITA") would understand to be uniquely associated with automated warehouse storage, such as:

> the transportation of various items, such as goods and/or products, and/or containers that may be empty and/or holding such goods and/or products[,] . . . the fulfillment of orders[,] . . . [and] transporting containers to and from workstations, moving objects from source locations to target locations, etc.

('404 Pat., 1:20-21; 5:29-36; *see id*. at 1:63-67.)

8.      The portions of the specification on which Dr. Ioannou relies do not support his identification of the field of the invention.  *First*, Dr. Ioannou cites a portion of the specification which states that the invention "is not limited to only systems that have 'hives', 'grids', and/or 'robots', but systems that broadly control and/or coordinate the movement and/or activities of a plurality of devices."  (Ioannou Reb. Decl. ¶ 8 (citing '404 Pat., 5:26-29).)  In my opinion this portion of the specification, in the context of the patent as a whole, merely discloses that one type of warehouse storage system that may embody the claimed inventions includes "hives," "grids," and/or "robots," and indicates that the inventions may be used with other storage systems as well.

9.      Dr. Ioannou also argues the field is broader than automated warehouse storage systems because "[t]he [path-planning algorithms] described in the common specification . . . may be implemented on autonomous guided vehicles more generally."  (*Id*. ¶ 8.)  However, the inventions of the Asserted Patents are not directed to path planning algorithms alone.  Rather, the inventions are directed to a particular control system that includes, for example, a route reservation module and a clearance module, as well as a path planning module, all of which operate in the context of an automated storage system.  (*E.g*., '404 Pat., 13:27-36.)  Merely because some of the *techniques* described in the specification may also be used in other fields does not mean that the

field of the *inventions* described and claimed in the patents is broader than automated storage systems.

10.    I also have reviewed Dr. Ioannou's opinion regarding the qualifications of a POSITA.  (Ioannou Reb. Decl. ¶¶ 8-9.)  I understand that Dr. Ioannou contends that my proposal for the qualifications of a POSITA as set out in my Opening Declaration (*see* Opening Decl. ¶ 23)—including 3-5 years of experience in the design or operation of robot control systems—is too broad because "it includes experience in aspects of design (or operation) of robot control systems that do not bear directly on planning optimal paths for robots, which is the subject of the '404 and '770 patent claims."  (Ioannou Reb. Decl. ¶ 9.)

11.    I disagree with Dr. Ioannou's opinion to the extent it limits a POSITA to a person "with a focus on path planning for automated guided vehicles" (Ioannou Opening Decl. ¶ 61), because the inventions of the Asserted Patents are not limited to just "path planning."   Rather, the inventions of the '404 and '770 Patents are directed to "[t]he co-ordination of the movement of one or more robotic or otherwise automated means" in the context of an automated warehouse storage system.  ('404 Pat., 1:63-67; *see id.* at 1:20-21.)  They claim the use of a reservation module and a clearance module to control robot movement in the storage system, in addition to a movement optimisation module for path planning (*see id.* 10:58-62, 13:27-40, 18:31-19:29, 19:30-57).  They further disclose the integration of these various modules in a comprehensive control system for an automated warehouse storage system to avoid collisions and to improve the "overall efficiency and scalability of a system for storage and retrieval of a large number of different products."  (*Id.* at 1:63-67, 2:5-10, 10:35-39, 18:34-37.)  Dr. Ioannou's proposed qualification for a POSITA—focused on planning optimal paths for robots—is too narrow because it would not include experience in these other important aspects of the claimed inventions.

12.    Dr. Ioannou also asserts that the level of skill in the art should be higher because "[p]lanning optimum paths for robots or vehicles in general . . . is not something a robot control system person would necessarily know." (Ioannou Reb. Decl. ¶ 9.) I disagree. As Dr. Ioannou admits in his rebuttal declaration, the path-planning algorithms, such as the A* and Dykstra algorithms, incorporated for use in the claimed inventions, "have been used extensively in vehicle routing problems . . . at least as of the 1930's." (*Id.* ¶ 8) I have experience as a university professor teaching robot control systems to both undergraduate and graduate students, as well as experience in working with others in industry to develop similar technology to that disclosed in the '404 and '770 patents. In my opinion, based on that experience, a POSITA with a Bachelor's degree in Electrical Engineering, Computer Science, Mechanical Engineering, Robotics, or a related field, and three to five years of experience in the design or operation of robot control systems, or a Master's degree in one of these fields, or a related field, and one to three years of experience, would be familiar with these concepts.

