**IN THE UNITED STATES DISTRICT COURT**

**FOR THE DISTRICT OF NEW HAMPSHIRE**

|  |  |  |
|---|---|---|
| OCADO INNOVATION LTD. and OCADO SOLUTIONS LTD., | ) ) ) ) | |
| Plaintiffs, | ) ) | |
| v. | ) ) | **Civil Action No. 1:21-cv-00041** |
| AUTOSTORE AS and AUTOSTORE SYSTEM INC., | ) ) ) | JURY TRIAL DEMANDED |
| Defendants. | ) ) ) ) ) ) ) | |

**REBUTTAL DECLARATION OF STEPHEN DERBY, PH.D.
REGARDING CLAIM CONSTRUCTION**

**TABLE OF CONTENTS**

I.      BACKGROUND ........................................................................................................... 3

        A.      Qualifications and Experience ...................................................................... 3

        B.      Compensation ................................................................................................ 7

        C.      Scope of This Declaration............................................................................. 7

        D.      Materials Considered .................................................................................... 8

II.     CLAIM CONSTRUCTION PRINCIPLES...................................................................... 8

III.    OPINIONS AND ANALYSIS......................................................................................... 10

        A.      The Level of Skill in the Art ........................................................................ 11

        B.      "a load handling device of the multiplicity of load handling devices will
                occupy a grid space" / "load handling device is located above the stack and
                occupying a grid space" ................................................................................ 12

        C.      "wheel hub motor"........................................................................................ 17

IV.     RESERVATION OF RIGHTS ....................................................................................... 19

I, Stephen Derby, declare under penalty of perjury as follows:

1. I have been retained by counsel on behalf of AutoStore AS and AutoStore System, Inc. (collectively, "AutoStore") to provide analysis and opinions regarding the opinions rendered in the May 27, 2022 Declaration of Brian Pfeifer, Ph.D., P.E., in Support of Plaintiffs' Proposed Claim Constructions ("Pfeifer Declaration"). Specifically, I submit this Rebuttal Declaration to provide my rebuttal opinions to Dr. Pfeifer regarding how a person of ordinary skill in the art at the time of invention would understand the terms "a load handling device of the multiplicity of load handling devices will occupy a grid space" / "load handling device is located above the stack and occupying a grid space" and "wheel hub motor."

2. My opinions are based on my skills, knowledge, training, education, and experience in matters of this nature, and my examination of the materials used in preparing this Rebuttal Declaration.

3. I have personal knowledge of the matters set forth in this Rebuttal Declaration, and if I am called upon, I could testify competently about them.

## I.    BACKGROUND

### A.    Qualifications and Experience

4. A copy of my current Curriculum Vitae is attached as Exhibit 1 and provides accurate identification of my background and experience. For the Court's convenience, I provide an overview of my qualifications here.

5. I am an expert in the fields of packaging and automation, including the design, development, operation, and optimization of packaging and packaging machinery.

6. I am currently an Associate Professor Emeritus in the Mechanical Engineering, Aeronautical Engineering, and Nuclear Engineering Department at Rensselaer Polytechnic Institute ("RPI") in Troy, New York.

7.      I am the President of Distributed Robotics, LLC, which focuses on novel robotic automation, including for packaging applications. For example, we developed a machine for separating and sorting a bulk collection of packaged products into a uniformly separated, spaced flow (which we refer to as a "product singulator"). We developed a machine for stacking cases of packaged products on pallets (which we refer to as a "palletizer").

8.      I am the Automation Director for Pack Flow Concepts, LLC, a company that focuses on packaging automation and new product development. For example, we developed a machine for high-speed case packing that is directly connected to a packaging machine. The machine receives packaged products from the packaging machine and automatically places the products in cases at a high speed. I was the Head Automation Consultant for Home Delivery Services, which focuses on e-commerce robotic automation, such as order fulfillment of packaged goods for home-delivery groceries.

9.      I received a Bachelor of Science in mechanical engineering from RPI in 1976. I received a Master of Engineering in mechanical engineering in 1977 and a Ph.D. in mechanical engineering in 1981 from RPI. My Ph.D. thesis was titled "General Robot Arm Simulation Program," which related to computer graphic simulation of robot arms.

