**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW HAMPSHIRE**

| | |
|---|---|
| OCADO INNOVATION LTD. and OCADO SOLUTIONS LTD., <br><br> Plaintiffs, <br><br> v. <br><br> AUTOSTORE AS and AUTOSTORE SYSTEM INC., <br><br> Defendants. | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) |

Civil Action No. 1:21-cv-00041

## <u>DECLARATION OF PETROS IOANNOU, PH.D.</u>

**TABLE OF CONTENTS**

TABLE OF EXHIBITS ...................................................................................................... iv

I.      QUALIFICATIONS AND EXPERIENCE ............................................................. 1

II.     COMPENSATION ................................................................................................... 5

III.    SCOPE OF THIS DECLARATION ........................................................................ 5

IV.     MATERIALS CONSIDERED.................................................................................. 8

V.      LEGAL PRINCIPLES RELATED TO CLAIM CONSTRUCTION........................ 8

VI.     THE '404 AND '770 PATENTS .............................................................................. 11

        A.      The '404 Patent ............................................................................................ 11

        B.      The '770 Patent ............................................................................................ 13

        C.      The Common Specification .......................................................................... 15

        D.      Prosecution Histories of the '404 and '770 Patents ..................................... 21

                1.      The '404 Patent Application ............................................................... 21

                2.      The '770 Patent Application ............................................................... 23

VII.    THE LEVEL OF SKILL IN THE ART ................................................................... 24

VIII.   CLAIM TERMS IN THE '404 PATENT ................................................................ 25

        A.      "Clearance Unit"........................................................................................... 25

                1.      "Clearance Unit" in Claim 1 ............................................................. 25

                2.      "Clearance Unit" in Claim 3 ............................................................. 34

                3.      "Clearance Unit" in Claim 7 ............................................................. 35

                4.      "Clearance Unit" in Claim 8 ............................................................. 40

                5.      "Clearance Unit" in Claim 9 ............................................................. 41

                6.      "Clearance Unit" in Claim 11 ........................................................... 45

                7.      "Clearance Unit" in Claim 12 ........................................................... 45

        **8.**      "Clearance Unit" in Claim 13 ................................................................. 46

        **9.**      "Clearance Unit" in Claim 14 ................................................................. 46

    B.      "Wherein the Clearance Instruction Is Provided for Execution by [a Control Unit on Each Transporting Device] / [Each Transporting Device] at a Future Time" ............................................................................................................... 47

        **1.**      A person of ordinary skill in the art would not understand "for execution at a future time" with reasonable certainty.............................. 47

    C.      "Clearance Instruction" / "Clearance Command" ................................................. 52

    D.      "A Route [of a Transporting Device] From One Location on the Grid-Like Structure to Another Location on the Grid-like Structure [for Each Transporting Device]" ..................................................................................... 60

    E.      "Control Unit" (Claim 14) ................................................................................. 63

**IX.**      **CLAIM TERMS IN THE '770 PATENT** ........................................................................ **65**

    A.      "One or More Processors ................................................................................. 65

        **1.**      "One or more processors" in Claim 1 ....................................................... 66

        **2.**      "One or more processors" in Claim 9 ....................................................... 67

        **3.**      "One or more processors" in Claim 10 ..................................................... 68

        **4.**      Claim 29 ................................................................................................. 68

    B.      "Wherein the one or More Processors Are Configured to Control Operations of the Plurality of Transporting Devices in Real Time" (Claim 21) ..................... 69

    C.      "Potential for Collision" ................................................................................... 72

**X.**      **RESERVATION OF RIGHTS** ........................................................................................ **74**

## TABLE OF EXHIBITS

| EXHIBIT | DESCRIPTION | BATES NO. |
|---------|-------------|-----------|
| A | Curriculum Vitae of Dr. Petros Ioannou | |
| B | List of Materials Considered | |
| C | U.S. Patent No. 10,901,404 | AS-NH_00211497-521 |
| D | U.S. Patent No. 11,079,770 | AS-NH_00211471-496 |
| E | File History of U.S. Patent No. 10,901,404 | AS-NH_00215115-6487 |
| F | File History of U.S. Patent No. 11,079,770 | AS-NH_00208874-9329 |
| G | 5/13/2022 Ocado's Supplemental Proposed Claim Constructions and Supporting Evidence | |
| H | U.S. Patent No. 7,912,574 | |
| I | U.S. Patent No. 9,188,982 | |
| J | U.S. Patent No. 9,886,036 | |
| K | File History of European Patent Application EP 3376450 | AS-NH_00209330-683 |
| L | File History of U.S. Patent No. 10,474,141 | AS-NH_00207203-750 |
| M | Excerpt from Webster's New World College Dictionary (5th Ed.) (2014). | AS-NH_00217322-24 |
| N | Excerpt from The American Heritage Dictionary (2d Ed.) (1989) | AS-NH_00217319-21 |
| O | Excerpt from Webster's Third International Dictionary (1986). | AS-NH_00217302-04 |
| P | 5/24/2022 AutoStore's Updated Disclosure of Proposed Claim Constructions and Supporting Evidence | |

I, Petros Ioannou, declare under penalty of perjury as follows:

1.      I submit this Declaration to provide relevant background information regarding the technology at issue in U.S. Patent Nos. 10,901,404 ("the '404 patent") and 11,079,770 ("the '770 patent") (collectively, "Asserted Patents") and to set forth my opinions about the meaning of certain disputed claim terms in the Asserted Patents from the perspective of a person of ordinary skill in the art ("POSITA").

2.      I have been retained by counsel on behalf of AutoStore AS and AutoStore System, Inc. (collectively, "AutoStore") to provide opinions in this matter related to my experience and expertise.  My opinions are based on my skills, knowledge, training, education, and experience, including in matters of this nature, and my examination of the materials used in preparing this Declaration.

3.      I have personal knowledge of the matters set forth in this Declaration, and if I am called upon, I could testify competently about them.

## I.      QUALIFICATIONS AND EXPERIENCE

4.      I am a citizen of the United States, currently residing in Palos Verdes Estates, California where I am a Professor of Electrical and Computer Engineering Department with joint Professor appointments with the Departments of Aerospace and Mechanical and Industrial Engineering.  I am the holder of the A.V. 'Bal' Balakrishnan Endowed Chair.

5.      I have more than 42 years of experience in automatic control systems and system theory with applications to a wide range of areas that include automated container terminals, automated vehicles, collision avoidance systems, routing of vehicles and other intelligent transportation technologies

1

6.      I received a Bachelor of Science degree in Mechanical Engineering from the University London (University College) in 1978, a Master of Science degree in Mechanical Engineering from the University of Illinois at Urbana Champaign in 1980 and a Ph.D. degree in Electrical Engineering from University of Illinois at Urbana Champaign in 1982.  My Ph.D. thesis was on the topic of Robust Adaptive Control with applications to vehicle and process automation.

7.      In 1982, I became an assistant professor in Electrical Engineering and Systems at the University of Southern California (U.S.C.), Los Angeles, California.  In 1987, I was promoted to associate professor at U.S.C. and in 1992 I was promoted to a Full Professor.

8.      My research at U.S.C. was initially focused on Robust Adaptive Control theory and applications some of which involved vehicle automation and safety funded by Ford Motor Company and General Motors, Adaptive Routing and Learning Automata funded by AT&T and aircraft control funded by Rockwell International, theory and applications in a wide range of areas that include robotics, computer disc drives, aerospace funded by the National Science Foundation and many other funding agencies and industry.  In 1991, I founded the Center for Advanced Transportation Technologies (CATT) as an organized unit at the University of Southern California with focus on vehicle automation for the road network and port operations which I am still directing.  In 1999, I co-founded the Metropolitan Transportation Center (METRANS) which I became the Associate Director of Research whose focus is on goods movements in metropolitan areas which involved freight routing, port operations and technologies.  The center was funded by the Department of Transportation as a Tier I University Center.  In 2016, METRANS won a Regional University Center which is the only one in the Pacific Southwest Region 9.  My involvement with intelligent transportation systems shifted my research focus to vehicle automation with applications to traffic and container terminals.  We designed and evaluated several

2

automated storage and retrieval systems (AS/AR) for container terminals in various configurations which involved automated vehicles and robotic shuttles operating in a warehouse type of environment. The work was published and received considerable attention as confirmed by the number of citations and awards received. Due to this expertise I am often invited to participate in panels of experts involving different automated technologies for terminal operations by local stakeholders.

9.  Based on my experience with a very wide range of applications involving vehicle automation, vehicle routing, collision avoidance systems, optimization of processes, mobility and efficiency, I am very familiar with the issues and challenges involved in the coordination of robots in warehouse environments. Many of these issues and challenges are common to automated vehicles and robotic shuttles operating in container terminals that I worked with as well as in automated vehicles crossing intersections, merging and changing lanes and avoiding collisions, planning routes using optimization techniques etc. Even though every application has unique features when it comes to implementation the issue of efficiency, mobility, collision avoidance, making sure logical processes and traffic protocols do not lead to deadlocks, issues of equipment and software failure, optimum path planning, *etc.*, are all common features of every AS/AR and automated system involving mobile robots, automated vehicles, automated shuttles and automated equipment interacting with mobile agents as often called.

10.  I have received numerous awards for my work and research in the field of control and intelligent transportation systems as listed in my CV attached hereto as Exhibit ("Ex.") A to this Declaration. For example:

- In 2022, I was inducted to the National Academy of Engineering for my work in robust adaptive control and intelligent transportation systems.

3

- In 2019, I received the User-Inspired Research Award *In recognition and Appreciation of Excellence*, USC Viterbi School of Engineering, April 24, 2019.

- In 2018, I became an IEEE Lifetime Fellow.

- In 2017, I became a Fellow of the American Association for the Advancement of Science ("AAAS").

- In 2017, I received the Transition to Practice Award for research in vehicle automation and commercialization of adaptive cruise control systems by IEEE Control System Society.

- In 2016, I received the IEEE Transportation Technologies Field Award, the highest level award under IEEE for contributions to the design, analysis and implementation of adaptive cruise control systems.

- In 2016, I received the Senior Research Award, by the Viterbi School of Engineering at USC.

- In 2012, I received the IEEE Intelligent Transportation System Society (ITSS) Outstanding Research Award.

- In 2009, I received the Heaviside Medal for Achievement in Control by the Institution of Engineering and Technology (IET) in the United Kingdom.

- In 2008, I received the IEEE ITSS Outstanding ITS Application Award.

- In 2006, I became a Fellow of the International Federation of Automatic Control (IFAC)

- In 1985, I received the Presidential Young Investigator Award from the White House.

11.    I am the author of 9 books and a coauthor of over 400 peer-reviewed publications and numerous presentations, in the field of control systems and applications, vehicle routing and automation and intelligent transportation systems.  I graduated up to now 40 Ph.D. students and I served as Principal and Co-Principal Investigator of projects worth over $80 million during my academic career.  I also served as a consultant to a number of companies.  A complete list of my publications and research projects are included in my CV.  I am a highly cited author as shown in the download from Google Scholar appended to the end of my CV in Ex. A.  I am named as an inventor in three patents in the United States.

12.     I previously provided an expert report and/or deposition testimony in the following matters:

- Bartlit Beck Herman Palenchar & Scott LLP representing Carrum Technologies, LLC. 2018 Litigation case.

- Aackoff Mohamed Barristers @ Solicitors, Vancouver Canada, Aston Martin Unintended acceleration accident.

- RCRSD Legal firm, Newport Beach, CA: Expert Consultant to Toyota Unintended Acceleration (Utah case) 2011, 2012.

- Thomson Reuters Expert Witness Services: Expert Consultant to a Toyota Unintended Acceleration (San Diego Case), 2012.

- Liner LLP. Period: 2014-2015. Hired as a consultant by Liner LLP to provide professional services on behalf of, Signal IP, Inc. with respect to litigation and investigations involving a Signal's United States Patent.  Case Nos. 2:14-cv-02454-JAK (JEMx) (Related to 2:14-cv-02962-JAK (JEMx); SA CV14-00497-JAK (JEMx); 8:14-cv-00491-JAK (JEMx); 2:14-cv-02963 JAK (JEMx); 2:14-cv-02457-JAK (JEMx); 2:14-cv-03106-JAK (JEMx); 2:14-cv-03111-JAK (JEMx); LA CV14-03109 JAK (JEMx); 2:14-cv-03105-JAK (JEMx); 2:14-cv-03107-JAK (JEMx); 2:14-cv-03113-JAK (JEMx); 2:14-cv-03108-JAK (JEMx); 2:14-cv-03114-JAK (JEMx)) Declaration: Signed Dec. 2014, Deposition: January 22, 2015, Los Angeles.

## II.     COMPENSATION

13.     I am being compensated for my time spent on this matter at my usual and customary rate of $465 per hour, plus reasonable expenses.  My compensation is not contingent on the outcome of this action, and I have no financial interest in this case.

## III.     SCOPE OF THIS DECLARATION

14.     I understand from AutoStore's counsel that Ocado Innovation Ltd. and Ocado Solutions Ltd. (collectively, "Ocado"), filed the present patent infringement case against AutoStore, alleging infringement of, among others, the '404 and '770 patents.  I understand that in its Preliminary Infringement Contentions, Ocado asserted claims 1, 6-9, 15, and 20 of the '404 patent, and claims 1, 2, 5, 7-8, 12-15, 17-22, and 27 of the '770 patents.  I further understand from AutoStore's counsel that, on May 16, 2022, Ocado asserted new claims from the '404 and '770

5

patents against AutoStore.  In total, I understand that Ocado presently asserts the following claims

of the '404 and '770 patents against AutoStore:    Claims 1-3, 6-9, 11-15, and 17-20 of the '404

patent; and claims 1, 2-10, 12-15, 17-22,  25-27, and 29-30 of the '770 patent.

