**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW HAMPSHIRE**

| | |
|---|---|
| OCADO INNOVATION LTD. and OCADO SOLUTIONS LTD., | ) ) ) |
| Plaintiffs, | ) ) |
| v. | ) ) |
| AUTOSTORE AS and AUTOSTORE SYSTEM INC., | ) **Civil Action No. 1:21-cv-00041** ) ) |
| Defendants. | ) ) ) ) ) ) ) |

**REBUTTAL DECLARATION OF PETROS IOANNOU, PH.D.**

## TABLE OF CONTENTS

TABLE OF EXHIBITS ................................................................................................................. iii

I.      THE RELEVANT FIELD AND THE LEVEL OF SKILL IN THE ART ................... 2

II.     THE '404 PATENT ........................................................................................................ 4

    A.      "Clearance Unit" ................................................................................................ 4

    B.      "Wherein The Clearance Instruction Is Provided For Execution By A Control Unit On Each Transporting Device At A Future Time" / "Wherein The Clearance Instruction Is Provided For Execution By Each Transporting Device At A Future Time" ................................................................................... 6

    C.      "Wherein The Clearance Unit Is Configured As A Passive Collision Avoidance System, Wherein Each Transporting Device Is Operated In A Manner Without Impacting System Performance" ("Passive Collision Avoidance Limitation") ...................................................................................... 12

    D.      "Clearance Instruction" .................................................................................... 13

    E.      "Wherein At Least One Of The Clearance Unit, And The Movement Optimisation Unit Is Configured To Dynamically Re-Plan A Route" ................. 14

III.    THE '770 PATENT ...................................................................................................... 16

    A.      "Clearance Command" ...................................................................................... 16

    B.      "Potential For [A/The] Collision" ..................................................................... 16

    C.      "Wherein The One Or More Processors Are Configured To Control Operations Of The Plurality Of Transporting Devices In Real Time" ................. 18

IV.     RESERVATION OF RIGHTS ..................................................................................... 19

## TABLE OF EXHIBITS

| EXHIBIT | DESCRIPTION | BATES NO. |
|---|---|---|
| A | List of Materials Considered | |
| B | April 23, 2021 D'Andrea Declaration (Case No. 1:21-cv-00041 (D.N.H.) Dkt. No. 35-22) | |
| C | Lanning, Daniel & Harrell, Gregory & Wang, Jin. (2014). *Dijkstra's algorithm and Google maps*, ACM SE '14: Proceedings of the 2014 ACM Southeast Regional Conference, March 2014, Article No.: 30, Pages 1–3 (https://doi.org/10.1145/2638404.2638494) | |

I, Petros Ioannou, declare under penalty of perjury as follows:

1.      I submit this rebuttal declaration in response to the Declaration of Raffaello D'Andrea, Ph.D., in Support of Plaintiffs' Proposed Claim Constructions ("DA") regarding the meaning of certain disputed claim terms in U.S. Patent Nos. 10,901,404 ("the '404 patent") and 11,079,770 ("the '770 patent").

2.      My opinions are based on my skills, knowledge, training, education, and experience, including in matters of this nature, and my examination of the materials used in preparing this Declaration.

3.      I have personal knowledge of the matters set forth in this Declaration, and if I am called upon, I could testify competently about them.

4.      I previously provided a declaration in this matter on May 27, 2022 ("Ioannou #1").

5.      I am being compensated for my time spent on this matter at my usual and customary rate of $465 per hour, plus reasonable expenses.  My compensation is not contingent on the outcome of this action, and I have no financial interest in this case.

6.      I provided my curriculum vitae as an exhibit to my first declaration. After I submitted my first declaration in this matter, I was inducted into Academia Europaea (also known as Academy of Europe), a prestigious academy dedicated to "the advancement and propagation of excellence in scholarship in, among others, technological sciences anywhere in the world for the public benefit and for the advancement of the education of the public of all ages."

