**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF NEW HAMPSHIRE**

| | |
|---|---|
| OCADO INNOVATION LTD. and OCADO SOLUTIONS LTD., <br><br> Plaintiffs, <br><br> v. <br><br> AUTOSTORE AS and AUTOSTORE SYSTEM INC., <br><br> Defendants. | ) ) ) ) ) ) ) ) ) ) ) ) ) Case No. 1:21-cv-00041 |

## DECLARATION OF BRIAN PFEIFER, PH.D., P.E., IN SUPPORT OF PLAINTIFFS' PROPOSED CLAIM CONSTRUCTIONS

I, Brian Pfeifer, Ph.D., P.E., do hereby declare:

## INTRODUCTION

1.    I, Brian Pfeifer, Ph.D., P.E., am making this declaration at the request of Plaintiffs Ocado Innovation Ltd. and Ocado Solutions Ltd. (together, "Ocado") in the above-captioned action to provide expert opinions and testimony on claim construction with respect to U.S. Patent Nos. 9,796,080 (the "'080 Patent"), 10,913,602 (the "'602 Patent"), and 10,961,051 (the "'051 Patent").  Unless otherwise noted, the statements made herein are based on my personal knowledge and experience, and if called to testify in Court, I could and would testify competently and truthfully with regard to this matter.

2.    Ocado is being charged $590 per hour for my consulting services.    My compensation in no way depends on the outcome of this proceeding.

3.    I have been asked to opine about construction of the following claim terms:

-1-

- "a structural framework defining a grid of storage locations," which appears in claims 1 and 23 of the '080 Patent;

- "a load handling device of the multiplicity of load handling devices will occupy a grid space" or "load handling device is located above the stack and occupying a grid space," which appears in claims 1 and 12 of the '602 Patent;

- "wheel hub motor," which appears in claims 6, 10, and 17 of the '602 Patent;

- "the first set of rails is part of a first set of tracks, and the second set of rails is part of a second set of tracks," which appears in claims 9 and 18 of the '051 Patent.

In addition, I have been asked to opine on the following claim terms, for which I understand Defendants AutoStore AS and AutoStore System Inc. (together, "AutoStore") intend to offer expert testimony:

- "nest" or "nestable," which appears in claims 8, 17, and 23 of the'080 Patent.

4.      In conducting the analysis and forming the opinions set forth in this declaration, I have considered, in addition to my knowledge and expertise in the relevant field, various sources, which are cited herein and listed in the attached Appendix I (Materials Considered).

5.      I understand that Ocado may cite and rely on portions of my opinions and analysis set forth in this declaration in support of its claim construction briefing.  I have not been provided with or reviewed Ocado's claim construction briefing or drafts thereof, and thus that briefing has not influenced my opinions or analysis.

6.      My opinions and analysis are based upon the information that I have considered to date.  I reserve the right to amend or supplement my declaration to take into account new information that becomes available to me.  I also reserve the right to amend or supplement my declaration to respond to any opinions and testimony of experts retained by AutoStore in

connection with claim construction in this action, as well as any arguments raised by AutoStore in its claim construction briefing.

**QUALIFICATIONS**

7.    Information concerning my professional qualifications, experience, and publications, and the matters in which I have served as an expert, are set forth in my current curriculum vitae, which is attached as Appendix II (Curriculum Vitae).

8.    I received my Bachelor of Science in Mechanical Engineering in 1990, my Master of Science in Mechanical Engineering in 1992, and my Doctor of Philosophy in Civil Engineering in 1997, each from the University of Nebraska in Lincoln, NE.  In 2002, I received a Certification in Biomedical Engineering from the University of Florida in Gainesville, FL.

9.    I spent the first seven years of my career as a Research Associate Engineer at Midwest Roadside Safety Facility, Lincoln, NE.  I primarily focused on the design, development, computer simulation, and testing of roadside safety hardware.  This included conducting full-scale vehicular crash tests and the subsequent analysis of the results.

