**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW HAMPSHIRE**

| | |
|---|---|
| OCADO INNOVATION LTD. and OCADO SOLUTIONS LTD., <br><br> Plaintiffs, <br><br> v. <br><br> AUTOSTORE AS and AUTOSTORE SYSTEM INC., <br><br> Defendants. | ) ) ) ) ) ) ) ) ) ) ) ) ) <br><br> Case No. 1:21-cv-00041 |

**REBUTTAL DECLARATION OF BRIAN PFEIFER, PH.D., P.E., IN
FURTHER SUPPORT OF PLAINTIFFS' PROPOSED CLAIM
CONSTRUCTIONS**

I, Brian Pfeifer, Ph.D., P.E., do hereby declare:

**<u>INTRODUCTION</u>**

1.      I submit this rebuttal declaration in response to the opinions expressed in the May 27, 2022 Declaration of Matthew Spenko, Ph.D.

2.      I have been asked to consider Dr. Spenko's construction of the term "nest" or "nestable," which appears in claims 8, 17, and 23 of the '080 Patent, and provide my opinion on construction of that claim term.

3.      In conducting the analysis and forming the opinions set forth in this declaration, I have considered, in addition to my knowledge and expertise in the relevant field, various sources that are cited herein and listed in the attached Appendix I (Materials Considered).

4.      I understand that Ocado may cite and rely on portions of my opinions and analysis set forth in this rebuttal declaration in support of its claim construction briefing.  I have not been

provided with or reviewed Ocado's claim construction briefing or drafts thereof, and thus that briefing has not influenced my opinions or analysis.

5. My opinions and analysis are based upon the information that I have considered to date. I reserve the right to amend or supplement my rebuttal declaration to take into account new information that becomes available to me. I also reserve the right to amend or supplement my rebuttal declaration to respond to any opinions and testimony of experts retained by AutoStore in connection with claim construction in this action, as well as any arguments raised by AutoStore in its claim construction briefing.

**PERSON OF ORDINARY SKILL IN THE ART**

6. I have reviewed Dr. Spenko's definition of a person of ordinary skill in the art ("POSITA"). (Spenko Decl. ¶¶ 31-34.) I disagree with Dr. Spenko's definition to the extent it requires someone with a master's degree in Mechanical Engineering or Robotics to have at least three to four years of experience working as an engineer in the relevant field and someone with a bachelor's degree in Mechanical Engineering to have at least four to five years of experience working as an engineer in the relevant field. (*Id.* ¶ 32.) I provided my opinion on the level of ordinary skill in the art in Paragraph 22 of my May 27, 2022 Declaration in Support of Plaintiffs' Proposed Constructions (hereinafter, the "May 27 Declaration"). Nevertheless, my opinions in this rebuttal declaration and in the May 27 Declaration would remain the same under either my or Dr. Spenko's definition of a POSITA.

**CLAIM CONSTRUCTION TESTIMONY**

7. I incorporate Paragraphs 30-31 of my May 27 Declaration.

8. Dr. Spenko and I agree that nothing in the '080 Patent or in its prosecution history gives "nest" / "nestable" a special meaning and that the plain and ordinary meaning should apply.

(*Id.* ¶ 35; May 27 Declaration ¶ 30.)  However, I understand that we disagree on the plain and ordinary meaning of "nest" / "nestable."  In the context of the '080 Patent, my opinion is that a POSITA would readily understand the plain and ordinary meaning of "nest" / "nestable" to be "place within" / "capable of being placed within."[1]

9.    Without citing anything from the claim language, specification, or prosecution history that would create a specialized definition of "nest" / "nestable," Dr. Spenko opines that "nest" / "nestable" should be construed to mean "designed to fit snugly" / "fitting snugly as designed."  (Spenko Decl. ¶ 36.)  I respectfully disagree.  In my opinion, nothing about the term "nest" / "nestable" requires a container to "fit snugly" or to be "designed" to accomplish a "snug" fit.

10.    Before responding to each of Dr. Spenko's arguments, I believe three high-level observations are appropriate.

11.    First, the specification equates "combined" and "nested" without additional adjectives or requirements.  ('080 Pat., 13:3-4.)  That is (i) consistent with my opinion that the plain meaning of "nest" / "nestable" is "place within" / "capable of being placed within," and (ii) inconsistent with Dr. Spenko's opinion that imposes additional qualifiers (*i.e.*, "designed to fit snugly").  The patentee simply describes "combined/nested" delivery and storage containers, and neither the word "snugly" nor the phrase "designed to" appears in words or substance.

