**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW HAMPSHIRE**

|  |  |  |
|---|---|---|
| OCADO INNOVATION LTD. and OCADO SOLUTIONS LTD., | ) ) ) ) | |
| Plaintiffs, | ) ) | |
| v. | ) ) ) | **Civil Action No. 1:21-cv-00041** |
| AUTOSTORE AS and AUTOSTORE SYSTEM INC., | ) ) ) | |
| Defendants. | ) ) ) ) ) ) ) ) | |

**DECLARATION OF MATTHEW SPENKO, PH.D.**

**TABLE OF CONTENTS**

TABLE OF EXHIBITS ..................................................................................................................... iii

I.   BACKGROUND ............................................................................................................ 1

     A.   Experience.......................................................................................................... 1

     B.   Compensation .................................................................................................... 4

     C.   Scope.................................................................................................................. 4

     D.   Materials Considered ......................................................................................... 4

II.  CLAIM CONSTRUCTION PRINCIPLES........................................................................ 5

III. THE '080 PATENT........................................................................................................ 7

     A.   The '080 Patent.................................................................................................. 7

     B.   Prosecution History............................................................................................ 7

IV.  OPINIONS AND ANALYSIS........................................................................................ 8

     A.   The Level of Skill in the Art.............................................................................. 8

     B.   "Nestable" / "Nested" ....................................................................................... 9

V.   RESERVATION OF RIGHTS ...................................................................................... 19

## TABLE OF EXHIBITS

| EXHIBIT | DESCRIPTION | BATES NO. |
|---|---|---|
| 1 | Curriculum Vitae of Dr. Matthew Spenko | N/A |
| 2 | Materials Considered in Expert Declaration of Dr. Matthew Spenko | N/A |
| 3 | Excerpts of File History of U.S. Patent No. 9,796,080 | OC-DNH_000004555 |
| 4 | Ocado's Supplemental Proposed Claim Constructions and Supporting Evidence for the '080 Patent (May 13, 2022) | N/A |
| 5 | The American Heritage Dictionary 5th Ed. (2012) | OC-DNH_000008722 |
| 6 | AutoStore's SPR 6.1(b) Updated Disclosure of Preliminary Claim Constructions and Evidence for the '080 Patent (May 13, 2022) | N/A |

I, Matthew Spenko, declare under penalty of perjury as follows:

1.      I have been retained by counsel on behalf of AutoStore AS and AutoStore System, Inc. (collectively, "AutoStore" or "Defendants") to provide relevant technical explanation regarding the technology in U.S. Patent No. 9,796,080 (the "'080 patent") and to set forth my opinion about the meaning of a disputed claim term in the '080 patent from the perspective of a person of ordinary skill in the relevant art ("POSITA").

## I.      BACKGROUND

### A.      Experience

2.      I am a citizen of the United States, currently residing in Chicago, Illinois, where I am a Professor of Mechanical and Aerospace Engineering at the Illinois Institute of Technology.

3.      I have more than 20 years of experience in automatic control systems, robotics, and system theory with applications to a wide range of areas that include automated factory and warehouse operations with a focus on robotic grippers, automated vehicles, collision avoidance systems, routing of vehicles, and other intelligent transportation technologies.

4.      I received a Bachelor of Science degree in Mechanical Engineering from Northwestern University in 1999, a Master of Science degree in Mechanical Engineering from Massachusetts Institute of Technology in 2001, and a PhD. degree in Mechanical Engineering from Massachusetts Institute of Technology in 2005.  My doctoral thesis was on the topic of Hazard Avoidance for High-Speed Rough Terrain Unmanned Ground Vehicles.

5.      From 2005-2007 I worked as a Post-Doctoral Scholar at the Center for Design Research in the Department of Mechanical Engineering at Stanford University.

6.      In 2007 I became an Assistant Professor in Mechanical Engineering at the Illinois Institute of Technology.  In 2013 I was promoted to Associate Professor with tenure at IIT, and in 2019 I was promoted to Full Professor.

