**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW HAMPSHIRE**

| | |
|---|---|
| OCADO INNOVATION LTD. and OCADO SOLUTIONS LTD., <br><br> Plaintiffs, <br><br> v. <br><br> AUTOSTORE AS and AUTOSTORE SYSTEM INC., <br><br> Defendants. | ) ) ) ) ) ) ) ) ) ) ) ) ) <br><br> Case No. 1:21-cv-00041-JL <br><br> **Hon. Joseph N. Laplante** |

**AUTOSTORE'S REPLY CLAIM CONSTRUCTION BRIEF**

**TABLE OF CONTENTS**

I.    U.S. PATENT NO. 9,796,080 .......................................................................... 1

    A.    "mechanism" (Claims 9–12, 21)................................................................ 1

    B.    "nestable" / "nested" (Claims 8, 17, 23)................................................. 2

    C.    "delivery container" (Claims 1–6, 8–11, 13–16, 18–23)........................ 6

    D.    "delivery container containing at least one picked item" (Claim 15)...... 9

    E.    "at least one of a lip, a handle, and an aperture" (Claim 11)................. 9

    F.    "a structural framework defining a grid of storage locations" (Claims 1, 23)
          ........................................................................................................... 11

    G.    "exclusively within the storage and retrieval system" (Claims 1, 13).... 12

II.   U.S. PATENT NO. 10,913,602 ..................................................................... 13

    A.    "A load handling device … will occupy a grid space" (Claim 1) / "load
          handling device … occupying a grid space" (Claim 12)..................... 13

          1.    AutoStore's Construction Is the Plain and Ordinary Meaning ................. 13

          2.    At a Minimum, the Patentee Disavowed Claim Scope........................... 16

          3.    "Substantially" Does Not Teach More Than One Grid Space................. 18

          4.    Ocado's Remaining Arguments Are Meritless ...................................... 20

    B.    "Load handling devices … will not obstruct a load handling device …
          occupying or traversing an adjacent grid space in the X-direction and will
          not obstruct a load handling device … occupying or traversing an adjacent
          grid space in the Y-direction" (Claim 1) / "the load handling device will not
          obstruct a load handling device occupying or traversing an adjacent grid
          space in the X-direction and will not obstruct a load handling device
          occupying or traversing an adjacent grid space in the Y-direction" (Claim
          12) ..................................................................................................... 22

    C.    "wheel hub motor" (Claims 6, 10, 17)................................................. 24

III.  U.S. PATENT NO. 10,961,051 ..................................................................... 26

    A.    "A housing footprint" (Claims 1, 13) ................................................. 26

    B.    "The second housing has a housing footprint that occupies less than twice
          the area of the grid space" (Claim 1) / "the second load handling device has

a housing footprint that occupies less than twice the area of the grid space" (Claim 13) .......................................................................................... 26

C.   "The first set of rails is part of a first set of tracks, and the second set of rails is part of a second set of tracks" (Claims 9 and 18) .............................. 28

IV.   U.S. PATENT NO. 10,901,404 ........................................................................... 29

A.   "Clearance instruction" ('404 Patent Claim 1) / "Clearance command" ('770 Patent Claims 1, 29) ................................................................... 29

1.   The Claim Language Disproves Ocado's Proposed Construction............ 30

2.   The Specification Directly Contradicts Ocado's Proposed Construction ...................................................................................... 32

B.   "For execution at a future time" (Claim 20) .......................................... 33

C.   "Route" (Claim 20) ................................................................................ 37

V.   U.S. PATENT NO. 11,079,770 ........................................................................... 41

A.   "One or more processors configured to" (Claim 1) ............................... 41

1.   A Generic "Processor" Does Not Provide Sufficient Structure for Specialized, Non-typical Processor Functions........................................... 42

2.   The '770 Patent Claims Do Not Recite Structure Beyond "Processor" .............................................................................................. 45

B.   "Potential for [a/the] collision" (Claims 1, 8–10, 12, 27, 29)............................... 48

C.   "Real time" (Claim 21) ........................................................................... 49

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*AbbVie Inc. v. Mathilda & Terrence Kennedy Inst. of Rheumatology Tr.*,
764 F.3d 1366 (Fed. Cir. 2014)............................................................................................13

*Acumed v. Stryker Corp.*,
483 F.3d 800 (Fed. Cir. 2007)............................................................................................3, 39

*Allen Eng'g Corp. v. Bartell Indus., Inc.*,
299 F.3d 1336 (Fed. Cir. 2002)..................................................................................... 35, 40-41

*Apple Inc. v. Andrea Elecs. Corp.*,
949 F.3d 697 (Fed. Cir. 2020)............................................................................................10

*Aristocrat Techs. Austl. Pty Ltd. v. Int'l Game Tech.*,
521 F.3d 1328 (Fed. Cir. 2008)............................................................................................43

*Augme Techs., Inc. v. Yahoo! Inc.*,
755 F.3d 1326 (Fed. Cir. 2014)............................................................................................39

*BCS Software, LLC v. Open Text, Inc.*,
No. 6:21-CV-00050-ADA, 2021 WL 8202515 (W.D. Tex. Oct. 20, 2021)..............................1

*Bicon, Inc. v. Straumann Co.*,
441 F.3d 945 (Fed. Cir. 2006)..................................................................................33, 34, 38

*BioDelivery Sci. Int'l, Inc. v. Alvogen PB Rsch. & Dev. LLC*,
576 F. Supp. 3d 184 (D. Del. 2021)......................................................................................18

*Blue Spike LLC v. Grande Commc'ns Inc.*,
No. 4:20-CV-671, 2021 WL 5094911 (E.D. Tex. Nov. 2, 2021) ...........................................45

*CA, Inc. v. Netflix, Inc.*,
No. 221CV00080JRGRSP, 2021 WL 5323413 (E.D. Tex. Nov. 16, 2021)...........................44

*Cellular Commc'ns Equip. LLC v. AT&T, Inc.*,
No. 2:15-CV-576-RWS-RSP, 2016 WL 7364266 (E.D. Tex. Dec. 19, 2016) ........................45

*Centripetal Networks, Inc. v. Cisco Sys., Inc.*,
No. 2:18-CV-94, 2020 WL 863976 (E.D. Va. Feb. 20, 2020) .................................................6

*Chef Am., Inc. v. Lamb-Weston, Inc.*,
358 F.3d 1371 (Fed. Cir. 2004)............................................................................................13

*CIAS, Inc. v. Alliance Gaming Corp.*,
   504 F.3d 1356 (Fed. Cir. 2007)..............................................................................14

*Crystal Semiconductor Corp. v. TriTech Microelecs. Int'l, Inc.*,
   246 F.3d 1336 (Fed. Cir. 2001)..............................................................................23

*Digital Reg of Texas, LLC v. Adobe Sys., Inc.*,
   No. C 12-1971 CW, 2014 WL 4090550 (N.D. Cal. Aug. 19, 2014) .......................11

*Digital-Vending Servs. Int'l, LLC v. Univ. of Phoenix, Inc.*,
   672 F.3d 1270 (Fed. Cir. 2012)..............................................................................33

*Dow Chem. Co. v. Sumitomo Chem. Co.*,
   257 F.3d 1364 (Fed. Cir. 2001)................................................................................7

*Dyfan, LLC v. Target Corp.*,
   28 F.4th 1360 (Fed. Cir. 2022) ..............................................................................42

*Egenera, Inc. v. Cisco Sys., Inc.*,
   972 F.3d 1367 (Fed. Cir. 2020)..............................................................................48

*EON Corp. IP Holdings v. Silver Springs Networks*,
   815 F.3d 1314 (Fed. Cir. 2016)................................................................................3

*Exmark Mfg. Co., Inc. v. Briggs & Stratton Corp.*,
   830 F. App'x 305 (Fed. Cir. 2020) .........................................................................38

*Forbis v. City of Portland*,
   No. 02-135-P-H, 2003 WL 21250675 (D. Me. May 29, 2003) .................................2

*Gillette Co. v. Energizer Holdings, Inc.*,
   405 F.3d 1367 (Fed. Cir. 2005)..............................................................................17

*GoDaddy.com, LLC v. RPost Commc'ns Ltd*,
   No. CV-14-00126-PHX-JAT, 2016 WL 212676 (D. Ariz. Jan. 19, 2016),
   *aff'd*, 685 F. App'x 992 (Fed. Cir. 2017)...............................................................42

*Haemonetics Corp. v. Baxter Healthcare Corp.*,
   607 F.3d 776 (Fed. Cir. 2010).................................................................................35

*Hill-Rom v. Stryker Corp.*,
   755 F.3d 1367, 1371 (Fed. Cir. 2014).....................................................................35

*Interval Licensing LLC v. AOL*,
   766 F.3d 1364 (Fed. Cir. 2014)...............................................................................50

*Juxtacomm-Texas Software, LLC v. Axway, Inc.*,
    No. 6:10CV011, 2012 WL 7637197 (E.D. Tex. July 5, 2012), *aff'd sub nom.*
    *JuxtaComm-Texas Software, LLC v. TIBCO Software, Inc.*, 532 F. App'x 911
    (Fed. Cir. 2013) .............................................................................................................41

*In re Katz Interactive Call Processing Pat. Litig.*,
    639 F.3d 1303 (Fed. Cir. 2011) .....................................................................................43

*Kaufman v. Microsoft Corp.*,
    34 F.4th 1360 (Fed. Cir. 2022) ...................................................................................9, 10

*Koki Holdings Co. v. Kyocera Senco Indus. Tools, Inc.*,
    No. 18-313-CFC, 2021 WL 1092579 (D. Del. Mar. 22, 2021) ......................................35

*Konami Gaming, Inc. v. High 5 Games, LLC*,
    No. 2:14-cv-01483-RFB-NJK, 2018 WL 1020120 (D. Nev. Feb. 22, 2018)
    *aff'd*, 756 F. App'x 994 (Fed. Cir. 2019) .......................................................................43

*LNP Eng'g Plastics, Inc. v. Miller Waste Mills, Inc.*,
    275 F.3d 1347 (Fed. Cir. 2001) .....................................................................................18

*Lucent Techs. Inc. v. Gateway*,
    525 F.3d 1200 (Fed. Cir. 2008) .....................................................................................29

*MySpace, Inc. v. GraphOn Corp.*,
    672 F.3d 1250 (Fed. Cir. 2012) .....................................................................................25

*Nautilus Inc. v. Biosig Instruments, Inc.*,
    572 U.S. 898 (2014) ......................................................................................................38

*Niz-Chavez v. Garland*,
    141 S.Ct. 1474 (2021) ...................................................................................................13

*Nomadix, Inc. v. Hosp. Core Servs. LLC*,
    No. CV14082256DDPVBKX, 2016 WL 3444461 (C.D. Cal. Jan. 27, 2016) ................45

*Nystrom v. TREX Co.*
    424 F.3d 1136 (Fed. Cir. 2005) .....................................................................................39

*Odyssey Wireless, Inc. v. Apple Inc.*,
    No. 15-CV-1735-H (RBB), 2016 WL 3055900 (S.D. Cal. Mar. 30, 2016) ...................45

*Phillips v. AWH Corp.*,
    415 F.3d 1303 (Fed. Cir. 2005) (en banc) .................................................................25, 35

*Poly-Am., L.P. v. API Indus., Inc.*,
    839 F.3d 1131 (Fed. Cir. 2017) .....................................................................................35

*In re Power Integrations, Inc.*,
    884 F.3d 1370 (Fed. Cir. 2018)................................................................38

*PowerOASIS, Inc. v. T-Mobile USA, Inc.*,
    No. 05-CV-42-PB, 2006 WL 753206 (D.N.H. Mar. 22, 2006) ..............................29

*Quanergy Sys., Inc. v. Velodyne Lidar, Inc.*,
    No. 16-CV-05251-EJD, 2017 WL 4410174 (N.D. Cal. Oct. 4, 2017) ....................45

*Realtime Adaptive Streaming LLC v. Adobe Sys. Inc.*,
    No. CV 18-9344-GW(JCX), 2019 WL 13039644 (C.D. Cal. July 25, 2019) .............45

*Regents of Univ. of Minn. v. AGA Med. Corp.*,
    717 F.3d 929 (Fed. Cir. 2013)................................................................17

*Samsung Elecs. Am., Inc. v. Prisua Eng'g Corp.*,
    948 F.3d 1342 (Fed. Cir. 2020)..............................................................44

*Savvy Dog Sys., LLC v. Pa. Coin, LLC*,
    No. 3:19-CV-01470, 2020 WL 7488878 (M.D. Pa. Dec. 21, 2020)........................45

*St. Isidore Rsch., LLC v. Comerica Inc.*,
    No. 2:15-CV-1390-JRG-RSP, 2016 WL 4988246 (E.D. Tex. Sept. 19, 2016).............43

*Stenberg v. Carhart*,
    530 U.S. 914 (2000)..........................................................................19

*Summit 6 LLC v. HTC Corp.*,
    No. 7:14-cv-00014-O, 2015 WL 11117868 (N.D. Tex. Mar. 21, 2015) ...................40

*SuperGuide v. DirecTV Enterprises, Inc.*,
    358 F.3d 870 (Fed. Cir. 2004) ..............................................................10

*Thorner v. Sony Comput. Ent. Am. LLC*,
    669 F.3d 1362 (Fed. Cir. 2012)..............................................................35

*U.S. v. One 1973 Rolls Royce*,
    43 F.3d 794 (3d Cir. 1994)...................................................................23

*Uniloc USA, Inc. v. Autodesk, Inc.*,
    No. 2:15-cv-1187_JRG-RSP, 2016 WL 3647977 (E.D. Tex. Jul. 7, 2016) ...............47

*VDPP LLC v. Vizio, Inc.*,
    No. 2021-2040, 2022 WL 885771 (Fed. Cir. Mar. 25, 2022)...........................43, 44

*Velocity Pat. LLC v. Mercedes-Benz USA, LLC*,
    No. 13-cv-8413, 2016 WL 5234110 (N.D. Ill. Sept. 21, 2016)...........................43

*Wasica Fin. GmbH v. Cont'l Auto. Sys., Inc.*,
  853 F.3d 1272 (Fed. Cir 2017)......................................................................................38

*Wastow Enterprises, LLC v. Truckmovers.com, Inc.*,
  855 F. App'x. 748 (Fed. Cir. 2021) ........................................................................16, 27, 28

*Williamson v. Citrix Online, LLC*,
  792 F.3d 1339 (Fed. Cir. 2015)................................................................................ *passim*

*XR Commc'n LLC v. D-Link Sys., Inc.*,
  No. SA CV 17-00596-DOC-JDE, 2022 WL 2291747 (C.D. Cal. Apr. 18,
  2022),  *report and recommendation adopted*, No. SACV1700596DOCJDE,
  2022 WL 2291747 (C.D. Cal. Apr. 18, 2022) ....................................................44, 48

*XR Commc'ns, LLC v. Ruckus Wireless, Inc.*,
  No. 18-CV-01992-WHO, 2021 WL 3918136 (N.D. Cal. Sept. 1, 2021) ...............................42

*Zeroclick, LLC v. Apple Inc.*
  891 F.3d 1003 (Fed. Cir. 2018 ..........................................................................................44

**Statutes**

35 U.S.C § 112...........................................................................................................43, 45

35 U.S.C. § 112(f)............................................................................................... *passim*

