**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW HAMPSHIRE**

|  |  |
|---|---|
| OCADO INNOVATION LTD. and OCADO SOLUTIONS LTD., | |
| *Plaintiffs*, | Case No. 21 Civ. 41 (JL) |
| v. | |
| AUTOSTORE AS and AUTOSTORE SYSTEM INC., | **Hon. Joseph N. Laplante** |
| *Defendants*. | |

**OCADO'S RESPONSIVE CLAIM CONSTRUCTION BRIEF**

## TABLE OF CONTENTS

TABLE OF AUTHORITIES .................................................................................................... iii

GLOSSARY OF TERMS..................................................................................................... viii

TABLE OF DISPUTED CLAIM TERMS ............................................................................ xi

INTRODUCTION.................................................................................................................. 1

ARGUMENT ......................................................................................................................... 1

I.    U.S. PATENT NO. 9,796,080 ..................................................................................... 1

    A.    "mechanism"........................................................................................................ 1

    B.    "nested" / "nestable" .......................................................................................... 3

    C.    "delivery container" ........................................................................................... 6

    D.    "delivery container containing at least one picked item" ..................................... 11

    E.    "at least one of a lip, a handle, and an aperture".................................................. 11

    F.    "a structural framework defining a grid of storage locations".............................. 13

    G.    "exclusively within the storage and retrieval system"......................................... 15

II.   U.S. PATENT NO. 10,913,602 ................................................................................. 16

    A.    "occupy a grid space" ........................................................................................ 16

    B.    "a load handling device . . . will not obstruct a load handling
        device . . . occupying or traversing an adjacent grid space in
        the X-direction and will not obstruct a load handling device . . .
        occupying or traversing an adjacent grid space in the Y-direction"..................... 20

    C.    "wheel hub motor" ............................................................................................ 21

III.  U.S. PATENT NO. 10,961,051 ................................................................................. 23

    A.    "housing footprint" ........................................................................................... 23

    B.    "a housing footprint that occupies less than twice
        the area of the grid space"................................................................................... 25

    C.    "the [first/second] set of rails is part of the [first/second] set of tracks" .............. 27

IV.   U.S. PATENT NO. 10,901,404 ................................................................................. 28

    A.    "route"............................................................................................................... 28

    B.    "clearance instruction" ('404 Patent) /
        "clearance command" ('770 Patent) .................................................................. 30

    C.    "execution . . . at a future time" ......................................................................... 34

**V.**    **U.S. PATENT NO. 11,079,770** ...................................................................................... **36**

   A.    "one or more processors configured to . . ." ........................................................ 36

            1.    AutoStore Failed to Rebut the Presumption Against
                  Means Plus Function Construction ............................................................ 37

            2.    The Claim Language Itself Recites Sufficient Structure ......................... 41

   B.    "potential for [a/the] collision" ............................................................................ 45

   C.    "control operations . . . in real time" .................................................................... 48

**CONCLUSION** ........................................................................................................................... **50**

## TABLE OF AUTHORITIES

*Page(s)*

**Cases**

*AbbVie Inc.* v. *Mathilda & Terrence Kennedy Inst. of Rheumatology Tr.*,
764 F.3d 1366 (Fed. Cir. 2014)............................................................................................19

*Absolute Software, Inc.* v. *Stealth Signal, Inc.*,
659 F.3d 1121 (Fed. Cir. 2011)..........................................................................................8, 18

*Advanced Mktg. Sys., LLC* v. *CVS Pharmacy, Inc.*,
2016 WL 1741396 (E.D. Tex. May 3, 2016)........................................................................42

*AIA Eng'g Ltd.* v. *Magotteaux Int'l S/A*,
657 F.3d 1264 (Fed. Cir. 2011)............................................................................................24

*Arthrex, Inc.* v. *Smith & Nephew, Inc.*,
935 F.3d 1319 (Fed. Cir. 2019)..............................................................................................2

*Bicon, Inc.* v. *Straumann Co.*,
441 F.3d 945 (Fed. Cir. 2006)..............................................................................................35

*Brookhill-Wilk 1, LLC* v. *Intuitive Surgical, Inc.*,
326 F.3d 1215 (Fed. Cir. 2003)..............................................................................................5

*Cent. Admixture Pharmacy Servs., Inc.* v. *Advanced Cardiac Sols., P.C.*,
482 F.3d 1347 (Fed. Cir. 2007)............................................................................................30

*Contour IP Holding, LLC* v. *GoPro, Inc.*,
2018 WL 3428606 (N.D. Cal. Jul. 16, 2018)........................................................................49

*Crystal Semiconductor Corp.* v. *TriTech Microelecs. Int'l, Inc.*,
246 F.3d 1336 (Fed. Cir. 2001)......................................................................................19, 46

*Digene Corp.* v. *Third Wave Techs., Inc.*,
323 F. App'x 902 (Fed. Cir. 2009) .......................................................................................32

*DSW, Inc.* v. *Shoe Pavilion, Inc.*,
537 F.3d 1342 (Fed. Cir. 2008)..............................................................................................9

*Dyfan, LLC* v. *Target Corp.*,
28 F.4th 1360 (Fed. Cir. 2022) .......................................................................................39, 40

*Egenera, Inc.* v. *Cisco Sys., Inc.*,
972 F.3d 1367 (Fed. Cir. 2020)............................................................................................41

*Elekta Instrument S.A.* v. *O.U.R. Sci. Int'l, Inc.*,
    214 F.3d 1302 (Fed. Cir. 2000)..................................................................................26

*Epistar Corp.* v. *ITC*,
    566 F.3d 1321 (Fed. Cir. 2009)..................................................................................26

*Fiber, LLC* v. *Ciena Corp.*,
    2017 WL 3896443 (D. Colo. Sept. 6, 2017).............................................................12

*Finjan, Inc.* v. *Proofpoint, Inc.*,
    2015 WL 7770208 (N.D. Cal. Dec. 3, 2015).........................................................42, 43

*Firtiva Corp.* v. *Funimation Global Grp., LLC*,
    2022 WL 23165 (E.D. Tex. Jan. 3, 2022)...................................................................12

*Fujifilm Corp.* v. *Motorola Mobility LLC*,
    2015 WL 1265009 (N.D. Cal. Mar. 19, 2015).............................................................11

*GoDaddy.com, LLC* v. *RPost Commc'ns. Ltd.*,
    2016 WL 212676 (D. Ariz. Jan 19, 2016) ..................................................................43

*GREE, Inc.* v. *Supercell Oy*,
    2020 WL 2476497 (E.D. Tex. May 12, 2020).............................................................13

*Halliburton Energy Servs., Inc.* v. *M-I LLC*,
    514 F.3d 1244 (Fed. Cir. 2008)..................................................................................49

*Hill-Rom Servs., Inc.* v. *Stryker Corp.*,
    755 F.3d 1367 (Fed. Cir. 2014)........................................................................8, 27, 31

*HIP, Inc.* v. *Hormel Foods Corp.*,
    2019 WL 2579266 (D. Del. June 24, 2019)................................................................47

*Intermec Techs. Corp.* v. *Palm Inc.*,
    811 F. Supp. 2d 973 (D. Del. 2011)............................................................................49

*Iridescent Networks, Inc.* v. *AT&T Mobility, LLC*,
    2017 WL 10185852 (E.D. Tex. Dec. 1, 2017)............................................................12

*Kaufman* v. *Microsoft Corp.*,
    34 F.4th 1360 (Fed. Cir. 2022) ..................................................................................25

*KNAPP Logistics & Automation, Inc.* v. *R/X Automation Sols., Inc.*,
    2015 WL 5608124 (D. Colo. Sept. 24, 2015)..............................................................23

*Kraft Foods, Inc.* v. *Int'l Trading Co.*,
    203 F.3d 1362 (Fed. Cir. 2000)..................................................................................10

*Linear Tech. Corp.* v. *Impala Linear Corp.*,
  379 F.3d 1311 (Fed. Cir. 2004)..............................................................................42

*Mantissa Corp.* v. *FiServ Sols., LLC*,
  2022 WL 2439938 (N.D. Ill. Jul. 5, 2022)...............................................................50

*Microsoft Corp.* v. *i4i L.P.*,
  564 U.S. 91, 95 (2011).............................................................................................28

*MicroStrategy Inc.* v. *Bus. Objects, S.A.*,
  429 F.3d 1344 (Fed. Cir. 2005).........................................................................35, 36

*MySpace, Inc.* v. *GraphOn Corp.*,
  672 F.3d 1250 (Fed. Cir. 2012)...............................................................................31

*Niz-Chavez* v. *Garland*,
  141 S. Ct. 1474 (2021).............................................................................................19

*One-E-Way, Inc.* v. *ITC*,
  859 F.3d 1059 (Fed. Cir. 2017)...............................................................................46

*Openwave Sys., Inc.* v. *Apple Inc.*,
  808 F.3d 509 (Fed. Cir. 2015).................................................................................18

*Panoptis Patent Mgt., LLC* v. *Blackberry Ltd.*,
  2017 WL 497571 (E.D. Tex. Feb. 7, 2017) ............................................................43

*Poly-Am., L.P.* v. *API Indus., Inc.*,
  839 F.3d 1131 (Fed. Cir. 2016)..................................................................16, 21, 33

*Rambus Inc.* v. *Infineon Techs. AG*,
  318 F.3d 1081 (Fed. Cir. 2003)...............................................................................17

*Retractable Techs., Inc.* v. *Becton, Dickinson & Co.*,
  653 F.3d 1296 (Fed. Cir. 2011)...............................................................................10

*Samsung Elecs. Am., Inc.* v. *Prisua Eng'g Corp.*,
  2018 WL 5274000 (P.T.A.B. Oct. 2, 2018)............................................................40

*Samsung Elecs. Am., Inc.* v. *Prisua Eng'g Corp*,
  948 F.3d 1324 (Fed. Cir. 2020)...............................................................................40

*Sensor Elec. Tech., Inc.* v. *Bolb, Inc.*,
  2019 WL 4645338 (N.D. Cal. Sept. 24, 2019) .......................................................47

*SIPCO, LLC* v. *Emerson Elec. Co.*,
  794 F. App'x 946 (Fed. Cir. 2019) .........................................................................30

*SIPCO, LLC* v. *ABB, Inc.*,
  2012 WL 3112302 (E.D. Tex. July 30, 2012) .......................................................................11

*St. Isadore Res., LLC* v. *Comerica Inc.*,
  2016 WL 4988246 (E.D. Tex. Sept. 19, 2016) ......................................................................44

*SuperGuide Corp.* v. *DirecTV Enters., Inc.*,
  358 F.3d 870 (Fed. Cir. 2004) ...................................................................................11, 12

*Syneron Med., Ltd.* v. *Invasix, Inc.*,
  2018 WL 4696971 (C.D. Cal. Sept. 5, 2018) ........................................................................43

*TiVo, Inc.* v. *EchoStar Commc'ns. Corp.*,
  516 F.3d 1290 (Fed. Cir. 2008) ...................................................................................19

*TQ Delta, LLC* v. *Comcast Cable Commc'ns, LLC*,
  2016 WL 7013481 (D. Del. Nov. 30, 2016) .........................................................................12

*Trs. of Columbia Univ.* v. *Symantec Corp.*,
  811 F.3d 1359 (Fed. Cir. 2016) ...................................................................................22

*Ultimax Cement Mfg. Corp.* v. *CTS Cement Mfg. Corp.*,
  587 F.3d 1339 (Fed. Cir. 2009) ....................................................................................6

*Uniloc USA Inc.* v. *Autodesk, Inc.*,
  2016 WL 3647977 (E.D. Tex. July 7, 2016) .........................................................................42

*Unwired Planet, LLC* v. *Apple Inc.*,
  829 F.3d 1353 (Fed. Cir. 2016) ...............................................................................11, 16

*Vanderlande Indus. Nederland BV* v. *ITC*,
  366 F.3d 1311 (Fed. Cir. 2004) ...................................................................................33

*VDPP LLC* v. *Vizio, Inc.*,
  2022 WL 885771 (Fed. Cir. Mar. 25, 2022) ...............................................................37, 38, 40

*Velocity Patent LLC* v. *FCA US LLC*,
  2018 WL 4214161 (N.D. Ill. Sept. 4, 2018) .........................................................................41

*Virnetx, Inc.* v. *Cisco Sys., Inc.*,
  767 F.3d 1308 (Fed. Cir. 2014) ....................................................................................2

*Voda* v. *Cordis Corp.*,
  536 F.3d 1311 (Fed. Cir. 2008) ...................................................................................18

*XR Commc'ns, LLC* v. *Ruckus Wireless, Inc.*,
  2021 WL 3918136 (N.D. Cal. Sept. 1, 2021) .......................................................................41

**Statutes**

35 U.S.C. § 112(b) ............................................................................................................27

35 U.S.C. § 112(d) ....................................................................................................1, 27, 28

35 U.S.C. § 112(f) ............................................................................................................37

### GLOSSARY OF TERMS

**Common Abbreviations and Acronyms**

| Term | Definition |
|---|---|
| AS/RS | Automated storage and retrieval system(s) |
| IPR | *Inter partes* review |
| ITC | U.S. International Trade Commission |
| MPF | Means Plus Function claim limitation, construed under 35 U.S.C. § 112(f) |
| POSITA | Person of ordinary skill in the art |
| PTAB | Patent Trial and Appeal Board |
| Pls.' Br. | Ocado's Opening Claim Construction Brief (Dkt. 128) |
| Defs.' Br. | AutoStore's Opening Claim Construction Brief (Dkt. 127) |

**Patents**

| Term | Definition | Ex. Number |
|---|---|---|
| '080 Patent | U.S. Patent No. 9,796,080, owned by Ocado | 1 |
| '602 Patent | U.S. Patent No. 10,913,602, owned by Ocado | 2 |
| '051 Patent | U.S. Patent No. 10,961,051, owned by Ocado | 3 |
| '404 Patent | U.S. Patent No. 10,901,404, owned by Ocado | 4 |
| '770 Patent | U.S. Patent No. 11,079,770, owned by Ocado | 5 |
| '337 Patent | U.S. Patent No. 10,000,337, a family member of the '602 and '051 Patents | N/A |
| '302 Patent | U.S. Patent No. 10,829,302, a family member of the '602 and '051 Patents | N/A |
| '140 Patent | U.S. Patent No. 10,474,140, owned by AutoStore | 6 |
| Asserted Patents | The '080, '602, '051, '404, and '770 Patents | N/A |

-viii-

**Experts**

| Term | Definition |
|---|---|
| Dr. Raffaello D'Andrea | Ocado's expert on the disputed terms in the '404 and '770 Patents |
| Dr. Stephen Derby | AutoStore's expert on the disputed terms in the '602 Patent |
| Dr. Petros Ioannou | AutoStore's expert on the disputed terms in the '404 and '770 Patents |
| Dr. Brian Pfeifer | Ocado's expert on the disputed terms in the '080, '602, and '051 Patents |
| Dr. Matthew Spenko | AutoStore's expert on the disputed terms in the '080 Patent |

