**NO COPY OF THIS TRANSCRIPT MAY BE MADE PRIOR TO 1-16-2023

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW HAMPSHIRE

```
* * * * * * * * * * * * * * * * * * * *
                                      *
OCADO INNOVATION LTD., AND OCADO      *
SOLUTIONS LTD.                        *   21-cv-41-JL
                                      *   September 29, 2022
              v.                      *   1:30 p.m.
                                      *
AUTOSTORE AS AND AUTOSTORE SYSTEM,    *
INC.                                  *
                                      *
* * * * * * * * * * * * * * * * * * * *
```

TRANSCRIPT OF MARKMAN HEARING - AFTERNOON SESSION
BEFORE THE HONORABLE JOSEPH N. LAPLANTE

APPEARANCES:

For the Plaintiffs:        Garrard R. Beeney, Esq.
                           Marc De Leeuw, Esq.
                           Dustin Guzior, Esq.
                           Alexander N. Gross, Esq.
                           Michael Thomas Lemanski, Esq.
                           Sullivan & Cromwell, LLP

                           Henry C. Quillen, Esq.
                           Whatley Kallas, LLP


For the Defendants:        Gregg F. LoCascio, Esq.
                           Joseph Loy, Esq.
                           Ali-Reza Boloori, Esq.
                           Tiffany M. Knapp, Esq.
                           Emily Scott, Esq.
                           Kirkland & Ellis, LLP

                           Robert R. Lucic, Esq.
                           Sheehan Phinney Bass & Green, PA


Court Reporter:            Susan M. Bateman, RPR, CRR
                           Official Court Reporter
                           United States District Court
                           55 Pleasant Street
                           Concord, NH 03301
                           (603) 225-1453

P R O C E E D I N G S

THE CLERK:  Court is back in session.

THE COURT:  We'll stay off the record for a minute.

(Off the record)

Let's go on the record.

A couple things.  I forget which one of you presented it, the slide that shows the two examples of old art and then it's black and white?

MR. LOCASCIO:  My slide 11, I think, your Honor.

THE COURT:  Okay.  And the middle one --

MR. LOCASCIO:  It's Hognaland.

THE COURT:  The Hognaland version?

MR. LOCASCIO:  Yes.

THE COURT:  Somebody said it takes up more than two grid spaces.  That's what you said.  All right.

Because it doesn't look like that when I look at it.  So if I could just get -- is that an exhibit anywhere?  I don't think it is.

MR. LOCASCIO:  It is a prior reference cited on the face of the patent.  My expectation is it's somewhere on the record, but it's a publication.  It's a patent application that's cited.  So we can get you the slide, obviously.

If you want the reference itself, if that's the question?

THE COURT:  Yeah.

MR. LOCASCIO:  We'll get you the reference which has that image in it.

THE COURT:  Yeah.  And so here's what I would like. Either just sometime, you know, after this is over, tell me where it is in the record or send me a copy.

MR. LOCASCIO:  Of course.

THE COURT:  The other thing is a question, and I'll just get to it when it's natural.

Go ahead.  Let's get underway.

MR. LOCASCIO:  Thank you, your Honor.

MR. BEENEY:  You know, just on that, your Honor, I will say this.  You know, it is hard to make a determination as to whether a robot is a single space, a double space, or something in between when the robot is depicted without a grid.  You really can't make that determination.

THE COURT:  Let me ask this.  Does anybody have, like, a visual depiction or, like, a similar video of that version in action?

MR. LOCASCIO:  So I don't know -- I don't believe there's one in the record, but what I would say is it shows the bottom.  If it just shows the top of a robot, we could maybe say, well, I'm not sure how it sits on the grid.

It has the wheels on the bottom.  So you know exactly what the grid space is because the wheels ride on the rails over the bins.

MR. BEENEY:  I think the point I was making, your Honor, is that if you put a track underneath the wheels the way they're configured there --

THE COURT:  Yeah, they go in different directions. They're perpendicular.

MR. BEENEY:  -- you'll see that it takes up --

THE COURT:  More than two.

MR. BEENEY:  -- part of two and more than one.

THE COURT:  Oh, wait a minute.  That's different. I know it takes more than one and part of -- two, one on each side.

MR. BEENEY:  So it's three.

THE COURT:  Oh.  Okay.  I was thinking what you meant by that was it takes up the equivalent of two -- more than two grid spaces, like the area of two grid spaces, but you're saying that it's in one, like where the housing is, I don't want to get into that, but the one grid space and encroaches on two others?

MR. BEENEY:  Exactly.

THE COURT:  That's your point?

MR. BEENEY:  Exactly.

THE COURT:  Okay.

MR. BEENEY:  So when we talk about occupy in the context of passing --

THE COURT:  Got you.  That I get.

Now, here's this.  Look, if anybody can still -- is it Hognaland?  How do I pronounce it?

MR. LOCASCIO:  Hognaland.

THE COURT:  Hognaland.  If anybody can scare up an actual photo, video, something of that thing running, I would like to see it.

MR. LOCASCIO:  We'll be able to send you something on that, your Honor.

THE COURT:  Okay.

You may proceed, Mr. Beeney.

MR. BEENEY:  Thank you, your Honor.

So, your Honor, the next claim term of the '051 Patent is housing footprint.

It's used in the patent in claims 1 and 13 in the context of juxtaposing the housing footprint of a robot that occupies twice an area of the grid space with the housing footprint of a robot that occupies less than twice the area of a grid space.

Your Honor, I don't want to repeat the briefs, nor do I actually want to touch on everything that's in the slide presentation, but I do want to make three points.

One is that AutoStore has conceded that our construction of housing footprint is correct, and I'll show your Honor where that is; second of all, that the AutoStore construction is rebutted by the specification; and third, that

the AutoStore construction would actually rule out an embodiment of the patent.  Something that the law instructs we should not do.

So here are the competing constructions.  AutoStore creates a concept nowhere found in the patent or in the specification about extensions from the housing.  There's just nothing in the specification that suggests that.

The dispute is whether there is something like an extension from the housing that's not part of the footprint.

I already mentioned plain and ordinary meaning and what that actually means, and here's the specification describing the term.

Now, your Honor, I said that AutoStore had conceded that our interpretation is correct, and, you know, I think in this context it might be useful to put up AutoStore's slide 39.

And I think -- you know, this basically sets out the parties' dispute.  We're talking about a two-space robot here.  The prior art cantilevered robot.

AutoStore's contention is it's just kind of the guts of the robot that make up the housing footprint, not the cantilevered arm.  Ocado's construction is that you have to include the cantilever arm.

And when I say that AutoStore has conceded that the latter is accurate, it's because in the '051 IPR proceeding

AutoStore told the board that the footprint of this prior art robot, the housing footprint takes up two spaces, not one space, and I'll show that to your Honor.

So, you know, on I think it was September 16th we provided to your Honor the board decision to institute IPR on the '051.  Your Honor raised a question about that this morning in terms of a stay, and I'll get to the actual decision in a second.

But the question here, whether this two-space robot has a housing footprint of one or more, was answered by AutoStore in connection with the IPR, and that is in Exhibit 46 that we, as plaintiffs, submitted.  I can show that to your Honor.  It would be in the exhibits that were submitted to the Court.  Let me see if I can do that here.

Your Honor, this is --

THE COURT:  Can you put that slide back up?

MR. BEENEY:  Sure.

THE COURT:  I want to make sure there's not something that I'm misunderstanding about these bots.

Do you see how -- this might be part of my imagination, but in both of these proposed constructions, right, do you see how -- AutoStore is the blue on the left. The other wheels are on the track and they seem to be outside the housing except for the two wheels at the top.  Is that just the way you've represented it on a graphic or is the

housing different on one side that sort of covers up the wheels?  Do you see what I'm saying?

MR. BEENEY:  I do.  This is AutoStore's slide.

THE COURT:  Okay.

MR. BEENEY:  So I'll probably have to defer to them.  I don't think there's a -- well, this is the AutoStore prior art two-space robot.

THE COURT:  Am I just dreaming this?

MR. LOY:  No, you're not dreaming it, your Honor.  It looks like the blue portion of the left most image does extend in the upper direction.

THE COURT:  In the purple.  But that's not really different really, right?

MR. LOY:  It is only insofar as on the left here, where these wheels are, the housing is actually depicted within the inner bounds of the wheels, and so that blue portion on the left most image does exceed a little high in this image on the slide.

THE COURT:  Just like it does on the purple one, right?

MR. LOY:  In the purple on this particular version if that dotted line suggests the wall, then it is the housing.  If the wall is on the other side of those wheels, then that would be the limit of the housing.  And here on the right side, which you see as the rectangle, because this is Ocado's

understanding of the terms, it also captures --

THE COURT:  I get that, because to them the housing includes more, but what I'm trying to understand is why are the wheels outside the housing on three sides and within the housing on the top side?

MR. LOY:  And this one the dotted line is just on the opposite side of the wheels.  It should be on the lower end.

THE COURT:  It shouldn't be, right?

MR. LOY:  Correct.

THE COURT:  It's a mistake?

MR. LOY:  Yes, it is a mistake, and it doesn't really matter for the substance of this argument.

THE COURT:  Understood.  Sorry for that detour.

MR. BEENEY:  No, not at all, your Honor.

So, your Honor, where I was going was that in the petition for IPR on this patent, the '051 Patent, AutoStore told the board that this prior art robot has a housing footprint of two grid spaces, not one grid space as they're telling your Honor.

And I'm going to refer to Plaintiff's Exhibit 46 in connection with the claim construction briefing, and I'm putting up, first of all, page 25 of AutoStore's petition to the board.

And you'll see here, your Honor, this is Figure 3

from a prior art patent which depicts exactly what was on the previous slide, the cantilever two-space robot.  Your Honor can see it up here in the upper left-hand corner quadrant.

So what AutoStore told the board, and I'll go down now to the bottom of the same page, your Honor, is that, in other words, as confirmed by Figure 2, the load handling device, that is this cantilevered robot, has a housing footprint, the term that we're construing, that occupies twice an area of the grid space.  Exactly the opposite of what they're telling your Honor today.

Now, this is not a construction of a term in the prior art patent.  The prior art patent doesn't use the phrase housing footprint.  It's only the '051 that uses the phrase housing footprint.

So in telling the board that the prior art two-space robot has a housing footprint that occupies twice the area of the grid, AutoStore is confirming our claim construction here and disavowing its claim construction here.

And AutoStore didn't say it just once.  I think they said it three times.  And so if I now go to 48 of AutoStore's brief and it's talking here about the '051 Patent, it says it admits that the NO366, the cantilevered prior art robot, discloses a load handling device with a housing footprint that occupies twice an area of the grid space.

And then they got the figure from the '051 Patent

with the cantilevered robot and they're telling the board that that cantilevered robot has a housing footprint that occupies twice an area of the grid space.  Again, exactly what we're saying and exactly the opposite of what they're representing to your Honor.

Now, finally, the third time that they say this to the board is on page 49 of our Exhibit 46, and you'll see here AutoStore not only, you know, says it, but they created a diagram to show it.  And it says, "Figure 1 below, which illustrates how the load handling device 1 from the prior art NO366," the cantilever robot, "has a housing footprint that occupies twice an area of the grid space.

Now, the board instituted IPR based on this representation, and, with respect, AutoStore should not be able to speak out of both sides of its mouth when it suits its purpose of telling the board that the housing footprint in the '051 with respect to the cantilever robot takes up two spaces while telling your Honor that, oh, no, no, it's very different, it only takes up one space.  It's the same issue. There's no way to reconcile these two irreconcilable positions that they've taken.

And then as to the board's decision which instituted IPR based on this representation -- we provided that to your Honor earlier on September 16th as a notice of prior art.  And there the board instituted, based on this

NO366 alleged prior art, even though the board found in the decision that we submitted to your Honor on pages 20 to 22 and 29, that the reference NO366 did not disclose a single-space robot.

So what does that mean for our proceeding today? Respectfully, the board must have concluded that the '051 disclosed an invention of more than a single-space robot or NO366 can't be prior art because it doesn't disclose a single-space robot, and that's why we submitted the decision to your Honor; both to show that AutoStore obtained IPR based on a representation directly contrary to the representations it's making to your Honor and to show that the board instituted based on its conclusion, again consistent with our interpretation of these patents, that they disclose a robot greater than a single grid space robot.  Otherwise, there would have been no institution because the prior art reference that was the basis for the institution doesn't disclose a single-space robot according to the board on the pages that I cited to your Honor.

Now, I mentioned to your Honor that there was a second and third ground that I wanted to cover on this patent claim.

And going back to, if I may, our presentation, Mr. Lemanski, at page 60, please.

Obviously, we've talked about the fact that the

claims must be construed in light of the invention and, your Honor, as your Honor has pointed out, the patents regularly, I believe exclusively, and in many, many instances refer to the prior art cantilever robot as one that occupies two grid spaces.

But if you go to AutoStore slide 40, if we may.

So here, your Honor, what they've done in Figure 3B, this is the AutoStore slide, they basically -- and, again, I don't mean this pejoratively, but they've chopped up the prior art cantilever robot into something that they call the housing and something they call the cantilever arm.

But the problem with doing that is that it is directly contradicted by the specification.  Because under this interpretation that AutoStore is asking you to adopt, the housing footprint would have to be -- the green part would have to be two grid spaces, and that's because that's the language that we're construing in the claim.

The language that we're construing in the claim is "wherein the first housing footprint that occupies twice an area of the grid space."  So if AutoStore is correct and that green part is only the housing footprint -- contrary to what they told the board, but if that green space is only the housing footprint and the patent talks about the housing footprint occupying twice an area of the grid space, then this cantilevered robot which the patent unambiguously describes as

a two-space robot would have to be a three-space robot, and there's just nothing in the specification that suggests that.

And it's a little tricky and I'm not sure if I was clear as to how I get to the three spaces, but I can try to be clearer if I was not --

THE COURT:  Oh, I get it now.  Yeah, I get it.

MR. BEENEY:  Okay.

So they're saying that this cantilever robot, the way that they want to chop it up, is a three-space robot because the claim says the housing footprint occupies two spaces and then they have to add the cantilever arm, which makes it three spaces, and the patent regularly describes this thing as a two-space robot.

So then how do we read this language in the patent consistent with the specification?  Well, AutoStore wants to say that each of the indented paragraphs here that begin with "a" are disclosing something separate that you have to add up together, but that's not a way of reading the claim and it's certainly not a way of reading the claim according to the specification.

The second part of the limitation that AutoStore has highlighted here is just a way of describing what the crane device must do and how it proceeds laterally.  It's not telling you, particularly in light of the specification, that you have to chop this up and that the housing footprint is

only the green part.

So to the extent that AutoStore has created ambiguity by its interpretation of the claim language, that ambiguity is put to rest by the specification because there's no way the specification can be read as reading that the cantilever robot occupies three grid spaces, which is what your Honor is being told by AutoStore, separating the cantilever arm from the housing footprint.

THE COURT:  What do you say -- I don't think in the papers I've noticed either side tell me what the housing is.

What is the housing from your perspective?

MR. BEENEY:  It's the lateral plane of the robot. It's the thing that houses the robot.

THE COURT:  Okay.

MR. BEENEY:  As used in this claim term.

THE COURT:  Okay.  Houses the robot, but is the robot only what sits over that single grid?

MR. BEENEY:  No, your Honor.  It's the cantilever arm.  It's, you know, anything that extends, to use the AutoStore word that the patent doesn't use.  And, again, that's made clear by the fact that the specification always describes what's on the slides, on AutoStore's slide here, the cantilever robot, as a two-space robot.

THE COURT:  But claim 1 seems to describe the cantilever arm as being something separate from the housing,

doesn't it?

