*NO COPY OF THIS TRANSCRIPT MAY BE MADE PRIOR TO JANUARY 16, 2023

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW HAMPSHIRE

```
* * * * * * * * * * * * * * * * * * * *
                               *
OCADO INNOVATION LTD., AND OCADO      *
SOLUTIONS LTD                         *
                               *  1:21-cv-41-JL
            v.                 *  September 29, 2022
                               *  9:16 a.m.
AUTOSTORE AS AND AUTOSTORE SYSTEM,    *
INC.                                  *
                               *
* * * * * * * * * * * * * * * * * * *
```

TRANSCRIPT OF MARKMAN HEARING - MORNING SESSION
BEFORE THE HONORABLE JOSEPH N. LAPLANTE

Appearances:

For the Plaintiffs:            Garrard R. Beeney, Esq.
                               Marc De Leeuw, Esq.
                               Dustin Guzior, Esq.
                               Alexander N. Gross, Esq.
                               Michael Thomas Lemanski, Esq.
                               Sullivan & Cromwell, LLP

                               Henry C. Quillen, Esq.
                               Whatley Kallas, LLP


For the Defendants:            Gregg F. LoCascio, Esq.
                               Joseph Loy, Esq.
                               Ali-Reza Boloori, Esq.
                               Tiffany M. Knapp, Esq.
                               Emily Scott, Esq.
                               Kirkland & Ellis, LLP

                               Robert R. Lucic, Esq.
                               Sheehan Phinney Bass & Green, PA


Court Reporter:                Liza W. Dubois, RMR, CRR
                               Official Court Reporter
                               U.S. District Court
                               55 Pleasant Street
                               Concord, New Hampshire 03301
                               (603) 225-1442

P R O C E E D I N G S

THE CLERK:  Court is now in session and has before it for consideration a markman hearing in civil case 21-cv-41-JL, Ocado Innovation, Ltd., et al vs. AutoStore SCLL (sic), et al.

THE COURT:  Okay.  I think -- I hope you've been notified.  I did receive your proposed schedule and sort of game plan and that's fine, we can go -- we can go exactly in that fashion if you like.  I -- okay.  A few preliminary questions.

In that email you sent me, you did -- you had reached an agreement regarding one of the disputed terms.  Have there been any other agreements reached on any other terms?

MR. BEENEY:  (Shakes head.)

THE COURT:  No?  Okay.  Now, this PTAB decision that was just recently submitted, is anybody -- you know, vis-a-vis the '051 Patent, is anybody requesting a stay of my construction of that based on that or do you still want me to go ahead and construe the '051?

MR. BEENEY:  Plaintiffs are not seeking a stay, your Honor.

MR. LOCASCIO:  We're not.  You can go ahead and construe, your Honor.

THE COURT:  Okay.  My last sort of general question is it seems to me, based on your papers, that the parties have

a different -- possibly potentially have a different take or a different view on what is the upshot when a term or claim has plain and ordinary meaning.  Is that -- if it has plain and ordinary meaning, is it -- it seems to me your view, Ocado, right, that I should just instruct the jury that they should construe it by plain and ordinary terms or -- and you seem to have a different take.

MR. LOCASCIO:  I do, your Honor.

THE COURT:  So I'm not misreading that.  Okay.

MR. LOCASCIO:  You're not.

THE COURT:  So why don't we take turns here.

Just -- if something's plain and ordinary and -- not indefinite, but just plain and ordinary, what is your take on what ought to happen?

MR. LOCASCIO:  What ought happen, your Honor, is if it's -- let's say like a straightforward word, it was a single word, and the parties didn't dispute what it -- would you like me to stand here or here or do you have a preference?

THE COURT:  Wherever you're comfortable.

MR. LOCASCIO:  Thank you.

And there was no dispute over it, there are times where no construction at all is provided to the jury.  Where there's a dispute over what that term means, as there are certainly here --

THE COURT:  Yup.

MR. LOCASCIO:  -- then we believe -- and there are cases, and perhaps the most apt one is a case called *O2 Micro* from the federal circuit which speaks to the idea of you can't just toss to the jury plain and ordinary meaning and hope they get it because what happens then is typically the plaintiff uses whatever -- they say, well, this is plain and ordinary meaning with the goal of broadening the claims that capture the accused product; the defendant in that posture says no, no, no, that's not what it means, it means something narrower.  And then we've taken claim construction, which is a question of law for the Court, and --

THE COURT:  And made it a jury question.

MR. LOCASCIO:  Yes.  And so where there is a dispute -- and, for instance, there are several examples where Ocado doesn't offer a construction.  It says plain and ordinary meaning.  Some districts in their patent rules say if you offer plain and ordinary meaning, you have to tell me what you think it means so then we know where the boundaries are.

THE COURT:  I'm just curious.  That's not a rule here.

MR. LOCASCIO:  It is not.

THE COURT:  Should it be?

MR. LOCASCIO:  I believe it should.  We can get samples where that's a -- at least in the submission --

THE COURT:  I can get the samples.  I'm just

curious.  As someone who is in the area, you think that's a good local rule?

MR. LOCASCIO:  I do.  I'm of the view that this is a space where the parties can agree its plain and ordinary meaning, like automobile.  Okay.  We don't need to have a dispute over that.  Where there's a core dispute, it just kicks the can down the road or puts ambiguity into a case that, frankly, often provides for mischief in front of the jury.

So there are some times where the plaintiff, Ocado here, has given us in their briefing, if you peel back maybe through the second brief, what they think the term means --

THE COURT:  Sure.

MR. LOCASCIO:  -- like this obstruction issue, except they're not willing to put that in their actual claim construction.  And part of the reason that is, if it's narrow, well, then, that will hurt them, from their perspective, on infringement.  If it is broad, and we would say contrary to the specification, the risk to them there is it's either contrary to what they told the patent office or it creates validity problems, whereas if you just leave it up to plain and ordinary meaning, well, then, that's sort of a plaintiff's Shangri-La.

THE COURT:  Okay.  Your take?

MR. BEENEY:  I don't disagree with much of what was said, your Honor.  I think, first of all, I'd start with the idea that plain and ordinary meaning is not just saying to the

jury what do you understand this to mean.

Under the *Phillips vs. AWH* case at 415 F.3d 1316 --

THE COURT:  Yup.

MR. BEENEY:  -- it teaches us that plain and ordinary meaning means as understood by a person of skill in the art with a full understanding of what the inventors invented.

So that is the plain and ordinary meaning to a, if I may, POSITA, understanding what the -- what the invention claims.

THE COURT:  So it still requires me to construe it then and then give the jury an instruction -- or it requires me to construe it and that's just a final decision in the case.

MR. BEENEY:  Well, I think what the law asks your Honor to do is -- you know, thankfully, not construe every term and every claim in every patent that's --

THE COURT:  Right.

MR. BEENEY:  -- headed to the jury.  I mean, that is clear, thankfully.

And so I think what -- with the disputed claim terms, I think what the law asks your Honor to do is to determine whether if we take, for example, the first claim term, "occupy a grid space."  Our friends say that that means occupy only a single grid space; we say plain and ordinary meaning.

I think what the law asks your Honor to do in this claim construction hearing is to resolve that dispute.  To the extent your Honor would say, no, it's not only a single grid space, it's the plain and ordinary meaning, the experts, who would be POSITAs, would then explain what they understand the plain and ordinary meaning to be in the context of the invention and the jury would then decide and your Honor would instruct the jury in the instructions that you have not construed the term; it's the plain and ordinary meaning.

But, of course, in light of your construction ruling, no one could take the position that the plain and ordinary meaning is what your Honor rejected, only a single grid space.

So I hope that is helpful.

THE COURT:  Okay.  So if you say something is plain and ordinary meaning and they have a -- a suggested construction, you say it goes to the experts and I have to sort of use the expert opinions to construe the claim.

MR. BEENEY:  Well, with the exception of the dispute that's raised in the claim construction.  Your Honor is asked to resolve that dispute.

So, for example, we would know at the end of your Honor's decision-making process --

THE COURT:  Yup.

MR. BEENEY:  -- that plain and ordinary meaning does

8

not mean only a single grid space.

THE COURT:  Yeah.

MR. BEENEY:  And that would be out of bounds for anybody to say during the course of the trial before the jury.

THE COURT:  So if I choose plain and ordinary meaning, if I accept your -- and you've suggested that many times, right?

MR. BEENEY:  (Nods head.)

THE COURT:  What that amounts to from your perspective is a rejection of whatever their proposed construction is.

MR. BEENEY:  Yes, your Honor.

THE COURT:  And nothing more?  Like that's where it ends?

MR. BEENEY:  Yes, your Honor.

THE COURT:  That that's foreclosed -- the AutoStore proposed construction is foreclosed, but nothing more?  Or -- I mean, I -- what -- what is -- the -- the jurors are not POSITAs, right?  So, like, what are they going to do with that?

MR. BEENEY:  Well, that's why they would hear the experts, and the experts can do things within the bounds of what they are qualified to do as to how they would understand the term.

THE COURT:  Okay.  But having never tried one of these to a jury, okay, I'm just trying to figure out where the

rubber hits the road.

Isn't the AutoStore expert going to come in and say the plain and ordinary meaning was exactly what their proposed construction was?

MR. LOCASCIO:  (Nods head.)

MR. BEENEY:  No.

THE COURT:  You say no; you're nodding yes.  So what really happens in these situations?

MR. BEENEY:  No, you -- if your Honor -- I'm sorry.  If I --

MR. LOCASCIO:  No, no.  I stood up.  I shouldn't have stood up.  Sorry.

MR. BEENEY:  Okay.  I mean, once your Honor resolves this dispute in the claim construction ruling, no one can take the position that plain and ordinary meaning is what your Honor rejected in the proposed construction.

If your Honor determines that these patents in light of the specification and the other intrinsic evidence is not only a single grid space, that's the end of that issue.

THE COURT:  Understood.  But you have more to say about it?

MR. LOCASCIO:  I have one thing to say and I don't want to -- I appreciate the Court's indulgence on this, which is I -- I think the most apt thing, and I mentioned I'll give the Court the citation, the case squarely on this question

that, frankly, every district court judge has, is *O2 Micro vs. Beyond Innovation*, 521 F.3d 1351.  And in that case, the federal circuit reversed the district court who just said plain and ordinary meaning.

And there's a passage of particular note here.  It's 1361.  It says:  A determination that a claim term needs no construction or has the plain and ordinary meaning may be inadequate when a term has more than one ordinary meaning or when reliance on a term's ordinary meaning does not resolve the parties' dispute.

And so what -- how what Mr. Beeney describes plays out, to your question of what happens in the trial, is both sides' experts, when the Court has just said plain and ordinary meaning, say consistent with the Court's instruction that this is plain and ordinary meaning, I, as one of skill in the art, believe this is or is not within the plain and ordinary meaning.

And when you drill down to that, Mr. Beeney's correct.  If the Court's order says it is not this, well, now we know it's somewhere in the world, not there.

And so for this term, for instance, what we'd have then, I expect, if the Court didn't address the dispute, would be to say -- on the AutoStore side, we'd say the plain and ordinary meaning of a grid space is the grid space and maybe some little zone around it where the wheel sits --

THE COURT:  Yeah.

MR. LOCASCIO:  -- and on their side they'd say, no, no, a robot with three-quarters sticking into the next grid space is still less than two, presumably, which I think is their actual construction, that they don't offer of anything less than two, and that would be a battle for the jury, sort of dodging -- that's not the right word, but leaving for the jury a question that's a question for the Court.

THE COURT:  I get it.

MR. BEENEY:  So if your Honor please, Mr. Guzior, two to my right, and I just tried a case in Virginia in April where this came up.  Mr. Guzior briefed that case.  He argued that case.  Would it all right with your Honor if Mr. Guzior addresses this?

THE COURT:  Everybody can speak today who, you know, has an appearance in the court.  So sure.

MR. BEENEY:  Thank you.

THE COURT:  But I'd -- but I'd -- I just want to ask this question because I think my -- I was given a seating chart and I've got -- I've got Guzior in the back row.  You're not in the back row.

MR. GUZIOR:  That's correct.

THE COURT:  You're Guzior?

MR. GUZIOR:  I'm Guzior.

THE COURT:  Okay.  I won't forget.  Go ahead.

MR. GUZIOR: Your Honor, in the -- and thank you for the flexibility in permitting me to speak on this.

In the *O2 Micro* case, which is a case that supports what my colleague Mr. Beeney said, the disputed claim term was "only if." Only if.

THE COURT: Yeah.

MR. GUZIOR: One party said "only if" had exceptions. So only if X didn't mean only if X. There was an exception to only X.

And the district court said, I'm not going to resolve the dispute; I'm going to tell the jury "only if" has its plain and ordinary meaning, only if.

On appeal, the federal court circuit didn't say you have to turn "only if" into different words. The federal circuit said the Court had an obligation to resolve the dispute and issue a holding as to whether "only if" had exceptions or not. You don't have to replace those words with other words, just resolve the dispute.

And then the trial that Mr. Beeney mentioned, this came up in our -- our case, and the judge didn't replace words with other words. The judge had a holding that the other side's claim construction was wrong --

THE COURT: Uh-huh.

MR. GUZIOR: -- and the vehicle to resolve that when the expert was continuing to take the rejected position was a

motion in limine and a Daubert motion, where the judge issued an order, as courts in these cases frequently do, saying, you can't give expert testimony contrary to my holding on the dispute.

You don't have to replace words with other words just for the sake of doing it.

THE COURT:  You're saying it becomes law of the case.

MR. GUZIOR:  It's law of the case, your Honor.

THE COURT:  Yeah.

MR. GUZIOR:  That -- that's bingo.

THE COURT:  Okay.

MR. GUZIOR:  Thank you.

THE COURT:  Thanks.

All right.  Let's get started.

MR. LOCASCIO:  We're just trying to get our feed up, your Honor.  One second.

We did test all this before your Honor got in the courtroom, your Honor.

THE COURT:  That's okay.

MR. LOCASCIO:  I'm going to try to switch to something else and see what happens.

THE COURT:  There you go.

MR. LOCASCIO:  And now let me switch back to the table.

14

THE COURT:  Kellie, are you in a position to assist here?

THE CLERK:  He has the right button, your Honor.  I believe it has to do with their laptop.

MR. LOCASCIO:  Thank you, your Honor.  We appreciate your indulgence on this.

THE CLERK:  I can have IT come up, though, if you want.

MR. LOCASCIO:  No, we have it.

Okay.  May I proceed, your Honor?

THE COURT:  Yup.

MR. LOCASCIO:  Thank you.

