**NO COPY OF THIS TRANSCRIPT MAY BE MADE PRIOR TO 3-20-2023**

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW HAMPSHIRE

```
* * * * * * * * * * * * * * * * * * * *
                              *
OCADO INNOVATION, LTD., AND OCADO    *
SOLUTIONS, LTD.                      *   21-cv-41-JL
                              *   November 18, 2022
             v.               *   4:55 p.m.
                              *
AUTOSTORE AS AND AUTOSTORE SYSTEM,   *
INC.                                 *
                              *
* * * * * * * * * * * * * * * * * * * *
```

TRANSCRIPT OF MARKMAN HEARING
AFTERNOON SESSION - PART TWO
BEFORE THE HONORABLE JOSEPH N. LAPLANTE

APPEARANCES:

For the Plaintiffs:          Garrard R. Beeney, Esq.
                             Marc De Leeuw, Esq.
                             Dustin Guzior, Esq.
                             Alexander N. Gross, Esq.
                             Austin Mayron, Esq.
                             Sullivan & Cromwell, LLP

                             Henry C. Quillen, Esq.
                             Whatley Kallas, LLP


For the Defendants:          Gregg F. LoCascio, Esq.
                             Joseph Loy, Esq.
                             Ali-Reza Boloori, Esq.
                             Kirkland & Ellis, LLP

                             Robert R. Lucic, Esq.
                             Abbygale Martinen, Esq.
                             Sheehan, Phinney, Bass & Green, PA


Court Reporter:              Susan M. Bateman, RPR, CRR
                             Official Court Reporter
                             United States District Court
                             55 Pleasant Street
                             Concord, NH 03301
                             (603) 225-1453

P R O C E E D I N G S

THE COURT:  Please proceed.  We're on the record.

MR. LOY:  Thank you, your Honor.

Joseph Loy on behalf of AutoStore.

So we'll start with the accusation that AutoStore has somehow8 skipped step one of the process that the Court must determine, whether or not 112(f) even applies.

And there was emphasis on this question of an admission that a processor by itself is not a black box in that there's an admission from AutoStore that a processor is itself a structure.

We're not denying that a processor by itself cannot provide structure and even a processor that is programmed with simple programming.  Like the example that Mr. Guzior gave, that your temperature is exceeding 68 degrees and therefore you have an output.  Those types of very simplistic just run-of-the-mill programming is not what we're talking about here.

We are talking about extraordinarily complex claims that have functions.  They claim functions that are generating steps.  There are reserving steps.  There are determining steps.  And that is not in the prior art.  That is not something that you can just go to the shelf, rather, and purchase code that has been designed to run this system.

Now, AutoStore certainly did do it.  We will have

-- and you've heard from Mr. LoCascio's argument that we will have invalidity arguments based on prior use, prior sale, but the claims -- we must focus our attention in the claims. Are processors configured to do a very specific function? That is classic means-plus-function claiming. It does overcome the presumption here.

Now, we were shown code, too, just a very simple example of code from Ocado, but the reality is Ocado's code that it programmed and that it did not share with the public, it keeps super secret, it is hundreds of thousands if not millions of lines of code in order to perform these functions that are claimed.

Similarly, the AutoStore code that their experts have been reviewing in locked rooms for almost a month, literally day in, day out, an aggregate of a month just to figure out how this stuff works, it's complicated, that is not disclosed in these claims.

It does not say the how you do it. It says, rather, what you're trying to achieve. It's functionally drafted claim language without a doubt.

Now, there was an accusation that somehow at step one, much like the cases that Ocado is relying on, that AutoStore did not present any evidence that one of ordinary skill would not understand the structure is present in the claim. That is false.

If we look to AutoStore's opening brief as just one example on page 40, this is -- at the top of page 40, I think in the docket it's page 53 of 65 at document number 127, this is a citation to AutoStore's expert.  It says verbatim at the last line of the paragraph that is at the top:  The claims do not explain how the one or more processors determine that there is a potential for collision.

This is the very crux of the alleged invention here.  This is the heart of what they're claiming is novel.  And so if the claims themselves do not tell you how, which there's citation to our experts at their declarations that are in the record, then this issue of whether the claim has provided you sufficient structure is answered in the negative.

So we now have to move to its functional language without proper structure.  We have to move to the next question about what's disclosed in the specification.  And as we saw during the opening argument, nothing in the specification discloses the claim of functions.

Now, Mr. Guzior focused a lot on argument related to the Dyfan case, and I think this is one area of law, your Honor, where as you're going through the process of reaching determination it is going to be critical that we don't just focus on excerpt paragraphs of what the law is.  It's not really disputed what the law is.  It's really digging into the underlying facts of each of these cases and looking in each

instance to what was the claim, what was the claim function, and whether or not that claim function was something that was known that could have been bought off the shelf, and that is true for the Dyfan case.

If we look at the Dyfan case -- this is 28 F.4th 360 at 1368.  I'll just zoom in here.