13.    While I disagree with Dr. Ioannou regarding the appropriate level of ordinary skill in the art, my opinions in this Sur-Rebuttal Declaration, my Rebuttal Declaration, and my Opening Declaration would remain the same under either my or Dr. Ioannou's definition of a POSITA.

## II.    The '404 Patent

### A.    "clearance unit"

14.    Dr. Ioannou contends that the structure of the "clearance unit" of claim 1 is indefinite, based on his argument that the specification of the '404 patent "does not provide any algorithms for 'providing a clearance instruction for each transporting device to traverse a portion of the reserved path.'" (Ioannou Reb. Decl. ¶ 13.)

15.    I disagree. As I explained in my Rebuttal Declaration, the "clearance unit" of claim 1 corresponds to the clearance module described in the specification, primarily at column

18, line 31 to column 19, line 29. (Rebuttal Decl. ¶ 22.) This portion of the specification teaches that the clearance unit "generat[es]" or "provid[es]" an instruction to direct the robot to "continue along [a] planned path[]," or may withhold an instruction to prevent the robot from continuing along that path. ('404 Pat. at 18:46-50.) The generation or withholding of an instruction is a function that a generic processor or computer server would be able to do as a matter of course, and a POSITA would not expect the specification to disclose a specialized algorithm to perform that basic function of a generic processor or server. (Rebuttal Decl. ¶ 23.)

16.    In addition, this portion of the specification of the '404 Patent describes the methodology used by the clearance unit to determine whether to grant or withhold a clearance instruction. Contrary to Dr. Ioannou's claim (*see* Ioannou Reb. Decl. ¶ 12), the specification of the '404 Patent describes the steps performed by the clearance unit to "determine[] that a path is clear" so that the clearance instruction can be provided. Specifically, the specification discloses that:

- The clearance unit determines and stores the possible positions of other robots on the grid during some period, based on, *e.g.*, "grid dimensions, grid positions, move commands generated by planning, cancellation of move commands . . . , the current positions and speeds of robots, [or] braking ability of robots as well as where they have been cleared to visit." ('404 Pat. at 18:40-45.)

    o The possible positions may be different from earlier planned or reserved positions based on the tolerances, or uncertainties, that exist because of, *e.g.*, missed messages, processing time, clock sync or robot discrepancies with the physics model. (*Id.* at 18:64-67.)

- Before issuing a clearance instruction for a robot to travel over a grid position, the clearance unit checks the stored possible positions of other robots to determine if there is a possible collision (*i.e.*, another robot will possibly occupy the same grid position for which clearance is to be issued). (*E.g.*, *id.* at 18:32-34 ("A system of clearances may be accessed to determine whether a path is clear for a robot to traverse."), 18:50-51 ("the clearance module may act as a path conflict resolver.").)

- If no possible collision is found, the clearance instruction is stored and/or issued. If a possible collision is found, the clearance instruction is withheld. (*Id.* at 18:31-51.)

-6-

17.     Dr. Ioannou also asserts that the disclosure of the '404 Patent specification is deficient because it does not disclose a specific formula that uses the various parameters it identifies (*e.g.*, current speed and position of the robots) to determine the possible positions of the robots, or to determine the possibility of a collision.  (*See* Ioannou Reb. Decl. ¶ 12(c), 12(d).)  I understand from Ocado's counsel, however, that a description of computer-implemented structure in the specification need not provide a particular formula or disclose well-known techniques.  Rather, a disclosure is sufficient if it describes the steps or methodology carried out by the computer-implemented structure, and in my opinion, the specification of the '404 Patent does that.