10.     After receiving my Ph.D., I served as an Assistant Professor in Mechanical Engineering at RPI from 1981 to 1986. In 1986, I became an Associate Professor of Mechanical Engineering at RPI. I have taught various packaging-related courses at RPI, including "Modular Automation Concepts" and "Design of Automatic Machinery," which are courses related to the design and development of packaging machinery. I also taught the course "Advanced Manufacturing Lab," in which students design custom packaging for an item and are graded on the aesthetics, functionality, and appropriateness of the packaging. I have also taught various

courses related to machine operation, design, and development at RPI. In addition to the courses listed above, I have taught "Mechanisms" and "Kinematic Synthesis," both of which teach students to design machines for a variety of applications, including, but not limited to, packaging applications.

11. My research has focused on various areas of automation and design, including designing machines for packaging goods. I have served on consulting teams for many companies on projects related to manufacturing, automation, and robotics, including in the packaging area.

12. Over the years, I have actively served in leadership roles for a number of organizations, including on the Conference Planning Board for the American Society of Mechanical Engineers ("ASME"). Since 2005, I have been a Fellow of ASME, which is a distinction given to select ASME members to recognize outstanding achievements in the engineering field. I also received the ASME Best Paper Award in 2005 for the Material Handling Engineering Division.

13. I have published over 80 peer-reviewed publications, as well as authored several book chapters, books, and trade journal contributions in the field of robotics and packaging. For example, I am the author of the textbook *Design of Automatic Machinery* which, among other things, examines options for practical design of automated processes and provides a desk reference for designers of automated machines on many automation concepts.

14. I am also an inventor of several United States patents and published patent applications in the automated storage and retrieval systems ("AS/RS") field. For example, U.S. Patent No. 9,399,529, titled "Automated product engager, transporter and patterned depositor system," relates "to automated systems for engaging products to process the products and then position them on a transporter to transport the products to a patterned depositor for depositing the

products in a pattern. An example includes filling bags with food, placing the bags on a conveyor and depositing the bags in a packing pattern within a packing case." Another patent on which I am a named inventor is U.S. Patent No. 9,334,081, titled "Folding side-wall container and automated system of use," which relates to "containers utilized in transport of goods typically sold at retail stores, such as pharmacy chain stores, hardware stores, etc., and in particular relates to such a container having a folding side wall." In one "embodiment of the disclosure, the folding side wall container may also include a corrugated, semi-rigid cardboard-type box nested within the container." Another patent, U.S. Patent No. 6,688,451, titled "Multi-head robot system and method of use," relates to "a number of robotic devices, each of which is able to operate independently at any of a number of discrete destinations."

15.     I am also an inventor of numerous United States patents and published patent applications in the area of machine design and operation. For example, U.S. Patent No. 6,565,308, titled "Bulk mail container unloading system, apparatus and method," relates to a system for material loading and unloading, and more particularly, to an apparatus for moving a bulk mail container from an upright position to an upended position to allow dumping of the container's contents onto an unloading surface. U.S. Patent No. 7,712,598, titled "Robotic tread system having a net-zero motion head for moving objects," relates to a continuous robotic tread system for picking and placing packaged goods, which eliminates repeated stopping and starting of the system.

16.     I am a frequent consultant, expert witness, and speaker on matters related to packaging and machine design, including the design and operation of packaging machinery.

17.     I have served as an expert witness on multiple cases, including cases involving IPRs, contract disputes, and civil litigation in federal and state courts. My Curriculum Vitae lists many of these cases.

18.    I have provided testimony in a deposition or trial in the past four years in the following proceedings:

- *Antonio Partida v. Burke Rehabilitation Hosp.*, Index No. 67977/16 (Sup. Ct., Westchester Cnty);

- *In re: Certain Personal Transporters and Components Thereof, and Packaging and Manuals Therefor and Certain Personal Transporter and Components Thereof*, Inv. Nos. 337-TA-1007 and 337-TA-1021 (U.S. Int'l Trade Comm'n);

- *Changer & Dresser, Inc. v. Ontario Ltd.*, Case No. IPR2015-00341;

- *Automated Packaging Systems, Inc. v. Free-Flow Packaging International, Inc.*, Case No. IPR2018-00849;

- *AutoStore System, Inc. v. Ocado Innovation Ltd.*, Case No. IPR2021-00798;

- *AutoStore System, Inc. v. Ocado Innovation Ltd.*, Case No. IPR2022-00443;

- *AutoStore System, Inc. v. Ocado Innovation Ltd.*, Case No. IPR2022-00673.