15.    I have been asked by AutoStore's counsel to provide my opinion about the

technology disclosed in the '404 and '770 patents

16.    I have also been asked by AutoStore's counsel to give my opinion on the

understanding of a person of ordinary skill in the art, as of the priority date of the '404 and '770

patents (which I understand from AutoStore's counsel to be June 3, 2014), of the meaning of the

following claim terms in light of the claim language, the patents' specifications, the patents'

prosecution histories, and other relevant sources of information:

**'404 patent**

- "wherein the clearance instruction is provided for execution by a control unit on each transporting device at a future time" (claim 1); and "wherein the clearance instruction is provided for execution by each transporting device at a future time" (claim 20)

- "clearance instruction" (appearing in claims 1, 20, and certain dependent claims)

- "a route of a transporting device from one location on the grid-like structure to another location on the grid-like structure" (claim 1); and "a route from one location on the grid-like structure to another location on the grid-like structure for each transporting device" (claim 20)

**'770 patent**

- "potential for collision" (claims 1 and 29, and dependent claim 27)

17.    AutoStore's counsel also asked me to provide my opinion as to whether the

specifications of the '404 and '770 patents disclose any algorithm(s) or methods for programming

a computer to perform the functions claimed for the following terms:

6

### '404 patent

- "clearance unit" (appearing in claims 1, 20, and certain dependent claims)

- "wherein the clearance unit is configured as a passive collision avoidance system, wherein each transporting device is operated in a manner without impacting system performance" (claim 7).

- "wherein at least one of the clearance unit, and the movement optimisation unit is configured to dynamically re-plan a route" (claim 9).

- "control unit" (claim 14).

### '770 patent

- "one or more processors configured to:

  determine there is a potential for a collision between the first transporting device traveling along the first path and the second transporting device traveling along the second path, and

  responsive to a determination that there is the potential for the collision;

    withhold a second clearance command for the first transporting device that would cause the first transporting device to travel on the pathways along a portion of the first path,

    determine a revised path different from the first path for the first transporting device to travel on the pathways, and

    generate a third clearance command for the first transporting device to cause the first transporting device to travel on the pathways along a portion of the revised path …"

  (claim 1).

- "wherein the one or more processors are configured to control operations of the plurality of transporting devices in real time" (claim 21).

- "generating, by the one or more processors, a plurality of clearance commands for the plurality of transporting devices to cause the plurality of transporting devices to travel on the pathways along portions of the plurality of paths, the plurality of clearance commands comprising a first clearance command for the first transporting device;

  determining, by the one or more processors, there is a potential for a collision between the first transporting device traveling along the first path and the second transporting device traveling along the second path;

7

in response to determining that there is the potential for the collision:

> withholding, by the one or more processors, a second clearance command for the first transporting device that would cause the first transporting device to travel on the pathways along a portion of the first path,

> determining, by the one or more processors, a revised path different from the first path for the first transporting device to travel on the pathways, and

> generating, by the one or more processors, a third clearance command for the first transporting device to cause the first transporting device to travel on the pathways along a portion of the revised path."

(claim 29).

## IV.    MATERIALS CONSIDERED

18.    In preparing this Declaration, I have considered, among other things, the Asserted Patents, their prosecution histories (also referred to as file histories), and the Parties' claim construction disclosures, including the intrinsic and extrinsic evidence cited therein. A complete list of the materials I considered is attached as Exhibit B to this Declaration. I have also relied on and considered my knowledge, training, and experience as a robotics and control systems engineer and professor over the past more than forty years.

## V.    LEGAL PRINCIPLES RELATED TO CLAIM CONSTRUCTION

19.    I am not a lawyer and have no formal training or education in patent law. For the purposes of performing my analyses and forming my opinions, I have been informed by counsel of certain legal principles with respect to patent law and claim construction, discussed below.

20.    I applied these legal principles while reviewing materials and forming the opinions expressed in this Declaration, and my opinions are informed by my understanding of the relevant law.

21.    I understand that claim construction is solely a matter for the Court to decide and, in general, the ordinary meaning to one of ordinary skill in the art of a claim term used in a patent

8

is determined in the context of the patent's "intrinsic evidence"—namely, the claim language itself, the specification, and the file history of the patent as well as of its family members. The file history is a record of the patentee's (or "applicant's") arguments to the United States Patent and Trademark Office ("USPTO") in support of the patentability of the claims of the patent application.

22.    I understand that a "person of ordinary skill in the art," or "POSITA," is a hypothetical person who is presumed to have known the relevant art at the time of the invention. Factors that may be considered in determining the level of ordinary skill in the art may include: (1) type of problems encountered in the art; (2) prior art solutions to those problems; (3) how quickly innovations are made; (4) sophistication of the technology; and (5) educational level of active workers in the field. In a given case, not every factor may be present, and one or more factors may predominate. A person of ordinary skill in the art is a person of ordinary creativity. A person of ordinary skill in the art would have the capability to understand the scientific principles applicable to the pertinent art.

23.    I understand that persons of ordinary skill in the art are deemed to read the claims in the context of the entire patent, including the specification and file history. In other words, the terms are not considered in a vacuum. A person of skill in the art is also deemed to read the words used in the patent with an understanding of their meaning in the field, and to have and apply knowledge of any special meaning and usage associated with the term within the field. The words used by the inventor to describe the invention must be understood and interpreted as they would be understood and interpreted by a person of ordinary skill in the art.

24.    I understand that the claims (the numbered items found at the end of a patent) define the invention, and the terms used in the claims are generally given the ordinary and customary meanings they would have to a person of ordinary skill in the art at the time of the effective filing

9

date of the application. The context of a claim can be particularly helpful, and other claims may inform the meaning of a term in a particular claim. Terms are normally used consistently throughout a patent. The meaning of a term may help inform the meaning of the same term in other claims. Differences between claims may also help define the terms. For example, a dependent claim (*i.e.*, a claim that refers back to another, earlier claim) that includes a particular limitation (*i.e.*, a claimed aspect of the invention) may indicate that the earlier claim lacks the added limitation.

25.    I understand that reference materials that were publicly available at the time that the patent application was filed, such as dictionaries, treatises or other technical references, may provide context and background for deciphering how one of ordinary skill in the art would have considered the terms used in the claims. However, I understand that such references, as well as testimony (including this declaration) are generally known as "extrinsic evidence," and are accorded less weight than evidence found within the patent and file history.

26.    I have also been informed by counsel that the patent claims must point out and distinctly claim the subject matter that is regarded as the invention. I understand that a failure of a patent claim to point out and distinctly claim the subject matter may render a patent claim "indefinite" and, therefore, invalid. I have also been advised that a patent is invalid for indefiniteness if its claims, read in light of the specification delineating the patent, and the file history, fail to inform, with reasonable certainty, those skilled in the art about the scope of the claimed subject matter.

27.    I have been informed by counsel that under 35 U.S.C. § 112(f), "[a]n element in a claim for a combination may be expressed as a means or step for performing a specified function without the recital of structure, material, or acts in support thereof, and such claim shall be

10

construed to cover the corresponding structure, material, or acts described in the specification and equivalents thereof." I understand that such claim terms are referred to as "means plus function" or "step plus function" terms. For such a term, counsel has informed me that when the structure disclosed in the specification for carrying out its specified function(s) is a general-purpose computer, the term is indefinite when the patent specification fails to disclose algorithms or methods for carrying out the specified function(s).

28.    I have approached my analysis of the Asserted Patents from the perspective of a person having ordinary skill in the art at priority date of the Asserted Patents, informed by the specification and teachings of the Asserted Patents, the intrinsic record, and extrinsic evidence where appropriate, consistent with the legal standards noted above.

## VI.    THE '404 AND '770 PATENTS

### A.    The '404 Patent

29.    The '404 patent issued from U.S. Patent Application No. 16/575,906, filed September 19, 2019, and purports to claim priority to U.S. Patent Application No. 15,992,899, filed on May 30, 2018 and issued a U.S. Patent No. 10,474,141, which purports to be a divisional application of U.S. Patent Application No. 15/316,249, filed as application No. PCT/EP2015/062380 on June 3, 2015 and issued as U.S. Patent No. 10,086,999, which purports to claim priority to British Patent Application GB 1409883.4, filed June 3, 2014 and issued as U.S. Patent No. 10,086,999. '404 patent (Ex. C) at Cover Page, 2.

30.    The '404 patent has twenty claims, including two independent claims: 1 and 20. At a high level, independent claim 1 describes a system for controlling movement of robots in a facility that includes a "movement optimisation unit" ("MOU"); a "reservation unit" ("RU"); and a clearance unit ("CU"). Independent claim 1 recites:

11

1. A system for controlling movement of transporting devices arranged to transport containers, the containers being stored in stacks arranged in a facility, the facility having pathways arranged in a grid-like structure above the stacks, the transporting devices being configured to operate on the grid-like structure, the system comprising:

a movement optimisation unit configured to determine a route of a transporting device from one location on a grid-like structure to another location on the grid-like structure for each transporting device;

a reservation unit configured to reserve a path on the grid-like structure for each transporting device based on the determined route, wherein the path reserved for each transporting device is provided such that no two transporting devices have locations on the grid-like structure which would cause transporting devices to overlap at a same time; and

a clearance unit configured to provide a clearance instruction for each transporting device to traverse a portion of the reserved path, wherein the clearance instruction is provided for execution by a control unit on each transporting device at a future time.

'404 patent, claim 1. Dependent claims 2-19 depend on independent claim 1.

31.    Dependent claim 7 further provides that "the clearance unit is configured as a passive collision avoidance system, wherein each transporting device is operated in a manner without impacting system performance." '404 patent, claim 7.

32.    Dependent claim 8 further provides that "the clearance unit is configured to grant or withhold providing the clearance instruction for a transporting device to traverse a portion of the reserved path based on at least one of: dimensions of the grid-like structure, positions on the grid-like structure, commands to move the transporting device, cancellation of commands to move the transporting device, a current position of the transporting device, a speed of the transporting device, a braking ability of the transporting device, and the clearance instructions provided to the transporting device." '404 patent, claim 8.

33.     Dependent claim 9 further provides that "at least one of the clearance unit, and the movement optimisation unit is configured to dynamically re-plan a route of at least one transporting device." '404 patent, claim 9.

34.     Independent claim 20 recites a method for controlling the movement of robots in a facility that is analogous to system claim 1 but covers a method of operation:

> 20. A method for controlling movement of transporting devices arranged to transport containers, the containers being stored in stacks arranged in a facility, the facility having pathways arranged in a grid-like structure above the stacks, the transporting devices configured to operate on the grid-like structure, the method comprising:
>
> determining a route from one location on the grid-like structure to another location on the grid-like structure for each transporting device;
>
> reserving a path on the grid-like structure for each of the transporting devices based on the determined route, wherein the path reserved for each transporting device is provided such that no two transporting devices have locations on the grid-like structure which would cause transporting devices to overlap at a same time; and
>
> providing a clearance instruction for each transporting device to traverse a portion of the reserved path, wherein the clearance instruction is provided for execution by each transporting device at a future time.

'404 patent, claim 20.

### B.     The '770 Patent

35.     The '770 patent issued from U.S. Application No. 17/149,426, filed January 14, 2021, and purports to claim priority to U.S. Patent Application No. 15/933,097, filed May 30, 2018 and issued as U.S. Patent No. 10,955,834, which purports to be a divisional application of U.S. Application No. 15/316,249, filed as application No. PCT/EP2015/062380 on June 3, 2015 and issued as U.S. Patent NO. 10,086,999.  '770 patent (Ex. D) at Cover Page, 2.

13

36.     The '770 patent has thirty claims, including two independent claims: 1 and 29.

Independent claim 1 recites:

1. A system for controlling movement of at least one transporting device arranged to transport at least one container, the system comprising:

one or more processors configured to:

determine a plurality of paths for a plurality of transporting devices to travel on pathways of a facility so that no two of the plurality of transporting devices have locations while traveling along the plurality of paths that would cause the plurality of transporting devices to overlap at a same time, the plurality of paths comprising a first path for traveling by a first transporting device of the plurality of transporting devices and a second path for traveling by a second transporting device of the plurality of transporting devices,

wherein the pathways form a grid-like structure above a plurality of containers arranged within the facility, the pathways comprising a first set of parallel rails extending in a first direction and a second set of parallel rails extending in a second direction transverse to the first direction in a substantially horizontal plane, at least some of the plurality of containers being stored in stacks,

wherein the plurality of transporting devices are configured to selectively move laterally in the first direction and the second direction on the pathways, at least some of the plurality of transporting devices being configured to transport the plurality of containers,

generate a plurality of clearance commands for the plurality of transporting devices to cause the plurality of transporting devices to travel on the pathways along portions of the plurality of paths, the plurality of clearance commands comprising a first clearance command for the first transporting device,

determine there is a potential for a collision between the first transporting device traveling along the first path and the second transporting device traveling along the second path, and

14

responsive to a determination that there is the potential for the collision;

withhold a second clearance command for the first transporting device that would cause the first transporting device to travel on the pathways along a portion of the first path,

determine a revised path different from the first path for the first transporting device to travel on the pathways, and

generate a third clearance command for the first transporting device to cause the first transporting device to travel on the pathways along a portion of the revised path; and

a memory device configured to store the plurality of clearance commands and the third clearance command.

'770 patent, claim 1.

37.     Dependent claim 21 further requires that "the one or more processors are configured to control operations of the plurality of transporting devices in real time." *Id.*, claim 21.

### C.     The Common Specification

38.     The '404 and '770 patents are both titled "Methods, Systems and Apparatus for Controlling Movement of Transporting Devices" and share an essentially identical specification ("common specification"), but have different claims.  According to their Abstracts, the '404 patent relates to "[a] system and method for controlling movement of transporting devices arranged to transport containers stored in stacks arranged in a facility having pathways arranged in a grid-like structure above the stacks, the transporting devices being configured to operate on the grid-like structure" and the '770 patent related to "[a] system and method for controlling movement of transporting devices arranged to transport containers, the containers being stored in stacks arranged in a facility." '404 patent at Cover Page; '770 patent at Cover Page.

15

39.     In the section of the specification entitled "Summary of the Invention," the specification provides a description of the alleged invention:

> According to exemplary embodiments, a system is provided for controlling movement of transporting devices arranged to transport containers, the containers being stored in stacks arranged in a facility, the facility having pathways arranged in a grid-like structure above the stacks, the transporting devices being configured to operate on the grid-like structure, the system comprising: a movement optimisation unit configured to determine a route of a transporting device from one location on a grid-like structure to another location on the grid-like structure for each transporting device; a reservation unit configured to reserve a path on the grid-like structure for each transporting device based on the determined route, wherein the path reserved for each transporting device is provided such that no two transporting devices have locations on the grid-like structure which would cause transporting devices to overlap at a same time; and a clearance unit configured to provide clearance for each transporting device to traverse a portion of the reserved path.
>
> A method is also disclosed for controlling movement of transporting devices arranged to transport containers, the containers being stored in stacks arranged in a facility, the facility having pathways arranged in a grid-like structure above the stacks, the transporting devices configured to operate on the grid-like structure, the method comprising: determining a route from one location on the grid-like structure to another location on the grid-like structure for each transporting device; reserving a path on the grid-like structure for each of the transporting devices based on the determined route, wherein the path reserved for each transporting device is provided such that no two transporting devices have locations on the grid-like structure which would cause transporting devices to overlap at a same time; and providing clearance for each transporting device to traverse a portion of the reserved path.