7.      In preparing this declaration, I have considered, among other things, the '404 and '770 patents, their prosecution histories (also referred to as file histories), Dr. D'Andrea's declaration, and the Parties' claim construction disclosures, including the intrinsic and extrinsic evidence cited therein.  A complete list of the materials I considered is attached as Exhibit A to

1

this Declaration.  I have also relied on and considered my knowledge, training, and experience as a robotics and control systems engineer and professor over the past more than forty years.

## I.    THE RELEVANT FIELD AND THE LEVEL OF SKILL IN THE ART

8.    I disagree with Dr. D'Andrea's opinion that the field of the '404 and '770 patents is limited to automated warehouse storage systems.  The claims of the '404 and '770 patents recite a system for controlling movement of transporting devices that transport containers, where the transporting devices move laterally in a first direction and laterally in a second direction on pathways that form a grid-like structure.  *See, e.g.*, '404 patent at claim 1.  However, the methods described in the patent common specification of the '404 and '770 patents are not limited in their use to automated warehouse systems, but relate more generally to autonomous guided vehicles. Indeed, the common specification acknowledges as much.  *See* '404 patent at 5:26-29 ("The specification is not limited to only systems that have 'hives', 'grids', and/or 'robots', but systems that broadly control and/or coordinate the movement and/or activities of a plurality of devices may also be contemplated.")  Also, the common specification identifies "[a] number of different algorithms and techniques may be used in determining a preferential path for a robot to take," including "branch and bound algorithms, constraint programming, local search, heuristics, graph-traversal, dynamic path learning advisor techniques, pruning techniques and Bayesian graph searching techniques, Dijikstra's algorithm, Bellman-Ford algorithm, Floyd-Warshall algorithm, Johnson's algorithm, breadth-first recursive searches and depth-first recursive searches, weighted paths, A* search algorithm, variants on A* search algorithm (e.g. D*, Field D*, IDA*, Fringe, Fringe Saving A*, Generalized Adaptive A*, Lifelong Planning A*, Simplified Memory Bounded A*, Jump Point Search, Theta*)."  *Id.* at 22:12-24.  These algorithms have their uses in a variety of path planning problems, including those for autonomous guided vehicles and mobile robots

2

outside of the automated warehouse systems. These algorithms have been used extensively in vehicle routing problems, motivated by the well-known "travelling salesman" problem posed mathematically at least as of the 1930's. Google maps, for example, uses Dijikstra's and A* algorithm for generating vehicle routes in today's navigation devices. *See* Ex. C. As I stated in my first declaration in this matter, the appropriate field of the '404 and '770 patents is path planning for automated guided vehicles. *See* Ioannou #1 ¶ 61. The methods described in the common specification of the '404 and '770 patents may be implemented on autonomous guided vehicles more generally.

9.      In addition, I disagree with Dr. D'Andrea's opinion regarding the qualifications of a person of ordinary skill in the art ("POSITA"). Specifically, Dr. D'Andrea states that a POSITA would have "three to five years of experience in the design or operation of robot control systems." DA ¶ 23. This is too broad, because it includes experience in aspects of design (or operation) of robot control systems that do not bear directly on planning optimal paths for robots, which is the subject of the '404 and '770 patent claims. For example, someone may focus on the design and operation of the sensors on board the robot and how their signals are processed and used for controlling the motion of the vehicle. Someone else may work on the physical layer of robot motion by designing the control system to follow desired trajectories to avoid obstacles without necessarily having any knowledge how these desired trajectories are optimized and computed on the path planning level. Another person may focus on software and hardware aspects associated with the control of robots. Planning optimum paths for robots or vehicles in general involves expertise from operation research and optimization and is not something a robot control system person would necessarily know.

3

10.     Regardless of whether the Court accepts mine or Dr. D'Andrea's opinions as to the relevant field and the level of ordinary skill in the art, as of the effective filing date and right now, I had and have more training, expertise, and knowledge than a POSITA.  Moreover, my opinions below hold even if the Court were to accept Dr. D'Andrea's opinion as to the relevant field and the relevant amount of ordinary skill in the art (since he general attributes a lower amount of skill to a person of ordinary skill in the art than I do).