10.    Most of my professional career has been spent at BEC Industries, LLC/BEC Consulting, LLC, where I worked on multi-directional material handling systems and, specifically, on streamlining container handling within GRID systems.  I have a number of publications and presentations directed to robotic material handling systems, including:

- Pfeifer, Brian G. "Offshore and Intermodal Applications of the GRID System." Presented at the International Port and Terminal Technology Conference, Savannah, GA, May 2014.

- Pfeifer, Brian G. and Benedict, C.E. "Streamlining Container Handling with the GRID System."  Port Tech. Int'l., Nov. 2012.

- Pfeifer, Brian G. "Automation of Container Handling with the GRID System." Presented at the International Port and Terminal Technology Conference, Houston, TX, Apr. 2011.

- Pfeifer, Brian G. "Streamlining Container Handling with the GRID System." Presented at the International Port and Terminal Technology Conference, Houston, TX, Apr. 2009.

11.     While serving as Director of Engineering and General Manager for BEC Industries, I was the program manager and chief engineer for a number of military contracts involving the development of shipboard material handling systems.  One of those programs involved the development of an automated system for handling pallet-sized containers on CVN aircraft carriers. This patented system is capable of automatically storing and retrieving pallet-sized containers. This system greatly reduces the manpower necessary to handle material aboard the ship and increases storage efficiency.

12.     I also managed a program funded by the Military Sealift Command (MSC) for the development of a system capable of automatically storing and retrieving 20-foot ISO containers in a shipboard environment.  This system provides the military with selective discharge capabilities and allows them to operate in a sea-base environment.

13.     In 2019, I founded Quality Forensic Engineering, LLC in Tallahassee, FL as President and CEO.

14.     I am a licensed Professional Engineer in the states of Florida, Alabama and Nebraska.  I am a member of a number of professional organizations in the fields of mechanical and civil engineering, including:

- American Society for Testing and Materials – Member of Committee E30 on Forensic Sciences and E58 on Forensic Engineering (ASTM)

- American Society of Mechanical Engineers (ASME)

- American Society of Civil Engineers (ASCE)

- Florida Engineering Society (FES)

- National Society of Professional Engineers (NSPE)

15. I have more than 30 patents and pending patent applications worldwide for my inventions, including 15 issued U.S. patents, as listed in my CV. This includes patents for my work in the design and development of robotic material handling systems.

16. I have provided testimony as a forensic engineer in more than 200 cases. With respect to patent disputes, I have provided opinions and testimony as Ocado's expert witness in the *Inter Partes* Review ("IPR") of the '080 Patent (IPR2021-00798) and the '602 Patent (IPR2022-00443). I was also retained by Ocado to provide expert testimony in the IPR of AutoStore's U.S. Patent Nos. 10,294,025 (the "'025 Patent") (IPR2021-00274) and 10,474,140 (the "'140 Patent") (IPR2021-00311). I understand that AutoStore relies on various statements made in those IPRs to support its proposed claim constructions in this action. (*See, e.g.*, AutoStore's SPR 6.1(b) Updated Disclosure of Preliminary Claim Constructions and Evidence (hereinafter, "AutoStore's Preliminary Claim Constructions"), at 78, 90-92, 110.) Additionally, I was retained by Ocado to provide expert testimony in the IPR of AutoStore's U.S. Patent Nos. 10,093,525 (the "'525 Patent") (IPR2021-00398), 10,494,239 (the "'239 Patent") (IPR2021-00412), and 10,696,478 (the "'478 Patent") (IPR2021-00038). The '525, '239, and '478 Patents all claim priority to WIPO Publication No. WO2014090684 ("WO684") and share the same specification. I understand that in this action AutoStore refers to WO684 as support for its

interpretation of the term "the first set of rails is part of a first set of tracks, and the second set of rails is part of a second set of tracks" recited in claims 9 and 18 of the '051 Patent. (*See id.* at 123.) I have also been retained as Ocado's expert witness in the International Trade Commission Investigation No. 337-TA-1228 (the "ITC Investigation") to offer opinions on the '525, '239, '478, '025, and '140 Patents. AutoStore cites various statements made in the ITC Investigation in connection with the '025 and '140 Patents to support its proposed constructions. (*See, e.g.*, *id.* at 80-86, 111-117.)