12.    Second, Dr. Spenko would introduce into the claims an intent requirement:  that one container was "designed to" fit snugly within another container.  Such a requirement would

---

[1] In situations where the claim language already includes the preposition "within" or "with," a POSITA obviously would not include the preposition twice.  For example, "nested within" means "placed within" and "nestable with" means "capable of being placed within."

rule out situations in which one container is nested within a second container simply because the nested container was not specifically designed for that purpose. I do not think it is reasonable to say that a POSITA would understand the plain claim language to contain such a requirement. Instead, a POSITA would understand that nestable delivery and storage containers could be purchased to practice the invention even if those containers were not designed for that purpose. Moreover, even in circumstances in which delivery and storage containers clearly have a nestable design, Dr. Spenko's interpretation would require specific inquiry into the intent of the individual who designed the containers—*i.e.*, a subjective inquiry into whether that individual designed the containers to be nestable. I do not think a POSITA would reasonably read the claims to include such a requirement.

13. Third, Dr. Spenko would introduce unnecessary ambiguity by adding the requirement that the delivery container fit "snugly" within the storage container. That subjective qualifier is in the eye of the beholder, and it is not reasonable to say that a POSITA—a mechanical engineer generally trained to communicate in objective terms—would read the claim language to include such a qualifier. Rather, consistent with the plain and ordinary meaning of "nest" / "nestable," a POSITA would readily understand that the claims require that the delivery container is placed within or capable of being placed within the storage container to practice and achieve the benefits of the invention.

14. I next turn to Dr. Spenko's criticisms of my opinion and Ocado's proposed construction. Dr. Spenko opines that Ocado's proposed construction must be wrong for several reasons. I respectfully disagree with Dr. Spenko on each issue, as explained below.

15. First, Dr. Spenko contends that Ocado's proposed construction—"place within" / "capable of being placed within"—would render certain language in claim 23 of the '080 Patent

-4-

superfluous: "at least one delivery container nested within a storage container." (Spenko Decl. ¶ 38.) As I understand the argument, Dr. Spenko contends that interpreting "nested within" to mean "placed within" would render claim language superfluous because the claim *could* have been written more simply to say "at least one delivery container within a storage container." In other words, Dr. Spenko interprets the word "within" to itself mean "placed within."

16.     Setting aside the abstract grammar issue, a POSITA reading the '080 Patent would not perceive any redundancy in light of the patentee's language throughout the specification. The patentee consistently describes delivery containers as being "placed within" storage containers— indicating that the patentee's use of "placed" and "within" is not redundant. (*See*, *e.g.*, '080 Pat., 9:7-10 ("Another aspect of the invention therefore uses a method where . . . a . . . nestable . . . order container 10, 70 *is placed within* storage bins 10, 80.") (emphasis added).) Moreover, the word "within" alone does not convey how the delivery container came to be inside the storage container; "nest" / "place" conveys an action that resulted in the delivery container being within the storage container. It thus would be natural for a POSITA to read the claim language—"nested within"—consistently with the specification's description of a delivery container being "placed within" a storage container.

17.     Dr. Spenko further contends that, as a matter of grammar, Ocado's proposed construction cannot be incorporated verbatim into claims 8 and 17 because it would result in repeated prepositions, *i.e.*, claims 8 and 17 would read "delivery container is [capable of being placed within] within a storage container" and "one of the plurality of delivery containers is [capable of being placed within] with at least one other delivery container," respectively. (Spenko Decl. ¶¶ 39-40.) Dr. Spenko once again makes an abstract grammar argument rather than addressing substance. As noted in footnote 1 above, I am not proposing to introduce the same

preposition twice, which is not a reasonable way to interpret the claims.  Rather, for example, "nested within" would be understood by a POSITA as "placed within" and "nestable with" would be understood by a POSITA as "capable of being placed within" without the additional restrictions that Dr. Spenko tries to introduce.