7.      One of the focuses of my research at IIT has been on robotic grippers, specifically those that employ electrostatic and gecko-like adhesives.  These controllable adhesives have been applied to a range of robotics systems designed for climbing vertical and inverted surfaces; perching on vertical, flat surfaces; and manipulating flat and curved objects. The electrostatic/gecko-like grippers in the field of manipulation have advantages over traditional grippers, because the grippers using the electrostatic/gecko-like adhesives can controllably grasp a wide variety of object shapes including those that are irregular, flat, or possessing a large radius of curvature.  Among other work, I have spent five years collaborating with OnRobot (formally Perception Robotics) and NASA in developing robot end effectors for manipulating flat objects in warehouse and manufacturing operations.  I have over 30 peer-reviewed publications on this topic, and in 2020 I served as the Co-Chair for Soft Grippers at the IEE/RSJ International Conference on Intelligent Robots and Systems.  There are a variety of use cases for these electrostatic/gecko-like gripping devices.  For example, in one of my patent applications. U.S. Pub. No. 2020/0338750 we acknowledged that "there is growing need for mobile robotic platforms, such as small unmanned aerial vehicles with grippers that allow the robot to perch onto surfaces and maintain that positions for an extended period of time as well as robotic manipulators with grippers capable of grabbing objects of different shapes and sizes."

8.      Many of the issues and challenges related to developing effective electrostatic/gecko-like grippers are common to automated picking and retrieving generally.

9.      I have received numerous awards for my work and research in the field of control and intelligent transportation systems as listed in my CV attached hereto as Exhibit 1. For example:

- In 2022 I won Armour College of Engineering's Dean's Award for Excellence in Engineering

- In 2020 I received an award for a Best Paper Finalist at the IEEE International Conference on Soft Robotics (Robosoft).

- In 2019 I was recognized as One of 21 Researchers to Know by the Illinois Science and Technology Coalition.

- In 2019 I became a Senior Member of the Institute of Electrical and Electronics Engineers (IEEE).

- In 2018 I received the Mechanical, Materials, and Aerospace Engineering (MMAE) Department's Excellence in Research Award from the Illinois Institute of Technology.

- In 2014 and 2017 I received the MMAE Excellence in Teaching Award from the Illinois Institute of Technology.

- In 2015 I was recognized as a Top Researcher by ChicagoInno.

- In 2014 I received the IIT/Bauer Family Excellence in Undergraduate Teaching Award from IIT.

- In 2011 I received recognition for the Best Paper, in the Planetary Rovers Session at the International Society of Terrain-Vehicle Systems conference.

- In 2009, I was awarded an Air Force Summer Faculty Fellowship.

- In 2008 I received the Best Paper Award, from the IEEE Transactions on Robotics.

- In 2007 I received an award for the Best Student Paper at the IEEE International Conference on Robotics and Automation (ICRA).

10.     I am the coeditor of 1 book and coauthor of over 90 journal and conference publications as well as numerous presentations in the fields of soft robotics, vehicle routing, and automation and intelligent transportation systems.  I am a highly cited author as shown in the download from Google Scholar attached in Exhibit 1.  I am named as an inventor in nine patents in the United States.

11.     My CV attached hereto as Exhibit 1 fully lays out my professional experience, my publications, and my experience consulting and testifying on legal matters.

### B.     Compensation

12.     I am being compensated for my time spent on this matter at my usual and customary rate of $300 per hour for consultation services and $400 per hour for deposition and trial testimony, plus reasonable expenses.  My compensation is not contingent on the outcome of this action nor my opinions, and I have no financial interest in this case.

### C.     Scope

13.     I understand that Ocado Innovation Ltd. and Ocado Solutions Ltd. (collectively, "Ocado" or "Plaintiffs") filed the present lawsuit against AutoStore and alleged infringement of claims 1–16 and 18–23 of the '080 patent.

14.     I have been asked to provide my opinion on how a person of ordinary skill in the art, at the time of the '080 patent, would understand the claim term "nestable" / "nested," in light of the claim language, the patents' specifications, the patents' prosecution histories, and other relevant sources of information.