**TABLE OF EXHIBITS**

| Ex. No. | Description | Bates Range |
|---|---|---|
| 1 | U.S. Patent No. 9,796,080 | |
| 2 | U.S. Patent No. 10,913,602 | |
| 3 | U.S. Patent No. 10,961,051 | |
| 4 | U.S. Patent No. 10,901,404 | AS-NH_00211497 |
| 5 | U.S. Patent No. 11,079,770 | AS-NH_00211471 |
| 6 | Excerpts from Transcript of the Deposition Lars Sverker Ture Lindbo (April 30, 2021), in Inv. No. 337-TA-1228 (U.S.I.T.C.) **(filed under seal)** | |
| 7 | *Thomas Ventrudo v. United States of America*, Case No. 3:13-CV-00862, Dkt. No. 54 (M.D. Fla. Jul. 24, 2015) | |
| 8 | Excerpts from the Transcript of the Deposition of Raffaello D'Andrea, Ph.D. (July 20, 2022) | |
| 9 | Excerpts from the Transcript of the Deposition of Brian George Pfeifer, Ph.D. (July 21, 2022) | |
| 10 | Excerpts from the Transcript of the Deposition of Petros Ioannou, Ph.D. (July 22, 2022) | |
| 11 | Declaration of Matthew Spenko, Ph.D. (May 27, 2022) | |
| 12 | Rebuttal Declaration of Matthew Spenko, Ph.D. (June 24, 2022) | |
| 13 | Rebuttal Declaration of Stephen Derby Regarding Claim Construction, Ph.D. (June 24, 2022) | |
| 14 | Declaration of Brian Pfeifer, Ph.D. (April 25, 2022), submitted as Exhibit 2020 in Case No. IPR2022-00443 | |
| 15 | Declaration of Brian Pfeifer, Ph.D. (December 11, 2020), submitted as Exhibit 1015 in Case No. IPR2021-00311 | |

| Ex. No. | Description | Bates Range |
|---|---|---|
| 16 | Declaration of Professor Raffaello D'Andrea (Case No. 1:21-cv-00041-JL (D.N.H.), Dkt. No. 35-22) | |
| 17 | Declaration of Raffaello D'Andrea, Ph.D., in Support of Plaintiffs' Proposed Claim Constructions (served May 27, 2022) | |
| 18 | Rebuttal Declaration of Raffaello D'Andrea, Ph.D., in Further Support of Plaintiffs' Proposed Claim Constructions (served June 24, 2022) | |
| 19 | Sur-Rebuttal Declaration of Raffaello D'Andrea, Ph.D., in Further Support of Plaintiffs' Proposed Claim Constructions (served July 12, 2022) | |
| 20 | Declaration of Petros Ioannou, Ph.D. (served May 27, 2022) | |
| 21 | Rebuttal Declaration of Petros Ioannou, Ph.D. (served June 24, 2022) | |
| 22 | Sur-Rebuttal Declaration of Petros Ioannou, Ph.D. (served July 12, 2022) | |
| 23 | Excerpts from the File History of U.S. Patent No. 9,796,080 | |
| 24 | Excerpts from the File History of U.S. Patent No. 10,901,404 | AS-NH_00216216–227 |
| 25 | Excerpts from the File History of U.S. Patent No. 11,079,770 | AS-NH_00208993–999 |
| 26 | Excerpts from the File History of U.S. Patent No. 10,474,141 | AS-NH_00207451–57 |
| 27 | Excerpts from the File History of European Patent No. 3376450 | AS-NH_00209330, AS-NH_00209627–674 |
| 28 | Email from Josh Glucoft to Laurie Stempler on May 24, 2022 at 6:27 p.m. E.D.T. | |
| 29 | Patent Trial & Appeal Board decision, Case No. IPR2022-00443 (July 20, 2022) | |

| Ex. No. | Description | Bates Range |
|---|---|---|
| 30 | Excerpts from the Oxford English Dictionary | OC-DNH_000008741–751 |
| 31 | Excerpts from The American Heritage Dictionary | OC-DNH_000008722–740 |
| 32 | Excerpts from the Webster's New World College Dictionary | AS-NH_00217322–324 |
| 33 | Excerpts from the American Heritage Dictionary | AS-NH_00217319–321 |
| 34 | Excerpts from the Webster's Third New International Dictionary | AS-NH_00217302–304 |
| 35 | The AutoStore System brochure (2010) (color version of AS-ITC_00452501–512) | |
| 36 | Additional Excerpts from the Transcript of the Deposition of Matthew Spenko, Ph.D. (July 14, 2022) | |
| 37 | Curriculum Vitae of Matthew Spenko, Ph.D. | |
| 38 | Additional Excerpts from the Transcript of the Deposition of Brian George Pfeifer, Ph.D. (July 21, 2022) | |
| 39 | Excerpts of Respondents' Initial Post-Hearing Brief, U.S.I.T.C Investigation No. 337-TA-1228 | AS-NH_00218372-695 |
| 40 | Additional Excerpts from the Transcript of the Deposition of Stephen Derby (July 18, 2022) | |
| 41 | Excerpts from Prosecution Proceedings for EP3030504 | AS_NH_00222546-6311 |
| 42 | Excerpts of Response by Patentee to Opposition of EP3293129B1 | AS-NH_00218963-982 |
| 43 | Excerpts of Response by Patentee to Opposition of EP 3299316B1 | AS-NH_00218983-9003 |
| 44 | GB 1314313.6 | OC-ITC_000551822-851 |
| 45 | Excerpts from the Curriculum Vitae of Brian G. Pfeifer, Ph.D., P.E. | |
| 46 | Excerpts from Plaintiffs' First Supplemental Preliminary Infringement Contentions, dated May 16, 2022 | |

| Ex. No. | Description | Bates Range |
|---------|-------------|-------------|
| 47 | Appendix I: Materials Considered to the Declaration of Brian Pfeifer, dated May 27, 2022 | |
| 48 | Patent Owner's Preliminary Response, Case No. IPR2022-00443 (July 20, 2022) | |
| 49 | Additional excerpts from the Transcript of the Deposition of Petros Ioannou, Ph.D. (July 22, 2022) | |
| 50 | Additional excerpts from the Transcript of the Deposition of Raffaello D'Andrea, Ph.D. (July 20, 2022) | |

**TABLE OF ABBREVIATIONS**

| Abbreviation | Description |
|---|---|
| AutoStore | Defendants AutoStore AS and AutoStore System Inc. |
| Ocado | Plaintiffs Ocado Innovation Ltd. and Ocado Solutions Ltd. |
| D'Andrea #1 | Declaration of Professor Raffaello D'Andrea (Case No. 1:21-cv-00041-JL (D.N.H.), Dkt. 35-22) (Dkt. 127-16) |
| D'Andrea #2 | Declaration of Raffaello D'Andrea, Ph.D., in Support of Plaintiffs' Proposed Claim Constructions (served May 27, 2022) (Dkt. 127-17) |
| D'Andrea #3 | Rebuttal Declaration of Raffaello D'Andrea, Ph.D., in Further Support of Plaintiffs' Proposed Claim Constructions (served June 24, 2022) (Dkt. 127-18) |
| D'Andrea #4 | Sur-Rebuttal Declaration of Raffaello D'Andrea, Ph.D., in Further Support of Plaintiffs' Proposed Claim Constructions (served July 12, 2022) (Dkt. 127-19) |
| Ioannou #1 | Declaration of Petros Ioannou, Ph.D. (served May 27, 2022) (Ex. 20) (Dkt. 127-20) |
| Ioannou #2 | Rebuttal Declaration of Petros Ioannou, Ph.D. (served June 24, 2022) (Ex. 21) (Dkt. 127-21) |
| Ioannou #3 | Sur-Rebuttal Declaration of Petros Ioannou, Ph.D. (served July 12, 2022) (Ex. 22) (corrected exhibit: Dkt. 127-41). |
| POSITA | Person of Ordinary Skill In The Art |
| USPTO | United States Patent and Trademark Office |
| '080 patent | U.S. Patent No. 9,796,080 (Dkt. 127-1) |
| '602 patent | U.S. Patent No. 10,913,602 (Dkt. 127-2) |
| '051 patent | U.S. Patent No. 10,961,051 (Dkt. 127-3) |
| '404 patent | U.S. Patent No. 10,901,404 (Dkt. 127-4) |
| '770 patent | U.S. Patent No. 11,079,770 (Dkt. 127-5) |

*\* All emphases are added unless otherwise noted.*

## I.   U.S. PATENT NO. 9,796,080

### A.   "mechanism" (Claims 9–12, 21)

| AutoStore's Proposed Construction | Ocado's Proposed Construction |
|---|---|
| Plain and ordinary meaning: "a piece of machinery" | No construction necessary / plain and ordinary meaning |

Ocado tries to run away from its own evidence with three arguments, all of which fail.

**First**, Ocado contends that AutoStore's construction "is narrower than the plain and ordinary meaning of the term." *See* Dkt. 128 at 10. That is incorrect: AutoStore's construction is the definition taken from a dictionary provided **by Ocado**. Ocado's arguments related to narrowing "connot[ations]" of AutoStore's constructions are strawmen that Ocado conjured up; those "connot[ations]" were never suggested by AutoStore. *See id.*[1]

**Second**, Ocado argues that there are broader dictionary definitions that support its construction. *See* Dkt. 128 at 10 n. 7. But not all dictionary definitions are equally applicable to the '080 patent. *See BCS Software, LLC v. Open Text, Inc.*, No. 6:21-CV-00050-ADA, 2021 WL 8202515, at *2 (W.D. Tex. Oct. 20, 2021) ("Technical dictionaries may be helpful, but they may also provide definitions that are too broad…."). Ocado's preferred definition is so broad as to encompass a human being alone, which even Ocado recognizes does not make sense. *Compare* Dkt. 128 at 10 n. 7 (Ocado's definition encompassing a human being's actions), *with* Dkt. 127-32 (Ex. 28) at 2 (Ocado: "Ocado agrees that a human being alone is not a 'mechanism.'").

**Third**, Ocado argues that its construction is supported by the specification's teaching at 4:53–57. But that teaching is about storing and retrieving containers *from the AS/RS*, not removing delivery containers *from storage containers*. Thus, Ocado's specification citation does not support

---

[1] To the extent that "a piece of machinery" is considered too narrow, the alternative definition of "a machine or mechanical appliance" (which is also taken verbatim from a dictionary that Ocado provided) should resolve any arguable issue regarding undue narrowing.

1

the overly broad construction of "mechanism" that it seeks. Every teaching in the specification regarding a "mechanism" for delivery container removal (as found in the claims) is a piece of machinery, in accordance with AutoStore's construction. *See* '080 patent at, *e.g.*, 11:36–38.

### B.      "nestable" / "nested" (Claims 8, 17, 23)

| AutoStore's Proposed Construction | Ocado's Proposed Construction |
| --- | --- |
| Plain and ordinary meaning: "designed to fit snugly" / "fitting snugly as designed" | No construction necessary / plain and ordinary meaning<br><br>In the alternative: "placed within" / "capable of being placed within" |

Ocado takes issue with the word "snugly" in AutoStore's construction because, according to Ocado, "snugly" "introduces unnecessary ambiguity and renders the claims indefinite." *See* Dkt. 128 at 14. That argument, however, is based on the false premise that AutoStore and its expert[2], Dr. Spenko, are "unable to articulate an objective measure by which to determine whether a container fits 'snugly.'" *See id*. To the contrary, Dr. Spenko provided an objective measure. As he explained, on the upper end of a snug fit, the delivery container cannot be so tight that it cannot be removed from the storage container, otherwise the delivery container could not be removed and delivered. *See* Ex. 36 at 133:6–24. On the lower end of a snug fit, the delivery container must fit tightly enough such that it does not tip over and does not move beyond the bounds of where the removal mechanism expects the delivery container to be located within the storage container. Dkt. 127-12 (Ex. 12) ¶ 12. Otherwise, the "fully or semi-automated storage and retrieval systems"

---

[2] Ocado's contention that Dr. Spenko is not a POSITA because he is an academic and does not work at a for-profit company is meritless. *See* Dkt. 128 at 12 n. 10. Neither party's opinion regarding the required experience mandates that such experience be in for-profit industry rather than in academia, and in any event, Dr. Spenko's work in academia includes on-the-ground partnerships with commercial industry. *See* Dkt. 128 at Appendix A, No. 1; Ex. 36 at 84:2-85:19, 96:2-99:24. Moreover, courts routinely accept academic backgrounds in lieu of for-profit experience. *See Forbis v. City of Portland*, No. 02-135-P-H, 2003 WL 21250675, at \*2 (D. Me. May 29, 2003); *see also* Dkt. 127-11 (Ex. 11) ¶¶ 2-10; *see generally* Ex. 37.

taught by the '080 patent would not be able to reliably remove the delivery container from the storage container. *See* Dkt. 127-11 (Ex. 11) ¶¶ 44–50; '080 patent at 1:14–17. This is a narrowly banded, objective definition that aligns with the specification, including the example of a snug fit illustrated by the "nestable configuration" shown in Figure 6. *See* '080 patent at 9:28–30.

Ocado relatedly argues that "[s]nug is a nonsense word" and questions how the jury would determine snugness, even though Ocado's purported expert, Dr. Pfeifer, admitted that both he and a POSITA would be able to conclude whether a fit was snug. *See* Ex. 38 at 89:19–90:17 ("If I gave a person of ordinary skill in the art a delivery container and a storage container, that person would be able to determine whether those containers fit together snugly? Is that right? **A.** If asked, I imagine that person could give an opinion with regards to whether they believe it fits together snugly…."). Ocado's demand for an infinitely precise, "universally accepted" measure of snug is neither required nor practical. *See EON Corp. IP Holdings v. Silver Springs Networks*, 815 F.3d 1314, 1318 (Fed. Cir. 2016) ("[A] court need not attempt the impossible task of resolving all questions of meaning with absolute, univocal finality. Such an endeavor could proceed ad infinitum, as every word—[including] the words a court uses to construe a claim term—is susceptible to further definition, elucidation, and explanation."). Ocado is effectively arguing that a court cannot use adjectives when construing claim terms, but that is not the law. *See Acumed v. Stryker Corp.*, 483 F.3d 800, 806 (Fed. Cir. 2007) ("Stryker also argues that the district court's exclusion of 'sharp corners or sharp angles' renders the construction insufficiently definite, since the court did not specify precisely how 'sharp' is too sharp. However, a sound claim construction need not always purge every shred of ambiguity. The resolution of some line-drawing problems—especially easy ones like this one—is properly left to the trier of fact.").

Ocado also takes issue with the notion that the snug fit must be by "design" because,

3

according to Ocado, that is a subjective test that "would improperly require inquiry into the mental state of the designer." *See* Dkt. 128 at 14. Not true. As Dr. Spenko explained, determining whether a fit is "designed" to be snug is an objective analysis that can be performed just by looking at the containers: A rigid container that fits snugly is "designed" to fit snugly, while a non-rigid container (like a plastic bag, for example) that may happen to fit snugly when full but not fit snugly when empty is clearly not "designed" to fit snugly. *See* Ex. 36 at 303:8–304:25. This objective analysis does not require knowing anyone's state of mind. Functionally, the word "designed" means the same thing as "configured," which Ocado itself uses in its own proposed construction of the term "delivery container."[3] *See* Dkt. 131-1 at 4. Ocado's critique of the "designed" portion of AutoStore's construction is thus unfounded.

In short, AutoStore's proposed construction does not "violate[] several canons of claim construction" as Ocado contends. *See* Dkt. 128 at 12. The wording of AutoStore's construction aligns with the dictionary that Ocado cited as relevant extrinsic evidence[4], which Ocado admits in a footnote is "consistent with the plain and ordinary meaning." *See* Dkt. 128 at 12 n. 9; Dkt. 131-1 at 4 (Ocado's definition of "To fit or stack *snugly* together"). AutoStore's construction is also supported by the intrinsic evidence and Dr. Spenko's thorough analysis thereof. *See* Dkt. 127-11 (Ex. 11) ¶¶ 37–51; Dkt. 127 at 9–11. Ocado raises three critiques of that analysis, but each is flawed.