**Expert Materials**

| Term | Definition | Ex. Number |
|---|---|---|
| D'Andrea Decl. | Declaration of Raffaello D'Andrea, Ph.D., in Support of Plaintiffs' Proposed Claim Constructions, dated May 27, 2022 | 7 |
| D'Andrea Rebuttal | Rebuttal Declaration of Raffaello D'Andrea, Ph.D., dated June 24, 2022 | 8 |
| D'Andrea Sur-rebuttal | Sur-rebuttal Declaration of Raffaello D'Andrea, Ph.D., dated July 12, 2022 | 9 |
| Derby Rebuttal | Rebuttal Declaration of Stephen Derby, Ph.D., Regarding Claim Construction, dated June 24, 2022 | 10 |
| Ioannou Decl. | Declaration of Petros Ioannou, Ph.D., in Support of Defendants' Proposed Claim Constructions, dated May 27, 2022 | 11 |
| Ioannou Rebuttal | Rebuttal Declaration of Petros Ioannou, Ph.D., dated June 24, 2022 | 12 |
| Ioannou Sur-rebuttal | Sur-rebuttal Declaration of Petros Ioannou, Ph.D., dated July 12, 2022 | 13 |

-x-

| Term | Definition | Ex. Number |
|---|---|---|
| Pfeifer Decl. | Declaration of Brian Pfeifer, Ph.D., P.E., in Support of Plaintiffs' Proposed Claim Constructions, dated May 27, 2022 | 14 |
| Pfeifer Rebuttal | Rebuttal Declaration of Brian Pfeifer, Ph.D., P.E., dated June 24, 2022 | 15 |
| Pfeifer Sur-rebuttal | Sur-rebuttal Declaration of Brian Pfeifer, Ph.D., P.E., dated July 12, 2022 | 16 |
| Spenko Decl. | Declaration of Matthew Spenko, Ph.D., in Support of Defendants' Proposed Claim Constructions, dated May 27, 2022 | 17 |
| Spenko Rebuttal | Rebuttal Declaration of Matthew Spenko, Ph.D., dated June 24, 2022 | 18 |
| D'Andrea Tr. | Transcript of July 20, 2022 Deposition of Dr. Raffaello D'Andrea (excerpted) | 50 |
| Derby Tr. | Transcript of July 19, 2022 Deposition of Dr. Stephen Derby (excerpted) | 42 |
| Ioannou Tr. | Transcript of July 22, 2022 Deposition of Dr. Petros Ioannou (excerpted) | 49 |
| Pfeifer Tr. | Transcript of July 21, 2022 Deposition of Dr. Brian Pfeifer (excerpted) | 48 |
| Spenko Tr. | Transcript of July 14, 2022 Deposition of Dr. Matthew Spenko (excerpted) | 23 |

**TABLE OF DISPUTED CLAIM TERMS**

| Claim(s) | Disputed Term(s) |
|---|---|
| '080 Patent:  Claims 9, 10, 11, 12, 21 | mechanism |
| '080 Patent:  Claims 8, 17, 23 | nested / nestable |
| '080 Patent:  Claims 1-6, 8-11, 13-16, 18-23 | delivery container |
| '080 Patent:  Claims 1, 5 | delivery container containing at least one picked item |
| '080 Patent:  Claim 11 | at least one of a lip, a handle, and an aperture |
| '080 Patent:  Claims 1, 23 | a structural framework defining a grid of storage locations |
| '080 Patent:  Claims 1, 13 | exclusively within the storage and retrieval system |
| '080 Patent:  Claims 13, 20, 23 | storing . . . in at least one of a plurality of storage locations . . . a plurality of storage containers<br><br>/<br><br>retrieving . . . from at least one of a plurality of storage locations a plurality of storage containers |
| '602 Patent:  Claims 1, 12 | occupy a grid space / occupying a grid space |
| '602 Patent:  Claims 1, 12 | will not obstruct a load handling device of the multiplicity of load handling devices occupying or traversing an adjacent grid space in the X-direction and will not obstruct a load handling device of the multiplicity of load handling devices occupying or traversing an adjacent grid space in the Y-direction<br><br>/<br><br>will not obstruct a load handling device occupying or traversing an adjacent grid space in the X-direction and will not obstruct a load handling device occupying or traversing an adjacent grid space in the Y-direction |
| '602 Patent:  Claims 6, 10, 17 | wheel hub motor |
| '051 Patent:  Claims 1, 13 | housing footprint |

| Claim(s) | Disputed Term(s) |
|---|---|
| '051 Patent:  Claims 1, 13 | a housing footprint that occupies less than twice the area of the grid space |
| '051 Patent:  Claims 9, 18 | the first set of rails is part of a first set of tracks, and the second set of rails is part of a second set of tracks |
| '404 Patent:  Claim 20 | wherein the clearance instruction is provided for execution by a control unit on each transporting device at a future time<br><br>/<br><br>wherein the clearance instruction is provided for execution by each transporting device at a future time |
| '404 Patent:  Claim 20 | a route of a transporting device from one location on the grid-like structure to another location on the grid-like structure<br><br>/<br><br>a route from one location on the grid-like structure to another location on the grid-like structure for each transporting device |
| '404 Patent:  Claims 20<br>'770 Patent:  Claims 1-4, 6-7, 13, 23, 25, 29-30 | clearance instruction / clearance command |
| '770 Patent:  Claims 1, 3, 7-13, 15, 17-19, 21-22, 27 | one or more processors configured to |
| '770 Patent:  Claims 1, 8-10, 12, 27, 29 | potential for a collision<br><br>/<br><br>potential for the collision |

**INTRODUCTION**

In its opening brief, Ocado anticipated that AutoStore would manufacture non-infringement and invalidity defenses as purported "claim constructions."  That is exactly what AutoStore has done.  AutoStore repeatedly argues that common English words used by the inventors are confusing—and thus, that the Court should wholesale invalidate the '404 and '770 Patents and numerous claims of other Asserted Patents.  Even worse, AutoStore's opening brief replaces several unsustainable indefiniteness arguments with new invalidity arguments under 35 U.S.C. § 112(d)—invalidity theories that were not timely disclosed.  As explained below, all of AutoStore's "indefiniteness" and other invalidity arguments are baseless, and the Court should reject AutoStore's premature motion for judgment on validity issues that require additional expert discovery and on which AutoStore bears a clear-and-convincing-evidence burden.

AutoStore also repeatedly and openly asks the Court to rewrite the patent claims, often to add new claim limitations that do not appear in the claim language, to fit AutoStore's non-infringement theories.  These "constructions" are inconsistent with the plain claim language and specifications, exclude preferred embodiments or improperly limit broad claim language to specific embodiments, and violate blackletter rules of claim construction.  For these reasons, as explained below, the Court should reject AutoStore's attempts to "construe" the patent claims around its infringing products.

**ARGUMENT**

**I.    U.S. PATENT NO. 9,796,080**

**A.    "mechanism"**

"Mechanism" is a widely understood word that does not require construction, and Ocado respectfully submits that the plain and ordinary meaning of that term is sufficient.  In its brief, AutoStore relies on two, narrow dictionary definitions—ignoring several alternative definitions

that are broader—to ask the Court to limit this simple term to "a piece of machinery" that is fully automated.[1] (*See* Defs.' Br. at 10.) The '080 Patent does not describe the "mechanism" in that way, but rather repeatedly uses the word "mechanism" to include any arrangement for placing delivery containers—containers that are used to deliver customer orders—into or removing them from storage containers. That usage is consistent with the full breadth of the plain and ordinary meaning of "mechanism," and AutoStore's attempt to limit the claims to a fully automated "piece of machinery" fails for several reasons.

*First*, AutoStore does not provide legally relevant support for its proposed construction. AutoStore acknowledges that extrinsic evidence such as dictionary definitions "may not contradict or override the intrinsic evidence" (Defs.' Br. at 3), but does not cite any intrinsic evidence to support its proposed construction. AutoStore relies solely on two narrow dictionary definitions (despite alternative definitions that are broader) without explaining why those narrow definitions are consistent with the '080 Patent. (*Id.* at 8.) This is an improper use of extrinsic evidence. *See*, *e.g.*, *Virnetx, Inc.* v. *Cisco Sys., Inc.*, 767 F.3d 1308, 1317 (Fed. Cir. 2014) ("[I]ntrinsic evidence is not outweighed by the extrinsic evidence of one dictionary definition[, which] is particularly true . . . where . . . the specification makes clear that the claim term in question is not so limited."); *Arthrex, Inc.* v. *Smith & Nephew, Inc.*, 935 F.3d 1319, 1330-31 (Fed. Cir. 2019).

*Second*, AutoStore's proposed construction is inconsistent with the disclosures in the specification. The '080 Patent does not limit the term "mechanism" to a fully automated piece of machinery, but rather states that the AS/RS sub-systems, including the "mechanism" for placing a

---

[1] AutoStore would limit "mechanism" to a piece of machinery that provides a fully automated process for inserting delivery containers into or removing them from storage containers. (Defs.' Br. at 8.) AutoStore would exclude, for example, mechanical devices that are operated by a human and thus only semi-automated. In light of AutoStore's opening brief, this appears to be the primary claim construction dispute regarding the term "mechanism."

delivery container into, or removing it from, a storage container "can include any machine(s), devices(s), infrastructure or arrangement(s) suitable *for fully or __semi-automatically__* storing and retrieving containers." (*See* '080 Patent 4:53-56 (emphasis added).)  The mechanism contemplated by the specification thus includes a device that is only semi-automated, *i.e.*, partially operated by a human.  AutoStore argues that Ocado would include within the scope of the term "mechanism" "a human working alone" (Defs.' Br. at 8), but that is not accurate.  Clearly, the at-issue "mechanism" cannot be a human working alone because a human is not remotely within the scope of the plain and ordinary meaning of "mechanism."  Rather, Ocado objects to AutoStore's attempt to exclude from the claims what the specification discloses:  a __*semi*__-automated mechanism, which can be, for example, a device operated by a human.

### B.    "nested" / "nestable"

AutoStore seeks to narrow these simple terms by construing them to require that a delivery container is "designed to fit snugly" within a storage container—leaving all to guess what "snugly" might mean.  In its brief, AutoStore fails to provide sufficient support for its own construction, and instead focuses its efforts on criticizing Ocado's plain-meaning construction.  These criticisms are meritless.

*First*, AutoStore argues that Ocado's proposed construction renders the word "within" in claims 8 and 23 superfluous because these claims recite a delivery container that is "nested within" the storage container.  (Defs.' Br. at 9.)  As an initial matter, Ocado obviously is not proposing to construe "nested within" as "placed within within"—*i.e.*, claiming a typo.  Rather, Ocado contends that "nested within" means "placed within," which does not make the preposition "within" superfluous.  Rather, the word "placed" conveys how the delivery container came to be inside the storage container—the claimed "mechanism" placed the delivery container within the storage container.  (*See* Pfeifer Rebuttal ¶ 16.)  Moreover, as explained in Ocado's opening brief (Pls.' Br.

at 11), the specification consistently uses the phrase "placed within," showing that the patentee did not consider those words to be redundant.

*Second*, AutoStore claims that Ocado's plain-meaning construction is purportedly inconsistent with the specification, contending that "[t]he specification confirms that 'nestable' refers to more than mere capability of being placed within something" based on language from the specification stating that "a lighter, cheaper, and optionally nestable or collapsible" delivery container "is placed within storage bins." (Defs.' Br. at 9.) But this portion of the specification supports ***Ocado's*** construction. The text describes two different characteristics of delivery containers, either of which makes a delivery container capable of being placed within a storage container (*see* Pfeifer Rebuttal ¶ 31)—*i.e.*, a collapsible delivery container would be collapsed (*e.g.*, folded) for placement within a storage container, while a nestable delivery container has dimensions such that it can be placed directly within a storage container. That design flexibility does not impose limitations on the meaning of "nestable," and does not support AutoStore's construction.

The only "support" AutoStore cites for its construction is the conclusory testimony of its expert, Dr. Spenko, and a single dictionary definition (again cherry-picked from many). Dr. Spenko's opinion that the delivery tote must fit "snugly"—a word not once used in the '080 Patent—is based on (i) his interpretation of Figure 6 of the '080 Patent, and (ii) his concern that the delivery container "does not fall over during transit and is in the expected location to facilitate its removal from the storage container by the automated mechanisms." (Defs.' Br. at 10.) But Figure 6 is silent on whether the depicted fit is "snug," and in any event, it depicts only one non-limiting embodiment. (*See* Pls.' Br. at 13.) And Dr. Spenko's "falling over" and "expected location" concerns are entirely hypothetical problems not addressed by the '080 Patent. In any

event, Dr. Spenko acknowledged that his hypothetical problems readily could be addressed without a "snug" fit, and thus assuming it were valid to take them into account (it is not), they do not mandate AutoStore's construction.  (Spenko Tr. at 269:13-270:1; *see also* Pls.' Br. at 13.)[2]

AutoStore's cherry-picked dictionary definition—among several broader definitions (*e.g.*, Ex. 26, The Oxford English Dictionary 483 (7th ed. 2012) ("fit (an object or objects) inside a larger one"))—also is not consistent with the specification.[3]  As shown in Ocado's opening brief, the specification equates "nested" and "combined," and consistently depicts and describes the delivery containers as placed within storage containers without any qualification on the nature of the "fit." (*See* Pls.' Br. at 11.)  Similarly, one can fully achieve the benefits of the invention described in the specification if the delivery containers can be placed within the storage containers without any specific "fit" requirement.  (*See id.* at 13.)  Thus, if the Court believes it is necessary to consult dictionary definitions, the specification favors a broad definition of "nest" and "nestable," consistent with the broader definitions identified by Ocado.  *See Brookhill-Wilk 1, LLC* v. *Intuitive Surgical, Inc.*, 326 F.3d 1215, 1222 (Fed. Cir. 2003) ("Where there are several common meanings

---

[2] Dr. Spenko's opinion also relies on a single embodiment that uses an automated transfer mechanism, but that feature is not required by the vast majority of claims and thus provides no support for AutoStore's construction.  (*See* Pls.' Br. at 13-14.)