MR. BEENEY: Separate from the housing not in the sense of the lateral plane of the robot, but the crane device language that's on the slide here is not something separate from the housing. It's just describing -- it's giving structure and describing what the cantilever arm must be, and you can't read this as being separate from the housing footprint.

THE COURT: Because of the spec.

MR. BEENEY: Because of the specification. Exactly right, your Honor.

THE COURT: Okay.

MR. BEENEY: You just simply can't jibe their reading of this claim language with the specification. It's not that the specification doesn't support their reading. It's that the specification disclaims their reading, not in the sense of disavowal but calls this thing, Figure 3B, a two-space robot.

And under their reading because the claim talks about the housing occupying two grid spaces, this would have to be a three-space robot, and there's no such thing in the specification.

So because of the specification -- again, to the extent that AutoStore has created ambiguity, the claim language has to be the way I just suggested to your Honor.

The crane device is not separate from the housing footprint, and the language doesn't say it's separate from the housing footprint.  But the claim language is talking about the structure of the crane and how it extends and what it needs to do and the grippers and all the other things that make up the cantilever arm, and that's what this is describing.  It's not describing something separate from the housing footprint because it can't under the specification.

THE COURT:  The arm can't -- this is kind of a dumb question.  I have a mental image of this cantilever arm which probably has no resemblance to the actual cantilever arm, but the arm can't somehow extend out further than the housing, right?

MR. BEENEY:  No.  Correct, your Honor.

The purpose of the arm is to shoot down into the grid stack for bins and grab a bin and bring it up and then carry it along, which is why you've got the tipping problems with the cantilevered arm.

THE COURT:  Yeah.

MR. BEENEY:  And the Ocado invention, as reflected in these patents, is because again an arm needs --

THE COURT:  Straight up and down, one grid.

MR. BEENEY:  Exactly.

THE COURT:  Yep.

MR. BEENEY:  And because of our needs we use the

one grid space, which the patent refers to as the minimum embodiment, because we need to do so many of them.  So we need to clear as much space as possible.  But there could be uses, for example in grocery, where you would have a 1.2 or a 1.5.

And, you know, this comes up regularly in patent law, your Honor, where the question is, you know, how do you deal with the embodiments and the claims of the patent.  And there are, you know, a couple of legal principles, and one I'm going to deal with in a second which is that you should rarely construe the claims to exclude an embodiment, but the other legal principle that is important here is that you don't limit the claims to any one of the embodiments.

And there's always the question of the claim language being broader than any of the embodiments.

THE COURT:  Yep.

MR. BEENEY:  1, 2, 3, all of the embodiments, they're just suggestions of the inventor of how you might construct the invention.  They're not limiting.

So the fact that, you know, there isn't a 1.2, a 1.3, 1.5 embodiment doesn't mean the invention doesn't include those designer choice embodiments.  Embodiments are not limiting even in totality I guess is the point I want to make.

THE COURT:  Understood.

MR. BEENEY:  So then let me get to the final point, if I may, about this construction, you know, AutoStore

admitting that we're right, the fact that they can't be right, and then, finally, another reason why they can't be right, which is that their construction would impermissibly exclude the preferred embodiment.

And, Mr. Lemanski, can we go back to our deck slide 64, please?

Okay.  So the claims are directed to a system that include a prior art cantilever robot and the newer less than two-space robot.

If the housing footprint of the cantilever robot did not occupy twice the area of the grid space because the cantilever arm is included within the housing footprint, just what they told the PTAB --

THE COURT:  Okay.  What does included within mean? Claim 1 says it's separate from.  It says it.  So does that mean -- when you say included within, do you just mean, like, fits under or do you mean is part of?

MR. BEENEY:  When I say that the cantilever arm is included within the footprint --

THE COURT:  Included within.

MR. BEENEY:  -- I mean if you're looking down at the robot, the footprint is the space that the robot takes up.

THE COURT:  And the arm is part of the robot.

MR. BEENEY:  Yes, your Honor.  And that's exactly what they told the PTAB.

THE COURT:  But the arm is not housing.  It's just under the housing.

MR. BEENEY:  It's a housing footprint.

THE COURT:  A housing footprint.  Okay.  That's space.

MR. BEENEY:  So housing is different from housing footprint as it's used in the patent.

THE COURT:  The footprint, of course, is the space, what you called the horizontal plane.

MR. BEENEY:  The horizontal plane of the robot as you're looking down.

THE COURT:  Yeah.

MR. BEENEY:  And the housing footprint is what houses the robot, and that is, you know, I've said it before --

THE COURT:  No.  The house is what houses the robot.  The housing footprint is the volume of space on the horizontal plane.

MR. BEENEY:  Exactly right.

THE COURT:  Okay.

MR. BEENEY:  And, again, you can't read their construction as consistent with the specification because it would be a three-space robot, and that's not the way this cantilever robot was described.

THE COURT:  Okay.

MR. BEENEY:  Because the housing footprint under the claim language takes up two spaces.  If the housing footprint is limited just to the guts, you've got a gut taking up one space.  You've got a gut taking up two spaces.  Well, what about the cantilever arm?  That makes the cantilever robot taking up three spaces, and that's not the way it's described in the specification.

THE COURT:  I don't understand the middle step.  You said you've got guts taking up one space, you've got guts taking up the second space.  What's that guts?

MR. BEENEY:  Okay.  So let's go back to -- because I think this is an important point and I want to make sure I've made it as clear as I can.

Can we go back to the AutoStore slide?

So here, your Honor, is the AutoStore claim that the housing footprint is just the green part, right?

THE COURT:  What do you mean right?  Do I agree with that?

MR. BEENEY:  No.  That's what they're saying.

THE COURT:  Yeah.

MR. BEENEY:  I just want to make sure that you and I are on the same page that that's what they're saying.

THE COURT:  I think so.

MR. BEENEY:  Okay.  So they're saying that the green part is the housing footprint.

THE COURT:  The green part on top, the horizontal plane on top.

MR. BEENEY:  Exactly.  But what the claim language says is, and this is claim 1, "wherein the first housing has a housing footprint that occupies twice an area of the grid space."

So the green part under the claim would have to occupy two spaces because that's what the claim says.  It says a housing footprint that occupies twice an area of the grid space.

If AutoStore is right, then the green has to occupy two spaces because that's what the claim says.  But then how do you deal with the fact that the specification says this is a two-space robot because you've got to deal with the cantilever arm?  So they have to be wrong because this is not a three-space robot.

THE COURT:  The part you were just -- were you reading from this slide?  It looked like you were.

MR. BEENEY:  No.  This is the AutoStore slide, and regrettably, they didn't put up the claim language on this slide.

THE COURT:  Okay.

MR. BEENEY:  So let me go to our slide 57.

Thank you, Michael.

And here's the claim language, "The first housing

has a housing footprint that occupies twice an area of the grid space."

So the housing footprint has to be able to occupy, under the claim language, two grid spaces.  But if the green part occupies two grid spaces, what do they do with the cantilever arm?  That's got to occupy a third grid space.

THE COURT:  Why can't the -- if the housing footprint occupies two grid spaces, why can't the cantilever arm be under the second of the two?

MR. BEENEY:  Because it's never under it.  It extends out.

THE COURT:  It's under the footprint.

MR. BEENEY:  It is in our interpretation.  It's not in theirs.  They want to exclude the arm from the housing footprint and they want to say it's just that green guts of the robot thing.

THE COURT:  Yeah.

MR. BEENEY:  But that's got to be two grid spaces under the claim language.

THE COURT:  Okay.

MR. BEENEY:  So they can't make their robot fit, a cantilever arm robot fit into the way it's consistently described in the specification.

THE COURT:  I may have misunderstood.  Okay.

MR. BEENEY:  Was that clear at all?  I'm sorry.

THE COURT:  Yeah, it's clear.  I just don't know if I make the same assumptions you do about some of this language, but it is clear.  I get it, yeah.

MR. BEENEY:  Okay.  And I think -- you know, again, if the housing footprint is only the green and not the arm, and the claim language says that the housing footprint has to occupy two grid spaces, then only the green and not the arm has to occupy two grid spaces.  Then the arm has to occupy a third space.

THE COURT:  But why can't what the arm occupies be the second space?

MR. BEENEY:  Because that's already taken up.

THE COURT:  By what?

MR. BEENEY:  By the green.

THE COURT:  The robot is under one grid space.  That's the footprint.  Well, it's at least one.  It's more than one, right?

Where is the second one?  Where is it?  Isn't the second grid space the area that the arm is under?

MR. BEENEY:  In the specification.  Absolutely.  That's our point.

THE COURT:  That's not a third.  That's a second.

MR. BEENEY:  Exactly.

THE COURT:  Okay.

MR. BEENEY:  But that's the reason why their

construction can't be right.  Because under their construction it's only the green that occupies two grid spaces, not the arm.  Because they say the housing footprint is only the green, and the claim talks about the housing footprint occupying two spaces.

THE COURT:  Okay.

MR. BEENEY:  So when the specification says the cantilever robot occupies two spaces, what do they do with the arm?  They've already got the green part occupying two grid spaces under the claim.

THE COURT:  I'm not sure if they accept that, but I'll wait to hear from them.

MR. BEENEY:  Okay.  So then, just to go back, you know, again.  The cantilever arm robot would be excluded under their interpretation for largely the same reason because here it talks about a housing footprint of twice the area of the grid space.  The preferred embodiment -- or our preferred embodiment is using a two-spaced cantilevered robot.  They claim that it has to be three grid spaces.

So, your Honor, they told the PTAB and guide institution -- based on the fact that the housing footprint is, you know, what we say it is, their robot is nowhere described because they can't account for the arm and they would exclude a preferred embodiment.

Thank you.

THE COURT: Understood. All right.

Go ahead.

MR. LOY: Good afternoon, your Honor.

Joseph Loy on behalf of AutoStore.

THE COURT: Good afternoon.

MR. LOY: Your Honor hit the nail on the head with the question that was asked, what is the housing.

I think if you look at this claim in particular, you start to see the logical trouble with the claim, but it is drafted in a way that has some clarity.

And if we could just pull up slide 40, if you will.

Let's look at the claim. So the claim begins, this is the device claim, and it says it is a first load handling device.

And one of the things I heard Mr. Beeney say as he was answering your Honor's questions about what is the housing, he's confusing various elements. One of the components of a first load handling device is the first housing. That is the very first element that occurs below the comprising elements. This particular element is not followed by something that then says the first housing is then comprising other things. Instead, it is just the first housing.

And then it goes on. It's followed by a semicolon, and then it goes on to state other elements of this load

handling device, which is basically shorthand, we've been saying, robots.  So the load handling device, I think everyone will agree, is the robot.

Now, that robot is comprised of that first housing which we've depicted here in green on slide 40, and that is basically the walls that surround the mechanical instruments that allow the robot to move.

It is then followed by additional elements of the robot, or the first load handling device, including the wheels.  So you have wheels that move in one direction.  Then in the next clause, again separated by a semicolon, you have wheels that move in a different direction.  This is what enables the robot to traverse both an X and a Y axis.

THE COURT:  Let me ask you a completely unhelpful question.

MR. LOY:  Yes.

THE COURT:  Only because it's my curiosity.

Do you see how from number 30 it's a straight arrow and from the other numbers it's like a curvy line?

MR. LOY:  Yeah.

THE COURT:  Is that so I don't confuse lines with a part of the device?  Like, why is that?  Does that mean something that I'm supposed to understand?

MR. LOY:  I don't believe it does, your Honor.  I think these are just the way that the images were drawn.

THE COURT:  Okay.

MR. LOY:  You see all kinds of different images.

THE COURT:  I thought that might mean something in, like, IP language.

MR. LOCASCIO:  It actually is a -- I don't think we'll get disagreement.  In patent drafting when you're pointing to a specific thing, you put the curvy line that touches it.  If you look at the 30 with the arrow going to, like, a space, my guess is if you pull that up on the spec, it will say 30 is the load handling device.  So it points to kind of everything that --

THE COURT:  The overarching definition.

MR. LOCASCIO:  Yes.  So when the arrow doesn't touch, that's what it historically means, your Honor.

MR. LOY:  All right.  So turning back to the claim for a minute.  I learned something today.

THE COURT:  Okay.  Thank you.

MR. LOY:  We turn to this crane device.  And that device is the cantilever arm in this particular claim, and it says specifically, right, it differentiates between what that cantilevered arm is and the housing, and it says, and I will read, "The cantilevered arm extending laterally from a top side of the first housing."

Now, it's just referred back to that first clause following the comprising limit.  And if you can see here, we

were accused of chopping this up, but that's exactly what the patent claim does.  It itemizes these various components as individual things.  The first housing is separate from the cantilevered arm, and, in fact, the cantilevered arm extends from the first housing if there's any ambiguity about what that first housing is.

Now, that is why we argue that the housing footprint -- now, we turn to the issue of footprint, and we can turn back to the slide previously, setting aside the minor deviation and the dotted line we just discussed a minute ago.

The footprint that AutoStore is advocating here is the very footprint of that first housing.  It's not the footprint of the entire load handling device.

Now, Ocado says it's the footprint of the entire load handling device.  They certainly were the controller of the pen.  When they wrote the claim, they could have done a number of things to make that clear.  They could have said that the footprint, this is the first footprint of the entire load handling device, or later they could have said the footprint of the load handling device occupies two spaces.  Instead, they said the first -- or the housing footprint, which refers to the first housing, and that is a separate thing from the whole -- for footprint.

So let me turn for a moment to how this divides up.

If we look at slide 43, we'll just look for a

moment at the single cell or the single spaced bot that Ocado claims to have invented.

By the way, we dispute that. And just so it's clear for this record today, we dispute that they had the first single cell robot. We have the position that is in other proceedings that the Hognaland reference actually discloses a single cell robot. So I don't want there to be any confusion about that issue.

But for the purposes here today if you look at their device, the external housing of this device is just as is indicated in the cantilevered version. It is the walls that enclose the mechanical devices, right?

So there's nothing contradictory about these positions here. And it is very clear that the specification differentiates between the load handling device and other aspects of the claim.

For instance, on slide 43 you see that the load handling device is differentiated from the wheels and the housing is differentiated from the wheels. So if we think of the various footprints this could create, there is a device footprint, that would be the entirety, as I just learned from Mr. LoCascio, 252, the entire image, or it could be a subset of that, which is the housing footprint of the housing itself would be that volume beneath the green, or it could be the wheels separately. When you add them together, you end up

with load handling device.

Now, Mr. Beeney focused on the notion that we're somehow excluding a preferred embodiment.  The case law is clear that is not the preferred way to interpret a claim, but at the same time the Court is not here to redraft the claims when there has been a drafting error on behalf of the patentee, and that's the Lucent Technologies case at 525 F.3d 1200.

Really what it seems Ocado wants you to do, your Honor, is to redraft the claims, not to say it has to be something that actually they claim.

THE COURT:  I know you don't want me to do that, but what about what Mr. Beeney said?  He says, look, when there's ambiguity in the claim, claim language, you look at the spec.

MR. LOY:  Okay.  The question here is, is there ambiguity in the claim language, and I would --

THE COURT:  Well, my question -- you can tell me your question after, but my question is when there is ambiguity, and I know you're not accepting it necessarily, but when there is, is it the Court's obligation to look at the spec?

MR. LOY:  So the principles as articulated by Phillips on how claim construction starts and ends, you begin with the claim and you look for the clear meaning of the

claim, and if there's ambiguity, you look to the spec.  The spec inform what the meaning of the claim is.

So we're not saying don't look at the spec.  In fact, let's look at the spec.  We'll turn to 45 here.  I have sections on the spec that Ocado was relying on to support their argument.

Here again the patentee knew how to say the footprint of the load handling device.  You see that in the '051 Patent, column 5, lines 32 to 38.  They did not say that when they were referring to the asserted claim in this case, claim 1 as an example.

Now, if that's what they wish it to be, they could have done it.  They did not do that, and it is not the Court's responsibility to fix their drafting error.