Gregg LoCascio from Kirkland & Ellis on behalf of the AutoStore defendants.  So I appreciate, obviously, your Honor's time.

We're going to start off, per the game plan you referenced, with a little bit on the broader technology and then we'll turn to the '602 and '051 Patents first.

And it's worth noting there are five patents.  Three of them -- there are three families, meaning the patents are related in two of those families, and there are 81 claims at issue.

And if I have the indulgence of suggesting other changes to the local rules, some rules have claim-narrowing where parties have to narrow the claims or prior art references

as you get toward trial.  In this case, all 81 that Ocado's put in the mix are in play and I expect the goal is to see what happens here at claim construction and then sort of pick up what they can after that and jettison the rest.

But as a result, we have a fair number of terms. We've got it down to a manageable number to accomplish today.

I'm going to talk about some of the high-level technology and then with each patent we may drill into some specifics.

So let me start off with the history here.

So in the 1990s, AutoStore invented their groundbreaking storage system, saving significant space.

In the upper left here, on slide 3, you'll see sort of traditional warehousing space.  You need rows between the shelves for devices to access the product on shelves.  And by taking that and turning that into a grid structure with bins placed inside and on top of one another in vertical stacks, they reduced the footprint necessary from a full-size warehouse to one-quarter of the same space to maintain the same inventory.

And what we see here on slide 4 is an instance of this was AutoStore's primary system, their AS/RS, which stands for automated storage and retrieval system grid, and these are what are called AutoStore's Red Line robots.

And because -- let me look at the next slide here on

slide 5.

This is actually a figure from an AutoStore patent. It then gets replicated in almost full fashion into the Ocado patents, reflecting AutoStore's pioneering role here.

And you see the robots on top of the grid. The grid is made up of rails on a frame structure and then bins vertically stacked beneath those robots inside the grid.

You also see a port. That's designed so that the bins -- and ultimately after a bin is collected, it can be lowered down for a picker, it's called sometimes, to take something out of that bin, sent back into the system.

For a decade, about a decade, before Ocado even filed its patent applications, AutoStore had already commercialized and launched its Red Line system. And you can see here -- we've got a little video -- these had the grids, they had the robots, and, of course, the control system to keep the robots in control, to steer them and to route them.

And we'll go to rails and the robots and then I'll click that and the video will run.

Now, it's notable that Ocado themselves actually bought and had operating an AutoStore system from 2012 to 2013 before they started filing patents of their own.

And what you see here is now a top view with the bins. Some of these bins are sitting up on top of other bins. And then you'll see the robots --

(Video played.)

THE COURT:  Time out.  I just want to be clear.  The reporter doesn't have to pick this up, right?

MR. LOCASCIO:  No.  We can get it to the reporter.  If you want it, we can get it to you.  Otherwise, you don't need to pick it up.

THE COURT:  Yeah.  That doesn't need to be part of the record, as far as I'm concerned.  I have the PowerPoint.

MR. LOCASCIO:  Thank you.

Now, we've paused it here.  You can see this is now a top view down, where the -- you can see into the bins.  The robot hangs over them.

And so this instance, the Red Line robot, which we'll talk about more specifically in connection with the '602 Patent, is cantilevered.  So its sort of operating machinery sits over one grid space and the bin is picked from the adjacent grid space.  And you can see the bins in a stack and then those two ports that go down to picking stations.

(Video played.)

MR. LOCASCIO:  So what was -- I said there was -- let it run full and you'll hear in the video, as is obviously the case, there's a controller that has to control all these robots.  There's the workstations, which we see here as what I call the picking station, robots, a bin, and a grid.

And this is an overview of any cubic AS/RS system,

but it certainly began and is the AutoStore system to start.

And so with respect to getting its patents, now the '602 and '051 Patents, Ocado had to draft narrow, specific claims.  It didn't invent a grid system.  It didn't invent a robot that picked bins --

THE COURT:  Slow down a bit.

MR. LOCASCIO:  It didn't invent a robot that picked bins out of a grid.  And so they had to draft specific claims to their alleged innovations.

But now, in an effort to target AutoStore, Ocado comes in, as we started talking about and we'll see here, with plain and ordinary meaning constructions to try to broaden its claims.  And so when we look at what the disputes are around some of these, the question is is Ocado limited to what they disclosed in their specification, what they sought patent claims for, or something broader, to try to catch AutoStore within the scope of those claims.

The '602 and '051 Patents are related patents that Ocado has.  Now, the prior art to those is the AutoStore system.  We see it in Figures 1 through 4.  And the components of the robots, for instance, in the '602 and '051 that are described as prior art -- if we look at the next slide, slide 11 -- the two on the left are AutoStore robots.  This is Figure 3C from the '602 Patent and the Hognaland reference, which is cited on the face of the patent and is also prior art to the

Ocado system.

The one on the left is called the Red Line system; the one on the right, we often -- the center one we often refer to as Hognaland.

Now, you'll see in the Hognaland disclosure cavities in the middle.  It's a central-cavity robot.  And this particular figure, Figure 3 from that reference, prior art to the Ocado work, shows that there's the single bin in the center, the center bin, but the rest of the device takes up, in this case, less than two grid spaces, more than one.

Now, the one on the left, the Red Line, takes up two bin spaces, the body of the robot housing and then the cantilever bin location.

AutoStore also had the Hognaland reference, which is less than two bins, more than one space, and on the right we see what Ocado actually claimed and the only embodiments disclosed in the '602 Patent, and that's a single-space robot.

So the -- the issue over most of these claim terms, is Ocado limited to what it invented and disclosed, allegedly, to the patent office and is contained in every single embodiment in that patent, a single-space robot, or something more.

The patent talks about the alleged benefit over the prior art and again talks about how it's a single-space robot. If we look, this is Figure 7 from the patent.  The blue are the

prior art admitted robots.  That's an AutoStore Red Line.  It occupies two grid spaces, as shown in green.

On the I'll call it reddish-pink are the claimed robots.  Robot 100, that's the claimed robot in the '602 Patent.  That's Ocado's single-space robot.  It, notably, occupies only one grid space.

There's no figure anywhere in the patent, there's no description of any robot anywhere in the '602 Patent that's not the prior art where the patented robot covers more than one grid space.

So when we think about the terms we've got at issue, the single grid space issue is going to come up, but I'd actually like to step back for a second and just put the claim on the screen because I know several issues where I know Mr. Beeney and I will certainly agree, and the first of those is claim construction begins and ends with the actual words of the claim.  That is the federal circuit's proclamation in *Homeland Housewares*.

And I'm going to go to the document camera for a second, just put the whole claim up.

Because what sometimes happens, your Honor, when you -- when you're in a claim construction hearing is we spend so much time talking about this phrase, this word, this element, except we lose track of the sort of forest for the trees.  And so looking at the whole claim -- and in this

instance, I'm going to look at one limitation of the claim.

So when you read a patent claim, this is claim 1, which is the storage system; claim 12 refers to a load handling device or a robot.  So claim 1 covers the system that includes the robot; claim 12 covers the robot.

And you'll see it says "a storage system comprising."  That's called a transitional phrase in patent law and there are different ones you can choose to use.  Comprising is viewed as an open-ended transitional phrase, meaning there are various limitations or elements that follow that and you need to have each of those.

You could have something else.  So, for instance, you could bolt on four picking stations or you could have a second grid that was neighboring the other grid and you would still infringe this.

The classic example is, you know, an automobile with four wheels is the comprising claim.  Well, if I also have a steering wheel and a radio and a bunch of other stuff, I would still fall within the comprising claim because it's open-ended.

Now, we go down to the limitations and we have the last element, and that's where the action is for this argument.  It's an external housing that's shaped substantially in a cuboid, having two sides in the X- and two sides in the Y-direction.  So those are the four sides of the robot.

Now, if we see the part I've put in blue brackets,

that says that the sides of the robot in the X- and Y-direction, okay, have to have wheels that go no further in those directions.  So it sort of defines it now as having four walls on my robot and the wheels are in line with those walls of the robot.

And then it says "such that."  And this is why I want you to look at the whole claim, because it's often, I think, ignored in how Ocado looks at the claim language.

By having the robot have four walls and the wheels aligned on the rails, which comes earlier in the claim construction -- claim term on those, it results in something, such that a load handling device of the multiplicity of load handling devices -- that just means the device we're talking about of the many on the grid -- will occupy a grid space and will not obstruct a load handling device.

And then it goes on to say that traverses it in the X-direction or the Y-direction.

What we're talking about now for the first two terms of '602 all come out of that highlighted portion at the bottom which begins by saying because of the design of this robot, it will, such that it will occupy a grid space and not obstruct a device.

What we see from the Ocado side is an attempt to break this up and say, okay, what do each of these mean, ignoring the fact that this is all in one limitation that has

context and needs to be read together.  And the reading of this, the plain and ordinary meaning of this limitation as a whole, it has to have a housing with this shape, the wheels are on the rails, that's already set forth, the wheels have to -- the walls can be no further out than the wheels, and as a result of that, such that it will occupy a grid space and will not obstruct bots moving around it, either occupying the ones next to it or moving through the ones next to it.

So when we talk about claim construction, the law on this we shouldn't disagree about.  The claims define the patented invention full stop.  That's *Phillips*.  All of this is going to come from *Phillips*, the quintessential and leading case for claim construction for the last 18 years.

Terms of the claim are generally given their ordinary meaning, but claims must be construed in light of the specification.  Sometimes we call it the specs; sometimes we call it the disclosure.  It's the part of the patent that precedes the claim.  That's the specification.

I have found from enough transcripts I resort to calling it the spec, so I apologize in advance.

THE COURT:  Understood.

MR. LOCASCIO:  That's what I mean.

THE COURT:  Understood.

MR. LOCASCIO:  But claims must be construed in light of the specification, which is, according to *Phillips* itself,

the single best guide to the meaning of the disputed term.

Now, the Court can refer to what's called extrinsic evidence and the reason intrinsic evidence and extrinsic evidence are different is if you think about what a patent is purporting to do and why it's a question of law, it's essentially a deed.  It says you have a property right for a period of time in this scope and everyone else in the industry, or other inventors, need to be able to understand and know what the scope of your deed is.  Sort of like if your neighbor was trying to figure out where he's going to build his shed, he could go down to the records office and figure out, where is my property line, where's my neighbor's property line, so he doesn't end up on the wrong side of the line.

Now, intrinsic evidence is all readily available to someone looking at it.  It's the patent itself.  Okay? Intrinsic evidence is the claims plus the specification plus the file history and other exchanges with the patent office. Reason being that in negotiating to get your patent, if you say something to the government, one, that will limit the claim, potentially, but, two, it's available to the neighbor, for someone else to look at it.  Extrinsic evidence is not.  It's also typically not contemporaneous.

So, for instance, if the parties have experts that come in and say, here's what I think a term means, well, that's extrinsic evidence.  If someone wants to point to some

literature or dictionaries, all something the Court can look at, for sure, but extrinsic evidence can be used -- *Phillips* again -- to better understand the underlying technology and the way in which one of skill may use the terms.

THE COURT:  Yeah, this stuff I'm on.  I'm good with this.

MR. LOCASCIO:  Okay.  But it cannot contradict or override the interest.  That's the key takeaway on this, your Honor.

So when we look at how this fits together -- we'll now go back to the slide deck.  Hopefully this time the switch will -- great.

The first term we're here to talk about is one of those phrases that follows "such that," meaning it will occupy a grid space.

THE COURT:  Let me check my notes here a minute.  I want to keep up with you.

MR. LOCASCIO:  Of course.  I'm on slide 14.

THE COURT:  Yeah, I'm not so much on the slides. I'm on the claims.  Give me a minute.

MR. LOCASCIO:  Of course.  So this presents in two claims, your Honor, claim 1 and 12 of the '602 Patent.

THE COURT:  Thank you.

MR. LOCASCIO:  So the phrase in the claim is "such that a load handling device will occupy a grid space."

And where this -- the dispute here is, frankly, both of us, if we didn't know from the claim -- from the proposals that the parties had sent back and forth and from our other exchanges with Ocado that this would be in dispute, I'd happily say, yeah, the plain and ordinary meaning of "occupy a grid space" is occupy a grid space, meaning occupy one grid space.

That's where we have a dispute. They say the plain and ordinary meaning is occupies more than one grid space or at least one grid space or anything less than two I think is -- they don't say that, but I think that's as far as they're willing to go with what they think it means. What it means is it occupies a single grid space.

And their basis for this, their argument as to how you get there, is they say, well, as a matter of claim construction, they say there's a default that says "a" means one or more, which they then sometimes say at least one.

Now, the basis for that, the support for that legally, they point to a case called *Crystal Semiconductor*. Now, *Crystal Semiconductor* walks through -- recall when I showed you the claim, I said it was a comprising claim. And that's a broad term. And it says my -- my car with four wheels can also have six wheels. Still be a car with four wheels.

In *Crystal Semiconductor*, the Court says -- the Court has construed -- consistently emphasized an indefinite article "a" or "an" when used in a patent claim, talking about

it as one of the elements --

THE COURT:  I think the reporter's having a little trouble keeping up.

MR. LOCASCIO:  I apologize.  Thank you, your Honor.

THE COURT:  That always happens when you read stuff. And I do the same thing, but let's --

MR. LOCASCIO:  I will.  I appreciate the second one. I'll try not to have a third.

THE COURT:  All right.

MR. LOCASCIO:  It can mean one or more in claims containing an open-ended transitional phrase such as comprising because if you have elements, you can add other elements, meaning if I said I mean "a" wheel, that could mean one or more wheels.

But the same case says -- in that case, the claim was -- there was a first clock signal and a second clock signal and the battle was do those signals need to come from the same clock, meaning is it "a" clock or more than one clock.  And the Court said, well, it could mean one or more, unless the written description or the prosecution history clearly limits the claim to its recited elements.  You have to look at what the written description and the figures say.  And then the Court says the written description and the figures actually disclose two clocks.

So it wasn't surprising that in that case it could

mean one or more.  No.  They act as if -- as if this is the end all be all and is always the case, except, for instance, *Harari v. Lee*, federal circuit 2011 656 F.3d 1331.  The case, the *Crystal* case they cited, is 2001.  Later on there was a federal circuit case, *Baldwin*, in 2008.

And in *Harari v. Lee*, federal circuit said: *Baldwin*, however, does not set a hard and fast rule that "a" always means one or more than one.  Instead, we read the limitation in light of the claim and specification to discern its meaning.  And they cite a case, *Insituform*, that said "a" vacuum cup means one and only one vacuum cup.

And we don't disagree about the case law because all of it says to construe the claim, you have to look at the specification to decide if "a" here means one or, as they say, one or more than one.  You have to look at what actually happens in the disclosure or the spec.