Dr. Goldberg, who was the plaintiff's expert in that case, testified that the claimed function would have been known to those of ordinary skill.  It was displaying information and it could have been implemented using off the shelf code or applications.

That is not true.  There is clearly no evidence that that is true.

And, additionally, the Federal Circuit went on to say:  We explained that a person of ordinary skill in the art would have been able to reasonably discern from the claim language that the disputed limitations program and user interface were references to conventional programs or code existing in the prior art at the time of the invention and were not used as generic terms or black box recitations.

Contrast that with Ocado's position here, which is this information was not known in the prior art and it is the very source of novelty that renders these claims capable of even being issued and granting them a monopoly power.

Now, let me just attack the -- or respond to the

last argument that there was somehow some inconsistency with the positions that AutoStore has taken with respect to means-plus-function claiming.

Now, as your Honor is well aware, the local rules in this court do prevent us from bringing an unlimited number of claim construction disputes.  There were lots of other issues with others of the claims, and we had the ability to pick and choose which arguments we would pursue.

We are more than happy to argue or brief to this Court other means-plus-function terms, other invalidity terms. We were being judicious in doing so.

And there's other instances where we didn't bring them because they're not valid arguments.  Let me give you one example, your Honor, of '770.

If you look at claim 1, the claim ends by claiming a memory device.  So we're focused on the processors configured to in each of those functional claims.  That's what's responsive to the 112 argument.

If you look here at the end, a memory device is also a structure, and sometimes the memory device will be amenable to a 112(f) argument.  Here it is not because it simply says a memory device configured to store the plurality of clearance commands.  It's doing the very thing that you bought it to do from off the shelf, right?  It's a memory device that stores information.  We're not going to bring a

112(f) argument to try to invalidate that because it's not a legitimate argument.

THE COURT:  So what are you telling me?  So you're being judicious because you're following the rules and you're doing me a favor because you're not bringing invalid arguments?  What are you trying to tell me?

MR. LOY:  I'm just responding to the suggestion that there's some contradiction in the choices that we made.  That's all.  There was a lot of emphasis at the end --

THE COURT:  Okay.  You're telling me you're only pushing claims that matter.

MR. LOY:  Exactly, your Honor.

THE COURT:  Okay.  I was a little cynical.  Sorry about that.

MR. LOY:  That's all right.  It's late in the day.  I understand.

Thank you, your Honor.

MR. GUZIOR:  Mr. Mayron, could you take us to slide 86, please?

Your Honor, we heard a moment ago that I was mistaken and AutoStore did not skip step one, and I thought it was interesting.  What Mr. Loy showed you as the evidence that AutoStore offered at step one was a page from AutoStore's claim construction brief written by the lawyers.  And Mr. Loy said, oh, and there's a citation here to Dr. Ioannou's

declarations.  Now, I would like to show your Honor what those citations are to.

So, your Honor, the first citation is to a range of paragraphs -- or the second citation is for a range of paragraphs that starts at paragraph 175 of Dr. Ioannou's first declaration.

Now, it's funny because this is exactly what I put on my slides to say that AutoStore skipped step one.  This is the statement:  AutoStore's counsel asked me to provide my opinion as to whether the '770 patent specification provides algorithms or methods to program computers to implement the functions recited for the "one or more processors."  In my opinion, the specification provides no such algorithms.

That is evidence for step two.  That is not for step one.  So when Mr. Loy put up their brief as the evidence they offered on step one and said look to Dr. Ioannou's declaration citations, this is what you'll find.  This is evidence of step two, not step one.

Now, the brief cites a paragraph 49(a) from Dr. Ioannou's surrebuttal declaration, and this also may look familiar because I also put this on my slide as explaining why when you look to Dr. Ioannou's surrebuttal in paragraph 49(a) and he says that in his opinion the specification doesn't provide an algorithm for the computer code that you would put on the processors.  That is evidence for step two.  That's the

step two inquiry, not step one.

This is the entirety of the evidence that Mr. Loy offered you, and I would note the peculiar way that that evidence was put in front of the Court, showing the Court the Markman brief and a citation to that evidence, and this is zero evidence of step one.  It's all step two.

So we heard, your Honor, that they didn't skip step one, but then where was the demonstration of the evidence for step one?  Mr. Loy said it, but there was no evidence and he couldn't point you to it because there isn't any.  What they need is the expert saying I don't know a code to perform these functions that are described in the claim.

But the expert said the opposite.  Here on slide 86, I want to draw the Court's attention back to Dr. D'Andrea's testimony:  A person of skill would know how to visualize the structure of the code necessary to perform these operations.

Slide 97, please, Mr. Mayron.

And Dr. D'Andrea testified that at the time of the invention people of skill would know and have available code that performs these operations.

Slide 98.  AutoStore's own expert, your Honor, testified that before 2010 he and his colleagues had code available to perform these operations.

So again, your Honor, when AutoStore has to put

forward step one evidence that a person of skill would not know how to create code to perform the operations described in the claims, all of the evidence establishes the opposite.