18.     With respect to the clearance unit of claim 1 of the '404 Patent, the manner in which the identified parameters would be used to determine whether to grant or withhold a clearance are well known, and a POSITA would not expect additional guidance from the specification.  In the first step, for example, the clearance unit determines and stores the possible positions of other robots on the grid during some period.  A POSITA would fully understand how to calculate the possible positions of the various robots on the grid during that period based on, among others, the "current position and speed of the robots," "grid dimensions," and "move commands generated by planning."  ('404 Pat., 18:38-45.)  For example, determining the likely future position of an object moving in one or two dimensions based on its current position and speed is taught in introductory physics and mechanics classes that would be part of a POSITA's educational background.

19.     A POSITA would also understand how to determine the possible future positions that could be occupied by the robot in light of the physical grid dimensions and the "move commands" that tell the robot how far to travel and in what direction, and would understand how to calculate those limits.  Such calculations are based on fundamental physical rules that are taught to every undergraduate engineering student.  He or she would also understand that the range of

possible positions could be increased to account for tolerances and uncertainties that might arise, for example, from missed communications or non-ideal robot behavior.

      **B.**       **"wherein the clearance instruction is provided for execution by a control unit on each transporting device at a future time" / "wherein the clearance instruction is provided for execution by each transporting device at a future time"**

20.       Dr. Ioannou asserts that the limitations recited in Claims 1 and 20 of the '404 Patent that require instructions to be provided to the robot "for execution . . . at a future time" are indefinite because the specification does not "teach a POSITA with reasonable certainty the minimum time delay" between receipt of the instruction and its execution that corresponds to a "future time." (Ioannou Reb. Decl. ¶ 16.)

21.       I disagree. As I explained in my Rebuttal Declaration, a POSITA would understand the scope of these limitations in light of the claim language and specification. In particular, a POSITA would understand "execution at a future time" to refer simply to execution at a time after the instruction is received by the robot. (Rebuttal Decl. ¶ 37.) The specification distinguishes between instructions that are executed immediately (not within the scope of the relevant limitation) and instructions that are to be executed at a time after receipt by the robot (within the scope of the relevant limitation). (*Id.*) For example, the specification explains that "instruction sets may be sent for the coordination of future movements." ('404 Pat., 20:21-23.) And instructions directed to controlling future movements may be "pre-populate[d] . . . [and] then be provided to the robot . . . to be executed at a future time," and the specification explains that configuring the controller in this way allows it "to process and/or send control messages to the one or more robots in anticipation of future movements." ('404 Pat., 10:53-56, 20:10-15.) The specification contrasts providing instructions to control future anticipated movements with a "current instruction set[]" or

"current clearance" to control its current movements (*i.e.*, an instruction that will be executed immediately).  (*Id*. at 10:49-53, 18:55-59, 21:1-3.)

22.     Dr. Ioannou asserts that the "at a future time" claim language is indefinite because the specification does not identify a specific ***amount*** of "delay" between receipt of an instruction by the robot and its execution that "is needed for scheduling to be considered to be in the future." (*E.g.*, Ioannou Reb. Decl. ¶ 20(a).)  In my opinion, however, identification of a particular amount of delay (in milliseconds, for example) is unnecessary, because it would be clear to a POSITA that the claim distinguishes between instructions executed immediately to direct current movement and instructions to be executed afterward (*i.e.*, to direct anticipated future movements) regardless of the amount of delay between receipt and the execution of the latter instructions.

23.     In Paragraph 16 of his Rebuttal Declaration, Dr. Ioannou provides a time line on which he relies for his opinion that the specification of the '404 Patent must disclose a minimum time delay.   In my opinion, the figure depicted in Paragraph 16 is misleading because it does not distinguish between clearance instructions directed to current movement, and clearance instructions directed to controlling anticipated future movements at a future time.