### B.    Compensation

19.    I am being compensated for my time spent on this matter at my usual and customary rate of $400 per hour, plus reasonable expenses. My compensation is not contingent on the outcome of this action, and I have no financial interest in this case.

### C.    Scope of This Declaration

20.    I understand that Ocado Innovation Ltd. and Ocado Solutions Ltd. (collectively, "Ocado") filed the present lawsuit against AutoStore and alleged infringement of claims 1–18 of U.S. Patent No. 10,913,602 ("'602 patent").

21.    I have been asked to evaluate the following claim terms:

- "a load handling device of the multiplicity of load handling devices will occupy a grid space" or "load handling device is located above the stack and occupying a grid space," which appears in claims 1 and 12 of the '602 patent; and

- "wheel hub motor," which appears in claims 6, 10, and 17 of the '602 patent.

22. I previously offered my opinion as to the meaning of these two claim terms in *Ocado Innovation Ltd. v. AutoStore System, Inc.*, Case No. IPR2022-00443. *See* IPR2022-00443, AS-1003, Derby Decl. ¶¶ 77–88.

### D.    Materials Considered

23. In preparing this Rebuttal Declaration, I have considered the '602 patent, its prosecution history (also referred to as file history), the Parties' claim construction disclosures, including the extrinsic evidence cited therein, and the Pfeifer Declaration. A complete list of the materials I considered is found in Exhibit 2 to this Rebuttal Declaration. I have also relied on and considered my knowledge, training, and experience as a mechanical engineer over the past more than fifty years.

## II.    CLAIM CONSTRUCTION PRINCIPLES

24. I am not a lawyer and have no formal education in patent law. For the purposes of performing my analyses and forming my opinions, I have been informed by counsel of certain legal principles with respect to patent law and claim construction, discussed below.

25. While reviewing materials and forming the opinions expressed in this Rebuttal Declaration, I applied these legal principles and informed my opinions based on my understanding of the relevant law.

26. I understand that the claims of a patent define the purported invention, and the purpose of claim construction is to understand how a person having ordinary skill in the art ("PHOSITA") would have understood disputed claim terms at the time of the purported invention.

27.    I understand that a "person of ordinary skill in the art" is a hypothetical person presumed to have known the relevant art at the time of the invention. Factors that may be considered in determining the level of ordinary skill in the art include: (1) type of problems encountered in the art; (2) prior art solutions to those problems; (3) how quickly innovations are made; (4) sophistication of the technology; and (5) educational level of active workers in the field. In a given case, not every factor may be present, and one or more factors may predominate. I also understand that the hypothetical PHOSITA to which the claimed subject matter pertains would, of necessity, have the capability of understanding the scientific and engineering principles applicable to the pertinent art and, moreover, would be a person of ordinary creativity, not an "automaton."

28.    I understand that patent claims are construed or interpreted from the perspective of a PHOSITA at the time of the claimed invention. I understand that the most important evidence to consider in construing the claims is the "intrinsic" record. This includes the claim language, the patent's specification, and the prosecution history. I understand that the PHOSITA must read the claim terms in the context of the claim and in the context of the entire patent specification.

29.    I understand reference materials that were publicly available at the time that the patent application was filed, such as dictionaries, treatises, or other technical references, may provide context and background for deciphering how a PHOSITA would have considered the terms used in the claims. However, I understand that such references, as well as testimony (including this Rebuttal Declaration) are generally known as "extrinsic evidence" and are accorded less weight than evidence found within the patent and file history.

30.    I understand that PHOSITAs are deemed to read the words used in the patent with an understanding of their meaning in the field and to have and apply knowledge of any special meaning and usage associated with the term within the field. The words used by the inventor to

describe the invention must be understood and interpreted as they would be understood and interpreted by a PHOSITA.

31.    I understand that the specification is the single best guide for construing the claims and that the interpretation to be given a term can only be determined and confirmed with a full understanding of what the inventors actually invented and intended to envelop with the claim as set forth in the patent itself. I understand that what an alleged inventor describes as "the present invention" in the specification is often a keystone for interpreting a claim in light of the specification.