'404 patent at 2:31-64.

40.     The '404 patent describes the system in which the alleged invention may be implemented:

> Fully- and semi-automatic goods storage and retrieval systems, various aspects of which may sometimes be referred to as "order fulfillment," "storage and retrieval," and/or "order picking" systems, can be implemented in a wide variety of types and forms.

16

One manner of providing access to goods stored for fully- and/or semi-automatic retrieval, for example, comprises placement of goods, which may be of any desired type(s), in bins or other containers (hereinafter referred to generically as containers), and stacking and/or otherwise disposing the containers in racking or vertically in layers, such that individual containers may be accessible by wholly or partially-automated container retrieval systems.

'404 patent at 4:66-5:11.

41.    Figure 7 of the '404 patent depicts a warehouse with the described structure:



FIG. 7

'404 patent, Fig. 7.  The specification describes robots ("transporting devices") that move on top

of the warehouse structure on a "grid" of pathways.  *See, e.g.*, '404 patent at 2:21-37, 5:18-25.

42.    With respect to the robots, the '404 patent describes:

Robots may have various shapes, sizes and configurations, and may have various communications means, sensors and tools. In some embodiments, each robot may be able to communicate with the control system through a set of frequency channels established through a set of base stations and base station controllers. Robots may utilize various tools to move and obtain containers from a stack, including, for example, a winch to carry a container.

17

'404 patent at 6:53-60.

43.    To control the movement of the robots around the grid, the '404 patent describes a

robot control system 202:

> The robot control system 202 may be configured to control the navigation/routing of robots, including, but not limited to, moving from one location to another, collision avoidance, optimisation of movement paths, control of activities to be performed, etc. The robot control system 202 may be implemented using one or more servers, each containing one or more processors configured based upon instructions stored upon one or more non-transitory computer-readable storage media. The robot control system 202 may be configured to send control messages to one or more robots, receive one or more updates from one or more robots, and communicate with one or more robots using a real or near-real time protocol. The robot control system 202 may receive information indicating robot location and availability from one or more base stations 208a and 208b. The robot control system 202 may be configured to keep track of the number of robots available, the status of one or more robots, the location of one or more robots and/or their current instruction sets. The robot control system 202 may also be configured to process and/or send control messages to the one or more robots in anticipation of future movements, potentially reducing the processor load, and also proactively managing the traffic load with respect to the communications links. Such an implementation could be advantageous in light of complex algorithms in use by the robot control system 202 in determining optimal pathways, calculating optimal locations for containers and/or determining reservations and/or clearances.

'404 patent at 10:35-62.

44.    Figure 3 "provides a sample block diagram of the robot control system in more

detail":

18



**FIG. 3**

'404 patent at 2:38-40, Fig. 3. This figure shows various processes that take place in a mobile robot environment using generic modules. The specification describes how these modules function and interact with each other at a very high level, providing no detail about how to implement these modules with computer programs or hardware circuitry.

45. Within the control system 202 are the movement optimisation module 304, reservation module 314, and the clearance module 312. *See* '404 patent, Fig. 3.

46. The '404 patent describes the function of the movement optimisation module:

> The movement optimisation module 304 may be configured to optimise the movement of robots through applying various algorithms to determine potentially advantageous routes from one location to another. The potential advantages may include shorter distance travelled, lower likelihood of encountering congestion, shorter time required, lower power consumption, co-ordination with movements of other robots, routing around obstacles such as broken

19

robots or broken areas of track, co-ordination with various workstation operations, etc.

'404 patent at 14:33-42.

47.    The '404 patent describes the function of the reservation module:

The reservation module 314 reserves various paths on the grid (e.g. robot A is planning to take path X and reserves path X during the expected traversal time. Robot B, knowing that robot A has reserved path X, chooses path Y instead). The reservation module 314 may be designed to create nonconflicting robot movement plans, and may be configured to work in conjunction with the clearance module 312 and the movement optimisation module 304.

The reservation module 314 may be configured to provide reservations for a robot for a grid location for a span of time, where no two robots may be given overlapping reservations, taking into account tolerances for robots being marginally off plan, tolerances for lost robot communication messages, and tolerances for clock discrepancies, among others.

In some embodiments, the reservation module 314 is used to reserve routes in advance and to make sure that robots do not plan to take conflicting paths, especially where there are a large number of robot actions and tasks taking place simultaneously. The reservation module 314 may be configured to allow sufficient tolerance for any robot to stop under controlled braking without risking a collision.

'404 patent at 19:30-50.

48.    The '404 patent describes the clearance module's function:

The clearance module 312 may be configured to store and provide clearances for various robots. A system of clearances may be accessed to determine whether a path is clear for a robot to traverse. The clearance module 312 may be implemented as a passive collision avoidance system, wherein robots are only given the smallest amount of work possible without impacting performance.

Upon providing a robot with a new instruction, the clearance module 312 checks that it will not be possible to collide with another robot, based upon, for example, grid dimensions, grid positions, move commands generated by planning, cancellation of move commands (generated on events such as a controlled stop), the current positions and speeds of robots, braking ability of robots as well as where they have been cleared to visit.

20

> The clearance module 312 may be configured to issue clearance "just in time", and may be used to grant permissions to robots to continue along their planned paths. A new clearance may be generated (or withheld) in response to each robot status report. As such, the clearance module 312 may act as a path conflict resolver. Where clearances are required, the clearance module 312 may interact with the movement optimisation module 304 to dynamically re-plan routes to resolve or avoid conflicts.

'404 patent at 18:31-54.

49.    The '404 patent also describes how the movement optimisation, reservation, and clearance modules may interact:

> In some embodiments, the clearance module 312, the reservation module 314 and the movement optimization module 304 are utilized together as a path conflict resolver, wherein a movement optimisation module 304 develops a path and then reserves the path using the reservation module 314, and the clearance module 312 provides a just-in-time approach to determining priority when robots are engaged in potentially conflicting paths.

'404 patent at 16:1-8.

**D.    Prosecution Histories of the '404 and '770 Patents**

**1.    _The '404 Patent Application_**

50.    Claims from the application that issued as the '404 patent were rejected one time. On June 19, 2020, the USPTO Examiner rejected pending independent claim 1 because the phrase "wherein the clearance is provided for execution …" is unclear and fails to point out and distinctly claim the subject matter of the invention.  Ex. E ('404 Patent File History) at AS-NH_00216090-91 (6/19/2020 Office Action).  According to the Examiner, the phrase was unclear "because the specification does not provide any context for clearance being provided for execution. Rather, instructions or commands for clearance are provided for execution by a control unit configured to control movements of the transporting devices based on the information received from the clearance unit."  Ex. E at AS-NH_00216090-91.

21

51.      The Examiner also rejected the pending claims because the phrase " … execution at a future start time" was unclear.  According to the Examiner, "the specification does not provide any context for clearance being provided for execution at a *future start time*.  Rather, instructions may be provided to a robot through the robot communications unit to be executed at a <u>future time</u>, or commands to the robot may be issued ahead of a <u>start time</u> for an operation to be performed by a robot, but "execution" at a *future start time[]* is unclear."  Ex. E at AS-NH_00216091.

52.      Likewise, the Examiner rejected pending claim 2 because "*wherein the time between providing the clearance and <u>the future start time</u>*" was unclear.  According to the examiner, "the specification does not provide any context for *the time between <u>providing the clearance</u> and the future start time*.  Rather, commands to robots may be issued ahead of a start time for an operation to be performed by a robot, and this time between the start time and the issuance of a command may be a configurable parameter."  Ex. E at AS-NH_00216091.

53.      The Examiner also rejected pending claims 17 and 18 because "*when the clearance is not received before the future start time*" was unclear.  The Examiner stated that "[w]here a message (ie, a received clearance)) is not received before a <u>scheduled start time</u>, the robot may be configured to ignore the command and may return a status message indicating that the command was received too late.  The phrase '*<u>future start time</u>*' is unclear because the specification does not provide any context for a '*<u>future start time</u>*'.  Instructions may be provided to a robot through a robot communications unit to be executed at a <u>future time</u>, or commands to the robots maybe issued ahead of a <u>start time</u> for an operation to be performed by a robot, or a received clearance is not received before a <u>scheduled start time</u>, but '*<u>future start time</u>*' is unclear."  Ex. E at AS-NH_00216091.

54.     In response, the patent applicant (Ocado Innovation Limited) amended pending independent claims 1 and 20 to recite providing "a clearance instruction" "for execution by a control unit on each transporting device at a *future time*."  Ex. E at AS-NH_00216226-27.  The applicant made analogous amendments for claims 2, 17, and 18 following the Examiner's suggestions.  Ex. E at AS-NH_00216227.

55.     The Examiner then allowed the claims in the '404 patent application on November 27, 2020.  Ex. E at AS-NH_00216321.  However, the Examiner initiated an interview to inform the applicant that "clearance instruction" in the claims should be amended to "a clearance instruction" or "the clearance instruction," as appropriate.  Ex. E AS-NH_00216332-33.

56.     The applicant submitted "Comments on Statement of Reasons for Allowance" in response to the Examiner's comments in the Notice of Allowance.  A Notice of Allowability issued on December 11, 2020.  Ex. E at AS-NH_00216479.

### 2.     *The '770 Patent Application*

57.     The application that issued as the '770 patent received one rejection on March 8, 2021.  In particular, the Examiner rejected the pending claims as obvious over U.S. Patent No. 8,381,982 ("Kunzig") in combination with U.S. Patent Application 2016/0027421 ("Hognaland"), which I understand is the reference disclosing an AutoStore system, and U.S. Patent Application 2006/0095160 ("Orita").  Ex. F at AS-NH_00209010-32 (3/8/2021 Office Action).

58.     The Applicant had an interview with the Examiner to propose certain amendments to the independent pending claims and made those amendments in an Office Action.  Ex. F at AS-NH_00209164.  I note one of the applicant's amendments (additions in underline, deletions crossed out):

> determine there is a potential for a collision between the first transporting device traveling along the first path route and the second transporting device traveling along the second path route, and
>
> responsive to a determination that there is the potential for the collision: [[,]]
>
> withhold a second clearance command for the first transporting device that would cause the first transporting device to travel on the pathways along a portion of the first path,
>
> determine a revised path route different from the first path route for the first transporting device to travel on the pathways, and
>
> generate a third second clearance command for the first transporting device to cause the first transporting device to travel on the pathways along a portion of the revised path route; and
>
> a memory device configured to store the plurality of first clearance commands and the third second clearance command.

Ex. F at AS-NH_00209157.

59.     The Examiner issued a Notice of Allowance on June 24, 2021. Ex. F at AS-NH_00209186.

60.     The applicant submitted "Comments on Statement of Reasons for Allowance" in response to the Examiner's comments in the Notice of Allowance. Ex. F at AS-NH_00209319-320.

## VII.    THE LEVEL OF SKILL IN THE ART

61.     Having reviewed the '404 and '770 patents and their file histories, in my opinion, a person of ordinary skill in the art as of the priority date of these patents would have had a Master's degree in computer science, electrical engineering, or robotics, with a focus on path planning for automated guided vehicles, and at least two years of experience or academic research in those fields. Additional education might compensate for less experience, and vice-versa.

62.    As discussed above, for the purposes of this Declaration, I take the priority date for the '404 and '770 patents to be June 3, 2014.

## VIII.  CLAIM TERMS IN THE '404 PATENT

### A.    "Clearance Unit"

63.    I understand from AutoStore's counsel that Ocado contends this term is a "means plus function" term.  I also understand from AutoStore's counsel that Ocado contends the alleged "function" to be:  "provide a clearance instruction for each transporting device to traverse a portion of the reserved path."  Ex. G at 19.

64.    AutoStore's counsel asked me to provide my technical opinion about whether the specification of the '404 patent discloses any algorithms for carrying out this function.  In my opinion, the specification provides no algorithms for carrying out the stated function.  The specification only identifies functions that the "clearance module" may perform, without explaining how to accomplish those functions.  As explained below, I agree with AutoStore's proposed definition of "clearance instruction" as a "[p]ermission instruction issued when the clearance unit checks that the robot will not collide with another robot."  See § VIII.C below.  But my conclusion regarding the lack of any algorithms to implement the function of "clearance unit" in the specification holds even if the Court were to use Ocado's proposed "alternative" definition of "clearance instruction" as "an instruction for a robot to traverse a portion of a reserved path, issued when the clearance module checks that the robot will not collide with another robot."

#### 1.    *"Clearance Unit" in Claim 1*

65.    Next I review the portions of the specification that I understand Ocado has identified as support for "clearance unit."  See Ex. G at 19-20.

66.    The specification explains that the "robot control system 202," which includes the "clearance module," may be "implemented using one or more servers, each containing one or more

25

processors configured based upon instructions stored upon one or more non-transitory computer-readable storage media." '404 patent at 10:39-43.  However, the specification does not provide any algorithms or examples for implementing a "clearance module." *See also* '404 patent at 10:58-64 (explaining that "cloud computing" may be used to implement servers without explaining how to implement any specific clearance module), 11:4-9 (explaining other forms that the control system may take: a local server, remote server, software as a service, but not explaining how to implement any specific clearance module), 12:65-13:4 (providing high-level statements that the "control system 202 may use various algorithms to identify, design and/or control the movement of various robots," and that some implementations may involve "one or more processors configured to perform one or more sets of instructions," but not explaining how to implement any specific clearance module), 13:36-40 (stating the "modules" may be implemented as computer "applications," without providing any explanation about how to implement any specific clearance module).

67.    I also understand that Ocado contends that this function is carried out by the following "structure":

> "a computer device for local or distributed computing including servers, processors, and computer-readable media, and also including associated networks, devices, software (including applications stored as instructions to be performed by one or more processors), and firmware, that, ***upon providing a robot with a new instruction, checks that it will not be possible for that robot to collide with another robot based on grid dimensions, grid positions, move commands generated by planning, cancellation of move commands (generated on events such as a controlled stop), the current positions and speeds of robots, braking ability of robots, and/or where the robots have been cleared to visit***, as described at '404 Pat., col. 18 ll.38-45."