## II.     THE '404 PATENT

### A.     "Clearance Unit"

11.     Dr. D'Andrea states that "a POSITA would understand that the structure of the 'clearance unit' is, among others":

> [a] suitably configured computer device, and associated communications networks, devices, software and firmware," that "provid[es] a robot with a new instruction" indicating that "a path is clear for a robot to traverse" based on "check[ing] that it will not be possible to collide with another robot, based upon, for example, grid dimensions, grid positions, move commands generated by planning, cancellation of move commands (generated on events such as a controlled stop), the current positions and speeds of robots, braking ability of robots as well as where [the robots] have been cleared to visit" (*id.*, 18:31-45, 21:15-18), as well as, or in addition to, "a set of tolerances, including missed messages, processing time, clock sync and robot discrepancies with [a] physics model" (*id.*, 18:64-66), or robot speed and/or position updates (*id.*, 19:2-4).

DA ¶ 32.

12.     In my opinion, what Dr. D'Andrea identifies in the above-quoted paragraph does not constitute adequate "structure" for the term "clearance unit."  As I explained in my first

declaration (Ioannou #1 ¶¶ 63–64), I understand that the parties agree "clearance unit" is governed under 35 U.S.C. § 112.  I also understand from AutoStore's counsel that a "means plus function" term governed under section 112 that is implemented via software on general purpose computers must be supported in the specification with adequate descriptions of algorithm(s) to implement the stated function of term.  Here I address each portion of the specification that Dr. D'Andrea cites in the above-quoted paragraph:

    a.    "[a] suitably configured computer device, and associated communications networks, devices, software and firmware":  This provides no details about any specific algorithm to be used to "configure[]" the "computer device," or present on the "devices, software and firmware."

    b.    "provides a robot with a new instruction indicating that a path is clear for a robot to traverse …":  This excerpt states only that the "clearance unit" provides a new instruction indicating that a path is clear.  Again, there is no description of how that instruction is generated or how it is determined that a path is clear.

    c.    "… based on checking that it will not be possible to collide with another robot, based upon, for example, grid dimensions, grid positions, move commands generated by planning, cancellation of move commands (generated on events such as a controlled stop), the current positions and speeds of robots, braking ability of robots as well as where the robots have been cleared to visit":  This excerpt only states the parameters used by the clearance unit without providing any detail as to *how* the parameter are used in any specific algorithm.

    d.    "… as well as, or in addition to, a set of tolerances, including missed messages, processing time, clock sync and robot discrepancies with a physics model":  This

excerpt also lists parameters / specific pieces of information used by the "clearance unit" to generate clearance instructions. It does not describe any algorithm for how these pieces of information are used.

13.    In addition, Dr. D'Andrea does not describe the basis for the POSITA's alleged "knowledge" that the structure for "clearance unit" is as he describes. Moreover, even if a POSITA would have such an understanding, that still does not fill in the gap that the specification does not provide any algorithms for "provid[ing] a clearance instruction for each transporting device to traverse a portion of the reserved path."

**B.    "Wherein The Clearance Instruction Is Provided For Execution By A Control Unit On Each Transporting Device At A Future Time" / "Wherein The Clearance Instruction Is Provided For Execution By Each Transporting Device At A Future Time"**

14.    I agree with D'Andrea that these claims use "common English words," and I even use Dr. D'Andrea's definition of "future" as "time that is to come." *See* DA ¶ 35. But Dr. D'Andrea's opinion still does not respond to the opinion expressed in my first declaration (Ioannou #1 ¶¶ 128–146) that these claim terms are indefinite because a POSITA would not understand their meaning with reasonable certainty.

15.    Dr. D'Andrea states that in his opinion, the "plain meaning" of the claim terms to a POSITA is that "a clearance instruction may be pre-processed and provided such that it is executed to coordinate the robot's movement at a time that is 'still to come'." DA ¶ 37. Dr. D'Andrea's reading appears to be that a clearance instruction is pre-processed and provided to a robot and that it is executed to coordinate a later movement of a robot ("such that it is executed to coordinate the robot's movement at a time that is 'still to come'). That is not what the plain words of the claim state. Rather, they state that the clearance instruction is given ("provided") such that

it is executed by a control unit on each robot "at a future time" ("for execution by a control unit on each transporting device at a future time").