**RELEVANT LEGAL STANDARD**

17.    The opinions that I set forth in this declaration involve the application of my knowledge and experience. My knowledge of patent law is that of a lay person. Therefore, Ocado's counsel in this action has provided me with guidance as to the applicable patent law in this matter. The paragraphs below express my understanding of how I must apply current principles related to claim construction to my analysis.

18.    I understand that the claim terms must be given their plain and ordinary meaning, as they would have been understood by a person of ordinary skill in the art ("POSITA") as of the effective filing date in view of the intrinsic record (patent claims, specification, and file history). However, I understand that the inventors may, in the patent specification, expressly define a claim term to have a meaning that differs from the term's plain and ordinary meaning. I also understand that the inventors may disavow or disclaim certain claim scope, thereby departing from the plain and ordinary meaning, when the intrinsic record demonstrates that a clear and unambiguous disavowal or disclaimer has occurred. I understand that extrinsic evidence, such as relevant technical literature and dictionaries, may be useful in ascertaining how a POSITA would have understood a claim term, but the intrinsic record is the primary source for determining the meaning

of claim terms. I understand that when interpreting a claim, all terms in the claim should be given effect and that it is improper to construe a term in a way that would render other terms superfluous. For the purposes of this declaration, and to the extent necessary, I have interpreted each claim term in accordance with the principles set forth in this paragraph.

19. I have been informed that patent law also requires that claims meet a definiteness requirement to particularly point out and distinctly claim the subject matter that the inventor regards as the invention. I understand that a claim may be indefinite if that claim, when read in light of the specification and prosecution history, fails to inform a POSITA of the scope of the claimed invention with reasonable certainty.

## CLAIM CONSTRUCTION TESTIMONY

### I.     The '080 Patent

#### A.     Prior testimony concerning the '080 Patent

20. As stated above at Paragraph 16, I was retained as Ocado's expert in the IPR of the '080 Patent, which, as I understand, involves a number of subjects related to the ultimate question of whether certain claims of the '080 Patent are anticipated by, or would have been obvious in view of, certain alleged prior art as of the effective filing date of the '080 Patent. In my IPR declaration, I offered opinions on, among other things, the field of the invention of the '080 Patent, the level of ordinary skill in the art, and the construction of the claim term "a structural framework defining a grid of storage locations," which is also in dispute in this action. (*See* IPR2021-00798, Ex. 2009, Pfeifer Decl. ¶¶ 29-30, 32-37.) I understand that AutoStore's IPR petition was unsuccessful, and that the PTAB declined to institute AutoStore's requested review of the '080 Patent.

**B.    The field of the invention and the level of ordinary skill in the art**

21.    I was asked by Ocado's counsel in this action to assess the field of the invention of the '080 Patent and the level of ordinary skill in the art.  Based on my review of the '080 Patent and understanding of the technology it describes, and consistent with the opinion I offered in the IPR of the '080 Patent, it is my view that the field of the invention of the '080 Patent is "fully or semi-automated storage and retrieval systems" ("AS/RS").  (*See* '080 Pat., 1:13-17, claims 1, 13, 23; *see also* IPR2021-00798, Ex. 2009, Pfeifer Decl. ¶ 29.)

22.    In my opinion, a POSITA at the time of the invention of the '080 Patent would have had a Master's degree in Mechanical Engineering or Robotics with at least one year of experience working as an engineer in the field of AS/RS, or a Bachelor's degree in Mechanical Engineering with at least three years of experience working as an engineer in the field of AS/RS.  (*See* IPR2021-00798, Ex. 2009, Pfeifer Decl. ¶ 30.)

23.    As of the effective filing date of the '080 Patent and presently, I did and do have more training, expertise, and knowledge than a POSITA.  However, I understand what a POSITA would have known and understood as of the effective filing date, and my testimony herein is from the perspective of a POSITA at the relevant time.

**C.    "a structural framework defining a grid of storage locations"**

24.    Each of claim 1 and 23 of the '080 Patent recites "a structural framework defining a grid of storage locations."  In my view, and consistent with the opinion I offered in the IPR of the '080 Patent, this limitation should be construed to mean "a structural framework in which crossed structural elements define a two-dimensional array of storage locations."  (*See* IPR2021-00798, Ex. 2009, Pfeifer Decl. ¶¶ 32-37.)