18.     Dr. Spenko purports to rely on the specification of the '080 Patent to support his proposed construction.  But nothing from the text or figures that Dr. Spenko cites requires that delivery containers are "designed to fit snugly" within storage containers, as Dr. Spenko contends. For example, Dr. Spenko cites Figure 6 from the '080 Patent as depicting a "nestable configuration."  (*Id.* ¶ 42.)  He then states, without any explanation, that the figure shows how the "delivery container fits *snugly* as designed in the . . . storage container."  (*Id.* (emphasis added).) For convenience, Figure 6 is reproduced below.



19.     Although I agree with Dr. Spenko that Figure 6 depicts a delivery container placed within a storage container, this exemplary and illustrative isometric view provides no indication that the depicted delivery container "fits snugly as designed" within the storage container.  The figure is silent on the purpose for which the containers were "designed," and whether the containers

shown in the figure depict a "snug" fit depends on how much space exists between the delivery container and storage container before the fit no longer is considered "snug."  By contrast, the question of whether Figure 6 depicts nested/nestable containers—as I believe a POSITA would understand the term—is objective, and that construction permits a range of configurations and size variations for the exemplary containers depicted in Figure 6, as long as the delivery container is capable of being placed within the storage container.

20.    The fact that Figure 6 is a single, illustrative example—and not depicting a requirement of all iterations of the claimed invention—is made clear in the specification:  "***One or more pluralities*** of suitably-configured delivery containers 80 may be stored within single storage containers 70 to form container combinations 90.  For example, delivery containers 80 may be provided in nestable configurations, as shown for example in Fig. 6."  ('080 Pat., 9:26-30 (emphasis added); *see also id.* 9:30-38.)  In other words, although Figure 6 shows a ***single***, relatively large delivery container nested within a single storage container, the specification describes that configuration as an example, and the patent also expressly contemplates a single storage container with one or ***multiple*** nested delivery containers that necessarily have a smaller configuration.  If the term "nested" required the fit depicted in Figure 6, which Dr. Spenko contends to be "snug," then the disclosed embodiment of multiple nested delivery containers would not be feasible because it would be impossible to fit more than one delivery container into a storage container.  Therefore, for such configurations to be feasible, "nested" cannot be limited to a "snug" fit.  Moreover, claim 23 recites "combined containers including ***at least one*** delivery container nested within a storage container" and thus contemplates an embodiment in which (i) delivery containers are substantially smaller than the storage container (to allow multiple delivery containers to fit within a single storage container), and (ii) only one such delivery

container is placed in a storage container.  That embodiment would not have a "snug fit," and Dr. Spenko's construction would rule out that embodiment contemplated by the patent.

21.    Additionally, Figures 8-15 also depict delivery and storage containers, but depict configurations where the spatial relationship between the delivery and storage container is not necessarily the same as depicted in Figure 6.  A POSITA would understand from these figures—taken together with the description in the specification—that the critical feature of a delivery container nestable within a storage container is that the delivery container is of a smaller configuration compared to the storage container so that it is capable of being placed within the storage container, without any further restriction on the "fit" or the design purpose.

22.    Dr. Spenko also contends that the only way the benefits of the '080 Patent are realized is if "nested" means "designed to fit snugly."  I respectfully disagree.  The benefits of nesting are described as (i) "mak[ing] handling of multiple empty bins in a confined space such as a vehicle" less difficult (*id.* 9:1-2), (ii) "allow[ing] the storage and manipulation of order containers 10, 70 within the storage and retrieval system" (*id.* 9:10-12), (iii) "allowing multiple delivery containers 80 to be stored within a single storage container 70" (*id.* 9:30-32), (iv) "facilitat[ing] easier and more efficient handling of delivery containers," *e.g.*, by making it "easier for human handlers to carry multiple delivery containers when they are nested, and/or to transport nested delivery containers 80 in trucks and other means of conveyance" (*id.* 9:33-38), and (v) allowing "one or more delivery bin 80 [to] be placed within each storage bin 70, and optionally one or more shopping or other bags [to] be placed within such bins; and the resulting container combination(s) 90 can be placed within grid 200 until needed at an order picking station 4" (*id.* 9:56-61).  All of these benefits are accomplished by having delivery containers capable of being placed within

storage containers, regardless of whether the containers were "designed" specifically for that purpose and regardless of whether the fit is "snug."