### D.     Materials Considered

15.     A complete list of the materials I considered is attached as Exhibit 2 to this declaration.  I have also relied on my extensive knowledge, training, and experience as a robotics, mechanical, and control systems engineer and professor.

4

## II.      CLAIM CONSTRUCTION PRINCIPLES

16.      I am not a lawyer and have no formal education in patent law.  For the purposes of performing my analyses and forming my opinions, I have been informed by counsel of certain legal principles with respect to patent law and claim construction, discussed below.  I applied these legal principles while reviewing materials and forming the opinions expressed in this declaration, and my opinions are informed by my understanding of the relevant law.

17.      I understand that claim construction is solely a matter for the Court to decide and, in general, the ordinary meaning to one of ordinary skill in the art of a claim term used in a patent is determined in the context of the patent's "intrinsic evidence"—namely, the claim language itself, the specification, and the file history of the patent as well as of its family members.  The file history is a record of the patentee's (or "applicant's") arguments to the Patent Office in support of the patentability of the claims of the patent application.

18.      I understand that a "person of ordinary skill in the art," or "POSITA," is a hypothetical person who is presumed to have known the relevant art at the time of the invention. Factors that may be considered in determining the level of ordinary skill in the art may include: (1) type of problems encountered in the art; (2) prior art solutions to those problems; (3) how quickly innovations are made; (4) sophistication of the technology; and (5) educational level of active workers in the field.  In a given case, not every factor may be present, and one or more factors may predominate.  A person of ordinary skill in the art is a person of ordinary creativity. A person of ordinary skill in the art would have the capability to understand the scientific principles applicable to the pertinent art.

19.      I understand that persons of ordinary skill in the art are deemed to read the claims in the context of the entire patent, including the specification and file history.  In other words, the terms are not considered in a vacuum.  A person of skill in the art is also deemed to read the words

5

used in the patent with an understanding of their meaning in the field, and to have and apply knowledge of any special meaning and usage associated with the term within the field. The words used by the inventor to describe the invention must be understood and interpreted as they would be understood and interpreted by a person of ordinary skill in the art.

20.    I understand that the claims (numbered at the end of a patent) define the invention, and the terms used in the claims are generally given their ordinary and customary meanings they would have to a person of ordinary skill in the art at the time of the effective filing date of the application. The context of a claim can be particularly helpful, and other claims may inform the meaning of a term in a particular claim. Terms are normally used consistently throughout a patent. The meaning of a term may help inform the meaning of the same term in other claims. Differences between claims may also help define the terms.

21.    I understand that reference materials that were publicly available at the time that the patent application was filed, such as dictionaries, treatises, or other technical references, may provide context and background for deciphering how one of ordinary skill in the art would have considered the terms used in the claims. However, I understand that such references, as well as testimony (including this declaration) are generally known as "extrinsic evidence," and are accorded less weight than evidence found within the patent and file history.

22.    I have approached my analysis of the '080 patent from the perspective of a person having ordinary skill in the art at the time of the filing of the application giving rise to the '080 patent, informed by the specification and teachings of the '080 patent, the intrinsic record, and relevant extrinsic evidence where appropriate, consistent with the legal standards noted above.

### III.    THE '080 PATENT

#### A.    The '080 Patent

23.    The '080 patent issued on October 24, 2017 from U.S. Patent Application No. 14/899,367, which was filed on June 12, 2014, and also claims priority to foreign application GB Patent Application 1310784.2, which was filed on June 17, 2013.

24.    For the purposes of my declaration, I have been asked to assume that the effective priority date of the alleged invention recited in the '080 patent is June 17, 2013.  My opinions would not change, however, if the effective priority date of the '080 patent were the June 12, 2014 filing of the domestic application.

25.    The '080 patent states it is in the following field:

> "The disclosure herein relates to automated order fulfillment systems. In particular, the disclosure provides improved systems and methods for the handling, or manipulation, of containers in fully or semi-automated storage and retrieval systems."