*First*, neither Dr. Spenko's nor AutoStore's analysis is limited to the fit shown in Figure 6.

---

[3] The Court may equivalently adopt a construction of "configured to fit snugly" / "fitting snugly as configured" for "nestable" / "nested," which would mean the same thing as AutoStore's original proposal.

[4] Ocado does not explain why its dictionary definition is incorrect; it merely provides attorney argument that it is allegedly only appropriate in some unidentified "different circumstances." *See* Dkt. 128 at 12.

4

*See* Dkt. 127 at 10; Dkt. 127-11 (Ex. 11) ¶ 42 (Dr. Spenko quoting the '080 patent where it says that the nestable configuration shown in Figure 6 is an "***example***"). Figure 6 merely demonstrates that the patent's illustration of a "nestable configuration" is snugly fit. *See* '080 patent at Fig. 6.

*Second*, it is irrelevant that there may be other ways to solve the same problems that Dr. Spenko contends are solved by a snug fit, because none of those other solutions would be referred to as a "nestable" delivery container. For example, Ocado's purported expert, Dr. Pfeifer, opines that a container with a "weighted bottom" would solve the problems identified by Dr. Spenko (Dkt. 128-16 (Ocado Ex. 16) ¶ 24), but a weighted bottom container would not be called "nestable"—it would be called "weighted." This whole argument is a distraction because none of those other potential solutions would be called "nestable," so they do not shed light on what "nestable" means.

*Third*, neither Dr. Spenko's analysis nor AutoStore's is premised on the requirement of an automated transfer mechanism. *See* Dkt. 127 at 9–11; Dkt. 127-11 (Ex. 11) ¶ 46 (Dr. Spenko recognizing the "transfer mechanism" of the '080 patent is merely an "example"). The discussion of automated mechanisms merely highlights why a POSITA would recognize that a "nestable" configuration providing a snug fit would have benefits in the context of the '080 patent, which is in the field of "fully or semi-automated storage and retrieval systems." *See* '080 patent at 1:10–17. But using a snug fit to prevent delivery containers from falling over and spilling their contents is beneficial regardless of whether a human or an automated device is tasked with removing the delivery container, and AutoStore's construction does not depend on which option is used.

In support of its own construction, Ocado also cites the following portions of the '080 patent specification, none of which support its position:

- 8:55–59, which says literally nothing about "nestable" containers;

5

- 9:1–2, 10–12, 30–38, and 56–61, which describe benefits of nestable containers that are equally consistent with AutoStore's construction, and therefore does not weigh in favor of Ocado's construction any more than AutoStore's;

- 9:7–10, which, as explained in AutoStore's opening brief, proves that "nestable" means more than merely "capable of being placed within" as Ocado contends, because the delivery containers in that sentence[5] are placed within storage bins even though they are only "*optionally* nestable" (Dkt. 127 at 9); and

- 13:3–4, which uses the term "combined/nested" that, if anything, suggests that the terms do *not* mean the same thing, otherwise the use of both terms would be entirely duplicative. *See Centripetal Networks, Inc. v. Cisco Sys., Inc.*, No. 2:18-CV-94, 2020 WL 863976, at *4 (E.D. Va. Feb. 20, 2020) ("Ordinarily, different words in a patent have different meanings.")

Ocado's construction is therefore both unsupported and inconsistent with the intrinsic evidence.

### C.    "delivery container" (Claims 1–6, 8–11, 13–16, 18–23)

| AutoStore's Proposed Construction | Ocado's Proposed Construction |
|---|---|
| "Container suitable for engagement by the robotic load handlers for dispatch" | "Container for delivery to customers that is configured to contain at least one picked item" |

The first substantive dispute regarding this term is the propriety of Ocado's proposed inclusion of the phrase "configured to contain at least one picked item." Ocado acknowledges that during prosecution, the applicant stated: "one of ordinary skill in that art would have understood that the case units [of the prior art] are pre-packaged items that are not used to store items picked from a pallet, *as is Applicant's claimed delivery containers*." Dkt. 127-23 (Ex. 23) at 11–12. Ocado tries to sidestep this disavowal by using the vaguer wording of "configured to contain at least one picked item," rather than requiring that a delivery container is not a "pre-packaged item" and "store[s] items picked from a pallet" like Ocado stated during prosecution. AutoStore agrees that, as stated in Claim 1, delivery containers must at least be configured to "contain[] at least one picked item from [a] retrieved at least one storage container," but stopping there as Ocado proposes would be incomplete. The Court should adopt the full scope of the applicant's disclaimer.

---

[5] "Order containers" are delivery containers in the context of the '080 patent. *See* Ex. 38 at 58:17-19; *see also id*. at 70:10-71:1.

The second substantive dispute relates to AutoStore's construction requiring that the delivery containers are "suitable for engagement by the robotic load handlers." Here, Ocado summarily declares that "[n]othing in the claim language, specification, or prosecution history requires" that. *See* Dkt. 128 at 15. To the contrary, the intrinsic evidence says exactly that. The claims recite, for example, delivery containers that are "for transport … within the storage and retrieval system by at least one of the robotic load handlers." '080 patent at cl. 1. Thus, the delivery containers must be suitable for engagement by the robotic load handlers, otherwise they could not be transported, stored, or retrieved as required by the claims. *See also* Dkt. 127 at 12.

The specification further confirms this requirement when it states, for example, that delivery containers "may be retrieved, using one or more load handlers" ('080 patent at 7:49–54); again, the delivery containers must be suitable for engagement by the robotic load handlers if those containers are going to be retrieved by the robotic load handlers. *See also* Dkt. 127 at 14. It is therefore odd for Ocado to argue that AutoStore's construction includes "foreign words" when the words of AutoStore's construction are taken directly from the specification, which teaches that delivery containers are "***engaged by*** the same or another moveable overhead ***load handler***." *See* '080 patent at 7:17–24. Ocado attempts to avoid these teachings to exclude a preferred embodiment wherein delivery containers are capable of being engaged by robotic load handlers. This cannot be correct. *See Dow Chem. Co. v. Sumitomo Chem. Co.*, 257 F.3d 1364, 1378 (Fed. Cir. 2001) ("[A] claim construction that excludes a preferred embodiment is rarely, if ever, correct.").

Ocado's description of '080 patent appears to re-confirm that, in its view, all the delivery containers of the '080 patent must be placed within a storage container before being stored in the AS/RS system. *See* Dkt. 128 at 4. Under this incorrect view, the claims' requirement that delivery containers are (for example) "for transport … within the storage and retrieval system by at least

one of the robotic load handlers" would be satisfied exclusively by transporting storage containers with delivery containers within them. *See* '080 patent at cl. 1. This is incorrect not only in light of the plain claim language and specification as discussed above, but also for the reasons described in AutoStore's opening motion at pages 12–13, namely: (i) narrower dependent Claims 2 and 14 confirm that not all of the delivery containers of the claimed system are placed within storage containers; and (ii) when the patent contemplates transporting/storing/retrieving storage containers with delivery containers inside, it uses terms expressly indicating that (*see, e.g.*, '080 patent at cl. 13: "retrieving … storage containers *containing at least one of the delivery containers*").

Ocado's apparent interpretation of the teachings of the '080 patent is also irreconcilable with its position regarding the meaning of "nestable" / "nested." As discussed above, Ocado contends that "nestable" / "nested" means "capable of being placed within" / "placed within." *See* Dkt 131-1 at 3. But the '080 patent teaches that delivery containers *may*—but are *not necessarily*— nestable. *See* '080 patent at 9:28–29 ("delivery containers 80 *may* be provided in nestable configurations"); *see also id.* at 9:9 (teaching an "*optionally* nestable [delivery[6]] container"). Thus, under Ocado's construction of the term "nestable" / "nested," there are delivery containers that cannot even theoretically be placed within storage containers. Ocado's implied construction of "delivery container" would exclude those non-"nested" delivery containers (under Ocado's construction of "nested") from ever being stored in the AS/RS, which is contrary to the purpose of the patent. *See* '080 patent at 5:32–39 ("[T]he invention provides a variety of improvements in efficiency. For example…, the storage and other manipulation of *both* storage containers 10, 70

---

[6] "Order containers" are delivery containers in the context of the '080 patent. *See* Ex. 38 at 58:17-19; *see also id*. at 70:10-71:1.

*and delivery containers* 10, 80 … within storage and retrieval system(s) 400 can reduce and even eliminate the need for separate order container handling and sortation system(s)….").

In short, the claims and specification require that "delivery containers" be suitable for engagement by robotic load handlers in accordance with AutoStore's construction so that the delivery containers can be stored in the AS/RS, and that capability is even more critical in the event the Court adopts Ocado's construction of "nestable" / "nested."

### D.    "delivery container containing at least one picked item" (Claim 15)

| AutoStore's Proposed Construction | Ocado's Proposed Construction |
|---|---|
| Plain and ordinary meaning: "A delivery container containing at least one picked item from a retrieved storage container" | No additional construction necessary / plain and ordinary meaning of "containing at least one picked item" |

Ocado confirms that it contends that there is a difference between a "delivery container containing at least one picked item" as claimed in Claim 15 and a "delivery container containing at least one picked item from the retrieved at least one storage container" as claimed in Claim 1. *See* Dkt. 128 at 16. But Ocado is conspicuously silent as to what that difference is—*i.e.*, Ocado does not explain what a "picked item" in Claim 15 refers to if not an item picked from a retrieved storage container as in Claim 1. *See id*. Neither the specification nor the claims teach any other type of "picked item," and Ocado cites nothing to the contrary.[7]

### E.    "at least one of a lip, a handle, and an aperture" (Claim 11)

| AutoStore's Proposed Construction | Ocado's Proposed Construction |
|---|---|
| Plain and ordinary meaning: "at least one lip, at least one handle, and at least one aperture" | No construction necessary / plain and ordinary meaning |

---

[7] The confusion created by Ocado's position is not limited to Claim 15. As discussed above, Ocado proposes construing "delivery container" as "container for delivery to customers that is configured to contain at least one picked item." *See* Dkt. 131-1 at 4. Ambiguity about what a "picked item" is would therefore infect every claim, because a "delivery container" is an element of every claim. As such, the Court should clarify the scope of this term to avoid confusion and confirm that there are not multiple kinds of "picked items" in the context of the '080 patent.

9

Ocado contends that the "plain and ordinary meaning of 'at least one of' a list of items is any *one* of the listed items," citing *Kaufman v. Microsoft Corp.*, 34 F.4th 1360, 1372 (Fed. Cir. 2022). *See* Dkt. 128 at 17 (emphasis in original). That is incorrect, and that case does not stand for the proposition for which it is cited. *Kaufman* did not address the meaning of "and" specifically when following the introduction of a list following "at least one of"; that case only addressed the meaning of "and" standing alone in "certain contexts" not applicable here. *See* 34 F.4th at 1373.

Ocado cites one embodiment to contend that its construction of "and" as "or" is consistent with the specification. *See* Dkt. 128 at 17. But that embodiment falls far short of the clear and explicit redefinition required to rewrite the plain language of the claim. *See SuperGuide*, 358 F.3d 870, 888 ("[W]e decline to enlarge the claim scope from its plain and ordinary meaning … because the '211 patentee did not clearly and explicitly define the term 'and' in the covered criteria list as 'or.'"); '080 patent at 10:25–30 ("***In some examples***, the delivery containers 80 ***can*** have one or more handles…"). Moreover, that portion of the specification undermines Ocado's (unsupported) attorney argument that having multiple mechanism engagement locations "would lead to redundant features," because that same cited portion of the specification contemplates using exactly such allegedly "redundant features." *See* '080 patent at 10:25–30 ("This mechanism may be used alternatively ***or in addition to*** the aperture-enabled or any other mechanism.").

In fact, the '080 patent teaches an embodiment with three structural features on the containers, consistent with AutoStore's construction. *See* '080 at 10:12–17 ("storage containers 10, 70 with cutouts, holes (apertures) ***and***/*or* other structural features"). AutoStore's plain and ordinary construction captures that particular embodiment. *See Apple Inc. v. Andrea Elecs. Corp.*, 949 F.3d 697, 708 (Fed. Cir. 2020) ("[E]very claim does not need to cover every embodiment." (quoting another source)).

10

F.    **"a structural framework defining a grid of storage locations"** (Claims 1, 23)

| AutoStore's Proposed Construction | Ocado's Proposed Construction |
|---|---|
| Plain and ordinary meaning: "A structural framework defining a grid of storage locations" | "A structural framework in which crossed structural elements define a two-dimensional array of storage locations" |

Ocado mischaracterizes the "crux of the parties' dispute." *See* Dkt. 128 at 17. The issue is not, as Ocado contends, "whether containers laid out on the floor of a warehouse in a grid pattern … would satisfy this claim limitation" (*see id*. at 17–18); nobody's construction says anything about "containers laid out on the floor." The issue is whether this term should carry its plain and ordinary meaning, as AutoStore proposes, or whether the Court should add more, confusing words that find no support in the '080 patent, as Ocado proposes.

Ocado's construction narrows this term to require a "two-dimensional array," but Ocado does not point to anything supporting the additional limitation of a "two-dimensional array." *See* Dkt. 128 at 17–18 (Ocado citing no evidence). Moreover, "two-dimensional array" is not a common English phrase and adopting it would cause juror confusion. *See Digital Reg of Texas, LLC v. Adobe Sys., Inc.*, No. C 12-1971 CW, 2014 WL 4090550, at *13 (N.D. Cal. Aug. 19, 2014) ("[O]ne object of claim construction is to simplify the definitions of these terms for the jury.").

Ocado's support for "crossed" in its construction is even more convoluted. Ocado begins with Webster's College Dictionary, even though for every other '080 patent term, Ocado relied only on the American Heritage and Oxford English dictionaries. *See* Dkt. 131-1 at 2–9. Ocado then plucked one definition of "grid" out of that dictionary without explaining why that definition is appropriate or why the Court should ignore the other definitions (including those that weigh against Ocado's proposal). *See* Dkt. 128-31 (Ocado Ex. 30) at 577 (additionally defining "grid" as "a basic system of reference lines mapping a region, consisting of straight lines intersecting at right angles"). Then, after selecting the definition of "a grating of crossed bars," Ocado ignores the

11

"grating" and "bars" portion of the definition and only imports the notion of "crossed" into its construction, which is a term that only adds further confusion. *See* Dkt. 127 at 16.

Oddly, Ocado argues that its construction is consistent with the PTAB's decision, even though the PTAB *rejected* Ocado's construction that Ocado now re-proposes in this case. *See* Dkt. 128-25 (Ocado Ex. 24) at 11. The PTAB construed the term "to require that a structural framework define the grid of storage locations, as opposed to these locations being defined merely by the orientation or location of stacked containers" (*id.*);[8] the PTAB did *not* include "crossed" structural elements or a "two-dimensional array" that Ocado re-attempts to inject here. *See id.*

In sum, Ocado does not even contend that its construction is the plain and ordinary meaning of this term. *See* Dkt. 128 at 17. It does not point to any express definitions or disavowal of claim scope in support of its construction, and instead it pulls words from thin air and random dictionaries. The Court should reject these groundless narrowing limitations.