[3] AutoStore's attempt to draw support for its preferred definition from the testimony of Ocado's expert, Dr. Pfeifer, mischaracterizes his testimony.  *First*, AutoStore's argument that Dr. Pfeifer allegedly "admitted that [the] dictionary [AutoStore cites] is at least as good as any other that Ocado may rely upon" (Defs.' Br. at 10-11) is misleading.  Dr. Pfeifer only stated that he was not "aware of" and had not "looked into" whether there was "any specific reason that a [POSITA] would prefer the Oxford English Dictionary over the American Heritage Dictionary" (Ex. 48 ("Pfeifer Tr.") at 99:11-17); he never agreed that the definitions of "nest" in those dictionaries are equally applicable to the '080 Patent.  *Second*, whether any **other** technical documents use "nested" to mean "placed within" (Defs.' Br. at 11) is irrelevant, as Dr. Pfeifer repeatedly stressed that the primary source of his opinion is the '080 Patent itself, and "reference to [the] dictionary is certainly secondary."  (Pfeifer Rebuttal ¶¶ 9, 11; Pfeifer Tr. at 99:2-10.)

for a claim term, the patent disclosure serves to point away from the improper meanings and toward the proper meanings.").

In short, AutoStore provides the Court with nothing from the '080 Patent to support its proposed construction, which significantly narrows the patent claims by introducing words and concepts foreign to the '080 Patent. AutoStore's proposed construction is legally wrong and should be rejected. *See Ultimax Cement Mfg. Corp.* v. *CTS Cement Mfg. Corp.*, 587 F.3d 1339, 1347 (Fed. Cir. 2009) (reversing construction that "relied on expert testimony and a single dictionary definition to the exclusion of other dictionary definitions and, most importantly, the context in which the term was used within the claim and the specification").

### C.    "delivery container"

AutoStore first argues that Ocado's proposed construction (a "container for delivery to customers that is configured to contain at least one picked item") should be rejected because it "is broader than [Ocado's] disclaimer during prosecution [before the U.S. PTO] that the delivery containers are specifically not 'pre-packaged items' and must 'store items picked from a pallet.'" (Defs.' Br. at 11-12.) That is a manufactured dispute. Ocado agrees that, *e.g.*, a pre-packaged box of pencils is not a "delivery container" within the meaning of the claim language. Such a pre-packaged box, without modification, is not (using the words of Ocado's proposed construction) "configured to contain at least one ***picked*** item." This is consistent with the statements Ocado made during prosecution, and there never has been a dispute on this issue.

AutoStore next argues that the Court should read into the claims an additional limitation that does not appear in the claim language: that every "delivery container" be "suitable for engagement by the robotic load handler," which AutoStore further construes as the robot ***directly*** engaging delivery containers (as opposed to engaging them indirectly when delivery containers are placed within storage containers). (Defs' Br. at 12.) As a preliminary matter, this argument is

contrary to how the preferred embodiment of the invention is described and depicted in the '080 Patent. The specification repeatedly depicts and describes the preferred embodiment with robotic load handlers (i) engaging *directly* with storage containers, and (ii) engaging only indirectly with delivery containers that have been placed within storage containers. (*See*, *e.g.*, '080 Patent 8:55-59, 9:14-25, 10:47-66, 11:31-56, 12:17-46, 13:25-31, figs. 16-21.) The only figures that show both a robotic load handler and a delivery container, Figures 16-20, depict a robotic "load handler [] depositing a combined delivery and storage container [] onto a transfer platform" after which the delivery container is removed using "clamps" and the robotic "load handler . . . retrieve[s] the empty storage container." (*See id.* 11:33-54, figs. 16-20.) Those figures are consistent with the specification text, which consistently describes the use of robotic load handlers to engage directly with storage containers and indirectly with delivery containers (*i.e.*, to transport, store, or retrieve them) when the delivery containers are placed within storage containers. (*See id.* 8:55-59, 9:14-25, 10:47-66, 11:31-56, 12:17-46, 13:25-31.) It simply makes no sense to impose on the claims a requirement that the delivery containers be configured for direct engagement by robotic load handlers when that direct engagement is something that never happens in the preferred embodiment of the invention.

In its opening brief, AutoStore relies on two snippets from the specification: (i) "delivery containers can be 'engaged by the same or another moveable overhead load handler,'" and (ii) delivery containers "may be retrieved" or "may be accessed" by a robotic load handler. (Defs.' Br. at 14.) These passages clearly do not support AutoStore's attempt to insert a narrowing limitation into the claims. *First*, this text does not even say that the robotic load handlers *directly* engage delivery containers. A delivery container can be engaged, retrieved, and accessed when it is placed within a storage container, as depicted and described throughout the specification.

*Second*, and more importantly, even assuming the text said that delivery containers could be directly engaged by robotic load handlers, that expressly is an optional embodiment of the invention (*i.e.*, "can be" and "may be") that legally cannot limit the claims.[4]  *See Hill-Rom Servs., Inc.* v. *Stryker Corp.*, 755 F.3d 1367, 1371 (Fed. Cir. 2014) (courts should "not read limitations from the embodiments in the specification into the claims"); *Absolute Software, Inc.* v. *Stealth Signal, Inc.*, 659 F.3d 1121, 1137 (Fed. Cir. 2011) (declining to limit claims to "optional features").

AutoStore also argues that various portions of the claim language support its position, but those arguments also are unavailing.  Claim 1 recites "a plurality of robotic load handlers for retrieving shipment containers from any one of the storage locations" and "at least one processor configured to . . . generate signals for instructing or controlling at least one of the plurality of robotic load handlers to store at least one delivery container in the storage and retrieval system. . . ."  ('080 Patent claim 1.)  Nothing about this language requires—or even suggests—that the delivery containers must be suitable for direct engagement by robotic load handlers.  The claim language is agnostic as to the method of engagement; it encompasses situations in which robotic load handlers engage (i) only indirectly with delivery containers (when they have been placed within storage containers), (ii) only directly with delivery containers outside of storage containers, or (iii) with delivery containers in both ways.  Each of these scenarios is within the scope of the plain claim language, and it would be legal error to impose on the claims a requirement—*i.e.*, that all delivery containers are configured for direct engagement by robotic load handlers—that would make sense only for some of the scenarios, but not others expressly disclosed in the patent.

---

[4] Indeed, the rest of the first quoted sentence (which AutoStore omitted from the quotation in its opening brief) shows that other embodiments were contemplated—*e.g.*, engagement by "a bottom-access lifter/clamp" ('080 Patent 7:21-22).

Substantially the same point applies to independent claim 13. The claim recites storing and transporting delivery containers, but it is agnostic as to the direct or indirect nature of engagement between the robotic load handlers and the delivery containers. Here too, the plain claim language encompasses all three of the above-described scenarios, and there is no basis to impose on the claims a requirement that all delivery containers be configured for direct engagement by robotic load handlers.

Moreover, there is even less of a basis for AutoStore's argument when turning to independent claim 23. That claim recites "delivery containers," but says ***nothing*** about robotic load handlers engaging, transporting, or storing delivery containers in any respect. If the Court were to adopt AutoStore's construction of the term "delivery container"—a term used consistently across all of the claims—it would impose on Claim 23 a requirement that makes no sense in the context of that claim, and thus is legally improper. *See DSW, Inc.* v. *Shoe Pavilion, Inc.*, 537 F.3d 1342, 1348 (Fed. Cir. 2008) (finding "it was improper . . . to import limitations from [three independent] claims into [an unrelated independent claim and its dependent] claims"). This is another independently sufficient reason to reject AutoStore's proposal.

AutoStore also points to dependent claims 2 and 14, and confusingly argues that there is no difference between claims 1 and 2 and claims 13 and 14 unless delivery containers are configured for direct engagement by robotic load handlers. (Defs.' Br. at 12-13.) That is wrong. Although independent claims 1 and 13 encompass all three of the above-described scenarios, dependent claims 2 and 14 are narrower and encompass only an embodiment in which each delivery container is configured such that it can be placed within a storage container. Claims 2 and 14 exclude the scenario in which all delivery containers are configured only for direct engagement by the robotic load handlers, and thus they are narrower. This is a very common use

of a dependent claim—*i.e.*, claiming or excluding a specific embodiment that is within the broader scope of the independent claim.  There is no claim differentiation problem to address, and thus AutoStore's argument falls apart.[5]

Finally, AutoStore argues that if claims 1 and 13 encompass robotic load handlers that transport and store delivery containers when they are placed within storage containers, the claims should have used the phrase "combined container."  (Defs.' Br. at 13.)  But claims 1 and 13 do not use the term "combined container" because the claims are not that narrow.  As explained above, these claims are agnostic as to whether the robots transport, store, and retrieve combined containers, delivery containers alone, or both—each scenario is within the scope of the claims. Using the phrase "combined container" would have narrowed the claims, and the inventors chose to claim their invention more broadly.

In summary, the figures and text of the specification consistently describe and depict a system in which robotic load handlers directly engage with storage containers and may indirectly engage with delivery containers if the delivery containers have been placed within the storage containers.  That is consistent with the efficiency purpose of the invention, as described in the specification.   The plain claim language encompasses that embodiment, as well as other embodiments in which the robotic load handlers directly engage with the delivery containers. There is no basis for imposing AutoStore's requirement on the claims—found nowhere in the

---

[5] Moreover, even if there were a hypothetical claim differentiation issue (there is not), claim differentiation is only a tertiary aid in construing claims, and it cannot trump the claim language or specification, both of which here do not support AutoStore's non-infringement argument in the guise of a narrowing construction.  *See Retractable Techs., Inc.* v. *Becton, Dickinson & Co.*, 653 F.3d 1296, 1305 (Fed. Cir. 2011) ("[A]ny presumption created by the doctrine of claim differentiation will be overcome by a contrary construction dictated by the written description or prosecution history." (quotations omitted)); *Kraft Foods, Inc.* v. *Int'l Trading Co.*, 203 F.3d 1362, 1368 (Fed. Cir. 2000) ("[C]laim differentiation only creates a presumption that each claim in a patent has a different scope; it is not a hard and fast rule of construction." (quotations omitted)).

claim language—that all delivery containers be configured for direct engagement, which would make no sense in the context of the claim language and preferred embodiment.

### D.    "delivery container containing at least one picked item"

This phrase, found in both claims 1 and 15, consists of common words that are readily understandable without additional construction. (*See* Pls.' Br. at 16.) AutoStore seeks to construe this phrase in claim 15 to require that the picked item "must come from a storage container" (Defs.' Br. at 14)—language that is an explicit requirement of claim 1 but intentionally omitted from claim 15, which depends from a different independent claim. By adding this limitation into claim 15, AutoStore is not "construing" anything, and instead improperly seeks "to manufacture noninfringement arguments." *SIPCO, LLC* v. *ABB, Inc.*, 2012 WL 3112302, at *4 (E.D. Tex. July 30, 2012). The Court should reject this effort because importing a limitation from claim 1 into claim 15 is a plain legal error. *See Unwired Planet, LLC* v. *Apple Inc.*, 829 F.3d 1353, 1358-59 (Fed. Cir. 2016) (declining to import a limitation recited in other claims into the at-issue claims because "[i]f the patentee intended to restrict the claims-at-issue . . . it could have included that same limitation").

### E.    "at least one of a lip, a handle, and an aperture"

Without citing any evidence—intrinsic or extrinsic—AutoStore relies on *SuperGuide Corp.* v. *DirecTV Enterprises*, 358 F.3d 870 (Fed. Cir. 2004), and cases citing it, to argue that the term "at least one of" followed by a list of A and B means "at least one of A and at least one of B." (Defs.' Br. at 15.) However, "*SuperGuide* did not erect a universal rule of construction," and the Federal Circuit's reasoning "was based on the particular facts of the particular patent at issue there." *Fujifilm Corp.* v. *Motorola Mobility LLC*, 2015 WL 1265009, at *8 (N.D. Cal. Mar. 19,

2015).[6]  In *SuperGuide*, the disputed claim term was "at least one of a desired program start time, a desired program end time, a desired program service, and a desired program type."  358 F.3d at 884.  Because "[e]very disclosed embodiment t[aught] that the user must choose a value for each designated category" and "at least one of" preceded a series of broad ***categories***, the court concluded that "the patentee used the term 'and' to separate the categories of criteria, which connotes a conjunctive list."  *Id.* at 886-87.

    *SuperGuide* does not apply here.  Unlike *SuperGuide*, the '080 Patent makes clear that not all of the recited features are required.  For example, the specification describes an embodiment in which the delivery container has "one or more handles," but states that this embodiment "***may*** be used alternatively or in addition to the aperture-enabled [embodiment] or any other mechanism." ('080 Patent 10:25-30 (emphasis added).)   Thus, the specification expressly describes an embodiment in which the delivery container has only a handle and another embodiment in which it ***may*** also have an aperture, but there is no requirement that the container have both.  In addition, unlike in *SuperGuide*, the claim language recites specific features rather than broad categories. The Court should construe the term in accord with its plain and ordinary meaning (and common sense) to mean at least one of the three listed features—not at least one of each listed feature.

---

[6] *See also Firtiva Corp.* v. *Funimation Global Grp., LLC*, 2022 WL 23165, at *7 (E.D. Tex. Jan. 3, 2022) (the Federal Circuit's decision in *SuperGuide* was "context specific, and other courts have found it inapplicable when the facts so require"); *Iridescent Networks, Inc.* v. *AT&T Mobility, LLC*, 2017 WL 10185852, at *4 (E.D. Tex. Dec. 1, 2017) ("Defendants' objection based upon *SuperGuide* suggests that *SuperGuide* created a universal rule for all claims that use the phrase 'at least one of' and should be applied irrespective of the disclosures in the specification.  This is not the holding of *SuperGuide*."); *Fiber, LLC* v. *Ciena Corp.*, 2017 WL 3896443, at *8 (D. Colo. Sept. 6, 2017); *TQ Delta, LLC* v. *Comcast Cable Commc'ns, LLC*, 2016 WL 7013481, at *8 (D. Del. Nov. 30, 2016).

### F. "a structural framework defining a grid of storage locations"

The crux of the dispute, which AutoStore never directly addresses, is whether this claim limitation is satisfied by merely arranging containers in a grid pattern without structural components that define the grid. (Pls.' Br. at 17-18.) As Ocado explained in its opening brief, and as the PTAB readily concluded,[7] the answer to that question is "no." (*Id.* at 18.) Ocado asks the Court to construe the disputed term consistent with the PTAB's construction, which is part of the patent's intrinsic record. *See GREE, Inc.* v. *Supercell Oy*, 2020 WL 2476497, at *7 n.5 (E.D. Tex. May 12, 2020). AutoStore, having lost its invalidity arguments at the PTAB, asks the Court to adopt a construction different from the one adopted by the PTAB—the same construction that AutoStore previously offered and the PTAB rejected—so AutoStore can attempt to re-run in the district court its failed PTAB invalidity arguments. Ocado respectfully submits that the Court should adopt a construction that is consistent with the PTAB's decision.