I would just make one more point, your Honor, on the issue of the Patent Office proceedings that are going on.

Now, the Patent Office proceedings, as your Honor will appreciate, are invalidity proceedings, and parties sometimes take positions in those that are the positions that their opponents are taking.

So we filed this petition in March of 2022, so just this year, six months ago, and we knew at that point the very arguments that Ocado was making about what their claim covered, and our prior art would do that in this circumstance.  So to the extent that there is any contradiction there, that

contradiction is easily explained by that issue.

Unless your Honor has further questions on this particular term, I will --

THE COURT:  I understand your argument.

MR. LOY:  Thank you very much.

MR. BEENEY:  So I think -- just briefly, if I may, your Honor?

THE COURT:  Yep.

MR. BEENEY:  So the explanation as to why AutoStore repeatedly told the PTAB that the housing footprint of the cantilever robot was two grid spaces is that they were actually advancing our position.  I mean, you know, I hate to say this, but seriously?  I mean, that's the explanation?  There's nothing in that paper that even hints at that explanation being credible.

They told the PTAB three times at least that our construction of the '051 that we're offering to the Court today is correct.  The housing footprint of the cantilever robot takes up two spaces.  And to say that, you know, that really what they were saying is we're advancing Ocado's position -- well, I'll leave it at that.

They want to suggest too, your Honor, that there's a drafting error.

Can we put up slide 40, please?

And, obviously, in terms of a drafting error, they

were obviously able to tell the PTAB what the claim meant.  So there wasn't that much of a drafting error.

But if we can put up AutoStore slide 40.

So I'll offer to your Honor another reason why that can't be right.  Their reading of this claim language that they have put up here is that the first housing is something separate and distinct in terms of the housing footprint from the crane, right?  That's their argument.

But if that's right, then so are the wheels because underneath the first housing it refers to a plurality of wheels, a second plurality of wheels.  So if they're right about the way this claim is constructed, then the wheels wouldn't be part of the housing either, right?  But that would mean that every robot is a two-space robot, and that's just not consistent with what the patent claims.

So they would exclude from the housing footprint the wheels.  And the claim talks about a single housing footprint.  You would never have a robot that had a single housing footprint even though that's the language of the claim if you exclude the wheels from the housing because every robot has got wheels.

So I'll repeat that again so I hope that it's clear.  If their construction is correct that each of these things listed in the claim language is separate from the housing, then the wheels have to be separate from the housing.

And if the wheels are separate from the housing footprint, you would never have a housing footprint that occupies a single space, but that's what the claim language talks about, a housing footprint of a single space.  You would never have it if the wheels were different from the housing footprint.

Thank you, your Honor.

MR. LOY:  Your Honor, may I be heard very briefly?

THE COURT:  Sure.

MR. LOY:  Just on the last point about the wheels.

The claim is very clear about what the first housing is.  The spec also talks about footprints being of different shapes depending on what you're including within it.  So if you're including the first housing and the wheels, that's its own footprint.  You can also have a footprint of an entire load handling device.

THE COURT:  Yeah.

MR. LOY:  And in the example that was just given by Mr. Beeney, you could actually have the wheels on the inside of the housing.  And if you did that, then your housing footprint would be the same size as your vehicle footprint in a single cell implementation.  That was not correct.  We don't want to agree.

The other issue here is the Patent Office has very specific procedures that patentees can go to fix claims, and they didn't do that here.  This Court has the opportunity and

can fix typographical errors in a proceeding like this, but it's a re-exam or certificate of correction proceeding where we should really be for these particular claims given the issues that are being presented.

THE COURT: Understood. All right.

MR. LOY: I should not have sat down.

THE COURT: You're good.

MR. LOY: Thank you.

So we are moving to the last term, I believe, of the '051, which is the rails and tracks term.

THE COURT: Yeah. The first set of rails is part of the first set of tracks. Second set of rails is part of the second set of tracks, right?

MR. LOY: Right.

And if we can pull up our slides, please.

Now, the claim phrase, as you just stated, your Honor, this particular phrase occurs in the '051 Patent, claims 9 and 18. As we'll see in a moment, this particular redundancy that has occurred in this construction makes or renders this particular term indefinite. You cannot conceivably determine what it means because on the one hand it supposedly means the same thing and on the other hand it means something different, and those two things are fundamentally irreconcilable.

So let's just take a look at claim 9 for a moment.

So in claim 9 you have a load handling system.  So it's a full system here, not just a device, and it is a dependent claim for --

THE COURT:  Can't they just be redundant?  Can't they just be redundant without being indefinite because they failed to narrow?

MR. LOY:  First of all, there's a principle of claim construction that words that are different in claims are presumed to mean different things, and there's another that you should not be -- any word that is superfluous in a claim shouldn't be there either.

So you're looking for meaning and you're looking for differentiated meaning when you have different claims, and that's exactly what we have here.

So we have a case that we've cited from the Federal Circuit, SIPCO, where the two different addresses that were being used, and one was a receiver address and the other was a scalable address, the patentee argued that they were the same.  And in this instance because of this presumption that these two terms had to have different meanings these particular claims were not upheld.

Now here -- let's look at the particular claim at issue again.  We have in the claim rails appear to be differentiated from tracks.  So here it says a first set of rails is a part of a first set of tracks.  So that begs the

question, what is the rail, what is the track.

When you look for -- and we were just talking a moment ago about if there's ambiguity or if there's some kind of question in your mind, you go to the spec to look.

When you go to the spec here, it is dizzying because what you see is that the specification uses the words interchangeably, and Ocado's own experts admit these words are used interchangeably. Our expert, as well, noticed that in the spec they're used interchangeably. So we look at a couple of examples.

As just one example, we see the first or a second set of rails or tracks. It's just used in the disjunctive.

Again, they're used in column 7, lines 9 through 14, rails and tracks are again used. You'll see that over and over again throughout this claim.

Now, when you're --

THE COURT: Wait. So the rules of construction are just sort of -- if they're used interchangeably, they're redundant.

MR. LOY: If you look -- so let's just say they are exactly the same thing, go back to claim 9, you could sub one in for the other and it would make sense.

The first set of rails is part of the first set of rails makes absolutely no sense. The second set of rails is part of the second set of rails makes absolutely no sense.

Now, here we have Dr. Pfeiffer, who's Ocado's expert, opining that, as I just mentioned, that these things are used -- these words, rails and tracks, are used interchangeably within the specification, and not just used that way but that a person of ordinary skill in the art would understand that they were used interchangeably to do something, to create a grid structure.

Now, he goes on, however, when faced with the conundrum of what does this all mean, because it truly makes no sense, to then give you an explanation, and I would call that a justification. He's trying to make sense of something that is at once synonymous and different, and his explanation is that for this to be true, and this is for there actually to be some difference here, the tracks must mean something different from the rails, and he gives an explanation. Each track must be comprised of dual rails.

So this is the first time we're hearing of a system of two rails are now a track; whereas before rails and tracks are used as the same. It makes absolutely no sense.

I think I probably can sit down on that, and I would love to hear how they think it makes sense.

THE COURT: Oh, okay. You don't have to taunt them.

Go ahead.

MR. BEENEY: I relish the taunt, your Honor. I

absolutely relish it.

So let me start at slide 68 of our presentation, if I may.

So, you know, to kind of start with a little bit of background, if I may, your Honor, what your Honor just heard was never briefed. AutoStore never briefed indefiniteness, and here's kind of a little bit of the history. I think it's important to understand the difference between invalidity and indefiniteness.

So in the joint claim construction statement AutoStore said that their argument about this claim limitation was that it was indefinite, but in its opening statement -- in it's opening brief, rather, AutoStore didn't brief indefiniteness under 112(b); that is, you know, can a person of skill in the art with reasonable certainty understand the claim term. But what they briefed was invalidity under 112(d), that the dependent claim doesn't limit the independent claim from which it depends, and therefore it's invalid.

So, for example, in their brief at 27 AutoStore says that the dependent claims 9 and 18 which uses claim language, "fail to narrow the scope of the claims on which they depend," and therefore, they are "invalid." That's the language of 112(d).

So we saw that in their opening brief, and so we briefed 112(d) in our reply brief. AutoStore briefed 112(d)

in their reply brief.  Then we get their slides on Tuesday and they're back to an issue that they never briefed, which is 112(b), which is the indefiniteness.

So to start with, I think it's important to understand the difference between the two.  As Mr. Guzior said to me on Monday, if there's anything indefinite about this claim, it's AutoStore's position with respect to it.

THE COURT:  Okay.  So you answered the taunt.

MR. BEENEY:  So I will try to deal with both, but our slides dealt with what AutoStore had briefed, and, therefore, I'm going to skip over them because it's not what they seem to be arguing today.

So let me skip over our slides which actually deal with 112(d).

I'm sorry, your Honor.  We're having a little problem.  There we go.  So I'm going to skip over those.

And, you know, I've put this slide up, your Honor, to describe the grid structure when we talked about that earlier this morning, and I just want to point out to your Honor why under the indefiniteness argument a person of skill in the art, Dr. Pfeiffer, has no problem understanding this claim.

So the patents don't use rails or tracks to mean the same thing.  They use them as alternatives.  Just the way you would say, you know, if you were to say John or Mary can

go to the grocery store, you don't mean that John and Mary are the same thing, and that's the way the patent uses them. That's the way Dr. Pfeiffer says he reads them.

And so the way he reads this dependent claim is, on the structure circled on the right, that the double rails are melded together to form a track, and that's what the dependent claims mean to a person of skill in the art, Dr. Pfeiffer. He has no problem understanding it. He testified to that. It's in his declaration.

And so the evidence in front of your Honor with respect to the indefinite question is only that a person of ordinary skill in the art has no trouble understanding this claim.

So where is AutoStore's evidence clear and convincing burden that this claim is indefinite? There is none. They haven't offered you anything from their expert that he can't understand this claim. All your Honor has about indefiniteness is -- there's no briefing. It's just what your Honor heard from a lawyer today, and that -- you know, frankly -- you know, obviously what I say is not evidence of what a person of skill in the art says and what they say is not evidence of what a person of skill in the art would read.

So the state of this record on the question of indefiniteness where AutoStore has a burden of clear and convincing evidence to show that under Nautilus the claim

doesn't inform a person of skill in the art with reasonable clarity as to what the claim means, the only evidence is Dr. Pfeiffer saying I understand what this claim means when I look at the specification and it's clear to me and this is what it means.

What Dr. Pfeiffer says is what I just explained to your Honor.  The rails are blended together to form a track, and that's how they depend from the original independent claim which discloses different types of tracks.  And it depends and limits the original claim, and, therefore, it's not an issue of 112(b) or 112(d).  There's just no evidence to contrast what Dr. Pfeiffer explains to the Court in his deposition and in his declaration.

THE COURT:  All right.

MR. BEENEY:  Thank you, your Honor.

THE COURT:  What's next?

MR. LOY:  Just very briefly on this, and then we'll be turning to the next patent, your Honor.

THE COURT:  Okay.

MR. LOY:  I think you found it interesting and I invited Mr. Beeney to explain the difference in the claim, and the first thing we heard was a 112(d) argument about our briefing.  Our briefing does claim and has consistently claimed that the term rails and tracks as used in these claims is indefinite.  It's abundantly clear.

One of the principles of claim drafting is that under 112(d), a dependent claim must be narrower than the claim from which it depends, so the independent claim above or another dependent claim. That was -- all we were doing was citing there.

There is also a potential 112(d) summary judgment motion that we can make later. That's not the argument that's being made here now today. The waiver and the hand waving about this is the new argument is just not true.

Let's turn to Ocado's slide 71 for a moment.

We see -- if there was some explanation about this use of rails that was reconcilable, we would have seen an explanation of that in the specification. We would have seen citations to it in the record. And all we saw was -- if you could turn to Ocado slide 71, please -- is three images that were placed -- I believe Mr. Beeney admitted in earlier argument that that was their graphic's people who created these. It wasn't something that they pulled from the specification. These images do not appear in the '051 Patent. If they had some image from the '051 Patent that explained this issue, we would have seen it. Instead, what we have is Dr. Pfeiffer talking out of both sides of his mouth.

On the other hand, and this is our slide, slide 55, Pfeiffer says the spec says that rails and tracks are interchangeable, they mean the same thing.

And then, turn to 56, he says, well, no, they're not the same thing after all, each track must be comprised of dual rails. So how can a track be a rail if a track is a dual rail? It's perplexing.

What we really see from Ocado's argument is that they want to have a reexamination proceeding in this Court, but they don't want to go to the Patent Office to ask the Patent Office for these claims to be corrected and fixed. They don't want that outcome.

And with that, your Honor, we can turn I believe to the '080 Patent unless your Honor has any questions.

THE COURT: I'm good. '080.

MR. BEENEY: Can I have two sentences, your Honor?

THE COURT: Please.

MR. BEENEY: Thank you. I'll just be very brief.

THE COURT: Sure.

MR. BEENEY: So, your Honor, if counsel is going to quote Dr. Pfeiffer, they ought to not replace his words. They just put something up on the screen where they said that Dr. Pfeiffer said that the words are used alternatively -- or interchangeably. That's not what he said. What he said was that they're used alternatively.

And then the second point I want to make is, it's not our burden to convince the Court that the claim is definite. It's their burden to convince the Court that the

claim is indefinite under clear and convincing evidence.

Dr. Pfeiffer, fairly read, testifies he has no problem reading the claim.  That's the only evidence your Honor has from a person of skill in the art.

They have utterly failed to meet their burden, and it's not ours to prove definiteness.  It's theirs to prove indefiniteness by clear and convincing evidence.

MR. LOY:  Okay.  With that, your Honor, we have concluded the presentations on the disputed claim terms for the '602 and the '051 Patents, and we'll be moving on to the '080 Patent, and that is U.S. Patent No. 9,796,080.

Pull up our first slide, please.

I would just get into a very brief tutorial about the technology background for the '080 Patent, your Honor. This patent is titled System and Method for Order Processing.

Can we have our slide pulled up?

Just like we heard in the earlier single bot or single-spaced bot patents, for the '080 Patent you will also see when you're reading the specification that the '080 purports to use existing or already existing automated storage and retrieval systems.

And, in particular, in the '080 Patent at column 5, lines 27 through 31, this is slide 3, you see that AutoStore is actually specifically called out in the specification as one of the systems that is capable of performing what they

claim to be a novel method for basically taking what they call a storage bin and placing inside of it a delivery bin.  And the idea is that traditional orders that were placed with these types of systems, you may retrieve items from the grid, and rather than combining them together in nestable or separate containers and storing them perhaps temporarily while you fill an entire order in the greater grid, they may fill up floor space, for instance, and it's not a sufficient process.

So they claim to have developed a more efficient process by nesting or combining storage bins on the one hand, so those are the typical bins, with what they call delivery bins on the other hand, which is just a bin that sits in another bin.

So let's look at what that looks like in particular with the graph with the figures from the patent.

Here we see -- the delivery containers, as we described, are No. 80 which you see in blue, and the storage containers where the delivery containers are placed within are No. 70, as you see in slide 4 of the '080 Patent, in green.

And there is a mechanical -- they call this the merge station where a storage container on the lower level is brought underneath a delivery container on the upper level, and then they're combined together with this mechanical process.

And in the right image, which is Figure 15, we see

an example of that merge station.  In particular, you see this arm, 93, in the upper right-hand corner where the nested delivery container and storage container are being combined. That is a mechanism, and that will be one of the issues that is in dispute in this patent.

So this is one of those patents -- as Mr. LoCascio mentioned earlier, there's 81 asserted claims in this case still.  There are 22 claims asserted from the '080 Patent, and of those the parties will be addressing seven claim terms, and the first will be mechanism.

So mechanism, both parties agree, should take its plain and ordinary meaning.