It's also notable when Ocado filed the complaint here, they describe the '602 Patent and they themselves refer to their invention as a single-space bot, SSB, single-space robot, single-cell robot, something occupying a single grid space.

Now, because I don't think this is going to come as a stunner to your Honor, AutoStore does not make or sell a single-space robot.  That's why Ocado wants to have their claim construction cover something more than a single-space bot,

because if it doesn't and it is limited as the claim terms read, as the specification discloses, to a bot that fits within one grid space, a single-space bot, well, they don't have an infringement case.

Now, the Court's construction is independent of infringement or other things, but at base, that's why this is a dispute.  That's why plain and ordinary meaning doesn't cut it here, because the question is is their invention a single-space bot as they themselves in the complaint said it was or is it something broader than that so they can contend AutoStore infringes.

The specification -- I don't think it could be clearer.  I -- I give them kudos for trying to put a lot of weight on the word substantially.  Their argument is essentially the specification which doesn't disclose any embodiment that shows a robot, that's the invented robot, covering more than one square in the grid.  They say, well, sometimes we have the word substantially in there, so we think that somehow changes it.  Except the specification, the claims say occupy a grid space.  And the specification says -- those are two examples.  The first one, column 5, lines 38 to 47, the load handling device of the invention occupies the space above only one stack.

And they say why this is the advantage of the invention is in contrast to the cantilever design shown in

Figures 3A to 3C.  That's the AutoStore prior art device which is the bot that's cantilevered.

THE COURT:  You're taking up less space on the grid and not -- you're avoiding collisions.  I get it.

MR. LOCASCIO:  Correct.  Now -- and it's not just 1.9 is more space on the grid.  The point is if you look at the -- the claim term as a whole, we'll get to the other limitation in a second, the benefit as they style it is you can minimize, meaning have as few as possible, interferences so that bots can run right next to each other.

In all of their promotional videos, and they're slick and they look great, the bots are whizzing past each other, they're right next to each other, and every one of them, of course, is a single-space bot, as they contend.  The benefit of the invention is it occupies a single place on the stack.

Now, they also often in the claim say the present invention or the invention, and that means something.  So when you draft patent claims, patent drafting 101 is leave yourself some elbow room or some ambiguity if you think you invented something that's got breadth around it because you don't want to limit yourself because the claims must be supported by the specification.  What that means, your Honor, is I can't draft claims that don't find some written description and are not enabled by the language I gave to the public in my specification.

And so often you'll see words like "a preferred embodiment" or "in different embodiments" and then at the end there's usually some language that says one of skill would know you could do this with a screw or a nut or a fastener or any other capable technique of fastenings these things.

Now -- or you if you -- but if you specifically have an invention, and often where there's prior art you need to get around, as the case here, well, then, your claim has to be narrower and your disclosure in this case would be narrower.

And it says this is my invention; the present invention is this. And in this specification, they do just that. Where an inventor uses the phrase "the present invention" and no embodiments contradict that at all, that's an argument that, okay, even if you want to try to argue the plain and ordinary meaning is somehow more than one space on the grid, well, you've -- you've disavowed that.

And in response, in the opposing brief from Ocado, their only real answer to *Wastow*, they say, well, it's an unprecedential and nonprecedential decision, as if this is some outlier. Except it's not. The cite in our brief to *Wastow* actually cited to the *Verizon* case and *Verizon* is -- I have that for your Honor's benefit as well. I think I do. There it is.

*Verizon Services vs. Vonage*, 503 F.3d 1295, which says where you use the phrase "the present invention," well,

that limits you to what you actually follow the words "the present invention" with.

There's also another case cited therein.  That case is *Poly-America*, 839 F.3d 1131.

Both of those cases are most certainly precedential.  Ocado knows they are.  They know this is the law.  And their only effort to get around this was sort of a hand wave to say, well, that case is nonprecedential.

Their disclosure here says the present invention is a single-space bot.  They also say "the invention" repeatedly.  They don't use words like "it may be" or "in one embodiment" or "preferably" it's a single space but could be others.

They also in related patents -- so the law around this is if you make statements in prosecution in related patents in the same family, they are relevant also to construction.  Two different instances where during prosecution of patents in the family, Ocado said their -- Hognaland -- now, remember, if you remember back to that slide where we had three images, the middle one was prior art AutoStore Hognaland, which was a center-cavity bot, but it didn't -- that figure showed the robot going into two neighboring cells by about a quarter in each direction.

And they told the patent office when faced with Hognaland, which is cited in this case, '602, and in the related cases, they say it doesn't disclose an embodiment.  It

has a footprint that occupies only a single grid space.

THE COURT:  You know, it's different -- the little wheel overhang, though, is different obviously than the arm, right?

MR. LOCASCIO:  Uh-huh.

THE COURT:  What should I do with that?

MR. LOCASCIO:  Well, so, if I could -- just let me show you.  I want to make sure we're talking about the same thing about the little wheel.

So if I go to slide 11 --

THE COURT:  Yup.

MR. LOCASCIO:  So Hognaland is the center one. That's a robot that in this figure shows more than one grid space on both sides.

Now, when you say a -- this overlap, this is not a cantilevered robot, the Hognaland.  It's prior art to Ocado's system and Ocado's robot.

On the right side --

THE COURT:  I'm talking about the wheels on the inside track on area 7, right?

MR. LOCASCIO:  Yes.  So --

THE COURT:  That -- like that's right around the edges of the -- of a grid space, whereas the other wheels, I understand those are way over.

MR. LOCASCIO:  Yes.  So are you looking at, for

instance, on the right figure here, the invention as disclosed in their patent, the wheels being outside of the housing in that figure?  That's actually an embodiment from the patent. The wheels --

THE COURT:  That what I'm saying.  Is it -- is it an important distinction, just, you know, that the wheels barely -- you know, they're going over the grid space just enough to roll along the tracks.

MR. LOCASCIO:  Yeah.

THE COURT:  And that's different than the whole arm on Figure 3C.  That's a whole -- that's two spaces, basically.

MR. LOCASCIO:  Correct.  So it is what I -- how I'd answer that is let me show you slide 31.

THE COURT:  In other words, does de minimus not matter?

MR. LOCASCIO:  So --

THE COURT:  Sorry to confuse --

MR. LOCASCIO:  No, you're not confusing me at all. You're spot on.

This is -- so here's another image that's accused of infringement.  This is an AutoStore robot.  It is not a single grid space.  It has hardware and guts and things that span beyond that grid space and you see it goes, in this case, kind of up and to the right.  Okay?  Under Ocado's version, this is occupy a grid space.

Now, here, the wheels are always on the track.  The wheels are always outside the bin space.  It comes down to -- and during prosecution -- let me show you a slide that is slide 32, please.

On the left we have the prior art.  You obviously recognize there's no way on earth that's "occupy a grid space" because it's two grid spaces.

The expert from Ocado, in front of the patent office, to try to avoid institution and invalidation of this patent, says -- and is consistent with his opinions here and their arguments.  They say, well, the robot can overhang one side in the X side and one side of the Y.

We'll get to this in a second as to why that's not the case, but the wheels, you'll see, are always on the rail.  The -- the space that's gray on these figures is the space the bin fits in.  And during prosecution, where they said substantially it doesn't mean anything different than one grid space --

THE COURT:  Yeah.

MR. LOCASCIO:  -- there was some discussion in front of the European Patent Office in their own submissions about, okay, there's always some tolerance around the edges and the wheels are on the rail.

And so it becomes a question, your Honor, if the parties aren't proposing constructions for grid space, my

construction of grid space is it includes the rail.  And so while the wheels are on the rail, the robot's in the grid space.  They say it occupies substantially some of that grid space.  That might be because there are some parts of the rail that don't have a wheel on it, for instance.

The point is the bin has to come up into the robot and so the cavity fits over the bin space.  The bin, of course, must be slightly toleranced larger than the bin -- or, pardon me, the cavity -- because otherwise the bin couldn't get in it.

THE COURT:  Yup.

MR. LOCASCIO:  And the wheels are on the rail.

And so I don't think their argument is, well, the robot is slightly bigger than the opening the bins come in and that's why they're saying it can be more than one grid space to accommodate the wheels.  Their point is they want to accommodate the robot that isn't only in that grid space defined by the rails but is actually in the grid space next to it, which is what they're accusing of infringement.

Have I answered your question?

THE COURT:  Yeah.  Yeah.

MR. LOCASCIO:  You look like you have another, though.

THE COURT:  I don't.

MR. LOCASCIO:  Okay.

THE COURT:  I've got a million, but we're not going

to do that.

MR. LOCASCIO:  Okay.

THE COURT:  If I do that, we're never getting out of here.

MR. LOCASCIO:  Sure.

So if we can go back to slide 18, which is where I was.  Thank you.

And so in describing the difference between the prior art, Hognaland, which was the center-cavity robot that we saw in the center figure of my three figures, that was also an AutoStore design, that's -- and the figure spans into the neighboring grid spaces slightly.  They said, look, that isn't a single grid space and they contended their claims and their invention was a single grid space.

Now, their response to this is, well, in those cases, the claim itself said single grid space.  The invention is the same invention.  What did they invent?  And when talking to the patent office, they said -- we invented just like they said in the complaint here -- a single-space bot.  And those statements and prosecution are relevant in construing the terms.  There's not a dispute over that.  It's a question of law.

They also told the patent office -- now, you asked about the '051 and the interplay between the patent office and this court and so for the last, I'll get it wrong, but we'll

say seven years or so, we've had this process where the patent office will handle what's called IPRs, inter partes reviews, with a look at the validity of a patent, often while parallel cases are going on in court. And so as a patent owner, this has made things a lot harder because now your patent's at play in front of the patent office while you're in your case.

But the real challenge is consistency. Because if I'm going to argue in district court that the claims should be brought, well, if I go argue to the patent office that the claims are going to be brought, more prior art is going to get swept in and the chances of my patent surviving are much lower.

And so it sort of holds your feet to the fire; okay, what are the boundaries? And the patent office in this -- looked at the '602 Patent, did not institute and didn't institute because -- for a host of reasons, but one of the things they said was, okay, this is what Ocado told us about their patent, what we have on the screen here in slide 20. They described the patent as occupying a single space on the grid.

So to get the patent office to not institute and not have their patent be challenged there so its validity is only going to be addressed here in the court, they told the patent office themselves that the robot has a reduced footprint, i.e., it occupies a single space in the storage system.

The patent office agreed. They said, we don't have

to ultimately construe this question, but in describing the patent they pointed to the same passages in the specification that Ocado tries to avoid now that says to achieve this goal, the '602 Patent discloses a load handling vehicle that occupies the space above only one stack of containers in the frame in contrast to prior art vehicles that occupied the stack -- the spaces above two stacks.

Well, Ocado's argument is we agree with the second part, but we want everything up to that.  We want the bot that's 1.9.  Except they didn't disclose that, they never showed that in any embodiment, and they themselves called it a single-space robot.

They put, as I said, a ton of weight on substantially.  They say that's where -- because you have to disclose it in the specification to be able to say it's covered by your claims.  It has to be within the scope of the description.

And they say, well, we occasionally say substantially one space.  Except occupying substantially one parking space doesn't mean that -- it certainly doesn't necessarily mean that I'm hanging over the outside.  It might mean that I have a -- like we have one SUV and then we have one smaller car.  The SUV occupies substantially the parking space.  The smaller car probably occupies half.  It's a lot easier to park.  Okay?

Substantially means, by default, less than all. It doesn't mean inherently more than it, but it certainly can't contradict and change the language. And when looking at what they said, Ocado, to other patent offices -- so this patent -- Ocado is a British company. Ocado's original patent application was filed in Great Britain. This patent disclosure here, the '602 Patent, claims priority backed status, meaning it isn't any broader in scope than the British application or you wouldn't have that priority date. You want an early priority date, your Honor, so you avoid later prior art. So the goal is to get as early a date as you can.

During that exchange, they said it occupies one space in the grid repeatedly. This is the original application in Great Britain. And then they later on said substantially to the European office doesn't mean anything different than a single grid space.

So this is the passage I was talking about. Repeatedly to the European Patent Office, Ocado said -- this is their own filing -- there is no difference in meaning between occupies substantially only a single grid space and occupies only a single grid space.

So if occupies only -- I don't think there's any argument that occupies only a single grid space is what they're now arguing. I think it's the opposite of what they're arguing. And they told the European Patent Office that

substantially meant nothing different and then they went through it because there's tolerances, to your point. It might be some, it might not be the whole thing, but it's certainly not a second grid space.

So there's also a problem of their proposal, to your point, of how does this play out. We asked their own expert, okay, there's got to be some objective metric of what this thing means if you think it means more than one. And he says something less than two is his proposed construction.

Now, they say plain and ordinary meaning, but this is where they are and he says, well, where does the patent teach any of this? Okay. Does it teach a one and a half grid space? No. What if it's 1.49? He said, I can't tell you exactly what that number is without looking at the design, meaning I'll tell you if it infringes when I see the accused product. That's the opposite of how claims are supposed to be construed and why claim construction is a question of law to be determined by the Court.

And the last thing I'll say is they've -- they suggest sometimes -- actually, we'll get it in the no instructions section that, well, if it's one and a half or less, two bots can pass each other one row away from each other. Okay, except you didn't show that, you didn't disclose that. And that's certainly not minimizing the interference nor is it now consistent with the next limitation we're going to

talk about that says that same "such that" language that we showed, the whole of claim 1 --

THE COURT:  What do you mean, it's not minimizing interference?  Because to minimize interference, that means you've just got to be on one grid space?

MR. LOCASCIO:  So as the -- as described in the specification, the -- minimizing interference and allowing unfettered flow, where you don't hit the neighboring one means you're in one.

THE COURT:  One.

MR. LOCASCIO:  And the claim itself -- that's why I want to come back to the whole claim.  Recall the claim language for claim 1 of the '602 Patent says, okay, the housing can't be any further out than the wheels, meaning the housing can't stick out past the rail because if it does, now I'm going to block another bot from passing by.  And because of that, such that the device will do two things, it will occupy a grid space and will not obstruct a load handling device, another robot, occupying or traversing, meaning it's either -- it will not obstruct a robot sitting in to take a bin out or moving through an adjacent grid space in the X-direction.

Now, the X-direction is not one way.  If we -- I've got a middle schooler, so we're doing some graphing at home. And X axis, if you remember this, runs in both direction, your Honor, and then the Y axis runs in both the other way.

In the X-direction, this way, it will not block another bot from being there on the grid occupying it or moving through it, traversing it, and then in the Y-direction it won't do it.