And once again, your Honor, and I probably sound like a broken record, it's their burden, and all of the evidence shows at step one that the claim term is not means-plus-function.

Thank you, your Honor.

THE COURT:  Okay.

MR. BOLOORI:  Good afternoon, your Honor.

THE COURT:  Good afternoon.

MR. BOLOORI:  Ali Boloori for AutoStore.

I will be addressing the potential for a collision term.

This is another term -- AutoStore contends that the term is indefinite because the scope of the term is not reasonably certain to a person of ordinary skill.

Now, Ocado claims that the term requires no construction, and I will mention what Ocado's proposed meaning for the term is and I will explain why that is actually flawed and does not get rid of the indefiniteness problem.

But before we get to that issue, just to show you the context of where this claim actually occurs -- where this claim term occurs in the patent.  On claim 1 the second limitation of the claim recites:  Determine that there is a

potential for a collision, and then it goes on to say, between a first robot and a second robot. And then the next limitation says: Responsive to a determination that there is the potential for a collision. And then there are a number of actions that the claim requires to be done responsive to that determination that there is a potential for a collision.

Now, the problem with the term determining if there is a potential for a collision is that it requires some parameters, some objective factors to be used in the determination, and the patent provides no explanation for that action. There's no explanation of what potential is. There is no explanation of the limits or the bounds for that determination, meaning how large the potential must be in order for that to count, and there's no explanation for how that potential -- how the determination is made.

Here's Dr. Ioannou explaining that the specification or the patent in general does not provide any objective measure for determining potential for a collision. And, indeed, Ocado's expert, Dr. D'Andrea, did not actually address this point at all. He cites the point. He never addressed directly the point that Dr. Ioannou made that the specification does not explain or does not provide any objective measure for how to determine the potential for a collision.

And, indeed, the patent does not provide any

criteria for making this yes or no determination, which is what Ocado claims the term means.

In his deposition Dr. Ioannou was asked is it possible that a person of skill would know how to go about making a determination, and he said that if given a number of assumptions that the person would understand and would understand what the objective is, he would be able to do that, but none of those assumptions are provided in the specification.

Now, Ocado's position is legally flawed. What they want to say is that determining a potential for a collision means any determination that either there is a potential for a collision or there is not based on the data available to the system. That is their proposed meaning for the ordinary meaning of the term.

Now, there are two flaws for this. One is that it includes -- because they say it includes any determination, that it also includes subjective determinations that are not amenable to objective criteria at all, and the second is that it does not describe any criteria for making the determination at all.

The HIP versus the Hormel Foods case that AutoStore cites in its brief explains that when you have a claim term that is amenable to subjective determinations, that is indefinite.

And there's another case that AutoStore cited, which is the -- if I just go to the -- it's the Sensor Electronic case which again explains that if there is a claim term that the patent does not explain, does not provide any objective criteria for making or understanding what that claim means, what that terms means, the term would be indefinite.

Now, in its briefing Ocado mischaracterizes Dr. Ioannou's testimony.  They claim Dr. Ioannou agreed that a controller could check for a potential for a collision in the prior art in the same way that the claim recites.

What Dr. Ioannou actually testified was about a paper he wrote.  In that paper he testified that -- he described a system that could determine a possibility for a collision, but that doesn't say anything about whether the patent itself, the '770 patent itself explains what determining a potential for a collision means.

It just means that somebody else in the prior art was able to come up with a system that could determine whether two robots -- whether there was a chance for two robots to collide.  It doesn't say anything about whether the '770 patent explains with sufficient certainty what determining a potential for a collision is.

Thank you.  I'll stop at this point.

MR. GUZIOR:  Mr. Mayron, if we could start at -- you're ahead of me.  Thank you very much.

Your Honor, I think we can be brief on this claim term because, to be honest, I actually do not understand what AutoStore's argument is or why it makes sense.

Because if I follow, the argument goes something like this. The claims talk about an assessment of whether there's potential for a collision, yes or no, but the Court should first construe the claim language to mean something very different, i.e., that the claims require an assessment of the likelihood or the probability that there will be a collision, that there's an 80 percent or higher chance that there's a collision, and then, having construed the claims to mean something they don't say, find that the claim is indefinite because neither the claims nor the specifications say what the probability threshold is.

It makes no sense to me, your Honor, and I say that respectfully. Why would the Court first construe the claim to require probability only to conclude that there is no probability? The claim doesn't say anything about probability.

And here, your Honor, on slide 111 we see what the claim language actually is. It talks about determining whether there is potential for a collision, yes or no, and then taking certain actions in response to that determination.

There's nothing indefinite about it. There either is potential for a collision or there is not.

AutoStore contends that this term is indefinite. Again, seeking to invalidate all of the claims of the '770 patent, your Honor. All of them.

To reach that result, they insert the probability requirement that doesn't exist.

Mr. Mayron, can you take us to slide 114, please?

And as Dr. D'Andrea explained, a person of skill would not understand this claim language to be probability based. This is what Dr. D'Andrea explains in his surrebuttal declaration excerpted here on slide 114.