24.     A figure more accurately depicting what is described in the specification of the '404 Patent is shown below:  A set of the instructions for anticipated future movement is received by the robot at $t_0$ and added to the robot's instruction queue, which already includes clearance instructions which must be executed to direct the robot's current movement.  The current clearance instruction is immediately executed at $t_0$.  Only after execution of that current clearance instruction is completed—*i.e.,* only "at a future time" beginning at $t_1$—are the clearance instructions directed to anticipated future movements executed.



At $t_0$ Robot receives pre-populated clearance instructions directed to future movement of the robot:

> Clearance Instruction 1 (future movement)
>
> ⋮
>
> Clearance Instruction n (future movement)

Future clearance instructions are added to queue and robot then executes received instructions only after clearance instruction 0 (current movement) is executed:

*at a future time*

| Clearance Instruction 0 current movement | Clearance Instruction 1 | . . . | Clearance Instruction n |

**TIME**

$t_0$        $t_1$

25.     The figure above demonstrates why "at a future time" is not indefinite. A POSITA would understand that the time between $t_0$ and $t_1$ may vary from system to system. But regardless of the amount of time between $t_0$ and $t_1$, a POSITA would understand the distinction between an instruction to be executed immediately and an instruction to be executed at a later time. For substantially the same reason, Dr. Ioannou is wrong to assert that Ocado's reading of "at a future time" "adds no meaning to the claim" because it includes even "infinitesimally small" delays. (Ioannou Reb. Decl. ¶ 18.) To the contrary, Ocado's interpretation establishes a bright line boundary to the claim: instructions to be executed immediately are outside the scope of the claim language; instructions to be executed at a later time to direct future movement are within the scope of the claim language.

26.     Dr. Ioannou also argues that the portions of the specification on which I relied, which discuss how to control "future . . . actions" by the robot and the "control messages" sent to the robot, do not relate to clearance instructions. (Ioannou Reb. Decl. ¶ 20(a), (b).) That is not correct.

27.    A POSITA would understand that the "future . . . actions" discussed in the specification at column 9, lines 34 to 35, relate to, among others, clearance instructions, regardless of the fact that clearance instructions are not expressly identified in that passage. That portion of the specification provides a general discussion of the "central management of one or more robots" ('404 Pat., 9:1-35), and a POSITA would understand that clearance instructions are used by the central controller to manage the future actions of a robot. The specification discloses even more clearly that the "control messages" described at column 10, lines 53 to 56, include clearance instructions. The patent states that "[t]he robot control system 202 may also be configured to process and/or send *control messages* . . . in anticipation of future movements" because "[s]uch an implementation could be advantageous" for "determining reservations and/or *clearances*." (*Id*. at 10:53-56 (emphasis added).)

28.    Dr. Ioannou also argues that the term is indefinite because "at a future time" may include "arbitrarily large delays" and "a POSITA would know that a realistic control system would not operate with arbitrarily large delays." (Ioannou Reb. Decl. ¶ 17.) But there is a bright line distinction between instructions executed immediately and instructions to be executed at a later time regardless of how much time after receipt. Dr. Ioannou's position that certain amounts of time (*e.g.*, nine days or years) might be impractical is beside the point—that is a matter of Dr. Ioannou's belief that certain control systems within the clear scope of the claims may be impractical for particular applications.

29.    Finally, Dr. Ioannou wrongly dismisses the prosecution history of the '404 Patent. (Ioannou Reb. Decl. ¶ 22.) As I pointed out in my Rebuttal Declaration, during prosecution of the application that led to the '404 Patent the examiner suggested the use of "at a future time" in the claims would avoid indefiniteness. (*See* Rebuttal Decl. ¶ 39; *see* Appl. No. 16/575,906, Non-Final

Rejection dated June 19, 2020 at 2-3; Amendment and Reply dated Sept. 16, 2020 at 7-8.) Dr. Ioannou does not dispute that the examiner was required to determine whether the claim language was indefinite, nor does Dr. Ioannou dispute that the examiner suggested substituting "at a future time" in place of "at a future start time" to make the claims definite.  (*See* Ioannou Reb. Decl. ¶ 22.)  Nor does Dr. Ioannou provide any evidence or opinion that the examiner was wrong. (*See id.*)

> **C.   "wherein the clearance unit is configured as a passive collision avoidance system, wherein each transporting device is operated in a manner without impacting system performance"**

30.     Claim 7 of the '404 Patent includes the limitation "wherein the clearance unit is configured as a passive collision avoidance system, wherein each transporting device is operated in a manner without impacting system performance."  As I explained in my Opening and Rebuttal Declarations, a POSITA would understand, with reasonable certainty, the scope of this limitation. (Opening Decl. ¶¶ 39-44; Rebuttal Decl. ¶¶ 40-45.)