32.    I have approached my analysis of the '602 patent from the perspective of a PHOSITA at the time of the filing of the relevant patent applications giving rise to the '602 patent, informed by the specification and teachings of the '602 patent, the intrinsic record, and extrinsic evidence where appropriate, consistent with the legal standards noted above.

## III.    OPINIONS AND ANALYSIS

33.    I understand that the Parties dispute the meaning of several terms in the '602 patent. I have been asked to analyze and offer my opinions on Dr. Pfeifer's opinions on the following terms:

- "a load handling device of the multiplicity of load handling devices will occupy a grid space" or "load handling device is located above the stack and occupying a grid space," which appears in claims 1 and 12 of the '602 patent; and

- "wheel hub motor," which appears in claims 6, 10, and 17 of the '602 patent.

34.    I disagree with Dr. Pfeifer's opinion that the term "a load handling device of the multiplicity of load handling devices will occupy a grid space" or "load handling device is located above the stack and occupying a grid space" should be given its plain and ordinary meaning. In my opinion, a PHOSITA would more reasonably understand the term to remain consistent with

the way the patent describes the alleged invention: a load handling device will occupy only a single grid space in a storage system.

35.     I further disagree with Dr. Pfeifer's opinion that the plain and ordinary meaning of "wheel hub motor" is a motor that is integrated within a hub of a wheel as too narrow. In my opinion, a PHOSITA would more reasonably understand the term "wheel hub motor" to mean an electric motor situated at or at least partly within the wheels of the vehicle.

## A.     The Level of Skill in the Art

36.     In rendering the opinions set forth in this Rebuttal Declaration, I was asked to consider the patent claims and the prior art through the eyes of a PHOSITA. Dr. Pfeifer proposes a PHOSITA "would have had at least a Bachelor's degree in Mechanical Engineering and at least two to three years' experience working in the field of the design of robotic vehicles for material handling systems." *See* Pfeifer Decl. at ¶ 34. I disagree with this definition of a PHOSITA.

37.     I placed myself back in time to approximately 2013 and considered the factors set forth above to determine the skill level of a PHOSITA. In my opinion, a PHOSITA has at least a Master's degree in mechanical engineering or robotics and at least three to four years of experience working as an engineer in the field of AS/RS. Alternatively, in my opinion, a PHOSITA would have at least a Bachelor's degree in mechanical engineering and at least four to five years of experience working as an engineer in the field of AS/RS.

38.     I was a PHOSITA as of the '602 patent's earliest possible priority date (August 9, 2013).

39.     I have applied this level of skill in arriving at my opinions in this Rebuttal Declaration. However, my opinions would be the same if I applied Dr. Pfeifer's proposed level of skill.

11

**B.**     **"a load handling device of the multiplicity of load handling devices will occupy a grid space" / "load handling device is located above the stack and occupying a grid space"**

40.     The Parties' competing constructions for the term "a load handling device of the multiplicity of load handling devices will occupy a grid space" or "load handling device is located above the stack and occupying a grid space" are listed below:

| Claim Term | AutoStore/Defendants' Proposed Constructions | Ocado/Plaintiffs' Proposed Constructions |
|---|---|---|
| "a load handling device of the multiplicity of load handling devices will occupy a grid space" or "load handling device is located above the stack and occupying a grid space" | The load handling device will occupy only a single grid space in the storage system | No construction necessary / plain and ordinary meaning |

41.     Dr. Pfeifer opines that the term "a load handling device of the multiplicity of load handling devices will occupy a grid space" / "load handling device is located above the stack and occupying a grid space" should be given its plain and ordinary meaning "without further construction because the terms are common English words without a specialized technical meaning." Pfeifer Decl. at ¶ 36. However, Dr. Pfeifer offers no opinion as to what the term's plain and ordinary meaning is; instead, he opines only that the term should not be limited to "claims to robots that cover 'only' a single grid space."

42.     Dr. Pfeifer opines that the '602 patent's specification description of a robot that "occupies substantially a single grid space" ('602 patent, 7:3–8) indicates that "the robot can occupy more than a single grid space." Pfeifer Decl. at ¶ 37. I disagree. There are no examples in the '602 patent where an allegedly novel load handler occupies more than a single grid space. Instead, the only examples of the alleged invention in the '602 patent's specification and

12

prosecution history consistently describe the invention as a load handling device that occupies only a single grid space in the storage system.