Ex. G at 19-20 (emphasis added).

68.     The portion that I have emphasized above states the function that the "clearance unit" performs: checking that the robot cannot collide with another robot based on one or more of the following: (i) grid dimensions; (ii) grid positions; (iii) move commands generated by planning; (iv) cancellation of move commands (generated on events such as a controlled stop); (v) the current positions and speeds of robots; (vi) braking ability of robots; and/or (vii) where the robots have been cleared to visit.  This function is not a generic function that any generic processor can do as a matter of course.  Rather, specific algorithms to carry out this function must be implemented on the processor using source code and/or specialized electronic circuitry.  But the specification (including at 18:38-45) gives no actual methods or algorithms by which the clearance unit can perform the identified function.  There is no explanation for specific methods or algorithms by which a clearance instruction could be determined.

69.     Likewise, the '404 patent at 18:31-37 provides no algorithm for carrying out the function contended by Ocado—"provid[ing] a clearance instruction for each transporting device to traverse a portion of the reserved path."  There is no disclosure of specific methods or algorithms by which the clearance unit could ascertain whether to issue a clearance instruction or not.

70.     Other portions of the specification cited by Ocado also do not disclose any algorithm for accomplishing the function of "provid[ing] a clearance instruction for each transporting device to traverse a portion of the reserved path."  The '404 patent at 18:31-37 states that the clearance unit may store and provide clearances for multiple robots and that a system of clearances may be accessed to determine whether a path is clear for a robot to traverse.  There is no disclosure of *how* this would be accomplished or indeed what even a "system of clearances" is or how it is implemented.  The excerpt then states that the "clearance module … may be implemented as a passive collision avoidance system, wherein robots are only given the smallest

27

amount of work possible without impacting performance" but again provides no specific details as to how this is done. *See also* § VIII.A.3 below.

71.     Ocado also relies on 18:46-19:28 as support for "clearance module." Based on my review of that section, it is my technical opinion that this excerpt provides no specific algorithms by which a "clearance module" may carry out the function that Ocado contends it does: There is no disclosure of any algorithms showing *how* a clearance instruction or command is computed based on information received from the system.

a.     At 18:46-54, the patent states that clearance module may issue "just in time" clearances and "may be used to grant permissions to robots to continue along their planned paths." According to the patent, new clearances may be generated or withheld in response to each robot's status report, but the patent provides no algorithm for doing so. The excerpt also states that "[w]here clearances are required, the clearance module 312 may interact with the movement optimisation module 304 to dynamically re-plan routes to resolve or avoid conflicts." Again, there is no disclosure in the patent of an algorithm or example of *how* to implement such a function.

b.     The paragraph at 18:55-63 states what information the clearance module may provide to the control interface for subsequent transmission to the robots: "what the clearances for a path would be, notification of when a clearance is issued (e.g. to the planning system as this may allow dynamic re-planning from the end of the current clearance), notification of when a clearance is withheld (e.g. to identify error cases, and to identify needs to re-plan), and to an alerting system (because there is a potential problem with

28

a robot, robot communications, or the control system 202)." However, there is no disclosure in the patent of any algorithms or examples showing how any of this information (particularly the generation of "clearances for a path") is computed.

c.  The paragraph at 18:64-67 states that the clearance module may "device clearance schemes based upon a set of tolerances, including missed messages, processing time, clock sync and robot discrepancies with the physics model, among others." There is no disclosure in the patent of any algorithms or examples showing how any such "clearance schemes" may be implemented.

d.  The paragraph at 19:1-5 explains that the clearance module may provide "a set of safe entry times" for grid positions "based upon robot position and speed updates, and clearances given/withheld." However, the patent does not provide any algorithm or method for determining these "safe entry times" based on position and speed updates and the given/withheld clearances. Nor does the patent explain how the set of "safe entry times" may be dynamically updated as the conditions on the grid change.

e.  The paragraph at 19:6-11 explains that in some embodiments the clearance may be provided for a predetermined period of time that may be sufficient for the robot to come to rest without risking a collision. There is no disclosure of any algorithm or example by which such a predetermined period of time may be determined.

29

f.  The paragraph at 19:12-24 identifies an embodiment in which the control system can "miss" a number of status messages from the robot and still permit the robot to continue operation for a short period of time. The patent describes no algorithm or example for achieving this function. Moreover, this paragraph does not expressly refer to the generation of clearance commands/instructions.

g.  The paragraph at 19:25-28 states that in some embodiments, if a robot has begun to slow down, the system may let it come to rest and cancel its onward reservations and re-plan its path over the grid. There is no reference here to how to generate clearance instructions.

72.  The '404 patent at 21:1-3 also does not provide any algorithms for the generation and/or determination of clearances: The excerpt states that "[o]n receipt of each robot status message," the control system may "extend a robot's movement clearance through the clearance module." The patent does not provide any algorithm or example showing how to generate clearance instructions based on information received from the robots; nor does the patent disclose how the "movement clearance" may be "extend[ed]."

73.  I also understand that Ocado contends that the '404 patent at 13:11-23 lends support for "clearance unit." Ex. G at 19. This excerpt provides no specific algorithm or example for implementing a "clearance unit" or generating clearance instructions. It does give examples of "constraints" (13:15-24), but those constraints refer to constraints to "analyze various pathways in the grid to determine one or more paths that may potentially be preferential relative to other pathways" as described at 12:50-56—that is, the "constraints" refer to constraints used in path planning, not in the generation of clearance instructions.

30

74.     The paragraph at 16:1-8 states: "the clearance module 312, the reservation module 314 and the movement optimisation module 304 are utilized together as a path conflict resolver, wherein a movement optimisation module 304 develops a path and then reserves the path using the reservation module 314, and the clearance module 312 provides a just-in-time approach to determining priority when robots are engaged in potentially conflicting paths." The patent does not explain any method by which a "clearance module" or clearance unit generates clearances, how such clearances provide a "just-in-time approach to determining priority," or how the clearance module determines that robots are in potentially conflicting paths. Moreover, a "just-in-time" approach to determining priority does not explain the priority rules (*i.e.*, who has priority in a conflicting path situation).

75.     Ocado also relies on paragraph at 21:15-22:7 for "clearance module," but based on my review of that section, my technical opinion is that it provides no specific algorithms by which a "clearance module" may carry out the function that Ocado contends it does. There is no disclosure of any algorithms showing *how* a clearance instruction or command is computed based on information received from the system.

a.  The paragraph at 21:15-21:47 describes the various ways that the control system can be implemented using hardware (*e.g.*, using CPUs or GPUs). They do not describe any specific methods or algorithms for a clearance unit to determine whether to issue a clearance instruction.

b.  The paragraphs at 21:48-22:7 state that the control system may be implemented on different computers or devices and using different operating systems, without giving any detail about system requirements (*e.g.*, memory or speed requirements). Also, importantly, they do not

describe any specific methods or algorithms for a clearance unit to determine whether to issue a clearance instruction.

76.     I also understand that Ocado for support for "clearance unit" on '404 patent at 22:65-23:4.  That excerpt appears in the context of describing ways to find robot paths and branches.  *See* '404 patent at 22:12-58 (describing ways to determine "preferential paths").  The excerpt at 22:65-23:4 appears in the context of *path planning/determination*.  Specifically, 22:46-64 provides an over-simplified and standard description of a generic Dijkstra-based path search algorithms.  *See also id.* at 22:12-44 (describing path search).  In this context, 22:65-23:4 states that if a new branch being considered conflicts with the path of another robot (or with an idle robot), the "search algorithm" may take a number of different tasks, including: (i) "[a]lter[ing] the branch to outrun the conflicting reservation"; (ii) [a]lter[ing] the branch to contain a wait at any position along the path; or [d]iscard the branch as unfeasible."  In my opinion, a person of ordinary skill in the art would understand that 22:65-23:4 does not disclose a method used by the "clearance unit" but rather a method for the movement optimisation unit working to search for and identify a preferential paths/branches for the robots.  A clearance unit, on the other hand, gives clearances to robots to cross a portion of the path that has already been determined and reserved.  *See, e.g.*, '404 patent at 2:46-48, 16:1-8.

77.     I understand that, when prosecuting a related patent application before the USPTO,[1] Ocado said the following about the functions of the "movement optimisation unit," "reservation unit," and "clearance unit":

---

[1] I understand from AutoStore's counsel that this related patent application issued as U.S. Patent No. 10,474,141 ("the '141 patent").  The '141 patent shares essentially a common specification with the '404 and '770 patents.  Both the '404 and '770 patents claim priority to the application that issued as the '141 patent.

32

> The use of a movement optimisation unit and a reservation unit … may not result in perfect routes suitable for traversal … because [the robots] may be marginally off route due to tolerances in the transmission of communication messages and tolerances for clock discrepancies …. Accordingly, a clearance unit can be used to issue 'just in time' permissions for a [robot] to continue along a planned route once the tolerances have been sufficiently resolved. In this way, the clearance unit can operate as a path conflict resolver …."

Ex. L (AS-NH_00207203-7750; File History of U.S. Patent No. 10,474,141) at AS-NH_00207453 (12/3/2018 Amendment and Reply).  In my opinion, this is consistent with, and further confirms, the understanding of a person of ordinary skill in the art that the clearance module gives clearances for paths that have already been determined and reserved.

78.     I also understand that, in the context of prosecution of a counterpart patent application before the European Patent Office ("EPO"), Ocado explained the operation of the "clearance unit" as follows:

> "A reserved path containing a wait (to allow another robot to pass) is not the same as a clearance module stopping a robot to avoid a collision based on current position and speed information."

Ex. K (File History of European Patent Application No. EP 3376450; AS-NH_00209330-9683) at AS-NH_00209632-633.

> "The system also includes a second component (namely a clearance module) which acts during movement of the robots along their reserved paths, granting permissions for the robots to continue along their paths, and stopping a robot if it is determined, based on current positions and speeds of the robots, that a collision is possible ….
>
> To address this problem, a clearance module is provided which selectively grants permissions to robots to continue along their reserved paths.  The clearance module checks, based on current position and speed data, whether a collision between robots is actually possible (despite the reservation module having previously ensured that there are no conflicting paths).  The clearance module stops a robot to avoid a potential collision, and then interacts with a movement optimisation module to dynamically re-plan a route for the robot to resolve or avoid the conflict.  As such, the clearance module of the claimed invention acts during movement of the robots, based on real-time position and speed information, whereas the reservation module of the claimed invention acts in advance of movement of the robots and does        not        require        real-time        information.

33

Therefore, the system achieves the realisation of the reserved path but moderated by the clearance module which only grants permission for a robot to continue along the reserved path when it is deemed safe so as to avoid potential collisions caused by possible deviations from the planned routes."

Ex. K at AS-NH_00209631-32.

79.    In my opinion, these statements are consistent with, and confirm, my opinion that a person of ordinary skill in the art would understand from reading the patent specification that the clearance module gives *permissions* for robots to move on paths that have already been determined and reserved.

80.    Figures 1-3 of the '404 patent also do not disclose any algorithms by which a clearance instruction may be generated from available data. The figures show the schematics of the control system and the control system together with robots.

81.    Next, AutoStore's counsel asked me provide my opinions as to whether the '404 patent provides any algorithms or methods for carrying out additional functions of the "clearance unit" that are recited in certain dependent claims.

### 2.    *"Clearance Unit" in Claim 3*

82.    Claim 3 recites "[t]he system according to claim 1, wherein the clearance unit is further configured such that the clearance instruction is not provided until a last issued clearance instruction is acknowledged by a transporting device." '404 patent at claim 3. AutoStore's counsel asked me whether the '404 patent specification provides any algorithm or method to implement the clearance unit performing the function of not providing a clearance instruction until a last issued clearance instruction is acknowledged by a transporting device.

83.    Based on my review of the specification, there is no disclosure of any specific algorithm or method by which the clearance unit withholds a clearance instruction until a "last

34

issued clearance instruction" is acknowledged by a robot. The specification at 20:58-64 merely states that such a function may be implemented but gives no algorithms for doing so.

### 3. *"Clearance Unit" in Claim 7*

84.    Dependent claim 7 of the '404 patent includes the phrase "wherein the clearance unit is configured as a passive collision avoidance system, wherein each transporting device is operated in a manner without impacting system performance."

85.    I understand from AutoStore's counsel that Ocado contends that this phrase requires no construction and that it should take its "plain and ordinary meaning." Ex. G at 23. I also understand that Ocado has not proposed what that "plain and ordinary meaning" is. In my opinion, read in light of the claims and specification of the '404 patent, a person of ordinary skill in the art would not have been able to understand the meaning of this phrase with reasonable certainty.

86.    In my opinion, a person of ordinary skill in the art would not have understood the meaning of the phrase with reasonable certainty for at least two reasons. Moreover, the specification does not disclose any algorithm to implement this limitation.

> a.    <u>A person of ordinary skill in the art would not understand "a passive collision avoidance system, wherein each transporting device is operated in a manner without impacting system" with reasonable certainty.</u>

87.    There are two reasons for my opinion. *First,* there is no explanation of what a "*passive* collision avoidance system" could be, either in the claims or the specification. The word "passive' implies that the "collision avoidance system" does not provide an active response. However, it is difficult to imagine how a "collision avoidance system" could function without it having to take some action to avoid a collision. Thus, a person of ordinary skill in the art would not have reasonable certainty as to what "passive collision avoidance system" means based on the

35

claim language.  And the specification of the '404 patent does not describe what "passive collision avoidance system" means.  The only reference to a "passive collision avoidance system" outside of the claims is at column 18, lines 34 to 37, where the specification states that "[t]he clearance module 312 may be implemented as a passive collision avoidance system, wherein robots are only given the smallest amount of work possible without impacting performance."  This portion does not explain what a "passive" collision avoidance system is.  I have also reviewed the file histories of the '404 patent and those of its U.S. family members.  There is no explanation by the applicant of a "passive collision avoidance system" in those file histories.