16.    As I explained in my first declaration, neither the specification nor the claim language teach a POSITA with reasonable certainty the minimum time delay (between provision of the clearance instruction and the execution of the clearance instruction by the robot) that is required for the limitation "for execution at a future time" to be met.  The plain meaning of "at a future time" covers ***any*** time delay (even an infinitesimally small one) between provision of the clearance instruction and the execution of the clearance instruction by the robot.  But all physical systems would necessarily have some amount of delay between provision of the clearance instruction and the execution of the clearance instruction by the robot.  I show this with the below schematic, where $\Delta_1$ refers to the period (delay) between when the controller/clearance unit provides a clearance instruction to the robot and when the robot receives the instruction; and $\Delta_2$ refers to the period (delay) between when the robot receives the clearance instruction and when the robot executes the instruction.



For this reason, a POSITA would understand that for the term "at a future time" to add any meaning to the claim, the patent must teach a minimum time value for the delay between provision of the clearance instruction and the execution of the clearance instruction by the robot (that is, a minimum

value for time $t_2$ in the above schematic). The specification does not teach a POSITA at all (let alone with reasonable certainly) what this minimum value should be. Neither does Dr. D'Andrea in his declaration. This is one reason why the claim term "for execution at a future time" is indefinite in my opinion.

17.    Also, a POSITA would understand that the plain meaning of "at a future time" includes arbitrarily large delays between provision of the clearance instruction and the execution of the clearance instruction by the robot. But a POSITA would know that a realistic control system would not operate with arbitrarily large delays. The specification does not teach a POSITA with reasonable certainty what the upper limit for the delay (*i.e.*, the maximum value for time $t_2$ in the above schematic) should be. This is another reason why the claim term "for execution at a future time" is indefinite in my opinion.

18.    Even under Dr. D'Andrea's reading of the claim terms—that "a clearance instruction may be pre-processed and provided such that it is executed to coordinate the robot's movement at a time that is 'still to come'"—the claim terms is indefinite because the specification and the claims do not provide reasonable certainty to a POSITA about the scope of the term. In particular, the specification and the claims do not explain the minimum time delay is required for a time to be considered "that is 'still to come'." If *any* time in the future counts (even one infinitesimally small, as Dr. D'Andrea's definition allows), then the phrase "at a future time" adds no meaning to the claim. That is in any physical system, some time passes: (i) between when the controller/clearance unit provides a clearance instruction to the robot and when the robot receives the instruction; and (ii) between when the robot receives the clearance instruction and when the robot executes the instruction. Therefore, any robot movement resulting from the execution of the clearance instruction *necessarily* comes *after* the provision of the clearance instruction (in other

8

words, under the laws of physics and causality, a clearance instruction must first be received and executed *before* it can cause / control robot movement).

19.     Dr. D'Andrea's proposal also covers arbitrarily large delays under the "time that is to come" definition.  In other words, Dr. D'Andrea's proposed definition of the claim term allows a clearance instruction to be pre-processed to coordinate a robot's movement far into the future (*e.g.*, six months later). This would not make any sense to a POSITA.  The claims and the specification provide no objective measure by which the POSITA could determine the maximum delay that still qualifies as "a future time."

20.     Dr. D'Andrea's reliance on the specification (*see* DA ¶ 36) does not address the indefiniteness problem I identified in my initial opinion.  The cited portions also do not address the problem I identified with Dr. D'Andrea's proposed definition:

a.     '404 patent at 9:34-35:  There is no indication that the specification at this excerpt even intends to include clearance instruction as an example of "tasks and actions" in the "[p]re-processing of tasks and actions to schedule future tasks and actions" language.  The specification refers to "clearance instruction" in a variety of settings, so a POSITA would expect the specification to refer to "clearance instruction" in the context of 9:34-35 if that were the intent.  Moreover, Dr. D'Andrea does not address my concern (*see* Ioannou #1 ¶ 135) that this excerpt does not explain how much delay is needed for scheduling to be considered to be at the future.