25.    In the IPR of the '080 Patent, AutoStore argued that this limitation should be accorded its "plain and ordinary meaning," which AutoStore claimed required only that "the

storage locations must be arranged in a grid." (*See* IPR2021-00798, Petition, at 20; Reply to Patent Owner's Preliminary Response, at 11.)  Ocado, in contrast, proposed to construe this limitation to mean "a structural framework in which crossed structural elements define a two-dimensional array of storage locations," which I supported in my IPR declaration and which is the same construction as Ocado proposes in this action.  (IPR2021-00798, Patent Owner's Preliminary Response, at 6; *see also* Ex. 2009, Pfeifer Decl. ¶ 34.)  AutoStore's construction was rejected by the PTAB, which concluded that this limitation "require[s] that a structural framework define the grid of storage locations, as opposed to these locations being defined merely by the orientation or location of stacked containers."  (*See* IPR2021-00798, Decision Denying Institution, at 9-11.)

26.     I agree with the PTAB's conclusion.  In my view, this limitation does not cover every storage structure in which containers could be arranged in a grid pattern; it covers storage structures whose "structural framework" itself defines the "grid of storage locations" where containers may be stored.  The fact that the limitation requires a "structural framework" to "defin[e]" the "grid" indicates that the term "grid" should be construed in structural terms consistent with the dictionary definition:  "a grating of crossed bars."  (Random House Webster's College Dictionary (2000), at 577.)  Based on my knowledge and experience in the relevant field, this dictionary definition is consistent with the plain and ordinary meaning of "grid."  Accordingly, a POSITA would understand that the claimed "structural framework" performs the action of "defining a grid of storage locations."  Further, a POSITA would understand that the "structural framework" that defines a "grid of storage locations" is formed of "crossed bars" to create a two-dimensional array of storage locations.

27.     The specification also supports this construction. The specification discloses:

> As shown for example in FIGS. 3-5, such systems can comprise grids 200 of containers 10 stored in rows 100 and columns 120 of

> stacks 30.  Specific container(s) 10 required for fulfillment of orders may be accessed by automated devices such as robotic overhead load handlers 40, operating on rails 160 formed by *frames* used to support the containers 10 and *thereby define the grid 200*.

('080 Pat., 6:35-42 (emphases added)).  Accordingly, the frames, which a POSITA would understand to be the "structural framework," both support the containers and define the grid of storage containers.  Further, the grid defined by the "frames" is a two-dimensional array with "rows 100 and columns 120."  Figure 3 is annotated below to show that the grid 200 is formed by crossed bars that define a two-dimensional array of storage locations.  As shown, two sets of crossed bars (some of which are shown in blue crossing some shown in red) define a two-dimensional array of storage locations (some shown in green).



28.    Importantly, both the ordinary meaning of the claim language and the specification make clear that it is the structural framework itself that defines the grid of storage locations.  In other words, one can determine whether the limitation is met even when no containers are stored simply by examining the framework.  In contrast, under AutoStore's construction in the IPR—

-10-

which required only that "the storage locations must be arranged in a grid"—merely arranging containers in rows and columns on a flat warehouse floor, without any structure for supporting the containers (except the floor itself), and even without any markings indicating where the containers are supposed to be placed on the floor, could satisfy this limitation. The claim construction proposed by Ocado avoids such an absurd result by recognizing that the claim language requires the structural framework itself—not the way containers are arranged after placement—to define the grid of storage locations.

29.    For all these reasons, a POSITA at the time of filing would have understood the phrase "a structural framework defining a grid of storage locations" to mean "a structural framework in which crossed structural elements define a two-dimensional array of storage locations."

### D.    "nest" / "nestable"

30.    The terms are recited in claims 8, 17, and 23 of the '080 Patent. In light of the claim language and specification, I am of the opinion that the terms "nest" / "nestable" should be given their plain and ordinary meaning. In my opinion, the plain and ordinary meaning of "nest" / "nestable" is "place within" / "capable of being placed within." The specification uses the terms in this way. (*See* '080 Pat., 9:8-13 ("a . . . nestable . . . order container 10, 70 is placed within storage bins 10, 80 [to allow] manipulation of order containers 10, 70 within the storage and retrieval system without sacrificing weight, cost, nestability or collapsibility.").) This is consistent with dictionary definitions of the term. (The Oxford English Dictionary 7th Ed. (2012), at 483 ("fit (an object or objects) inside a larger one.").)