23. For his "snugness" opinion, Dr. Spenko relies on a different issue that the patent specification never mentions—*i.e.*, keeping delivery containers upright to avoid spillage of their contents. (*See* Spenko Decl. ¶¶ 43-44.) As an initial matter, nothing in the specification suggests that a delivery container nested in a storage container would "fall on its side" and "spill [its] contents" (*id.*) if the delivery container did not fit "snugly" within the storage container. Nor does the specification suggest that the containers are handled in such an aggressive way that such a problem would arise. Moreover, even if one assumed that tipping and spillage were problems in the abstract, a POSITA would understand that is not the problem that the invention of the '080 Patent addresses. Rather, as demonstrated above, the '080 Patent's specification explains that the invention is concerned with efficient use of space and efficient handling of multiple delivery containers at once. The functionality of the '080 Patent is achieved if the delivery containers are capable of being placed within the storage containers, without any "snugness" requirement. The '080 Patent does not have to solve all conceivable improvements to such a system.[2]

24. Moreover, even if the '080 Patent sought to avoid spillage of the contents in a delivery container, I disagree with Dr. Spenko that the "only" way to ensure that multiple delivery

---

[2] Nothing in the '080 Patent suggests that if the delivery container did not fit "snugly" within the storage container, the order contents would spill. But even if that were the case, a mechanical engineer would understand that the '080 Patent's invention need not address all conceivable problems with operation of the system. The '080 Patent's invention addresses space and handling efficiency, and other inventions may address how to make sure the goods in a customer order remain perfectly upright (assuming that were a problem in the first instance). It also would be good for a system to make sure that dairy products in delivery containers are primarily kept in a chilled environment—along with hundreds of other issues one could imagine with a storage and retrieval system—but the '080 Patent simply does not have to solve all imaginable problems.

containers do not shift or spill their contents is to design them to fit snugly within a storage container. (*Cf. id.*) Rather, a POSITA would recognize that there are numerous mechanisms to prevent the delivery container from tipping, falling over, or spilling its contents inside the storage container, such as, for example, dimensions that would prevent the delivery container from tipping over within the storage container or a weighted bottom of the delivery container. Thus, Dr. Spenko is wrong to add an additional restriction to the patent claims—"snugness"—based on a hypothetical problem that the '080 Patent did not seek to address and that, in any event, could be addressed in other ways.

25. Dr. Spenko raises additional unsubstantiated hypotheticals to support his opinions. For example, he contends that the transfer mechanisms for lifting delivery containers out of storage containers disclosed in the figures would not work unless the delivery containers are designed to fit snugly in the storage containers. His primary contentions are that a "snug" fit is required for the delivery container handles to be located in specific positions relative to the storage container and for the clamps to grasp the delivery container. (*See id.* ¶¶ 46-47.)

26. I disagree with Dr. Spenko's assumptions regarding operation of the transfer mechanism. Nothing in the specification suggests that the transfer mechanism would not be able to grasp the delivery container in the absence of a "snug" fit. And, contrary to Dr. Spenko's contention, nothing in the '080 Patent states that the transfer mechanism would be inoperable unless the delivery container remains "fixed in place once placed in the storage container." (*Cf. id.* ¶ 46.)

27. For example, the specification requires only that the delivery container be of a smaller size compared to the storage container such that "the delivery container can be positioned over and lowered into the storage container with the transfer mechanism 93 or any other

mechanism." ('080 Pat., 11:11-13.)  It says nothing about a "snug" fit.  Moreover, as discussed in Paragraph 20, the specification discloses embodiments in which multiple delivery containers are stored within storage containers.  ('080 Pat., 9:26-30; *see also id.* 9:30-38, claim 23.)  In such an embodiment, multiple, smaller delivery containers will necessarily be in locations different from that of the single delivery container within a storage container.  Therefore, the transfer mechanism must be able to access delivery containers that are in more than one possible location within the storage container.  Dr. Spenko's unsupported assumption about the transfer mechanism therefore is inconsistent with embodiments disclosed in the patent.