#### B.    Prosecution History

26.    Claims from the '080 patent application were rejected only one time during the application process, for the following reasons: (i) for "being indefinite for failing to particularly point out and distinctly claim the subject matter which the inventor . . . regards as the invention," for using the word "containers" in claim 1; (ii) anticipated (*i.e.*, not novel) in view of U.S. Patent 9,187,244 ("Toebes") alone; and (iii) obvious in view of Toebes in combination with U.S. Patent 8,092,140 ("Baker").  Ex. 3, OC-DNH_000004609-4625.

27.    In response, Ocado amended the claims and argued for issuance of the amended claims.  Ex. 3, OC-DNH_000004589-4600.  The term "nestable" / "nested" was found within the originally filed claims and was not added during the course of prosecution, and the applicant did not rely on this term to distinguish Toebes or Baker during the course of prosecution.  *See id.*

7

28.     The USPTO then issued a Notice of Allowance.  Ex. 3, OC-DNH_000004568-4577.

## IV.     OPINIONS AND ANALYSIS

29.     If called as a witness to testify at a claim construction hearing, I expect to testify on the following topics and provide opinions and testimony on what is summarized in this declaration, as well as the technology underlying what is disclosed in the '080 patent.

30.     In my opinion, the claim term "nestable" / "nested," when read in light of the '080 patent's claims, specification, and file history, would be understood by a POSITA at the time of the '080 patent to have its plain and ordinary meaning, which is "designed to fit snugly" / "fitting snugly as designed."

### A.     The Level of Skill in the Art

31.     In rendering the opinions set forth in this declaration, I was asked to consider the patent claims and the prior art through the eyes of a POSITA.  I placed myself back in time to approximately June 17, 2013 and considered the factors set forth above to determine what level of skill a POSITA would have.

32.     In my opinion, a POSITA would have a master's degree in Mechanical Engineering or Robotics and at least three to four years of experience working as an engineer in the field of automated storage and retrieval systems.  Alternatively, in my opinion, a POSITA would have a bachelor's degree in Mechanical Engineering and at least four to five years of experience working as an engineer in the field.

33.     I understand that Ocado has asserted that a POSITA may have had as little as one year of experience working as an engineer in the field if possessing a master's degree in Mechanical Engineering or Robotics, or as little as three years of experience working as an engineer in the field if possessing a bachelor's degree in Mechanical Engineering.  I disagree with

Ocado's assessment of the experience a POSITA would possess; however, for my analysis in this declaration, I have considered both my understanding of the level of ordinary skill in the art and Ocado's understanding, and my opinion would be the same under either understanding.

34.    My opinion herein would not be affected if a somewhat higher or lower level of skill were ultimately adopted.

### B.    "Nestable" / "Nested"

35.    As discussed further below, there is nothing in the patent claims, specification, or prosecution history that indicates that the applicant intended to redefine the term "nestable" / "nested" or otherwise act as a lexicographer.  For example, there is no discussion in the intrinsic record of a special "definition" to be applied to these terms, nor the use of "i.e." to introduce something that could be considered a definition for the term, nor any other indicators that a special definition was adopted for this term.  Relatedly, there is no indication that the applicant disavowed scope and changed the meaning of the term to something narrower than its plain and ordinary meaning during the course of prosecution.  The plain and ordinary meaning of the term "nestable" / "nested" is completely consistent with how it is used in the patent claims, specification, and prosecution history, and a POSITA would therefore understand that this term carries its plain and ordinary meaning as is used in the art and in view of the intrinsic record.[1]

36.    The plain and ordinary meaning of "nestable" / "nested" is "designed to fit snugly" / "fitting snugly as designed."

37.    My analysis begins with the claims.  The term "nestable" / "nested" appears only in independent claim 23 and dependent claims 8 and 17 (which depend on claims 1 and 13,

---

[1]    I understand that both parties contend that the plain and ordinary meaning of the term applies, but that they dispute what the plain and ordinary meaning is.  *See* Ex. 4 at 3; Ex. 6 at 7.

respectively).[2]  The claims are fully consistent with a POSITA's understanding of the plain and

ordinary meaning of the term being "designed to fit snugly" / "fitting snugly as designed."