### G.   "exclusively within the storage and retrieval system" (Claims 1, 13)

| AutoStore's Proposed Construction | Ocado's Proposed Construction |
| --- | --- |
| Indefinite | No construction necessary / plain and ordinary meaning<br><br>In the alternative: "not for delivery" |

To try to save this claim from impossibility, Ocado argues that this claim term "does *not* mean that storage containers can never leave the cube/grid storage system." *See* Dkt. 128 at 19 (emphasis in original). But that is, in fact, exactly what the claims say: storage containers "*for transport … exclusively within the storage and retrieval system*." *See* '080 patent at cl. 1.

---

[8] The additional requirement noted by the PTAB resolved the specific validity issue in dispute in view of the prior art in that IPR proceeding, which is not presently before this Court and thus not needed here.

Unable to deal with the plain claim language, Ocado argues that this term must be understood "appropriately in the context of the '080 patent" because, according to Ocado, "the specification makes clear" that Ocado's understanding is correct. *See* Dkt. 128 at 19. Ocado's argument about "context" in the specification is a veiled request for this Court to rewrite the plain claim language in order to save the claim from impossibility (notwithstanding Ocado's superficial advocacy for "no construction necessary / plain and ordinary meaning"). The Court should decline that invitation because doing so would be improper. *See Chef Am., Inc. v. Lamb-Weston, Inc.*, 358 F.3d 1371, 1374 (Fed. Cir. 2004) ("[C]ourts may not redraft claims, whether to make them operable or to sustain their validity.").

## II.   U.S. PATENT NO. 10,913,602

### A.   "A load handling device … will occupy a grid space" (Claim 1) / "load handling device … occupying a grid space" (Claim 12)

| AutoStore's Construction | Ocado's Construction |
| --- | --- |
| The load handling device will occupy only a single grid space in the storage system | No construction necessary / plain and ordinary meaning |

AutoStore's construction is the plain and ordinary meaning of "occupy *a* grid space." Even if it were not, there is still sufficiently clear disclaimer to limit that phrase in accordance with AutoStore's construction. Ocado attempts to distract the Court with a host of meritless arguments, including with respect to the import of the patent's teaching of occupying "substantially" a single grid space, but as discussed in turn below, these arguments fail to hold up to scrutiny.

### 1.   *AutoStore's Construction Is the Plain and Ordinary Meaning*

The plain and ordinary meaning of "a" in "occupy *a* grid space" is "one." *See* Dkt. 127 at 21; *Niz-Chavez v. Garland*, 141 S.Ct. 1474, 1481 (2021) (Plain meaning of "a" thing is one "single" thing.); *AbbVie Inc. v. Mathilda & Terrence Kennedy Inst. of Rheumatology Tr.*, 764 F.3d 1366, 1372 (Fed. Cir. 2014) ("A" patent means "one" patent.).

Ocado attempts to invoke what it contends is the "'conventional rule' that the indefinite article 'a' means 'at least one'" when used in a patent. *See* Dkt. 128 at 20. As Ocado itself recently explained the principle in more detail:

> Although the indefinite article "a" when used following the open-ended transitional word "comprising" ***typically*** means "one or more than one," it will not be so interpreted where "a patentee ... 'evince[s] a clear intent' to limit 'a' or 'an' to 'one.'" *Baldwin Graphic Sys., Inc. v. Siebert, Inc.*, 512 F.3d 1338, 1342 (Fed. Cir. 2008) (quoting *KCJ Corp. v. Kinetic Concepts, Inc.*, 223 F.3d 1351, 1356 (Fed. Cir. 2000)). The Federal Circuit has clarified that "Baldwin ... ***does not set a hard and fast rule*** that 'a' always means one or more than one. Instead, [courts] ***read the limitation in light of the claim and specification to discern its meaning***." *Harari v. Lee*, 656 F.3d 1331, 1341 (Fed. Cir. 2011) (citing *Insituform Techs., Inc. v. Cat Contracting, Inc.*, 99 F.3d 1098, 1105-06 (Fed. Cir. 1996)). "When the claim language and specification indicate that 'a' means one and only one, it is appropriate to construe it as such even in the context of an open-ended 'comprising' claim."

Ex. 39 at 238–39. This principle does not apply in this context, however. As background, "[i]n the patent claim context the term 'comprising' is well understood to mean 'including but not limited to.'" *CIAS, Inc. v. Alliance Gaming Corp.*, 504 F.3d 1356, 1360 (Fed. Cir. 2007). So, for example, a claim directed to a car "comprising ***a*** wheel" can have four wheels and still be within the scope of the claims. This is the source of the principle that "a" in a patent can mean "one or more than one"; a system "comprising ***an*** element" can have any number of those elements, and the claim construction principle applies to the ***number of elements*** the system is comprised of. *See KCJ*, 223 F.3d at 1356 ("Unless the claim is specific ***as to the number of elements***, the article 'a' receives a singular interpretation only in rare circumstances when the patentee evinces a clear intent to so limit the article."). But that is not what is at issue. Here, the disputed claim term is a ***characteristic*** of a recited element (namely, how many grid spaces the load handling device can occupy), not the ***number*** of elements the system comprises (*i.e.*, not the number of load handling devices). The claimed load handling device is not "***comprised*** of a grid space," so it makes no sense to apply this claim construction principle which is rooted in a the system "comprising" a number of elements.

14

One key clue that this claim construction principle does not apply here is the fact that Ocado (quietly) disclaims it. In a footnote, Ocado argues that "occupy a grid space" does not require the load handling device to occupy even one grid space. *See* Dkt. 128 at 21 ("[AutoStore] contends that the phrase 'occupy a grid space' *must* carry some size constraint. Not so." (emphasis in original)). Ocado's purported expert, Dr. Pfeifer, likewise contended that "occupy a grid space" does not require even one grid space to be occupied. Ex. 38 at 124:15–25, 125:5–15. In other words, Ocado does not truly contend that the indefinite article "a" should be understood as "at least one" because neither Ocado nor its expert demand that even one grid space actually be occupied; instead, Ocado reads "a" out of the term and interprets "occupy a grid space" to mean just "occupy grid space." Thus, Ocado's attempt to invoke the claim construction principle regarding the indefinite article "a" is not consistent with Ocado's actual position on the term.

Ocado also attempts to rely on Dr. Derby's (AutoStore's expert) deposition testimony to argue that AutoStore's construction is not the plain meaning. But Dr. Derby's testimony does not support Ocado. Dr. Derby admitted that "the plain and ordinary meaning of the phrase 'occupy a grid spaces' does not mean that a ***robot*** only occupies one grid space." *See* Dkt 128-21 at 105:11–22. Anything can occupy a grid space, not only a robot, so Dr. Derby's response is literally correct and not inconsistent with AutoStore's position. Indeed, the wording of that question is why Dr. Derby immediately clarified that the meaning of that phrase is "[s]pecialized related to the hardware in this patent," because the full element he opined about was "***a load handling device*** [*i.e.*, hardware] will occupy a grid space," not just the phrase "occupy a grid space" in isolation as in the prompt of the first question. *See id*. Dr. Derby was clear during his deposition that his construction was based on the plain wording. Ex. 40 at 146:13–24 ("[Y]ou are not relying on any definition of the phrase 'will occupy a grid space' from the specification and prosecution history,

15

correct? A. I don't need to rely on it when it's spelled out for me in the claim." (objection omitted)).

AutoStore's construction of this term is the plain and ordinary meaning of "occupy *a* grid space." Ocado's implied construction of the term is not.

### 2.    *At a Minimum, the Patentee Disavowed Claim Scope*[9]

Even if Ocado were correct about the plain and ordinary meaning of "occupy a grid space" (and it is not), the patentee disavowed claim scope to narrow the claims to only a single grid space.

As noted in AutoStore's opening brief, the '602 patent repeatedly states that "the load handling device of *the invention* occupies the space above *only one stack* of containers." '602 patent at 5:38–47; *see also id*. at 7:61–8:3 (same). Such descriptions of "the invention" / "the present invention" constitute limiting disclaimer. *See Wastow Enterprises, LLC v. Truckmovers.com, Inc.*, 855 F. App'x. 748, 750 (Fed. Cir. 2021).

It is true that the '602 patent also describes "the present invention" as occupying "substantially" only a single grid space. *See* '602 patent at, *e.g.*, 4:63–5:21, 7:3–35. These statements still constitute disclaimer, however. Ocado argues that the Court should reject the disclaimer entirely because of this "substantially" teaching, but provides no legal basis as to why the Court should ignore these statements about "the present invention." There has been disclaimer no matter what "substantially" means, the question is simply how to appropriately account for that disclaimer in the construction of the claim.

Fortunately, that analysis is simple because these two disclaimers regarding the scope of "the present invention"—*i.e.*, (1) "occupy only a single grid space" and (2) "occupy substantially

---

[9] The Court should not rely on Dr. Pfeifer's (Ocado's purported expert) opinion at all because he admitted that he did not consider whether there had been disavowal of claim scope. *See* Ex. 38 at 140:15-21 ("You did not render an opinion on whether there has been disavowal or disclaimer of the claim scope with respect to the term 'a load-handling device o[f] the multiplicity of load-handling devices will occupy a grid space.' Is that correct? A. That's correct.").

only a single grid space"—mean the same thing. We know this because Ocado repeatedly said exactly that. For example, during prosecution proceedings for EP3030504, a European counterpart to the '602 patent that shares the same specification, Ocado stated:

> *[T]here is no difference in meaning between "occupies substantially only a single grid space" and "occupies only a single grid space".* … This is also supported by the description of the patent as filed which *uses these terms interchangeably*.

Ex. 41 at AS-NH_00222591.  Ocado said the same thing during the prosecution of, for example, European patent no. EP3293129 (*see* Ex. 42 at AS-NH_00218968: "[T]he terms have the same meaning") and European patent no. EP3299316 (Ex. 43 at AS-NH_00218989 (same)).[10]

In addition to these express admissions that the phrases mean the same thing, Ocado also admitted that these two phrases mean the same thing as part of its priority allegations in this case. As background, Ocado asserts that the priority date for the '602 patent is August 9, 2013, based on the filing date of foreign patent application GB 1314313.6 (Ex. 44), as shown on the face of the '602 patent. *See* Ex. 46 at 10. That GB patent application states that in "the present invention," the "load handling device[] occupies only a single grid space" and *never* uses the word "substantially." Ex. 44 at 5:35–39. That is because the '602 patent's teaching regarding "substantially" was not added until later in its family filings, after the GB patent application was filed. Therefore, in order for the '602 patent to be entitled to priority back to that GB patent application as Ocado asserts, the later-added disclosure of "substantially" (which never appeared in that GB patent application) cannot be meaningful; otherwise, the '602 patent would not be entitled to that 2013 priority date

---

[10] Ocado seeks to dissuade the Court from relying on these statements from foreign patent prosecution proceedings, but these are not statements that relate to or depend on "'theories and laws of patentability' differing from U.S. patent law." *See* Dkt. 128 at 25. These are technical statements by the same patentee about the meaning of the same English words found in patents sharing the same specification as the '602 patent, so they are entirely appropriate for the Court's consideration. *See Regents of Univ. of Minn. v. AGA Med. Corp.*, 717 F.3d 929, 937 n.5 (Fed. Cir. 2013); *Gillette Co. v. Energizer Holdings, Inc.*, 405 F.3d 1367, 1374 (Fed. Cir. 2005).

and would instead only be entitled to priority as of the later date when the "substantially" teaching was added. *See BioDelivery Sci. Int'l, Inc. v. Alvogen PB Rsch. & Dev. LLC*, 576 F. Supp. 3d 184, 210 n. 9 (D. Del. 2021); *e.g.*, Ex. 42 at AS-NH_00218968 (Ocado: "Since the terms have the same meaning, there cannot be any added-matter."). "Occupies only a single grid space" must therefore have the same meaning as "occupies substantially only a single grid space" (as Ocado repeatedly represented to the European patent office) because, if they differed, then Ocado would have no basis to claim priority back to the 2013 GB patent application.

The implication of all this is that the Court need not choose between "occupy only a single grid space" and "occupy substantially only a single grid space" when analyzing the scope of disavowal. The '602 patent uses both formulations because "there is no difference in meaning between" the two, and the Court should choose the simpler version proposed by AutoStore as its construction for sake of clarity for the jury.[11]

### 3.   *"Substantially" Does Not Teach More Than One Grid Space*

As discussed above, the '602 patent's teaching of occupying "substantially" only a single grid space does not mean anything other than occupying only a single grid space. But to the extent the Court believes "substantially" has some further meaning in this context, if anything, the Court should hold that the term does not teach occupying ***more*** than one grid space and instead teaches (at most) only an immaterial amount ***less*** than one grid space.

This understanding is supported by the plain meaning of "substantially," which encompasses ***less***, not ***more***. *See LNP Eng'g Plastics, Inc. v. Miller Waste Mills, Inc.*, 275 F.3d 1347, 1354 (Fed. Cir. 2001) ("The meaning of the word 'substantially' is 'largely ***but not wholly***

---

[11] Including the word "substantially" in the construction of this term would invite juror confusion, as even in Dr. Pfeifer's (unfounded) understanding of that word, the limits of this term are "not defined." *See* Ex. 38 at 130:17-23. AutoStore's simpler construction is therefore better.

that which is specified.'"); *Stenberg v. Carhart*, 530 U.S. 914, 997 (2000) ("'[S]ubstantial' can mean '*almost all'* of the thing denominated." (citations omitted) (dissent)).

The '602 patent specification likewise suggests that, if "substantially" means anything, it means *less*, not *more*, than one grid space. In particular, the '602 patent teaches that "[e]ach load handling device occupies ***substantially*** a single grid space, ***corresponding to the area occupied by only one stack of containers***." '602 patent at 7:3–7; *see also id*. at 5:38–39. In other words, if the load handler does not occupy a full grid space (outlined in blue in this annotated version of

Figure 2), then it occupies "substantially" a single grid space which "correspond[s]" to a small amount less than one grid space, in particular the space of one stack of containers (outlined in red) that sit inside the grid space. This small tolerance in the downward direction would still achieve the stated purpose of the invention, which is to "minimi[z]e"



the footprint of the load handler and reduce obstructions ('602 patent at 4:57–60), while also being large enough for the robot to receive a container into its "container-receiving space" as required by the claims ('602 patent at cl. 1). So, if anything is meant by "substantially" in the '602 patent, it "correspond[s]" to a minor ***downward*** variation in the size of the load handling device where such minor variation has no impact on the operation of the system nor the purported benefits.

There is certainly no disclosure in the specification that "substantially" corresponds to occupying *more* than a single grid space. That argument by Ocado is based exclusively on the

19

extrinsic testimony of Dr. Pfeifer, who is not an expert and not credible,[12] and an incomplete, cropped purported admission[13] by Dr. Derby who expressly ***disagreed*** with Ocado's interpretation of "substantially" (Dkt. 127-13, *e.g.*, ¶ 42). The Court should therefore reject Ocado's position because it is not based on any intrinsic evidence nor on any credible extrinsic evidence, and it does not align with the plain meaning of the word "substantially."

In sum, in the event the Court finds that "substantially" teaches anything other than a single grid space, it should hold that "substantially" does not teach occupying ***more*** than a single grid space, only (if anything) an immaterial amount ***less*** than a single grid space.

### 4.    *Ocado's Remaining Arguments Are Meritless*

Ocado throws additional arguments at the wall hoping that one will stick, but none do. Ocado first points out that the word "single" appears in other patent family members and other portions of the '602 patent to argue that, if Ocado had intended to limit this element to a "single" grid space, it would have expressly used that word. *See* Dkt. 128 at 21, 24. But that contrast-based argument is inconclusive at best because the patentee repeatedly used the phrases "at least one" and "one or more" in the '602 patent claims but did ***not*** do so for this term, demonstrating a countervailing intent to limit "a" to just one. *See, e.g.*, '602 patent at cls. 7, 10, 15, 17, 18. Additionally, Dr. Pfeifer admitted that he did not consider the '051 patent's (which is a

---

[12] Dr. Pfeifer is not an expert in the relevant field. His CV provides a "complete" list of technical "Areas of Expertise," but he admitted that none of those areas relate to the '602 patent. *See* Ex. 38 at 37:3-38:5; Ex. 45. Dr. Pfeifer serves as a repeat expert witness for car crashes, and has had his prior opinion excluded because he provided contradictory sworn testimony. *See* Dkt. 127-7 at 2, 14-15. The Court should not give any weight to Dr. Pfeifer's paid testimony.