AutoStore's two criticisms of Ocado's proposed construction are unavailing. *First*, AutoStore argues that nothing in the intrinsic record limits the grid to an "array" and that it is unclear whether "crossed" requires that the structural elements overlap with each other or only meet at a point in the middle. (Defs.' Br. at 16.) But every figure depicting the grid shows an array of structural elements intersecting at a 90-degree angle and forming rows and columns (*i.e.*, a grid). ('080 Patent figs. 3, 5, 9, 16-20.) As can be seen in the figures, the claimed system includes

---

[7] AutoStore incorrectly represents that the PTAB "rejected both parties' constructions." (Defs.' Br. at 16 n.9.) But the PTAB **rejected AutoStore's** construction and **agreed with Ocado** that this limitation "require[s] that a structural framework define the grid of storage locations, as opposed to these locations being defined merely by the orientation or location of stacked containers." (Ex. 24, IPR2021-00798, PTAB Decision Denying Institution at 11; *see also* Pls.' Br. at 18.) In its Request for Rehearing, AutoStore erroneously interprets the PTAB's construction as "unquestionably broader than the one proposed by" Ocado and disputes the PTAB's construction based on the same misguided arguments about "single rails" discussed below. (*See* Ex. 41, IPR2021-00798, Petitioner's Request for Rehearing at 5-6.) The standard for obtaining a rehearing is abuse of discretion, and AutoStore's baseless argument does meet that high bar.

*both* overlapping structural elements in the middle of the grid *and* structural elements that meet in the middle on the four sides of the grid. The specification also discloses that "grids . . . of containers stored in rows[] and columns[] of stacks[]" where the "rails [] formed by frames used to support the containers . . . define the grid." (*Id.* 6:35-42.) Thus, the patent uniformly describes the grid as an array, and AutoStore's argument to the contrary (without citing any evidence) is baseless.

*Second*, AutoStore's argument that the disclosure of "single rails" means that the specification discloses rails that do not cross (Defs.' Br. at 16) is simply wrong. In prior art systems, like AutoStore's Red Line, the grid had a single rail in one direction and a double rail in the other direction to allow robots to pass one another:



The specification explains that, for the '080 Patent, the "[r]ails[] along which the [robots] are configured to move . . . can include single rails, double rails, track(s), guideway(s), gro[o]ve(s), or any other structure along with the [robots] can operate." ('080 Patent 6:45-49.) Thus, the description of an embodiment utilizing "single rails" clearly relates to the number of rails (one versus two, as shown in the above image) that guide the movement of the robots' wheels, and does not suggest that single rails never cross another rail, as AutoStore contends.

---

[8] AutoStore Logistic, *Technical Presentation*, https://www.youtube.com/watch?v=iyVDMp2b L9c, at 3:22.

### G.    "exclusively within the storage and retrieval system"

AutoStore argues that this term is indefinite because "robotic load handlers cannot **both** 'exclusively' transport the storage bins within the storage and retrieval system **and** deliver those same bins to the separate order picking station."  (Defs.' Br. at 17 (emphasis in original).) AutoStore's indefiniteness argument requires mischaracterizing the claim language to require the robot itself to deliver the bin to the order picking station.  That is not a requirement of the claims and, applying the plain claim language, there is no inconsistency.

The actual language of claim 1 requires a system with "at least one *processor* configured to . . . *generate signals* for instructing or controlling at least one of the plurality of robotic load handlers *to retrieve* from the storage and retrieval system at least one storage container containing stored items *for delivering* the retrieved at least one storage container to an order picking station." ('080 Patent 14:15-25 (emphasis added).)  In its opening brief, AutoStore omits critical claim language to invent a requirement that the robots "*deliver[]* the retrieved at least one storage container *to* an order picking station."  (Defs.' Br. at 17 (emphasis added); *see also id.* at 18 (changing claim 1 to "deliver[ed] . . . to").)  But, again, that plainly is not what the claim says. Having a processor configured to provide signals for a robot to retrieve a container for delivering the container to a picking station (*i.e.*, a signal for retrieval of a container from the system, as one part of the delivery process) is different from using the robots to "*deliver* [the storage container] *to*" a picking station (*i.e.,* requiring the robots to drop the container off at the picking station).

Indeed, the specification describes a set up in which the robot plays a role in only part of the delivery to a picking station.  For example, the specification contemplates "various types and form of conveyor or trolley-based systems, wherein containers[] can be loaded on conveyor(s) or picking trolley(s) for transport to picking areas" ('080 Patent 4:63-5:4)—*i.e.*, that robots might retrieve containers and position them to be picked up by conveyors that take them to the order

-15-

picking station.  In addition, the specification states that "containers may be . . . delivered to the identified picking station[] by, for example being hoisted by an overhead load handler[], delivered to a port[], and taken by conveyor to the desired pick station."  (*Id.* 7:31-36.)  Thus, the specification is clear that the process "for delivering" the storage container to a picking station involves (i) using a robot to retrieve a container and bring it to a port at the edge of the cube/grid and then (ii) using a conveyor belt or other mechanism to bring the storage container to a picking station.  The scope of the patent claim is entirely clear—a system infringes if it has at least one **processor** configured to provide signals for a robot to retrieve a container for delivery to a picking station.  The claims do not require, call for, or encompass direct deposit of the container at the picking station **by the robot**, and thus there is no inconsistency in the claims.

## II.    U.S. PATENT NO. 10,913,602

### A.    "occupy a grid space"

AutoStore admits that its purported "construction" of the phrase "occupy a grid space" attempts to "limit[]" the plain and ordinary meaning of claims 1 and 12 by additionally requiring a load-handling device (*i.e.*, robot) that occupies "**only** a **single** grid space" (Defs.' Br. at 19 (emphasis added)), thereby excluding embodiments in which the robot extends beyond the grid space it occupies.  But a grid space plainly can be occupied by a robot that extends beyond that space (as made clear by the specification), and limiting the claim term's plain and ordinary meaning requires AutoStore to come forward with "clear and unmistakable" evidence of disavowal, *Unwired Planet*, 829 F.3d at 1358.  AutoStore has failed to meet this "exacting" burden. *Poly-Am., L.P.* v. *API Indus., Inc.*, 839 F.3d 1131, 1136 (Fed. Cir. 2016).

Relying mainly on the non-precedential Federal Circuit decision in *Wastow Enterprises, LLC* v. *Truckmovers.com, Inc.*, 855 F. App'x 748 (Fed. Cir. 2021), AutoStore argues that Ocado disavowed a robot larger than a single grid space because, AutoStore contends, the specification

repeatedly refers to "the present invention" as occupying "only a single grid space."  (*See* Defs.' Br. at 19-20.)  This mischaracterizes the specification.  The specification does ***not*** say that the "invention" is a robot that occupies "only a single grid space" (*id.* at 19); rather, it states that the robot "occupies ***substantially*** a single grid space" ('602 Patent 7:3-7 (emphasis added)) or "occupies ***substantially*** only a single grid space" (*id.* 4:63-5:6, 5:7-21, 7:9-24 (emphasis added)).  As both parties' experts testified at deposition, by using the word "substantially," the specification discloses a robot "***larger than*** a single grid space."  (Ex. 42 ("Derby Tr.") at 116:15-117:4 (emphasis added); Pfeifer Sur-rebuttal ¶ 21.)    Far  from  proving  that  Ocado  clearly  and unmistakably disavowed robots occupying more than "only a single grid space," this disclosure demonstrates the opposite—that the robot must occupy (*i.e.*, "fill up") one grid space, but the robot can encroach on an adjacent space (*e.g.*, a total size of 1.2 grid spaces).  (*See* Pls.' Br. at 20-21.)

AutoStore's reliance on (i) an isolated reference in the abstract to a robot that "occupies only a single grid space in the storage system" ('602 Patent abstract), and (ii) scattered references to "the load handling device of the invention occup[ying] the space above only one stack of containers" (*id.* 5:38-40, 7:61-63) do not change this conclusion.  As an initial matter, the reference in the abstract does not even include the "present invention" language on which AutoStore purports to rely.  (*See* Defs.' Br. at 19.)  Setting that aside, however, these statements "read in [the] context of the entire specification" refer to optional embodiments of the invention, and not to the invention as a whole, as is required for disavowal.  *Rambus Inc.* v. *Infineon Techs. AG*, 318 F.3d 1081, 1094 (Fed. Cir. 2003).  As Dr. Pfeifer testified, a POSITA would understand these statements to refer to optional embodiments because other embodiments disclosed in the specification "occupy more than a single grid space" (Pfeifer Sur-rebuttal ¶¶ 20-21)—a point AutoStore's expert conceded (Derby Tr. at 116:15-117:4).  (*See* Pls.' Br. at 22-23.)  The lack of uniformity in the description—

-17-

showing that these descriptions pertain to optional embodiments, not the invention as a whole—

legally closes the door to disavowal.  *See Absolute Software*, 659 F.3d at 1136-37; *Voda* v. *Cordis Corp.*, 536 F.3d 1311, 1321 (Fed. Cir. 2008).

AutoStore also argues that Ocado disavowed a robot larger than "only a single grid space" because such a robot purportedly would not "achieve[]" the "full . . . benefits" of the invention "over the prior art."  (Defs.' Br. at 20.)  AutoStore's own expert, however, acknowledged the obvious:  the "benefits [of the invention] can be achieved by a robot that occupies" more than a single grid space, and indeed, can be achieved even if the robot is so large that it occupies "about 50 percent greater than a single grid space in one direction."  (Derby Tr. at 135:18-138:1, 138:13-24; *see also* Pls.' Br. at 23.)  Moreover, the Federal Circuit has underscored that, to establish "disavowal of claim scope through disparagement of a particular feature," the patentee must make "repeated derogatory statements" about that feature.  *Openwave Sys., Inc.* v. *Apple Inc.*, 808 F.3d 509, 513 (Fed. Cir. 2015).  That did not happen here.  The portions of the specification AutoStore cites criticize only the "cantilever design" of "prior art [robots] which occupy ***two or more*** [grid] spaces" ('602 Patent 5:40-42, 7:63-65 (emphasis added)); they do not remotely criticize robots larger than "only a single grid space" but smaller than two-space prior-art robots, much less anything so clearly derogatory as to trigger disavowal.[9]

---

[9] In passing, AutoStore suggests that the PTAB "expressly recognized that [a] single-space requirement was key to obtaining the full . . . benefits of the patent" in the IPR proceedings concerning the '602 Patent.  (Defs.' Br. at 21.)  The PTAB did no such thing, as the portion of the PTAB's decision AutoStore conspicuously (and misleadingly) omits from the parenthetical quotation in its brief reveals.  Like the specification of '602 Patent itself, addressed above, the PTAB noted the benefits of the "disclosed [] load handling vehicle that 'occupies the space above only one stack of containers in the frame,' *in contrast to prior art vehicles* that occupy *the spaces above two stacks of containers*."  (Defs.' Ex. 29, IPR2022-00443, PTAB Decision Denying Institution at 3 (emphasis added) (quoting '602 Patent 5:38-42).)  The PTAB did not find that the '602 Patent disparages robots larger than only a single grid space but smaller than two grid spaces,

Trying a different tack to support a non-infringement argument, AutoStore contends that the indefinite article "a" means "only a single" because the word refers to "one discrete, countable thing." (Defs.' Br. at 21.) This argument is entirely beside the point. Ocado agrees that the claimed robot must occupy "one discrete" grid space, but that does not mean the robot cannot also occupy part of an adjacent grid space. Ocado's position is consistent with the blackletter claim construction rule that "a" typically means "at least one" (*i.e.*, under Ocado's construction, the robot must occupy at least one grid space). *Crystal Semiconductor Corp.* v. *TriTech Microelecs. Int'l, Inc.*, 246 F.3d 1336, 1347 (Fed. Cir. 2001); *TiVo, Inc.* v. *EchoStar Commc'ns Corp.*, 516 F.3d 1290, 1303 (Fed. Cir. 2008). Indeed, not even AutoStore's expert Dr. Derby read the indefinite article "a" the way AutoStore now contends. (*E.g.*, Derby Tr. at 105:11-17 (testifying that "the phrase 'occupy a grid space' does not mean that a robot only occupies one grid space").)[10]

Finally, AutoStore argues in passing that claims of the '602 Patent that contain the words "at least one" and "one or more" support the notion that "a grid space" means "only one grid space." (*See* Defs.' Br. at 21.) This argument is misleading and irrelevant: Claims 7, 15, and 18 use the phrase "at least one *of*" to introduce a list of discrete options—"the first *or* second set of wheels"—and that phrase does not set a minimum quantity for an open-ended term like "grid space." Similarly, claims 10 and 17 use the phrase "one or more *of*" to identify *which* of "the first or second set of wheels" "comprise[] a wheel hub motor." Each claim AutoStore cites thus uses

---

nor did it suggest that *only* a robot limited to the size of a single grid space could achieve the benefits of the patent *over a prior-art two-space robot*.

[10] AutoStore cites two **statutory** interpretation cases: *Niz-Chavez* v. *Garland*, 141 S. Ct. 1474, 1481 (2021), and *AbbVie Inc.* v. *Mathilda & Terrence Kennedy Institute of Rheumatology Trust*, 764 F.3d 1366, 1372 (Fed. Cir. 2014). These statutory-interpretation decisions have no application here. Unlike the terms "a notice to appear" in *Niz-Chavez* and "a patent" in *AbbVie*—both discrete, countable things that, in their statutory context, refer to a single document—"a grid space" is a measure of space that does not warrant a similarly restrictive interpretation.

these phrases for selection, a completely different usage than in the phrase "occupy a grid space." In fact, as Ocado pointed out at in its opening brief, the claim language favors Ocado's ordinary-meaning construction: Claims 1 and 12 of the '602 Patent require a feature to fit "within" a "*single* grid space." (*See* Pls.' Br. at 21.) Thus, when the inventors intended to limit the claims to a *single* grid space, they knew how to say that and did so expressly.

All told, AutoStore's "construction" of "occupy a grid space" fails because it does not come close to satisfying the high legal hurdle required for disavowal, leaving the proposed construction entirely unmoored to the intrinsic evidence and the ordinary English meaning of the disputed phrase. The Court should give the term "occupy a grid space" its plain and ordinary meaning without adding the additional narrowing limitation that the robot must occupy *only* a *single* space. (*See* Pls.' Br. at 20-21.)

### B. "a load handling device . . . will not obstruct a load handling device . . . occupying or traversing an adjacent grid space in the X-direction and will not obstruct a load handling device . . . occupying or traversing an adjacent grid space in the Y-direction"

AutoStore also urges the Court to rewrite the "non-obstruction" limitation of claims 1 and 12—which provides that a load-handling device must "not obstruct [another] device occupying or traversing an adjacent grid space in the X-direction" or "traversing an adjacent grid space in the Y-direction"—to require that the robot not obstruct another robot in "any of the four adjacent grid spaces." (Defs.' Br. at 22-24; *see also* Pls.' Br. at 26.) Like AutoStore's attempt to rewrite the "occupy a grid space" limitation to manufacture a non-infringement defense, this all-four-sides disavowal argument also would effectively impose on the claims the improper requirement that the robot occupies only a single grid space. The patent claims only require clearance on *two*, not all four sides, *i.e.*, clearance on one side in the X direction and one side in the Y direction (*see* Pls.' Br. at 26), and AutoStore's proposed narrowing limitation—clearance on all four sides—can be

sustained only if there is "clear and unequivocal evidence" of disavowal.  *E.g.*, *Poly-Am.*, 839 F.3d at 1136.  AutoStore has put forward no evidence of disavowal.  In fact, in the two pages of its brief devoted to the non-obstruction limitation, AutoStore does not once mention disavowal.