THE COURT:  Yep.

MR. LOY:  And this is one of those issues we talked about earlier with 02 Micro.  We may all agree it's plain and ordinary meaning but differ as to what that in fact means.

THE COURT:  Uh-huh.

MR. LOY:  And this is also one of those issues where the dispute really does arise after seeing the infringement contentions.

What we know is that we have infringement contentions in this case that appear to require the claimed mechanism to involve human activity or only human activity.

So as you see here in the image on the left, and this is from Ocado's supplemental infringement contention,

this is a picking station where a bin could be delivered for an operator, a human operator to be looking at -- what you can see kind of in front of them is a screen, you just see the lateral view of a screen, which may be presenting to the operator particular orders that that operator should be pulling out.  You see he has a scanner in his hand and is scanning that item, and they may be placing that in a broader delivery system to be shipped to a particular customer.

Now, nowhere on that left image do you see what is claimed in this patent, which is a mechanism to lift a delivery container.

Now, to see what's depicted in the patent we look at that right image of the '080 Patent, Figure 15.  There is a physical arm that is lifting a delivery container from a storage container.  Circling back to the left image, you see nothing of the sort.

Now, the issue here really is does a mechanism have to be a piece of machinery.  Is it a piece of machinery?  It seems like a very simple question.  Why it's in dispute is somewhat baffling.

So let's look at some of the other evidence.  This kind of helps crystalize what's disputed.

I'm not suggesting that your Honor should be looking to the infringement contention to define the term, but I think it is important for context, as your Honor stated

earlier, to understand what the impact may be.

THE COURT:  Can't a mechanism be a device that is not a piece of machinery?

MR. LOY:  It could be.  The issue is whether or not it's a human.  So it could be a physical device, a mechanical device.

THE COURT:  Yeah.  The issue is -- I mean, well, go ahead.

MR. LOY:  Usually a device is comprised of mechanisms or is a mechanism.  That may be just a synonym for it.

THE COURT:  Yeah.  I guess a mechanism doesn't necessarily have to have moving parts necessarily.  Device and mechanism might be kind of synonyms.

Your point is, though, that it doesn't necessarily implicate human manipulation or interaction or anything.

MR. LOY:  If a human is picking up the delivery bin, that is not something that would be a mechanism, picking up a delivery bin, under these claims.

Now, let's look to some of the other evidence that Ocado has cited to as purported evidence of infringement.

This is an excerpt of a presentation that was given by one of AutoStore's distribution partners.  So AutoStore sells its systems through distribution partners, one of them is Swisslog, and this was a particular presentation presented

at a conference called MODEX in 2020, and this is evidence cited of infringement.

If you look at the steps of this flowchart on the left, there's something called an item pit that takes items automatically to an empty order bin with the shipping cart, and that order bin is stored in an AutoStore.

Then step two is that that order bin with the picked item stored inside is retrieved to a manual station. That's similar to what you just saw on that prior slide where there's an individual with a scan gun and that individual may be working at the picking station.

So that's a manual station.  That is not a mechanical station.

And then one of two things can happen, but really the shipping compartment is removed, and we're seeing from Ocado in this case that that's an act of -- an alleged act of infringement.

Now, let's turn for a moment.  As the parties were trying to prepare for submissions to the Court in dispute on claim construction, one of the attorneys from Sullivan and Cromwell did say that they believed that we could remove this from the Court's list of disputed terms.  I'm all for relieving the Court of disputes, if we can.

In this instance for the specific term mechanism, Ms. Stempler from the Sullivan and Cromwell firm said Ocado

agrees that a human being alone is not a mechanism.

Now, I guess where the rubber meets the road here is to what degree can human intervention be. What we're seeing is just human activity being pointed to you for the alleged mechanism. So we're asking the Court to construe this as just the plain and ordinary meaning of mechanism, and I'll point to Ocado's own evidence suggesting that's the right construction.

The very first definition of mechanism in the Oxford English Dictionary which Ocado cited is a piece of machinery.

Similarly, in the American Heritage Dictionary it's a machine or mechanical appliance.

This should end the story and we shouldn't continue disputing this.

I think I'll accede the floor at this point.

MR. DE LEEUW:  Good afternoon, your Honor.

THE COURT:  Good afternoon.

MR. DE LEEUW:  May I proceed?

THE COURT:  You may.  Thank you.

MR. DE LEEUW:  First of all, my name is Marc De Leeuw.  I'll be presenting on the first four disputed claim terms of the '080 Patent, and then my colleague, Alex Gross, will be presenting on the last three.

THE COURT:  Okay.

MR. DE LEEUW:  And like Mr. Beeney, hopefully this works, I have a slide deck that we've provided to you.

THE COURT:  Yeah.

MR. DE LEEUW:  As my colleague did and as my adversaries did, I think it's actually helpful to start out with just a little bit of background on the technology here.

The '080 Patent relates to an improved system for handling the goods that are being stored and then ultimately delivered to customers.

We have referred to it as something called tote-in-tote technology, which refers to two different types of containers, a storage container and a delivery container. The delivery container being something that can go out and be delivered to customers.

Here's one example in the patent, Figure 6.  In this figure we've colored it in.  The blue container is the storage container, the red container is the delivery container, and the delivery container can be placed within. In fact, my adversary just referred to that as being placed within, and that will relate to one of the disputed terms, and that's how the system works.  That's the -- and I want to show you how this works to make an advantageous more efficient system.

So what we've done here is I just did a little animation, and what we started with is Figure 16, and then I'm

going to move through the remaining Figures 17, 18, 19, 20, and I'm animating it along with what's described in count 11 of the patent to show how the system can operate more efficiently.

So in this figure, Figure 16, you have a robot or a load handling device in yellow and the storage container in blue.

And then the next picture, this is Figure 17, which you'll see in a moment, you can't see it much right now, but there's a delivery container that's in red that's inside that storage container, and then there are these green clamps, 302.

What the system does, and what you'll see here in this example as described in column 11, is that the robot handles the storage container that holds the delivery container, and then the delivery container can be secured in this case by clamps and moved out of the system.

So I'll play that. You can see here the robot is lowering the storage container, the storage container is moved off by a transfer platform and retrieves back into the robot, and the clamps bring the delivery container off onto a conveyor belt and leaves the system.

The advantage of all of this is that the delivery containers, that red container off on the right, can be loaded up with goods and held in the storage grid until the order is ready to be delivered. So just let's say you order some

groceries on a Wednesday and you want them on a Friday.  Those groceries can be packaged in delivery containers gradually over those two days, or maybe they can be packed up all on Wednesday if that's a slow day in the warehouse, and then held in the storage grid until they're ready for delivery.

The advantage here is that you don't need a whole separate space in the warehouse that occupies a whole bunch of storage containers.  So before this invention what you would have is you would have a whole bunch of storage containers in a separate area where you would have to take out all the material from the storage container and then put it into bags or boxes or whatever it was you were going to use for delivery, and that takes up a lot of space.  The patent refers to up to 20 to 35 percent of the warehouse.  That can be eliminated by using the system.

The other advantage, of course, is that it can move goods very quickly.  You can keep on putting goods into delivery containers, and then when it's all ready to go you can send it out to a customer.  One shot.  You don't have to wait and pack up bags along the way.

And of course that's very important for a company like Ocado that delivers groceries.  As I think my colleague said, some of the Ocado systems process up to 50 to 100,000 items per hour.  So they need to process that very quickly, and having this system helps that.

So I'll move to the first claim term in dispute, mechanism.

I'm showing here where mechanism appears in claim 9. It appears in claims 9 through 12 and 21. And you can see here mechanism is just the simple task of removing a delivery container from a storage container. In other words, taking out that red container from the blue container.

And I've put up here the parties' competing construction. Ocado believes this was a term that needed no construction, and AutoStore has replaced the term with a piece of machinery.

And I think what the briefing has revealed is the crux of the dispute. I don't agree quite with what my adversary said.

The crux of the dispute is whether the mechanism, that mechanism for removing a delivery container from a storage container, can be only a piece of machinery. In other words, a fully automated system as opposed to whether it can be semi-automated and a human can be part of that process. We don't say that a human alone is a mechanism. We say that as the specification teaches, a human can be part of a process along with some other maybe device or equipment or possibly a machine. That's just one option.

Respectfully, there's nothing in the specification or the prosecution history that limits the mechanism to just a

piece of machinery and a fully automated system.

So I'll start off with dictionaries. I think my adversary was just incorrect to say dictionaries somehow resolve this dispute. They don't.

I think it's fair to say that there are dictionary definitions that support both sides. We've highlighted some of them on this slide, slide 12. We believe that the definitions in blue are consistent with how it's described in the patent specification, a means or process by which something is done, the way in which something works or is brought about. That's a mechanism.

But we recognize that there are other definitions that refer to machinery. So the dictionaries don't really resolve this question, but I think it's fair to say that AutoStore is just wrong to say that mechanism must be mechanical and therefore must be a machine.

So I think -- in light of the competing dictionary definitions, I think it's common ground that the most important thing beyond the claim language to look to is the intrinsic record, the intrinsic evidence, and that's the specification and prosecution history. Nobody cites to the prosecution history on this term. So it's really the specification that should be dispositive. And the specification, as I said, says nothing about the mechanism just for removing the delivery container from the storage

container can be only a machine and it has to be fully automated.

In fact, it says just the opposite, and here's the specification.  The first part is in column 4.  It says the subsystems can include any machine, but it also says it could include any arrangement and it could be fully or semi-automated.

And then, even more specifically, later in column 10 the patent specification says explicitly that the mechanism we're talking about, removing a delivery container from a storage container, can be done in a fully or semi-automated fashion.  You see there fully or semi-automated removal of delivery containers from storage containers.

And then it goes on to give an example where there's a mechanical lift there and a removal of the delivery bins by a human or other operator.  So it says it explicitly that one mechanism for removing the delivery container from the storage container is in part a human in a semi-automated fashion.

That really ought to be the end of the dispute here.  The patent specification makes clear that the mechanism can be semi-automated and can be operated in part by a human.

And really the only argument from AutoStore is that the only embodiments are the things that my adversary showed. They showed, well, there's this gripper machine, and so

therefore, it should be limited to that example.  But as I think as I just showed you, there's a specific embodiment described where they're using a human.  So it's not even true that all embodiments are machines.  There's that one that refers to a human.

But beyond that, the language of the embodiments, I think Mr. LoCascio said it at the beginning, it's often the case in patents, and this patent is not an exception, where the specification makes clear that these are just possible implementations.  That's what's said here in column 10.  And the law is clear, and I don't think there's any dispute about that, that limitations from embodiments shouldn't be read into the claims.  The embodiments don't limit the claims.  The embodiments are just examples, often the preferred embodiments, but they're not limiting from the claims, and that's even more true here.

In column 11 of the '080 Patent the specification -- the inventor said specifically that there could be alternative mechanisms used to place delivery containers into storage containers beyond those that they just talked about.

So, again, none of this limits the claim language in any way.  A mechanism can be fully automated or it can be semi-automated, and it can be done in part by a human.  And, respectfully, there's no reason to limit it only to a piece of machinery in a fully automated system.

Thank you, your Honor.

THE COURT:  Thank you.

MR. LOY:  I should be brief here in rebuttal, your Honor.

THE COURT:  You know what?  It's 90 minutes.  Let's take a break.

MR. LOY:  Sounds good.  See you in fifteen.

THE COURT:  Okay.

(RECESS)

MR. LOY:  During the break the parties did discuss briefly some potential dates.  I don't know if you want us to share those with you now.

THE COURT:  You don't need to.  You can talk to Kellie.

MR. LOY:  Okay.  Sounds good.

All right.  So let's go to slide 12 for a moment, if you will, Emily.

This is rebuttal on the issue of mechanism in the '080 Patent, your Honor.

Ocado cites a passage from the specification in support of the notion that the mechanism at issue here that is literally a lifting mechanism that lifts this delivery container can be semi-automatic or fully automatic, but what it appears -- and, again, this is sort of why we're even here. What we are seeing in the infringement is really -- all we see

is a mechanism that would be -- like a conveyor belt that would move a delivery bin or a storage bin to a place, a picking center, where someone could then lift out an item. We're not seeing any other device, and that's where this issue is really arising as to why we're even here disputing it.

It is -- if you turn for a minute to their slide, I think slide 13.

THE COURT:  Yeah.

MR. LOY:  There's nothing here saying that the lifting mechanism that is part of the claims can be a human lifter.  In fact, it talks about it can be any machine.  Let's see here.  Can be any machine, device, infrastructure or -- this is talking about the overall storage and retrieval system.  This is not isolating the mechanism that lifts a delivery container.

So let's look at the claims again, and we'll go to 13 of our deck.

The claims -- slide 13, please -- require at least one mechanism for removing a delivery container from a storage container.  Now, that one lifting mechanism can be configured to extend through one or more apertures.  That's clearly not a human configured to put their hands between holes and pick up a bin.  That lifting mechanism can be configured to engage and lift a delivery container.  That's not a human engaging in lifting a delivery container, but that's all we're seeing.  It

can be a suction device.  Clearly that's not a human.  I don't even want to get the visual there.

So what we really I think are struggling with is what is it.  It's a mechanism.  It is a piece of machinery.

And with that I think the next term is Ocado's turn to start.

I will mention, your Honor, that the parties have been engaged in further discussions about this term, and our view is that because be will be returning for a second day, it may be more beneficial to punt the argument on this term and efficient to do that because we might be able to reach resolution on it.

THE COURT:  What, on nested?

MR. LOY:  Yes.  We have been actively engaged today in discussing possibly reaching consensus.

THE COURT:  What about just using the word placed?

MR. LOY:  So maybe we'll argue it then.

THE COURT:  That's what I was thinking.

MR. DE LEEUW:  I think that would be good with us, your Honor.

THE COURT:  You could use placed for nest or nestable I think.  I mean, I do, but whatever.

MR. DE LEEUW:  Could I just respond very, very briefly on the last term, mechanism?

THE COURT:  Yeah, of course.

MR. DE LEEUW:  And I'll just do this very briefly.

THE COURT:  Mr. Loy, are you doing the whole '080?

MR. LOY:  No.  I'll just be doing one additional term other than nest and nestable, and then I'll be splitting the remainder with my colleagues Mr. Ali Boloori and Ms. Knapp.

THE COURT:  I'm just -- let's go off the record.

(Off the record)

MR. DE LEEUW:  Your Honor, just one last point on mechanism.

My adversary put up our slide 13, and I'm just putting it up again, and he referred to the top portion of it. I could argue for a long time about what the top portion says, but I don't think I need to.  The bottom portion says specifically that the mechanism for removing the delivery container from the storage container, which is what we're talking about in this disputed claim term, can be fully or semi-automated.  It says that right here on column 10, and then it goes on to say that it can be done by the combination of a mechanical piece and a human operator.  That's part of what the specification describes as a mechanism for this very task.

So, respectfully, I don't think there's any way to construe the claim to mean anything other than what the specification discusses, and I think all parties agree that

the dictionary doesn't provide any dispositive answer.

So I'll move on to nested and nestable, the next two terms that are together.

These terms are used in claims 8, 17 and 23, either nested or nestable, and it refers again to the delivery container being within the storage container, placed within the storage container, and here you can see all the parties' competing constructions.

And I think, your Honor, our view is very much like what your Honor just expressed, that nested is placed within and nestable is capable of being placed within, and that's what the specification refers to.

One issue to start just before I get into the substance of what the specification says.  AutoStore's argument is that somehow Ocado's construction is superfluous because the terms already contain -- the claims already contain the word within to refer to delivery container within. That's just not the way English language is normally used. The construction we're asking for is placed within, to explain that the delivery container can be placed within or capable of such a size and shape such that it can be placed within.  And in fact the specification repeatedly refers to that same phrase, placed within.  It's used five times in columns 8 and 9.