Now, we're now on the second limitation because Ocado -- to get around the problem of trying to accuse a bot that doesn't fit on a single space, not a -- let me back up.

They started this case by saying they had a single-space bot path. We don't have a single-space bot at Ocado -- at AutoStore. So to try to now get this claim, based on a disclosure that only says we invented an invention that's a single-space bot to cover something more, a grid space doesn't mean one and then this limitation they even take further from its original and actual language.

Because they say what this really means is one X-direction and one Y-direction has to be clear, meaning I have to be able to -- bots have to be able to move past me on, let's say, the top and the left, but I can block the right and I can block the bottom all I want.  Okay?  That's not certainly what's disclosed, but it also isn't even consistent with the language of the claim itself.

So if we go to the slide deck again, slide 26, they say -- now, to the conversation we started with, this is perhaps one of the most glaring examples of this *O2 Micro* scenario.  They say there's no construction necessary, plain

and ordinary meaning.  And what Ocado wants to then do is say a bot that blocks one of the adjacent cells from being occupied or traversed is somehow within the construction of not obstructing a bot from occupying or traversing an adjacent grid space in the X- and Y-direction.  Okay?  That's the opposite of their -- what they're claiming, but they say it's plain and ordinary meaning.  And it's just on its face not, but let's look at how we get there.

This is the claim language we just looked at.  It has to both occupy a grid space and as a result not obstruct a load handling device.  That's what the claim language says.

They talk about the benefit over the prior art.  This is a top view of the prior art AutoStore Red Line.  Obviously it blocks the cell, my framing to the top or one or the Y directions.  It did not block occupying or traversing the left or the right or the bottom.  And they told everyone in their disclosure at Ocado the advantage of their single-space bot is by occupying only above one stack of containers, it is more efficient, the storage system can be improved, and the reduced footprint allows more load handling devices to be accommodated and reduces the likelihood of one device obstructing the optimum path of the other one.

Well, the only cell, the only grid space, that was being blocked by the prior art they contrasted their invention to is that guy on top.  It was free to maneuver, occupy, or

traverse on three sides.

So AutoStore's construction is the adjacent grid spaces cannot be obstructing in either the X- or the Y-direction. And because we knew this was a dispute from what they're trying to claim is infringing, we said the construction to be given the jury should say it will not obstruct a load handling device occupying or traversing any of the four adjacent grid spaces, meaning top, left, right, and bottom, because that's what the claim says with the X and Y. They try to say it's only two. This is a heck of a lot clearer in what it actually means.

And on this point, I want to -- there's a -- there's a bit of a sleight of hand. I don't mean that pejoratively, but there's a -- the claim gets twisted by Ocado.

If you look at their briefing on this, this is page 26. I think this is their second brief. I will confirm.

They start off where you have to start off. The claim says it must not obstruct a device occupying or traversing an adjacent grid space in the X- or Y-direction.

But then at some point they change the game and now it is not so much it's the bot that's stationary, the bot that's active on a bin, is it obstructing one of the ones around it, now it's -- the ordinary meaning of the term is that the robots must be able to pass one another on at least one side.

That's not what the claim says.  The claim doesn't say two bots must be able to pass each other on one side.  And the -- the result of this is what they've done is they have taken the claim and broadened it from having four spots free to having two spots free.

And if you look, the way they say they get there is this, again, idea that "a" or "an" means at least one, except logically that's not true either.  They have to change it from not obstruct to make it pass to even have their logic pulled up.  Because if we look at the claim:  It will not obstruct a device occupying or traversing an adjacent grid space.

Their alleged basis is that, well, an adjacent grid space should be one or more grid spaces.  Well, that doesn't get them where they want to go.  Because if I say do not obstruct one or more grid spaces, well, that means you can't obstruct one or two.

But if now I change the game and I say, well, allow me to pass on one or more sides, which is not what the claim says, well, that, I think, is the sleight of hand.

And if you look at this, I -- I took -- you recall in their brief, it's page 28 of their first brief, docket number 128, by the way.

What we have on the top is the claim language showing no obstructions in the adjacent X- and Y-direction.  If you take Ocado's position that you replace "an" with one or

more, you'd have the exact same outcome; you can't obstruct any of those four.

Ocado's construction changes "not obstruct" to "allow a device to occupy or traverse one or more."  That's not the claim, that's not their invention, and it's certainly not disclosed anywhere in their specification, this two-grid-blocking bot that their construction would allow to exist.

Go to slide 32, Emily.

Their own proposal would lead to a bot that is more likely to create obstructions than the prior art they were distinguishing against.  And so that's why this claim term requires an adjacent grid space not be obstructed.  And because of the, I think, efforts they're taking to try to avoid this claim, it should be construed because its ordinary meaning is do not block any of the four.  Because of what's going on with the dispute between the parties, it should be clarified and made clear that Ocado's proposal was incorrect and the actual construction is it does not obstruct a device occupying or traversing any of the four adjacent grid spaces.

And then the last point I'll raise, your Honor, is the '051 Patent.  So it's a different patent.  It's related.  It's in the same family.  It uses slightly different language.  It talks about two bots and says one has to be less than twice the area of the grid space.

And while I agree that the ordinary -- plain and ordinary meaning of that term, unlike the others in the '051 Patent, that talks about the area, and it does say it's less than twice the area, but we come back to the same principles that what you invented ultimately has to control and what you disclosed in your specification matters.  And it's a related patent, so all of the other exchanges we looked at are all relevant to the construction of '051.  And each of those pieces of intrinsic evidence support the idea that while they might have included this "less than twice the area," the actual invention they have and the only thing they're entitled to is a single-space robot.

And in the event that that claim language, that your Honor views that as broader and not narrowed by everything else in the specification, like that might be an issue for the '051 Patent.  It is not -- I actually think they asserted the '051 Patent to try to have that phrase, like, wash over the shore and take out the '602 Patent, which is clearly a single-space bot.  Because the language of '051 is -- is not the same as the language in '602 and it does not dictate anything other than what happens with the '051 Patent.

THE COURT:  Well, see, this is one of the problems for me.  What -- I'd like you to answer this in the sort of legal abstract and then as applied to this case.  Okay?  I think I know the answer applied to this case, but I still want

to talk about it.

And then I'm going to ask you the same question.

I know I'm kind of knocking off the schedule here, but I still want to know.

Like does the plain language control above all else? You know, when you've got plain language indicating one embodiment, right, something like of a size between one and two grid spaces but not limited to one, right, but the embodiments and the spec and the videos of the invention at work suggest that it's only one space, as a matter of law, what's the Court do when you've got that conflict?

And here I think I know what you think I need to do, but I want to hear you say it anyway.

MR. LOCASCIO:  Sure.  As a matter of law, let me make clear what's in their commercial videos or what's in their commercial product, like, that's not -- that doesn't dictate what you do on claim construction.  I want to be abundantly clear about that.

But for the -- your question is law as to how you apply these claim terms.  The language of the claim controls, but it begins and ends and must be construed -- this is *Phillips* -- in light of the specification, which is the single best guide to the meaning of the term.

And so that's why the cases -- and we cited some, I can get your Honor a couple others, that say if all -- the only

embodiments ever disclosed are of one thing and you specifically say, as they did here, the present invention is -- my words, not theirs -- single-space bot, if you do that, you can disclaim and disavow anything broader than that.

If, though -- the other way this -- this becomes a double-edged sword because let's say that the plain and ordinary meaning of a grid space, we all can agree, is a single grid space. The plain and ordinary meaning of don't obstruct anything in the X and Y means all four of those have to be free. But then your Honor looks at '051 and says, well, the plain and ordinary meaning of that phrase in that patent, it's a different term we're asking you to construe, could maybe be slightly more than one.

Well, how is your Honor supposed to deal with that? And the answer to that is first and foremost as a matter of law it might be construed in the light of the specification, what they told the patent office, and disclaimers they made in related patents, what they told the patent office in PTAB proceedings, and we think as a matter of law under that it should be construed as a single grid space.

If your Honor said, well, on the first two you had me at hello, but on this guy I'm not so sure and I think the language of '051 might mean it's slightly more, what happens there and why the claim construction is supposed to be based on what the specification says is because it has to support it.

51

And so even if they were to get that claim construction for '051, what they would then be faced with is a claim that's likely invalid because you didn't disclose to anyone, there's no written description, another requirement under the patent act, for any such thing.

And so often courts will say, well, can I consider that, whether there's a written description to support the claim when I'm construing it, and the answer is it's already inherent in *Phillips* because *Phillips* says you must construe the claims in light of the specification.

And the specification, to be clear, of '051, is identical to the specification of '602.  There is no place in the specification that shows the second type of bot, the single-space bot, being anything more than one space on the grid or occupying anything more than the area of one space.

And so that's why we think on the '051, although it would be readily apparent, the '051 question is a tougher question and one that requires the Court's analysis to say, okay, I do have to look at what you actually said you invented and what you disclosed when construing that phrase that refers to area as opposed to the bot chassis or housing and whether it occupies a single grid space.

Have I --

THE COURT:  All right.

MR. LOCASCIO:  Have I answered your question?

THE COURT:  You have.

Mr. Beeney, same question.  Do you want me to repeat it again?

MR. BEENEY:  No.  No, your Honor.

THE COURT:  Okay.

MR. BEENEY:  So, your Honor, the claim language here is not just a question of plain and ordinary.  It's a question of the fact that in patent language, it has a well-understood meaning.  And I'll explain that to your Honor.

THE COURT:  I get it.

MR. BEENEY:  That is not the end of the story, however, because there is a doctrine of law called disavowal.

THE COURT:  Yup.

MR. BEENEY:  And if AutoStore, which bears a very heavy burden, and I'll get to some of this in some detail, if I may, during my presentation.

THE COURT:  Of course.

MR. BEENEY:  If AutoStore can show your Honor that there was clear disavowal of the well-understood term in the patent claim, then your Honor can construe the patent claim to mean something different.

But that burden is extremely heavy.  The words that the federal circuit uses for the doctrine of disavowal are quite stark, and what I hope to show your Honor is that there's nothing in the specification that comes close to meeting

AutoStore's burden under the law of disavowal for your Honor to construe well-understood patent terms to mean something different than what they're well understood to mean.

THE COURT:  So you're basically -- but I don't mean this in a challenging way, but you're basically saying that, like, my premise -- my premise is what do you do when plain language indicates one embodiment, but other things, right, embodiments, specs, video, all that stuff, showing it at work suggests something else.

You're saying, well, it's not a plain language question, right, at all to begin with.  So what's the legal answer to my question?

MR. BEENEY:  It's not -- it's not a level playing field when you look at the claim language.  Because as the federal circuit said, and I believe AutoStore just conceded, the federal circuit has said that occupy a grid space, the word "a" is not limiting to one.

So when -- when patent people use the -- the word "a," occupy "a" grid space, in normal usage that means one or more than one.  So that's the presumption, that the inventors used the words as patent people use those words to mean more than one.

So is that the end of the story?  No, your Honor, it's not the end of the story, because we have the doctrine of disavowal, the law of disavowal.

THE COURT:  Yeah.

MR. BEENEY:  And so AutoStore has to show you that the inventors, when they selected that word, didn't mean it to mean what patent people normally mean when they select those words.  How do they do that?  They have to go to the specification and show your Honor that that ordinary, well-understood, typical meaning was disavowed.

And I'll show your Honor the cases, but the burden of showing you that is nothing like this specification which talks about designer choice and using different size robots and all sorts of other things.

So the issue for your Honor, respectfully, I believe, is we start with the idea that the inventors used the language the way patent people mean the language to mean and your Honor should construe it that way as to mean more than one because that's the way that language is used by inventors and that's the way everybody understood -- understands that language to be used by inventors.

The next question is has AutoStore met its very, very heavy burden to show disavowal, and what I hope to show your Honor in my presentation is they have not met that burden.

THE COURT:  Understood.  All right.

MR. LOCASCIO:  I just want to finish this up, your Honor.

THE COURT:  I'll let you wrap up.  Yeah.

MR. LOCASCIO:  Thank you.

THE COURT:  Kellie, how are we doing on time in terms of 90 minutes?

THE CLERK:  It'll be 10:45, your Honor.

THE COURT:  Okay.  We're good.  Keep going.

MR. LOCASCIO:  Sure.  I just want to wrap up with this question of '051 versus '602.

And it's Ocado's position -- I understand why they want to make this their position, that we've got to somehow overcome some steep burden.  Not so on '602, your Honor.

On the '602 Patent, plain and ordinary meaning of the term "a" grid space is one grid space.  The suggestion that we've heard now that, well, no, no, we've agreed it means one or more.  No.

If we look at claim 1, the language of all the cases that Ocado or anybody else decided on this issue say comprising the open-ended language.  And when you used in a comprising claim, "a," for an element, means one or more, meaning -- you see how it says "a first set of parallel rails for this limitation," but it also says "a lifting device."  That means, yeah, you could have two sets of parallel rails.  It doesn't define the grid size.  That's what "a" meaning one or more means.  It's my four wheels, could be six wheels.  If my car had limitations, it said a car width comprising a wheel, could be two wheels.

Except look at where -- what Ocado's trying to do is saying that -- that principle of law which applies to limitations, for instance, or elements like this "a" or "an" over here, well, we want to take this guy right here in the middle, occupy a grid space, and apply that same comprising concept to that.  It -- that's not what the law they cite stands for, but it also, as I've pointed out in several cases, says what matters ultimately is the context of the claim and how it's used.  And the language right above it makes clear that this is a single-space bot, as they recognize.

And then the last thing I'll say is so for the '602, plain and ordinary meaning, no higher burden on us over here on the AutoStore side; it's one grid space and you can't obstruct things in either X- or Y-direction.

And the -- the reason that language is not a specific element is because that follows "such that."  It says the element is a housing and a housing has to have sides that are in line no further than the wheels, such that two things occur by that and that alone.  One is occupying a grid space; two is it's not going to interfere with its neighbors.  It doesn't mean now we get to broaden or play with or change those definitions under this theory they want to point out that "a" can mean one or more.

'051, I agree.  The '051 language does require a disavowal.  '602 does not.  There's no higher burden.  It's

what does it actually say, let's look at the specification.

'051, they say the burden is super high, it never happens. The cases I cited to your Honor, *Verizon* and *Poly-America* -- *Poly-America*, the federal circuit says: While disavowal must be clear and unequivocal, it need not be explicit. For example, an inventor may disallow claims lacking a particular feature when the specification describes the present invention as having that feature.

And then *Verizon* says the same thing.

Thank you, your Honor.

THE COURT: Thank you.

Mr. Beeney, you'll be interrupted here, but only because at 90 minutes I give the court reporter a little break and we'll take a little break.