And slide 115 shows text from a specification in accord. The clearance module tracks that it will not be possible for a robot to collide with another robot. Again, yes or no.

And on slide 116 AutoStore's expert confirmed at his deposition that this is a well-understood concept to people of skill in the art. And this is critical, your Honor. What you see on slide 116 is called a Petri net, and it's something the Court will hear about a lot as this case heads toward trial because people in this field use Petri nets, and it describes the states of a system. And this particular Petri net was from a research paper that AutoStore's expert published in 2002.

The figure shown on slide 116 describes two states. One: Yes, possible collision. Two: No, no collision.

And the no description described by AutoStore's expert is no collision possibility exists during the next time interval.  Again, it's not about probability.

THE COURT:  Are T1 and T2 the two time intervals?

MR. GUZIOR:  Correct, your Honor.

THE COURT:  All right.

MR. GUZIOR:  It's not about probability.  It's a simple yes or no question.

And Dr. Ioannou confirmed this in his deposition testimony.  When I asked him about his research paper, he said:  What I mean here by the collision possibility is the probability of collision is zero.  So there's no probability threshold.  It's zero.  In the no collision case we consider that there is no possibility of collision, which means the probability of collision is equal to zero.

Your Honor, this is not the least bit confusing.  When the system determines whether there is a potential for a collision, the claim is talking about exactly what Dr. Ioannou, AutoStore's expert, described very clearly in his 2002 research paper and explained very clearly in his deposition testimony.

The system does not play dice with accidents.  It's not probability.  It's not chance.  It's not is there a 80 percent plus chance of a collision, 90 percent plus.  It's is there any possibility.  And if the answer is yes, the

clearance command is withheld.  If the answer is no, the clearance command is provided.

Again, your Honor, this is indefiniteness, AutoStore's clear and convincing burden of proof, and on the papers I respectfully submit there is no way to find based on their expert's testimony and our expert's testimony that the term is indefinite.

Thank you, your Honor.

THE COURT:  Thank you.

MR. BOLOORI:  Your Honor, just very briefly.

So two points.  The first point was when Mr. Guzior said that we're trying to bake in a probability into the claim language, that's actually not what we're doing at all.

We agree that the claim says determine there is a potential for a collision.  That is a yes or no question. However, the way that one would determine if there is a potential for a collision is based on some kind of calculation.  And the point is that the patent does not describe any objective criteria for that determination to take place at all.  So it could be a subjective determination.  It could be anything.  There is no explanation in the patent for how to do that.

The second point is when Mr. Guzior mentioned Dr. Ioannou's paper, that Dr. Ioannou had no trouble explaining -- determining what a possibility for a collision is, the point

of that paper is -- there is no connection actually between what that paper talks about and the patent at issue here.

In the context of that paper Dr. Ioannou explained that he came up with an objective way to make a determination as to whether, again, two robots or two vehicles are able to collide or not.  That doesn't say anything about whether the '770 patent provides any kind of objective guidance about how to make that determination.

Thank you.

THE COURT:  All right.

MR. GUZIOR:  Your Honor, this will be very brief.

Mr. Mayron, slide 113, please.

So Mr. Boloori says that there is no guidance in the specification about how to make the very simple and I believe now admittedly crystal clear determination about whether there is or is not a potential for a collision.

But, actually, as shown here on slide 113, the patent talks about such that no transporting devices have locations on the grid-like structure which would cause transporting devices to overlap at the same time.

Does that refer to the idea of a collision?  It does.

So it's pretty clear how you determine whether there's a potential for a collision or not based on all of the information you have about the moving robots.  The system says

is it possible based on the current state of the system that this robot and a second robot will occupy the same space at the same time.  If there's a risk of that, the system says no dice because this is a system that guarantees the absence of collisions.

Now, additionally, your Honor, on -- slide 115 please, Mr. Mayron.

The specification talks about how you might do this.  This is the specification at the bottom.  The system checks that it will not be possible to collide with another robot based upon, for example, grid dimensions, grid positions, move commands generated by planning, cancellation of move commands, the current positions of speed of robots --

THE COURT:  Slow down, counsel.  Slow down, counsel.

MR. GUZIOR:  I'm sorry, your Honor.

THE COURT:  It's okay.

MR. GUZIOR:  -- braking ability of robots, as well as where they have been cleared to visit.

So when my colleague tells your Honor that there's nothing in the specification saying how you would make this determination, I just can't understand that because it's right here on slide 115.

Thank you, your Honor.

THE COURT:  Thank you.

Mr. Loy.

MR. LOY:  Your Honor, we've reached agreement that we will divide up the remainder of the time to 15 minutes on each side.

We're going to move to the remaining terms of the '080 Patent, those two remaining terms.

And I'll be addressing, your Honor, the term exclusively within the storage and retrieval system.

THE COURT:  Give me a second.  Okay.