31.     As I previously explained, a POSITA would understand that a passive collision avoidance system is one in which "robots that do not receive a clearance instruction will come to a stop on their own without colliding with other robots," without any intervention by the central controller.  (Rebuttal Decl. ¶ 41.)  Such a system is operated in a manner without impacting system performance where "the clearance path [is] as short as possible (to maximize routes available to other robots, and thus maximize throughput) without requiring counterbalancing adjustments (*e.g.*, a decrease of maximum robot speed) that would cause an overall reduction of performance." (*id.* ¶ 44.)

32.     Dr. Ioannou asserts that "a 'passive collision avoidance system' is an oxymoron because a passive system by definition cannot do *anything* to avoid collisions."  (Ioannou Reb. Decl. ¶ 24.)  I disagree.  A POSITA would understand that the control system described in the '404

Patent is "passive" because it avoids collisions by "withholding (*i.e.*, not providing) a clearance instruction," such that the robot stops by itself without any intervention or instruction from the control system. (Rebuttal Decl. ¶ 41.) That is in contrast to an active collision avoidance system that does not operate by ***withholding*** instructions but instead operates by actively providing commands (*e.g.*, to move in a different direction to avoid a collision).

33.     Dr. Ioannou does not dispute that the system described in the '404 Patent "avoids collisions by withholding 'clearances,' thereby letting robots stop before collisions." (*See* Ioannou Reb. Decl. ¶ 24.) Instead, Dr. Ioannou asserts that the control system is "not 'passive,' because work is done on the robots to stop them." (*Id.*) Again, I disagree. While the *robot* may take action—which is what I assume Dr. Ioannou means by "work"—to stop its movement, that action is not done by the *control system*. The robot control system avoids collisions by withholding clearances—by *not* sending an instruction to the robot—thereby "***letting*** robots stop before collisions" (*i.e.*, by allowing the robots to come to rest as a result of frictional forces). (*Id.*) This is passive control because it involves "accepting or allowing what happens," in contrast to active control involving affirmative action by the control system such as sending an emergency route change command to the robot. Again, this is a relatively simple concept and a POSITA would readily understand the distinction between active and passive collision avoidance.

34.     Dr. Ioannou also asserts that the meaning of operating the collision avoidance system "without impacting system performance" is unclear. (Ioannou Reb. Decl. ¶ 25.) As I explained in my Rebuttal Declaration, a POSITA would readily understand that system performance refers to the throughput of the system—the number of jobs successfully completed in a given period. (Rebuttal Decl. ¶ 42.) A passive collision avoidance system is within the scope of the claim language only if it does not impact the throughput of the system. (*Id.*) If clearance

instructions are generated such that "the clearance path is too short, the robots' maximum speed will have to be significantly reduced to ensure that the robot can slow to a stop over the space for which it has received clearance." (*Id.* ¶ 44; *see also* '404 Pat., 18:38-45 (describing granting or withholding a clearance instruction based on the "speeds . . . [and] braking ability of robots").) During the prosecution of the '404 Patent, the applicant explained that operating the collision avoidance system in this way to require "stopping or slowing [the] transporting devices," decreases the throughput of the system as a whole because it "cause[s] a loss in productivity of the transporting devices which [] should be avoided." (*See* Appl. 15/992,899, Remarks/Amendment dated June 3, 2019 at 8-9.) Thus, the claims require a balancing of, *e.g.*, the length of the clearance path and the robot speed such that the passive collision avoidance system does not utilize clearance path lengths so short that robot speed would need to be reduced to ensure that the robot comes to a stop when a clearance instruction is withheld (thus passively avoiding a collision).