43.    I understand that Ocado contends that the priority date of the '602 patent is August 9, 2013 based on the filing date of UK Patent Application GB 1314313.6 ("GB 131413.6"). *See* Plaintiffs' First Suppl. Prelim. Infringement Contentions at 10. I further understand that because claims are to be construed from the point of a PHOSITA *at the time of the invention*, GB 1314313.6 is particularly indicative of what the alleged invention is. The specification of GB 1314313.6 consistently states that "*the present invention* concerns load handling devices" that "occup[y] *only a single grid space* in the storage system." GB 1314313.6 at 5:35–39 (emphasis added); *see also id.* at 6:10-15 (noting one advantage of the invention was that "the load handling device of *the invention occupies the space above only one stack of containers* in the frame"). Thus, Dr. Pfeifer's opinion is inconsistent with how the alleged inventors described their invention in the specification of GB 1314313.6. Indeed, the specification of GB 1314313.6 nowhere stated that the robot "occupies *substantially* a single grid space"; rather, it only ever stated that the robot "occupies *a single* grid space":

> *Each load handling device occupies a single grid space*, corresponding to the area occupied by only one stack of containers.

GB 1314313.6 at 7:40–8:2 (emphasis added). Thus, because the intrinsic record at the time of invention only ever describes a robot that "occupies a single grid space," Dr. Pfeifer's opinion is also inconsistent with how a PHOSITA would best understand "[will occupy/and occupying] a grid space" at the time of invention.

44.    Dr. Pfeifer's opinion is also inconsistent with the overall objective of the invention as described in the specification of the '602 patent. The specification repeatedly touts the benefit "of *the invention*" as advantageous over the prior art "because the reduced footprint allows more

13

load handling devices to be accommodated and reduces the likelihood of one device obstructing the optimum path of another." *Id.* at 5:44–47 (emphasis added). Specifically, the '602 patent states that the "benefit of the present invention is that, because the load handling devices ***occupy*** the space above ***only one stack***, the efficiency of a multiple-device system can be improved compared to prior art load handling device designs which occupy two or more stack spaces." *Id.* at 7:61–65 (emphasis added). The specification specifically distinguishes the prior art from "the invention" because "the invention" occupies only a single grid space: "[T]he prior art devices 30, although less tall, occupy two stack spaces compared to the taller but smaller-footprint devices 100 of the invention," which "occup[y] a single grid space in the storage system." *Id.* at 9:36–48. The '602 patent purports to solve this problem by "reduc[ing] the size of the load handling devices." *Id.* 4:58. Dr. Pfeifer's proposed construction, which would include robots that occupy more than one grid space in the storage system, would not achieve these stated benefits.

45.     Consistent with the overall objective of the invention, the specification consistently describes the invention as relating to a load handling device that occupies only a single grid space. The Abstract states that "[t]he load handling device has a footprint that, in use, occupies ***only*** a single grid space in the storage system." '602 patent, Abstract. Indeed, the specification repeatedly refers to the "invention" as "load handling devices [that] occupy the space above only one stack." *Id.* at 7:61–63; *see also id.* at 5:38–40 ("Advantageously, the load handling device of the invention occupies the space above only one stack of containers in the frame."). Based on the teachings in the specification, a PHOSITA would therefore understand that the claims are limited to load handling devices that occupy only a single grid space in the storage system.

46.     The emphasis of the invention being a load handler that occupies only a single grid space is further supported by the statements Ocado made to the PTO during the prosecution of the

parent and grandparent of the '602 patent, U.S. Patent Nos. 10,000337 ("'337 patent") and 10,829,302 ("'302 patent"), both of which share a specification with the '602 patent. For example, during the prosecution of the '337 patent, in response to a Non-final Office Action, Ocado stated "[t]he load-handling device is sized such that it occupies *only a single grid space* in the storage system." *See*, '337 patent, File history, Resp. to Non-final Office Action at 11 (Feb. 7, 2018). Ocado then went on to distinguish its alleged invention from the prior art by stating "Hognaland does not disclose an embodiment having a footprint that occupies a single grid space in the storage system." *Id*. at 13. Similarly, during the prosecution of the '302 patent, the patent examiner issued a notice of allowance because of the alleged novelty of a robot with a footprint of a single grid space:

> The prior art of record does not disclose or render obvious a storage system as specifically claimed with the structure of the load handling device with the wheel and rail configuration as claimed, such that the load handling device has a footprint that occupies only a single grid space in the storage system.