88.      ***Second,*** neither "smallest amount of work possible" nor "without impacting system performance" is defined in the specification.  A person of ordinary skill in the art would have known that employing the clearance unit as a "passive collision avoidance system" will inevitably involve ***some*** amount of work and have ***some*** impact on system performance.  From reading the '404 patent and its file history, a POSITA would not be able to determine how much "work" or "impact" would be within the meaning of the claim.  The only mention of the phrase "smallest amount of work without impacting system performance" in the '404 patent specification provides no meaningful relevant information as to the meaning of the phrase: At column 18, lines 34 to 37, the specification states that "[t]he clearance module 312 may be implemented as a passive collision avoidance system, wherein robots are only given the smallest amount of work possible without impacting performance."  There is no explanation here of what "the smallest amount of work possible without impacting performance" means, or even whether the stated "performance" is that of the "robots" or that of the "system."[2]  Nor does the '404 patent's file history provide any helpful

---

[2]  I note that a person of ordinary skill in the art, based on reading  the claims of the '404 patent, would understand that the "system" in claim 7 refers to the "system for controlling movement of

36

information.  Therefore, a POSITA would be left to speculate which metrics to measure to assess how much "work" a robot does and to determine whether a clearance unit configured as a collision avoidance system has no impact on the system's performance.

89.     To support of its claim construction position, I understand Ocado cites to the '404 patent at 16:34-40, 18:31-37, and 19:6-11.  Ex. G at 23.  None of these portions discloses what a "passive collision avoidance system" or "without impacting system performance" means.

90.     The '404 patent at 16:34-40 states that, in some embodiments, the degree of forward planning required may be computed by simulation.

> The simulations may be used to adjudicate (in a statistical sense) between the efficiency gains of planning far into the future; against the efficiency loss of having higher probabilities of having to re-plan when robots fail to maintain their plan, because of various reasons, such as short-term communication packet losses, and/or robots running outside the allowed tolerances.

'404 patent at 16:34-40.

91.     This excerpt discloses that simulations may be used to assess "efficiency gains" due to forward planning and reservation of paths and how such gains may be offset to some degree by "efficiency loss[es]" due to the need to re-plan "when robots fail to maintain their plan."  Even if one assumes (and this is not stated explicitly) that "re-plan[ning]" involves "collision avoidance," there is no explanation of what a "passive" collision avoidance system is.  Moreover, '404 patent at 16:34-40 does not describe anything about what "system performance" is or how a

---

transporting devices" in claim 1, which includes the MOU, RU, and CU.  Indeed, claim 1 does not even state that the "transporting devices" (robots) are part of the "system" itself.  I also understand from AutoStore's counsel that "system performance" in claim 7 refers to the performance of this "system."

37

hypothetical "passive collision avoidance system" would work without affecting or changing[3] system performance.  This portion does not even describe what "system performance" is.

92.    I have already addressed the disclosure of the '404 patent at 18:34-37 and why my opinion is that it does not give sufficient information for a person of ordinary skill in the art to understand, with reasonable certainty, what "passive collision system" and "without impacting system performance" mean.

93.    The '404 patent at 19:6-11 states:

> "The clearance module 312, in some embodiments, may be configured such that robots are only provided clearances for a predetermined period of time (e.g. 3 seconds). The clearance given to a robot may be configured such that the period of time is sufficient for the robot to come to rest without risking a collision."

This excerpt discloses that robots may be provided clearances "for a predetermined period of time" and that such a period may be enough to let the robots stop without risking a collision.  There is no teaching here that would inform a person of ordinary skill in the art, with reasonable certainty, what a "passive" system is, let alone one that would not "impact[] system performance."  In my opinion, even providing "clearances" that would let robots move for a period of time before stopping so as to not risk a collision, is not a "passive" operation, because those clearances make the robots perform certain tasks for a period of time.

> b.    <u>The '404 patent specification does not disclose an algorithm for implementing a "passive collision avoidance system, where in each transporting device is operated in a without impacting system performance."</u>

94.    AutoStore's counsel also asked me to provide my opinion as to whether the specification of the '404 patent discloses any algorithms for carrying out the function of "a passive

---

[3] For purposes of my analysis, I agree with Ocado's proposed definition of "impact" as "[t]o affect or change." Ex. G at 23.

collision avoidance system, wherein each transporting device is operated in a manner without impacting system performance." '404 patent, claim 7.

95.    In my opinion, the '404 patent specification does not provide any such algorithm. First, as support for claim 7, Ocado itself only cites to '404 patent at 16:34-40, 18:31-37, and 19:6-11. Ex. G at 23. I have explained above what each of these excerpts discloses in subsection (a) above. None describes any specific algorithm to create a "passive collision avoidance system" or a way to operate robots such the operation does not impact system performance.

96.    For support of its position with respect to claim 7, Ocado cites to: U.S. Patent No. 7,912,574 at 1:18-24; U.S. Patent No. 9,188,982 at 3:48-50; and U.S. Patent No. 9,886,036 at 1:55-60. Ex. G at 23. I have reviewed these references. None of them describes an algorithm for a "clearance unit configured as a passive collision avoidance system, wherein each transporting device is operated in a manner without impacting system performance."

97.    U.S. Patent No. 7,912,574 (Ex. H) at 1:18-24 describes potential problems with "inventory systems tasked with responding to large numbers of diverse inventory requests." It contains no description of an algorithm for a passive collision avoidance system or of operating robots without impacting system performance.

98.    The two lines of U.S. Patent No. 9,188,982 (Ex. I) at 3:48-50 state that "[i]mproving runtime performance prevents various problems, such as delays caused by idling, wasting of resources and/or missing deadlines." There is no disclosure of any algorithm for a passive collision avoidance system or of operating robots without impacting system performance.

99.    U.S. Patent No. 9,886,036 (Ex. J) at 1:55-60 states that "design of travel paths or routes of the AGVs has a significant impact on the overall system performance and reliability" because "this directly affects the travel time and complexity of the software used to control the

39

scheduling and travel paths of the AGVs."  There is no disclosure of any algorithm for a passive collision avoidance system or of operating robots without impacting system performance.

100.    Nor do the cited excerpts from U.S. Patent No. 7,912,574; U.S. Patent No. 9,188,982; and U.S. Patent No. 9,886,036 explain what "passive collision avoidance system" is or how such a system could operate robots "without impacting system performance."  Indeed, U.S. Patent No. 9,886,036 at 1:55-60 supports my opinion (stated above) that operation of a CU would have *some* impact on system performance as it may cause changes to path planning.

### 4.    *"Clearance Unit" in Claim 8*

101.    Dependent claim 8 recites "[t]he system according to claim 1, wherein the clearance unit is configured to grant or withhold providing the clearance instruction for a transporting device to traverse a portion of the reserved path based on at least one of: dimensions of the grid-like structure, positions on the grid-like structure, commands to move the transporting device, cancellation of commands to move the transporting device, a current position of the transporting device, a speed of the transporting device, a braking ability of the transporting device, and the clearance instructions provided to the transporting device."

102.    AutoStore's counsel asked me whether the '404 patent specification provides any algorithm or method to implement the clearance unit performing the function of granting or withholding providing the clearance instruction for a transporting device to traverse a portion of the reserved path based on at least one of: dimensions of the grid-like structure, positions on the grid-like structure, commands to move the transporting device, cancellation of commands to move the transporting device, a current position of the transporting device, a speed of the transporting device, a braking ability of the transporting device, and the clearance instructions provided to the transporting device.

40

103.    Based on my review of the specification, there is no disclosure of any specific algorithm or method for programming the clearance unit to perform this function. For example, the specification at 18:38-45 explains that this function may be performed but provides no specific method for granting or withholding clearance based on: dimensions of the grid-like structure, positions on the grid-like structure, commands to move the transporting device, cancellation of commands to move the transporting device, a current position of the transporting device, a speed of the transporting device, a braking ability of the transporting device, and the clearance instructions provided to the transporting device.

### 5.    *"Clearance Unit" in Claim 9*

104.    Dependent claim 9 of the '404 patent contains the phrase "wherein at least one of the clearance unit, and the movement optimisation unit is configured to dynamically re-plan a route."

105.    I understand from AutoStore's counsel that Ocado contends that this phrase needs no construction and that it should take its "plain and ordinary meaning." Ex. G at 24. I also understand that Ocado has not proposed what such a "plain and ordinary meaning" is. In my opinion, the '404 patent specification does not disclose any algorithms to implement the full scope of this phrase.

106.    I have been instructed by AutoStore's counsel to assume that, as a legal matter, this phrase covers three cases: (A) only the MOU is configured to dynamically re-plan a route; (B) only the CU is configured to dynamically re-plan a route; and (C) both the MOU and CU are configured to dynamically re-plan a route.

107.    In my opinion, the '404 patent specification has no disclosure about scenario (B). That is, there is no explanation in the specification of the '404 patent where the CU *on its own* dynamically re-plans a route. For example, the specification states that "[i]n some embodiments,

41

the movement optimisation module 304 may dynamically recalculate preferential paths during the course of a robot's journey to potentially determine an updated set of paths as conditions and constraints change over time." '404 patent at 15:20-24. This description does not refer to the CU conducting any dynamic re-planning on its own. Likewise, elsewhere the specification states that "[w]here clearances are required, the clearance module 312 *may interact with the movement optimisation module* 304 to dynamically re-plan routes to resolve or avoid conflicts." '404 patent at 18:51-54. This excerpt also does not describe the CU on its own dynamically re-planning routes—rather, it states that dynamical re-planning may be done via an interaction between the CU and MOU. The specification further states that the CU provides clearances and other information to a "control interface" so that, among other things, the "planning system could perform dynamic re-planning from the end of the current clearance." *Id.* at 18:55-63.

108. When prosecuting the EP '450 application before the EPO,[4] Ocado also stated that re-planning is carried out by the interaction of MOU and CU (and thus, not by the CU alone). Ocado stated the following to the EPO:

> The skilled person reading the specification understands that the described techniques for planning a route (e.g. based on expected congestion levels and/or movement of other transporting devices, and optionally using a graph traversal algorithm) are applicable to re-planning of routes. Indeed, re-planning of a route necessarily involves planning a route. That is, to re-plan a route means to plan the route for a second (or third, fourth, etc.) time. Hence, *the skilled person would understand that, when a route is re-planned by the clearance module interacting with the movement optimisation module* (as described, for example, on page 26, lines 28-30 of the original PCT application from which the parent derives), *the same techniques would be applied as for planning a route*.

---

[4] Based on my review the specification of the EP '450 application is essentially identical to that of the '404 patent.

Ex. K at AS-NH_00209602 (emphasis added).

109.    The excerpts from the '404 patent that Ocado cites as support for its claim construction position (15:43-49, 16:1-8, 18:46-67; 22:65-23:4) also do not disclose that the CU on its own can do dynamic re-planning, let alone disclose any algorithms for doing so.

110.    The '404 patent at 15:43-49 describes the case where "the [MOU] may also interact with the [CU] and the [RU] in determining whether the navigation of a proposed pathway will encounter issues ….." That is, at best it relates to scenario (C) but not to (B).

111.    The '404 patent at 16:1-8 also describes that the CU, RU, and MO are used together (that it is, it relates to scenario (C)): "[i]n some embodiments, the clearance module 312, the reservation module 314 and the movement optimisation module 304 *are utilized together* as a path conflict resolver, wherein a movement optimisation module 304 develops a path and then reserves the path using the reservation module 314, and the clearance module 312 provides a just-in-time approach to determining priority when robots are engaged in potentially conflicting paths." Here, the role of the CU is to provide "a just-in-time approach to determining priority of robots," but there is no mention that the CU actually dynamically *re-plans* any routes or paths.

112.    The '404 patent at 18:46-67 states:

> The clearance module 312 may be configured to issue clearance "just in time", and may be used to grant permissions to robots to continue along their planned paths. A new clearance may be generated (or withheld) in response to each robot status report. As such, the clearance module 312 may act as a path conflict resolver. Where clearances are required, the clearance module 312 may interact with the movement optimisation module 304 to dynamically re-plan routes to resolve or avoid conflicts.
>
> The clearance module 312 may provide to the control interface 302 what the clearances for a path would be, notification of when a clearance is issued (e.g. to the planning system as this may allow dynamic re-planning from the end of the current clearance), notification of when a clearance is withheld (e.g. to identify error cases, and to identify needs to re-plan), and to an alerting system

43

(because there is a potential problem with a robot, robot communications, or the control system 202).

The clearance module 312 may be configured to devise clearance schemes based upon a set of tolerances, including missed messages, processing time, clock sync and robot discrepancies with the physics model, among others.

113.    This excerpt again describes the CU "interact[ing] with the [MOU] to dynamically re-plan routes to resolve or avoid conflicts." There is no disclosure of the CU alone dynamically re-planning paths, or of any algorithm for the CU being configured to dynamically re-plan paths.

114.    The '404 patent at 22:65-23:4 states:

Where a new branch has a conflict with a path that another robot may be taking, or conflicts with an idle robot, the search algorithm may:

Alter the branch to outrun the conflicting reservation (if acceleration profile allows);

Alter the branch to contain a wait at any position along its path; or Discard the branch as infeasible.

115.    This portion also does not disclose that the CU, alone, dynamically re-plans a route. In particular, the excerpt describes a ***path planning*** search (a "branch & bound" algorithm). *See id.* at 22:29-64. That is, the search is done to plan a path for robots, before they actually move along paths. This operation is to be carried out by the MOU and not the CU. (According to Ocado's own contention, the CU performs the "function" of "provid[ing] a clearance instruction for each transporting device to traverse a portion of the reserved path." Ex. G at 19. Thus, the CU operates to allow a robot to move on a path only after a path has already been reserved. *See also* '404 patent at 16:1-8 (explaining that after the MOU develops a path and reserves it using the RU, the CU "provides a "just-in-time approach to determining priority when robots are engaged in potentially conflicting paths"), 18:33-45 (explaining that after the system provides an instruction

44

to a robot, the CU checks that it will not be possible for that robot to collide with another robot based upon a number of factors (*e.g.*, grid position current positions and speeds of the robots, *etc.*)).

### 6.    *"Clearance Unit" in Claim 11*

116.    Dependent claim 11 recites: "[t] he system according to claim 1, wherein the clearance unit is configured to provide the clearance instruction based upon a set of tolerances, including at least one of: missed messages, a processing time, a clock sync, and transporting device discrepancies with a physics model."

117.    AutoStore's counsel asked me whether the '404 patent provides any specific algorithms or methods to implement the clearance unit performing the function of providing the clearance instruction based upon a set of tolerances, including at least one of: missed messages, a processing time, a clock sync, and transporting device discrepancies with a physics model.