b.     '404 patent at 10:53-56:  I have addressed this disclosure in paragraph 137 of my initial opinion.  *See* Ioannou #1 ¶ 137.  Further, this disclosure states that *"control messages"* are processed and sent.  It does not refer to "clearance commands," and a POSITA would not understand the two to be the same given that the specification

9

uses different phrases to refer to them. *See* '404 patent at 10:35-62 (referring both to "control messages" and "clearances," which to a POSITA implies that they are different things). Even if one were to assume that a control message can be a "clearance," (which is not the case as I just stated), the excerpt at 10:53-56 merely states that clearance is provided to robots in anticipation of future movement. There is no mention of *when* that clearance must be executed (as the claim term at issue requires) and there is certainly no clarity given regarding the boundary between real-time and non-real time operation. *See, e.g.*, DA ¶ 137.

    c.    <u>'404 patent at 20:10-15</u>: I have addressed this disclosure in paragraph 141 of my initial opinion. *See* Ioannou #1 ¶ 141. Dr. D'Andrea's opinion does not address the problem that I explained in my initial declaration. There is no explanation instructing a POSITA how far in the future the instruction must be executed to meet the claim language. Dr. D'Andrea merely states that "certain of the pre-populated instructions are executed sequentially—***in the future—after the receipt of the instruction by the robot***, in conjunction with the movement of the robot." DA ¶ 36. But he does not explain how much after the receipt of the instruction by the robot this must occur.

21.    The excerpt at 20:21-23 states the instructions may be sent for the coordination of future movements. '404 patent at 20:21-23; DA ¶ 36. But as I explained in my initial declaration, this portion does not explain how much delay is needed for the execution to be considered to be "at a future time" as opposed to something that does not meet that limitation. *See* Ioannou #1 ¶ 141. This excerpt distinguishes between "just in time" instructions and those sent "for the coordination of future movements," (*id.*), but no objective boundary between the two is provided

in the specification, based on which a POSITA can determine whether an instruction is for "just in time" execution or for execution at a future time.

22.    Dr. D'Andrea's opinion regarding the file history of the '404 patent also does not address the problem I raised.  *First,* in my opinion, Dr. D'Andrea is incorrect to state that "the examiner acknowledged that the specification [of the '404 patent] did inform a POSITA regarding the scope of 'instructions . . . to be executed at a future time,' and the claims were amended to reflect the examiner's determination" (DA ¶ 38).  I am not a lawyer and therefore do not opine on the legal meaning or significance of the examiner's actions and statements during the prosecution of the '404 patent.[1]  As a purely technical matter, however, I do not read the examiner's agreement with the amended claim language "for execution at a future time" to say that the examiner expressly said that the specification informed a POSITA regarding the scope of that claim language.  As I read the file history, the examiner stated that the original claim language "future start time" does not make sense and that instead, "future time" or "ahead of a start time" makes sense from logical and grammatical perspectives.  The reference made no express reference to the adequacy of the specification to adequately inform a POSITA regarding the scope of "for execution at a future time."  *Second,* even if the examiner agreed that the specification provides reasonable certainty about the scope of the "for execution at a future time," Dr. D'Andrea points to nothing in the file history (and I read none) that would explain what that claim limitation means to a POSITA.  Dr. D'Andrea provides no substantive response to the problem I raised in my initial declaration.  *See* Ioannou #1 ¶¶ 130–133.

---

[1]  I also observe that Dr. D'Andrea has no such credentials and yet appears to be opining on the meaning of the examiner's actions.

**C.    "Wherein The Clearance Unit Is Configured As A Passive Collision Avoidance System, Wherein Each Transporting Device Is Operated In A Manner Without Impacting System Performance" ("Passive Collision Avoidance Limitation")**

23.    This limitation has two parts: (i) "a passive collision avoidance system"; and (ii) "wherein each transporting device is operated in a manner without impacting system performance."