31.    I understand AutoStore is proposing that the terms be construed to mean "designed to fit snugly" / "fitting snugly as designed." (AutoStore's Preliminary Claim Constructions, at 7.) I disagree that this is the plain and ordinary meaning of the term. In particular, a POSITA would

not think that the terms "nest" / "nestable" require the additional limitation of fitting "snugly," for two reasons.  First, the meaning of "snugly" itself is unclear, thus failing to inform a POSITA with reasonable certainty about the full scope of the invention.  Second, the specification does not impose any particular limitation of snugness or tightness of fit on the nestability of the order containers, and things that "nest" or are "nestable" may fit together "snugly," but there is no requirement that they do so.  Instead, the specification uses the term "nested" interchangeably with the term "combined."  (*See, e.g.*, '080 Pat., 13:3-9.)  To the extent that AutoStore relies on expert opinions and testimony for its construction of this term, I reserve the right to amend or supplement my declaration to consider and respond to such expert opinions or testimony.

## II.    The '602 Patent

### A.    Prior testimony concerning the '602 Patent

32.    As stated above at Paragraph 16, I have been retained as Ocado's expert in the IPR of the '602 Patent, which, as I understand, involves a number of subjects related to the ultimate question of whether certain claims of the '602 Patent are anticipated by, or would have been obvious in view of, certain alleged prior art as of the effective filing date of the '602 Patent.  In my IPR declaration, I have offered opinions on, among other things, the level of ordinary skill in the art and construction of the two claim terms that are also at issue in this action:  (1) "a load handling device of the multiplicity of load handling devices will occupy a grid space" or "load handling device is located above the stack and occupying a grid space"; and (2) "wheel hub motor."  (*See* IPR2022-00443, Ex. 2020, Pfeifer Decl. ¶¶ 74, 78-85.)

### B.    The field of the invention and the level of ordinary skill in the art

33.    I was asked by Ocado's counsel in this action to assess the field of the invention of the '602 Patent and the level of ordinary skill in the art.  Based on my review of the '602 Patent and understanding of the technology it describes, it is my view that the field of the invention of

the '602 Patent is "robotic devices for handling storage containers or bins in a store comprising a grid of stacked units." (*See* '602 Pat., 1:6-10, claims 1, 12.)

34.    In my view—and consistent with my opinions in the IPR of the '602 Patent—a POSITA at the time of the invention of the '602 Patent would have had at least a Bachelor's degree in Mechanical Engineering and at least two to three years' experience working in the field of the design of robotic vehicles for material handling systems. (*See* IPR2022-00443, Ex. 2020, Pfeifer Decl. ¶ 74.)

35.    As of the effective filing date of the '602 Patent and presently, I did and do have more training, expertise, and knowledge in the relevant field than a POSITA. However, I understand what a POSITA would have known and understood as of the effective filing date and my testimony herein is from the perspective of a POSITA at the relevant time.

**C.    "a load handling device of the multiplicity of load handling devices will occupy a grid space" / "load handling device is located above the stack and occupying a grid space"**

36.    Each of claims 1 and 12 of the '602 Patent recites that "a load handling device of the multiplicity of load handling devices will occupy a grid space" or "load handling device is located above the stack and occupying a grid space" (the "Will Occupy/Occupying a Grid Space" limitation). In light of the claim language and specification, and consistent with my opinions in the IPR of the '602 Patent, I am of the opinion that a POSITA would understand the scope of this limitation with reasonable certainty, and that this limitation should be given its plain and ordinary meaning without further construction because the terms are common English words without a specialized technical meaning. (*See* IPR2022-00443, Ex. 2020, Pfeifer Decl. ¶¶ 78-81.)