28.     Furthermore, nothing in the '080 Patent suggests that, absent a snug fit, the delivery container would "fall over" (Spenko Decl. ¶ 46) so that the transfer mechanism is unable to reach the handles or that the clamps are unable to grasp the delivery container.  And even if that hypothetically were a problem, the possible solutions for preventing disruptive movement of the delivery container within the storage container are not limited to "additional sensors, degrees-of-freedom, and actuators" for the transfer mechanism, all of which Dr. Spenko opines would purportedly render the embodiments "more costly, complex, and break more often" (*id.* ¶ 50).  Rather, the specification states that containers "suitable for use in implementing the invention can comprise any one or more of a wide range of specialized structural features to enable further gains in handling efficiency."  ('080 Pat., 10:8-11.)  As described above in Paragraph 24, a POSITA would know that there are numerous ways to prevent tipping or spillage of the delivery container that do not require Dr. Spenko's purportedly "costly" modifications to the transfer mechanism.

29.     Dr. Spenko also contends that at the time of the '080 Patent, the field of robotics was not advanced enough to achieve grasping of the delivery containers without a snug fit, but he bases this contention on picking loose items "arbitrarily placed inside the container," not the

-11-

separation of delivery and storage containers.  (*See* Spenko Decl. ¶ 48.)  Only the latter is the concern of the '080 Patent, and thus Dr. Spenko's opinions regarding the handling of loose items (*e.g.*, a box of cereal or bunch of bananas) that might be placed in a delivery container is beside the point.  The '080 Patent concerns the combination of delivery and storage containers of particular sizes and configurations, and in my opinion, the robotics at the time of the invention were sufficiently advanced for the transfer mechanism to handle a delivery container nested within a storage container even if the fit was not "snug."

30.     Furthermore, I disagree with Dr. Spenko that a robotic gripper would struggle with the "many edge cases that arise in applications outside of carefully controlled laboratory settings" and that "it is incredibly difficult to devise a system that can reliably and repeatably handle all of the different situations that might arise." (*Id.*)  Dr. Spenko opines that, at the time of the invention, a POSITA would have worked to "constrain the number of variables . . . by using delivery containers designed to fit snugly within the storage containers." (*Id.* ¶ 49.)  But this is not an issue addressed in the '080 Patent, and nothing in the '080 Patent suggests that removal of delivery containers would create "many edge cases" or that there were overwhelming variations that would complicate the removal of delivery containers from storage containers, and Dr. Spenko cites nothing to the contrary.  Indeed, removing a predefined container whose size and shape would be selected from a set of available containers involves much fewer and more predictable variables than removing individual goods or items that have a much greater variety of shapes and sizes.  As explained in Paragraphs 20 and 27, the patent already contemplates multiple delivery containers nesting within a single storage container.  Therefore, the mechanism that removes the delivery container from the storage container would have to be able to remove delivery containers of different sizes, further demonstrating that snugness is not a requirement of a delivery container

-12-

nested within a storage container.  Moreover, in my opinion, by June 2013, a POSITA would have known, from a familiarity with the prior art in the field, how to achieve separation of similarly shaped containers using robots.

31.    Finally, Dr. Spenko notes that the specification uses "combined" and "collapsible" to describe delivery containers that are placed within a storage container, and he contends that these words "would be superfluous if they meant the same thing as 'nestable' / 'nested.'"  (*See id.* ¶ 51.)  I disagree.  As explained above in Paragraph 11, the specification uses the term "nested" interchangeably with the term "combined."  (*See* '080 Pat., 13:3-7 ("In some embodiments, upon being ***combined/nested***, instead of being stored into the storage-and-retrieval system (for example at 2220), some or all empty delivery and storage container units can be transferred directly to a picking or workstation.") (emphasis added).)  Regarding the term "collapsible," the specification does not indicate that it conveys "mere capability of being placed within something else," as Dr. Spenko asserts.  (Spenko Decl. ¶ 51.)  "Collapsible" conveys a feature of an individual container; it says nothing about how that container relates to other containers in the claimed system.  Thus, the specification's alternative use of "nestable" and "collapsible" confirms that "nestable" and "collapsible" have different meanings.  In my opinion, a POSITA would not perceive any redundancy if "nest" / "nestable" are given their plain and ordinary meaning.  Rather, the patent expressly equates "nested" and "combined," and "collapsible" refers to a different quality of an individual container.

**DECLARATION**

I declare that all statements made herein on my knowledge are true.  I understand that knowingly and willfully making false statements is punishable by fine or imprisonment, or both, under Section 1001 of Title 18 of the United States Code.

-14-

Dated:  June 24, 2022

_____

Brian Pfeifer, Ph.D., P.E.