38.     The final element of independent claim 23 reads as follows, emphasized in key part:

> "wherein the plurality of containers includes storage containers configured to store products to be ordered, delivery containers configured to store products at least partially fulfilling an order, and combined containers including at least one **delivery container nested within a storage container**."

Notably, the claim already requires that a combined container includes a delivery container

"within" a storage container; therefore, "nested" imparts additional meaning beyond merely being

placed "within" something else, otherwise the claim could have simply read "delivery container

~~nested~~ within a storage container."  For this reason, Ocado's proposed plain and ordinary meaning

of "place[d] within" is redundant and not helpful to understand the claim term.

39. Similarly, claim 8 reads as follows, again emphasized in key part:

> "The system according to claim 1, wherein at least one **delivery container is nestable within a storage container**."

Once again, the claim already requires that the delivery container can be placed "within" a storage

container, so "nestable" would be understood by a POSITA to impart additional meaning so that

the term is not superfluous.  Again, Ocado's proposed plain and ordinary meaning highlights this

redundancy when inserted into the claim: "delivery container is [capable of being placed within]

within a storage container."

40.     Lastly, Claim 17 reads as follows, again emphasized in key part:

> "The method according to claim 13, wherein at least one of the plurality of **delivery containers is nestable with at least one other delivery container**."

---

[2]     No claims depend on claim 8, 17, or 23, and therefore the term "nestable" / "nested" is not incorporated by dependency into any other claims.

This claim does not use the term "within" after "nestable," but rather uses the phrase "nestable with." If a POSITA understood this to be a typo that should read "nestable with*in*," then my analysis above with respect to claim 8 would apply here, as the language would be almost verbatim identical in relevant part. But taking the claim on its face makes it even clearer that "nestable" does not merely imply that something is "capable of being placed within," because that construction would not make grammatical sense if inserted into the claim: "one of the plurality of delivery containers is [capable of being placed within] with at least one other delivery container."

41.    My analysis continues with the specification. The specification makes clear that "nestable" / "nested" containers are not those that are merely capable of placement within another container, but instead must be designed to fit snugly, and fit snugly as designed.

42.    The '080 patent states that a "nestable configuration[]" is "shown for example in FIG. 6" ('080 patent at 9:28-30), which is annotated here and colored for ease of understanding:



11

As can be seen, the (blue/grey) delivery container fits snugly as designed in the (yellow) storage container.

43.    The specification describes benefits associated with nested delivery containers that are designed to fit snugly into storage containers, and that would not be achieved if the containers were merely required to be capable of being placed within the storage container.  For example, the '080 patent at 9:30-38 (emphasis added) teaches:

> "In addition to allowing multiple delivery containers 80 to be stored within a single storage container 70, the use of nestable delivery configurations can facilitate easier and more efficient handling of delivery containers 80 in other ways—for example, it can be ***easier for human handlers to carry multiple delivery containers when they are nested***, and/or to transport nested delivery containers 80 in trucks and other means of conveyance."

The only way to ensure that "multiple delivery containers" can all fit inside one storage container and save space is to design the delivery containers in that manner; otherwise, while one delivery container might fit inside the storage container, any additional delivery container may not fit because it might be blocked by the initial delivery container.  *See also* '080 patent at 8:67-9:2 ("In addition, such containers 10, 70, 80 sometimes do not nest, which can make handling of ***multiple*** empty bins in a confined space such as a vehicle difficult.") (emphasis added).  Moreover, a snug fit ensures that the first delivery container does not shift around from where it was originally placed or fall on its side, which might prevent an additional delivery container from being placed properly inside the same storage bin.

44.    More generally, designing the delivery container to fit snugly ensures that it stays upright, which both makes it easier to place items into the delivery bin and ensures that those picked items do not fall out of the delivery bin.  As a POSITA would recognize, when "transport[ing] delivery containers 80 in trucks and other means of conveyance" (such as within the automated storage and retrieval system discussed in the '080 patent), the delivery containers

12

are subject to forces in various directions, and without a snug fit to ensure they remain steady, the delivery containers might fall over and spill their contents during transport, which would undermine the purported "easier and more efficient" technology claimed in the '080 patent. *See* '080 patent at 9:30-38.