[13] Ocado cites Dr. Derby's deposition transcript at 116:15-117:4 (*see* Dkt. 128 at 21) but omits the very next question and answer that clarifies Ocado's cited testimony and refutes Ocado's mischaracterization. *See* Ex. 40 at 117:6-12 ("So you understand the word 'substantially' as used here to describe a robot that is larger than a single grid space, correct? A. Yes, larger by one grid space because of the wheels on the outside. ***But it's still a single grid space***." (objections omitted)).

continuation of the '602 patent) phrasing of the corresponding term (Ex. 38 at 161:15-21), nor did he consider the many European patent family members of the '602 patent in his analysis (Ex. 38 at 142:2–18, 144:13–21, 147:6–9). *See generally* Ex. 47 at Appx. I (Dr. Pfeifer not considering any other family members of the '602 patent). It is disingenuous for Ocado to suggest that the Court should contrast language in certain family members when Ocado believes it helps its position but ignore those other family members when they detract from Ocado's position.

Ocado next contends that AutoStore's construction would render superfluous the "non-obstruction limitation" requiring that load handlers in adjacent grid spaces not be obstructed. *See* Dkt. 128 at 25.[14] Not so. Even a robot that is only as large as a single grid space (in accordance with AutoStore's construction) would still obstruct adjacent robots when the single-space robot is moving from one grid space to the next. The non-obstruction limitation thus comes into play "when the load handling device is located above the stack and occupying a grid space" (*i.e.*, not transitioning spaces) as expressly recited in Claim 12. If anything, it is Ocado's construction that renders the term superfluous. According to Ocado, the term is only used to "provide[] a necessary reference" point to establish that the robot is to be placed on the grid (*see* Dkt. 128 at 21 n. 15), but the other claim limitations already establish that. *See* '602 patent at, *e.g.*, cl. 12 ("[T]he load handling device comprising: a wheel assembly having a first set of wheels for engaging with a first set of rails" of the grid.). Indeed, Ocado's expert could not articulate *any* impact on the scope of the claim if "occupy a grid space" were cut out, indicating that the term is not an actual limitation

---

[14] Ocado's reliance on Dr. Derby's testimony regarding alleged redundancy is misplaced because Dr. Derby did not admit that *all* robots satisfying AutoStore's construction of "occupy a grid space" would necessarily satisfy the non-obstruction limitation; rather, the line of questioning cited by Ocado begins "[i]n the context of the '602 patent" where the only disclosed robots are single-space robots that would satisfy the non-obstruction limitation. *See* Ex. 40 at 106:6-17. Ocado did not ask Dr. Derby about the counterexample discussed in this paragraph (which supports AutoStore's position).

of scope (*i.e.*, has no meaning) under Ocado's construction. *See* Ex. 38 at 122:19–25.

Ocado also contends that the claims need not be limited in accordance with AutoStore's construction because the system can achieve benefits even if the robot is larger than one single grid space. It is true, as Dr. Derby admitted, that *some* of the purported benefits of the system could be achieved by a robot even if that robot is not as small as one single grid space. But that does not mean that *all* benefits would be achieved by a robot larger than one grid space (and Ocado's citations to Dr. Derby's testimony do not suggest otherwise). Specifically, the '602 patent teaches that "it may be desirable to reduce the size of the load handling devices in order to *minimi[z]e* instances in which the optimum movement path for one device is hindered by the presence of other devices." '602 patent at 4:57–60. Yes, as Dr. Derby admitted, a robot that is 20 percent larger than a single grid space could *reduce* obstructions of other robots, but it would not "*minimi[z]e*" the number of obstructions; as long as there is any protrusion into adjacent grid spaces, the travel of other robots will be hindered more frequently than if there were no protrusion into adjacent grid spaces. The purported benefits of the system therefore point towards a single-space robot.

Ultimately, whether considered the plain and ordinary meaning or the result of disavowal, AutoStore's construction aligns with the PTAB's understanding of what the '602 patent teaches (Dkt. 127-33 (Ex. 29) at 3) and with how Ocado described the teachings of the patent during *inter partes* review when the patent's validity was being challenged. *See* Ex. 48 at 4 (Ocado: "The '602 Patent describes a compact load-handling device (*e.g.*, a robot) configured to have a reduced footprint on the storage grid on which the device travels as compared to prior art systems—*i.e.* [not *e.g.*], the robot *occupies a single grid space* in the storage system.").

   **B.    "Load handling devices … will not obstruct a load handling device … occupying or traversing an adjacent grid space in the X-direction and will not obstruct a load handling device … occupying or traversing an adjacent grid space in the Y-direction" (Claim 1) / "the load handling device will not obstruct**

**a load handling device occupying or traversing an adjacent grid space in the X-direction and will not obstruct a load handling device occupying or traversing an adjacent grid space in the Y-direction" (Claim 12)**

| AutoStore's Construction | Ocado's Construction |
|---|---|
| Plain and ordinary meaning: the load handling device will not obstruct a load handling device occupying or traversing any of the four adjacent grid spaces | No construction necessary / plain and ordinary meaning |

In the context of this term which recites "*an* adjacent grid space," Ocado (but *not* its expert[15]) contends that the "indefinite article 'a' or 'an' means 'at least one,'" citing *Crystal Semiconductor Corp. v. TriTech Microelecs. Int'l, Inc.*, 246 F.3d 1336, 1347 (Fed. Cir. 2001). *See* Dkt. 128 at 26. But what that case first says about the indefinite article is: "This court has consistently emphasized that the indefinite articles 'a' or 'an,' when used in a patent claim, mean '*one or more*'...." Under this alternative formulation of the principle regarding the meaning of the indefinite article, it is clear that AutoStore's construction of "an adjacent grid space" is correct, for the following reason.

This claim term is phrased in the negative: "a load handling device ... will not obstruct ... an adjacent grid space." Inserting "one or more" in place of "an" as found in the claim term (like Ocado does with its "at least one" formulation) yields: "a load handling device ... will not obstruct ... <u>one or more</u> adjacent grid space[s]." As a matter of basic logic, a device that "will not do A or B" is not permitted to do A and is also not permitted to do B. *See U.S. v. One 1973 Rolls Royce*, 43 F.3d 794, 815 n. 19 (3d Cir. 1994) ("the denial of the alternation [not (A or B)] is equivalent to the conjunction of the denials [not A and not B]." (brackets in original)). Therefore, a load handling device that does not obstruct "one or more" adjacent grid spaces must not obstruct one adjacent grid space *and also* must not obstruct more than one adjacent grid space in the X-direction (and

---

[15] *See* Ex. 38 at 149:14-22.

23

same in the Y-direction). This non-obstruction requirement therefore covers all four sides of the load handling device as illustrated in AutoStore's opening brief, not only two sides.

Of course, the meaning of this limitation should not depend on whether "an" is understood to mean "at least one" versus its equivalent "one or more"; that outcome would be paradoxical. That is a key clue that Ocado's proposal to construe the indefinite article in this manner is inappropriate in this context. *See* Section III.A.1 (explaining why the claim construction principle regarding indefinite articles "a"/"an" does not make sense to apply in the context of a limitation about characteristics of elements, as opposed to the number of elements the system is comprised of). The more logical reading simply looks at the plain wording of the claims: If it is "an adjacent grid space," it must not be obstructed. Any of the four grid spaces next to the occupied grid space is "an adjacent grid space," so none of them can be obstructed under the plain wording of the claims. Ocado cannot choose an arbitrary subset of adjacent grid spaces to not obstruct, which does not align with the plain wording of the claims nor with the teachings of the specification more generally. The Court should therefore choose AutoStore's construction.

## C.    "wheel hub motor" (Claims 6, 10, 17)

| AutoStore's Construction | Ocado's Construction |
|---|---|
| Plain and ordinary meaning: an electric motor situated at or at least partly within the wheels of the vehicle | No construction necessary / plain and ordinary meaning<br><br>In the alternative: "a motor that is integrated within a hub of a wheel" |

Ocado admits that the portions of the specification it relies on for its construction represent "very ***specific*** designs for a wheel hub motor [that] are indeed ***embodiments***." Dkt. 128 at 28. Yet Ocado nonetheless contends that the "specific designs" of these admitted embodiments define the "fundamental characteristic of a wheel hub motor." *Id*. None of the cited portions of the specification suggest though that these descriptions of "specific designs" were laying out a wheel

24

hub motor's "fundamental characteristics"; to the contrary, those portions of the specification suggest they were *not* describing any "fundamental characteristics" of a wheel hub motor. *See, e.g.*, '602 patent at 6:1–2 ("Alternatively, the wheel *may* include integrated motors, *for example* motors integrated within the wheel hubs."). It is improper to limit the claims based on the specification's descriptions of "specific designs" of motors in particular embodiments. *See MySpace, Inc. v. GraphOn Corp.*, 672 F.3d 1250, 1255 (Fed. Cir. 2012).

The specification does not support Ocado's construction, and neither do the claims, because wheels that "comprise" a wheel hub motor (as the claims require) can do so even if the wheel hub motor is situated at or only partly within the wheel (in accordance with AutoStore's construction). By way of example, a car can "comprise" a side view mirror even though that side view mirror is still on the outside of the car. "Comprise" does not mean "include entirely inside of," as Ocado contends, and Ocado cites no authority holding as much.[16]

Ultimately, Ocado cannot run away from its purported expert's prior testimony defining "wheel hub motors" just because it was provided in the background discussion for different patent, especially when he admitted that that patent is "certainly in the same area" of technology as the '602 patent. *See* Ex. 38 at 152:21–153:19. Ocado's argument that the law precludes consideration of such evidence is incorrect. *See Phillips v. AWH Corp.*, 415 F.3d 1303, 1317 (Fed. Cir. 2005) (en banc) ("We have also authorized district courts to rely on extrinsic evidence, … including

---

[16] AutoStore's expert's testimony regarding "adjacent" motors cited by Ocado is irrelevant because adjacency is a broader concept than being "situated at" the wheel (as found in AutoStore's construction). It is thus no surprise then that there can be motors adjacent to the wheels that are not "wheel hub motors." As a result, Dr. Derby's testimony about the distinction between the claimed "wheel hub motors" and "adjacent" motors says nothing about the propriety of AutoStore's "situated at or at least partly within" construction.

*expert* and inventor *testimony*….” (internal quotation marks omitted)). The Court should hold

Ocado to its prior position on the issue.

### III.   U.S. PATENT NO. 10,961,051

#### A.   “A housing footprint” (Claims 1, 13)

| AutoStore's Construction | Ocado's Construction |
|---|---|
| Plain and ordinary meaning: The footprint of the load handling device's housing and not extensions from the housing | No construction necessary / plain and ordinary meaning |

The central dispute with this term is whether the claimed “housing” is limited to the robot

housing, as AutoStore contends, or includes the *entire* robot and not just its housing, as Ocado

contends. AutoStore's construction merely seeks to confirm that not every single part of the

claimed robot is part of the claimed “housing,” and therefore not every single part of the claimed

robot contributes to the claimed “housing footprint.”[17] This understanding is dictated by the plain

wording of the claims, which references a “*housing* footprint” rather than a *robot* footprint.

Ocado feigns ignorance about the meaning of “extension from the housing” in AutoStore's

construction because, according to Ocado, that is “a distinction foreign to the '051 Patent's claims”

(Dkt. 128 at 30), but Ocado's refusal to accept that expressly claimed distinction is precisely what

precipitated this dispute. The claims on their face make a distinction by reciting a “housing”

separately from things that extend from the housing (such as the “cantilever arm”), yet Ocado

ignores that distinction. *See* '051 patent at cl. 1.

#### B.   “The second housing has a housing footprint that occupies less than twice the area of the grid space” (Claim 1) / “the second load handling device has a

---

[17] Whether the parts of the claimed robot other than its housing (such as the cantilever arm) contribute to the claimed “housing footprint” is not a question of infringement, and AutoStore is not asking the Court to consider its accused systems in this determination. Rather, it is a question of claim scope based on the plain wording of the claims.

**housing footprint that occupies less than twice the area of the grid space"**
**(Claim 13)**

| AutoStore's Construction | Ocado's Construction |
|---|---|
| The second housing will occupy only a single grid space in the storage system | No construction necessary / plain and ordinary meaning |

Ocado's interpretation of this term would deprive the claimed invention of its purported benefits. Ocado's purported expert, Dr. Pfeifer, maintains that the benefits of the patent are only achieved if the robot is smaller than 1.5 grid spaces. *See* Ex. 38 at, *e.g.*, 132:5–134:13 ("[T]he advantages of this design is that you would expect it to be at least less than one and a half spaces to be able to – to be able to be beneficial over the prior art."). Yet Ocado invites this Court to permit this term to encompass robots even larger than 1.5 grid spaces, all the way up to just shy of 2 grid spaces. That is improper, and disavowal in accordance with AutoStore's construction is the only reasonable conclusion, lest the claims cover systems that do not capture *any* of the purported benefits of the system over the prior art. *See Wastow*, 855 F. App'x at 751; Dkt. 127-3 ('051 patent) at 5:38–47 ("Advantageously, the load handling device of *the invention occupies the space above only one stack of containers in the frame*, in contrast to the cantilever design shown in FIGS. 3A to 3C which occupies the space above two stacks.").

It is particularly inappropriate to interpret this claim as Ocado suggests because the specification does not teach anything like the system that Ocado contends would be covered by this term under its construction. The patent's *only* teaching that Ocado contends occupies more than one grid space is the patent's teaching of a system that occupies "substantially" a single grid space. *See* Dkt. 128-15 ¶ 13; Dkt. 128 at 21. According to Dr. Pfeifer, this means the robot is "at least somewhat close to a grid space." *See* Ex. 38 at 130:17–21. Thus, there is not even arguably any teaching of a robot that occupies, for example, 1.99 grid spaces, even though that robot would be "less than twice the area of the grid space." The claims therefore cannot be understood to

encompass a load handling device that is 1.99 grid spaces, because there is no teaching in the patent of such a large robot.[18]

The disavowal of claim scope is manifest in the patentee's repeated definition of "the present invention" as occupying only a single grid space. *See* Dkt. 127-3 ('051 patent) at 4:63–5:21, 5:38–47, 7:3–35, 7:61–8:3; *Wastow*, 855 F. App'x. at 750. Ocado's construction leads to nonsensical results that deprive the claimed system of any benefits and would fail the written description requirement. The Court should construe this term as limited to only a single grid space.

### C. "The first set of rails is part of a first set of tracks, and the second set of rails is part of a second set of tracks" (Claims 9 and 18)

| AutoStore's Construction | Ocado's Construction |
| --- | --- |
| Indefinite | No construction necessary / plain and ordinary meaning |

Ocado's purported expert, Dr. Pfeifer, could not identify any sets of rails taught in the '051 patent that were not already part of sets of tracks. *See* Dkt. 127-9 at 182:2–9. He further admits that the "patent specification uses the terms 'rail' and 'track' alternatively"—*i.e.*, interchangeably. *See* Dkt. 128-15 ¶ 51. It should therefore come as no surprise then that the claimed sets of rails that "guide movement" in Claims 1 and 13 are already necessarily part of a set of tracks.