Instead, AutoStore makes a convoluted argument based on part of a diagram from an expert report in another proceeding.  (Defs.' Br. at 23.)  AutoStore appears to suggest that, because *each* grid space adjacent to the grid space that a robot occupies is "*an* adjacent grid space," the claim's requirement that one robot must "not obstruct [another] occupying or traversing an adjacent grid space" in the X direction and in the Y direction means that the robot may not obstruct a robot occupying or traversing **any** of the four adjacent grid spaces.  (*Id.*)  That argument is utterly illogical and confuses a structure **sufficient** to meet the claim language with a structure **necessary** to meet the claim language.  A robot that allows passing on all four adjacent sides (both X sides and both Y sides) satisfies the claim language, but so too does a robot that allows passing on one X side and one Y side, and there is no legal basis to limit the claims to only the former.

AutoStore argues that Ocado construes the indefinite article "a" inconsistently across the "occupy a grid space" and non-obstruction limitations (Defs.' Br. at 23-24), but that is wrong.  As Ocado explained in its opening brief, it is blackletter law that the word "a" typically means "at least one," and that is how Ocado construes the article for both disputed terms.  (Pls.' Br. at 20-21, 26.)  The Court should give the non-obstruction limitation its ordinary meaning:  namely, that the robots must be able to pass one another on **at least one side** in the X-direction and on **at least one side** in the Y-direction.  (*Id.* at 26.)

## C.    "wheel hub motor"

AutoStore advances only a single argument in support of its proposed construction:  that Ocado's expert, Dr. Pfeifer, supposedly equated a "wheel hub motor" with "an electric motor situated at or at least partly within the wheels of [a] vehicle" in the context of a very different

proceeding concerning an entirely different patent owned not by Ocado, but by AutoStore. (Defs.' Br. at 24-25.) As Ocado explained in its opening brief (Pls.' Br. at 28-29), the construction of a different term in a different patent attributed to different inventors is legally irrelevant under Federal Circuit law, and indeed it is reversible error to construe a claim term based on its definition in an unrelated patent from a "separate [patent] famil[y]." *Trs. of Columbia Univ.* v. *Symantec Corp.*, 811 F.3d 1359, 1369-71 (Fed. Cir. 2016).

Moreover, as Ocado also explained, even if the law allowed the Court to construe "wheel hub motor" based on different language in an unrelated patent, AutoStore's argument still fails. (*See* Pls.' Br. at 29.) Confronted at deposition with the text of Dr. Pfeifer's declaration from the other proceeding, AutoStore's expert Dr. Derby admitted that Dr. Pfeifer has consistently testified that an "'in-wheel or 'wheel-hub' motor" must be "part of the wheel itself." (Derby Tr. at 73:7-74:20; *see* Ex. 33 ¶¶ 78-80.) Faced with reality, Dr. Derby was forced to concede that Dr. Pfeifer's declaration "doesn't appear to support" the construction AutoStore advances. (Derby Tr. at 74:6-13.) AutoStore's brief cites Dr. Derby's pre-deposition declaration to give its construction the veneer of expert support but AutoStore notably makes no mention of Dr. Derby's contrary deposition testimony, much less attempts to explain it away. (*See* Defs.' Br. at 25.)[11]

---

[11] AutoStore represents to the Court that Dr. Pfeifer "is known to improperly change his opinion" and asks the Court to question his credibility. (Defs.' Br. at 25.) To support this *ad hominem* attack, AutoStore cites only a single, seven-year-old case (from the hundreds of times Dr. Pfeifer has provided expert testimony and addressing an entirely different subject matter—whether the defendant violated Florida traffic laws) in which a magistrate judge granted a motion to exclude **as untimely** a previously undisclosed argument from Dr. Pfeifer that allegedly contradicted his prior deposition testimony. (*See* Defs.' Ex. 7.) That is hardly evidence that Dr. Pfeifer "is known" for anything. Moreover, it is ironic, to say the least, for AutoStore to sling mud about expert credibility. Dr. Derby, Dr. Pfeifer's opposite expert in this proceeding, disclosed only in response to deposition questions that he "hop[es] after this case is over to potentially go into business with AutoStore" by selling his patents to AutoStore (Derby Tr. at 43:9-24), and had large swaths of his opinion in a prior case excluded after the judge there found "it [was] apparent counsel put

## III.   U.S. PATENT NO. 10,961,051

### A.   "housing footprint"

AutoStore asks the Court to rewrite the term "housing footprint" in claims 1 and 13 to draw a distinction between the "housing" of the load-handling device (*i.e.*, robot) and something AutoStore calls "extensions from the housing," a concept that appears nowhere in the patent. (Defs.' Br. at 25.)  The Court should decline AutoStore's request to exclude "extensions from the housing" from the scope of the recited "housing" for at least three reasons.

*First*, AutoStore's argument is based on a faulty premise—that the "cantilever arm" of the robot cannot be part of the robot's "housing footprint" because the arm "extend[s] laterally from a top side of the . . . housing." (*Id*.)  AutoStore provides no evidence—intrinsic or extrinsic—to support this *ipse dixit*, which fails as a matter of basic logic.  By analogy, a dog's head "extend[s] laterally from [the] top side of" the dog's body, but no one would say that the head therefore cannot be part of the body.  The same applies here:  the cantilever arm is described as extending from a top part of the housing (to orient it in space), but that does not mean that the cantilever arm is not part of the "housing footprint" of the robot.[12]

---

[Dr. Derby] up to signing a document that, in very large part, expresses opinions that are not within his expertise," *KNAPP Logistics & Automation, Inc.* v. *R/X Automation Sols., Inc.*, 2015 WL 5608124, at *1 (D. Colo. Sept. 24, 2015).  And AutoStore's previous go-to expert, Dr. Jason Janét, not only had opinions relating to the subject matter of this case excluded because they were "the polar opposite" of his deposition testimony (Ex. 43, ITC Inv. No. 337-TA-1228, Order No. 51 at 5), but was found to be "not credible" after reversing his testimony to suit AutoStore's interests (Ex. 44, ITC Inv. No. 337-TA-1228, Final Initial Decision at 128).  AutoStore also fails to mention that both the ITC and the PTAB have credited Dr. Pfeifer's opinions over opinions provided by AutoStore's purported experts on subject matters like the ones at issue here.  (*See*, *e.g.*, *id.*; Ex. 45, IPR2021-00274, Final Written Decision at 23-25, 58-59.)  The depths to which AutoStore feels it necessary to stoop speak volumes about the strength of its arguments.

[12] The language of claim 13 underscores why AutoStore's argument fails.  Claim 13 recites a "cantilever arm extending from a top side **of the first load handling device"** (*i.e.*, the robot itself, rather than the robot's housing, as recited in claim 1).  According to AutoStore's flawed logic,

*Second*, the specification contradicts AutoStore's argument because it makes clear that the "housing footprint" of the cantilevered robot includes the space taken up by its cantilever arm. The specification—text and figures—repeatedly depicts and describes cantilever robots that occupy two grid spaces operating on the same system with smaller cavity robots that occupy less than two grid spaces. ('051 Patent 5:32-42, 7:61-65, 8:35-39, 9:41-48, fig. 7.) The specification also repeatedly distinguishes the cantilevered robot from the smaller cavity robot because the "footprint" of the cantilevered robot occupies two grid spaces, while the cavity robot has a "smaller [] footprint." *See*, *e.g.*, *id.* 5:32-42 ("the footprint of the load handling device [100] is reduced compared to the cantilever design[]," which "occupies the space above two stacks"), 9:45-48 (in Figure 7 "it can be seen that the prior art devices 30, although less tall, occupy two stack spaces compared to the taller but smaller-footprint devices 100 of the invention"). As Figure 7 shows, the "footprint" of the cantilevered robot occupies two grid spaces because the vehicle module occupies one grid space, and the cantilever arm occupies an adjacent grid space:



First grid space, occupied by the vehicle module

Second grid space, occupied by the cantilever arm

*Third*, the claims must be read in light of the specification, and in that context, it becomes obvious that claims 1 and 13 are directed to the described and depicted system that uses two

---

because the cantilever arm "extend[s] from" the robot, the cantilever arm would not be part of the robot. That is an absurd result, and the Court should reject AutoStore's construction for this reason alone. *See AIA Eng'g Ltd.* v. *Magotteaux Int'l S/A*, 657 F.3d 1264, 1276 (Fed. Cir. 2011) (courts should "avoid nonsensical results in construing claim language").

different types of robots—(i) a prior-art, cantilevered robot (reference numeral 30 or "first load-handling device"), and (ii) a taller cavity robot (reference numeral 100 or "second load-handling device"). (*Id*. 9:41-48.) The cantilever arm therefore must be part of the robot's "housing footprint," or else the claim would exclude the preferred embodiment—consistently depicted and described throughout the specification—in contravention of Federal Circuit law. *See Kaufman* v. *Microsoft Corp.*, 34 F.4th 1360, 1372 (Fed. Cir. 2022) ("A claim construction that excludes a preferred embodiment is rarely, if ever[,] correct and would require highly persuasive evidentiary support." (quoting *Epos Techs. Ltd.* v. *Pegasus Techs. Ltd.*, 766 F.3d 1338, 1347 (Fed. Cir. 2014))). Moreover, in parallel PTAB proceedings, AutoStore ***admitted*** that Ocado's argument is correct, *i.e.*, that the cantilever arm of its Red Line robot (described in a Norwegian patent referred to as "NO366") was part of the "housing footprint," as that term is used in the claims of the '051 Patent. (Ex. 46, IPR2022-00673, Pet. at 25, 48-49.) Consistent with AutoStore's admission and all of the disclosures in the specification, the Court should decline to construe the claims to exclude the cantilever arm from the "housing footprint."[13]

> **B.**    **"a housing footprint that occupies less than twice the area of the grid space"**

AutoStore makes two arguments in support of its attempt to rewrite claims 1 and 13 of the '051 Patent, replacing the phrase "less than twice" with the much narrower phrase "only a single." (*See* Defs.' Br. at 26.) *First*, AutoStore argues for disavowal, incorporating by reference its

---

[13] At the risk of belaboring the point, it also is relevant that the claim language is "housing ***footprint***," not "housing." Whatever arguments AutoStore might make about the term "housing," standing alone, there can be no serious doubt that the term "housing footprint" includes the cantilever arm because otherwise the claims would be entirely divorced from the invention disclosed in the specification. Reading the claims and the specification together, it is straightforward to conclude that the "housing footprint" includes the cantilever arm, and the claims encompass the system described and depicted in the specification with (i) a cantilevered robot that has a two-space "housing footprint" and (ii) a cavity robot that has a "housing footprint" less than two spaces.

argument with respect to the "occupy a grid space" limitation. That argument fails for substantially the same reasons shown above. *See supra* at 16-20. Additionally, given the specification's express statements contrasting the invention with a prior-art ***two-space*** robot (*e.g.*, '051 Patent 5:38-42, 7:61-65, 9:41-48), a POSITA would understand the claim language to mean what it says, *i.e.*, a robot that "occupies ***less than twice*** the area of [a] grid space" (*id.* claims 1, 13 (emphasis added)). Such a robot is smaller than the two-space prior-art robot, but it is not limited to only a single space.

*Second*, AutoStore argues that "there is no disclosure in the specification of a load handling device with a footprint of any arbitrary amount less than two grid spaces." (Defs.' Br. at 26.) But the specification does disclose a robot that occupies less than two grid spaces but more than one grid space: As AutoStore's Dr. Derby admitted, the phrase "substantially a single grid space" (used in the specification of both the '602 and '051 Patents) discloses a robot "***larger than*** a single grid space." (Derby Tr. at 116:15-117:4 (emphasis added).) In any event, whether the specification explicitly describes such an embodiment is irrelevant because the claim language—"less than twice the area of the grid space"—is unambiguous. *See Elekta Inst. S.A.* v. *O.U.R. Sci. Int'l, Inc.*, 214 F.3d 1302, 1308 (Fed. Cir. 2000) ("[T]he unambiguous language of the [] claim controls over any contradictory language in the written description."); *Epistar Corp.* v. *ITC*, 566 F.3d 1321, 1336 (Fed. Cir. 2009) ("[A]n applicant is not required to describe in the specification every conceivable . . . embodiment of his invention.").

The claim language unambiguously encompasses robots that occupy less than two grid spaces but more than one grid space. Redrafting the claims to add a narrowing limitation requires AutoStore to come forward with "clear and unequivocal evidence" of disavowal. (*See supra* at

16.)  Once again, AutoStore has utterly failed to carry its high burden, and AutoStore's request to narrow the plain claim language should be rejected.

### C.   "the [first/second] set of rails is part of the [first/second] set of tracks"

AutoStore's opening brief advances a new argument that claims 9 and 18 are *invalid* under 35 U.S.C. § 112(d), abandoning its prior assertion that they are *indefinite* under 35 U.S.C. § 112(b).  (Defs.' Br. at 27-28.)  In its Updated Preliminary Claim Constructions and Evidence, AutoStore argued only that this claim term was indefinite, and stated that it intended to submit a declaration from its expert addressing the standard for indefiniteness.  (Ex. 47, AutoStore's Updated Preliminary Claim Constructions and Evidence at 118, 124.)  After receiving Dr. Pfeifer's claim construction declaration, which showed that a POSITA would be able to understand this claim term with reasonable certainty (*see* Pfeifer Decl. ¶¶ 48-54), AutoStore abandoned its argument that this claim term is indefinite and belatedly pivoted to a new § 112(d) argument that it had never raised as an issue for claim construction.  This argument should be disregarded because it was untimely and unfairly disclosed to Ocado late in the claim construction process, in contravention of the relevant scheduling order (Dkt. 80) and the relevant local rule (D.N.H. Supplemental Patent Rule 6.1).

Even if the Court were to excuse AutoStore's untimely disclosure, it would be premature to address this invalidity argument now rather than at an appropriate time after full expert discovery on validity issues.  The Federal Circuit has urged courts to "be cautious not to allow claim construction to morph into a mini-trial on validity." *Hill-Rom Servs.*, 755 F.3d at 1374.  That principle is especially important where, as here, a party raises invalidity by ambush.  By failing to disclose that it intended to raise a § 112(d) argument during claim construction, AutoStore prevented Ocado from defending the validity of its patent by fully developing the record.  Given AutoStore's unexplained delay, the Court should decline to address § 112(d) validity until the

parties submit expert testimony on validity, giving Ocado a full and fair opportunity to develop the record.