In fact, my adversary when he was describing the

background technology of the '080 Patent, says that delivery container is placed within. It's a common phrase that's often used. It refers to how the two -- the relationship of the two containers.

So I'll move on. I'll do the same thing I did the last time, to show the dictionary definitions. And, again, dictionaries don't really answer the question. There are dictionary definitions that we believe are consistent with the specification. Fit two objects within a larger one, a set of objects that can be stacked together, but there are additional dictionary definitions that AutoStore cites to.

The essence of this dispute is whether AutoStore's proposal should be adopted that limits the claim only to be placed within snugly. That's a word that AutoStore adds to this claim term. It's found nowhere in the specification and nowhere in the prosecution history. In fact, there's no discussion at all about the closeness of fit and certainly no reference to the word snugly or snug.

So, again, in light of the competing dictionary definitions, I think again it's common ground that the intrinsic evidence really should be dispositive here. And, again, neither side refers to the prosecution history on this term. So it's really the specification that should tell the tale.

And here -- I've put up a couple of portions of the

specification, and you can see around the bottom -- I'll start with what's at the bottom on column 13.

The specification refers to the containers being combined/nested, using those two words interchangeably, showing that the inventors were really considering those two as interchangeable.

And then above that, on column 9, you can see here what the patentees were describing. One or more pluralities of suitably configured delivery containers may be stored within storage containers. And then it refers to container combinations or nestable configurations, and then there's an example that it provides.

So it's really referring to these two things that are really interchangeable combinations. The nestable delivery container can be placed within the storage container.

There's another point on this slide that I think is useful to look at. This portion of the specification says one or more pluralities of delivery containers may be stored within a storage container. Well, if AutoStore is right that nestable means that it must fit together snugly, well then you couldn't have multiple delivery containers. If one fit together, was very close together, then how could you put another one in?

And if there was any doubt here on the language, I realize that this portion of the specification didn't all come

out on the -- I'll zoom in on this.  This is the additional portion of the specification right after the language I was pointing to you at column 9.

The language of the specification again makes it very clear that nestable configurations include multiple delivery containers in a storage container.  It says:  In addition to allowing multiple delivery containers to be stored within a single container, the use of nestable delivery configurations can facilitate easier and more efficient handling of delivery containers.  Then it goes on to explain.

So, again, what the specification is saying is that there can be multiple delivery containers within a storage container as nestable.  And if that's so, it couldn't possibly be fit together snugly.

So I'll turn to AutoStore's arguments.  AutoStore's arguments really boil down mostly to Figure 6.  That's that figure I showed at the beginning with the blue storage container and the red container that fits within, or it's placed within, and they say that figure shows a snug fit between the delivery and storage container.

First, on this point, as I said before, the law is very, very clear that the embodiments don't limit the claims. The claim language should be read as a person of ordinary skill would read it, and it's not limited just because particular embodiments are configured in a certain way.

In fact, again, as you can see here on the slide, I have slide 19, the specification even refers to Figure 6 as just an example of a nestable configuration.  Showing there could be other ones.  It doesn't have to fit necessarily in exactly that same configuration.

The second point though is perhaps even more important.  There is nothing about the specification or the figure that says that that figure has the two containers fitting together snugly.  That's just lawyer say-so.  There's nothing about the closeness of the fit described in the specification at all, and figures in patents are not usually drawn to scale.  There's nothing about the scale shown in them.  It doesn't show how close together they are.

So that leads to the main problem with AutoStore's proposed addition of snugly.  It's inherently subjective.

Here's an example.  We showed this to Dr. Spenko, AutoStore's expert, at deposition.  This is an example of nested basket containers.  We printed it off for him and we showed it to him at his deposition.

At least I would not have used the word snugly to refer to these nested containers here and I don't think most people would, but we asked Dr. Spenko at his deposition, would you say these containers fit together snugly, and he said he couldn't decide, and other people couldn't decide just from looking at this, and that's really the problem here.  He

answered the same way for many other pictures we showed him.

THE COURT:  They don't look snug to me.

MR. DE LEEUW:  They don't look snug to me, either, your Honor.  I agree.  These are described as nested containers.

And so here we are in a situation where we have nested containers, and I don't think they're snugly, it sounds like your Honor agrees, and Dr. Spenko couldn't say one way or the other, and that's really the problem.  What's snugly?  Do they have to be really close at the top?  Do they have to be really close at the bottom?  Maybe a little bit of both?  How do you know?

And the law is very clear here that claims shouldn't be construed to render them indefinite.  We've cited here two cases.  The Geneva Pharmaceuticals case is really one of many where it says when you have a proposed construction that renders the claim indefinite, that should be rejected, and that's exactly the problem here.

So what is the proposal by AutoStore and Dr. Spenko?  How do you provide any objective limitations? Because both experts said I could come up with my own opinion about what might be snugly, but other people might disagree. That's what our expert, Dr. Pfeiffer, said.  You know, you ask him a question, do you think this is snugly, he might say yes, but other engineers might very well have different views about

that, and there's no real objective limitation.

So what did Dr. Spenko say?  This is the only argument from AutoStore and Dr. Spenko.  It's really a functional argument.  They say that a snug fit ensures that the nested delivery container stays in place so it doesn't tip over and spill out and it's in the expected location to facilitate automated removal from the storage container.

Now, first of all, as I think we've just discussed, the patent claims don't require automated removal of the delivery container, so already you've got a big problem, but beyond that, this is just a question of system design.  There are many different ways you could design a system where the delivery container doesn't spill over in operation or it could be in the expected location.  You could put clamps.  You could put a weight on the bottom.  You could even use Velcro or some other material that would stick until you're ready to use it.

And so we asked Dr. Spenko, could you figure out other design mechanisms, could you do other designs that would allow a delivery container to be in the expected location and not spill over without a snug fit, and he said, of course, I could do many different things.

And so it renders this all circular and contradictory.  A snug fit, according to AutoStore and Dr. Spenko, is such that the delivery container is in the expected location and it won't spill over, but then Dr. Spenko admits

you could do it a whole bunch of different ways without it being a snug fit.  So you don't really have any definition at all.

The last point is a relatively brief point, your Honor, beyond the snugly issue.

As we read AutoStore's proposed construction, a delivery container designed to fit snugly, we believe that AutoStore's construction was bringing in an intent requirement or a state of mind requirement, and we briefed why that would be wrong as a matter of law.

In AutoStore's reply brief they agreed.  They said this is an objective analysis.  It doesn't require knowing anybody's state of mind.

The problem I think, respectfully, with their construction is the word designed would seem to suggest the intent of the designer, and that was certainly what we thought until we saw AutoStore's reply brief.  And so, therefore, I think the word designed is another reason to reject AutoStore's proposed construction.

But, in sum, there's no reason to add this limitation of snugly, which is nowhere found in this specification, nowhere even described.  And the term nested and nestable should be construed simply to be placed within or capable of being placed within.

Thank you, your Honor.

MR. LOY:  Your Honor, one thing I want to be very clear about is we're not trying to be stubborn here with a definition, nor did we pull this definition out of thin air. The idea again here is to make sure that the parties can figure out where the metes and bounds are of these claims.

And although Mr. De Leeuw seems to suggest probably implicitly and unintentionally that all delivery containers in the '080 Patent are nested, this is one embodiment.

But what we're faced with here is claims that are asserted for delivery containers that are either nested or nestable.  And so we need to ask ourselves, what does that definition mean as it is a qualifier for what a delivery container that is nested or nestable is, and that dispute is really -- I think in practical terms these are automated storage and retrieval systems.  I don't think anyone here would deny that they are designed to store goods.  They are designed to retrieve goods.  And we don't need to get into the mens rea or the intent of the designers to know that that's what they were built to do.  And we're talking again about systems that are largely automated, and so they need to have certain dimensions in order for them to function within those automations.

So let's look at the images that the patentee shows us for the nested delivery containers, and you see that they fit quite nicely within it.  And what we're trying to avoid

here is an infringement read by Ocado that this allows you to throw some bags, some grocery bags into a storage container.

Their systems are designed largely in the grocery business. So they have a partnership with Kroger and they store and deliver groceries.

One of the possibilities of the way they are reading this is it's just placed within. You could just take a grocery bag, put it into a storage container, and that would be a nested delivery container.

But let's think about this. Have we ever described, and maybe someone does, but I've never heard anyone describe the groceries inside the bag as nested within the grocery bag. But under their definition it seems like that would be captured as well.

So what we're trying to do is figure out what are the metes and bounds of that nested delivery container. And we looked, as one does when the specification doesn't give you clarity other than these images which are fit snugly together, we look to dictionary definitions. So we look to slide 20.

THE COURT: What about fitted?

MR. LOY: Fitted may very well work, your Honor. The idea being that they're designed to fit together.

THE COURT: To fit.

MR. LOY: And Mr. De Leeuw said you couldn't have multiple nested delivery containers under our definition,

which is false.  I mean, Russian dolls fit together.  You can have many, many, many layers of that, and they fit together snugly or they fit together, right?  Fit can be -- well, I actually -- when I took this podium, I said we continued to discuss a possible meeting of the minds here, and one of them is just to remove the word snugly.

THE COURT:  Yeah, yeah.

MR. LOY:  Designed to fit would be perfect, I think.

THE COURT:  Snugly does seem to be kind of the sticking point.

MR. LOY:  Yeah, and I don't want to be stubborn about it.  We'll back away from that.  We pulled it straight out of a dictionary definition.

THE COURT:  Because who cares about it.

MR. LOY:  And I don't care today, I'll tell you.  We'll move away from it.

But look at this.  Look at this image here.  On the left you have cartons that are in a storage bin.  In this scenario -- we understand that this is one of the scenarios that Ocado wants to say is a nested delivery container.  Are those nested?  They're boxes that have been placed in, placed within, which is one of the definitions we're hearing from Ocado.  I don't think anyone in their right mind would say that that is nested.

Now, the other issue is this issue of lifting. We hear it again and again that the patent claims do not require the automated lifting of delivery containers, but that's precisely what they say. It's a mechanism for lifting. It's not a human lifting these boxes out.

So I don't know that we need to consume much more of the Court's time today, particularly given that we are engaged in discussion, but we do think there needs to be some definition for nested to give it some meaning above and beyond, one, what a non-nested delivery container is, and two, how do we interpret something within a storage container that is or is not a nested delivery container.

And we would offer for the Court that to fit together or, let's see, just taking out the word snugly, how do we get there? We say fitting as designed or designed to fit, those would work.

THE COURT:  Okay.

MR. DE LEEUW:  Your Honor, I will be very brief on this.

THE COURT:  Yep.

MR. DE LEEUW:  I think the arguments here don't really fully capture what's -- I'm sorry. I don't really know how to do this, but I'll try.

Using the slide that my adversary just used, and he showed Figure 6, I'm going to try to zoom out a little bit,

and I just marked that up as I was sitting here.

The slide says nestable configuration as shown in Figure 6, and in fact what that very portion of the specification actually says is a nestable configuration as shown, for example, in Figure 6.  So even if you consider this to be one example of a nestable configuration, it's not the only example.

And then we move to this other slide, slide 21 of AutoStore's, and they say, well, these containers aren't nestable containers.  First of all, the first thing I say is this actually fast forwards us a little bit to the next claim term we're going to talk about, delivery containers and whether delivery containers include prepackaged items.

We agree that delivery containers don't include prepackaged items.  And so if this is just a bunch of prepackaged boxes, then of course they're not delivery containers.

But one of the things I thought about this as I was looking at this is that looks like a bunch of eggs in a nest. Delivery containers can be nested inside a storage container.

The question that my adversary raised is, what is a delivery container.  That's an issue we're going to discuss in a second, but the question of whether these containers are nested within is really, just really almost a self-answering question.

The patent specification repeatedly refers to the idea of delivery containers being placed within or capable of being placed within.  The idea is you want to be able to have a delivery container that you can put inside a storage container.

Now, it's unlikely that in most embodiments you're going to have little tiny delivery containers because you want the delivery container to contain what's ultimately going to be delivered out to a customer.  So you're going to have bigger containers.  But that's, again, a system design choice.  The idea in this specification is just to have the delivery containers in such a fashion so that they go inside the storage container, and that way ultimately you can put picked goods into the delivery containers and eventually ship them out of the system so they can be delivered to customers.

And that's all, unless you have any questions on this, and I can address the delivery containers on the next round.

THE COURT:  You guys are going to work out nested.  No, you're going to work it out.

Go ahead.

MR. BOLOORI:  Good afternoon, your Honor.

THE COURT:  Hello.

MR. BOLOORI:  Ali Boloori from Kirkland & Ellis for AutoStore.

THE COURT:  Welcome.

MR. BOLOORI:  Thank you.

I'll be addressing delivery container and delivery container containing at least one picked item both together.

With respect to delivery container, there are actually two disputes here with respect to the construction of the term.

The first one is whether delivery container is suitable for engagement by the robotic handler, as AutoStore contends, or whether delivery container could have a broader meaning and need not be engageable directly by the robotic handlers.

The second dispute here is whether delivery container needs to be construed in a way to include the limitations that Ocado used to distinguish its claims over the prior art during the prosecution.

Ocado's proposed construction here, as you can see on the right, does not include the same limitations that they used to distinguish over the prior art when they secured their patents, and AutoStore contends that the construction needs to be modified to specifically include those limitations.

But before I get to the substance of the dispute, again, as we discussed before, just to give your Honor context of why this matters ultimately.

Here on the right is a picture from Ocado's

infringement contentions that show what they have accused with respect to the AutoStore system.  And, ultimately, what they want to say is that delivery container would be those brown boxes that you see on the left-hand side, those brown boxes that just look like reg boxes.  What AutoStore contends is that the boxes need to be suitable to be engaged directly by the robotic handlers; whereas Ocado's definition would be broader than that.

Now, if your Honor looks at the claims, all of the claims directly support AutoStore's proposed construction, which is that the robotic handlers need to be able to engage the delivery containers.

The claims say the robotic handlers store at least one delivery container.  They then -- further down they say the delivery containers are of a certain size for transport outside of the AS/RS, and within the AS/RS system by at least one robotic handler for storage.  So, again, the robotic handlers need to be able to store the delivery containers.

And other claims, claim 13, also have similar language.  Basically they all say that the robotic handlers need to be able to store or transport the delivery containers themselves.

And what Ocado wants to say is that just because the claims say that the robotic handlers need to be able to store a delivery container does not mean that the robotic

handlers need to be able to directly engage the delivery container.  Meaning that one could place a delivery container inside a storage container and then just move the storage container and that would constitute storing or moving the delivery container which is inside, and the issue is that the specification actually teaches away from that understanding.

So, your Honor, I direct your attention to Figure 21 of the specification.  The specification when it wants to talk about a delivery container inside a storage container, it uses a different word.  It says combined containers.  It doesn't say a delivery container inside a storage container and we are storing the delivery container.  It says we are moving and storing the combined containers.

That is in Figure 21.  And, again, in column 13, lines 25 through 36, I've highlighted it, it says retrieving combined container units, and in fact claim 23 has the same language as well.

So I direct your attention to claim 23, the last limitation, and the claim specifically says combined containers including at least one delivery container nested within a storage container.

So, again, if the patent wishes to discuss a delivery container inside the storage container, it was perfectly capable of doing that.  That indicates that -- when the claims recite storing or moving a delivery container by a

robotic handler, they are referring to just directly engaging the robotic handler -- the delivery container.

And there's more support in the specification for AutoStore's proposed construction. Specifically, in column 7 the specification directly states that the delivery containers are engaged by the same or another moveable overhead handler, and the engaged language is exactly the language that AutoStore proposes needs to be something that the delivery containers are suitable for. They must be able to be engaged by the robotic handler. And, again, the specification elsewhere says that the delivery containers may be retrieved using the load handlers.