MR. BEENEY: Absolutely, your Honor.

THE COURT: But you'll get your full time.

Are you guys still running a timer, keeping score? I'm assuming you are because I'm not.

MR. LOY: Yes.

THE COURT: Yeah. So how did you do? How did he do? Did he go over or --

MR. LOCASCIO: I have a hunch.

MR. LOY: A little over.

THE COURT: All right. That's all right.

MR. BEENEY: So good morning, your Honor.

THE COURT:  Good morning.

MR. BEENEY:  Before I begin, I just would like to introduce the Court to Lucy Wojcik, the chief intellectual property counsel of Ocado, who's here this morning.

MS. WOJCIK:  Good morning, your Honor.

THE COURT:  Welcome.

MR. BEENEY:  Thank you, your Honor.

And, your Honor, if I also can start by answering, I think, the other question, if I understood it, that the Court had about the wheels and how to deal with --

THE COURT:  Yeah.

MR. BEENEY:  -- wheels coming over the --

THE COURT:  I was thinking of it more, you know, wheels versus the arm, you know, the extension.

MR. BEENEY:  Yeah.

THE COURT:  It seems to me to be two different things.  Like, are the -- the wheels seem de minimis, but there is also a potential for, I guess, interference and collision.  Or is there?  Like, that's, I guess, what I'm asking.  Can wheels be on the same track at the same time?  Do you follow me?

MR. BEENEY:  Actually, that's a good question that I intend to address --

THE COURT:  Good.

MR. BEENEY:  -- your Honor, because there are

59

several different iterations of tracks, which is why the presentation your Honor just heard about, the prior art, is entirely --

THE COURT:  Was completely irrelevant.

MR. BEENEY:  Well, it's incorrect, actually --

THE COURT:  Okay.

MR. BEENEY:  -- as well as irrelevant.

But as to the -- as to how your Honor should consider the wheels, the patent actually answers that question, your Honor --

THE COURT:  Okay.

MR. BEENEY:  -- because at 9 -- in the specification at 934 to 41, it talks about the wheels coming out a little bit, as your Honor has observed, but it refers to that as a single-space robot.

THE COURT:  Okay.

MR. BEENEY:  And obviously the two-space cantilever robot, that also has wheels that come out a little bit, but it's still a two-space robot.  It's not a three-space robot.

So the way the patent answers that question, if I understood your Honor's question, the wheels, even though they come out a little bit --

THE COURT:  Are still single space.

MR. BEENEY:  Exactly, your Honor.

THE COURT:  Okay.  So just as a matter of -- you

know, not as a matter of construing the claim but just sort of as a matter of how to put this, like, operation, can two -- can two bots be right next to each other, sharing -- are they sharing a rail or sharing a grid arm?  Do you know what I'm saying?  Can that happen?

MR. BEENEY:  Let me, if I may -- and I'm going to, with your Honor's permission, ask Mr. Lemanski to help me with the slides every now and then.

But if we can get to slide 71, and I hope that will answer your Honor's question.

THE COURT:  My law clerk's telling me, yeah, it can. He sent me a message.  Okay.  He definitely noticed something I didn't, which is not unusual.

MR. BEENEY:  Right.

So, your Honor, this is our diagram.  This doesn't come from the patents.  This is our diagram.  But these are three different configurations of rails on top of the grid space.

Before these patents, the prior art rails are the ones that your Honor sees on the left.  They're called single rails.  And because they are single rails, and because -- if I can show your Honor here, once a wheel occupies that space on the single rail, a robot can't be in an adjacent grid space.

So on the prior art, pre-'051, '602 Patents, no robot could pass on a single grid space under the prior art

robot that's disclosed in the patent because once a wheel is occupying that space, if -- if that wheel is occupied by a bot over here, your Honor --

THE COURT:  Yeah.

MR. BEENEY:  -- you can't have a bot over here because there's no space for the wheel.

THE COURT:  Right.

MR. BEENEY:  The wheel's already being occupied.

THE COURT:  The track's -- the track's already being occupied.

MR. BEENEY:  Exactly, your Honor.

So what these patents invented was this double-double wheel configuration here so that bots, robots, can pass adjacent to each other.

THE COURT:  Uh-huh.

MR. BEENEY:  And I'll explain to your Honor when I get to the claim limitation that this is relevant to what -- what that figure is on the right.

But I think important to your Honor's question is that prior art -- no bot could pass on an adjacent grid space.

And to, you know, jump ahead a bit, even if your Honor looks at what is, I believe -- sorry, what exhibit is this?

I think if your Honor looks at Defendant's Exhibit 35, which is -- I can show you here, your Honor, on

the -- so this is Exhibit 35, which is a modern AutoStore system. But if your Honor looks at this, your Honor will see that what AutoStore actually uses after these patents were issued is something called a single-double grid -- grid structure, which means that you can't have robots passing on all four sides because it's a hybrid between a single rail in one direction and a double rail in another direction. It's only the Ocado invention and the Ocado system that allows robots to pass because of the double-double rail.

THE COURT: Okay.

MR. BEENEY: So let me go back to the first slide, if we can, Mr. Lemanski.

And, your Honor, at a -- at a very high level, you know, what your Honor just heard on these three claim terms is that "occupy a grid space" must mean only one; on the second claim term, that not obstruct a bot on an adjacent grid space, "an" must mean all four; and that less than two has to mean only one.

The -- the contentions that AutoStore is forced to make are, you know, so internally inconsistent as you pull the thread that ultimately if you look at what they're saying about these three claim terms, they actually make no sense.

So, your Honor, let me get -- and I'll go through some of this quickly, but I obviously would, as John W. Davis once said, relish the opportunity to answer any questions your

Honor may have.

THE COURT:  Yup.

MR. BEENEY:  So the -- the three basic claim terms that we'll discuss together really all deal with the same question, did Ocado invent only a single-space robot.  And, your Honor, we disagree a little bit about what the dispute is about because it is not about did Ocado invent a single-space robot.  Yes, we invented a single-space robot.  But the dispute is about whether Ocado invented only a single-space robot, basically kind of leaving in no man's land robots that are somewhere between the two-space prior art and the one-space robot.

And so the dispute is not does Ocado say here and there that we invented the single-space robot.  We did.  The question is did Ocado ever say it only invented the single-space robot.  And we did not.  So that's what the dispute is about.

And I'll proceed through there.  These are the patents.  They are from the same family.

So, your Honor, in terms of the technology presentation you were shown, I'm sure there'll come a time when it will be appropriate for me to respond to what we believe are some historical inaccuracies about who invented what, but since claim construction deals with the Ocado patents, not AutoStore, I'm going to pass on that, if I may, and I'm also going to pass

on these issues that have been raised about infringement. You -- it's entirely inappropriate to ask your Honor to consider infringement issues in claim construction. If your Honor please, we'll deal with that at some point --

THE COURT: He's trying just to characterize your motivations for advancing the arguments you are. That's the context I put it in. I get it.

MR. BEENEY: I mean, I'll tell your Honor a little secret. When lawyers do claim construction, they actually have in the back of their mind validity and infringement.

THE COURT: That's what I gather.

MR. BEENEY: But it's inappropriate to suggest to your Honor that those are considerations that your Honor should reach in -- in claim construction and so I'm going to pass on those issues as well, if I may.

THE COURT: Uh-huh.

MR. BEENEY: So what I want to show your Honor is, you know, kind of an embodiment of the patented invention. And these are the single-space robots that Ocado uses because of the designer choice that's afforded by the patents, given Ocado's needs in the grocery business, to do an awful lot of moving of the robots and taking stuff from the -- the grid which may store 50,000 items and deliver an order to a customer who may have ordered, you know, 30 different things. So Ocado's choice from the -- this embodiment is to use the

single-space robots.

So what does this invention do for us, whether it be, under our contention, a single-space robot or something less than two?  We believe I can show your Honor that that's what these patents cover.  It allows an increased concentration on top of the grid.  You can put more robots on it than you could under the prior art.  It allows for more efficient movement because the robots aren't occupying as much of the grid.

Because the robots have an internal cavity, you eliminate certain balance issues that you have with a cantilever robot, whereas if the cantilever robot is picking something up, it can tip over.  So you have to make the body of the cantilever robot much heavier than you would need to here, which makes it slower and more costly to move from an energy point of view.

So there are a variety of benefits that the patent discloses, mostly in column 5 of the specification, some having to do with the ability to pass on an adjacent grid space, but multiple other benefits as well.

And as your Honor heard, the patent does talk about prior art, the hoisting system, the -- the tube system over here where the tube goes down into the grid, but the tube has to be twice the size of the grid.  So there are obviously a lot of limitations in the prior art, including the limitations in

the prior art Red Line AutoStore system which is shown here and disclosed in the patent in Figure 3C with the limitations being some that I mentioned.  It has to be heavier, it has to balance, it takes up two grid spaces, a variety of other problems with the prior art.

And, again, here is the depiction of the prior art and your Honor will see, I think it's clear, there's no dispute that the footprint of the prior art robot takes up two grid spaces.

THE COURT:  Yup.

MR. BEENEY:  Your Honor saw the animation.

But what the patent teaches and what the patent was able to achieve is a reduced footprint, reduced from two grid spaces.  And the dispute, again, your Honor, is was it reduced to only one or was it, as we contend, reduced to something less than two.  And what the patent shows you is how to get away from this prior art design of taking up two grid spaces.  And here the specification tells you all the benefits of the reduced footprint.

So how does the patent tell you to do that?  How does the patent tell you that it's able to reduce the two-grid space footprint of the prior art?  Well, it gives you several embodiments and it gives you several ways in which to do this. One way, and one embodiment, is to take some of the bulky components that are in the side of the body of the robot and

put them above the robot.

So the robot disclosed in the patents in the yellow is the internal cavity space to lift the bin into it and the blue space is where the patent suggests you can put some or all of the bulky components in order to reduce the space of the -- of the prior art to footprint.

And we've done an animation here, your Honor -- again, this is not from the patent, this is an animation -- to show your Honor exactly what the patent specification teaches, which is how you reduce the size of the robot.

And I think what this animation hopefully shows your Honor is that there are an endless number of iterations between two and one that the patent teaches that you can use. And the patent tells you about the designer choice, depending upon your needs. And I'll show that to your Honor, but it makes no sense to have the patent disclose, well, here's a 1.9-space robot, here's a 1.8-space robot, here's a 1.7-space robot. My point being that what the patent tells you is that the benefit is reducing the space from two to one and everything in between as well.

And here's the -- the animation. You move the wheels to the side, you take the bulky components that are in the blue, you put some or more of them above the robot and you have the yellow space for receiving the bin.

And any of these iterations, any of these

depictions, whether it be one space, 1.2, 1.5, 1.9, they're all disclosed in the patent specification by allowing the designer to have a choice and also by explaining that there may be different needs to use different types of robots.

Another embodiment, your Honor, to achieve the benefits of the invention teaches us that you can use wheel hub motors.  By having wheel hub motors, you can eliminate the belts that are shown here that were in the prior art.

And, you know, just by way of making a point about the size of the robots, obviously if an embodiment, you simply used wheel hub motors, you're not reducing a two-space robot to a one-space robot.  It's the combination of all these teachings of the patent that tell us that the patent claimed something between one and two as well.

And someone will be able to tell me, I'm sure, how I can get rid of that red circle.

THE COURT:  You tap the corner.  Right?

MR. BEENEY:  I didn't know that's how it was going to be, your Honor.

THE COURT:  Kellie?

THE CLERK:  Yes, I can do that, your Honor.

MR. BEENEY:  Thank you.

THE COURT:  It's a good time for a break.  We've got to give the reporter a break.  So we'll reconvene in 15 minutes.

MR. BEENEY:  Thank you, your Honor.

THE CLERK:  All rise.

THE COURT:  Just for -- off the record.

(Off-the-record discussion.)

(Recess taken from 10:45 a.m. until 11:07 a.m.)

THE COURT:  All right, Mr. Beeney.  You can proceed.
Thanks.

MR. BEENEY:  Thank you, your Honor.

So, your Honor, we left off where I was just
discussing how the patent teaches you how to achieve the
objects of the invention.

And here, on slide 20, I think it's important to
note that this is an embodiment of the invention.  And as your
Honor knows, it's inappropriate to limit the claims to an
embodiment.

And what this embodiment shows is one way of
achieving the invention, which is to use, in the words of the
specification, a design that takes up the minimum possible
amount of space and has a footprint of approximately half that
of the prior art cantilever design.

So this is an embodiment.  This is not the scope of
the invention.  And it's teaching you that if you want to have
a single-space bot, you can do that, but it's an embodiment of
the invention.

And the patent goes on to tell you that, in fact, in

typical applications, there'll be multiple load handling devices or robots and that depending upon what you need to do, the handling devices may be of different types.

So I think that's precisely what we are contending the patent teaches, that you can do anything between the prior art two-space robot -- obviously the patent doesn't claim two spaces because that's the prior art -- and the one space, minimum space in the embodiment. And the patent is telling you you can do anything in between, different types of robots selected upon your -- depending upon your needs.

So we get to the first claim term of the three, your Honor, and I'm going to spend most of my time on this because the arguments are the same with respect to all three of the claim terms.

THE COURT: Right.

MR. BEENEY: But in doing so, I don't want to lose track of the fact that AutoStore is asking your Honor in the third claim term to construe the phrase "less than twice the area of the grid space" to mean only one grid space.

THE COURT: Yeah.

MR. BEENEY: If your Honor is not prepared to do that, and I respectfully suggest that no inventor in their right mind uses less than twice to mean only one, but if your Honor is not prepared to do that, the rest of their arguments fall. Because if occupy less than twice of a grid space means

occupy less than twice of a grid space, then the inventors have invented something less than two-space robots.

Here's the "occupy a grid space" in the patent. Your Honor has seen the competing constructions.

As I mentioned earlier, your Honor, plain and ordinary meaning is, as the federal circuit teaches us in the *Phillips* case, from the point of view of a person of skill in the art who understands what the inventors invented.  And I respectfully submit that what AutoStore is doing here is adding words that are nowhere in the claim.

So what's the dispute?

THE COURT:  This is from the '602?

MR. BEENEY:  Yes, your Honor.

THE COURT:  Okay.

MR. BEENEY:  Yes, your Honor.

THE COURT:  I'm sorry.

MR. BEENEY:  That's where this claim appears.

THE COURT:  I was going to '051 and I think I got --

MR. BEENEY:  No, I -- I did not because I jumped ahead to the occupy --

THE COURT:  Right.

MR. BEENEY:  -- you know, less than one, which is the '051.  So I apologize.  Now I'm back to --

THE COURT:  No need.