MR. LOY:  Just as a brief recap, your Honor, if you'll recall, the '080 Patent addresses a system that has storage containers and delivery containers.  Those systems use a container within a container, sometimes referred to a bin within a bin or a tote-in-tote, and there are picked items that are placed into a delivery container which is then placed into a storage container and stored within the automated storage and retrieval system.

The specific claim at issue here in the '080 Patent is claims 1 and 13 that address this issue, and we will turn now to slide 59.

Now, just for a little context, I've excerpted Figure 1 on the right which includes two issues that are two sections that are really at issue here.

The storage and retrieval system, which is the largest rectangle, is marked as item No. 400 and throughout

the specification is described using that reference.

Separate and apart from the storage and retrieval system is the order picking station, which is directly below the storage and retrieval system, and that is a separate entity and it is referred to by item No. 4.

Now, the claim -- if we look at the claim at issue here, claim 1 refers to generating signals for instructing or controlling robot load handlers to retrieve from the storage and retrieval system, that's 400, at least one storage container containing stored items for delivery and retrieval, at least one storage container to an order picking station.

So what you have here is you have a storage container that is sent to be picked up by a robot load handling device and then brought to an order picking station.

The claim then goes on to require that the first -- that the robot load handling device delivers the retrieved storage container to that picking station.

But then there is a requirement in the claim that those same storage containers are for transport by the robotic handlers exclusively within the storage and retrieval system.

So if you read the literal language of the claim, the storage containers never leave and, pursuant to this claim, the box or the rectangle that is labeled as 400.

So there is just an internal inconsistency here because it cannot be exclusively, as the claim requires,

within the storage and retrieval system and at the same time be delivered to the order picking station.

What Ocado would like you to do -- I'll just put this up on the ELMO for a minute -- is to redraw Figure 1 and place a box around both storage and retrieval system and the order picking station and now call that the storage and retrieval system.

That is not what the specification says, that is not what the claim requires, and therefore this claim term, your Honor, is indefinite.  This was the drafter's choice.  It is not the Court's requirement to redraft the claims for the patent.

And I believe Mr. Gross is going to be handling this argument, and I hope I was well within my fifteen minutes.

THE COURT:  Yeah, you were.

MR. GROSS:  Good afternoon, your Honor.

Alexander Gross on behalf of plaintiffs.

So Mr. Loy just explained to you that claim 1 allegedly includes impossibility, but AutoStore's argument is based on two fundamental misrepresentations of what the claim language actually says.

I'll explain that to you in just a moment, but before I do that I would like to go back to something that Mr. Guzior was discussing earlier, which is the legal standard

here, and you heard nothing about the legal standard in Mr. Loy's presentation.

As Mr. Guzior explained earlier, AutoStore has a clear and convincing evidence burden here and it must show that when viewed in light of the specifications and the prosecution history, the claim language would not inform a person of skill in the art about the scope of the invention with reasonable certainty.

In addition, Federal Circuit law is clear that your Honor should not construe a claim term to include an ambiguity in order to create an indefiniteness argument, and that's precisely what AutoStore is attempting to do here.

So how does AutoStore attempt to meet its clear and convincing evidence burden of what a person of skill in the art would understand?

AutoStore has no expert testimony here.  Earlier when we were discussing indefiniteness in connection with the '770 patent, you heard a lot about what Dr. Ioannou said, what Dr. D'Andrea said.  There is no expert testimony here. AutoStore decided not to submit any.  I respectfully submit this alone should be fatal to AutoStore's indefiniteness argument.  They have failed to provide any evidence of how a person of skill in the art would read this claim term.

Instead, AutoStore provides only attorney argument based on mischaracterizations of the claim language.

So the first mischaracterization is that AutoStore says the robots deliver the storage containers directly to the order picking stations.  And AutoStore says, well, the robots only operate within the grid, how can they deliver the storage containers to the picking stations, but that's not what the claim language says.

What the claim language says is that claim 1 is directed to a processor configured to do a number of actions, including configured to generate signals for instructing or controlling robots to retrieve a storage container and generating signals for delivering the retrieved storage container to the order picking station.

But what claim 1 does not say is that the robots must deliver the storage container to the picking station. While it specifies that the robots have to retrieve the container, it does not specify any method for delivering the storage container to the order picking station.

So to manufacture the result that it wants, AutoStore has to focus on a snippet of the claim language, divorce it from the context of the claim about the processor configured to generate signals to perform certain actions, and then it has to alter the snippet of the language that it includes.

So the claim language does not say the robotic load handlers deliver the retrieved storage container as AutoStore

suggests, but as you can see here in this red line of what AutoStore said in its brief, it says that the robotic load handlers retrieve the storage container from the storage and retrieval system for delivering the retrieved at least one storage container to an order picking station.

So the first requirement that AutoStore says creates this conflict simply does not exist in the claim language.

Now, let's turn to the second requirement that AutoStore says creates this conflict.

AutoStore says the storage containers can never leave the storage and retrieval system. But, again, that's not what the claim language says.

As you can see here at the red line on the bottom of slide 56, this is the language that AutoStore has to omit from the claim language in order to try and create this requirement out of whole cloth. So, yet again, to create this purported inconsistency AutoStore has to substantially alter their claim language.