35.    Dr. Ioannou opines that the limitation is indefinite because the specification does not disclose a "reference point" to which the "reduced speeds" that may be necessary for the collision avoidance system can be compared. (Ioannou Reb. Decl. ¶ 25.) I disagree. A POSITA would understand that no "reference point" is necessary because any system in which the operating speed of the robots is reduced to operate a clearance-based collision avoidance system would fall outside the scope of this limitation because that would reduce throughput.

**D.    "wherein at least one of the clearance unit, and the movement optimisation unit is configured to dynamically re-plan a route"**

36.    In his rebuttal declaration, Dr. Ioannou asserts that the limitation of Claim 9 of the '404 Patent, "wherein at least one of the clearance unit, and the movement optimisation unit is configured to dynamically re-plan a route," is indefinite because "the specification provides no

algorithm by which the 'clearance unit can carry out dynamic re-planning on its own.'" (Ioannou Reb. Decl. ¶¶ 29-30.)

37.     I disagree with the conclusion, although I agree with Dr. Ioannou that the specification of the '404 Patent does not disclose the clearance unit alone dynamically re-planning a route.  As I explained in my Rebuttal Declaration, a POSITA reading the claims in light of the specification would understand with reasonable certainty that Claim 9 applies to the use of the movement optimisation unit (corresponding to the "movement optimization module" described in the specification) alone, or to the use of the movement optimisation unit in combination with the clearance unit, to dynamically re-plan a route.  (Rebuttal Decl. ¶ 62.)  It does not make sense that the clearance unit alone would dynamically re-plan a route, and I do not think a POSITA would reasonably read the claim language in that way.

38.     The specification discloses that "the movement optimisation module 304 may dynamically recalculate preferential paths during the course of a robot's journey to potentially determine an updated set of paths as conditions and constraints change over time."  ('404 Pat., 15:20-24.)  It also explains that "the clearance module 312 may interact with the movement optimisation module 304 to dynamically re-plan routes to resolve or avoid conflicts."  (*Id*. at 18:52-54; *see also id*. at 18:55-60 (explaining that the clearance module may be configured to report when clearance is provided or withheld to trigger dynamic re-planning by the movement optimization module), 19:12-29 (explaining that the clearance unit may be configured so as to withhold clearance to allow a robot that has already begun to decelerate to come to rest, triggering re-planning of the robot's "path over the grid.").)  In light of these disclosures, and others I discussed in my Rebuttal Declaration, I do not believe a POSITA would have any doubt that Claim 9 refers to either the movement optimisation unit alone or the movement optimisation unit

acting together with the clearance unit.  That scope is consistent with the claim language, the specification and common sense.

### III.    The '770 Patent

#### A.    "potential for [a/the] collision"

39.    Dr. Ioannou asserts that the phrase "potential for [a/the] collision" is indefinite because "the record does not explain to a POSITA how high the probability of collision must be in order to determine whether there is a 'potential for collision.'"  (Ioannou Reb. Decl. ¶ 32.)

40.    I disagree.  As I explained in my rebuttal declaration, the use of "potential" in the claim language does not require that the system determine whether the *likelihood* of collision is above some threshold *probability*.  (Rebuttal Decl. ¶¶ 89-90.)  Rather, the scope of the limitation would be understood by a POSITA to include any determination that two robots may occupy the same position on the grid at the same time, based on the information available to the system.  In other words, the scope of the limitation includes any system that either (i) guarantees such an overlap is not possible for the robots to collide or (ii) reports that it cannot provide such a guarantee.  (*Id.*)  The claims are not probability based; rather, a POSITA would understand them to require certainty (*i.e.*, there is or is not a potential for collision).