*See* '302 patent, File history, Notice of Allowance at 2 (July 9, 2020). Dr. Pfeifer's proposed construction, which would include robots that occupy more than one grid space in the storage system, goes against what the inventors and the patent examiner understood to be the invention disclosed in the specification of the '602 patent.

47.    Dr. Pfeifer's opinion is also inconsistent with Ocado's recent description of the invention disclosed in the '602 patent in IPR2022-00443. In its overview of the '602 patent, Ocado states "[t]he '602 Patent describes a compact load-handling device (e.g., a robot) configured to have a reduced footprint on the storage grid on which the device travels as compared to prior art systems—i.e., the robot *occupies a single grid space* in the storage system." IPR2022-00443, Paper 6, Patent Owner Prelim. Resp. at 4.

15

48.    Dr. Pfeifer also states that construing "[will occupy/and occupying] a grid space" as meaning "will occupy only a single grid space in the storage system" "cannot be correct because it would render superfluous other limitations in the claim." Pfeifer Decl. at ¶ 38. I disagree with this assertion. Dr. Pfeifer identifies a "No-Obstruction limitation" and a "No-Extension limitation" in claim 1 of the '602 patent as rendered "superfluous if the robot is limited to only a single grid space." However, Dr. Pfeifer's analysis reflects a flawed reading of claim 1 of the '602 patent. As written, the pertinent limitation of claim 1 reads:

> [A] side of the external housing facing the Y-direction extending no further, in the Y-direction, than the first set of wheels on that side of the load handling device, and a side of the external housing facing the X-direction extending no further, in the X-direction, than the second set of wheels on that side of the load handling device, ***such that*** a load handling device of the multiplicity of load handling devices will occupy a grid space ***and*** will not obstruct a load handling device of the multiplicity of load handling devices occupying or traversing an adjacent grid space in the X-direction and will not obstruct a load handling device of the multiplicity of load handling devices occupying or traversing an adjacent grid space in the Y-direction.

'602 patent, Claim 1. As indicated by the phrase "***such that***," when read in the proper context, the "Will Occupy/Occupying a Grid Space limitation," "No-Obstruction limitation," and "No-Extension limitation" as discussed by Dr. Pfeifer are not distinct concepts but rather all part of one, consistent description of the overall invention of a load handling device that occupies only a single grid space. Thus, construing "[will occupy/and occupying] a grid space" as meaning "will occupy only a single grid space in the storage system" is not superfluous for the same reasons. Indeed, that claim 1, in the same sentence, requires the load handling device to not obstruct another load handling device that may occupy or pass by the adjacent grid space in both the X- and Y-directions further indicates to a PHOSITA that the "[will occupy/and occupying] a grid space" limitation covers load handling devices that occupy only a single grid space in the storage system. *See*

16

IPR2022-00443, Derby Decl. at ¶¶ 123–133. Taken together, the most reasonable way a PHOSITA would understand the "Will Occupy/Occupying a Grid Space limitation," "No-Obstruction limitation," and "No-Extension limitation" is that they claim load handling devices that occupy only a single grid space in the storage system.

49.    For all these reasons, I disagree with Dr. Pfeifer's opinions. In my opinion, construing "a load handling device of the multiplicity of load handling devices will occupy a grid space" / "load handling device is located above the stack and occupying a grid space" to mean the load handling device will occupy only a single grid space in the storage system better aligns with the specification, the inventor's understanding of their alleged invention, and the consistency of the claim language.

C.    "wheel hub motor"

50.    The Parties' competing constructions for the term "wheel hub motor" are listed below:

| Claim Term | AutoStore/Defendants' Proposed Constructions | Ocado/Plaintiffs' Proposed Constructions |
|---|---|---|
| "wheel hub motor" | Plain and ordinary meaning: an electric motor situated at or at least partly within the wheels of the vehicle | No construction necessary / plain and ordinary meaning<br><br>In the alternative:<br><br>"a motor that is integrated within a hub of a wheel" |

51.    Dr. Pfeifer opines that "[a] POSITA would understand that a 'wheel hub motor' is integrated within the wheel, not 'situated at' (but not within) the wheel." Pfeifer Decl. at ¶ 43.