118.    Based on my review, there is no disclosure in the specification of any specific algorithms or methods for programming a computer to perform this function.  For example, the specification 18:64-67 repeats this language, but gives no actual method for accomplishing the function.  The patent at 17:60-18:10 describes what the robot physics module may contain and the uses it may have, but provides no algorithms for determining a "clearance" instruction.

### 7.    *"Clearance Unit" in Claim 12*

119.    Dependent claim 12 recites: "[t]he system according to claim 1, wherein the clearance unit is configured to calculate a set of safe entry times for at least one position on the grid-like structure based upon at least one of transporting device position, speed updates, and the clearance instructions given and withheld."

120.    AutoStore's counsel asked me whether the '404 patent provides any specific algorithms or methods to implement the clearance unit performing the function of calculating a set

45

of safe entry times for at least one position on the grid-like structure based upon at least one of transporting device position, speed updates, and the clearance instructions given and withheld.

121.    Based on my review of the specification, there is no disclosure of any algorithm or method by which the clearance unit performs this function. For example, the specification 19:1-5 states that the clearance unit may "provide a set of safe entry times" based on "robot position and speed updates, and clearances given/withheld." It also states that the set of safe entry times may be dynamically updated. However, there is no disclosure of any actual method for accomplishing the function using the listed information.

### 8.    *"Clearance Unit" in Claim 13*

122.    Dependent claim 13 recite: "[t]he system according to claim 1, wherein the clearance unit is configured to provide the clearance instructions for a predetermined period of time."

123.    AutoStore's counsel asked me whether the '404 patent provides any specific algorithms or methods to implement the clearance unit performing the function of providing the clearance instructions for a predetermined period of time.

124.    In my opinion, the '404 patent specification does not provide any algorithm or method by which the clearance unit performs this function. For example, the specification at 19:6-11 repeats the same language as in the claim, but provides no algorithm for accomplishing the stated function.

### 9.    *"Clearance Unit" in Claim 14*

125.    Dependent claim 14 recites the following element: "wherein the clearance unit is configured to provide to the control unit at least one of: the clearance instructions required to traverse a reserved path, notification of when the clearance instruction is issued, notification of when the clearance instruction is withheld, and problems with a transporting device."

46

126. AutoStore's counsel asked to provide my opinion as to whether the '404 patent provides any specific algorithms or methods to implement the function of the clearance unit providing to the control unit at least one of: the clearance instructions required to traverse a reserved path, notification of when the clearance instruction is issued, notification of when the clearance instruction is withheld, and problems with a transporting device.

127. In my opinion, the '404 patent specification does not provide any algorithm or method by which the clearance unit performs this function.

**B.    "Wherein the Clearance Instruction Is Provided for Execution by [a Control Unit on Each Transporting Device] / [Each Transporting Device] at a Future Time"**

128. Independent claims 1 and 20 of the '404 patent include the phrases "wherein the clearance instruction is provided for execution by a control unit on each transporting device at a future time" (claim 1) and "wherein the clearance instruction is provided for execution by each transporting device at a future time" (claim 20).

129. I understand from AutoStore's counsel that Ocado contends that these terms require no construction and that they should take their "plain and ordinary meaning." Ex. G at 20-21. I also understand that Ocado has not proposed what such a "plain and ordinary meaning" is. *Id.*

**1.    *A person of ordinary skill in the art would not understand "for execution at a future time" with reasonable certainty.***

130. A person of ordinary skill in the art would not understand the scope of this term with reasonable certainty. As a matter of the laws of physics, ***any*** command sent from a control system for execution by a control unit of a robot must be "for execution at a future time." That is because a command generated by the control system cannot be executed by the robot instantaneously. At a minimum, some time will pass (albeit very small) for the command to be

47

wirelessly transmitted to the control unit of the robot.  Moreover, additional time will pass for the command to be executed.

131.    Thus, from a perspective of a person of ordinary skill in the art, if understood in a literal sense, the phrase "at a future time" imposes no limit on the claims beyond saying that the "clearance instruction is provided for execution by a control unit on each transporting device."

132.    In my opinion a person of ordinary skill in the art therefore would not understand the phrase "at a future time" in a literal sense:  Doing so would make "at a future time" meaningless.  I am told by AutoStore's counsel that, in general and as a matter of law, a claim should not be read or understood in a way that makes any words or part of the claim meaningless.

133.    Based on this reasoning, it is my opinion that a person of ordinary skill in the art would interpret the reference to "execution at a future time" to refer execution at some unspecified delay between when the clearance instruction is provided and when it is executed.

134.    The '404 patent specification does not provide any explanation or objective measure by which a person of ordinary skill in the art could determine how much delay between the provision of the clearance instruction and execution by a control unit of a transporting device is within the scope of the phrase "execution at a future time."  The specification at 18:46-47 identifies an embodiment for which "clearance" is issued "just in time," but the specification does not explain how this is objectively delineated from an embodiment in which "instructions" (which may include a clearance instruction) are issued for "execution at a future time" ('404 patent at 20:10-14).  Claim 2 states that "the time between the time the clearance instruction is provided and the future time is a configurable parameter."  But neither the specification nor the claim imposes any objective lower limit on this "configurable parameter."

135.    Ocado relies on certain excerpts from the '404 patent. *See* Ex. G at 20-21.  But in my opinion, none provides the required explanation or objective measure to inform a POSITA with reasonable certainty how much delay between the provision of the clearance instruction and execution by a control unit of a transporting device is within the scope of the phrase "execution at a future time."  The '404 patent at 4:6-10 states that control commands to control the movement of the robots may be provided to the robots "in advance" of their movements.  But it does not explain how much delay is required for a command to be considered to have been provided "in advance."  Likewise, '404 patent at 9:17-18 refers to "[s]cheduling/pro-processing movement pathways in advance" without explaining how much delay is required for a command to be considered to have been provided "in advance."  The '404 patent at 9:34-35 refers to scheduling tasks and actions for the future, without explaining how much delay is needed for such scheduling to be considered to be "future."

136.    The '404 patent at 10:43-47 does not explain any way to determine the minimum amount of time delay necessary for a command to be considered to be for execution "at a future time."  That portion only explains that the robot control system may send control messages to robots using a "real or near-real time protocol."  Likewise, 13:41-44 states that the control system may provide "real or near-real time control of … the movements or robots," again lacking any explanation of any way to determine the minimum amount of time delay necessary for a command to be considered to be for execution "at a future time."  The phrase "near-real time" involves a time scale that is not defined.  Neither does the specification explain what timescales refer to "real time."

137.    The '404 patent at 10:53-62 states that the control system may "process and/or send control messages to the one or more robots in anticipation of future movements."  This does not

49

explain any way to determine the minimum amount of time delay necessary for a command to be considered to be "in anticipation of future movements."

138. The '404 patent at 12:32-35 states that "[t]he control system … may be configured to schedule when specific types of movements should happen and in what order they should occur." But this language is does not inform a person of ordinary skill, with reasonable certainty, that it refers to the function of the "clearance unit." Indeed, the surrounding text makes no mention of the "clearance unit." Rather, the language refers broadly to the general functioning of the control system being described. In any event, the language does not explain how much delay is required for the execution to be considered to be "at a future time."

139. The '404 patent at 13:24-36 generally describes the various modules included in the control system, but makes no mention of instructions by the clearance unit or what "for execution at a future time" means.

140. The portion at 19:55-66 states that the "command generation and schedule module"—which is not the "clearance unit" (*see, e.g.*, '404 patent at Fig. 3)—can generate instructions to be transmitted to the robots, which may include that a robot is required to move to a certain location, *etc.* There is no discussion of what the "clearance unit" does or how much time delay is required for the execution to be considered to be "at a future time."

141. The '404 patent at 20:10-15 again refers to the "command generation and schedule module" can "pre-populate[] instructions for a particular robot," and that these instructions may be provided to the robot "to be executed at a future time." This excerpt repeats the claim language and does not explain what "to be executed at a future time." In other words, a POSITA reading this excerpt would not be able to ascertain how much delay is required for the execution to be considered to be "at a future time." The disclosure at 20:21-23 states that "instruction sets … may

50

be sent for the coordination of future movements." The specification in this portion distinguishes "just-in-time" instructions from those to be sent for coordination of future movements, but it still does not explain how much delay is required for the execution to be considered to be "at a future time."

142.    The '404 patent at 20:50-55 explains that if a message is not received by the robot before "a scheduled start time," the robot may ignore the command and take additional follow-on actions. In my opinion, a POSITA reading this excerpt would understand that a command for a "scheduled start time" may be for execution at a future time. However, this portion does not explain how a POSITA could reasonably ascertain how much time delay "for execution at a future time" requires.

143.    The '404 patent at 16:28-33 does not even relate to the provision of "clearance instructions." Rather, it states that robot path planning and establishing reservations (*i.e.*, tasks not done by the "clearance unit") may be planned "sufficiently far in the future." It provides no explanation as to the execution of *clearance instructions*.

144.    The '404 patent at 20:43-46 states that commands to the robots may be issued "ahead of the start time for an operation to be performed by a robot." This does not explain how much "ahead of the start time" a command need be sent (as any command is, in a technical sense, sent "ahead of the start time").

145.    Claims 17-18 also do not shed any light on the ambiguity that I have identified. Those claims concern the situation where a clearance instruction is received before a scheduled start time. They do not explain how much earlier (before the scheduled start time) a clearance instruction must be sent in order for the instruction to be considered for "execution at a future time."

51

146.    From my review of the file history of the '404 patent, I understand that the USPTO examiner rejected the claims for containing: "execution at a future start time." The examiner's objection that "[t]he phrase [was] unclear because the specification does not provide any context for clearance being provided for execution at a future start time." Ex. E at AS-NH_00216090-91. The examiner went on to explain that "instructions may be provided to a robot through the robot communications unit to be executed at a future time, or commands to the robots may be issued ahead of a start time for an operation to be performed by a robot, but 'execution at a *future start time*' is unclear." *Id.* I understand that Ocado amended the claim language to "for execution at a future time," and that the patent examiner accepted that change without raising any other objection to the clarity of the language. Ex. E at AS-NH_00216221, AS-NH_00216226-27. This sequence of events does not change my opinion as to the ambiguity that I identified above with respect to "for execution at a future time." It is my opinion that the examiner's statements would not allow a person of ordinary skill in the art to ascertain, with reasonable certainty, the minimum delay between the provision of the clearance instruction and execution by a control unit of a transporting device that is within the meaning of "execution at a future time."

### C.    "Clearance Instruction" / "Clearance Command"

147.    The independent claims of the '404 patent (claims 1 and 20) recite a "clearance instruction." The independent claims of the 770 patent recite a "clearance command." AutoStore's counsel requested that I provide my opinion as to the meaning of these phrases to a person of ordinary skill in the art in light of the claims, the specification, prosecution history, and extrinsic evidence.

148.    In the table below, I contrast what I understand to be AutoStore's and Ocado's proposed constructions for "clearance instruction" and "clearance command."

52

|  | **AutoStore's Proposed Construction** | **Ocado's Proposed Construction** |
|---|---|---|
| **Clearance Instruction** | Permission instruction issued when the clearance unit checks that the robot will not collide with another robot. | No construction necessary / ordinary meaning<br><br>In the alternative:<br><br>"an instruction for a robot to traverse a portion of a reserved path, issued when the clearance module checks that the robot will not collide with another robot." |
| **Clearance Command** | Permission issued after checking that the robot will not collide with another robot. | No construction necessary / ordinary meaning<br><br>In the alternative:<br><br>"a command for a robot to traverse a portion of a reserved path, issued when the clearance module checks that the robot will not collide with another robot." |

149.    The main difference between AutoStore's and Ocado's proposed constructions for "clearance instruction" and "clearance command" is that AutoStore's constructions are limited to, respectively: a "permission instruction" and "permission," whereas Ocado's constructions cover a generic "instruction" and a generic "command." It is my opinion, the plain and ordinary meaning of "clearance instruction" and "clearance command" are as proposed by AutoStore. In both constructions above proposed by AutoStore, "clearance" means a "permission" issued after checking that the robot will not collide with another robot.

150.    My analysis begins with the claim language. In particular, in claim 1 of the '440 patent, the movement optimisation "determine[s] a route of a transporting device from one location on a grid-like structure to another location on the grid-like structure for each transporting device," the reservation unit "reserve[s] a path on the grid-like structure for each transporting device based

on the determined route," and the clearance unit provides a clearance instruction for each robot "to traverse portion of the reserved path …."[5]  Based on this, a person of ordinary skill in the art would understand that the "clearance instruction" permits the robot to traverse a portion of its reserved path.

151.    Claims 23-24 of the '770 patent distinguish between a "clearance command" and "travel commands" to "instruct the plurality of transporting devices to travel on the pathways along the plurality of paths."  Claims 23 and 24 recite:

> 23. The system of claim 1, wherein the one or more processors are configured to generate a plurality of travel commands to instruct the plurality of transporting devices to travel on the pathways along the plurality of paths, the plurality of travel commands being different from the plurality of clearance commands.

> 24. The system of claim 23, wherein the one or more processors are configured to generate one of the plurality of travel commands to instruct one of the plurality of transporting devices perform an operation with one of the plurality of containers.

152.    The plain language of the claims informs a person of ordinary skill in the art that the "clearance command" (and its analogous "clearance instructions") are distinct from "travel commands."  Specifically, claim 23 states: (i) travel commands are "to *instruct* the plurality of transporting devices to travel on the pathways along the plurality of paths"; and (ii) a "travel command" is "different from" a "clearance command."  From these teachings, a person of ordinary skill in the art would know that a "travel command," which instructs a robot to travel along a path is different from a "clearance command" (or its analogous "clearance instruction") that is provided to traverse a portion of the reserved path.  Claim 24 then explains that a "travel command" may also instruct a robot to perform an operation with the containers.

---

[5]  Claim 20 is an analogous method claim and recites analogous steps.

153.    The specification further confirms that a "clearance command" or "clearance instruction" is a ***permission*** provided to the robot for the robot to traverse a portion of a path.  This is contrast with the "travel commands" in claims 23-24, which ***instruct*** a robot to travel or perform another operation.  In particular:

154.    The '440 patent specification states that the system of the invention includes:

"… one or more utilities providing a clearance system for permitting or stopping movement of the one or more transporting devices to avoid collisions."