24.    With respect to the first part, Dr. D'Andrea's opinion is that a POSITA would understand its meaning and scope to be a system "in which robots are controlled such that robots that do not receive instructions or commands will come to a stop on their own without colliding with other robots." DA ¶ 42. I disagree that a POSITA would have this understanding. To begin, I agree with Dr. D'Andrea's definition of "passive" as "accepting or allowing what happens." DA ¶ 41. But under such a definition of "passive," a "passive collision avoidance system" is an oxymoron because a passive system by definition cannot do anything to avoid collisions. A system that avoids collision by withholding "clearances," thereby letting robots stop before collisions, is not "passive," because work is done on the robots to stop them. Thus, a POSITA would not have the understanding of a "passive collision avoidance system" that Dr. D'Andrea advocates for, and the specification of the '404 patent provides no such explanation. Indeed, the '404 patent at 65:11-13 states that "one or more utilities provid[e] a clearance system for permitting or stopping movement of the one or more transporting devices to avoid collisions." This statement does not appear to imply any passive operation.

25.    With respect to the second part, Dr. D'Andrea's opinion is that "without impacting system performance" means "a clearance system that provides passive collision avoidance without requiring the robots to operate at reduced speed." DA ¶ 44. As an initial matter, it is unclear what reference point Dr. D'Andrea has in mind when he refers to "reduced speeds." Further, for his

opinion, Dr. D'Andrea relies on the patent applicant's statement during the prosecution of the parent '141 patent. *See id.*[2]  But the patent applicant in that office action response stated that "stopping or slowing transporting devices causes a loss in ***productivity*** of the transporting devices which is [*sic*] should be avoided."  Ioannou #1, Ex. L at 382–383 (AS-NH_00207583–84).  I have seen no explanation either in the file history of the '141 patent or anywhere else in the specification or file history of the '404 and '770 patents informing a POSITA that "productivity of the transporting devices" equates to "system performance" (as recited in claim 7).  Dr. D'Andrea assumes the two are the same without any explanation.  And in my opinion, a POSITA would not have such an understanding.

26.    Further, even Dr. D'Andrea's understanding of "wherein the clearance unit is configured as a passive collision avoidance system, wherein each transporting device is operated in a manner without impacting system performance" as "a clearance system that provides passive collision avoidance without requiring the robots to operate at reduced speed," (DA ¶ 44), has no support in the specification of the '404 patent and the specification provides no explanation of any algorithm to provide a "passive collision avoidance without requiring the robots to operate a reduced speed."  For example, the specification does not provide any algorithm or teaching for a POSITA how to make the trade-offs that Dr. D'Andrea purports are needed in paragraphs 43-44 of his report.

**D.    "Clearance Instruction"**

27.    The disagreement between my opinion about the meaning of the term "clearance instruction" to a POSITA and Dr. D'Andrea's opinion is that Dr. D'Andrea believes that the term

---

[2] Although Dr. D'Andrea refers to the prosecution of the '404 patent, he cites to the June 3, 2019 office action during the prosecution history of the '141 patent.

13

is not limited to just a permission and covers any "instruction for a robot to traverse a portion of a reserved path." *Compare* Ioannou #1 ¶¶ 148 *with* DA ¶ 45; Ioannou #1 ¶ 149. In my opinion, and for the reasons I explained in my initial declaration, a POSITA would not understand "clearance instruction" as Dr. D'Andrea asserts it for multiple reasons.

28. Moreover, Dr. D'Andrea provides no substantive reasons why the "clearance instruction" allegedly can be anything other than a "permission," stating only that AutoStore's proposed construction somehow "improperly limits the claim scope." DA ¶ 47. I have already provided my opinion as to why AutoStore's proposed construction of "clearance instruction" is correct (*see* Ioannou #1 ¶¶ 147-161) and reserve the right to respond to any further opinions by Dr. D'Andrea regarding this issue in his rebuttal declaration.