37.    AutoStore contends that this limitation should be construed to mean that the robot "will occupy *only* a single grid space in the storage system." (AutoStore's Preliminary Claim Constructions, at 70 (emphasis added).) I disagree with AutoStore's proposed construction to the

extent that it limits the claims to robots that cover "only" a single grid space. The specification of the '602 Patent consistently describes the robot as occupying "substantially" a single grid space, indicating that the robot can occupy more than a single grid space. For example, in one aspect, the robot is described as "occup[ying] substantially only a single grid space in the storage system." ('602 Pat., 5:5-6.) "From another aspect . . . , [e]ach load handling device occupies substantially a single grid space." (*Id.* 7:3-8.) There is no language in the specification that disavows or disclaims a robot that occupies more than a single grid space. In my opinion, in view of the specification, a POSITA would not have understood the claim language to depart from its plain and ordinary meaning such that the claims are further limited to robots that "will occupy only a single grid space in the storage system," as AutoStore asserts. (AutoStore's Preliminary Claim Constructions, at 70.)

38.    In fact, AutoStore's proposed construction cannot be correct because it would render superfluous other limitations in the claim as AutoStore would construe them. Specifically, AutoStore and its IPR expert, Dr. Stephen Derby,[1] propose to construe the limitation "load handling devices . . . will not obstruct a load handling device of the multiplicity of load handling devices occupying or traversing an adjacent grid space in the X-direction and will not obstruct a load handling device of the multiplicity of load handling devices occupying or traversing an adjacent grid space in the Y-direction" (the "No-Obstruction" limitation) to mean that "the [robot] will not obstruct [another robot] occupying or traversing any of the four adjacent grid spaces." (AutoStore's Preliminary Claim Constructions, at 86; *see also* IPR2022-00443, Ex. 1003, Derby

---

[1]    In this action, Dr. Derby has been retained by AutoStore to render "an opinion regarding the term 'the first set of rails is part of a first set of tracks, and the second set of rails is part of a second set of tracks.'" (AutoStore's Preliminary Claim Constructions, at 124.)

Decl. ¶ 82.) According to Dr. Derby, if "the device covers only a single grid space, it would not obstruct [another robot] occupying or traversing an adjacent grid space in either the X- or Y-directions." (IPR2022-00443, Ex. 1003, Derby Decl. ¶ 124.)

39.     Dr. Derby also opined that the limitation "a side of the external housing facing the Y-direction extending no further, in the Y-direction, than the first set of wheels on that side of the load handling device, and a side of the external housing facing the X-direction extending no further, in the X-direction, than the second set of wheels on that side of the load handling device" (the "No-Extension" limitation) is "a necessary result of the modification" to reduce the robot's footprint to only a single grid space. (*Id.* ¶ 131.)

40.     The limitations, if construed as proposed by AutoStore and Dr. Derby, are superfluous if the robot is limited to only a single grid space by the Will Occupy/Occupying a Grid Space limitation.   In other words, if AutoStore's proposed construction of the Will Occupy/Occupying a Grid Space limitation is adopted, a robot meeting this limitation necessarily satisfies the No-Obstruction and No-Extension limitations, as AutoStore and Dr. Derby would argue, thus rendering those limitations superfluous.  This is another reason that a POSITA would not understand the at-issue limitation to have the narrower meanings for which AutoStore and Dr. Derby advocate.  Rather, a POSITA would understand the at-issue claim limitation to have its full scope according to its plain and ordinary meaning.

**D.     "wheel hub motor"**

41.     The term "wheel hub motor" is recited in claims 6, 10, and 17 of the '602 Patent. In light of the claim language and specification, and consistent with my opinions in the IPR of the '602 Patent, I am of the opinion that a POSITA would understand this term to have its plain and ordinary meaning, *i.e.*, "a motor that is integrated within the hub of a wheel."  (*See* IPR2022-00443, Ex. 2020, Pfeifer Decl. ¶¶ 82-85.)

-15-

42.     The specification describes the in-wheel motors of the patent as being "integrated within the wheel hub[]." (602 Pat., 6:1-2.) Figure 17 also shows "each wheel 256 having a motor integrated within a hub 260 of the wheel 256." (*Id.* 11:52-54.) "This arrangement is advantageous as it reduces the size of the load-handling device and facilitates servicing." (*Id.* 6:4-6.)