45.    The requirement that nestable containers are designed to fit snugly is salient in all the embodiments disclosed in the specification that rely on "nested" delivery containers, as shown above in Figure 6.

46.    For example, Figures 9 through 15 of the '080 patent show a "transfer mechanism 93 [that] lifts the delivery container 80" out of the storage container.  '080 patent at 10:55-57. As can be seen, for example, in Figure 15, the transfer mechanism is designed to work when the handles of the delivery container are located in a specific location in the middle of the top portion of the storage container:



Figure 15

For the handles of the delivery container to be located where the transfer mechanism is able to use them, the delivery container must be designed to remain fixed in place once placed in the storage

13

container so that the handles do not shift around within the storage container while the containers are jostled around during transit.  Designing the delivery container to fit snugly within the storage container (*i.e.*, to be nested within the storage container) ensures that the delivery container stays in place.  If the delivery container were not so designed, then the delivery container might shift forward or backward within the storage container such that the handle of the delivery container would not be in the middle, as required by the transfer mechanism illustrated above.  Likewise, if the delivery container were not designed to fit snugly, the delivery container might fall over such that the handle of delivery container is at the bottom of the storage container instead of at the top, as required by the transfer mechanism illustrated above.

47.     The same is true for the removal of the nested delivery container in the embodiment depicted in Figures 16-20.  As shown below in the cropped and annotated portion of Figure 17, "the delivery container 80 is secured by [highlighted] clamps 302" as the storage container continues to drop downwards, thereby removing the delivery container from the storage container ('080 patent at 11:31-41):



14

If the delivery container were not designed to fit snugly within the storage bin, then the system could not ensure that the clamps would apply as expected to the deliver container, because the delivery container might otherwise have shifted around or fallen over during its movement within the system.

48.   For years, I have been researching and lecturing on automated solutions to handling objects (including the same kinds of systems that could be used to remove items from containers like those shown above). As a POSITA would recognize at the time of the '080 patent—and which is still true today—there was no automated solution that could reliably and efficiently pick all items from containers (including picking delivery containers themselves from within storage containers) if the items are arbitrarily placed inside the container. There are simply too many variations in object geometry, material, position and orientation (i.e., pose) within the container, and orientation with respect to other objects in the container for even current technology to reliably and efficiently tackle that problem. In the robotics field, researchers have been concentrating on object grasping for well over 40 years, and while significant progress has been made, the area is still active because of its complexity and unsolved problems. For example, even though it might be possible for a robotic gripper to grasp a majority of objects with different geometries and surface properties, there are so many edge cases that arise in applications outside of carefully controlled laboratory settings that it is incredibly difficult to devise a system that can reliably and repeatably handle all of the different situations that might arise. In a high throughput situation such as an automated storage and retrieval system, one failure point can have substantial consequences, similar to how a car accident in one lane can cause massive traffic jams across a freeway.

49.   The way that a POSITA would have understood a reliable solution to work at the time is to constrain the number of variables to account for. In the context of the '080 patent, a

15

POSITA would understand that this is accomplished by using delivery containers designed to fit snugly within the storage containers, which prevents the delivery containers from shifting around or falling over within the storage containers, which in turn allows the system to reliably use simpler mechanical systems to remove the delivery container from the storage container (such as the clamp and transfer mechanism shown above).