Faced with this conundrum, Dr. Pfeifer tries to back into meaning for this term by opining about what Claims 9 ***should*** have said for there to be some difference between Claims 1 and 9: "***for tracks to mean something different from rails***, each track must be comprised of dual rails." Dkt. 128-15 ¶ 50. But the claim does not say that; it is silent regarding any "dual rail" requirement.

---

[18] If the Court does hold that this term is as broad as Ocado contends, then the Court should order Ocado to show cause why the claim is not invalid for failure to provide written description support, given the admitted lack of disclosure of any robot occupying more than 1 grid space. *See* Ex. 38 at 138:25-139:14 (Dr. Pfeifer admitting that he cannot identify anything that would permit a POSITA to determine that the inventors possessed a load handling device that occupied even 1.3 grid spaces); *see also id*. at 136:8-137:8 ("[The patent] doesn't teach any specific ratio. … I don't recall anything specific that would give a specific ratio.").

It is improper to rewrite the claim to include a "dual rail" requirement to try to save the claims from invalidity. *See Lucent Techs. Inc. v. Gateway*, 525 F.3d 1200, 1215 (Fed. Cir. 2008) ("This court has repeatedly held that courts may not redraft claims to cure a drafting error made by the patentee, whether to make them operable or to sustain their validity."); *PowerOASIS, Inc. v. T-Mobile USA, Inc.*, No. 05-CV-42-PB, 2006 WL 753206, at *9 (D.N.H. Mar. 22, 2006) (similar).

## IV.     U.S. PATENT NO. 10,901,404

### A.     "Clearance instruction" ('404 Patent Claim 1) / "Clearance command" ('770 Patent Claims 1, 29)

|  | AutoStore's Proposed Construction | Ocado's Proposed Construction |
|---|---|---|
| **Clearance Instruction ('404 patent, Claim 20)** | Permission instruction issued when the clearance unit checks that the robot will not collide with another robot. | No construction necessary / ordinary meaning<br><br>In the alternative:<br><br>"an instruction for a robot to traverse a portion of a reserved path, issued when the clearance module checks that the robot will not collide with another robot." |
| **Clearance Command ('770 patent, Claims 1, 29)** | Permission issued after checking that the robot will not collide with another robot. | No construction necessary / ordinary meaning<br><br>In the alternative:<br><br>"a command for a robot to traverse a portion of a reserved path, issued when the clearance module checks that the robot will not collide with another robot." |

AutoStore explained why "clearance [instruction/command]" should be construed as a "permission" instruction/command for a robot to traverse a portion of a reserved path. *See* Dkt. 127 at 28–33. Ocado contends the term should be broader, as any instruction/command (*e.g.*, a

move command) for a robot to traverse a portion of its reserved path.[19] But that is untenable given the intrinsic and extrinsic evidence.

As an initial matter, Ocado mistakenly contends Dr. Ioannou testified that "permission" (AutoStore's proposed construction) encompasses move commands and thus moots the parties' dispute over "clearance [instruction/command]." *See* Dkt. 128 at 35 (citing Ex. 49 at 118:7–119:7). Not so. Dr. Ioannou was asked about whether an air traffic controller's command to an airplane to go to a specific altitude or to land is a permission; he agreed that it would be a permission for the pilot to go to the directed altitude or to land. Ex. 49 at 118:20–119:7. From this testimony, Ocado wants to conclude that a move command, in the context of the '404/'770 patents, is also a permission. But the Q&A was divorced from the context of the '404/'770 patents. In testimony that Ocado did not cite, Dr. Ioannou explained his understanding of "permission":

> "The permission … says the robot knows the path, knows the task, knows what it needs to do, and ***it just needs the green light to be allowed to go over the path that is planned for it to follow***, up to a certain -- and the way it goes up to the point -- up to the point in time of space that is permitted to go, and that's controlled by the clearance unit. That's my understanding."

*Id.* at 119:9–120:13. This understanding matches AutoStore's position. He also explained that the patent distinguishes between "clearance" commands/instructions and other commands such as "move commands." *Id.* at 120:20–122:14, 125:13–126:8.

Further, the intrinsic evidence disproves Ocado's proposed construction and confirms that "clearance" is a permission to move, distinct from a move command.

1.     *The Claim Language Disproves Ocado's Proposed Construction*

The claims, considered as a whole, confirm that "clearance" means a permission that does

---

[19] The parties agree in their proposed constructions that the instruction/command is issued after checking that the robot will not collide with another robot.

not include a move command. ***First,*** contrary to Ocado's contention, the claim language does not resolve the parties' dispute. The relevant claims recite: (i) a "clearance instruction" "for each transporting device to traverse a portion of the reserved path" (for the '404 patent); and (ii) a "clearance command" to "cause the plurality of transporting devices to travel on the pathways" (for the '770 patent). This language on its face covers a permission distinct from a move command (as AutoStore contends): A "permission instruction" (as AutoStore proposes) is "for each transporting device to traverse a portion of the reserved path"; likewise, a "permission" command would "cause the plurality of transporting devices to travel on the pathways." Dkt. 127 at 28–29.

***Second,*** claim 2 of the '770 patent does not require construing "clearance" as something broader than a "permission." The claim recites that "the plurality of clearance commands indicate a permission for the plurality of transporting devices to travel on the pathways only along the portions of the plurality of paths." Ocado contends that the language "the plurality of clearance commands indicate a permission" means that in claim 1, clearance commands need not indicate a permission and thus can be something other than a permission. Dkt. 128 at 35–36. But Ocado disregards key language in the claim: "the plurality of clearance commands indicate a permission … to travel … ***only along the portions of the plurality of paths***." *Id.* Considered in full, the claim therefore limits clearance commands to permission for travel ***only*** along portions of the plurality of paths. By contrast, claim 1 does not so limit clearance commands—they represent permission for the robots to travel along portions of the plurality of paths, but the robots do not need permission for each portion of their paths. *See also* Ioannou #3 ¶¶ 37; Ex. 49 at 133:14–137:16. The specification also does not mandate that a clearance be issued for each portion of a robot's path (or for the entirely of the robot's path). *See* '770 patent at 18:27–35 (indicating that clearances may be required in some locations but not everywhere).

31

***Third,*** as AutoStore explained in its brief, claim 23 confirms that "clearance [instruction/command]" is a permission and nothing more (*e.g.*, not a move command). That claim expressly distinguishes between clearance and travel commands. *See* Dkt. 127 at 29–30.

2.    *The Specification Directly Contradicts Ocado's Proposed Construction*

The specification also contradicts Ocado's proposed construction. Ocado cites to the statement that "'commands' or 'command sets' may be provided to the robots to perform various tasks and operations, including to move along the 'one or more paths.'" Dkt. 128 at 36 (citing '404 patent at 19:51–54, 20:4–7, 20:21–27). But these portions do not state that a "clearance command" is a command to move the robot—*i.e.*, a move command. Indeed, the specification expressly distinguishes between a clearance instruction and a "move command":

> Upon providing a robot with a new instruction, the clearance module 312 checks that it will not be possible to collide with another robot, **based upon, for example, grid dimensions, grid positions, *move commands generated by planning, cancellation of move commands (generated on events such as a controlled stop)*, the current positions and speeds of robots, braking ability of robots as well as where they have been cleared to visit**.

'404 patent at 18:38–45. The italicized and underlined portion clearly contemplates a "move command" distinct from the "clearance" instruction. Tellingly, Ocado cites only the first two lines of this passage, right up to, but not including, the bolded section; then it declares "that portion of the specification never mentions, must [*sic*] less requires, a separate movement instruction, which necessarily would be required if a clearance instruction was limited to a 'permission' as AutoStore argues." Dkt. 128 at 36. But as shown above, the full passage ***does*** describe "a separate movement instruction"—*i.e.*, the "move command." *See also* Dkt. 127 at 30–31.

As a last resort, Ocado argues that the embodiment wherein "[t]he clearance module 312 … ***may be used*** to grant permissions to robots to continue along their planned paths" means that a clearance instruction need not necessarily grant permissions, and that construing clearance to be a

32

permission would constitute impermissibly reading in limitations from the specification. *See* Dkt. 128 at 36 (citing '404 patent 18:47–48). This argument misses the mark. Read in the context of the paragraph in which it appears, the statement means that the clearance module may provide permission for robots to continue along their planned paths, as opposed to withhold permissions[20] and/or work with the movement optimization module to change robot paths. *See, e.g.*, '404 patent at 18:50–54. Although Ocado does not acknowledge it, Dr. Ioannou explained the same point. *See* Ex. 49 at 108:4–110:12. Ocado's expert agrees. *See* Ex. 50 at 152:20–153:14. Thus, "may" in this context does not mean that providing permission is an optional feature of a "clearance module." The same paragraph explains that "[a]s such, the clearance module 312 may act as a path conflict resolver." '404 patent at 18:50–51. The whole point of the clearance module in the '404 patent is to serve as a "path conflict resolver," so it does not make sense to read "may" as optional.

### B.    "For execution at a future time" (Claim 20)

| AutoStore's Construction | Ocado's Construction |
|---|---|
| Indefinite | No construction necessary / ordinary meaning |

As AutoStore explained in its opening brief, the plain meaning of "for execution … at a future time" renders the phrase, as used in the claim, meaningless. *See* Dkt. 127 at 33–34. Grammatically, "execution … at a future time" refers to execution at a time after the "clearance instruction" is provided. This is tautologically true—any instruction is executed after it is provided—and therefore giving the term its plain meaning would impermissibly render it meaningless. Thus, "for execution … at a future time" cannot take its plain meaning and instead must refer to a minimum time in the future. *See Digital-Vending Servs. Int'l, LLC v. Univ. of Phoenix, Inc.*, 672 F.3d 1270, 1275 (Fed. Cir. 2012) (quoting *Bicon, Inc. v. Straumann Co.*, 441 F.3d 945, 950 (Fed. Cir. 2006) (stating that it is a "well-established rule that 'claims are interpreted

---

[20] In certain embodiments, this may result in robots coming to a stop. *See* '404 patent at 19:6–11.

with an eye toward giving effect to all terms in the claim' . . . such that words in a claim are not rendered superfluous.")); *see also Bicon*, 441 F.3d at 950 ("Allowing a patentee to argue that physical structures and characteristics specifically described in a claim are merely superfluous would render the scope of the patent ambiguous, leaving examiners and the public to guess about which claim language the drafter deems necessary to his claimed invention."). Rather, the term must refer to a minimum time in the future. But as Dr. Ioannou explained, the patent does not provide an objective criterion for a POSITA to determine the scope of "future"—*i.e.*, how far into the future must the instruction be for execution to be covered by the claim.

Ocado does not dispute that "for execution … at a future time" cannot be interpreted to cover execution at *any* future time, and thus, that "future time" cannot take its full scope. Ocado proposes that the term refers to execution of a clearance instruction that controls a "future movement" of a robot, as distinct from a clearance instruction that controls a robot's "current movement." Dkt. 128 at 37. This is premised on a tacit agreement that the term must include a minimum time delay that is absent from the claim language: Instructions for control of "current movements" are outside the scope; instructions for control of "future movements" are within the scope. Ocado's proposed interpretation fails to save claim 20 for at least two reasons:

*First,* Ocado's proposed interpretation amounts to an impermissible rewriting of the claim to save it from invalidity. Although Ocado proclaims that its proposed interpretation reflects the plain meaning of the claim, as explained above, its reading rests on the assumption that the term *cannot* take its plain meaning. Whereas the plain claim language shows that "future time" is relative to the time of provision of the clearance instruction, Ocado's reading rewrites the claim to say that "future time" is relative to whatever movements/instructions need to be performed first. But Federal Circuit law squarely contradicts this argument, mandating that Ocado live with the

34

claim language it chose. *See Allen Eng'g Corp. v. Bartell Indus., Inc.*, 299 F.3d 1336, 1349 (Fed. Cir. 2002) (stating that "[i]t is not our function to rewrite claims to preserve their validity," and ruling that when a POSITA would understand based on the specification that the claims do not set forth what the inventor regards as his invention, the claims are indefinite.); *see also Haemonetics Corp. v. Baxter Healthcare Corp.*, 607 F.3d 776, 782 (Fed. Cir. 2010) ("[W]e do not redraft claims to contradict their plain language in order to avoid a nonsensical result," even if it the plain language leads to invalidity); *Koki Holdings Co. v. Kyocera Senco Indus. Tools, Inc.*, No. 18-313-CFC, 2021 WL 1092579, at *2 (D. Del. Mar. 22, 2021) ("[I]t is improper to rewrite claim language to save a patent from impossibility.").

*Second,* Ocado's interpretation impermissibly narrows the claim more than warranted by the specification. Ocado seeks to exclude from the claim scope provision of a clearance instruction "for execution upon receipt," limiting the claim to cover only provision of an instruction to control a robot's future movement. *See* Dkt. 128 at 38. But the plain meaning of "for execution … at a future time" covers both situations. A court will depart from the plain and ordinary meaning of a claim term in only these two circumstances: The first is when a patentee acts as its own lexicographer, setting forth a clear definition of the disputed claim term. *Hill-Rom v. Stryker Corp.*, 755 F.3d 1367, 1371 (Fed. Cir. 2014); *Thorner v. Sony Comput. Ent. Am. LLC*, 669 F.3d 1362, 1365–66 (Fed. Cir. 2012). The second is when the patentee disavows the full scope of the claim term through statements made in the specification or prosecution history. *Thorner*, 669 F.3d at 1365–66; *Phillips*, 415 F.3d at 1316–17. "In either case, the standard for disavowal is exacting, requiring *clear and unequivocal evidence* that the claimed invention includes or does not include a particular feature." *Poly-Am., L.P. v. API Indus., Inc.*, 839 F.3d 1131, 1136 (Fed. Cir. 2017).

Ocado cannot show that either restriction applies. The specification does not provide an

35

express definition that "for execution … at a future time" refers to the control of a robot's "future movements," and Ocado does not argue otherwise. Further, the specification does not disavow the full scope of "for execution … at a future time." The specification only references "execut[ion] at a future time" in one place:

> The command generation and scheduler module 316 may be configured to provide a command set comprising a single path, or one or more paths, and/or a number of operations to be performed at various locations. The command generation and scheduler module 316 provides these commands to the robot communications module 318 to be provided to the individual robots. In some embodiments, the command generation and scheduler module 316 pre-populates instructions for a particular robot—these instructions may then be provided to the robot through the robot communications module 318 to be **executed at a future time**.

'404 patent at 20:4–15. This passage explains that the "command generation and scheduler module" provides commands to the robots via the "robot communications module," and that it may pre-populate instructions for a robot that are provided to be executed at a future time. The specification is clear that "a future time" is relative to when the instructions are pre-populated and provided. The specification does not use "execut[ion] at a future time" to refer to control of future movements (as distinct from current movements), let alone limit the phrase as Ocado contends. The patent at 20:21–23 states that, "[a]s indicated above, these instruction sets are not necessarily just-in-time, instruction sets may be sent for the coordination of future movements." This portion states that instructions for coordination of future movements are not just-in-time instructions. But the patent does not clearly and unmistakably disavow commands that are "to be executed at a future time" to commands that are for coordination of future movements. Moreover, the specification does not indicate that these instructions sent for the coordination of future movements are "clearance instructions" (as distinguished from other instructions), which is the kind of instruction recited in claim 20.