Even if the Court decides to address § 112(d) invalidity during claim construction, AutoStore has failed to satisfy its clear-and-convincing-evidence burden. *See Microsoft Corp.* v. *i4i L.P.*, 564 U.S. 91, 95 (2011). AutoStore simply provides no evidence—intrinsic or extrinsic—to support its invalidity argument, let alone clear and convincing evidence. Although AutoStore distorts Dr. Pfeifer's deposition testimony in a bid to support its position, this attempt falls flat. In response to questions about whether the '051 Patent teaches sets of rails that are not part of tracks, Dr. Pfeifer—who has not yet offered any validity opinions in this proceeding and had never considered AutoStore's undisclosed § 112(d) invalidity theory—responded that he had not "looked through the entire patent . . . with [that undisclosed theory] in mind." (Pfeifer Tr. at 182:2-9.) Thus, contrary to AutoStore's argument (Defs.' Br. at 27-28), Dr. Pfeifer's testimony is not an admission that "all the sets of rails taught by the '051 Patent . . . [are] necessarily part of sets of tracks." As Dr. Pfeifer's deposition testimony does not support AutoStore's invalidity argument, AutoStore simply has no evidence to carry its burden, and, if the Court decides to address this issue now, the Court should reject AutoStore's bid for premature invalidation of the relevant claims.

## IV.    U.S. PATENT NO. 10,901,404

### A.    "route"

AutoStore argues that a POSITA could not reasonably understand the meaning of the term "route," as used in claim 20 of the '404 Patent, because, AutoStore contends, "'route' and 'path' cannot at once be the same (as required by the specification) and distinct (as required by the claims)." (Defs.' Br. at 37.) This argument is wrong.

*First*, as AutoStore's expert testified at length, a POSITA would understand without difficulty what "route" and "path" mean. (Ex. 49 ("Ioannou Tr.") at 139:7-18, 159:2-160:12.) Speaking from the perspective of a POSITA at his deposition, Dr. Ioannou treated the terms as interchangeable. (Ioannou Tr. at 142:16-17 ("that route is [a] geometric path"), 154:21-22 ("I am going to allow the geometric paths or routes to cross . . . ."), 158:18-21 ("But these routes could be shared by different robots, following the same path, same route.").)[14] Moreover, as AutoStore admits, there is no dispute that the specification uses the terms "route" and "path" interchangeably (Defs.' Br. at 36), and in the same way they would be used by a POSITA. Each term refers to a series of grid coordinates for a robot to traverse. (D'Andrea Rebuttal ¶¶ 66-67 (a "route" in the context of the '404 Patent is "a series of grid coordinates for a robot to traverse"); *see also* '404 Patent claim 20 (describing a route as being "from one location . . . to another").) Dr. Ioannou agreed, testifying that a "route" in this context is a "sequence of landmarks." (Ioannou Tr. at 139:7-9.) Thus, there is no indefiniteness. A POSITA would understand the scope of the claims because the terms "route" and "path" are widely understood to have the same meaning. AutoStore incorrectly asserts that these terms are used "inconsistently" in the specification versus the claims (Defs.' Br. at 37), but that is not accurate. The terms have the same meaning in claim 20 that they have in the specification ("route" and "path" mean a series of grid coordinates for a robot to traverse).

Although the terms have the same meaning—a series of grid coordinates for a robot to traverse—claim 20 uses the two terms ("route" and "path") to distinguish different claim

---

[14] At one point during his deposition, Dr. Ioannou asserted that a route is "time independent" and a path is "time dependent." (Ioannou Tr. at 142:23-143:1.) Dr. Ioannou later conceded that this is not a distinction that renders the terms different, because a route can be time dependent and a path can be time independent as well. (*Id*. at 159:2-160:12.)

limitations. The term "route" in claim 20 refers to the set of grid coordinates determined or planned for the robot, and the term "path" refers to the set of grid coordinates subsequently reserved for the robot. In both cases, "route" and "path" mean a series of grid coordinates for the robot to traverse, but those terms appear in different limitations that refer to different aspects of the invention.

The only case cited by AutoStore in support of its argument is entirely off base. In *SIPCO, LLC* v. *Emerson Elec. Co.*, 794 F. App'x 946, 949 (Fed. Cir. 2019), the plaintiff unsuccessfully argued that a claim used two different terms—terms that were never used interchangeably in the specification—to refer to the same, unique thing (a particular memory address). The court properly held that two different terms, with different meanings according to the specification, could not be construed in the claims to refer to the same thing. *Id.* By contrast, "route" and "path" are used interchangeably in the specification as terms having the same meaning—a set of grid coordinates for a robot to traverse—and claim 20 simply uses the two words to address different claim limitations. A POSITA would understand the scope of the claims and there is no indefiniteness.

B.      **"clearance instruction" ('404 Patent) / "clearance command" ('770 Patent)**

AutoStore seeks to limit a "clearance instruction" or "clearance command" to a "permission," which it argues (contrary to its expert's deposition testimony (*see* Pls.' Br. at 35)) cannot include an affirmative movement instruction or command. AutoStore attempts to impose a new limitation—unsupported by the claim language—that draws a line between (i) an affirmative movement instruction or command, versus (ii) a passive permission, which tells a robot that it can continue to move in response to a previous affirmative movement command. (Defs.' Br. at 29-33.) There is no basis to add this narrowing limitation to the claims.

As an initial matter, "[c]laims mean precisely what they say," *Cent. Admixture Pharmacy Servs., Inc.* v. *Advanced Cardiac Sols., P.C.*, 482 F.3d 1347, 1355 (Fed. Cir. 2007), and the claim

-30-

language here is not limited to passive permissions.  Rather, the claim language states that (i) a "clearance instruction" is an instruction for a robot "to *traverse* a portion of a reserved path," and (ii) a "clearance command" is a command "to cause the plurality of transporting devices to *travel* on the pathways along portions of the plurality of paths" determined for the robots.  (Pls.' Br. at 34-35; *see* '404 Patent claim 20; '770 Patent claim 1.)  This claim language encompasses both affirmative movement commands as well as passive permissions, both of which cause robots to move along portions of paths.  (*See* D'Andrea Rebuttal ¶ 23; Ex. 50 ("D'Andrea Tr.") at 161:14-24.)  In fact, AutoStore's expert Dr. Ioannou agrees.  He conceded that the language of claim 1 of the '770 Patent "tell[s] me what [a clearance command] is doing" and agreed that this language establishes that a "clearance instruction" or a "clearance command" is simply a command to "cause the plurality of transporting devices to travel in the pathways along portions of the plurality of paths."  (Ioannou Tr. at 127:1-19, 127:21-128:7.)  The claim language is dispositive.

To support the addition of a narrowing limitation, AutoStore again cherry-picks statements from the specification of the '404 Patent, which describe embodiments in which the clearance command results in a "permission."  (*See* Defs.' Br. at 30 (citing '404 Patent 3:8-10 (describing an embodiment containing "one or more utilities providing a clearance system for permitting or stopping movement"), *id.* 18:38-45 ("the clearance module . . . checks that it will not be possible to collide with another robot, based upon, for example . . . move commands generated by planning . . ."), *id.* 18:46-48 ("The clearance module . . . *may* be used to grant permissions to robots to continue along their planned paths.")).)  But this language describes an optional implementation of the invention, and it is settled law that features in particular embodiments cannot be read into the claims.  *Hill-Rom Servs.*, 755 F.3d at 1371; *MySpace, Inc.* v. *GraphOn Corp.*, 672 F.3d 1250, 1255 (Fed. Cir. 2012).  (*See also* Pls.' Br. at 36.)  Had the inventors intended to limit the claims to

-31-

the optional embodiment, they would have drafted the claims using the word "permission," as they did when describing an optional embodiment in the specification. Instead, the inventors used broader claim language that encompasses embodiments using active commands and passive permissions.[15]

AutoStore also points to dependent claim 23 of the '770 Patent, which recites "travel commands to instruct the [robots] to travel on the pathways" where the "travel commands [are] ***different from*** the plurality of clearance commands." (Defs.' Br. at 29-30 (emphasis added).) But this evidence backfires. If the broad term "clearance command" did not include affirmative movement commands—as AutoStore argues—there would be no need to state in claim 23 that the travel commands are ***different*** from the plurality of clearance commands recited in claim 1. Rather, the difference would exist because of the term "travel command," which AutoStore contends is fundamentally different from a "clearance command." The claim language makes sense only if the term "clearance command" encompasses affirmative travel commands (and passive permissions) such that it was necessary to clarify in dependent claim 23 that the added limitation was a set of commands different from those already provided under claim 1.

Finally, AutoStore points to statements made during the prosecution of different family members of the '404 and '770 Patents, which describe embodiments in which the clearance system is "used to issue . . . permissions" or "grant[] permissions." (Defs.' Br. at 31-33.) None of these

---

[15] AutoStore's citation of *Digene Corp.* v. *Third Wave Techs., Inc.*, 323 F. App'x 902, 908 (Fed. Cir. 2009) does not support AutoStore's argument. In *Digene*, the court held that the term "HPV 52" in one claim did not include other HPV types because another claim recited both "HPV 52 DNA" and "DNA or RNA of at least one other HPV type." *Id*. The problem was that the claim recited a species that the court properly would not construe as encompassing a broader class. That has nothing to do with the situation here. Here, the claims recite a class—clearance instructions or commands—that includes more specific species, *e.g.*, affirmative travel commands and passive permissions. *Digene* thus is inapposite, and if anything, supports Ocado's position.

statements supports AutoStore's proposed claim narrowing because each statement describes an embodiment of the claimed invention. (*See id.* at 32-33.) *See also Poly-Am.*, 839 F.3d at 1136. As explained above, the invention includes an implementation in which the clearance commands result in permissions, but the claim language in the asserted patents is broader.

AutoStore also turns to various dictionaries that use the word "permission" in the definition of "clearance" (Defs.' Br. at 29), but AutoStore overlooks that the claim language is not "clearance," but "clearance ***command***" and "clearance ***instruction***." In other words, the claims do not recite providing "clearance" to the robot, and instead recite providing a clearance ***command*** or clearance ***instruction*** to the robot. (*See* D'Andrea Tr. at 151:7-17, 152:2-19 (explaining that a POSITA would not even understand what it means for a clearance ***command*** to be a "permission").) These two-word phrases must be understood in the context of the patents, and they are not synonymous with "clearance" or "permission." Moreover, "general-usage dictionaries are . . . irrelevant" where, as here, the claims expressly recite what constitutes a "clearance instruction" and "clearance command" in the context of the claimed invention (*i.e.*, an instruction or command causing robot movement along a pathway), as explained above. *Vanderlande Indus. Nederland BV* v. *ITC*, 366 F.3d 1311, 1321 (Fed. Cir. 2004). It would therefore be legal error to use a lay dictionary to impose a narrower definition inconsistent with the plain claim language.

In addition, contrary to AutoStore's argument, its expert Dr. Ioannou testified at deposition that AutoStore's definitions of clearance do not exclude an affirmative travel command. (*See* Ioannou Tr. at 118:7-119:7.) Dr. Ioannou testified that the definitions of "permission" on which AutoStore relies encompass a move command. For example, AutoStore's lead definition is "[p]ermission, usually from a control tower, to take off, land, etc." (Defs' Br. at 29.) But Dr. Ioannou admitted that an affirmative command to land a plane or to move the plane to 36,000

feet would be a type of permission. (Ioannou Tr. at 118:7-119:7.) Thus, even if the Court were to adopt the word "permission" in its construction (and it should not for the reasons explained above), there is no basis to further construe a "permission" to exclude an affirmative movement command or instruction. Thus, the non-infringement argument AutoStore seeks to manufacture would fail in any event because factual disputes would remain as to whether a "permission" includes movement commands.

### C.    "execution . . . at a future time"

AutoStore contends that "execution . . . at a future time" is indefinite because the specification fails to identify a specific time delay between receipt of an instruction by a robot and execution of the instruction. (*See* Defs.' Br. at 33-36.) But a POSITA would understand, after reading the specification, that an instruction for "execution . . . at a future time" is an instruction to control a robot's *future* movements, as distinguished from an instruction to control a robot's *current* movements. (*See* Pls.' Br. at 37-38.) The '404 Patent explains that a robot can have a "current clearance" or "current instruction set[]" ('404 Patent 10:49-53, 18:57-59, 21:1-3), and also that a robot can receive instructions for "future movements," which may be "pre-populate[d]" (*id*. 9:34-35, 10:53-56, 20:10-14, 20:21-23). As Dr. D'Andrea testified, "identification of a particular amount of delay . . . is unnecessary, because it would be clear to a POSITA that the claim distinguishes between instructions executed immediately to direct current movement and instructions to be executed afterward." (D'Andrea Sur-rebuttal ¶ 22.)

At his deposition, Dr. Ioannou agreed that the pre-population of instructions refers to "generat[ing instructions] ahead of time . . . to be executed later on." (Ioannou Tr. at 83:20-84:1.) Thus, as Dr. D'Andrea explained, "[execution . . . at a] future time is simply . . . saying that the robot is executing a command and it takes time for it to finish. And when it's finished, then they can execute the next one." (D'Andrea Tr. at 109:8-19.) When a robot is finished executing its

current movement instruction, it can execute the instructions that were provided to control its subsequent movements, which occurs at a "future time."

Dr. Ioannou conceded that a POSITA would have been familiar with control system methodologies—such as those implemented in the '404 Patent—that execute both "current time event[s]" immediately and "future time events" at a future time. (Ex. 51, Ioannou Ex. 6 at 26; *see also* Ioannou Tr. at 74:15-75:24.) In fact, Dr. Ioannou wrote a paper discussing prior art systems (from 2005, 2008 and 2013) that implement this type of control. (Ex. 51, Ioannou Ex. 6 at 5-7, 26.) Dr. Ioannou's paper illustrates that a POSITA would understand the distinction between (i) control of a current movement and (ii) control of a future movement at a future time. (*See* Ioannou Tr. at 78:2-79:19 (admitting a POSITA would be familiar with the type of control referenced in his paper).) That is a clear distinction created by the claim language, and a POSITA would have no difficulty understanding the scope of the claim.