So that was with respect to the first point of construction.

The second point of construction, as I alluded to before, has to do with Ocado's proposed construction and the fact that it's broader than what Ocado used to distinguish over the prior art.

So the law is well-known that once the patent applicant disclaims patent scope in order to -- or claim scope to get around prior art during prosecution it can't later get that scope back, or, as the cases call it, it can't recapture the scope that it has disavowed in order to get around the prior art. So I will show what Ocado said exactly during prosecution.

During prosecution Ocado's pending claims were rejected over a prior art. Here it's referenced by Toebes, and the examiners said that the Toebes reference discloses case units that represent delivery containers. So the case units, the so-called case units in Toebes, the examiner thought that they were just like the delivery units, delivery containers that Ocado wanted to claim.

And Ocado tried to get around Toebes by arguing that the Toebes case units are prepackaged items that are not used to store items picked from a pallet, and it then said that its own delivery containers are things that basically can be used to store items picked from a pallet and are not prepackaged items.

THE COURT: Are you saying that it would have to say not prepackaged items?

MR. BOLOORI: Well, what I'm trying to say is that Ocado said that the Toebes case units were prepackaged items and this is one reason they're different from our delivery containers. And so if Toebes disclosed case units that were prepackaged, Ocado is saying ours is different, ours cannot be prepackaged items.

THE COURT: Okay.

MR. BOLOORI: And then the other thing that they said is different from Toebes is, they said that Ocado's delivery containers are used to store items picked from a

pallet, and that's also something different from Toebes.

THE COURT:  Yeah, but when you say that we need to adopt the full scope of the disclaimer, are you saying that we have to somehow, you know, recognize, or, I don't know if we disavow, but we have to reject the idea that it includes prepackaged items?

MR. BOLOORI:  Yes, your Honor.

THE COURT:  Okay.

MR. BOLOORI:  And Ocado's proposed construction does not.  Ocado's proposed construction, all it says is that the container has to be for delivery to customers that is configured to contain at least one picked item.  That is broader than what they said their delivery containers are in order to get around that.

A final point about the first disputed point of construction, which has to do with whether delivery containers need to be directly engageable by robotic handlers, is that even if the Court were to adopt Ocado's proposed construction for nested and nestable, Ocado's proposed construction for delivery container would actually be inconsistent with what it's trying to say for nested and nestable.

So with respect to nested and nestable, Ocado wants to say that a delivery container needs to be able to be placed inside a storage container, but what we also know from the specification is that not all delivery containers need to be

nestable.  Some are -- this is an optional configuration. Some delivery containers are optionally nestable, but that's not always the case.  So there are going to be delivery containers that are not nestable, meaning that they cannot ever be put into a storage container, and yet we know from the invention that all delivery containers need to be able to be moved by robotic handlers.

So if a delivery container is not necessarily going to be able to be engaged by a robotic handler itself directly, delivery containers that are not nestable cannot be manipulated by robots, which is, again, inconsistent with the point of the invention.

So I'll just move on to the second term in the sequence.  Delivery container containing at least one picked item.

So the plain and ordinary meaning AutoStore proposes is a delivery container containing at least one picked item from a retrieved storage container.  So really the dispute between the parties is whether the picked items come from a retrieved storage container or not.

And the reason that AutoStore proposes that the delivery containers need to include one picked item that comes from a storage container is that it makes claims 1 and 15 consistent with each other, or basically it makes claims 1 and 15 consistent in that claim 1 has that language in it.  Claim

15 does not.

Ocado argues that this means that there's a difference in scope between the two, but really if one were to look at the specification, all AutoStore is proposing is to make the two terms consistent to provide clarity for what a picked item is.

If one were to read the specification, the one point that comes out is that there is no other way that there could be a picked item other than -- according to the specification, other than from a storage container, and Ocado has not provided any examples of when a storage -- I'm sorry -- a picked item can come from anything other than a storage container itself.

I'll stop here, your Honor.  Thank you.

THE COURT:  Okay.

MR. DE LEEUW:  I'll address both the delivery container terms, your Honor.

THE COURT:  Sure.

MR. DE LEEUW:  I'll start with the first delivery container term, and I show here delivery container is in every single asserted claim.  I'm showing here claim 1.  It's in claim 1 multiple times, but it's in all the other claims.

And here's the parties' competing constructions. There's really I think one dispute between the parties.  Even though my adversary said there was two, I think there's really

only one between the parties, and I'll explain.

Here are the two issues that you just heard from my adversary. The first dispute is the one he actually discussed last about prepackaged items. That's not a dispute. We said in our brief directly prepackaged items are not delivery containers. And, in fact, if you go back to our construction, the whole idea of adding in configured to contain at least one picked item was so it wouldn't be just a prepackaged item. In our brief we used the example of a box of pencils, and I think you saw a picture earlier of those closed boxes. That's not a delivery container. It's not capable -- it's not configured to contain at least one picked item because those are closed boxes. The box of pencils has twelve pencils in it. It's not getting picked items. It's not configured to contain at least one picked item.

We agree prepackaged goods or prepackaged boxes are not delivery containers. And going back to the discussion I think we had at the very beginning of the day when we were talking about 02 Micro, that really -- I think we can agree that's law of the case, that prepackaged items are not delivery containers. In fact, you might notice that neither parties' proposed constructions has anything about prepackaged boxes. Our intent in trying to put together this construction was to eliminate prepackaged boxes. Configured to contain at least one picked item.

So then I go to the second item on this slide is really the core of the dispute between the parties. AutoStore says that delivery containers must be suitable for engagement by the robotic load handlers. And what does that mean? Well, they said it in their brief, and you just heard it from my adversary. That means, according to AutoStore, that the robots must directly engage with the delivery containers, i.e., they can't indirectly engage.

As I'm going to show I think in a few minutes, the claims and the other language make clear that the robots have to engage in some fashion, but one way in which they can engage with the delivery containers is indirectly by having the delivery container inside the storage container.

So the real crux of the dispute is whether, as my adversary says, the robots need to engage directly with the delivery container or whether the delivery containers can engage both directly and indirectly as in what I'm about to show you.

So there's no reason to add these words to the claim language, suitable for engagement by the robotic load handlers. There's nothing in the claim language at all. This is just adding a limitation to delivery containers. Nobody has suggested that the delivery container needs to be -- it needs to be construed because it wouldn't be understood unless it's suitable for engagement by robotic load handlers.

Delivery containers are what they sound like.  Containers that are used to deliver to customers.  So this is just an added limitation, and it's not consistent with the specification or prosecution history.

And I'll start with the specification.  I think this is probably the easiest way to understand why this additional limitation that AutoStore proposes is incorrect.

This is the preferred embodiment.  I started with this early on when I gave the background technology.  It's Figure 16, and I'm going to blow up in a moment a portion of Figure 17 so your Honor can see what I'm referring to.

This is 16.  It's got a storage container and a set of clamps, and now I'm blowing up Figure 17 so you can see what actually happens.  What happens here is that the robot lowers the storage container and it only directly engages with the storage container.  The delivery container is inside the storage container, and the delivery container is engaged only by that set of clamps.  How do we know that?  It's actually described in the specification both at column 8 and at column 11, lines 31 to 37, as I've shown here.

What it says is that the robots can have joint handling of the container combination.  That's the combination of both storage and delivery container.  And it says that the moveable load handler, that's the robot, deposits a combined delivery and storage container onto a transfer platform, and

then the delivery container is secured by clamps, 302.  That's the green coloration.

So what does that mean?  Well, it's the animation I showed, and I'll show it again.

What happens here is that the robot is handling the combined containers, the storage container that holds the delivery container, and the delivery container is only directly engaged by the clamps.  You can see that here.  The storage container is lowered by the robot, it's moved by the transfer platform, and the delivery container is only directly engaged by the clamp.

And that is reason alone to reject AutoStore's proposed construction.  It's actually contrary to the preferred embodiment.  The preferred embodiment is the robot handling the storage container that holds the delivery container.  And as my colleague said earlier, it's highly disfavored to construe the claims to exclude the preferred embodiments.

So what does AutoStore say?  In their brief they point out that there are various places in the specification where there's a reference to the robotic load handlers engaging with the delivery containers, and I've put up page 14 of their brief.

But, again, none of this talks about whether the robotic load handlers are engaging directly with the delivery

containers or indirectly like in the example, the preferred embodiment that I just showed. It just says that they're engaging. We agree that robots engage with delivery containers, but as the preferred embodiment shows and describes in column 11, it can be engaged indirectly.

And, in fact, the other problem with these portions of the specification is that all of them are optional. It says that delivery containers may be retrieved by the robots. The robots can access, may be accessed. And many Federal Circuit cases have said, and we've cited the Absolute Software case on this slide, slide 33, that you shouldn't limit claims to embodiments in the specification, but you certainly shouldn't do it when they're expressly described as optional features as these features are.

The next thing AutoStore argues is that the claim language somehow requires direct engagement, and they refer to claims 1 and 13 in their brief, and the claim language that they're referring to is up on this slide.

And what this slide shows is that the robots -- I'm going to call them robots even though it's robotic load handlers here. The robots are instructed or controlled to store a delivery container in the system and to transport delivery containers in the system.

But, again, nothing there talks about whether the robots are engaging directly with the delivery containers or

whether they're doing it indirectly as in this preferred embodiment.  All it says is that they need to be stored and transported, and just as I showed you, the preferred embodiment shows how the inventors thought the best embodiment was.  You have a storage container and you put a delivery container inside, and the robot holds the storage container.

This claim has any of those options.  So it can either be direct engagement, the robot could directly engage with the delivery container.  It could be indirectly by holding the storage container that holds the delivery container, or robots could do both, and nothing about this claim requires direct engagement.

In fact, claim 2 that you see here actually is a subset of claim 1.  It's a dependent claim.  It depends from claim 1.  And this claim is limited to a delivery container that's stored in a storage container.  So this claim actually requires that indirect engagement that I was talking about.

THE COURT:  So, I mean, do you -- maybe I'm misunderstanding.  Do you accept, like, sort of the hybrid construction that it can be human handlers or robotic handlers?  Maybe I'm misunderstanding you.

MR. DE LEEUW:  Well, that was an issue that was addressed with respect to mechanism.  So there was a dispute in the mechanism term as to whether or not the act of removing the delivery container from the storage container needs to be

fully automated or can it be semi-automated, and I think I showed there are places in the specification where it explicitly says it can be semi-automated and it can be removed by a human for a mechanism.

THE COURT:  Right.

MR. DE LEEUW:  And so now the question is, because of this claim language that we're looking at in claim 1 and 2, AutoStore argues, well, because these robots are instructed to store the delivery containers in the grid and to transport the delivery containers in the grid, that must mean that the robots are engaging directly with the delivery containers.  In other words, they're hooking them directly.  They must hold them and carry them.

But there's nothing in the claim language or the specification that requires that.  In fact, as I showed, the prefer embodiment is such that the robot only holds the storage container.  The delivery container is secured by something else, the clamps and that preferred embodiment.

And so there's nothing in these claims that requires direct engagement, and that's really the crux of the limitation that AutoStore attempts to impose on these claims.

And, in fact, I think my adversary pointed out one of the reasons why that's wrong.  He showed that in claim 23, another claim that has the words delivery container, that claim refers to container combinations.  And if delivery

containers were construed to mean there must be direct engagement, then that claim wouldn't make any sense.  You would have a requirement of direct engagement even though those containers would be container combinations where the robot is presumably handling the storage container.

THE COURT:  This is the first time today I really don't understand what you disagree about.  I don't even understand what you're arguing anymore, either side, really.

What's the dispute over?

MR. DE LEEUW:  The dispute is -- and I apologize, your Honor, if I'm not being clear.

THE COURT:  There's no need to apologize.

MR. DE LEEUW:  What AutoStore is arguing for -- if I could go back, maybe the slide -- sometimes, for me at least, pictures are a little bit more helpful.

In this slide -- it's slide 31.  I animated it, but I'll keep it still for the moment.

THE COURT:  Are you talking about delivery container or delivery container containing at least one picked item, or neither, or both?

MR. DE LEEUW:  Just the first, delivery container.

THE COURT:  Okay.

MR. DE LEEUW:  AutoStore argues that there should be an additional limitation on delivery container.  Not just the words delivery container.  A container that's delivered to

customers.

THE COURT:  Okay.

MR. DE LEEUW:  In addition to that, it must be suitable for engagement by the robots.

THE COURT:  Right.  That's why I asked you about the hybrid construction that allows for engagement by robots and humans.

MR. DE LEEUW:  Right.  And there's no requirement that it is.  It doesn't even need -- it could be handled by a claim, for instance, in this example.

THE COURT:  But humans can handle it under either construction that you propose.

MR. DE LEEUW:  Correct.  That's our point.  Our point is it doesn't need to be handled only by a robot directly.

THE COURT:  So it's not really a limitation.

MR. DE LEEUW:  There is no limitation in the claim, your Honor.  The word that we're talking about, or the words, are delivery containers.  And there's nothing about the words delivery containers that should imply that robots need to grab them.  It's just invented again because AutoStore says, well, they need to be.  And as I showed in this animation, the robot is engaging only with the storage container, the blue container.  There's no requirement that the robot engage with the red container.  The red container is inside the storage

container, it's lowered down because it's inside the storage container, and then secured by green clamps.

THE COURT:  See, in all of the disputes that we've talking about all day, I can understand the big picture about why you're claiming what you're claiming.  Sometimes it's about just disagreeing, but sometimes it's about the big picture or your goals.  This one I don't understand.  Like, I don't understand what difference it makes, the big picture.

MR. DE LEEUW:  Well, I think what AutoStore is arguing, and I think we all agree it's inappropriate to get into infringement, but I think what they're doing is that they're trying to impose an additional requirement.  The requirement must be in the system the robots need to actually engage directly with the delivery containers, and that's not a requirement of the claims.

THE COURT:  Okay.

MR. DE LEEUW:  And that's -- respectfully, their construction just adds this new language, suitable for engagement by the robotic load handlers, and that's inconsistent with this preferred embodiment.  The robots handle the storage containers.

So I think there's no -- in sum, your Honor, I don't think there's any reason to add this limitation.  It's not in the specification.  It's not in any way suggested by the claim language.  Delivery containers are pretty easy to

understand.  We put in some language there so that it was clear that they were not prepackaged boxes, but other than that, it's just configured to receive some picked items.

So I'll move to the second delivery container term, and I think I can handle this one fairly quickly.

THE COURT:  Okay.

MR. DE LEEUW:  This term, delivery container containing at least one picked item, is found in two claims, 1 and 15.  But AutoStore actually asks your Honor only to construe it for claim 15 and leave it as is in claim 1.

AutoStore says that delivery container containing at least one picked item should have an additional limitation added to it; the picked item must be from a retrieved storage container.

THE COURT:  Answer a general question then.

So, you know, there's sort of a canon of construction, rules of construction, right?  It's supposed to be consistent usage, right?  The way that a word is used is -- it should mean the same thing throughout the patent, right?

Does that apply only to claims or does it apply to terms as well as claims?

MR. DE LEEUW:  No.  It applies to terms in the claim.

THE COURT:  The claim and terms in the claim?

MR. DE LEEUW:  Well, claims are, as I think we

discussed earlier, ordinarily different from each other. That's the whole point of having multiple claims.

THE COURT:  But words within claims don't have to be different.  They can mean -- do they have to mean the same thing?

MR. DE LEEUW:  They usually do.  It would be a very unusual situation, as AutoStore is asking, where --

THE COURT:  In terms of the same claim should also mean the same thing?

MR. DE LEEUW:  That's usually the case, yes.

THE COURT:  Is that usually the case or is that rules of construction?

MR. DE LEEUW:  No.  I think a term used multiple times within the same claim, unless it -- you know, sometimes there's first something and second something.

THE COURT:  Sure.