MR. BEENEY:  So the dispute -- you know, when I

occupy something, does that mean that I'm limited and I can't occupy anything else?  And that's the dispute.  It's not whether we're claiming that we invented one, but whether we are limited to one.

Now, there's no dispute that the law is that "a," as used in patent claim language, is usually construed as at least one.

And, again, your Honor, there was some question raised in the argument this morning about whether we're claiming something more than two.  I want to kind of take that issue off your Honor's plate because there are enough.  We'll stipulate it's less than two because the two-space robot was prior art.  We're not claiming prior art.  So it's -- it's not an issue and Dr. Derby agreed at 139 in his deposition, Dr. Pfeiffer agreed at 131 in his deposition.  So that's not an issue.  The patent is between one and two.

So when we look at occupy a grid space, there's really no dispute about the law that "a" in "occupy a grid space," is usually construed and usually meant by people who write patents and inventors as at least one or one or more.

And as I mentioned to your Honor, the citations to Ocado saying we invented a single-space robot are a red herring.  We did invent a single-space robot.  That's not the issue.  The issue is did we ever say that we invented only a single-space robot.  And I will show your Honor that that's not

the case.

THE COURT:  Right.

MR. BEENEY:  So not only does the law tell us that in patent parlance "occupy a grid space" typically is meant to convey at least one or one or more, but AutoStore's expert, Dr. Derby, agrees that that is the plain and ordinary meaning of occupy a grid space.

So at page 105 of his deposition, Dr. Derby was asked the following question.  He was asked, quote:  The plain and ordinary meaning of the phrase occupy a grid space does not mean that a robot only occupies one grid space, correct?

And Dr. Derby's answer was one word:  Correct.

THE COURT:  Uh-huh.

MR. BEENEY:  So he agrees that this is not the way that you would read this language as a person of skill in the art.  The federal circuit tells us this is not the way you would read this language as a matter of law.

So what's the dispute?  And this gets to the question that your Honor put to us at the end of AutoStore's argument, is that the end of the issue.  It's not the end of the issue because AutoStore can rely on the doctrine of disavowal.

And AutoStore seems to agree, although they didn't address the doctrine in their presentation but in their slides they talk about disavowal.  In their reply brief, at page 13,

they say that they have presented sufficiently clear disclaimer.  At page 16 of their reply they say there has been sufficiently clear disclaimer.

THE COURT:  All right.

MR. BEENEY:  So they -- they understand.

THE COURT:  But in your papers you say they misread the disavowal document, they misread the spec.

Here's the thing, though.  No embodiments, right, show a robot occupying more than -- like 1.2 or something.  1.2 is a number you chose in your papers.  Like if I don't see that in the embodiments, how can I read the claim that way?

MR. BEENEY:  Because, your Honor, the claim language would include the 1.2, and the specification talks about designer choice and an embodiment being the one space so that the claim language can't be limited to that embodiment.  And it talks about ways of reducing that are not limited to one space.

And so if you get to the law of disavowal, this is where we are.  Is -- do those provisions of the specification that I mentioned meet this legal burden, clear and unequivocal, clear and unmistakable, expressions of manifest exclusion or restriction.  There's nothing in the specification that says this invention is limited to a single-space robot.  It has an embodiment of a single-space robot and, yes, your Honor is absolutely right, there's no embodiment of 1.9, 1.8, 1.6, 1.2. But, again, because there are an indefinite amount of size

robots between the one and the two, at least I think that that's the explanation as to why there is no embodiment of something in between, because there are an infinite variety of them.  And that's why I focused on that portion of the specification that talks about depending on your needs, you'll use all different types of robots.

And that, I think, is clear evidence of no disavowal as, your Honor, I will get to here is the fact that when the patent talks about a single space, it talks about substantially a single space.  And what AutoStore has to ask your Honor to do is in order to meet its burden on disavowal is to ignore substantially single space.

Well, because the patent regularly uses substantially to describe the invention, how can your Honor ignore what they -- what the patent inventors decided to do in writing the specification?  The only explanation that is consistent is that they wrote substantially a single space to denote all those choices that they make available in the specification.

And while it is absolutely true that the specification focuses and a preferred embodiment is a single-space robot, there is no disavowal of anything between the two-space and a one-space robot.

I also just, in response on the disavowal point, want to point out that the argument about present invention

being evidence of disavowal as a matter of law is just simply not accurate.  *Absolute Software*, 659 F.3d at 1136 to 37, *Voda vs. Cordis*, 536 F.3d at 1321.

But getting to substantially, and I think AutoStore recognizes that it's got to deal with substantially because substantially is evidence of a lack of disavowal.  There's no reason why the inventors would have used the word substantially repeatedly throughout this specification if they intended to mean a single-space robot.

THE COURT:  Yeah.

MR. BEENEY:  If they intended to mean single-space, what's the point of substantially?

So AutoStore has two arguments and I want to take them one by one and do my slides, if I may, out of order --

THE COURT:  Of course.  Yeah.

MR. BEENEY:  -- to address them as to why your Honor should ignore substantially.  And they go far afield from these two patents in order to try to convince your Honor to ignore these words that the inventors regularly used to describe the single space, substantially the single space.

And so the first thing that AutoStore says is, well, look, if you look at the priority document, GB313, that talks about only a single space and, therefore, if you want to construe these patents to be something more than single space, you can't, because it wouldn't be entitled to priority.

And I'm going to skip, if I may, your Honor, over to my slides, 42, which address -- which address this argument.

So, first of all, the question of priority is not a question for today.  To the extent after your Honor's claim construction AutoStore wishes at a later date to brief priority, we can address it.  But the point here is that what AutoStore is citing to convince your Honor to ignore the word substantially in the priority document is an embodiment in the -- in the priority document itself.  It talks about from one aspect.  It talks about advantageously.

The priority document is not limiting the invention to a single space any more than the two patents do.  It's an embodiment and, therefore, this does not explain why your Honor should ignore the word substantially.

The second reason that AutoStore addresses that your Honor should ignore the word substantially again goes far afield, across the ocean, and I'm going to go to slide 41 here to talk about -- sorry, to slide 40 -- to talk about proceedings in front of the European Patent Office.

Now, you know, first of all, your Honor, the proceedings in the EPO are irrelevant because they deal with different law and they deal with different issues.  And the federal circuit for those reasons in, for example, *AIA Engineering* or *Apple vs. Motorola*, has cautioned against putting any reliance on foreign proceedings.

Why was the law here different?  Because the question in this proceeding was whether removing the word substantially added subject matter under Article 123 of the European Patent Convention and dealt with the fact that "substantially" in EPO practice has a well-understood meaning under the guidelines.

The issue was also very different, and this is very important, because the claim language at issue in this case was only a single grid space, obviously something very different than what we're construing here.  And as I say, for these reasons, the federal circuit says this that is really not relevant to claim construction.

But, you know, perhaps most significantly, and this is something that for reasons I don't understand AutoStore did not bring to your Honor's attention, they argued to your Honor what the parties said, but they ignored what the court concluded or what the EPO concluded.

And AutoStore has had these documents for months.  We handed these up to the Court, I believe, on Tuesday.  What the EPO Opposition Division and the EPO Board of Appeal ultimately concluded is that substantially a single grid -- substantially a grid space is a footprint, as you'll see, your Honor will see here, equal or larger than the grid space.  So the conclusion of this proceeding is exactly what we say in terms of the claim construction.

And, again, you know, AutoStore has had these documents for months. Why they would argue what the parties said and not bring to the Court's attention what the conclusion of the proceeding was is something at least I don't understand.

So if I go back to slide 31, if I may. Sorry.

So if I go back to slide 31, we're talking about substantially and why AutoStore says you should ignore the word substantially.

AutoStore's expert, Dr. Derby, says something a little bit different. He says, well, you shouldn't ignore the word substantially, but what you ought to do is understand it to mean the wheels.

And this is the point that your Honor was raising.

But that obviously is wrong because the specification, as I mentioned earlier, at 934 to 41, talks about the wheels jutting out as being a single space. So substantially a single space has to mean something different and what it means is something between one and two.

And because of the word substantially, that in and of itself suggests that AutoStore has not met the burden that it has under the doctrine of disavowal to show that the patent inventors abandoned the well-understood meaning of the claim term clearly, unequivocally, unmistakably, a manifest exclusion or restriction. They simply haven't met that burden.

So next, your Honor, what AutoStore says, is that,

well, let's look at what the inventors used in other language. AutoStore says that the inventors knew how to say at least one or more when they meant that but, in fact, these references are really not relevant to the issue that the parties are presenting to your Honor. Why is that? Because these references are to a list of things that the reader is asked to choose.

So AutoStore has used these to suggest a meaning of one -- of occupy a grid space, but really what they mean or what these terms are being used is that you have to choose one or more of the options that the patent's providing to you.

So in claims 715 and 18, the inventors use the phrase "at least one of" to introduce a list of discrete options.

Similarly, in claims 10 and 17, the inventors used the phrase "one or more of" to identify which of the first set of wheels has a hub motor.

So this use of the term to select options from a list is not limiting of what occupy a grid space would mean.

But we agree that one needs to look at how inventors do use language when they mean a single grid space. And when they mean a single grid space, these inventors knew how to refer to it. They referred to it by saying a single grid space.

So in the '602 Patent itself, they talk about each

stack located within a footprint of a single grid space.  The same inventors in patents in the same family, when they talk about a load handling device has a footprint that occupies only a single grid space, they knew how to do it in both the patents.

When they elected in these patents --

THE COURT:  What if it said substantially only? What would I do with that?

MR. BEENEY:  I still believe, your Honor, that substantially only doesn't mean only.

THE COURT:  I know you do, but I need to know why.

MR. BEENEY:  Because you've got to have the word substantially do something.  And you can't just simply say --

THE COURT:  It's almost -- yeah.

MR. BEENEY:  You just can't simply say that substantially only means the same thing as only.  You know, maybe if there was a reference in the specification to doing that once, one might not understand that the word substantially was doing some work.  But if it's used a half a dozen times in the specification, it's not just an idle use of the word.  It's intended to mean something.  And it's intended to mean that the -- that you, when you take the patent and the invention as disclosed to you and you're implementing the invention, you've got this choice that the patent talks about about using different robots on top of the grid, depending upon what your

needs are in -- in using the patent.

THE COURT:  All right.

MR. BEENEY:  So, your Honor, Dr. Derby, AutoStore's Dr. Derby, you know, agrees that these references are important to your Honor's construction of the term "occupy a grid space." The fact that these inventors knew how to say only a grid space, only a single grid space, is important.

So, you know, here's Dr. Derby and the question on the bottom:  So you agree that the inventors of the '602 Patent knew how to say explicitly in the claims that the robot occupies only a single grid space, correct?

Apparently they knew, because it's there.

I mean, this is the kind of thing that a person of skill in the art will look at.

And, again, the reason all of this is significant, your Honor, is because we're talking about disavowal, the very heavy burden.  We're not talking about a 50/50 case.  We're talking about a case in which the language used by the inventors has a well-understood meaning both by AutoStore's Dr. Derby and by the federal circuit.  And so the question is did they unequivocally disavow it.

And all of these different elements that I'm presenting to your Honor respectfully suggest, I suggest, that there was no disavowal.  There was no unequivocal statement anywhere in the specification that we're only talking about a

single-space robot.  In fact, the suggestion of the specification is that we're talking about more than that.  That's why they used the word substantially.  That's why they talk about designer choice.  That's why "an" embodiment is the minimum space, not other embodiments.

So for all those reasons, there has not been a -- a -- a disavowal.

Now, another argument that AutoStore makes for disavowal is that you could only achieve the benefits of the invention by having a single-space robot.  And that is patently incorrect, as AutoStore's own expert agrees.

So, you know, here, your Honor, Dr. Derby, AutoStore's expert, was asked:  Can you achieve the benefits of a patent with a 1.2 grid space robot?

He says yes.

He's asked:  Can you achieve the benefits of the robot with a 1.5-space robot?

And he says yes.

And Dr. Pfeiffer agrees, and that is patently true.  You achieve the benefits of the invention with a robot that is greater than a single grid space but less than two grid spaces.

Now, Dr. Derby, AutoStore's expert, has actually answered AutoStore's question about whether giving weight to the repeated use of the word substantially injects some form of ambiguity into the claim.  Dr. Derby says no.  Because at the

bottom of this page on slide 37 you can see that Dr. Derby says all he needs to do is a little calculation to see what substantially means in terms of the size of the robot that would be necessary to achieve the objectives.

And here, your Honor, we've created, you know, again, a little graphic on the right which, again, is not part of the patent, the specification is on the left, to show why a robot that occupies more than a single space would achieve the benefits of the invention, just as to one of the benefits and that is the ability to pass and have, you know, more robots on top of the grid, putting aside the question of the weight and the space and the energy and all sorts of other benefits which are obviously achieved every time that you reduce the robot by just a little bit.

So here, your Honor, is a two-space robot.  If you use the prior art two-space robot on Ocado's invention of the grid with the double rails that we talked about, this is what has to happen; you use four grid spaces for two robots to pass each other.

But if you have a robot that's in this depiction about 1.2 grid spaces and you have them pass, you can see, your Honor, that they will take up three grid spaces when they pass.

THE COURT:  Yeah.

MR. BEENEY:  So you save and achieve a number of the benefits of the invention by having a robot that's less than

two but greater than one.  They take up less grid spaces when they pass on adjacent spaces; they clear the grid space faster than a two-space robot; they do all sorts of things to achieve the benefit of the invention.

And if we can go to AutoStore slide 32.  Thanks, Mr. Lemanski.

I think I explained to your Honor why the depiction on the left of the prior art robot is entirely incorrect.  The patent describes that robot as being described in NO317366, which it incorporates by reference at column 3, lines 6 to 8, of the specification.

There's no dispute that that robot occupies -- operates on single rails.  So that robot can't pass on any adjacent grid space, much less three.  So, you know, this comparison is entirely correct.

And as to the depiction on the right, as I've just showed to your Honor, there are benefits in terms of the space that's occupied with a robot of less than two but more than one.

So I'm going to skip over my slides that talked about the foreign proceeding which found that substantially a grid space means more than one and I'm going to skip over the issue about the priority date and get to AutoStore's argument on slide 44 about another reason why they say that they have met the burden of disavowal which has to do with the PTAB

proceedings in the '602.

And, you know, I'll be brief, I think, here, your Honor, because AutoStore's argument is that in this proceeding, Ocado disavowed a robot of less than two but more than one and they provided to your Honor excerpts of this Defendant Exhibit 48 on the slide. But, again, they didn't provide to your Honor what is really key, which makes this slide, you know, again, entirely misleading.