I respectfully submit that the claim language unambiguously rejects AutoStore's indefiniteness argument. But even if there is an ambiguity, then your Honor should look to the specification to see if it provides any guidance, and here it does.

If you look at column 7, lines 31 to 36, it

provides an example where, one, the robot is being used as only one part of the process for delivering the storage container to the picking station, and, two, where the storage container plainly leaves the storage and retrieval system.

And so what I've done is I've created an animation based on the modified version of Figure 16 on the right here with the robot in yellow and the storage container in blue.

So what column 7 of the specification says is that, first, the storage container is hoisted by the overhead load handler robot.  The robot then delivers the storage container to a port, labeled 70 here, and lowers it.  And then, crucially, the specification says the storage container is taken by a conveyor to the pick station.

So even if there was ambiguity in the claim language, and I respectfully submit that there is not, the specification makes clear that both of the requirements that AutoStore tries to impose on this claim in order to create an indefiniteness argument are entirely rejected by the specification.

Unless your Honor has any questions, I'll turn over the podium.

THE COURT:  Wait a minute.  I want to look at this again.  You're going to have to run it again so I can look at it again.

(Animation played again)

Okay.  I think I follow.

MR. GROSS:  Thank you, your Honor.

MR. LOY:  I'll just briefly address the argument just made, your Honor.

Ocado has created a straw man that is really not even addressing the argument at hand.  The argument at hand, and if you read the claim, your Honor, suggests that the storage containers are of a specific size and gauge, that they are used exclusively within the storage and retrieval system, and that they in this instance do not then go to the picking station.  So they remain in 400.  And in this claim -- very specifically looking at this claim, they remain exclusively within the storage and retrieval system.

So Mr. Gross nicely animated something that comes from the spec that is not referring to what is being claimed here.

If we read what's being claimed, it states:  The storage containers are of a first size and gauge for transport by at least one of the robotic handlers exclusively within the storage and retrieval system.

That excludes their ability to go to the picking station.  That is a different claim.  It's certainly not this one.

So, again, your Honor, we say there is an illogic to this claim that is not permissible based on the way that

the schematics have been drawn.  At Figure 3 again, these are two distinct and entirely separate sections of the system.

Now, Ocado was free to draft a claim that didn't require that these storage containers remained exclusively within the storage and retrieval system.  Whether or not the robotic handling devices bring them to the order picking station or whether it's just the signals that are instructed to bring them there, that's a red herring.

I'll turn it over to Mr. Gross to address the next claim.

MR. GROSS:  So before I move on to the next claim, I just want to make one quick point about what Mr. Loy just said.  Mr. Loy skipped over words again.

If you look at the portion of the claim language, it says that the storage containers are of a first size and gauge for transport by the at least one robotic load handler exclusively within the storage and retrieval system.

What that's saying is when the storage container is within the storage and retrieval system it is exclusively handled by the robotic load handler, which is precisely what I showed in that animation.

It doesn't say anything about the methods by which the storage container must be transported when it is outside of the storage and retrieval system.

So I just wanted to make that one brief point.

THE COURT:  Okay.

MR. GROSS:  Sorry.  I don't have as much experience with flipping around with this as others do.

THE COURT:  That's okay.

MR. GROSS:  So the final claim for construction in the '080 Patent is a structural framework defining a grid of storage locations which appears in independent claims 1 and 23.

Ocado's proposed construction is a structural framework in which crossed structural elements define a two-dimensional array of storage locations.  AutoStore proposes the plain claim language.

Now, it may not be obvious based on this chart I have on slide 61 precisely what the dispute is between the parties, but this isn't the first time that the parties have addressed the proper construction of this claim term.

Ocado and AutoStore addressed the proper construction of this claim term during IPR for the '080 Patent, and during that proceeding both Ocado and AutoStore proposed the exact same constructions that they do here.

However, AutoStore took the position that the plain claim language, its position here and in the PTAB, requires only that the storage locations or containers be arranged in the grid, not the structural framework define a grid of storage locations as the claim language plainly requires.

And on this core dispute the PTAB rejected AutoStore's construction and agreed with Ocado that the claims required the structural framework rather than the orientation or location of stacked containers must define the grid of storage locations.

And the PTAB has reached this conclusion not once but twice in its decision denying AutoStore's petition for IPR as well as in its decision rejecting AutoStore's rehearing request.

Now, while PTAB's construction is not binding on this Court, both of the PTAB decisions form part of the intrinsic record of the '080 Patent which is the primary source for claim construction.

Thus, the PTAB's well-reasoned decisions are highly persuasive evidence, and AutoStore has provided no basis for the Court to depart from the PTAB's conclusion.

While the PTAB resolved the major dispute between the parties, it did not have to reach the remaining minor dispute concerning what structural framework defining the grid of storage locations must look like.

And on this issue, as well, the parties' positions in the IPR are the exact same as they are here. Ocado contends the claim language requires crossed structural elements to form a checkerboard pattern. A more technical description of which is a two-dimensional array.