41.    The specification of the '770 Patent confirms my understanding, describing how embodiments of the invention determine whether or not a potential for collision exists.  These embodiments check that "it will *not be possible* [for a robot] to collide with another robot" based on information available to the system including, for example, "grid dimensions, grid positions, move commands generated by planning, cancellation of move commands (generated on events such as a controlled stop), the current positions and speeds of robots, braking ability of robots as well as where they have been cleared to visit."  ('770 Pat., 18:19-26.)  The system makes a "yes

or no" determination of whether, on the one hand, a collision might occur or, on the other hand, a collision "will not be possible" based on the information known to the system.

42.     Dr. Ioannou argues that the limitation is indefinite because "if 'potential for collision' referred to any chance of collision, (even an arbitrarily small one)," the limitation would always be met.  (Ioannou Reb. Decl. ¶ 35.)   That is not accurate.  The system described in the '404 Patent does not calculate a "chance" of collision, whether "arbitrarily small" or otherwise.  Rather, the system checks whether any of the information available to the system indicates that two robots could occupy a particular position on the grid during the same period of time.  If it does, there is a potential for collision; if it does not, the system has determined there is no potential for collision.

**B.     "wherein the one or more processors are configured to control operations of the plurality of transporting devices in real time"**

43.     As I explained in my opening declaration, a POSITA would understand the term "wherein the one or more processors are configured to control operations of the plurality of transporting devices in real time" as used in Claim 21 of the '770 Patent (the "Real Time Execution" limitation) to mean that the one or more processors are configured to receive data from the plurality of robots, process the data, and issue instructions or commands to the plurality of robots to control their movements.  (Opening Decl. ¶¶ 62-66.)

44.     Dr. Ioannou asserts that the limitation is indefinite because the specification does not explain "how quickly the processors must carry out the specified operations in order for that to qualify as 'sufficiently quickly' to a POSITA" (Ioannou Reb. Decl. ¶ 38), or "offer any explanation or examples of 'prescribed points of time within defined time tolerances,' so a POSITA can understand the meaning of 'real time' in the context of the application at hand" (*id*. ¶ 39).

45.     I disagree.  The term "real time" is widely used and understood.  "Real time" control refers to "[t]he performance of a computation during the actual time that the related physical process transpires in order that results of the computations are useful in guiding the physical process," Rudolf F. Graf, *Modern Dictionary of Electronics* 627 (7th ed. 1999), or a system or mode of operation in which computation is performed during the actual time that an external process occurs, in order that the computation results can be used to control, monitor, or respond in a timely manner to an external process," *IEEE 100: The Authoritative Dictionary of IEEE Standards Terms* 933 (7th ed. 2000).  Although the **specific** time tolerances for "real time" control vary from system to system, the concept of real-time control is the same across all systems.  A POSITA would be able to understand with reasonable certainty whether a particular control system is within the scope of the limitation by looking at whether it receives data from the robots, processes the data, and issues instructions or commands back to the robots to direct their movements based on that data.

46.     Dr. Ioannou asserts that a POSITA would not understand the meaning of "real time" because the specification also uses the terms "near-real time" and "just-in-time" without "provid[ing] any objective measure by which to classify an operation as either 'real time' or instead as 'near-real time.'"  (Ioannou Reb. Decl. ¶ 40.)   But the language of the limitation does not include the terms "near-real time" or "just-in-time"—it uses the term "real time," which has a clear objective meaning to a POSITA.

47.     Finally, Dr. Ioannou argues that "the specification provides no algorithm by which the processors can control the operations of the plurality of transporting devices in 'real time.'"  (Ioannou Reb. Decl. ¶ 41.)  In my opinion, the disclosure of such an algorithm is not necessary, because a POSITA would readily understand this claim term to refer to a class of physical

structures—*i.e.*, one or more hardware processors that carry out real-time control.  (*See* Rebuttal

Decl. ¶¶ 82-87.)

## DECLARATION

48.    I declare that all statements made herein on my own knowledge are true and that all statements made on information and belief are believed to be true, and further, that these statements were made with the knowledge that willful false statements and the like so made are punishable by fine or imprisonment, or both, under Section 1001 of Title 18 of the United States Code.

Executed on July 12, 2022 at Wollerau, Switzerland

Raffaello D'Andrea, Ph.D.

-20-