52.    Dr. Pfeifer does not explain what a PHOSITA would understand "integrated within" to mean. As an initial matter, Dr. Pfeifer does not appear to take issue with the "or at least partly within the wheels of the vehicle" portion of AutoStore's proposed construction. *See* Pfeifer

17

Decl. at ¶ 43. Moreover, as a technical matter, a motor "situated at" a wheel hub can still be "integrated within" a wheel hub, as the motor would need a way to attach to the wheel hub to apply the necessary force to turn the wheel. Dr. Pfeifer has not pointed to anything in the specification or prosecution history of the '602 patent that would exclude a motor situated at the wheel hub.

53.    To the extent Dr. Pfeifer's construction of "wheel hub motor" as integrated within the wheel would exclude motors "situated at or at least partly within the wheels of the vehicle," such a construction is too narrow and improperly reads additional language into the claim. A PHOSITA would recognize that a "wheel hub motor" could encompass many types of motors and thus would more reasonably understand "wheel hub motor" to mean "an electric motor situated at or at least partly within the wheels of the vehicle."

54.    Dr. Pfeifer states that "[t]he specification describes the wheel hub motors of the patent as being 'integrated within the wheel hub[],'" Pfeifer Decl. at ¶ 42; however, in context, such a motor is mentioned in the specification as only one possible motor-type, *see* '602 patent, 6:1–2 ("Alternatively, the wheels *may* include integrated motors, *for example* motors integrated within the wheel hubs."). Nothing in the patent limits the applicable wheel hub motors to one specific type of motor. Dr. Pfeifer also relies on Figure 17 in his analysis, but Figure 17 shows merely one embodiment of the alleged invention. *Id*. at 8:57–58 ("FIG. 17 is a perspective view of a load handling device according to *a further embodiment* of the invention."). Indeed, GB 1314313.6 did not even include Figure 17. *See generally* GB 1314313.6.

55.    Additionally, the '602 patent specification and its prosecution history do not ascribe any special meaning to the term "wheel hub motor," nor do they disclaim any subject matter from its scope. Thus, in my opinion, a PHOSITA would not understand the term "wheel hub motor" to be limited to only a single example. Rather, a PHOSITA would most reasonably understand

"wheel hub motor" to mean an electric motor situated at or at least partly within the wheels of the vehicle, which encompasses multiple types of wheel hub motors.

56.    This understanding is further supported by statements made by Ocado and Dr. Pfeifer himself in IPR2021-00311. In IPR2021-00311, Dr. Pfeifer (and Ocado) stated that "'[a]n electric motor' that is 'situated at or at least partly within' the wheels of the vehicle … *describes an 'in-wheel' or 'wheel-hub' motor*." IPR2021-00311, Ex. 1015, Pfeifer Decl. ¶ 78; *see also id.* at ¶ 80 ("[A] structure of 'electric motors situated at or at least partly within the wheels of the vehicle,'" is "otherwise known as 'in-wheel' or 'wheel hub' motors."). As a PHOSITA as of the effective filing date of the '602 patent, Dr. Pfeifer's above statement supports that a PHOSITA would understand "wheel hub motor" to mean an electric motor situated at or at least partly within the wheels of the vehicle. Dr. Pfeifer attempts to distinguish these statements as "the construction of a different term in a different patent," but that is not correct. *See* Pfeifer Decl. at ¶ 44. As is clear from the statements themselves, Ocado and Dr. Pfeifer were not limiting their statements to the specific terms at issue, but making a generic statement as to what the term "wheel hub motor" means.

57.    For the above reasons, it is my opinion that "a motor that is integrated within the hub of a wheel" is too narrow of a construction for "wheel hub motor." Rather, in my opinion, "an electric motor situated at or at least partly within a wheel of the vehicle" better aligns with a PHOSITA's understanding of "wheel hub motor."

## IV.    RESERVATION OF RIGHTS

58.    I reserve the right to respond to any evidence (including expert opinions) that Ocado may offer in support of its claim construction positions.

Dated: 6/24/22

_____
Stephen Derby, PhD