*Id.* at 3:8-10.  This makes clear to a person of ordinary skill in the art that the "clearance system" is for "permitting" movement or "stopping movement" (by way of withholding of a clearance) to avoid collisions.

155.    The '440 patent specification also states at 18:38-45:

Upon providing a robot with a new instruction, the clearance module 312 checks that it will not be possible to collide with another robot, based upon, for example, grid dimensions, grid positions, move commands generated by planning, cancellation of move commands (generated on events such as a controlled stop), the current positions and speeds of robots, braking ability of robots as well as where they have been cleared to visit.

This paragraph explains that after a robot is provided with a new ***instruction***, the clearance module subsequently checks whether the robot, moving according to that instruction, might collide with another robot based on a number of factors.  A person of ordinary skill in the art would understand from this that what the clearance module provides (a clearance instruction) differs from an "instruction" for the robot to move.[6]  Further, the paragraph states that clearance module checks for possibility of collision based on, potentially, "move commands generated by planning."  This

---

[6] The '404 patent at 19:58-20:11 explains that "instructions" sent to the robots include instructions to move and to obtain a container from a specific location.

further shows a person of ordinary skill in the art that "move commands" are different from "clearance instructions" provided by the clearance module.

156.    In the next paragraph, the specification again states that "[t]he clearance module 312 may be configured to issue clearance 'just in time', and may be used to grant **permissions** to robots to continue along their planned paths." *Id.* at 18:46-48. This again informs a person of ordinary skill in the art that a clearance is a permission given to a robot to continue along its planned path. There is no discussion here or elsewhere that the clearance includes information about the planned path itself—it is only a permission to move along a path that has been planned.

157.    The file history of the '141 patent, which is in the same family as the '404 and '770 patents, further confirms that the plain and ordinary meaning of "clearance," read in the context of the prosecution history, is a "permission." During the prosecution of the '141 patent, Ocado stated the following to the USPTO:

> "The use of [Movement Optimization Unit] and [Reservation Unit] … may not result in perfect routes suitable for traversal … because [the robot] may be marginally off route due to tolerances in the transmission of communication messages and tolerances for clock discrepancies …. Accordingly, *a clearance unit can be used to issue* 'just in time' *permissions for a transporting device to continue along a planned route* once the tolerances have been sufficiently resolved. In this way, the clearance unit can operate as a path resolver."

Ex. L at AS-NH_00207453 (12/3/2018 Amendment and Reply) (emphasis added). A person of ordinary skill would understand from this that the "clearance unit" issues "permissions."

158.    Ocado made analogous statements to the EPO during prosecution of EP '450. For instance, Ocado told the EPO that:

> " … *a clearance module* is provided which selectively grants *permissions to robots* to continue along their reserved paths. The clearance module checks, based on current position and speed data, whether a collision between robots is actually possible (despite the reservation module having previously ensured that there are no conflicting paths). The clearance module stops a robot to avoid a potential collision, and then interacts with a movement optimisation module to dynamically re-plan a route for the robot to resolve or avoid the conflict. As such, the clearance

56

module of the claimed invention acts during movement of the robots, based on real-time position and speed information, whereas the reservation module of the claimed invention acts in advance of movement of the robots and does not require real-time information."

Ex. K at AS-NH_00209631 (emphasis added).  Here again, a person of ordinary skill in the art reviewing this disclosure would understand that a "clearance" is a "permission."

159.    Other statements by AutoStore to the EPO during prosecution of the EP '450 patent further confirm this understanding:

> "[t]he system also includes a second component (namely *a clearance module*) which acts during movement of the robots along their reserved paths, granting *permissions* for the robots to continue along their paths, and stopping a robot if it is determined, based on current positions and speeds of the robots, that a collision is possible.")

*Id.* at AS-NH_00209631 (emphasis added).

> "Therefore, the system achieves the realisation of the reserved path but moderated by *the clearance module* which only grants *permission* for a robot along the reserved path when it is deemed safe so as to avoid potential collisions caused by possible deviations from planned routes."

*Id.* at AS-NH_00209631-632 (emphasis added).

160.    A person of ordinary skill in the art in my opinion would also consult regular English dictionaries for the definition of "clearance."  Those definitions further confirm that the plain and ordinary meaning of the term is a "permission."  For example:

  a. "Permission, usually from a control tower, to take off, land, etc."  Ex. M (Webster's New World College Dictionary (5th Ed.) (2014)) at AS-NH_00217324.

  b. "Permission to proceed."  Ex. N (The American Heritage Dictionary (2d Ed.) (1989)) at AS-NH_00217321.

  c. "Permission to proceed without objection, check or reservation."   Ex. O (Webster's Third International Dictionary (1986)) at AS-NH_00217304.

57

161.    I have also reviewed the portions of the specification that I understand Ocado may rely upon to support its proposed construction for "clearance instruction."  In my opinion, those portions do not support Ocado's proposed construction.

    a.  Ocado relies on claims 1, 4, 6, 8, and 17-20 of the '404 patent. Those claims do not specify that the "clearance instruction" or "clearance command" can be any command for a robot to traverse a portion of a reserved path.  They are all consistent with "clearance" being a permission.

    b.  Ocado also relies on the specification at 3:8-10, but I have also addressed that above and explained why that portion actually informs a person of ordinary skill in the art that a clearance is a permission.

    c.  The specification at 5:37-40 does not describe what a "clearance" is or what it does.  It states that the "device" in the system may be robots and that they communicate with a "control system" to coordinate / receive instructions about their movements.  There is no mention that any specific instruction about the devices' movements is a "clearance" instruction.

    d.  The specification at 18:31-34 states that "the clearance module" may "store and provide clearances for various robots," and that "a system of clearances may be accessed to determine whether a path is clear."  This portion actually further supports my opinion:  To a person of ordinary skill, "a system of clearances" can be used to determine whether a path is clear if those clearances represent *permissions* to travel along portions of a path.

    e.  Ocado also relies upon 18:38-54, but I have addressed those above.

58

f.  Ocado also relies on 21:1-3. This portion states that when the robot control system receives a "status message" from a robot, the clearance module may "extend a robot's current movement clearance." This is completely consistent with my opinion that a person of ordinary skill in the art would understand "clearance" in the 404 patent to mean permission. There is no disclosure here that the clearance module generates instructions to move to the robot that include substantive information about which direction to move into and for what distance.

g.  The specification at 16:1-8 also supports the reading that the "clearance" is a permission. Specifically, the specification states that the clearance module may be used together with the movement optimisation module and the reservation module to resolve path conflicts. It states that the "clearance module … provides a just-in-time- approach to determining priority when robots are engaged in potentially conflicting paths." As understood by a person of ordinary skill in the art, there is no disclosure or indication here that "clearance" can be anything other than a "permission." A permission would be used to determine robot priority.

h.  The portion at 19:58-63 states that the "command generation and scheduler … generates a set of instructions to be transmitted" to the robots, and that these instructions include instructions for a robot to move from one location to another location. According to the patent, the instructions may be transmitted "in a near-real time / real-time configuration, in a just-in-time configuration, and/or provided ahead of time to allow for planned/scheduled

59

routes." Although a person of ordinary skill in the art would understand that instructions transmitted by the command generation and scheduler module include clearance instruction, there is no disclosure that clearance instructions are the ones that inform a robot to move in a certain direction and/or for a certain distance.

i. The same point is true for 20:10-14, where the specification states that the command generation and scheduler module sends instructions through the communications module to robots "to be executed at a future time." There is no disclosure here that clearance instructions include instructions for a robot to move in a certain direction or for a certain distance.

**D. "A Route [of a Transporting Device] From One Location on the Grid-Like Structure to Another Location on the Grid-like Structure [for Each Transporting Device]"**

162. Independent claims 1 and 20 of the '404 patent include the phrases: "a route of a transporting device from one location on the grid-like structure to another location on the grid-like structure" (claim 1) and "a route from one location on the grid-like structure to another location on the grid-like structure for each transporting device" (claim 20).

163. I understand from AutoStore's counsel that Ocado contends that these terms require "no construction" and that they should take their "plain and ordinary meaning." Ex. G at 2. In my opinion, read in light of the claims, specification and file history, a person of ordinary skill in the art would not have been able to understand the meaning of this phrase with reasonable certainty. I am not an attorney, but I have been instructed on patent law by AutoStore's lawyers, who have told me that different claim terms in a claim are presumed to have different meanings. Claims 1 and 20 use both "path" and "route," thus implying that the two have different meanings. However, it is my opinion that a person of ordinary skill reading the specification and file history of the '404

60

patent would not understand the two terms to be different (or if different, what exactly is their difference). That is because the specification of the '404 patent sometimes treats the two terms as interchangeable and sometimes as different.

164. For example, claim 1 of the '404 patent recites in relevant part:

> a movement optimisation unit configured to determine a ***route*** of a transporting device from one location on a grid-like structure to another location on the grid-like structure for each transporting device;
>
> a reservation unit configured to reserve a ***path*** on the grid-like structure for each transporting device based on the determined ***route***, wherein the ***path*** reserved for each transporting device is provided such that no two transporting devices have locations on the grid-like structure which would cause transporting devices to overlap at a same time;

'404 patent, claim 1 (emphasis added); *see also* '404 patent, claims 10, 20. Because "path" and "route" are both used in the claim language, even in the same limitation, the terms are presumed to have different meanings. Indeed, the claim states that a "path" is determined "based on" a route that is determined by the MOU.

165. But, when explaining how to map a route, the specification uses the "path" term instead. For example, the '404 patent's specification explains:

> *A number of different algorithms and techniques may be used in determining a preferential **path** for a robot to take*, including, but not limited to: branch and bound algorithms, constraint programming, local search, heuristics, graph traversal, dynamic path learning advisor techniques, pruning techniques and Bayesian graph searching techniques, Dijkstra's algorithm, Bellman-Ford algorithm, Floyd-Warshall algorithm, Johnson's algorithm, breadth-first recursive searches and depth-first recursive searches, weighted paths, A* search algorithm, variants on A* search algorithm (e.g. D*, Field D*, IDA*, Fringe, Fringe Saving A*, Generalized Adaptive A*, Lifelong Planning A*, Simplified Memory Bounded A*, Jump Point Search, Theta*).

'404 patent at 22:12-25; *see also id.* at 22:26-24:48.

166.    I have also reviewed the file histories of the '404 patent and those of its U.S. family members. There is no explanation by the applicant of the meaning of "route" as opposed to "path" in those file histories.

167.    Ocado relies on a number of excerpts from the '404 patent (*see* Ex. G at 22), but none provides this explanation. Specifically, Ocado relies upon the following passages from the '404 specification:

- "A system and method for controlling movement of transporting devices arranged to transport containers stored in stacks arranged in a facility having pathways arranged in a grid-like structure above the stacks, the transporting devices being configured to operate on the grid-like structure. A movement optimisation unit is configured to determine a route of a transporting device from one location on a grid-like structure to another location on the grid-like structure for each transporting device. A reservation unit is configured to reserve a path on the grid-like structure for each transporting device based on the determined route. A clearance unit is configured to provide clearance for each transporting device to traverse a portion of the reserved path." '404 patent at Abstract.

- "a movement optimization unit configured to determine a route of a transporting device from one location on a grid-like structure to another location on the grid-like structure for each transporting device." '404 patent at 2:37-40.

- "determining a route from one location on the grid-like structure to another location on the grid-like structure for each transporting device." '404 patent at 2:55-57.

- "Furthermore, as mentioned above, individual containers may be in vertical layers, and their locations in the "hive" may be indicated using co-ordinates in three dimensions to represent the robot or a container's position and a container depth (e.g. container at (X, Y, Z), depth W). In some embodiments, locations in the "hive" may be indicated in two dimensions to represent the robot or a container's position and a container depth (e.g. container at (X, Y), depth Z)." '404 patent at 6:10-19.

None of the above quotes explains the difference between "route" and "path." Indeed, the discussion in the Abstract and following the '404 patent's discussion at 2:37-40 and 2:55-57 further support my opinion that the '404 patent does not provide reasonable certainty as to the meaning of "route" because the specification uses the terms "path" and "route" in the same way as the claims, which requires that the terms have different meanings, and provides no explanation

62

of the differences between the terms. *See* '404 patent at 2:31-48, 2:49-64. Further, Ocado relies upon Figures 4, 5, and 7, none of which indicate the difference between a "route" and a "path" either.

168.    Other portions of the specification add to the confusion.  For example:

  a. Although claims 1 and 20 recite that the "reservation unit" reserves "paths," the specification at times refers to reserving "routes" (*see, e.g.*, '404 patent at 3:5-7, 3:49-51, and 19:44-46) and at times to reserving "paths" (*see, e.g.*, *id.* at 19:52-53)..

  b. Although claims 1 and 20 recite that the "movement optimisation unit … determine[s] a route," the specification instead often refers to finding "paths" and "path finding." *See, e.g.*, '404 patent at 9:6-16, 10:60 (referring to "determining optimal pathways"); *see also id.* at 12:50-53 (referring to "determin[ing] one or more paths that may potentially be preferential relative to other pathways …."), 16:4-5 ("… a movement optimisation module 304 develops a path ..."), 22:12-13 ("determining a preferential path").   But in other instances, the specification refers to determining routes. *See id.* at 14:33-36.

### E. "Control Unit" (Claim 14)

169.    Claim 14 of the '404 patent recites:

"The system according to claim 1, comprising:

a control unit configured to control movement of the transporting devices,

wherein the clearance unit is configured to provide to the control unit at least one of: the clearance instructions required to traverse a reserved path, notification of when the clearance instruction is

issued, notification of when the clearance instruction is withheld, and problems with a transporting device,

wherein the control unit is configured to control movements of the transporting devices based on the information received from the clearance unit."

170. AutoStore's counsel requested that provide my opinion as to whether the '404 patent specification discloses specific algorithms for carrying out the function recited for the "control unit" in claim 14—namely, receiving from the clearance unit at least one of: the clearance instructions required to traverse a reserved path, notification of when the clearance instruction is issued, notification of when the clearance instruction is withheld, and problems with a transporting device, and controlling movements of the transporting devices based on the information received from the clearance unit. In my opinion, the '404 patent specification provides no such algorithm.