**E.    "Wherein At Least One Of The Clearance Unit, And The Movement Optimisation Unit Is Configured To Dynamically Re-Plan A Route"**

29. Dr. D'Andrea's opinion does not address my opinion regarding this term:  namely, that the specification provides no algorithm by which the "clearance unit can carry out the recited "dynamic re-plan[ning]" on its own. Dr. D'Andrea cites different excerpts of the '404 patent specification (*see* DA ¶ 51), but in each of those cases, the specification does not describe "the clearance unit" being configured to dynamically re-plan a route on its own, let alone describe an algorithm by which the "clearance unit" may do so.

a.    '404 patent at 18:51-54:  This portion merely states the "clearance module may interact with the movement optimisation module to dynamically re-plan route to resolve or avoid conflicts." There is no description of how this is done. There is also no description of the "clearance unit" or "clearance module" working alone to dynamically re-plan routes.

14

b.      '404 patent at 15:20-24:   This excerpt states that the "movement optimisation module" can "re-calculate preferential paths during the course of the robot's journey," but again, it does not state that the "clearance unit" or "clearance module" on its own can do so.

c.      '404 patent at 12:53-56: This portion states that preferential pathways determined by the "control system 202" may be provided dynamically to robots.   There is no explanation of the "clearance unit" or "clearance module" determining preferential pathways on its own.

d.      '404 patent at 19:4-5:   As I explained in my initial declaration, this portion states that the clearance unit may "provide a set of safe entry times" based on "robot position and speed updates, and clearances given/withheld." It also states that the set of safe entry times may be dynamically updated. However, there is no disclosure of any actual method for accomplishing the function using the listed information, or that the "clearance module" may re-plan paths on its own.

30.      Dr. D'Andrea also opines that "[a] POSITA would understand that that the system could use the same techniques and algorithms to "re-plan" a path that were disclosed in the specification for use in planning the original path."   Even if this were true, it still does not explain that a POSITA would understand that a "clearance unit" or "clearance module" on its own can plan or re-plan a path.   The specification uniformly states that path planning is done by the movement optimisation module.   Dr. D'Andrea confirmed the same in his declaration submitted on April 23, 2021.   *See* Ex. B ¶ 26 (describing the function of the "movement optimization unit" to be to "determine a 'route' from one location to another location), ¶¶ 29-32 (describing function

15

of "clearance unit" to be to "provide a robot on a reserved path with permission to traverse the next portion of the path" and making no mention of path planning by the clearance unit).

## III.    THE '770 PATENT

### A.    "Clearance Command"

31.    For the same reasons explained in connection with the "clearance instruction" term in the '404 patent claims, I disagree with Dr. D'Andrea's opinion regarding "clearance command." He only provides a conclusory assertion as to why AutoStore's proposed construction is allegedly wrong without any explanation to support his assertion.

### B.    "Potential For [A/The] Collision"

32.    As I explained in my initial declaration (Ioannou #1 ¶¶ 197-203), the record does not explain to a POSITA how high the probability of collision must be in order to determine whether there is a "potential for collision."

33.    Dr. D'Andrea states that a POSITA would understand that "potential for a collision" is a conflict of two objects that is capable of occurring, and that such a conflict can occur when two robots may attempt to occupy the same position on the grid at the same time.  DA ¶ 57. In other words, Dr. D'Andrea appears to opine that there is a "potential for collision" when two robots attempt to occupy the same position.

34.    This does not resolve the problem with the claim language that I pointed out in my initial declaration.  First, Dr. D'Andrea does not state that there is a "potential for collision" only when two robots attempt to occupy the same position.  Dr. D'Andrea does not address whether the scope of "potential for collision" covers anything other than when two robots attempt to occupy the same position.  For example, even if two robots do not attempt to occupy the same position,

16

there may be a potential for collision if at least one of the robots is not running on time or is otherwise deviating from its planned path.

35.    Second, as I explained in my initial declaration, "potential for collision" refers to a minimum probability of a collision. *See* Ioannou #1 ¶¶ 198–199. Otherwise, if "potential for a collision" referred to *any* probability for a collision, claim 1 of the '770 patent would not make sense—the claim requires "determin[ing] whether there is a potential for a collision," and carrying out certain tasks "responsive to a determination that ***there is*** the potential for the collision." '770 patent at claim 1 (emphasis added). A POSITA would understand that, if "potential for collision" referred to any chance of collision (even an arbitrarily small one), the condition "whether there is a potential for collision" would always be met. As I explained previously, the '770 patent specification does not give an objective measure by which to determine what probability of collision is high enough to constitute "potential for a collision."