43.     AutoStore proposes to construe the term to mean "an electric motor situated at or at least partly within the wheels of the vehicle." (AutoStore's Preliminary Claim Constructions, at 91.) In my opinion, this construction is overly broad, disregards a POSITA's understanding of the term, and lacks support in the specification. A POSITA would understand that a "wheel hub motor" is integrated within the wheel, not "situated at" (but not within) the wheel.

44.     AutoStore's proposed construction relies on (and is an inverse of) the parties' agreed claim construction in the IPR of the '140 Patent owned by AutoStore. (AutoStore's Proposed Claim Constructions, at 92 (quoting IPR2021-00311, Petition, at 21).) The construction of a claim term in an entirely different patent is inapposite. Claim 1 of the '140 Patent recites a "driving means situated at or at least partly within the first [or second] vehicle rolling means," and both parties agreed that the term included an electric "in-wheel" motor—a type of "wheel hub" motor. (IPR2021-00311, Petition, at 20-21.) In other words, Ocado stated that a "wheel hub motor" was a type of motor that fell within the definition of a "driving means situated at or at least partly within the first [or second] vehicle rolling means"—because a wheel hub motor is "at least partly within" the wheel. (*Id.*; *see also* IPR2022-00443, Ex. 2020, Pfeifer Decl. ¶ 85). Ocado did not argue or agree that the term "wheel hub motor" could encompass motors that are not "at least partly within" the wheel—*i.e.*, motors located entirely outside the wheel—as AutoStore now proposes to construe the term. I see no reason that the construction of a term in the '140 Patent

would inform the construction of a different term in a different patent, and I also fail to follow the logic of AutoStore's argument.

## III.   The '051 Patent

### A.   The field of the invention and the level of ordinary skill in the art

45.    I was asked by Ocado's counsel in this action to assess the field of the invention of the '051 Patent and the level of ordinary skill in the art.  Based on my review of the '051 Patent and understanding of the technology it describes, it is my view that the field of the invention of the '051 Patent is "robotic devices for handling storage containers or bins in a store comprising a grid of stacked units." (*See* '051 Pat., 1:6-10, claims 1, 13.)

46.    In my opinion, a POSITA at the time of the invention of the '051 Patent would have had at least a Bachelor's degree in Mechanical Engineering, and at least two to three years' experience working in the field of the design of robotic vehicles for material handling systems.

47.    As of the effective filing date of the '051 Patent and presently, I did and do have more training, expertise, and knowledge than a POSITA.  However, I understand what a POSITA would have known and understood as of the effective filing date and my testimony herein is from the perspective of a POSITA at the relevant time.

### B.    "the first set of rails is part of a first set of tracks, and the second set of rails is part of a second set of tracks"

48.    Each of claims 9 and 18 of the '051 Patent recites that "the first set of rails is part of a first set of tracks, and the second set of rails is part of a second set of tracks."  In my opinion, a POSITA would understand that, within the meaning of claims 8 and 19,  a "set of rails" comprises a series of paired rails for guiding the movement of the robots' wheels in one direction, and that the paired rails are "part of" the "set of tracks" used to construct the grid structure.

-17-

49.    The claim language provides support for how a POSITA would understand the at-issue limitation. First, claim 1's recitation of "a first set of rails" and "a second set of rails" makes clear that one set of rails is for guiding robot movement in one direction, and the other set of rails is for guiding movement in the other direction:

> a first plurality of wheels configured to engage a first set of rails of a grid frame to guide movement of the first housing in a first direction along a top side of the grid frame . . . ;
>
> a second plurality of wheels configured to engage a second set of rails of the grid frame to guide movement of the first housing in a second direction perpendicular to the first direction along the top side of the grid frame, two consecutive rails of the first set of rails and two consecutive rails of the second set of rails defining a grid space for the grid frame . . . .