50.    As a POSITA would recognize, if the "nested" delivery containers did not fit snugly as designed, then the embodiments discussed above would be more costly, complex, and break more often.  For example, in the clamp embodiment shown in Figure 17, if the delivery container did not fit snugly as designed, the system would require either additional sensors, degrees-of-freedom, and actuators in order for the clamps to locate and navigate to the appropriate clamping position depending on how the delivery container might have shifted within the storage container during transit, or the clamps themselves would need to be more compliant and flexible to handle a broader array of potential delivery container positions and orientations.  Either of those approaches incur additional costs due to added complexity to account for the increased components count (*e.g.*, a camera, range sensor, or LIDAR, among others, to identify where the delivery container is sitting within the storage container), and all those additional components and complexity make the system both more likely to break (because there are more points of failure) and more difficult to maintain.  The same applies to the transfer mechanism depicted in Figure 15 as described above.  A POSITA would thus recognize that the purpose of using the "nested" delivery container shown in those embodiments is that the snug fit avoids much of that expense and complication, and that involves a simpler, less expensive design decision made upstream about how the delivery containers will fit in the storage containers.

51.     I note that the specification uses alternative wording to describe delivery containers that are simply placed within a storage container, in particular "combined" and "collapsible." But these words are expressly made distinct from the use of the term "nestable" / "nested," and they would be superfluous if they meant the same thing as "nestable" / "nested." *See* '080 patent at 13:3-7 ("In some embodiments, upon being ***combined/nested***, instead of being stored into the storage-and-retrieval system (for example at 2220), some or all empty delivery and storage container units can be transferred directly to a picking or workstation.") (emphasis added); *id*. at 9:7-13 ("Another aspect of the invention therefore uses a method where, as for example described below, a lighter, cheaper, and optionally ***nestable or collapsible*** order container 10, 70 is placed within storage bins 10, 80. This allows the storage and manipulation of order containers 10, 70 within the storage and retrieval system without sacrificing weight, cost, ***nestability or collapsibility***.") (emphasis added).  Thus, "nestable" / "nested" means something different than merely "combinable" or "collapsible," and a POSITA would recognize that is because "nestable" / "nested" requires more than mere capability of being placed within something else.

52.     My analysis continues with the prosecution history, which does not change the analysis above.  As discussed above, the term "nestable" / "nested" was found within the originally filed claims and was not added during the course of prosecution, and the applicant did not rely on this term to distinguish prior art during the course of prosecution.  Accordingly, nothing in the prosecution history affects the plain and ordinary meaning of the term as used in the patent specification and claims and as described above.

53.     I note that the plain and ordinary meaning aligns with a lay dictionary that Ocado contends shows the plain and ordinary meaning of this term.  In particular, I understand that Ocado relies on The American Heritage Dictionary 5th Ed. (2012) for its definition of "nest" as "[t]o fit

17

or stack *snugly* together." *See* Ex. 4 at 3 (emphasis added); Ex. 5 at OC-DNH_000008734.

That definition is for the verb form of the word which is not the adjective part of speech as used

in the claims, but it still conveys the understanding that nested objects do not fit arbitrarily within

one another. The same dictionary provides the following picture to describe objects that are

"nesting," which is the adjective part of speech and better aligns with how the term is used in the

claims:



Both dictionaries cited by Ocado are lay dictionaries, not technical dictionaries that have any

specific connection to any engineering field. Accordingly, there is no indication that a POSITA

would look to any of these specific dictionaries to understand the meaning of the term in the

context of the '080 patent. Nonetheless, Ocado's dictionary is consistent with the plain meaning

as understood by a POSITA in the context of the '080 patent, because it requires designing objects

to "snugly" fit together as illustrated by the nesting Japanese figures above.

54.    Relatedly, in everyday parlance, "nest" connotes a sense of safety and security, like

a bird's nest which is mean to protect a bird's young offspring. This lay connotation naturally

extends itself into the field of art at issue here, where goods—including potentially fragile goods,

such as eggs, glass, etc.—are being transported within an industrial environment. A POSITA

would understand that the way to keep such goods safe and secure is by preventing them from

18

being tossed around too much, like how a seatbelt protects car passengers, and that fitting the objects snugly as designed—*i.e.*, nesting them—accomplishes just that.

## V.    RESERVATION OF RIGHTS

55.    I reserve the right to respond to any evidence (including expert opinions) that Ocado may offer in support of its claim construction positions.

//

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge.

Dated: May 27, 2022

_____
Matthew Spenko, Ph.D.

19