Other passages cited by Ocado also do not provide the requisite disclaimer. The '404 patent

36

at 9:34–35 merely refers generically to the pre-processing of tasks "to schedule future tasks and actions." The specification at 10:49–53 states "[t]he robot control system 202 may be configured to keep track of the number of robots available, the status of one or more robots, the location of one or more robots and/or their current instruction sets." There is no disclaimer relating to the time at which instructions are to be executed. The patent at 10:53–58 explains that "[t]he robot control system 202 may also be configured to process and/or send control messages to the one or more robots in anticipation of future movements, potentially reducing the processor load, and also proactively managing the traffic load with respect to the communications links." Although this passage discloses that the robot may send control messages in anticipation of future movements, it does not limit "execution … at a future time" to the execution of those instructions. The specification at 18:55–59 relates to issuance of clearance instructions and states that the system may also provide to the control interface a notification of when a clearance is issued or withheld, but does not limit "execution … at a future time" to those for coordination of future movements. The specification at 21:1–3 also does not provide the requisite disclaimer regarding "execution …. at a future time"—instead, it merely states that the control system may extend a robot's clearance after receiving a status message.

### C.    "Route" (Claim 20)

| AutoStore's Construction | Ocado's Construction |
|---|---|
| Indefinite | No construction necessary / ordinary meaning |

Ocado has no answer to the point that *if* the Court were to find that "route" and "path" have different meanings in claim 20, then "route" is indefinite. Instead, Ocado asserts that "route" and "path" have the same meaning in claim 20. This is false. The two have different meanings in the claim not just because they are different terms, but also (and primarily) because the claim makes clear that one is determined from the other. Because "route" and "path" must mean different things

in claim 20, and yet the specification requires them to have the same meaning, "route" does not have a reasonably certain "scope."[21]

Ocado's argument that the evidence overcomes the presumption that different claim terms have different meanings is unavailing. *See* Dkt. 128 at 33–34. ***First,*** Ocado does not acknowledge, let alone address, AutoStore's primary argument—namely, that the plain language of Claim 20 ***requires*** "path" and "route" to have different meanings. *See* Dkt. 127 at 36–37. The claim recites that, for each transporting device, a "route" is "determin[ed] … from one location on the grid-like structure to another location on the grid-like structure." '404 patent at 28:19–21. The claim then states that, for each of the transporting devices, a "path" is reserved "***based on*** the determined route." *Id.* at 28:22–23. Thus, the claim requires each "transporting device" to have a determined "route" and, separately, a path reserved "based on the determined route." The claim further explains that reserved paths are "such that no two transporting devices have locations on the grid-like structure which would cause transporting devices to overlap at a same time." *Id.* at 28:25–27. There is no such requirement for "route." Dr. Ioannou explained that this means that in the claims, whereas a "path" has time dependence, a "route" needs not. Ex. 49 at 149:16–151:13, 152:6–13. Reading "path" and "route" to be the same is impermissible because it removes meaning from the claim that expressly distinguishes between the two. *See Bicon*, 441 F.3d at 950 (reading limitations out of a claim would "be contrary to the principle that claim language should not be treated as meaningless"); *Exmark Mfg. Co., Inc. v. Briggs & Stratton Corp.*, 830 F. App'x 305, 310 (Fed. Cir. 2020); *In re Power Integrations, Inc.*, 884 F.3d 1370, 1376 (Fed. Cir. 2018); *Wasica Fin.*

---

[21] Here and elsewhere, Ocado wrongly and rhetorically suggests that the term must be "hopelessly confusing." Dkt. 128 at 1, 33, 45, 47. The correct standard for indefiniteness is whether a POSITA could discern the scope of the claim term with "reasonable certainty." *Nautilus Inc. v. Biosig Instruments, Inc.*, 572 U.S. 898, 901 (2014).

*GmbH v. Cont'l Auto. Sys., Inc.*, 853 F.3d 1272, 1288–89 (Fed. Cir 2017).

Ocado's expert likewise fails to acknowledge, let alone address, this point. *See* Dkt. 128 at 32–34; D'Andrea #3 ¶¶ 66–70; Ex. 50 at 228:18–229:10 (testifying that he was not instructed about the presumption that different claim terms carry different meanings, and that his opinion is based on the specification using "path" and "route" interchangeably). Indeed, the testimony of Ocado's expert supports the point that if "route" is understood to be different from "path" in the claims, but synonymous with "path" in the specification, "route" is indefinite. *See* Ex. 50 at 229:11–22 (testifying that if he were to presume that "route" and "path" should have different meanings, he would not know how to deal with that given that the specification treats the terms interchangeably).

**Second,** the presumption that different claim terms have different meanings is not overcome. *Nystrom v. TREX Co.*, on which Ocado relies, is inapposite. *Nystrom* addressed an attempt by patentee to broaden a term ("board") beyond its ordinary meaning. The court rejected that construction as impermissible under *Philips* because the specification did not support the broader reading. 424 F.3d 1136, 1145–46 (Fed. Cir. 2005). In that context, the court stated that different words or phrases may be construed to cover the same subject matter if supported by the specification and prosecution history, to avoid improperly broadening a claim term beyond its ordinary meaning. *Id.* at 1143; *see also Acumed LLC v. Stryker Corp.*, 483 F.3d 800, 808–09 (Fed. Cir. 2008) (interpreting *Nystrom*). But AutoStore does not seek to broaden "route" beyond its ordinary meaning. AutoStore only seeks to maintain the distinction between "path" and "route" that is imposed by the claim. *See Augme Techs., Inc. v. Yahoo! Inc.*, 755 F.3d 1326, 1333 (Fed. Cir. 2014) (rejecting claim construction that would "render meaningless the distinction between the embedded first code module and the downloaded or retrieved second code module" that was

stated in the claim language). Further, in *Nystrom* the different terms read to have the same meaning appeared in different claims, but here "route" and "path" are in the same claim. *See Summit 6 LLC v. HTC Corp.*, No. 7:14-cv-00014-O, 2015 WL 11117868, at \*16–\*17 (N.D. Tex. Mar. 21, 2015).

Ocado also mischaracterizes Dr. Ioannou's deposition testimony. *See* Dkt. 128 at 33. Ocado contends that he "testified that a POSITA would understand that 'route' and 'path' are synonymous because both terms encompass a time-dependent and *time*-independent path … such that that the scope of the claims would be clear." Dkt. 128 at 33 (citing Dkt. 128-22 at 159:2–160:12). But the cited testimony of Dr. Ioannou refers to his understanding of the meaning of "path" and "route" *outside* of the context of the patent. *See* Ex. 49 at 159:2–160:12 (Dr. Ioannou testifying about what a POSITA *"could"* understand "route" and "path" to mean, outside of the context of the specification). Indeed, Dr. Ioannou testified there may be time-dependent and time-independent "routes" and "paths" "[a]s long as you don't mix them up." *Id.* This does not support Ocado's contention that, in the context of the '404 patent claims, "route" and "path" are synonymous. Dr. Ioannou has explained that they are not. *See* Ioannou #1 ¶¶ 163–68; Ioannou #3 ¶¶ 41–43; Ex. 49 at 149:16–151:13, 152:6–13 (testifying that in the '404 patent claims, "route" need not be time dependent but "path" is). Separately, Dr. Ioannou's testimony that in robotics, "route" and "path" may be used interchangeably (*see* Dkt. 128 at 33 (citing Dkt. 128-22 at 139:12–18)) says nothing about how the terms are used in the *claims*, which is the dispositive issue here. There is no dispute that "route" and "path" are used interchangeably in the specification. *See* Dkt. 127 at 36; Dkt. 128 at 32–33.

Because the claim requires "route" to be distinct from "path," but the specification requires them to be synonymous "route" (and for that matter, "path") is indefinite. *See Allen Eng'g*, 299

40

F.3d at 1349 (ruling under the stricter pre-*Nautilus* standard that a claim term requiring a "pivot steering box" to pivot its gear box only in a plane perpendicular to a "biaxial plane" was indefinite because it was contrary to the teachings of the specification, which provided that the gearbox "cannot pivot in a plane perpendicular to the biaxial plan"); *Juxtacomm-Texas Software, LLC v. Axway, Inc.*, No. 6:10CV011, 2012 WL 7637197, at \*4–\*5 (E.D. Tex. July 5, 2012), *aff'd sub nom. JuxtaComm-Texas Software, LLC v. TIBCO Software, Inc.*, 532 F. App'x 911 (Fed. Cir. 2013) (under the stricter pre-*Nautilus* standard finding indefiniteness due the logical inconsistency between the claim requiring "data transformation" to "occur within the systems interface" and the specification stating that the interface was only for another purpose).

## V.    U.S. PATENT NO. 11,079,770

### A.    "One or more processors configured to" (Claim 1)

| AutoStore's Construction | Ocado's Construction |
|---|---|
| Construe under 35 U.S.C. § 112(f) / Indefinite[22] | N/A |

AutoStore explained that "one or more processors" is subject to § 112(f) because neither the term nor other claim language describes sufficient structure for the claimed functions of the processors. Dkt. 127 at 37–41. Ocado seeks to avoid § 112(f), which renders "one or more processors" indefinite due to lack of sufficient structure (algorithms) in the specification describing how the processors perform the functions recited in the claims. *See* Dkt. 127 at 41–45. Its excuse for why § 112(f) does not apply is that "processor" connotes a class of known structures. Dkt. 128 at 39–40. Although this may serve as sufficient structure for typical, well-known functions done by off-the-shelf processors (something AutoStore does not even dispute), it is insufficient for specialized functions that need specialized programming to implement. Here, there is no dispute that the functions recited in the '770 patent claims are not typical processor functions and requires

---

[22] *See* Dkt. 131-1 at 36–40, 44–47.

specialized programming. Because claim 1 recites no structure for performing the recited functions, "one or more processors" is subject to § 112(f).[23]

1.    *A Generic "Processor" Does Not Provide Sufficient Structure for Specialized, Non-typical Processor Functions*

According to the seminal *Williamson v. Citrix Online, LLC* opinion (which Ocado does not cite), when the claim does not recite "means," the presumption against § 112(f) is overcome when "the claim term fails to recite sufficiently definite structure or else recites function without reciting sufficient structure for performing that function." 792 F.3d 1339, 1349 (Fed. Cir. 2015). As AutoStore explained, so it is with the "processor" terms in claims 1 and 29. Dkt. 127 at 38–41.

Following *Williamson*, courts have found "processor" invokes § 112(f) when it fails to disclose "the internal components, structure, or specific operation of the processor." *GoDaddy.com, LLC v. RPost Commc'ns Ltd*, No. CV-14-00126-PHX-JAT, 2016 WL 212676, at *56–*57 (D. Ariz. Jan. 19, 2016), *aff'd*, 685 F. App'x 992 (Fed. Cir. 2017) ("processor" was subject to § 112(f) because a POSITA would not recognize it as a name of a sufficiently definite structure for the claimed function); *accord XR Commc'ns, LLC v. Ruckus Wireless, Inc.*, No. 18-CV-01992-WHO, 2021 WL 3918136, at *5–*6 (N.D. Cal. Sept. 1, 2021) ("search receiver logic" was subject to § 112(f) despite being a "known class of circuit structures for the general purpose of detecting and processing signals," because the claim did not recite sufficient structure to perform

---

[23] Ocado criticizes AutoStore for an argument AutoStore does not make. Ocado states: "AutoStore contends that the claims are indefinite because the specification does not disclose specific 'algorithms' to write software to perform each operation that the 'one or more processors' are 'configured' to carry out," and criticizes AutoStore "because the question of a disclosed algorithm arises only if a claim term is first determined to be [means-plus-function]." Dkt. 128 at 44 (citing *Dyfan, LLC v. Target Corp.*, 28 F.4th 1360, 1365 (Fed. Cir. 2022)). AutoStore's arguments are consistent with the law. AutoStore first explained why "one or more processors" is subject to § 112(f) **without** relying on the lack of algorithms in the specification. Dkt. 127 at 37–41. Only then did AutoStore argue that the term is indefinite because the specification lacks any algorithm or description explaining how the processors carry out their function. *Id.* at 41–45.

the claimed functions); *Konami Gaming, Inc. v. High 5 Games, LLC*, No. 2:14-cv-01483-RFB-NJK, 2018 WL 1020120, at \*13–\*14 (D. Nev. Feb. 22, 2018) *aff'd*, 756 F. App'x 994 (Fed. Cir. 2019) (processor limitations invoked § 112, ¶ 6 because the specification and claims did not disclose supporting algorithm, and there was no evidence that off-the-shelf processors could perform the disclosed functions); *Velocity Pat. LLC v. Mercedes-Benz USA, LLC*, No. 13-cv-8413, 2016 WL 5234110, at \*6 (N.D. Ill. Sept. 21, 2016) ("processor subsystem" invoked § 112, ¶ 6 because the claim did not recite how to perform the recited function); *St. Isidore Rsch., LLC v. Comerica Inc.*, No. 2:15-CV-1390-JRG-RSP, 2016 WL 4988246, at \*14–\*15 (E.D. Tex. Sept. 19, 2016) ("processor configured to" invoked § 112(f) because the claim did not describe how it achieved the stated objective of associating two data sets to generate a third); *cf. Aristocrat Techs. Austl. Pty Ltd. v. Int'l Game Tech.*, 521 F.3d 1328, 1334–35 (Fed. Cir. 2008) (merely describing the outcome of performing a function is not sufficient description of structure.)[24]

The non-precedential *VDPP LLC v. Vizio, Inc.* decision does not support, let alone compel, a different result in this case. *VDPP* neither changed the *Williamson* rule (indeed, it could not) nor created a new one that a "processor" is inherently sufficient structure for all functions recited in a claim. Instead, the case turned on Vizio's failure to adduce ***any*** evidence to overcome the presumption against application of § 112(f) to a "processor" claim term. Case No. 2021-2040, 2022 WL 885771, at \*3 (Fed. Cir. Mar. 25, 2022) ("Vizio was required to provide at least some evidence that a [POSITA] would not have understood the limitations to recite sufficiently definite

---

[24] If the processor's recited functions are those typically found in a commercially available off-the-shelf processor, then a POSITA may understand "processor" to provide sufficient structure for performing the recited functions. *See In re Katz Interactive Call Processing Pat. Litig.*, 639 F.3d 1303, 1316 (Fed. Cir. 2011) (functions that can be performed by any general purpose computer without special programming, *e.g.*, "processing," "receiving," and "storing," do not need more structure than the general-purpose processor that performs those functions).

structures," and "*[t]he [district] court pointed to no such evidence.*"). Here, there is ample evidence that claim 1 does not recite sufficient structure:  It does not explain how the processors perform the recited specialized functions. *See* Ioannou #1 ¶¶ 177–180; Ioannou #3 ¶¶ 48–51. Although *VDPP* acknowledged evidence that a POSITA would not understand processors and storage as mere black boxes, *VDPP*, 2022 WL 885771, at \*3, it did not hold the evidence constituted sufficient structure for the claimed functions there, or in any other case.[25]

The *Samsung* and *D-Link* cases (Dkt. 128 at 42) are also distinguishable. In *Samsung Elecs. Am., Inc. v. Prisua Eng'g Corp.*, there was evidence that the claim term at issue referred to a known image processing device that did not need special programming to perform the recited function. *See* 948 F.3d 1342, 1354 (Fed. Cir. 2020). Not so here. As for *XR Commc'n LLC v. D-Link Sys., Inc.*, the trial court found that the claim language provides sufficient structure to the "processor" term by specifying ***how the processor did its recited function***. *See* No. SA CV 17-00596-DOC-JDE, 2022 WL 2291747, at \*3 (C.D. Cal. Apr. 18, 2022). Insofar as these cases did not apply the Federal Circuit's directive in *Williamson* that § 112(f) applies when "the claim either fails to recite sufficiently definite structure or else recites function without reciting sufficient structure for performing that function," 792 F.3d at 1349, they are in error.[26]

---

[25] The reliance by the *VDPP* panel on *Zeroclick, LLC v. Apple Inc.* (*VDPP*, 2022 WL 885771, at \*3) further confirms *VDPP*'s narrow holding. In *Zeroclick*, like *VDPP*, the party seeking to invoke § 112, ¶ 6 offered no evidentiary support to overcome the presumption that the section does not apply when "means" is not used. 891 F.3d 1003, 1007–08 (Fed. Cir. 2018). Moreover, the functional language at issue in *Zeroclick* was not at the point of novelty, *id.* at 1008, such that there was no dispute that it could be performed with prior art programs and components. Here, by contrast, the functional language at issue includes the alleged point of novelty of the '770 patent (generation and use of clearance commands). And there is no dispute that these allegedly new functions ***cannot*** be performed with a processor without special programming. Ioannou #3 ¶ 49(a); Ex. 50 at 226:15–227:11. The claim thus does not recite sufficient structure for "processor."