AutoStore also asserts that construing "execution . . . at a future time" to refer to the pre-population of commands directed to control future movements renders the claim language meaningless. (Defs.' Br. at 34 (citing *Bicon, Inc.* v. *Straumann Co.*, 441 F.3d 945, 950-52 (Fed. Cir. 2006); *MicroStrategy Inc.* v. *Bus. Objects, S.A.*, 429 F.3d 1344, 1352 (Fed. Cir. 2005)).) Far from rendering the limitation meaningless, construing "execution . . . at a future time" to refer to the pre-population of commands directed to control movements after the current movement makes clear that the claims do not cover commands that are directed only to the control of current movement.[16]

---

[16] The cases cited by AutoStore do not support its argument. In *Bicon*, the court rejected a proposed construction of "emergence cuff" that did not include an abutment structure because the construction would render other claim language detailing an abutment's physical characteristics meaningless. 441 F.3d at 950-52. Similarly, in *MicroStrategy*, the court held that "device-specific

AutoStore makes two subsidiary arguments that are equally wrong. *First*, AutoStore argues that the "pre-populate[d] instructions" for "execut[ion] at a future time" referred to in the specification are for execution at a "future time" defined in comparison to the time at which the commands are generated, not the time at which they are provided to the robot. (Defs.' Br. at 34-35.) That is not what the specification says. It describes the "pre-populat[ion of] instructions for a particular robot" which are then "***provided to the robot*** . . . to be executed at a future time," *i.e.*, a future time after they are provided to the robot. ('404 Patent 20:10-14 (emphasis added).)

*Second*, AutoStore asserts that the specification does not expressly require a robot's "current clearance" or "current instruction set[]" to be for immediate execution. (Defs.' Br. at 35.) However, as Dr. D'Andrea testified, a POSITA would understand from the specification that the reason for providing the robot a "current instruction set[]" or "current clearance" is to direct to the robot's current movement—the movement the robot is executing or about to execute at the time when the current instruction or clearance is received. (D'Andrea Rebuttal ¶ 38.)

The '404 Patent establishes a clear distinction between current movement instructions and movement instructions for execution at a future time. The claim language "execution . . . at a future time" is consistent with that distinction, and a POSITA would understand the scope of the claim. Thus, AutoStore's indefiniteness argument fails.

## V.    U.S. PATENT NO. 11,079,770

### A.    "one or more processors configured to . . ."

Asserted claims 1, 3, 7-13, 15, 17-19, 21-22 and 27 of the '770 Patent recite "one or more processors configured to" carry out specific operations that control the movement of robots on the

---

style" required support for more than one type of user device because otherwise the phrase "device-specific" would be meaningless. 429 F.3d at 1351-52. Here, construing the claims to refer to pre-populated instructions for execution at a future time does not by any means render claim language meaningless.

grid while avoiding collisions.   AutoStore contends that these claims should be construed as "means plus function" ("MPF") claims under 35 U.S.C. § 112(f), and on that basis further contends that these claims are indefinite because the specification of the '770 Patent fails to disclose an "algorithm" for performing the operations recited in the claim.  AutoStore is wrong on both points, and its indefiniteness arguments fail under controlling Federal Circuit law.[17]

### 1.    AutoStore Failed to Rebut the Presumption Against Means Plus Function Construction.

As AutoStore must admit, the "one or more processors configured to" limitations of the asserted claims do not use the word "means," and as a result, governing law requires a presumption that they are not MPF limitations.  (Defs.' Br. at 38.)  AutoStore asserts, however, that it has carried its burden to overcome the presumption because, AutoStore vaguely argues, the claims do not recite sufficient structure.  (*See id.* at 38-39.)  AutoStore is wrong for several reasons.

As an initial matter, "[t]o overcome this presumption [AutoStore] was required to provide at least some evidence that a person of ordinary skill would not have understood the limitations to 'recite sufficiently definite structure[s].'"  *VDPP LLC* v. *Vizio, Inc.*, 2022 WL 885771, *3 (Fed. Cir. Mar. 25, 2022) (unpublished) (quoting *Dyfan, LLC* v. *Target Corp.*, 28 F.4th 1360, 1367 (Fed. Cir. 2022)).  The Federal Circuit's 2022 *VDPP* decision is highly instructive.  In that case, the Federal Circuit panel held that the defendant failed to overcome the presumption against MPF construction of the term "processor adapted to . . ." because it provided "no . . . evidence" that a

---

[17] Should the Court determine that "one or more processors configured to . . ." limitations should be construed as MPF limitations, the claims are not indefinite, as Ocado showed in its opening brief (Pls.' Br. at 39).  As explained there, a POSITA would understand that the specification of the '770 Patent describes an algorithm for determining whether to issue a clearance instruction.

POSITA "would not have understood the limitations to 'recite sufficiently definite structure[s].'" *VDPP*, 2022 WL 885771, at *3.[18]

In its opening brief, AutoStore, like the defendant in *VDPP*, did not present evidence establishing that a POSITA would not understand the term "processor" to connote structure, much less evidence sufficient to overcome the presumption against MPF construction.    Instead, AutoStore relies on (i) conclusory attorney argument that the claims do not recite sufficient structure because they do not "recite how the 'one or more processors' carry out [the] function[s]" it identifies in the claims and (ii) testimony from its expert that the '770 Patent's "specification does not provide any algorithm or steps" to carry out these functions.    (Defs.' Br. at 39-42 (emphasis omitted).)    This is precisely the kind of "evidence" the Federal Circuit rejected as insufficient in *VDPP*.

*First*, *VDPP* held, unremarkably, that conclusory lawyer arguments are not evidence and thus cannot overcome the presumption against MPF construction. *VDPP*, 2022 WL 885771, at *3. Here, just as in *VDPP*, AutoStore cannot carry its burden with mere conclusory statements in its opening brief.    The only record evidence establishes that "one or more processors" connotes sufficient structure to a POSITA.    Ocado's expert, Dr. D'Andrea, testified that the term "processor" identifies a class of structures that were well-known to a POSITA at the time of the invention of the '770 Patent claims.    (*See*, *e.g.*, D'Andrea Rebuttal ¶ 84 ("[A] POSITA would readily understand this claim term to refer to a class of physical structures—*i.e.*, one or more hardware processors."); *id.* ¶ 85 ("[A] POSITA would readily understand that 'processor' . . . as

---

[18] The plaintiff in *VDPP* provided evidence that established that the term "'processors' . . . do[es] connote structure to a skilled artisan," sufficient to show that he or she "would not understand 'processors' . . . to be merely 'black boxes for the performance of a function.'" 2022 WL 885771, at *3.

used in the '770 Patent connotes a specific structure, for example the central processing unit (CPU) of a computer . . . .").)  AutoStore's expert, Dr. Ioannou, agreed that a POSITA would understand a "processor" to refer to a specific class of physical structures.  (*See* Pls.' Br. at 40 (collecting citations to Ioannou's deposition testimony).)  AutoStore provides nothing to rebut the legal presumption, much less the mountain of evidence showing that the presumption cannot be rebutted on the facts of this case because a POSITA would understand a processor to be a specific physical structure.

*Second*, in *VDPP*, the Federal Circuit rejected the defendant's attempt to show that the claims did not recite sufficient structure based on the defendant's argument that no "algorithm for performance of the functions" was disclosed in the patent's specification.  *Id.*  The panel found such evidence "misses the mark" because "[w]hether the specification[] disclose[s] adequate corresponding structures for the claimed functions" only becomes relevant ***after*** the court determines that a defendant has overcome the presumption against MPF construction.  *Id.*  AutoStore attempts to run the same failed argument here—that the "specification does not provide any algorithm or steps" to carry out the operations of the one or more processors (Defs.' Br. at 39-42)—but as the Federal Circuit held in *VDPP*, that is not a legally relevant question when first determining whether the presumption against MPF has been rebutted.  AutoStore's argument fails here for substantially the same reason that an identical argument failed in *VDPP*.

AutoStore also argues that "one or more processors" does not recite sufficient structure because the "functions" it identifies in the asserted claims "cannot be performed with a processor without special programming."  (Defs.' Br. at 39.)  But as the Federal Circuit held in *Dyfan*— decided contemporaneously with *VDPP*—this argument is not sufficient to overcome the presumption in the face of evidence that a POSITA would have known how to configure a

processor to carry out the claimed functions. *Dyfan*, 28 F.4th at 1368 (holding defendant failed to overcome presumption against MPF construction of "code . . . configured to" in part because a POSITA would have known how "the claimed function . . . could be implemented").[19]   Here, Dr. D'Andrea testified at his deposition that a POSITA would have known, at the time of the invention, how to configure the processors to perform the operations recited in the claims, and that it would have been "straightforward" to configure such a processor based on the descriptions of those operations provided in the specification of the '770 Patent.  (*See* Pls.' Br. at 43 n.29 (citing D'Andrea Tr. at 64:2-21, 78:3-20, 216:8-16).)  Dr. Ioannou did not dispute this, and he testified at his deposition that processors available as of the priority date of the '770 Patent could be configured to carry out the claimed functions, and that a POSITA would readily know how to write software to do so.  (*See id.*)

The evidence thus shows that a POSITA would understand "one or more processors," as used in the claims of the '770 Patent, to refer to a specific class of physical structures configured to carry out the operations described in the claims, and "would not understand [it] to merely be '[a] black box[] for performance of a function.'"  *See VDPP*, 2022 WL 885771, *3; *Dyfan*, 28 F.4th at 1365 (holding that a term may "'describe a class of structures' and still recite 'sufficiently definite structure' to not invoke [MPF construction]").  Against this, AutoStore offers nothing

---

[19] In *Samsung Electronics America, Inc.* v. *Prisua Engineering Corp.*, 948 F.3d 1324, 1353-54 (Fed. Cir. 2020), the Federal Circuit held that the term "digital processing unit" did not invoke MPF construction in part because a prior art reference, called Sitrick, "disclose[d] a . . . CPU that is capable of performing all of the functions recited in [the] claim."  Although the patent itself did not provide "special programming" for the digital processing unit to perform the claimed functions, the court agreed that Sitrick, which disclosed that the claimed functions "may be performed by software executing on the general purpose computer," *Samsung Elecs. Am., Inc.* v. *Prisua Eng'g Corp.*, No. IPR2017-01188, 2018 WL 5274000, at *11 (P.T.A.B. Oct. 2, 2018), was sufficient to preclude MPF construction because it confirmed that a POSITA would understand how to implement the program.

more than attorney argument, relying on inapposite cases in which there was no evidence that a POSITA would understand the claim term as reciting structure.  (*See* Defs.' Br. at 38-39.)[20]  This does not overcome the legal presumption or the other record evidence showing that "one or more processors" recites sufficient structure to avoid construction as an MPF term.  Critically, because AutoStore bears the initial evidentiary burden, it cannot seek to carry its burden in its responsive *Markman* brief.  Thus, the question of whether AutoStore has rebutted the presumption should be based on the opening brief alone, and AutoStore has failed to carry its burden.

### 2.    The Claim Language Itself Recites Sufficient Structure.

Although the showing above should be dispositive, AutoStore additionally fails to overcome other claim language that recites sufficient structure to avoid MPF treatment for the "one or more processors" limitations.  *First*, independent claim 1 (incorporated into the dependent claims) describes the physical structure of the controller by reciting that the "one or more processors" are connected to a "memory device"—another well-known class of structures— "configured to store the . . . clearance commands" generated by the processors.  ('770 Patent claim 1.)  As this structure is provided in the claim language, it would be improper to construe this

---

[20] In *Egenera, Inc.* v. *Cisco Systems, Inc.*, 972 F.3d 1367 (Fed. Cir. 2020), the term at issue was "logic to modify," not "processors."  The evidence showed that "logic" did not denote a specific class of structures to a POSITA and that it "provide[d] no structural limitation[s]."  *Id.* at 1374. As a result, the *Egenera* court concluded that, as used in the claims, "'logic' is no more than a 'black box recitation of structure' that is simply a generic substitute for 'means.'"  *Id.* at 1375 (citing *Williamson* v. *Citrix Online, LLC*, 792 F.3d 1339, 1350 (Fed. Cir. 2015) (en banc)). Likewise, in *Velocity Patent LLC* v. *FCA US LLC*, 2018 WL 4214161 (N.D. Ill. Sept. 4, 2018), the court found that the term "processor subsystem" did not identify a class of structures; rather, the evidence showed that, to a POSITA, "the meaning of 'processor subsystem' depends on each claim limitation's function."  *Id.* at *7.  Finally, in *XR Communications, LLC* v. *Ruckus Wireless, Inc.*, 2021 WL 3918136 (N.D. Cal. Sept. 1, 2021), the court held that "search receiver logic" should be construed as an MPF term because there was no evidence that a POSITA would understand "[the] structure associated with search receiver logic in the field of wireless communications, or how to perform the claimed function."  *Id*. at *6.  The claim language in all of these cases is materially different from the claim language here.

claim term as MPF.  *See*, *e.g.*, *Advanced Mktg. Sys., LLC* v. *CVS Pharmacy, Inc.*, 2016 WL 1741396 (E.D. Tex. May 3, 2016) (finding that "data processor" should not be construed as MPF term in part because "[t]he claims at issue provide further evidence of structure by describing physical connections between the data processor and other claimed elements"); *Finjan, Inc.* v. *Proofpoint, Inc.*, 2015 WL 7770208 (N.D. Cal. Dec. 3, 2015) (finding that the "[t]erm 'content processor' has a sufficiently specific structure" where "[i]ndependent claim 1 describes how [it] interacts with the invention's other components (the transmitter and receiver)").

*Second*, the claims describe the "operations" carried out by the processor to achieve the "objectives" of the claims.  As shown in Ocado's opening brief at pages 42-43, reciting structure in this way also is inconsistent with MPF construction.  *See Linear Tech. Corp.* v. *Impala Linear Corp.*, 379 F.3d 1311, 1320-21 (Fed. Cir. 2004); *Uniloc USA, Inc.* v. *Autodesk, Inc.*, 2016 WL 3647977, at *19-20 (E.D. Tex. July 7, 2016) (rejecting MPF construction of the term "add-on computer software code" where claims recited that the code "generat[ed] a specific pricing schedule using the received pricing data").  Here, claim 1 of the '770 Patent recites, in a step-by-step manner, that the processors determine or calculate certain values (paths for the devices, potential for a collision) and then generate or withhold instructions/commands to the robots based on ("responsive to") those calculated values, in order to "control [robot] movement" and avoid collisions.  (*See* D'Andrea Rebuttal ¶¶ 86-87.)

 AutoStore contends that the step-by-step recitation of the operations carried out by the "one or more processors" is insufficient because the claims "do[] not recite ***how*** the clearance unit checks for collision" or "determine[s] there is 'a potential for collision.'"  (*See* Defs.' Br. at 40.)  But under the controlling law, there is no requirement that the claims recite such details—

-42-

particularly where, as here, the evidence shows that a POSITA would understand how to write the code for the processor to carry out the claimed operations. *See supra* at 39-40.

In fact, the cases on which AutoStore relies are perfectly consistent with a finding that claim 1 recites sufficient structure without also specifically reciting how the recited processors perform each operation. For example, in *Syneron Medical, Ltd.* v. *Invasix, Inc.*, 2018 WL 4696971 (C.D. Cal. Sept. 5, 2018) (cited in Defs.' Br. at 39), the court held that the claims did not recite sufficient structure because—unlike the situation here—the operations and objectives of the recited "circuit" were "nowhere to be found in the claim." *Id.* at *13.[21] The *Syneron* court contrasted the claim before it with a claim analyzed in *Finjan*, where the court found the term "content processor" was ***not*** MPF because:

> the claim language clearly recites the structures for performing, or the "operation of," the recited functions of "processing content received over a network" and "invoking a second function with the input," which are "including a call to a first function, and the call including an input" and "only if a security computer indicates that such invocation is safe," respectively.