MR. DE LEEUW:  It can be that kind of thing.  But otherwise, usually when you're talking about one thing, you refer to that thing throughout the claim, it's the same thing.

And the same rule, I would say certainly a favored construction, is terms that are in multiple claims should be construed in the same way.

THE COURT:  Consistently.

MR. DE LEEUW:  But AutoStore is asking that your Honor construe these words differently in claim 1 and claim

15. And why do they do that? Because claim 1 has the language that they're seeking to add to claim 15. Claim 1 and 15 are different.

THE COURT: It should mean item retrieved from a storage container.

MR. DE LEEUW: That limitation shouldn't be added to claim 15. It's in claim 1, but it's not in claim 15.

THE COURT: But it's the same term. You're saying that because it's in different claims it can mean different things?

MR. DE LEEUW: No. I'm saying it should mean the same thing.

Claim 1 says a delivery container containing at least one picked item. Let's just make it simple. The delivery container is a crate. The picked item is a loaf of bread. Claim 1 says that the delivery container contains the loaf of bread that came from a storage container somewhere. It was previously in a storage container somewhere in the grid or it came out of the storage container in the picking station.

Claim 15 doesn't have that requirement, and the reason it doesn't have that requirement is because you could get the loaf of bread from any number of different places.

And how do we know that? Well, it's actually in the slide that my adversary just showed. This is part of the

prosecution history that my adversary showed.

The language there right at the end of the highlighting, it says:  Prepackaged items that are not used to store items picked from a pallet.

Pallet is just the inventory that comes into the warehouse.

It says in that other prior art system it didn't have items that were picked from a pallet as its applicants claim delivery containers.  This portion of the prosecution history says specifically picked items can come from a pallet, from the inventory.  They don't need to necessarily come from a storage container.

And, again, that's the difference between claim 1 and claim 15.  Claim 1 requires that the picked item come from a storage container.  Claim 15 doesn't have that requirement.

And as the Unwired Planets case, the Federal Circuit case, said:  If the patentee intended to restrict the claim at issue, it would have included the same limitation.

There's a limitation in claim 1 that's there explicitly.  There's no such limitation in claim 15.  And AutoStore just says let's add that limitation so that claim 15 can be as limited as claim 1, but that's not in claim 15.  And as the Federal Circuit has said, you shouldn't impose limitations from other claims.  That's the whole idea of

multiple claims. Some may be broader. Some may be narrower. Some may have different limitations.

AutoStore is seeking to add a limitation to claim 15 that isn't there but is in claim 1.

Thank you, your Honor.

THE COURT: Yep.

MR. LOCASCIO: I'm going to try to play mediator to your question.

I think Mr. Boloori probably has multiple points to make, but to your question about, like, why does this all matter, like, where are we disagreeing --

THE COURT: Yeah. Well, sometimes the background noise isn't about setting up an infringement claim, right, or invalidity. So is that what's going on or does it matter to anybody's business really?

MR. LOCASCIO: So the suggestion appears to be that the robots and the AS/RS doesn't even need to deal with the delivery containers, okay? The claims obviously don't say that.

The claims, your Honor, claim 1, the robotic load handlers store at least one delivery container in the storage and retrieval system, okay? The delivery containers are of a size that they can be in the storage and retrieval system and handled by the robots.

And then if we look at claim 13 -- pardon me.

We're talking about claim 15. We have to remember claim 15 depends from 13. Claim 15 says storing by at least the one robotic load handler and at least one of the plurality of adjacent stacks at least one delivery container. Okay.

So delivery containers are engaging with robotic load handlers. They are kept in the storage system. And if we look higher, claim 13 from which it depends indicates that those delivery containers are kept in storage containers in the bin by the robot.

So what does this all matter to the question -- and I apologize to Mr. Boloori, and I will after the hearing as well, that I got up during his time.

But the suggestion we heard from Mr. De Leeuw was, like, the robot, and, heck, even the storage grid, doesn't need to engage with the delivery container. It can just be something you put an item into. A loaf of bread goes into a delivery container.

When I bag my groceries at the self-checkout at the Giant, there's a bag there and I put my loaf of bread in it. That doesn't all of the sudden make that a delivery container.

This is their -- the reason that we have a dispute over this is right here. This is Ocado's infringement contention. They say that when the storage bins come down and a person takes out the loaf of bread and then they drop it in a box, that's the delivery container.

That is by no means in any way, shape, or form the delivery container in this patent or in any of the images we saw, or the one that's picked up by not the robot but the clamp or whatever Mr. De Leeuw wants to call it.  That's why Mr. Boloori is up here explaining that these limitations need to be included because Ocado would just like to say essentially it's a box with something in it or a bag with something in it, your Honor.

THE COURT:  Okay.

Mr. Boloori, please.

MR. BOLOORI:  Thank you, your Honor.  Just very briefly.

So I just want to clarify what Mr. De Leeuw said. I think he may have misspoken about what the actual proposed construction for AutoStore is.

AutoStore is not saying that a delivery container always must be engaged by a robotic handler directly.  All AutoStore is proposing is that the delivery container should be capable or suitable to be engaged directly by a robotic handler.

THE COURT:  Okay.

MR. BOLOORI:  So the animation that Mr. De Leeuw showed where in that particular embodiment a storage container -- or a robot brought a storage container that contained a delivery container, and then the entire

combination was lowered, that does not contradict AutoStore's proposed construction.

AutoStore's proposed construction is that even in that case the specific delivery container that's inside the storage container, that delivery container on its own is capable of being engaged directly.

THE COURT:  Let me ask you about picked item then. Does a picked item have to be from at least one storage container or can it be from anywhere?

MR. BOLOORI:  From a storage container.

THE COURT:  That's a requirement?

MR. BOLOORI:  Yes, your Honor, according to AutoStore's proposed construction.

THE COURT:  Yeah.

MR. BOLOORI:  And just one point to add to that.

THE COURT:  Boloori gives me straight answers.  He doesn't talk around it.  He just answers the question.

That's a compliment.

MR. LOCASCIO:  He's known for that with us as well, your Honor.

MR. BOLOORI:  Just one point with respect to the prosecution history that Mr. De Leeuw pointed to.

He said that the other place where a picked item can come from is from a pallet.  And the point here is that the examiner thought the pallet was a storage container.  So

really the only place that the picked item can come from is really just the storage container even though the examiner used a different word.

THE COURT:  What's your take on that question? Picked item, does it have to come from a storage container or can it be from elsewhere?

MR. DE LEEUW:  There's no limitation in the claim that it has to be from the storage container.  It can come from the inventory coming in.  Let's say the --

THE COURT:  So it doesn't have to be.

MR. DE LEEUW:  It doesn't have to be.  It could be there.

THE COURT:  Or it could be.

MR. DE LEEUW:  It could be, or it could come from another delivery container.  So let's say you ordered your goods for a delivery on Friday.

THE COURT:  Well, a delivery container is not a storage container.

MR. DE LEEUW:  It's not, but there's no reason why -- for instance, let's say you're ordering a delivery for Friday and some other person orders that loaf of bread that you've ordered for Friday, and they're running low on bread and it's in your delivery container.  The system could be designed such as the delivery container is escorted over to the picking station.

THE COURT: But it's Wednesday, so the thing comes over and grabs it.

MR. DE LEEUW: Right. You take the loaf of bread out of Judge Laplante's delivery container and you put it into John Smith's container.

There's no limitation in claim 15 that it needs to come from a storage container. Claim 1 does have that limitation, we freely acknowledge that, but it doesn't have it in claim 15.

MR. BOLOORI: Just one other point, your Honor.

THE COURT: Yeah.

MR. BOLOORI: And this is what I said before as well.

When we argued that the limitation that Ocado argued to distinguish the prior art has to be read into the claim, this is one of the reasons for that.

Prepackaged items. What Ocado said is that a delivery container must be something that -- must include items stored that are picked from a pallet. And as I said, the examiner assumed pallet to be storage container.

So basically what Ocado was saying is that a delivery container contains things that are picked from a storage container.

THE COURT: Yep. I'm with you.

MR. BOLOORI: Thank you, your Honor.

THE COURT:  I mean, I follow you.

Okay.  Where are we at here?  Let's see.

MR. DE LEEUW:  Your Honor, if I could just respond very briefly, because I think there was some confusion introduced by Mr. LoCascio's description of the delivery container dispute.  I can get to it.

There's no disagreement that the robots need to in some fashion engage with the delivery containers in some fashion in the storage grid.  Claim 1 and claim 2 -- claim 1 and claim 13 talk specifically about instructing the robots to store a delivery container in the system and to transport the delivery container in the system.

What that claim does not require, though, is that the storage container engage it directly or be capable of engaging it directly.  What it says is that the delivery container needs to be transported and stored in the grid at some point.

And so I think the example Mr. LoCascio brought up, and it's always -- that's always the problem with bringing up infringement issues, because I don't really know what he's talking about when he's talking about a system, but we're talking about a container that is in the storage grid and it ultimately is -- it's brought out to picking stations where items are put into the delivery container and then held in the storage grid.  There's no dispute about that.  There's also no

dispute that the delivery container gets around in the storage grid by means of robots.

But what is in dispute is the issue that Mr. Boloori raised just a little while ago, which is that the delivery container must be capable of being engaged by the robot.

If you see on Figure 16 and 17, as I've shown on slide 28, that's a preferred embodiment, and the preferred embodiment says specifically, described in column 11, that the robot deposits a combined container. It's only engaging with the storage container, so the blue box, and the red box just gets lifted out of the blue box. It could be lifted out by a human, it could be lifted out by a clamp, it could be lifted out by some other mechanism, but the point is the red container, the delivery container, doesn't need to be engaged directly by the robot. There's nothing in the claims that require that. So, respectfully, there's no reason to add a limitation that's not found anywhere in the claim language.

With that, I'm going to pass to Mr. Gross who is handling the last three items in the '080 Patent.

THE COURT:  Okay.

MR. GROSS:  Good afternoon, your Honor.

THE COURT:  Good afternoon.

MR. GROSS:  Alexander Gross on behalf of the plaintiffs.

As Mr. De Leeuw just said, I'll be handling the remainder of the terms in the '080 patent.

So the next term for construction is "at least one of a lip, a handle, and an aperture."  And I want to start by putting this claim term in context.

So if you recall earlier, Mr. De Leeuw discussed a mechanism used to remove delivery containers from storage containers.  So this claim term, which appears in claim 11 shown on slide 40 here, introduces a lifter mechanism that is a part of that mechanism and requires that the lifter mechanism engage with delivery containers by using certain structural features of the delivery containers.

And, more particularly, it states that the lifter mechanism engages with at least one of three listed structural features which are a lip, a handle, and an aperture.

So Ocado believes that the plain and ordinary meaning of this claim term is that the lifter mechanism need only use at least one of those three structural features in order to engage with the delivery container.

In contrast, as you can see here, AutoStore seeks to rewrite the claim term to require that the lifter mechanism must use all three of the structural features.  While this extreme example is encompassed by Ocado's construction, AutoStore provides no reason and --

THE COURT:  That's basic grammar.  "And" means

everything in a series.

MR. GROSS:  So I agree with you that there is a grammatical --

THE COURT:  Except that you've got this crazy "at least one of" at the front end so it's -- I don't know how you guys are going to help me with this.  It's just bad.

Whoever wrote this, sorry if you're here, it's terrible.  It's terrible.  What do I do with this?

MR. GROSS:  I think, as Mr. Beeney was discussing earlier today, in patent drafting sometimes you have certain conventions.  So the example Mr. Beeney was discussing was that "a" can mean one or more.

THE COURT:  Sure.

MR. GROSS:  Which might not be what we would think of grammatically, but in the context of patent drafting that is how that term is interpreted.

THE COURT:  Okay.

MR. BEENEY:  Can I just say -- don't blame me for this.

THE COURT:  I don't blame anybody.  Sorry.

MR. GROSS:  Here we have another example.

In the patent context, as shown in the Federal Circuit's case rendered just four months ago in Kaufman versus Microsoft, it said that the word "and" in certain contexts can actually be used to denote alternatives.

So I agree with your Honor that it does say "and" in the claim language, but I think that that's not dispositive. To determine whether the lifter mechanism needs to engage with one of or a combination of the structural features, as Ocado contends, or all three of the structural features, as AutoStore contends, we really need to look to the context of the patent, and that's what all the cases say.

THE COURT: Okay. See, I thought you were going to tell me some kind of -- okay. So even though "and" -- you're telling me that as a matter of patent law "and" is a construction as a term of art is meant to be alternatives and not --

MR. GROSS: No, not that it always means that, but that it can mean that when the context requires. And to determine whether -- and especially with this sort of phrasing. There are a number of cases that use the at least one of A, B, and C, and there are I think dozens of cases that have looked at this issue.

THE COURT: Indictments are backwards. It's weird law, but everybody thinks, well, you know in normal writing "and" is conjunctive, "or" is disjunctive, right? Except in indictments for some reason it's reversed.

So it sounds like you're telling me patent law might be like indictments if the context requires.

I keep cutting you off. Go ahead.

MR. GROSS:  No, no, no, no.  Of course, your Honor.

So AutoStore really offers no reason beyond a single case, SuperGuide, and two cases that cite it.

But as I mentioned a moment ago, if you look at the case law, Courts are split on this issue, you know, some will say at least one of A, B, and C means all three.  Some say at least one of A, B, and C means at least one of those three.

THE COURT:  Definitely the "at least one of" is a curveball for sure.

MR. GROSS:  Yeah, and I do think that if you think about it in ordinary parlance, the "at least one of" I think is what's kind of doing some of the work here.

But if you look at these cases that kind of come out in two different ways and you ask yourself, well, what's causing that, and the answer is that you have to look at the context of the patent and in particular the descriptions in the specification.

So just to clear up a few things on the law, AutoStore says that as a matter of law, and this is from their opening brief at page 15, they say:  As a matter of law, the plain and ordinary meaning of at least one of A and B is at least one of A and at least one of B.

But the case that they're citing here, Ex Parte Jung, actually recognizes that many Courts have found that where the patent's claims specification or prosecution history

necessitate a broader meaning that it can mean the disjunctive.

And, in fact, I've circled here footnote 2 in Ex Parte Jung. And if you look at footnote 2, this case cites ten cases in which Courts have done exactly that, have found that based on the context of the patent, what you've referred to as the grammatical interpretation of "and" as the conjunctive, just doesn't apply.

Sorry. I seem to have lost my place.

So given the space entranced in our brief, we only cited a few examples of these sorts of cases, but as I mentioned before, there are dozens of cases in which the Courts, District Courts or the PTAB, have come to precisely this conclusion.

So I want to briefly address one other case that AutoStore relies on, SIMO, and it says -- the case that you'll see later today, it's in their slides, and I just wanted to say a few things about SIMO.

So, first, SIMO just restates the holding of SuperGuide. SIMO actually involved a different claim term. It was a plurality of a number of items joined by the word "and", but, importantly, even there the Court in SIMO didn't reach that conclusion based on an abstract rule of grammar. It looked to the context of the patent. It looked at the embodiments in the specification and at the claim language,

which the Court found was decisive in determining which construction to apply.

So SIMO is entirely consistent with these dozens and dozens of cases, and in fact I think every case I've seen, where the Courts actually looked to the context of the specification rather than trying to interpret the claim language just in a vacuum, essentially.

So I've included on this slide a few cases cited in our brief which I think kind of wrap up a few of the principles we've been talking about, which are that SuperGuide did not create a universal rule of claim construction. Courts have to look to the context of patents and have to interpret claim language based on the facts before them.

So I mentioned Kaufman earlier today. This is a case from May 20th of this year, and in this case the Federal Circuit said in certain context the word "and" can be interpreted to denote alternatives.