And if I can show your Honor footnote 5 on page 29 of this document which AutoStore did not provide to the Court --

THE COURT: Uh-huh.

MR. BEENEY: -- but I've got it here on the screen, Ocado said that petitioner's contention -- that is, AutoStore's contention -- that patent owner Ocado accepted petitioner's construction is incorrect. There, patent owner stated that the '602 specification discloses a robot that only occupies a single grid space in certain embodiments, but that was not an admission that claims 1 and 12 of the '602 Patent are limited to such a robot.

So the slide that was presented to your Honor about some form of disavowing is rebutted by what was said in the very same document which wasn't shown to your Honor.

And if I may, your Honor, I'd like to give your Honor a full copy of the document so your Honor can see the

fact that Ocado did not say what AutoStore says because it explicitly says claims 1 and 2 are not limited to such a robot.

THE COURT:  If you have a copy for counsel, you can hand one up to me.

MR. BEENEY:  Yeah.

MR. LOCASCIO:  Thanks.

MR. BEENEY:  Thank you very much.  And that's -- it's footnote 5 on page 29 which, you know, again, was not shown to the Court --

THE COURT:  Thank you.

MR. BEENEY:  -- but which rebuts everything that AutoStore is saying on their slide about this purported disavowal.

So, your Honor, you know, there really is -- going back to slide 45, there really is no support for disavowal.  We don't start with a level playing field and the disavowal is of such a nature, you know, that it has to be so clear, so convincing, that for all of these reasons, substantially, the fact that the European proceeding ended up adopting Ocado's claim construction in this case, the fact that there are all sorts of statements in the IPR proceeding that your Honor was asked to look at that are very consistent with our claim construction, there just really is no way that AutoStore has met anything like its burden to have this Court construe the words that were selected by the inventors which have a

well-understood meaning both in the law and to AutoStore's own expert.

So I'm going to go through these other two claim limitations, if I may, your Honor --

THE COURT:  Are you staying with '602 or are you moving on?

MR. BEENEY:  I'm moving on to the '602 second claim limitation having to do with the size of the robots.

THE COURT:  Let me ask you a question before you do that.  I want to stay with '602 for a second.

This wheel hub motor claim --

MR. BEENEY:  Yes, your Honor.

THE COURT:  I think AutoStore's construction sort of subsumes your construction.  Right?  A motor -- a motor that is, quote, at least partly within the wheels includes a motor that is, quote -- that is integrated with the hub of a wheel.

Do you agree?

MR. BEENEY:  I think I do, your Honor.  And if I can say yes with an explanation to make sure that I'm --

THE COURT:  Of course.

MR. BEENEY:  -- I'm agreeing.

Our real dispute with AutoStore's proposed construction was "adjacent to."  There are -- in the patent there's a reference to something called Christensen, I believe, and if your Honor looks at that Christensen reference that's

incorporated within the patent, it's clear that what a wheel hub motor is is integrated within, either completely or partly.

So the problem we had with the AutoStore construction was this "adjacent to."

THE COURT:  Yeah.

MR. BEENEY:  That is not a wheel hub motor.  But other than that, I think we would agree with the construction that a wheel hub motor can be partially integrated within as well as entirely integrated within.

THE COURT:  What about you, Mr. LoCascio?  Do you agree with that; your construction subsumes Ocado's?

MR. LOCASCIO:  I do.  The parties have agreed on this one.  This was the one we took off your plate.

THE COURT:  Oh, that's right.  That's right.

MR. LOCASCIO:  So it's actually -- we referenced it --

THE COURT:  Yeah, it's in that email.

MR. LOCASCIO:  Within a footnote, though.  So no, no.  To be clear, we've agreed the construction of wheel hub motor is plain and ordinary meaning, colon, a motor that is integrated within a wheel -- the hub of a wheel.

THE COURT:  Yeah.

MR. LOCASCIO:  So I think you're right and maybe your logic got us to where we found commonality.

THE COURT:  Well --

MR. LOCASCIO:  And the adjacent issue is out.

MR. BEENEY:  I was just going to say it was good to have this discussion so we're clear --

THE COURT:  That it's out.  Okay.

MR. LOCASCIO:  Yeah, but partially or fully integrated is where you go, yes.  It does not have to be entirely in.

THE COURT:  Okay.  Go ahead and move on then.  I just wanted to touch that base.

MR. BEENEY:  Thanks.

So, your Honor, the one kind of -- I don't know if it's a 30,000-foot level, but it's something like that point I wanted to make about this claim term is that if AutoStore is right, that the invention is limited to a single-space robot, this claim term means nothing.  Because if the invention is limited to a single-space robot, then the robots will be passing each other without obstructing an adjacent robot in a single grid space by necessity.

I don't know if your Honor is with me on that because --

THE COURT:  I am.

MR. BEENEY:  Okay.  So if AutoStore is right, the last five or six lines of the claim term mean nothing, add nothing, and are entirely superfluous.

And that just not is patent law.

Now, how does AutoStore's expert deal with that? Well, Dr. Derby says, well, you know, yes, you're right, and this is not a separate limitation.

Well, if it's not a separate limitation, why did AutoStore want your Honor to construe it? It obviously is doing some work in the context of the patent. Otherwise, there was no point in the inventors including it.

And if this language, if your Honor concludes that this language of the patent which AutoStore has asked your Honor to construe is doing any work, then the invention can't be limited to a single-space robot.

So the mere fact that we're standing up here talking to your Honor about how this should be construed and the mere fact that the inventors used this claim language to mean something --

THE COURT: Yeah.

MR. BEENEY: -- means that AutoStore is wrong. Because, otherwise, the robots will be passing each other willy-nilly and this means nothing.

So here's the claim term that the parties have asked your Honor to construe. Again, it uses the word "an" and as I said when I first stood up, AutoStore first wants "a" to mean only one and now they want "an" to mean all four. So it is, at best, internally inconsistent.

And I would just say, your Honor, again, you know,

kind of looking at these diagrams that we've put together, the question and the dispute is does an adjacent grid space mean all four or may it include all four but is not limited to all four. And if it's limited to all four, this claim language is doing nothing.

And -- and because the prior art robot could not pass in any adjacent grid space, the fact that the patent disclosed passing without obstructing in "an" X-direction and in "an" Y-direction was an enormous improvement over the prior art. And, again, this is why the invention was not limited to a single space.

AutoStore would rewrite the claim language so that the load handling device will not obstruct a device occupying or traversing any of the four adjacent grid spaces.

And forgive me for repeating myself, your Honor, but it is important. This has no meaning if the invention is limited to a single-space robot.

So disavowal falls for all the reasons that I mentioned earlier.

Now, let me get to the final claim term about the size of the robot that is disclosed by the invention. And, you know, again here, your Honor, you know, I -- I think as we go through the three claim terms, the first one is a real reach. AutoStore doesn't meet its disavowal burden.

The second one, you know, not only is there no

disavowal burden, but they want your Honor to conclude that the claim language means nothing.

And then, third, we get here and this is, you know, beyond a reach. This is not asking your Honor to give meaning to the term "occupy less than a grid space." It's asking your Honor to construe "occupy less than a grid space" contrary to its meaning, not, you know, in addition.

And, you know, to the extent that it's really necessary, we did a very short graphic here. Obviously less than twice means something between zero and two. It doesn't mean something between zero and one.

And so, you know, there has not been clear, unmistakable, unequivocal, manifest disavowal of less than two meaning less than two. And for your Honor to be asked to construe this contrary to its plain and ordinary meaning, Ocado -- AutoStore has to come up with far more evidence than they have ever suggested to your Honor to meet that burden. And if this construction fails, the rest do as well.

So, your Honor, that's my presentation on --

THE COURT: Thank you.

MR. BEENEY: -- those three claim terms.

Thank you.

THE COURT: All right. Where to next, Mr. LoCascio?

MR. LOCASCIO: I'm going to rebut several of the points that we just heard, if I may, your Honor --

THE COURT:  You may.

MR. LOCASCIO:  -- and then we'll proceed at pace to the next term.

THE COURT:  Yup.

MR. LOCASCIO:  Let me switch back to -- start with the document camera, I think.

I won't revisit stuff.  I just have a handful of points that Mr. Beeney made that I'd like to address, your Honor.

So the first -- and this came up a couple times.  The suggestion that the prior art robot couldn't pass in any direction is not in the prior art specification, it's not in the specification of the '602 Patent, it's not anywhere in the evidentiary record.

Essentially, Mr. Beeney's saying just trust me that couldn't have done it, except nothing about the specification of the prior art AutoStore Red Line says as much.  And, in fact, we saw examples where it was passing each other -- it couldn't pass each other on the cantilever side because it's blocking.  Behind it, yeah, two robots could go by.  On the sides, two robots could go by.

And we started the -- this came up first when your Honor asked a question about how the wheels played into this whole thing and could the single space or the single grid space include where the wheels are on the rail or is that sort of

somehow overhanging that, if I heard your Honor's question correctly.

And Mr. Beeney kind of pointed you to slides from a different section of their presentation.  He pointed you to this slide, which was their slide 71, I believe, and he said, no, no, see, there's like two tracks -- this sort of issue of single track versus double track.

Now, to be clear, single track versus double track isn't described anywhere in the '602 Patent.  It's not part of the claim construction issues around single grid space or not.  Okay?

Your Honor was curious about how these things work in real life --

THE COURT:  Yup.

MR. LOCASCIO:  -- and the answer is two robots can pass each other on a single track if the track is wide and you imagine the wheel is on sort of half of the track and two wheels are passing each other but the wheels don't hit on one track that's wide enough or you can have a double track which some of these systems use --

THE COURT:  The real-life stuff is really what's got me tied up in knots over some of these issues because, you know, I watched the -- I watched the embodiment videos, right?  So they don't reflect the language all the time.  And it -- to me, the analogy is, you know, statutory construction.  Some

people -- because a lot of this is similar, right, with the extrinsic and the intrinsic and all that.  And, you know, some interpret the statute as saying you're not supposed to worry about the consequences, just interpret the language and the chips fall where they may.  Right?

But with something as practical as patents, it's hard to ignore what I'm seeing and trying to make -- reconcile it with the language.

And I asked you that question before.  You both gave me a -- what I thought was a good faith answer, but they're different answers.

MR. LOCASCIO:  And what I -- what I'd suggest to your Honor on this is the -- if the -- if the practical videos, okay, were different than the embodiments disclosed in the specification -- so if, for instance, Ocado disclosed a single-cell robot, which they obviously did, it's the one thing that's shown in their embodiments, if they also disclosed the one and a half, let's say, that they say is in there but it's not really in there, or the 1.2, if those were all in the patent but in real life they were only doing the single-cell, well, of course we'd say, well, the patent controls because it does, to your Honor's point.  The claim and the specification control.

But whereas here the actual real world is no different than what's disclosed in the patent because the

patent itself only discloses that exact same single-cell bot that we saw on all the videos.  And the videos also disclosed the same Red Line prior art robot that's actually described in the specification itself and in the prior art patents that it cites to which show Red Line robots passing each other on three directions, not one.

So I don't believe the inconsistency that your Honor might feel is there is there when we actually look at the specification.

And this double-single track issue, which is a bit of a sideshow, even the slide Mr. Beeney pointed you to isn't talking about two rails that we're seeing in this figure at all.  It says a first plurality wheels on a first set of rails to guide movement in the first direction.  So that's one direction.  And then the second part he highlight says in a second direction, meaning the opposite direction.

So this is both sort of a sideshow and a sort of juke along the way.  Yet he said two or three times on this issue of could the disclosure identify more than one grid space.  And on this same conversation, I wrote it down, he said, oh, yeah, the -- the specification says the wheels can be bigger than the grid space.

Column 9 -- you heard column 9, I think line 31 or 34 is what he said.  He said it twice.  We never saw it.  Here's column 9, line 31.  It's actually 34.

Okay.  The suggestion was the patented specification discloses somehow a bot where the wheels are outside of the grid space.

No.  It says:  In this way, the footprint of the vehicle is larger -- not of the grid space, as Mr. Beeney suggested -- is larger than the size of a bin, only enough to accommodate the wheels either side of the recess.

In other words, the very next line:  The vehicle occupies a single grid space in the storage system, in this way, the vehicle, therefore, takes up the minimal possible amount of space in the X-Y plane and has a footprint approximately half, 1.0, of the prior art cantilever design shown in Figure 3.

So the suggestion twice that column 9 is the disclosure of the 1.2, 1.5, 1.9, 1.anything is the opposite of what the actual language says.  And the suggestion that this means it can be slightly bigger than a grid space, no, it says larger than the size of a bin.  And the rails are, of course, larger than the size of the bin.

So then the suggestion was made with this nice animation.  I'm just going to put a couple on the screen.  They're stills.  You remember the slides.  It's slide 14 on, where the animators on Team Ocado took the prior art Red Line and started changing it and showed sort of a one-and-a-half version, then they put some color-coding on it, then they sort

of made it a little taller, and then they put the -- most of it above but they're still hanging out over a grid space and then they got to slide 18.

Now, the only one that's actually in the patent is what's shown on their slide 18. And I guess if I didn't have any disclosures in the specification, I didn't have any figures in the specification, and I didn't even have any text saying what they were showing, well, then, maybe I'd resort to let's look at an animation. Except we're supposed to be looking at what's disclosed in the patent. And not a single one of these things that were in their animation are anywhere shown in or even described in the specification.

And, again, in fact, the language about sort of where to put the guts and the machinery, Mr. Beeney said, well, you could have some of it kind of over there in the second storage grid space. Except the disclosure and specification says, no, no, we're going to take all the guts and put it on top, meaning they're taller than the prior art, but they're now within the single grid space.

And -- oh, I got too close to the mic. Sorry, everybody.

There was a suggestion that there must be some no man's land. I think that was -- I don't know if that was exactly the phrase, that between one and two, well, who owns that was the suggestion we heard from Mr. Beeney. The prior

art is two and they were distinguishing from that.  What that studiously ignores is that the patent actually was -- cited two different prior art references from AutoStore.

This is the list of references, your Honor, on the second page of the patent, and you'll see two I've highlighted. They are a Norwegian patent application 317366 and a bureau application 2014/090684.  Okay?  Two applications.  Well, what are those?

Can we go to our slide 11, Emily?

The first of those is Figure 3C of the '602 Patent, the cantilevered robot, two grid spaces, the second of which, which is admittedly prior art to the '602 patent, is the Hognaland reference.  That's the reference 2014/090684 on the face of the patent.  And that's certainly, by all accounts, the figure shown in Figure 3 between one and two.

And so this theory that, well, we get everything under two because of the prior art ignores some of the other prior art, which is why when they claimed their invention they couldn't have claimed maybe bigger than one grid space but less than two and instead they had to claim a single grid space.