And as Ocado explained in its briefs, and as Ocado's expert, Dr. Pfeiffer, corroborated, this construction is consistent with every description in the specification of how the grid is defined and every single figure in the patent that depicts the grid.

Now, Ocado contends that AutoStore -- sorry.

AutoStore contends that Ocado's construction is wrong, but during the IPR and claim construction briefing AutoStore has never actually said what it contends the structural framework must look like.

However, it appears that this is no longer in dispute. And so if we look at slide 8 of AutoStore's Markman hearing presentation, which AutoStore said during the claim construction hearing in September these slides provide, and I quote, an overview of any cubic AS/RS.

And this slide identifies the grid in green. And when you zoom in, you can see that what AutoStore identifies as the grid is a set of crossed lines forming a checkerboard pattern on the top of the storage cube. Precisely what Ocado says Ocado's construction is.

And if we go to slide 6 of AutoStore's presentation materials, it then further defines what these green lines are. And what it shows is the green lines are rails, crossing rails that form a checkerboard pattern, and those rails are structural elements.

There appears to no longer be a dispute. AutoStore's hearing presentation materials show that it agrees that the grid consists of crossed structural elements, i.e., rails, that form a two-dimensional array or a checkerboard pattern.

I yield the podium.

THE COURT:  Go ahead.

MR. BOLOORI:  Your Honor, if I could, I would actually like to start with Ocado's slide 62.

Could you go back?  Would you be able to show this, sir?  Thank you.

I would actually like to switch over.

Your Honor, I would just like to start with Ocado's slide 62.

Mr. Gross just argued that in this case AutoStore is trying to argue that the claims require only that the storage locations contain -- that the storage locations or containers be arranged in a grid, not that the structural framework define a grid of locations.

That's actually not something that AutoStore is arguing in this case at all.  So that is just a straw man that's just, frankly, irrelevant to this case.

Now, if we could please go back to our presentation, Mr. Herschkowitz.  Thank you.

AutoStore's position is just simply that the term a

structural framework defining a grid of storage locations should just take its plain and ordinary meaning.

There's nothing in the patent that would justify Ocado deviating from that plain and ordinary meaning.  What Ocado is trying to do is to build in two requirements into the claim language that's actually not there.

The first one is that they want the grid to be limited to an array -- or a two-dimensional array.  There's, frankly, nothing in the intrinsic record that would require the grid to be limited to a two-dimensional array.

In fact, Mr. Gross showed you AutoStore slide 8.  So just to go to the ELMO, in here he pointed out that the grid is being shown with the green lines, but even there you can see the grid is actually a three-dimensional structure, not just a two-dimensional structure that Mr. Gross is pointing to.

And the second limitation that Ocado is trying to bake into the claims is that -- they want to say that the claims require that the elements be crossed, but they can't actually explain what crossed means in their construction and they haven't provided any definition of that.

With respect to the definition of grid, what Ocado says grid means is a grating of crossed bars.  That's the definition that they have pointed to from the dictionary, but what they've actually done is they've taken that definition

and they've taken the grating out of it, they've taken the bars out of it, and all they're left with is crossed. And what they want to do is they take that definition and divorce it from the context of the grating and the bars limitation and put it into their claims.

In the same dictionary excerpt that Ocado provided there's another definition for grid. It's called a basic system of reference lines mapping; a region consisting of straight lines intersecting at right angles. That would seem to be a more apt definition for a grid except that Ocado inexplicably -- they're not relying on that one at all.

Finally, a point about what the PTAB actually decided. What the PTAB decided -- how they construed the claim is that they said it requires a structural framework to define the grid of storage locations. That's it, and that's exactly what AutoStore is claiming -- arguing needs to be construed -- what AutoStore is arguing their claim needs to be construed as. Just exactly what it says. The plain and ordinary meaning.

Thank you.

THE COURT: Thank you.

MR. GROSS: All right. So AutoStore's counsel just said that this really isn't a dispute, AutoStore is not actually arguing this, but they're going to argue this.

As your Honor has noted a couple times throughout

the day today, you know, sometimes when doing claim construction you take kind of invalidity or infringement issues into consideration.

Based on the prior art reference --

THE COURT:  You take what issues into consideration?

MR. GROSS:  In determining which claims you suggest for claim construction.

THE COURT:  You said you take something issues into consideration.

MR. GROSS:  In the background there's always invalidity and infringement considerations.

THE COURT:  Okay.

MR. GROSS:  Your Honor has recognized that a number of times today.

The same claim reference that they asserted in the IPR, they're asserting it here.  The exact same prior art reference to the exact same claim showing that it meets this limitation.

So this is going to be a dispute either now -- and I respectfully submit that it's been fully briefed and should be decided now.  But if not now, later there's going to be a question of whether the grid must be a two-dimensional array formed by crossed structural elements or whether it can be something different.

So this issue has been fully briefed and argued, and I respectfully submit that it should be decided.