171. My analysis begins with the claim language. First, I observe that the "control unit" recited in claim 14 does not refer to the "control unit" referenced in claim 1. Although claim 14 depends on claim 1, I understand from AutoStore's counsel that as a matter of claim interpretation, if a term in a claim refers back to an earlier mention of the same term (its "antecedent basis") in the same or an earlier claim, the proposition "the" is used to identify the second and subsequent references to the claim. Here, although claim 14 depends on claim 1, it recites "a control unit." Thus, I do not understand claim 14's reference to "a control unit" to refer to the same "control unit" mentioned in claim 1.

172. This understanding is further confirmed by the consideration that the "control unit" in claim 1 is onboard a given robot ("… a control unit on each transporting device …"). By contrast, the plain language of claim 14 refers to a single control unit that controls movements of all robots in the system ("a control unit configured to control movement of the transporting devices.")

64

173. With that understanding, I next consider the '404 patent specification. The specification describes no such "control unit" that controls the movements of all transporting devices using at least one of: the clearance instructions required to traverse a reserved path, notification of when the clearance instruction is issued, notification of when the clearance instruction is withheld, and problems with a transporting device. Moreover, the '404 patent specification describes no algorithm or method for controlling the movement of robots using the above information.

174. The specification does not actually refer to a single "control unit" that can control the movement of each of the robots on the grid. By contrast, the specification describes components onboard each robot that receive information from the control system. Figure 2, for instance, refers to internal components of the robots, such as "real time controllers" (items 224a, 224b, and 224c), processors (items 222a, 222b, and 222c), and digital signal processors (items 220a, 220b, and 220c). *See also* '404 patent at 12:7-11.

## IX.  CLAIM TERMS IN THE '770 PATENT

### A.  "One or More Processors

175. Independent claims 1 and 29 recite "one or more processors" that are "configured to" perform certain functions (claim 1) and that perform certain functions (claim 29). Dependent claims 9 and 10 further recite that the "one or more processors" are configured to perform certain actions.

176. AutoStore's counsel asked me to provide my opinion as to whether the '770 patent specification provides algorithms or methods to program computers to implement the functions recited for the "one or more processors" in claims 1, 9, 10, and 29 of the '770 patent. In my opinion, the specification provides no such algorithms.

### 1.   *"One or more processors" in Claim 1*

177.   Claim 1 recites, in part (bolded Roman numerals in brackets are supplied by me):

"one or more processors configured to:

…

[i]   generate a plurality of clearance commands for the plurality of transporting devices to cause the plurality of transporting devices to travel on the pathways along portions of the plurality of paths, the plurality of clearance commands comprising a first clearance command for the first transporting device,

[ii]   determine there is a potential for a collision between the first transporting device traveling along the first path and the second transporting device traveling along the second path, and

[iii]   responsive to a determination that there is the potential for the collision;

> [iv]   withhold a second clearance command for the first transporting device that would cause the first transporting device to travel on the pathways along a portion of the first path,
>
> [v]   determine a revised path different from the first path for the first transporting device to travel on the pathways, and
>
> [vi]   generate a third clearance command for the first transporting device to cause the first transporting device to travel on the pathways along a portion of the revised path …"

178.   In my opinion, the '770 patent specification does not provide any algorithms or examples of how to implement the functions stated in items [i] through [vi]

179.   Function [i] mirrors the claim language reciting "clearance unit" and "clearance instruction" in claim 1 of the '404 patent.  For the reasons discussed in connection with those terms, it is my opinion that the '770 patent specification does not provide any algorithms or methods to program a computer to carry out the function specified by [i].

180.   My opinion is also that the '770 patent specification does not provide any algorithms or methods for carrying out the function articulated by item [ii].

66

a.  The '770 patent at 9:25-32 states that the system in comparing preferential paths for a robot to take to its destination, considers, among other things, "the potential for a collision."  But there is no explanation of how to compute the "potential for collision."

b.  The '770 patent at 15:47-54 states that the MOU, RU, and CU "are utilized together as a path conflict resolver," where the CU "provides a just-in- time approach to determining priority when robots are engaged in potentially conflicting paths."   Although this excerpt appears to state that a potential for a collision may be determined, it does not explain how to compute the "potential for collision."

c.  The '770 patent at 18:19-26 explains that the CU checks whether it is possible for a robot to collide with another robot, based upon a number of enumerated factors.  However, it does not explain any algorithm for conducting this check.

## 2.    *"One or more processors" in Claim 9*

181.  Dependent claim 9 recites: "[t]he system of claim 1, wherein the one or more processors are configured to determine from an attribute of the first transporting device that there is the potential for the collision."  My opinion is that the '770 patent specification does not provide any algorithm or example for implementing this function by the "clearance unit."  My reasons for this opinion are the same as those with respect to item **[ii]** of claim 1 of the '770 patent (*see* § IX.A.1 above).  The '770 patent specification provides no explanation as to how to compute the potential for a collision.

### 3.    *"One or more processors" in Claim 10*

182.    Dependent claim 10 recites: "The system of claim 1, wherein the one or more processors are configured to determine from one or more of (i) a missed message, (ii) a processing time, (iii) a clock sync, or (iv) a transporting device discrepancy with a physics model, that there is the potential for the collision."  My opinion is that the '770 patent specification does not provide any algorithm or example for implementing this function by the "clearance unit."  My reasons for this opinion are the same as those with respect to item **[ii]** of claim 1 (*see* § IX.A.1 above).  The '770 patent specification provides no explanation as to how to compute the potential for a collision, let alone that uses the pieces of information (i) - (iv) recited in claim 10.

### 4.    *Claim 29*

183.    Claim 29 of the '770 patent states in part (bolded Roman numerals in brackets supplied by me):

> "**[i]**   generating, by the one or more processors, a plurality of clearance commands for the plurality of transporting devices to cause the plurality of transporting devices to travel on the pathways along portions of the plurality of paths, the plurality of clearance commands comprising a first clearance command for the first transporting device;
>
> **[ii]**   determining, by the one or more processors, there is a potential for a collision between the first transporting device traveling along the first path and the second transporting device traveling along the second path;
>
> **[iii]**   in response to determining that there is the potential for the collision:
>
>> **[iv]**   withholding, by the one or more processors, a second clearance command for the first transporting device that would cause the first transporting device to travel on the pathways along a portion of the first path,
>>
>> **[v]**   determining, by the one or more processors, a revised path different from the first path for the first transporting device to travel on the pathways, and

[vi]  generating, by the one or more processors, a third clearance command for the first transporting device to cause the first transporting device to travel on the pathways along a portion of the revised path."

184.   Based on my reading of claim 29, these claim elements implement, as a method, what the corresponding limitations say that a system is configured to do.  For the same reasons that I explained above in connection with claim 1, my opinion is that the '770 patent specification does not describe any algorithms for programming computers to perform the functions in items [i]-[ii].

**B.   "Wherein the one or More Processors Are Configured to Control Operations of the Plurality of Transporting Devices in Real Time" (Claim 21)**

185.   Dependent claim 21 of the '770 patent includes the phrase "wherein the one or more processors are configured to control operations of the plurality of transporting devices in real time."

186.   I understand from AutoStore's counsel that Ocado contends that this phrase needs no construction and that it should take its "plain and ordinary meaning."  Ex. G at 26.  I also understand that Ocado has not proposed what such a "plain and ordinary meaning" is.  In my opinion, the '770 patent claims, specification, and file history do not inform the meaning of this phrase to a person of ordinary skill in the art with reasonable certainty.  Specifically, it is my opinion that a person of ordinary skill in the art reading the '770 patent and its file history would not have understood the scope of the phrase "in real time" with reasonable certainty.

187.   The specification distinguishes between "real time" and "near-real time" protocols.  For example, the specification states:

> The robot control system 202 may be configured to send control messages to one or more robots, receive one or more updates from one or more robots, and communicate with one or more robots using ***a real[-] or near-real time*** protocol."

'770 patent at 10:23-27 (emphasis added).  Elsewhere, the specification states:

69

> The control system 202 may be *a real **or** near-real time* control system (controlling the actions of the various units including robots and optionally the associated other units involved such as conveyors, pickers, humans, etc.).

*Id.* at 13:4-7 (emphasis added).

> The control system 202 may provide *real **or** near-real time control* of the allocation of work, workstation operations, the movement of robots and/or the placement of containers, according to some embodiments of the invention.

*Id.* at 13:21-24 (emphasis added); *see also id.* at 19:43-46. To a person of ordinary skill in the art, these excerpts signify that the '404 patent considers operation of robots in "real-time" to be different from "near-real time" operation. But there is no explanation in the specification as to what timeframe is considered to be "real time" and what timeframe is considered to be "near-real time."

188. The specification also appears to distinguish between "real-time" and "near real-time" and another form of control:

> In some embodiments, one or more control commands to control the movement of the plurality of transporting devices is provided to the plurality of transporting devices *in advance of the movement* of the plurality of transporting devices.

*Id.* at 3:61-65.

189. The specification, neither here or elsewhere, provides any objective measure by which a person of ordinary skill in the art may distinguish between this situation, "real time," and "near-real time" control. The specification includes no discussion of what amount of latency (delay) in controlling robot operations would nonetheless qualify as "real time," and what delays would qualify as "near real-time," even if not "real time."

190. The evidence that Ocado cites in support of its position does not change my opinion. Ocado cites to the dictionary definition of "real time" as: "1. The actual time in which a physical

70

process under computer study or control occurs. 3. The timing or arrangement allowing a process to occur normally, without delay.).”  Ex. G at 26.  But these definitions do not address the ambiguity I identified above.  Specifically, these definitions do not provide an objective measure of time delay by which a person of ordinary skill can use to determine whether control of robot operations qualifies as “real time” or not.

191.    Ocado also cites to the ’770 patent at 10:23-27, 13:4-7, and 13:21-24.  Ex. G at 26.  As I explained above, in my opinion these portions do not inform a person of ordinary skill in the art, with reasonable certainty, of the meaning of “real time” operation of transporting devices (robots).

192.    Ocado also cites to the ’770 patent at 12:12-15, 16:7-11, 19:57-61, and 19:67-20:2.  None of these excerpts informs a person of ordinary skill in the art, with reasonable certainty, of the meaning of “real time” operation of transporting devices (robots).

193.    The ’770 patent at 12:12-15 states that the control system may be configured to schedule when specific types of movements should happen and in which order.  There is no explanation of an objective measure by which a person of ordinary skill could discern, with reasonable certainty, what “real time” means within the meaning of claim 21.

194.    The ’770 patent at 16:7-11 states that the control system may plan robot paths and make path reservations “sufficiently far in advance.”  This does not qualify as a “real time” operation.  And again, there is no explanation of an objective measure by which a person of ordinary skill could discern, with reasonable certainty, what “real time” means within the meaning of claim 21.

195.    The ’770 patent at 19:57-61 states that the command generation and scheduler module pre-populates instructions for a particular robot, and that those instructions may then be

71

provided to the robot through the robot communications module. This excerpt makes no reference as to whether such instructions are provided in real time or whether they pertain to real-time operations. There is no explanation here of an objective measure by which a person of ordinary skill could discern, with reasonable certainty, what "real time" means within the meaning of claim 21.

196. The '770 patent at 19:67-20:2 distinguishes between "just-in-time" instructions to the robot and instructions "for the coordination of future movements." This portion does not explain what "just-in-time" means and how it relates to "real time." In addition, this excerpt does not describe any objective measure by which a person of ordinary skill in the art could determine whether a specific amount of delay qualifies as "just-in-time" (or "real time") versus not.

## C.    "Potential for Collision"

197. Independent claims 1 and 29 and dependent claim 27 of the '770 patent include the phrase "a potential for a collision between the first transporting device traveling along the first path and the second transporting device traveling along the second path" (claims 1 and 29) and "potential for the collision" (claim 27).

198. I understand from AutoStore's counsel that Ocado contends the phrases "potential for a collision" / "potential for the collision" need no construction and should take their "plain and ordinary meanings." Ex. G at 25-26. I also understand that Ocado has not proposed what such a "plain and ordinary meaning" is. In my opinion, the '770 patent claims, specification, and file history do not inform the meaning of this phrase to a person of ordinary skill in the art with reasonable certainty. Specifically, it is my opinion that a person of ordinary skill in the art reading the '770 patent and its file history would not have understood the scope of "determine there is a potential for a collision" with reasonable certainty. In particular, "potential for a collision" refers to the "chance" for a collision. In my opinion, the '770 patent and its file history do not provide

72

an objective measure by which a person of ordinary skill in the art could ascertain whether the probability of a collision reaches to the level of being considered to be a "potential for a collision." Further, the specification does not even explain whether probability of collision is used to determine the "potential for collision," or some other measure undefined is used.

199.    I am not a lawyer, but I am able to provide my opinion as to how a person of ordinary skill in the art would read and understand the claims of the '404 and '770 patents.  With respect to the following elements of claim 1 of the '770 patents: "*determine there is a potential for a collision …, and responsive to a determination that there is the potential for the collision; [carry out other tasks],*" it is my opinion that a person of ordinary skill in the art would interpret them as: (i) determining whether the probability of a collision reaches a sufficiently large value; and (ii) as a result of such a determination has been made ("responsive to a determination that there is the potential for a collision"), carry out other tasks.

200.    The '770 patent and its file history, however, lack any explanation as to what probability of collision is high enough to constitute "potential for a collision."

201.    The '770 patent at 9:25-32 states that the system in comparing preferential paths for a robot to take to its destination, considers, among other things, "the potential for a collision." But there is no explanation of how to determine an objective criterion by which one could determine how large of chance of collision constitutes "a potential for a collision."

202.    The '770 patent at 15:47-54 states that the MOU, RU, and CU "are utilized together as a path conflict resolver," where the CU "provides a just-in- time approach to determining priority when robots are engaged in potentially conflicting paths."  Although this excerpt appears to state that a potential for a collision may be determined, it does not provide an objective test for its determination.

73

203.    The '770 patent at 18:19-26 explains that the CU checks whether it is possible for a robot to collide with another robot, based upon a number of enumerated factors.  However, it does not provide an objective test for determining how large the probability for a collision needs to be before it is considered to be "a potential for a collision."

## X.    RESERVATION OF RIGHTS

204.    I reserve the right to respond to any evidence (including expert opinions) that Ocado may offer in support of its claim construction positions.

I declare under penalty of perjury that the foregoing is true and correct.

Dated:  May 27, 2022

_____

Petros Ioannou, Ph.D.

74