36.    Dr. D'Andrea also states that the '770 patent at 18:19-26 "describes how to determine whether or not a potential for collision exists." DA ¶ 59. That is incorrect. In that portion, the specification merely identifies the pieces of information that may be used by the system to determine whether it is possible for a robot to collide with another robot ("based upon, for example, grid dimensions, gird positions, move commands generated by planning, …. braking ability of the robots …"). '770 patent at 18:19-26. There is no explanation of *how* the system can use the listed information to determine whether it will be possible for a robot to collide with another robot. All of that is left unsaid in the specification. The same is true with respect to the claims of the '770 patent, to which Dr. D'Andrea points (*see* DA ¶ 60)—none provides any specific algorithm or method by which to determine the chance of a collision.

17

C.     **"Wherein The One Or More Processors Are Configured To Control Operations Of The Plurality Of Transporting Devices In Real Time"**

37.     Dr. D'Andrea opines that this limitation (the so-called "Real Time Execution limitation") should be construed to mean "that the one or more processors are configured to receive data from the plurality of robots, process the data, and issue instructions or commands to the plurality of robots sufficiently quickly to affect their movement."  DA ¶ 62.

38.     Dr. D'Andrea's proposed construction actually highlights the problem I pointed out in my initial declaration—*i.e.*, that the specification provides no objective measure by which a POSITA could distinguish between "real time" operation and operation with more delay.  *See* Ioannou #1 ¶¶ 185–196.  Namely, Dr. D'Andrea's proposed construction requires that the "one or more processors … receive data from the plurality of robots, process the data, and issue instructions or commands to the plurality of robots ***sufficiently quickly*** to affect their movement," (DA ¶¶ 62–63, 66), but he makes no effort to explain how quickly the processors must carry out the specified operations in order for that to qualify as "sufficiently quickly" to a POSITA.  The specification also provides no such explanation.

39.     Dr. D'Andrea also points to a publication from Adrian Gambier, *Real-time Control Systems: A Tutorial*, 5th Asian Control Conference (2004).  That reference, on page 2 (right column) gives the following definition of "real-time": "A real-time system is one in which the correctness of a result not only depends on the logical correctness of the calculation but also upon the time at which the result is made available."  On page 3 (first column), the reference states: "It should be noted here that real-time computing is not equivalent to fast computing. Fast computing aims at getting the results as quickly as possible, while real-time computing aims at getting the results at a prescribed point of time within defined time tolerances."  The '404 patent does not offer any explanation or examples of "prescribed points of time within defined time tolerances," so a

18

POSITA can understand the meaning of "real time" in the context of the application at hand and how it differs from "near-real time."

40.     Dr. D'Andrea points to the '770 patent at 10:14-28, but as I previously explained, this section actually distinguishes between "real time" and "near-real time" operations. Ioannou #1 ¶¶ 187-188; *see also* '770 patent at 13:4-7 (distinguishing "real [and] near-real time control system[s]").  However, it does not explain what timeframe is considered to be "real time" and what timeframe is considered to be "near-real time." *Id.*  The '770 patent specification at 13:4-7 merely states that the "control system" may be a real or near-real time control system but does not provide any objective measure by which to classify an operation as either "real time" or instead as "near-real time."  The same holds for the excerpt at 19:43-46, which refers to "near real-time," "real time," and "just-in-time" operations.  It gives no objective measure for a POSITA to classify a system or operation as one or another.

41.     Moreover, the specification provides no algorithm by which the processors can control the operations of the plurality of transporting devices in "real time."

## IV.     RESERVATION OF RIGHTS

42.     I reserve the right to respond to any evidence (including expert opinions) that Ocado may offer in support of its claim construction positions.

I declare under penalty of perjury that the foregoing is true and correct.

Dated:  June 24, 2022

Petros Ioannou, Ph.D.

19