('051 Pat., claim 1.)  In other words, a "first set of rails" is made up of the rails running in one direction atop the grid, and a "second set of rails" is made up of the rails running in the perpendicular direction atop the grid. Second, the claim language uses "rails" to describe the structure directly engaged by the wheels of the robot, *e.g.*, "a first plurality of wheels configure to engage a first set of rails of a grid frame to guide movement of the first housing in a first direction." (*Id.*; *see also* claims 3, 5-6, 13-15.)  Third, Claim 1 further recites that the grid space is defined by "consecutive rails." (*Id.*, 12:45-47.)  Claim 1 thus tells a POSITA what a "set of rails" is and that a grid space is defined by consecutive rails.

50.    The patent addresses the distinction between "rails" and "tracks" in claims 9 and 18, which recite, "the first set of rails is part of a first set of tracks, and the second set of rails is part of a second set of tracks."  A POSITA would therefore look to claims 9 and 18 to understand the relationship between "rails" and "tracks."  As explained above, based on the language of claim 1, the rails define the grid space.  For this to be true, and for tracks to mean something different from rails, each track must be comprised of dual rails:



(*Id.*, Fig. 7 (annotated).)  A POSITA would thus understand that the "set of rails" in claims 9 and 18 means paired structures for guiding the movement of the robots' wheels in one direction, and that each pair of dual rails is "part of" a "set of tracks" used to construct the grid structure.  (*See id.*, 2:48-3:5.)

51.    This interpretation of "rails" and "tracks" is consistent with how the terms are treated throughout the specification.  The patent specification uses the terms "rail" and "track" alternatively, and a POSITA would understand from the specification that either "rails" or "tracks" may be used to create the grid structure.  For example, the specification consistently discloses that either "rails" or "tracks" are part of the grid structure, *i.e.*, "a first set of parallel rails or tracks and a second set of parallel rails or tracks extending transverse to the first set in a substantially horizontal plane to form a grid pattern comprising a plurality of grid spaces."  (*Id.*, 7:10-13; *see also id.* Abstract, 5:7-10.)  The specification thus informs a POSITA that the grid structure can be made of a set of parallel rails or a set of parallel tracks, and claims 9 and 18 explain how "rails" and "tracks"—both capable of being used to create the grid structure—relate to one another.

52.    The drawings of the patent also support this interpretation of "rails" and "tracks." As the USPTO examiner found during examination of an earlier member of the same patent family, Figure 7 and other figures of the '051 Patent disclose "dual rails surrounding each grid space such that two load handling devices (*i.e.*, 100) can indeed occupy and service and [sic] adjacent grid spaces at the same time, overcoming the various 112 rejections presented previously."  (Appl. No. 15/905,294, Notice of Allowance, October 22, 2019, at 2-3.)



**FIG. 7**

53.    AutoStore contends that this limitation is indefinite without setting forth its indefiniteness arguments.  (AutoStore's Preliminary Claim Constructions, at 118.)  I disagree with AutoStore's contention.  In light of the claim language, specification, and prosecution history, it is my opinion that a POSITA would understand, with reasonable certainty, the meaning and scope of this limitation.  As explained above, a POSITA would understand that, within the meaning of claims 8 and 19,  a "set of rails" comprises paired rails for guiding the movement of the robots'

wheels in one direction, and that the paired rails are "part of" the "set of tracks" used to construct the grid structure.

54.     I recognize that in my declaration in support of Ocado in the IPR of the '025 Patent, I described Figure 7 and the other figures as showing a "double track rail" system—in other words, as showing dual "tracks" as "part of" the "rails."  (*See* IPR2021-00274, Ex. 1008, Pfeifer Decl. ¶¶ 108-13.)   However, in that IPR given the task at hand, I was applying the terminology of AutoStore's '025 Patent to the corresponding disclosures in the '178 Patent, to show that the substance of the disclosures was the same.  (*See id.* ¶¶ 107, 110.)  I did not construe the language of the claims of the '178 Patent, much less the terms of Ocado's '051 Patent, which is presently the task at hand.

**DECLARATION**

I declare that all statements made herein on my knowledge are true.  I understand that knowingly and willfully making false statements is punishable by fine or imprisonment, or both, under Section 1001 of Title 18 of the United States Code.

Dated:  May 27, 2022

_____

Brian Pfeifer, Ph.D., P.E.