[26] The cases in footnote 28 of Ocado's opening brief are distinguishable and inapplicable. In *CA, Inc. v. Netflix, Inc.*, the claim recited significant detail about how the processor performed its recited function and its structural interaction with other elements. No. 221CV00080JRGRSP, 2021

In sum, "one or more processors" invokes § 112(f) due the failure to recite sufficient structure for performing the claimed functions. Ocado contends "MPF construction is a drafting choice, not a punishment." Dkt. 127 at 41 n.27. But it **has** availed itself of this drafting choice. It chose to advance claims with functional limitations—at the point of alleged novelty no less—without reciting sufficient structure for performing those functions. It cannot escape § 112 by reciting a generic "processor" without specific structure for the recited functions. The Federal Circuit in *Williamson* articulated the standard for applying § 112(f)—whether "the claim term fails to recite sufficiently definite structure or else recites function without reciting sufficient structure for performing that function"—precisely to rein in such functional claiming. *See* 792 F.3d at 1349.

2.    *The '770 Patent Claims Do Not Recite Structure Beyond "Processor"*

Ocado's backup argument—that the '770 patent claims recite structure beyond the term

---

WL 5323413, at *21 (E.D. Tex. Nov. 16, 2021). The same was the case in *Odyssey Wireless, Inc. v. Apple Inc.*, where the claim language "sufficiently provide[d] the objectives and operations of the claimed processors." No. 15-CV-1735-H (RBB), 2016 WL 3055900, at *11 (S.D. Cal. Mar. 30, 2016). Here, the claim provides no such detail. In *Blue Spike LLC v. Grande Commc'ns Inc.*, the claim recited detail about the inputs to the recited algorithm. No. 4:20-CV-671, 2021 WL 5094911, at *25–*26 (E.D. Tex. Nov. 2, 2021). Claim 1 of the '770 patent gives no detail about the inputs used to create paths or to generate clearance commands. In *Cellular Commc'ns Equip. LLC v. AT&T, Inc.*, the claim "set forth detail regarding the operations of the 'processors'," which is absent here. No. 2:15-CV-576-RWS-RSP, 2016 WL 7364266, at *16 (E.D. Tex. Dec. 19, 2016). The same applies to *Quanergy Sys., Inc. v. Velodyne Lidar, Inc.*, in which the claim "describe[d] how the processor interacts with other components." No. 16-CV-05251-EJD, 2017 WL 4410174, at *19 (N.D. Cal. Oct. 4, 2017). In *Savvy Dog Sys., LLC v. Pa. Coin, LLC*, the court based its holding on the fact that "processor," in itself, provides sufficient structure to a POSITA. No. 3:19-CV-01470, 2020 WL 7488878, at *10 (M.D. Pa. Dec. 21, 2020). This is contrary to Federal Circuit's directive in *Williamson* that a term invokes § 112(f) when "the claim term fails to recite sufficiently definite structure or else recites function without reciting sufficient structure for performing that function." *Williamson*, 792 F.3d at 1349. The same point applies to *Realtime Adaptive Streaming LLC v. Adobe Sys. Inc.*, No. CV 18-9344-GW(JCX), 2019 WL 13039644, at *17 (C.D. Cal. July 25, 2019). The claim in *Realtime* also recited tasks that a typical processor could perform. And in *Nomadix, Inc. v. Hosp. Core Servs. LLC*, the court found that "processor" had many configurations that provided the operation and function of the term. No. CV1408256DDPVBKX, 2016 WL 344461, at *7 (C.D. Cal. Jan. 27, 2016). Here, the recited operations may be performed by off-the-shelf processors only with specialized programming.

"processor"—is also meritless. As AutoStore explained, claim 1 of the '770 patent does not describe how the processors achieve their claimed functions. Dkt. 127 at 37–41.

Ocado incorrectly asserts that claim 1 "specif[ies] that the 'one or more processors' are **connected to** another well-known structure, a 'memory device' for storing the output ('clearance commands') of the processors." The claim recites the memory device stores the plurality of clearance commands generated by the processors, but there is no express requirement that the processors be directly connected to the "memory device" (an indirect connection offers no meaningful limitation beyond the storage function of the "memory device"). Further, beyond "one or more processors" and the "memory device," there is no structure for the control system—*e.g.*, what the processors or the memory device should connect to, or what their inputs/outputs are.

Claim 1 also does not recite how the "processors" operate to achieve the recited objectives. The relevant limitations merely recite functions to be performed by the "one or more processors," without specifying **how** (*i.e.*, the method by which) the processors achieve these functions:[27]

- **"[D]etermine a plurality of [non-time overlapping] paths" for a plurality of robots:** Although Ocado characterizes "determin[ation]" as a "calculat[ion]," (Dkt. 128 at 43), the claim is not limited to a "calculation." And even if it were, it does not specify how that is done. The claim only defines the **outcome** of the determination: a plurality of paths that do not cause a collision as robots travel on them.

- **"[G]enerate a plurality of clearance commands" for those robots:** This limitation only recites the outcome of the operation—generating "clearance commands … to cause the plurality of transporting devices to travel on the pathways along portions of the plurality of paths"; it does not recite how the clearance command is generated.

---

[27] Any of these limitations alone suffices to invoke § 112(f) for "one or more processors."

- ***"[D]etermine there is a potential for a collision" between two of the robots:*** This limitation is also purely functional—determine a potential for a collision—and does not specify how such a determination is done. Ocado's expert confirms this point by taking the position that any determination that there is a potential for a collision meets this limitation. D'Andrea #3 ¶ 89.

- ***"Responsive to a determination that there is the potential for the collision," "withhold a second clearance command" for one of the robots, "determine a revised path" for that robot, and "generate a third clearance command for that robot":*** This only recites an outcome—if there is a potential for a collision, the processors would perform three functions. There is no explanation as to how the functions are performed.

The *Uniloc USA, Inc. v. Autodesk, Inc.* case is inapposite. The claim at issue there had significantly more detail about how the claimed "add-on computer software code" operated within the claimed system. Case No. 2:15-cv-1187-JRG-RSP, 2016 WL 3647977, at *19–*20 (E.D. Tex. Jul. 7, 2016). The claim recited inserting specific symbols into a drawing, transmitting specific symbol data to a pricing-data database, receiving specific pricing data based on the symbols from the database, and generating a specific pricing schedule using the received pricing data. By contrast, '770 patent claim 1 does not recite how paths are determined, how clearance commands are computed and generated, and how a determination that there is a potential for a collision takes place.

Whether a POSITA, based on the specification, would have found it "straightforward" to write any code needed to direct processors to perform the operations recited in claim 1, as Ocado contends (Dkt. 128 at 43 n.29), is irrelevant. The relevant inquiry in determining applicability of § 112(f) to "one or more processors" is whether "***the claim term*** fails to recite sufficiently definite structure or else recites function without reciting sufficient structure for performing that function."

47

*Williamson*, 792 F.3d at 1349; *Egenera, Inc. v. Cisco Sys., Inc.*, 972 F.3d 1367, 1373 (Fed. Cir. 2020). It is irrelevant whether a POSITA could have carried out the recited functions based on the descriptions in the patent. *Cf. D-Link*, 2022 WL 2288913, at *17 (in the context of whether a term invokes § 112(f), whether the specification describes how to perform the claimed function may implicate enablement or written description but does not present any issue for claim construction).

None of the facts Ocado throws in changes the clear picture of what is needed for the claim to recite sufficient structure for processors. Dkt. 128 at 43 n.29. ***First,*** Ocado contends Dr. Ioannou "testified at deposition that processors available as of the priority date of the '770 Patent could perform the generic operations necessary to carry out the claimed operations …." *Id.* If Ocado means Dr. Ioannou testified that the claimed operations of claim 1 are "generic operations," that is wrong. *See* Ex. 49 at 178:6–179:11, 182:6–183:15; Dkt. 128-36 (Ioannou deposition exhibit 20). And if Ocado means that the claimed operations of claim 1 are based on certain "generic operations," it is irrelevant that processors could perform such generic operations, for the claim does not recite them. ***Second,*** it is irrelevant that a POSITA would understand that processors available as of the applicable priority date could be configured, with software, to operate as recited in claim 1, and that a POSITA could write such programs. The relevant inquiry is whether the claim recites how to perform the recited function—and it does not.

### B.    "Potential for [a/the] collision" (Claims 1, 8–10, 12, 27, 29)

| AutoStore's Construction | Ocado's Construction |
| --- | --- |
| Indefinite | No construction necessary / ordinary meaning |

AutoStore explained that "potential for [a/the] collision" is indefinite because the specification does not explain how high the probability of collision must be for there to be "a potential for a collision." Dkt. 127 at 45. Without an objective minimum probability to mark a "potential for a collision," any determination of a chance for collision would meet the "determine

48

there is a potential for a collision" limitation, including when the probability of collision is arbitrarily small or is based on an arbitrary/subjective criterion. *Id.* A POSITA would not understand the limitation this way, because it would render the claim language meaningless. *Id.*

Ocado contends "potential for [a/the] collision" means a binary, yes/no determination that a collision is possible. Dkt. 128 at 46. AutoStore agrees that the plain meaning of the term covers *any* determination that a collision is possible, but that exactly why is indefinite. Dkt. 127 at 45.

Dr. Ioannou also did not testify that "a POSITA would understand that a system controller could check for potential collisions in exactly the manner claimed in the '770 Patent" (Dkt. 128 at 46). The questions put to Dr. Ioannou were outside of the context of the '770 patent, relating to his 2002 paper. *See* Ex. 49 at 213:17–214:14, 226:20–23. Dr. Ioannou testified that the '770 patent does not give reasonable certainty about the scope of "potential for [a/the] collision." Although Ocado asserts Dr. Ioannou "admitted that there was no reason the 'yes or no' system that he described in his paper could not be implemented as described in the specification of the '770 Patent," Dkt. 128 at 47, Dr. Ioannou testified that this required the POSITA to know the criteria/measures for making the yes/no determination (Ex. 49 at 253:7–20), and that while "there are many ways to decide, what is yes and what is no[,] [h]ere,"—*i.e., in the context of the '770 patent*—the required guidance is missing. *Id.* at 253:23–254:1; *see also id.* at 254:1–4.

### C.    "Real time" (Claim 21)

| AutoStore's Construction | Ocado's Construction |
|---|---|
| Indefinite | "wherein the one or more processors are configured to receive data from the plurality of robots, process the data, and issue instructions or commands to the plurality of robots sufficiently quickly to affect their movement" |

Ocado attacks a strawman argument that AutoStore does not make—the patent does not specify a "time limit" or "latency period" (Dkt. 128 at 48)—and avoids facing the argument that

AutoStore does make: "real time" is indefinite because the specification does not distinguish it from "near-real time." Dkt. 127 at 49.

The definition of "real time" used by Ocado's expert—"real time" as "requir[ing] the system to issue instructions quickly enough to affect the robot current movement, while avoiding collisions and responding to operational changes on the grid" (Dkt. 128 at 48–50)—is flawed. *First,* it is not based on the patent disclosure. Ex. 50 at 194:9–19. *Second*, it does not objectively distinguish between "real time" and "near-real time." *Id.* at 200:23–202:16, 202:22–203:10, 205:15–20, 207:14–208:22. A "near-real time" operation meets Ocado's definition even if there is no guarantee that it always does. *See* Dkt. 127 at 49. *Third,* "quickly enough" or "sufficiently quickly" are "terms of approximation" lacking objective criterion for their measurement. While mathematical precision is not required, objective boundaries are. *See Interval Licensing LLC v. AOL*, 766 F.3d 1364, 1370 (Fed. Cir. 2014). There is no such boundary in Ocado's definition or the specification. *Finally,* it does not address the full scope of the claim: Claim 21 recites that "the one or more processors are configured to control *operations* … in real time." "Operations" constitute more than just robot movement, and include digging of containers. *See* '770 patent at 1:53–59, 7:58–8:5, 14:48–56. But Ocado's definition relates only to "real time" control of robot *movements* and does not address any other kind of "operation." Even under Ocado's construction, there is no guidance about "real time" control of the full scope of "operations."

Ocado's cited cases (Dkt. 128 at 50) are divorced from the facts here. In *Paragon Sols. v. Timex*, there was no indefiniteness issue over "real time." In *Treehouse Avatar LLC v. Valve Corp.*, the court disagreed that "the patent must describe the precise amount of delay … for the claim to be definite." AutoStore makes no such argument. And unlike *Perfect Co. v. Adaptics Ltd.*, AutoStore does not argue that "real time" is indefinite due to lack of an "upper limit."

50

Dated: August 22, 2022

Respectfully submitted,

AUTOSTORE SYSTEM INC. and
AUTOSTORE AS,

By their attorneys,

/s/ Robert R. Lucic

Robert R. Lucic (NH Bar #9062)
Bryanna K. Devonshire (NH Bar #269462)
SHEEHAN PHINNEY BASS & GREEN PA
1000 Elm Street, PO Box 3701
Manchester, NH 03105
Telephone:  (603) 627-8188
rlucic@sheehan.com
bdevonshire@sheehan.com

Gregg F. LoCascio, P.C. (admitted *pro hac vice*)
Emily M. Scott (admitted *pro hac vice*)
KIRKLAND & ELLIS LLP
1301 Pennsylvania Avenue, N.W.
Washington, D.C. 20004
Telephone:  (202) 389-5000
glocascio@kirkland.com
emily.scott@kirkland.com

Joseph A. Loy, P.C. (admitted *pro hac vice*)
Nathaniel DeLucia (admitted *pro hac vice*)
KIRKLAND & ELLIS LLP
601 Lexington Avenue
New York, NY 10022
Telephone:  (212) 446-4800
jloy@kirkland.com
nathaniel.delucia@kirkland.com

Ali-Reza Boloori (admitted *pro hac vice*)
Josh Glucoft (admitted *pro hac vice*)
KIRKLAND & ELLIS LLP
2049 Century Park East, Suite 3700
Los Angeles, CA 90067
Telephone:  (310) 552-4200
ali-reza.boloori@kirkland.com
josh.glucoft@kirkland.com

51

Kristina R. Cary (admitted *pro hac vice*)
Tiffany Knapp (admitted *pro hac vice*)
KIRKLAND & ELLIS LLP
200 Clarendon Street
Boston, MA 02116
Telephone:  (617) 385-7500
tiffany.knapp@kirkland.com
kristina.cary@kirkland.com

*Attorneys for Defendants AutoStore AS and
AutoStore System Inc.*

52

## CERTIFICATE OF SERVICE

I hereby certify that all counsel of record are being served with a copy of the foregoing document via electronic mail on August 22, 2022.

/s/ Robert R. Lucic

Robert R. Lucic