*Syneron*, 2018 WL 4696971, at *13 (discussing *Finjan*, 2015 WL 7770208, at * 11). The *Finjan* court found sufficient structure recited in the claim despite the fact that the claim did not describe the details of "how" the content was processed or "how" the security computer determined that "such invocation was safe." *Id*. Likewise, the court in *Syneron* contrasted *Panoptis Patent Management, LLC* v. *Blackberry Ltd.*, 2017 WL 497571, *19 (E.D. Tex. Feb. 7, 2017). In *Panoptis*, the court found that the claim recited sufficient structure to preclude MPF construction of a "processor for associating . . ." where the claim "set forth detail regarding the operation of the

---

[21] Similarly, in *GoDaddy.com, LLC* v. *RPost Communications Ltd.*, 2016 WL 212676, at *56 (D. Ariz. Jan. 19, 2016), the district court held that MPF construction was appropriate only because, unlike here, "the claimed 'processor' and other claim language does not convey to a skilled artisan anything about the internal components, structure, or specific operation of the processor."

processor . . . such as 'adding information to the text message that identifies a server' and 'sending the attachment to the server,'" without requiring that the claim also recite precisely how information is added to a text message or how an attachment is set to a server. *Id*. The claims here are like the ones in *Panoptis* and *Finjan*—where the courts found MPF construction was inappropriate.

Another case on which AutoStore relies, *St. Isadore Research, LLC* v. *Comerica Inc.*, 2016 WL 4988246 (E.D. Tex. Sept. 19, 2016) (*see* Defs.' Br. at 40), also supports a finding that the claims at issue here recite sufficient structure. The court in *St. Isadore* found sufficient structure to avoid MPF construction of the term "transaction processing module" where the claim language—just as it does here—provided a step-by-step description of the operations carried out by the module. The court explained that the claim recites how the transaction processing module performs its "function":

> The "module" (1) communicates by receiving transaction information, (2) identifies a specific party to the transaction, (3) transmits a request for verification to that party, ([4]) recognizes the result of that request, ([5]) determines the authenticity of the request using that result, and ([6]) appropriately continues with the transaction.

2016 WL 4988246, at *13. The court found that "[t]his step-wise description of the operation of the 'module' . . . connotes structure," but did not require that the claim also recite, for example, how the module identifies a specific party to a transaction, or how it recognizes the result or determines the authenticity of a request. *Id.*

In short, AutoStore has failed to provide evidence to overcome the presumption that the "one or more processor" limitations in the asserted claims of the '770 Patent should not be construed as MPF terms, or to rebut the record evidence that the claims recite sufficient structure. Respectfully, the Court should follow established precedent and hold that the at-issue limitations are not MPF limitations and reject AutoStore's indefiniteness argument.

-44-

### B.    "potential for [a/the] collision"

As Ocado demonstrated in its opening brief, a POSITA would understand that determining a "potential for a collision" as used in claim 1 of the '770 Patent refers to assessment by the control system of whether there is any possibility of two robots colliding (based on the information available to the system), and not, as AutoStore contends, an assessment of the likelihood of a collision, according to some threshold of an acceptable risk of collision. (*See* Pls.' Br. at 45-47.) In other words, the control system makes a binary "yes or no" decision as to whether it can guarantee that no collision will occur and, if the answer is "no," the system will withhold a clearance command from a robot. (*Id.*)  Indeed, during his deposition, AutoStore's own expert, Dr. Ioannou, agreed that a POSITA would understand that the control system described in the '770 Patent works in this binary way. (*Id*. at 46-47 (citing Ioannou deposition testimony).)

In its opening brief, AutoStore contradicts its own expert and asserts that the term "potential for a collision" is indefinite because the '770 Patent does not provide a specific ***probability***-of-collision threshold above which the control system will withhold a clearance command to a robot. (*See* Defs.' Br. at 45-46.)  But the factual record has moved on from this argument—which no longer is viable in light of Dr. Ioannou's deposition testimony—because the claims simply do not deal with ***probabilities***.

AutoStore nevertheless contends that "the specification comports with 'potential for a collision' requiring a minimum threshold." (*Id.* at 46 (citing Ioannou Decl. ¶¶ 201-03).)  This is wrong, and the cited portions of the specification in Dr. Ioannou's declaration support Ocado's position, not AutoStore's.  For example at column 18, lines 19-26, the specification explains that, prior to issuing a clearance command to a robot, the system "checks that ***it will not be possible*** to collide with another robot"—in other words, the system makes a binary determination regarding whether a collision is possible or not possible; it does not assess the probability of a collision.

('770 Patent 18:19-26 (emphasis added); *see also* Pls.' Br. at 45.)   The other portions of the specification cited by Dr. Ioannou also are consistent with Ocado's construction and provide no support for AutoStore's attempt to read a probability threshold into the claims that would allow some chance of collision.[22]

AutoStore also argues that the specification does not provide an "objective measure" for determining whether there is "potential for a collision." (*See* Defs.' Br. at 45-46.)   But as explained above, the relevant claims do not require a probability threshold and thus there would be no reason to provide one in the specification.   Rather, the claimed invention checks whether there is any potential or possibility of a collision, and if so, it withholds a clearance instruction.   Additionally, a claim limitation is not indefinite simply because the specification does not disclose a specific numeric threshold.   *See*, *e.g.*, *One-E-Way, Inc.* v. *ITC*, 859 F.3d 1059, 1066-67 (Fed. Cir. 2017) (holding that the term "virtually free from interference" was not indefinite for failing to provide an exact "technical measure of the amount of interference" because the term "simply mean[s] that the wireless headphone user is able to listen without eavesdropping").   There is no legal requirement that the specification provide a specific numeric threshold, especially where a POSITA would readily understand what it means to determine whether there is a potential or possibility for a collision without specific, numeric guidance.[23]

---

[22] At column 9, lines 25-32, the specification explains that, in "compar[ing] potential paths for a robot to take," the control system considers, among other things, "the potential for collisions."  At column 15, lines 47-54, the specification explains that the control system may use a "just-in-time approach to determining priority when robots are engaged in potentially conflicting paths." Nothing about these disclosures supports AutoStore's contention that the control system uses a probability threshold in assessing the "potential for a collision," nor are these disclosures in any way inconsistent with a binary, yes or no, determination.

[23] Of course, it is blackletter law that a defendant infringes a patent claim if it meets all of the limitations even if the defendant adds additional features.  *Crystal Semiconductor Corp.*, 246 F.3d at 1348 (explaining that the use of "the transition 'comprising' creates a presumption that the

The cases cited by AutoStore, *HIP, Inc.* v. *Hormel Foods Corp.*, 2019 WL 2579266 (D. Del. June 24, 2019) and *Sensor Electronic Technology, Inc.* v. *Bolb, Inc.*, 2019 WL 4645338 (N.D. Cal. Sept. 24, 2019) (*see* Defs.' Br. at 46), do not support its argument.  In *HIP*, the court held that the term "a pre-cooked sliced bacon product resembling a pan-fried bacon product" was indefinite because the relevant factors for making the "resembling" determination described in the specification (texture, mouth feel, bite, appearance, and color) involved "a purely personal, subjective evaluation."  2019 WL 2579266, at *3-4.  Respectfully, this case citation makes no sense:  whether a system has determined there is a possibility of a collision is not subjective.  In the second case, *Sensor Electronic*, the court held that the claim term "the difference in the molar fractions is selected based on a thickness of at least one of the first layer or the second layer" was indefinite because it constituted a "term of degree" and "the intrinsic evidence fail[ed] to disclose *any* criteria for how one might 'select' a thickness of either or both of the layers."  2019 WL 4645338, at *29-30.  But "potential for a collision" is not a term of degree, and the criteria used in the control system's deterministic assessment (*i.e.*, yes or no) do not involve a "personal, subjective evaluation" to determine "how much" these binary criteria are met.

In short, a POSITA would understand the scope of the claimed invention to encompass a control system that makes a deterministic assessment of the potential or possibility for a collision

---

recited elements are only a part of the device, that the claim does not exclude additional, unrecited elements").  One could imagine a hypothetical implementation of the claimed invention in which the control system checks for any possibility of a collision ("yes or no") and withholds a clearance instruction on that basis, but then the system additionally implements a step that overrides the withholding of the instruction based on an optional probability threshold (*e.g.*, if the chance of collision is 50% or less, override the withholding of the instruction).  That is not relevant here because the scope of the claim encompasses any system that checks ("yes or no") whether there is a potential or possibility for collision, regardless of additional features an infringer might add to the system.

("yes or no") and withholds an instruction on that basis to avoid a possibility of collision. The claims are not indefinite.

### C. "control operations . . . in real time"

As shown in Ocado's opening brief, a POSITA would understand the term "real time" to mean that the "one or more processors" of the control system described in claim 21 of the '770 Patent "are configured to receive data from the plurality of robots, process the data, and issue instructions or commands to the plurality of robots sufficiently quickly to affect their [current] movement." (*See* Pls.' Br. at 47-50.) AutoStore contends that the claim term "real time" is indefinite because the specification also mentions a "near-real time" control protocol.[24] (*See* Defs.' Br. at 49.) This argument—another attempt to invalidate a patent claim early—is meritless.

AutoStore essentially argues that a claim term ("real time") is rendered indefinite simply because the specification also mentions a different term that is not used in the claims. But whether a POSITA understands the difference between "real time" and "near-real time" is irrelevant to the question of whether "real time," as used in the challenged claim, is indefinite. Claim 21 of the '770 Patent claims a system that controls operations of the plurality of robots in "real time"; it does not claim a system that uses a "near-real time" control protocol. The scope of a "real time" control system is well known to a POSITA, and AutoStore does not dispute that a POSITA's understanding of the term would be in accordance with Ocado's proposed construction. (Defs.' Br. at 48-49.) The fact that the specification mentions a "near-real time" protocol does not change

---

[24] Based on its expert's claim construction declarations, it appeared that AutoStore would contend that "real time" is indefinite because (as its expert argued) the '770 Patent does not disclose a specific measure of latency between issuance of an instruction by the control system and its execution by the robots. (*E.g.*, Ioannou Decl. ¶ 189.) AutoStore did not pursue this argument in its opening brief (*see* Defs.' Br. at 48-49), perhaps because Dr. Ioannou contradicted the argument during his deposition (*e.g.*, Ioannou Tr. at 66:11-19, 262:24-263:21). Accordingly, although Ocado addressed the point in its opening brief (*see* Pls.' Br. at 47-50), the Court need not resolve the issue because AutoStore has abandoned the argument.

the widely understood meaning of "real time," which is the term used in the patent claim.  *See Intermec Techs. Corp.* v. *Palm Inc.*, 811 F. Supp. 2d 973, 995-96 (D. Del. 2011) ("As with every construction issue, the focus of the indefiniteness inquiry is on *the meaning that claim terms would have* to one of ordinary skill in the art.") (emphasis added).

In fact, the specific argument AutoStore makes here was rejected in *Contour IP Holding, LLC* v. *GoPro, Inc.*, 2018 WL 3428606, at *3-4 (N.D. Cal. Jul. 16, 2018).  In *Contour IP*, the asserted claims recited only a system for the production of "real time video image data" but the specification disclosed both "real time" and "near real time" embodiments.  *Id.*  In rejecting defendant's indefiniteness argument and adopting plaintiff's proposed construction, the court held that "[a] POSITA would not be confused by the presence of 'near real time' and 'real time' in the specification" because "adding the modifier 'near' before 'real time,' does not change the meaning of the underlying term."  *Id.* at *3.

Moreover, even if the specification's use of "near-real time" were relevant (it is not), Dr. D'Andrea explained during his deposition that a POSITA would readily understand the difference between the two terms ("real time" versus "near-real time") without further explanation. (D'Andrea Tr. at 209:22-210:16.)  Therefore, a POSITA would understand the distinction drawn in the specification, and there would be no confusion about the meaning of "real time," as used in the at-issue claim, even assuming for argument's sake only that the use of "near-real time" in the specification is relevant.

The cases relied on by AutoStore do not support its argument.  In *Halliburton Energy Services, Inc.* v. *M-I LLC*, 514 F.3d 1244, 1254-55 (Fed. Cir. 2008), the court held that the term "fragile gel" was indefinite because whether or not a particular drilling gel infringed the asserted claims depended on environmental conditions—the same gel could infringe under one set of

-49-

environmental conditions and not infringe under another set.  That holding is not relevant here.[25]

Although different AS/RS systems may have different physical parameters, the term "real time" always means that the control system is set up to act with sufficient speed to affect current movements of robots operating in the system.  Accordingly, the Court should find that the "real-time" limitation is not indefinite.

**CONCLUSION**

For the foregoing reasons, and for those stated in Ocado's opening brief, Ocado respectfully requests that the Court adopt Ocado's proposed constructions.

---

[25] *Mantissa Corp.* v. *FiServ Solutions, LLC*, 2022 WL 2439938, *9-10 (N.D. Ill. Jul. 5, 2022) is similarly irrelevant.  In *Mantissa*, the patentee proposed to construe the term "network" as "real-time computer network," despite the fact that the term "'real-time' appear[ed] only twice in the Patent, as a description of the benefits of a non-limiting example of the invention."  *Id*. at *10. The patentee also provided no definition of "'real-time' other than saying it means 'pretty quickly.'"  *Id*.  Here, unlike in *Mantissa*, "real time" is the term used in the claims, and also is used repeatedly throughout the specification.  Further, Ocado has provided ample evidence—including dictionary definitions, excerpts from academic papers available to POSITAs, and expert testimony—that a POSITA would understand the meaning of "real time" in this context with reasonable certainty.  (Pls.' Br. at 48-50.)

Date:  August 22, 2022

Respectfully submitted,

/s/ *Henry C. Quillen*
Henry C. Quillen
New Hampshire Bar No. 265420
WHATLEY KALLAS, LLP
159 Middle Street, Suite 2C
Portsmouth, New Hampshire 03801
Tel.:  (603) 294-1591
Fax:  (800) 922-4851
Email: hquillen@whatleykallas.com

Garrard R. Beeney
Marc De Leeuw
Dustin F. Guzior
Stephen J. Elliott
Laurie Stempler
Alexander N. Gross
Austin P. Mayron
Navraj S. Dhillon
*Admitted pro hac vice*
SULLIVAN & CROMWELL LLP
125 Broad Street
New York, New York 10004
Tel.:  (212) 558-4000
Fax:  (212) 558-3588
Email: Ocado-DNH@sullcrom.com