AutoStore says that this case is irrelevant because it doesn't relate to the structure of the claim term at least one of A, B, and C, but as I mentioned earlier, the import of Kaufman is merely that the word "and" in the patent drafting parlance can be used to denote alternatives rather than a conjunctive list.

So with that understanding of the law, I want to turn to the context of the patent which is, as every Court

says, what matters here.

And if you look at the portion from column 10 of the '080 Patent that I've excerpted here on 46, this paragraph is the only paragraph in the patent specification that discusses the structural features of delivery containers.  And what it says is in some examples the delivery containers can only have one of the three listed features.  They can have one or more handles.  And what this means is that in order to practice the invention and in order to achieve the benefits of the invention, the more efficient removal of delivery containers from storage containers, you only need one of the three items.

The paragraph goes on to say that in the alternative, you can use another mechanism.  So what we can take from this is that you can achieve all the benefits of the invention and practice the invention with only one.  That it's not just handles.  It could be other types of mechanisms.

But the crucial thing I think about -- the thing that I think is crucial about this is that there actually is no example here in which the delivery container has all three of the structural features.  It's not mentioned in the patent.  It says it can have a handle or in the alternative any other mechanism.  There's no example of all three.

Now, I think a lifter mechanism that uses those -- all three of those structural features would be within the

scope of the invented concept, but there's not a specific example here that has all three.

So this context of this '080 Patent that we've been discussing is very different from the context in SuperGuide that led the Federal Circuit to conclude that the list meant at least one of A, at least one of B, and at least one of C.

There each category in the list was both necessary to perform the invention and every embodiment in the patent required all three.

Here neither of those things are true.  You can practice the invention with only one of these.  For example, a handle as stated here, and certainly this embodiment does not require all three.

Thus, the context of the '080 Patent suggests -- and, I'm sorry, suggests is the wrong word.

Based on the context of the '080 Patent this claim term should be required to only require that the lifter mechanism used at least one of the three structural features listed in claim 11.

Just two more brief points, your Honor.

If you apply the grammatical principle that we were discussing earlier, it would lead to a nonsensical result.  It would require that the lifter mechanism used at least one of the lifts.  And we've thought about it.  I don't know what at least one of the lifts means.  That's a nonsense term.  And in

order to make it make any sense, AutoStore has to delete a bunch of words from that.  So that shows again why the grammatical rule shouldn't apply here.

THE COURT:  That's a fair point.

MR. GROSS:  So just two last things if we can skip ahead a little bit.

AutoStore ignores the context of the patent in their opening brief.  And as I mentioned, this is something that every Court says you have to look to.

In reply they rely on this storage container embodiment here shown on the left side of the screen, but the claim language relates to structural features of delivery containers that lifter mechanisms use.

So the storage container embodiment here is entirely irrelevant to the claim term at issue.

Finally, looking back to the broader context that I started with, the claim requires that the lifter mechanism is configured to use at least one of these three structural features.  It would be nonsensical to require the mechanism be able to use multiple different features when use of one of them alone is sufficient.

Thus, in the context of the patent, which all Courts say is determinative of which construction applies, confirms Ocado's plain and ordinary meaning.

The lifter mechanism uses at least one of the three

listed structural features, or a combination of those features, but does not require all of them.

Thank you, your Honor.

THE COURT:  Thank you.  That was well done.

MR. LOY:  I'm somewhat loathe to take the podium, your Honor, and talk about the various rules of grammar and particularly as patent lawyers deal with them, and if there are indictments involved nonetheless, but I do like to point out, your Honor --

THE COURT:  I think you've got the grammatical argument, don't you?

MR. LOY:  Yes.  And I think we just heard that from Mr. Gross.  It's an admission that the grammar here is a rule of grammar.  And when you have an "at least one" followed by a series of items joined by an "and," it is conjunctive, not disjunctive, and it requires at least one of each.

And that may seem odd, and I appreciate your Honor's point.  We wish this had been written differently, but let's look at the controlling Federal Circuit case law on this issue.

It is SuperGuide, as my opponent has admitted, and it kind of brought me back to memory lane whenever I was reading it because it specifically references, let's see here, the gold standard book on rules of grammar which -- I pulled up the wrong case.  Let me get you the right one.

This is the SuperGuide case from the Federal Circuit 358 F.3d 870, and the issue here is the exact same construction that we saw in the patent claim here. It is an "at least one of" and followed by a series of terms, and the Federal Circuit says -- they agreed with DirecTV's perspective here that that was a conjunctive list and it required each one of those separate items to be contained within the claim, and they pointed to -- it reminded me of when I was a law clerk because when I was a law clerk to a federal judge, I had the Strunk and White book sitting on that desk, and we used it very often to make sure we were writing opinions that could be legible and intelligible, and it cites directly to that Elements of Style.

Now, one of the other issues -- we hear a lot of argument here from the other side about, well, it just wouldn't make sense because there's no embodiment that is contained here that has all three of a lip, a handle, and an aperture.

But we have to remember that what we're talking about here, your Honor, is claim 11, and claim 11 is a dependent claim, and let me actually pull that up.

Dependent claims -- oftentimes patentees write dependent claims because they're narrower. So the idea is the independent claim here, which is claim 9 of the '080 Patent, could include a mechanism that is one of a lip, that lifts

from one of a lip, or a mechanism that lifts a handle, or a mechanism that lifts an aperture.

But when we get to claim 11, claim 11 is dependent, and often these are written to avoid prior art.  So you narrow the claim by requiring more, and in general circumstances that can sometimes make your claim different from prior art because it requires more elements.

And here we have the exact same language in this dependent claim, which is claim 11 depending from 9, which requires the mechanism to engage and lift the delivery container from the stackable container using at least one of a lip, at least one of a handle, and at least one of an aperture.

Now, it is interesting some of the evidence that was shown from the specification of these particular delivery containers.

So if you look at Figure 8, for instance, Figure 8 specifically shows multiple engagement locations.  So you can have -- the aperture are those holes that are next to the handles, and there's nothing necessarily stating that there is or is not a lip here, but a lip could also be contemplated in some of the earlier designs that we saw of the delivery container.

There's nothing suggesting whatsoever that a system cannot be designed to have mechanisms that attach to each of

those, the aperture, the hole, the handle, and also the lip of that delivery container.

Now, we begin here with the traditional principles of grammar.  So AutoStore's proposed construction is correct and nothing in the specification deviates from that.

The cases that are cited by my opponent, and we can turn to slide -- just turn to slide 44 for a minute.

So this is the SIMO case.  This is the second Federal Circuit case that we cited that was acknowledging that the prior SuperGuide Federal Circuit case reaches the conclusion that this construction does require the conjunctive, not disjunctive, reading.

And Mr. Gross pointed to the Ex Parte Jung case. Now, that is a Patent Office opinion.  That's not a Federal Circuit opinion.  The controlling law in this court is the Federal Circuit.  And it cited, as he showed you, a big, long list of other District Courts that have reached the conclusion that "and" can sometimes mean "or."

First of all, the patentee did not use the word "or," and second of all, all of those cases are distinguishable.  They were all District Court cases and the facts were very different.  None of them said "at least one of" and none of them had a specification that supported the natural reading like this one does here.

So I think the obvious conclusion here, your Honor,

as a matter of both grammar, law, and consistent with the specification, is that "at least one of" here means at least one of each of a lip, a handle, and an aperture.

THE COURT:  Okay.  Look, on the grammar I'm with you, but I guess what was lost on me is -- I mean, how many containers are going to have at least one of each?

MR. LOY:  And that's beside the point because remember the --

THE COURT:  The reality is beside the point?

MR. LOY:  Well, no, but the claim that is the independent claim, claim 9, could have the broader interpretation.  So it could have a few.

And then claim 11 is a narrower claim that could require you to have -- it does require you to have each one of them.

Now, maybe there aren't in practice any of those, but that's what the claim says, and that is the more narrow claim of the sequence of claims.  Claim 9 is broader.  It could have just one of them.

THE COURT:  So explain to me the significance of broad versus narrow.

MR. LOY:  Sure.  As a principle of --

THE COURT:  Because in statutory interpretation narrower means that's the one you go with, right?

MR. LOY:  In this instance, your Honor, in claim

drafting language the independent claim will be your broadest claim, meaning it has --

THE COURT:  I get that part.

MR. LOY:  And as you start to add on to that -- so if you say claim 2 depends from claim 1, you have to add what's called additional limitations, but that means additional requirements of the claim that make that claim narrower than the previous.

So in this instance where you have a lifting mechanism that can engage any one of -- any type of -- it's not limited in claim 9.  When you get to claim 11, it narrows it to requiring a mechanism engaging all three of the lip, the aperture, and the handle.

THE COURT:  All right.

MR. LOY:  Do you understand that?

THE COURT:  Well, I understand that, but I already did understand that.

I'm trying to understand why that makes the sort of unreality, the sort of -- I don't want to call it absurdity because I don't mean absurdity, but the lack of any real life examples that would fit claim 9, why that gives me any solace then -- just that 11 is broader because it's not dependent. Like in the real world of construing this, how does that help me?

MR. LOY:  In the real world of construing this,

your Honor, the principle will guide you -- grammar guides you, that's where we start, and there's nothing contradicting that so we follow the general rule of grammar.

MR. LOCASCIO:  If I might, just on this real world question here.  Imagine this, your Honor.  My claim is to a pair of sneakers, okay, and I say sneakers with some means to fasten them.  That's my broad claim.  An athletic shoe with a sole and some fastener.  And then I start adding dependencies to that, and my first is I'm going to use laces.  So the fastening device has to be laces.

THE COURT:  Laces, Velcro, a buckle.

MR. LOCASCIO:  See, you're one step ahead of me. The next one is going to be Velcro.  The next is going to be snaps or something, right?

Then I might think, hey, you know what, maybe someday somebody is going to challenge my patent and say it's invalid and they're going to say I couldn't find a shoe out there, a dress shoe, that had laces, and I knew Velcro wasn't so that's obvious.  I could draft another dependent claim, and people do this all the time, on my list of claims and it would say a sneaker with a fastening device that is laces and Velcro and maybe even the snaps, too.

THE COURT:  Not maybe even because "and" means all, at least one of all, right?

MR. LOCASCIO:  I could use "and," and they are

conjunctive. And your question is, wait, I can't find one in the specification.

THE COURT: There's no shoes like that.

MR. LOCASCIO: There's none that show in the specification. That doesn't matter. That claim can survive because of that because I've taken three things from the spec. I've got a picture with laces, I've got a picture with Velcro, and I put them together.

The reason somebody would do that is the hope that, okay, this is a crowded field, maybe some of these claims are going to survive when challenged, and I'm going to have the broad one and that's my home run shot, but I'm also going to have all these other little guys. And some of them might seem like who's ever going to want that. Most dependent claims are never, ever asserted for infringement because they're too narrow, but they're safer if you're the patentee from the validity standpoint because when somebody comes to challenge it, the challenger has to find prior art that has all of the limitations. And if they were "or," I would just have to find one with laces and I would take the whole claim out, but with the "and" I now have to find a shoe with all of those things.

THE COURT: Yeah, I get it. It's protecting the patent.

MR. GUZIOR: Your Honor, if we're doing this tag team, there was a little bit of a cheat in Mr. LoCascio's

example.  He said a shoe with laces, Velcro, and a buckle.  He forgot at least one of them.

THE COURT:  He said snap, I said buckle, but go ahead.

MR. GUZIOR:  He said at least one of them.  He forgot at least one of them.

Now, if I said to your Honor that I'm going to make you a pair of shoes or I'll have a pair made, you can have at least one of snaps, Velcro, and laces, would you think I was making you an offer for a shoe that had all three?

THE COURT:  No.

MR. GUZIOR:  Well, that's exactly our point.

THE COURT:  Your point is that, I don't know, the most natural meaning should -- but that's not the law, is it?

MR. GUZIOR:  It is, though, because as the Federal Circuit acknowledged in Kaufman, which is March of 2022, the most recent precedent, in context --

THE COURT:  In context.  Okay.  That's different.  If the most natural meaning means context, that's what your partner or your associate, whatever, that's what your colleague told me, and I get that part.  I do.

MR. GUZIOR:  And we think the point of the example about shoes, in context you understood exactly what I was saying even though I said "and" instead of "or."  And in the context of this patent and what Mr. Gross showed you in the

specification, a person of skill would have the same understanding, the same natural reaction that your Honor had to the shoe example.

MR. BEENEY:  Your Honor, I hate to do this, and I apologize to Mr. Gross as well, but I do have to respond.

To the point that in the real world why you would do this, there's no point in crafting a valid claim that nobody would ever infringe.  There's no reason in the world why a bin would have all of these features.

And the final thing that I would just like to say to your Honor is, I want to suggest to your Honor that at least the grammar point is ambiguous.  It's not wrong, and that's because AutoStore's construction leaves out the words "one of."  This is not a lip, an aperture, and a handle.  This is "one of."  So let me suggest to your Honor that the grammar is actually correct.  "At least one of" means a list.  At least one of.

And I'm going to give you a list.  My list is A, B, and C.  That's my list.  You have to take at least one of my list.  My list is not A, B, or C.  My list is A, B, and C.

THE COURT:  Maybe.

MR. BEENEY:  The grammar is at least ambiguous.

THE COURT:  Yeah.

MR. BEENEY:  And I apologize.

THE COURT:  There's no need.  You know, I told

everybody starting off everybody is fair game, everybody can speak. You know, I'm more of a Garner's Legal Usage than a Strunk and White guy.

MR. LOY: So Garner is cited, your Honor, right below Strunk and White. I don't know if you saw that. It's the same rule.

THE COURT: Yeah. Okay.

MR. LOY: All right. Thank you, your Honor.

THE COURT: Go ahead, Mr. Gross.

MR. GROSS: So, I won't repeat --

THE COURT: I don't mind.

MR. GROSS: -- the things that Mr. Guzior or Mr. Beeney said a little bit better than I would, but it's interesting you mentioned Scalia and Garner.

THE COURT: Well, I didn't mention Scalia and Garner. I mentioned Garner.

MR. GROSS: Sorry. Garner.

THE COURT: But I like that book, too.

MR. GROSS: Well, I have a copy of Scalia and Garner which is the authority that Mr. Loy referenced is cited in SIMO.

THE COURT: Yeah.

MR. GROSS: So you see it here, this is what is cited in SIMO. This is a much more recent grammatical, or not grammatical, text on the reading of law. And what it says,

and this is what is actually referred to in SIMO, is that this particular grammatical concept we've been talking about is, perhaps more than the most of the other canons, highly sensitive to context, and that is precisely the point.

THE COURT:  That's your point.

MR. GROSS:  You know, yes, there is a grammatical rule, but it's one of many things we should consider, and it cannot trump the context of the patent which I think clearly shows that not all three are required.

THE COURT:  Well, he has, like, six charts there in that chapter where he gives you all the configurations in the conjunctive.  Believe me.  I know this thing like the back of my hand.

MR. GROSS:  Yeah, it's great.

And Mr. Loy showed you Figure 8 and said, oh, look, Figure 8 has two.  Well, it doesn't have three.  There is no example with three.

And Figure 8 is merely an example.  If you look at the specification in column 10 when it introduces Figure 8, it says merely one example.

So those are the two points I wanted to make in addition to the ones that my colleagues made.

THE COURT:  Okay.  I appreciate it.

MR. GROSS:  Thank you, your Honor.

THE COURT:  All right.  That's '080, or is there

more you want to do with '080?

MR. GROSS:  Unfortunately not, your Honor.

(Off the record)

(Hearing adjourned at 4:58 p.m.)

C E R T I F I C A T E


I, Susan M. Bateman, do hereby certify that the foregoing transcript is a true and accurate transcription of the within proceedings, to the best of my knowledge, skill, ability and belief.


Submitted:  10-17-22    /s/    Susan M. Bateman _____
                        SUSAN M. BATEMAN, RPR, CRR