There was a lot of references to designer choice by Mr. Beeney and, you know, different embodiments except, again, what's never shown is the actual language of the patent.  And so there are, I agree, four different, by my count, bot embodiments shown.  I'm going to show you each one.

The first is Figure 5 and 6.  That's the one we've seen a couple times.  It's, without question, a single-cell bot.

THE COURT:  Uh-huh.

MR. LOCASCIO:  The other embodiments are Figures 8 through -- 12 is another embodiment.  And the -- there's no question that guy -- I'll pull up 11, which makes it abundantly clear -- is a single-cell bot.  You can see the bin right below it.

The next embodiment, Figure 14 and 15 and 16, single-cell bot.  The designer choices are where you want -- how high up you want to put the guts, do you want to have it be enclosed on all sides.

And then the last one is Figure 17, what they refer to as another embodiment.  And what you will see there, like you saw in all of the others, is every single embodiment disclosed, there is no discussion of designer choice around how big the footprint of the bot is.  It covers and occupies one grid space.

So what Ocado is forced to do is to say, well, let's flip the burden on this.  Let's say occupy a grid space in the claim means more than one grid space.  And I'll come to that.  And then they say we have to show a disavowal.

Well, heads we win, tails they lose, on this one because, first of all, they cited to -- they tell you that

Dr. Derby says the -- the plain and ordinary meaning of occupy is something, and there's got to be a specialized meaning, this idea that we're departing from the plain and ordinary meaning. It's the plain and ordinary meaning of the claim term as used in the patent. That's the law on this, not what does a single word like occupy mean. Nobody asked the Court to construe occupy.

And Mr. Beeney read you or showed on a slide, I forget which it was, page 105 of the Derby dep, lines 11 to 17. And he said this one-word answer and he disagrees with it.

This is the actual dep. So you could see the question was put to him -- so the question you were read begins with "the plain and ordinary." It left off the highlighted intro to the question.

I'm asking about the plain and ordinary meaning of the phrase occupy.

Occupy, he's asked about, what does that mean?

He says: Correct.

And then the next line: So is it your opinion that occupy a grid space limitation has some specialized meaning, meaning it's different than what it says?

He says: Yeah, specialized related to the hardware in this patent, meaning when you look at this patent and you're talking about grid spaces and a bot, this is what it means, one.

This is not an instance where the expert -- they want to say he agrees with us. He couldn't have been further from agreeing with them. He said it's a single grid space. He also said with respect to the wheels, I can cite that to your Honor as well, that the wheels are also in that single grid space.

So we heard about "substantially" at some length. If they really wanted substantially, your Honor, they could have put it in the claim language. The claim language doesn't say substantially a grid space. Okay? That would create issues about the disclosure because it would raise questions of is it indefinite; does it tell one where that line is; is it 1.2, is it 1.5, et cetera.

So -- but they could have said a lot of things; roughly one grid space or slightly more than one grid space or one or -- like one and a half grid space, less than two. They didn't do any of that. They said a grid space. The claim language controls.

And your Honor asked a question, if I don't see it in there -- and this was, I think, about the embodiments -- well, how can I include it? And there was intention, I think, in your Honor's mind, as I interpreted it, between the disclosure in the spec, it's clear it's a single-cell bot, but now I'm being told that this language must mean something more than one, where it says "a" grid space.

And there's two answers to that that gets you to the same result.  The first is nowhere does the claim ever say it's going to be more than one or anything more than one.  And instead what happens is they say, well, you've got to follow this standard.  Except we pointed your Honor to several cases that say, no, no, that's actually not some hard and fast rule that always dictates everything.  You have to look at the claim.

And the claim language here doesn't say -- let me get the paragraph we're focusing on.

It says, yeah, there are several elements and one of them is an external housing.  And under the cases they cite to you, yeah, it could have more than one housing, except the housing has to be shaped in such a way such that, and that phrase, such that it is going to occupy a grid space and will not obstruct a load handling device, is not -- these are not additional elements.  Okay?  This is the description of the result of having the walls of the robot be where the wheels are.  It doesn't now become some abstraction.

But even if it did in their mind, we pointed your Honor to several cases where you have to say, well, let's look at the specification to construe and to interpret what "a" grid space is.  You have to look at the specification.

And we're told, well, that's a disavowal.  And Mr. Beeney said -- and I don't know if he just misspoke.  We

never talked about disavowal in our opening presentation and so I guess that ship has sailed except we cited to your Honor two specific cases that said when they use the phrase "the present invention," which is what they do for a single-space robot, that's a disavowal.

For instance, *Poly-America*, 839 F.3d 1131.  For example:  An inventor may disavow claims lacking a particular feature when the specification describes "the present invention" as having that feature.  That's exactly the situation here.

*Verizon vs. Vonage*, 503 F.3d 1295:  The characterization of the coaxial configuration as part of the present invention is strong evidence that the claim should not be read to encompass the opposite structure.

And others.

And so the law actually supports where your Honor's concern was and says if the claim says something, let's start with what it means, a grid space, the common meaning to one skilled in the art.  Derby says it -- it's -- as used in the claims here, that means one grid space.  But even if it didn't, we've got to look at the claims, look at the specification, and the specification has to be -- the claims have to be read in light of the specification.  And where you don't disclose it and only one embodiment -- one type of embodiment is ever shown, well, that's the limit particularly where you describe

106

it as the present invention.

And then I've got one or two other points I want to tackle. One is the suggestion that "substantially" changes it and there was a reference to the Great Britain parent application. It doesn't say substantially anywhere.

And Mr. Beeney showed you this slide, it's their slide 43, to suggest that this language was talking about one embodiment, meaning there were others, and he -- he leaned on "from one aspect," I don't know if you recall that, as suggesting that that meant there were other aspects that weren't single-cell. Except the Great Britain application is the parent application, it was the original application, so the specifications track in large part.

And that same phrase is used in the '602 Patent. And where it's used, it says the following, the bottom of column 4: From one aspect, the present invention concerns load handling devices -- and stay with me to column 5 -- that ends -- that paragraph ends with: Each load handling device occupies substantially only a single grid space in the storage system.

Now, he pointed you to the "from one aspect," which suggests there's another aspect. Well, we didn't see that, but it's in here. It's on page -- the next page, at column 7.

Column 7 says: From another aspect, the invention resides in a storage system comprising of a frame with

plurality of stacks and containers.

Now, again, in that aspect it says each device occupies substantially a single grid space corresponding to the area occupied by one stack of containers.

These two aspects are the two independent claims. This one is a system with bots on a frame, which is claim 12 and -- pardon me, claim 1 -- and this aspect that we started with is a load handling device, which is the other independent claim.

So the "from one aspect" doesn't actually suggest there's any other embodiment other than the single-cell robot, and the specification of the '602 Patent itself and the Great Britain patent application reveal as much.

And then there was -- there was, you know, a pointed comment kind of made that we somehow had misled the Court or used these European filings to suggest something that's not correct. Except you were shown 9.22 of -- this is their slide 41, which is the EPO Board of Appeal, and then you were also shown the EPO opposition.

If you look right at the paragraph above that, 9.21, there's the one they said went underneath it: It could be agreed with opponent that the term "grid space" could be understood as the space between the rails and tracks. The board is of the view that the footprint is to be seen as the projected surface.

So this is similar to this issue your Honor had a question about about bin space versus grid space, meaning, okay, are we talking about the footprint of the robot which goes into the rails where the wheels are or are we talking about the bin space, in this case, grid space, as the space between the rails or tracks.

So it's certainly not the sort of gotcha that the folks on the Ocado side would like to have made that out to be.

And then the last point I'll make, your Honor, is they kind of -- I don't know what the right word is -- sort of tried to slide by on the second of the two '602 phrases, the obstruction.  And the argument Mr. Beeney made is if you find for us on occupied grid space, heck, the rest is done.  He actually said, like, you don't even have to deal with the others.

Like not true, first of all, because as the way the claim is written, if the sides are within -- if the wheels are within the sides, the result is such that they will occupy a grid space and not obstruct.

Now, that -- he said what does the second one mean if the first one means in a grid space?  I'll give you a couple examples.

Let's say the bot has, like, an antenna that sticks out to the side.  Okay?  Well, the occupy part, it's still a single-cell bot.  It's got to be a one-cell.  If I've got an

arm sticking out of that bot, well, I don't think I'm going to satisfy the "will not obstruct the load handling device" because I have a piece that's now going to get sheared off on a good day when two bots pass each other.

Okay? So they're not -- under our construction, it is not superfluous. They don't mean anything. It says two things: One is it occupies a grid space and that is the result of being shaved the way the claim requires it to be shaved; and, secondarily, it has to not obstruct the neighboring cells.

And what Mr. Beeney points to, he says no, no, you only have to be clear on two. They sort of lean into this bottom right one in the handout, or the slide I'd shown which I'm going to hand up in a second, and say all it has to do is pass on two sides. Except the claim language itself, which is up top, unaltered: It will not obstruct a load handling device occupying or traversing an adjacent grid space in the X-direction and will not obstruct a load handling device occupying or traversing an adjacent grid space in the Y-direction.

That's both of the X ones and both of the Y ones. They've tried to flip it around by saying it's about two bots passing and they showed you that slide also not anywhere in the disclosure that shows that, well, you could pass two of them in a narrower group. That ignores the issue. It's can you be occupying or traversing the adjacent grid spaces. And the only

110

way you can do that is to have all four sides free and clear and the wheels can be on the rails, the wheels can be inside the housing or out, but ultimately you can't obstruct the one next to you.  It's not about allowed to pass.  It's about do -- does the bot obstruct a robot who's either going to occupy or traverse the ones in those four spaces.

And so we think the ordinary meaning of that, which Ocado sort of relies and says, well, go for us on one, go for us on all, it means something and it doesn't mean two sides are free.  It means as shown in the disclosure, as shown in every version of it anybody's ever seen in the patent, that it's free on all four sides.

I realize this was something that I cooked up to try to put all that in one place so you could see it with the claim language using their own "one or more" and then their actual proposal as they've described it in their briefing --

THE COURT:  Uh-huh.

MR. LOCASCIO:  -- and here.  So, if I may, your Honor, I'm going to hand this to -- a copy to them and a copy to the Court because it's not in our deck.

THE COURT:  Okay.

MR. LOCASCIO:  Thank you very much.

THE COURT:  Thanks.

MR. LOCASCIO:  Thank you.

And then we're now in '051.  I'll add that,

obviously, the '051 issue, unlike the '602 issue that we talked about, is a disclaimer issue.  We think we've provided to the Court why the language of '051, "less than the area of two," is disclaimed, but that certainly doesn't control '602.

With that, we have additional '051 claims that are on tap, so I will go to that if your Honor --

THE COURT:  Okay.

MR. LOCASCIO:  -- has no questions.

THE COURT:  Did you want to address --

MR. BEENEY:  If I may, just very quickly, your Honor.

THE COURT:  Okay.

MR. BEENEY:  Thank you.

So, your Honor, perhaps I wasn't clear, but we just heard a rebuttal of multiple points that I never made or at least I didn't think I ever made.

So, for example, you know, the single rail issue --

THE COURT:  Yeah.

MR. BEENEY:  -- the patent itself describes the prior art cantilever robot at 3, 6 to 8, as the NO31733 -- 366 robot which operates on single trails -- single rails.  It can't pass in any direction.

The point there was -- is that AutoStore's slide 32 is wrong.  It can't.  The prior art robot can't pass.  That's the point there.

I guess I don't understand the dispute about Dr. Derby's testimony. I -- I honestly don't. He is asked the plain -- sorry. No, let me get rid of that, if I can.

He's asked on line 12 of page 105: The plain and ordinary meaning of the phrase, occupy a grid space, that's the language in the patent, does not mean that a robot only occupies one grid space, correct?

And he answers: Correct.

So I don't understand the dispute there. But I think the point of this is that -- and I hope your Honor doesn't think me presumptuous in suggesting the -- the way the law provides to resolve what your Honor has said, you know, maybe be some issues that your Honor has with the claim language and the specification.

I think what the law states -- and we've briefed these cases and I've cited them in argument -- is that, you know, first of all, obviously the claim language controls and your Honor has to look to the claim language. And both the federal circuit in the cases that we've cited and Dr. Derby right here says that the plain and ordinary meaning of the claim term in the patent is not one grid space. That's the plain and ordinary meaning according to the federal circuit. That's the plain and ordinary meaning to Dr. Derby, a POSITA.

So the next question is how can your Honor construe the -- the term the way AutoStore wants to? And the law

answers that by saying they have to show disavowal.  And the burden of disavowal is substantial, as we've discussed, and then the purpose of discussing all of this business of what's in the specification is for your Honor to decide whether AutoStore has met its disavowal burden.

And then the purpose of, you know, talking about the fact that they want "a" to mean only one, they want "an" to mean two, they want "less than two" to mean only one, is to show that there has been no disavowal; that there is no clear and unambiguous statement by the patentees that they didn't claim a single -- you know, something less than a double-space robot.

And that's why I think that the specification 758 to 61 which I cited before is important.  The load handling device may be of different types.  And I think that is a lack of disavowal -- substantially is a lack of disavowal.  And I think, respectfully, that's the -- the construct that your Honor should use in addressing this question.

And then, again, I don't -- I also don't understand this dispute about the EPO.  What the EPO said was a footprint occupying a single grid space is to be understood under the board's view that this footprint is equal or larger than a grid space.  That's exactly what we're saying in terms of the claim construction here.

And, again, it's not that your Honor should be

following the EPO.  My point, if I didn't make it, is that in AutoStore citing the EPO arguments and not telling your Honor what the board concluded is not evidence of disavowal.

The Hognaland reference, again, is not evidence that the -- there's a space between the one and two that is not claimed.  Hognaland, as your Honor can see just by looking at it, occupies a single grid space and parts of two other grid spaces.  It's not something less than two.  It's something more than two.

So Hognaland doesn't really tell us anything.  It certainly doesn't tell us what AutoStore said.

So unless your Honor has further questions about these three claim terms, I think it's my task to lead off with a housing footprint.

THE COURT:  All right.  Let's take a lunch break.  Let's reconvene here at 1:15 sharp.  I'll try to get it right going at 1:15.

(Lunch recess taken at 12:17 p.m.)

115

C E R T I F I C A T E


I, Liza W. Dubois, do hereby certify that
the foregoing transcript is a true and accurate transcription
of the within proceedings, to the best of my knowledge, skill,
ability and belief.


Submitted: 10/18/22          */s/   Liza W. Dubois*
                             LIZA W. DUBOIS, RMR, CRR