Now, AutoStore says that they're merely arguing plain and ordinary meaning, but that's precisely what Ocado is doing, too.

Here we're saying the plain and ordinary meaning of these claim terms is our construction.  The plain and ordinary meaning of a grid is a two-dimensional array formed by crossed structural elements.

They say that, you know, nothing requires a limitation to a two-dimensional array because the cube is a three-dimensional array.  What they're missing is that it's not just -- the claim language isn't just a grid.  It's a grid of stacks, right?  So those stacks have height.  That's the Z-dimension.  And so the grid for the stack is a two-dimensional grid into which a stack of containers that occupies the third dimension fits.  And so that's why it's a two-dimensional --

THE COURT:  Does the ordinary meaning of the word grid exclude three-dimensional?  It sounds like you think it does.

MR. GROSS:  I think -- I haven't actually thought about the question, your Honor.  There may be a circumstance in which a --

THE COURT:  How can you not think about the

question if you're telling me it's the ordinary meaning of the word grid?

MR. GROSS:  When you and I say grid, I think we think a checkerboard.

THE COURT:  I do.  I do.  You're right.  I think two-dimensional, but I also think, maybe that's just me, what's the ordinary meaning, and the dictionary doesn't really help.

MR. GROSS:  I agree with your Honor.  The dictionary doesn't help, and I think -- what we should actually go to, if there's any question about this, is the specification, because the specification says precisely what I said and precisely what is shown in AutoStore's presentation. It says that it's the rails formed by the frames that define the grid.

THE COURT:  And since it only travels on top, the rails mean two-dimensional.

MR. GROSS:  And as you can see in this illustration here, this is what rails formed by frames that define the grid would look like.

It also says -- and this was what I was getting to earlier -- you have grids of containers stored in rows and columns and stacks.  So what does that mean?  It means you have stacks that are stored in these columns.  And so looking down at it from above, it would be a two-dimensional array

into which the stacks can be fit.

Just very briefly on the dictionary definitions.

You know, I agree with your Honor.  The dictionary definitions don't really help one way or the other here.

I do think that the dictionary definition that AutoStore's counsel just put up about, you know, mapping references, you know, is less applicable to, you know, an automated storage and retrieval system than a definition about kind of physical components.

But, in any event, I think it's entirely consistent.  You have, you know, a mapping of crossed lines.  That's precisely what we're talking about here is a two-dimensional array, or a checkerboard pattern, formed by the structural elements.

And then finally on the PTAB.  Mr. Boloori said that AutoStore is arguing for the same construction that the PTAB adopted, but that's not what they're doing.  What they're saying is the plain claim language should apply and you just use the words in the claim, and we can argue later about what it means.

But the PTAB expressly rejected that argument, adopted Ocado's construction that the structural framework -- it must be the structural framework defining the grid of storage locations rather than the --

(Court Reporter asks Attorney Gross to slow down)

MR. GROSS: Apologies. I just saw him looking at his watch.

MR. LOCASCIO: You're already a minute over. We're being terrible over here.

MR. GROSS: I'll take 30 more seconds of your time.

THE COURT: Okay.

MR. GROSS: The PTAB adopted kind of the first half of the construction already. They just didn't need to reach the second half.

And I respectfully submit your Honor should reach the second half of Ocado's proposed construction and that your Honor should agree with our construction that it is a two-dimensional array formed by crossed structural elements, which is the plain and ordinary meaning of the claim term.

Thank you, your Honor.

MR. LOY: I just want to add one point because I think we're all wrapped.

There was a comment just made, and I just want to make it clear for the record that -- earlier today your Honor had said that it's sort of useful context to sort of know what folks are thinking or some of these other side issues, but I did not hear, and I don't think your Honor intended as it was described by Mr. Gross, that you're taking infringement or invalidity into consideration in the claim construction, because that is certainly not our suggestion. I'm sure that's

not the suggestion from the Ocado side either because that would be error.

MR. GROSS:  Can I just say -- I was not suggesting that.  I was merely pointing out that of course there are considerations in the background.  Your Honor should decide the claim construction issue as presented to your Honor.

MR. BEENEY:  Given that we're at the end of the day, the only comment I would like to make is that's like walking into the room with a black robe and saying I am not wearing a black robe.

THE COURT:  Okay.  I get it.

MR. BEENEY:  Thank you.

THE COURT:  All right.  Is that submitted?

MR. LOY:  It is.

Thank you, your Honor.

MR. GUZIOR:  Yes, your Honor.

MR. BEENEY:  Yes.  Thank you very much.

THE COURT:  I know you want to get out of here.

Please be seated.  Off the record.

(Off the record discussion)

(Conclusion of hearing at 5:55 p.m.)

C E R T I F I C A T E

I, Susan M. Bateman, do hereby certify that the foregoing transcript is a true and accurate transcription of the within proceedings to the best of my knowledge, skill, ability and belief.


Submitted:  12-19-22    /s/    Susan M. Bateman _____
                        SUSAN M. BATEMAN, RPR, CRR