*<u>NO COPY OF THIS TRANSCRIPT MAY BE MADE PRIOR TO MARCH 28, 2023</u>

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW HAMPSHIRE

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*
                                         \*

OCADO INNOVATION LTD., AND OCADO    \*
SOLUTIONS LTD                                   \*
                                      \*  1:21-cv-41-JL
              v.                \*  November 18, 2022
                                        \*  1:20 p.m.

AUTOSTORE AS AND AUTOSTORE SYSTEM,  \*
INC.                                      \*
                                        \*

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

<u>TRANSCRIPT OF MARKMAN HEARING</u>
<u>AFTERNOON SESSION PART 1</u>
<u>BEFORE THE HONORABLE JOSEPH N. LAPLANTE</u>

<u>Appearances</u>:

<u>For the Plaintiffs</u>:        Garrard R. Beeney, Esq.
                              Marc De Leeuw, Esq.
                              Dustin Guzior, Esq.
                              Alexander N. Gross, Esq.
                              Michael Thomas Lemanski, Esq.
                              Sullivan & Cromwell, LLP

                              Henry C. Quillen, Esq.
                              Whatley Kallas, LLP

<u>For the Defendants</u>:       Gregg F. LoCascio, Esq.
                              Joseph Loy, Esq.
                              Ali-Reza Boloori, Esq.
                              Tiffany M. Knapp, Esq.
                              Emily Scott, Esq.
                              Kirklnd & Ellis, LLP

                              Robert R. Lucic, Esq.
                              Sheehan Phinney Bass & Green, PA

<u>Court Reporter</u>:         Liza W. Dubois, RMR, CRR
                              Official Court Reporter
                              U.S. District Court
                              55 Pleasant Street
                              Concord, New Hampshire 03301
                              (603) 225-1442

P R O C E E D I N G S

THE COURT:  Stay off the record a second.

(Off-the-record discussion.)

THE CLERK:  Court is now in session has before it for consideration continuation of the markman hearing in 21-cv-41-JL, Ocado Innovations, LTD, et al vs. AutoStore AS, et al.

THE COURT:  All right.  Let's just let me know how you want to proceed first.  We've got -- you've got the '404 left, right, we've got '770, and we've got a couple of terms from the '080.

MR. GUZIOR:  Yes.  Good afternoon, your Honor. We've agreed with counsel that we'll start with the '770 and '404 Patents.

THE COURT:  Okay.  Please proceed.

MR. GUZIOR:  Good afternoon, your Honor.  It's nice to appear before the Court again.  I'm Dustin Guzior from Sullivan & Cromwell and I represent Ocado in this case.

Before we jump in, I'd like to reintroduce Ocado's chief intellectual property counsel, Lucy Wojcik, and her colleague, Ben Lavigne, senior intellectual property counsel --

THE COURT:  In the gallery, right?

MR. GUZIOR:  Yes, your Honor.

THE COURT:  Yeah.

MR. GUZIOR:  And they're here with us today from the

UK.

THE COURT:  Welcome back.

MS. WOJCIK:  Thank you.

MR. GUZIOR:  So I promised Ms. Otis we'll try to finish by 5:00, so I'm going to get right to business.

Today we're talking about the robot control system. And this is described in the '770 and '404 Patents, which share a common specification.  I'm mostly going to focus on the '770 Patent, which is the key patent of the two.

And here on slide 5, your Honor -- you've seen this video a few times, but this is the video of the busy robots on the grocery hive.

THE COURT:  Yeah.

MR. GUZIOR:  And there are three points that I want to highlight for our discussion of the control system today.

One, each of these thousands of robots is on a mission.  One might be assigned to fetch the bananas, another to fetch the cream.  Some robots are assigned to help other robots dig down to reach a bin that's deep in the vertical stack.  But each has an assignment and a central control system tells the robot what to do.

Two, each of these thousands of robots moves at ten miles per hour and they pass each other with only five millimeters of clearance.  Not a lot.  If you have two robots next to each other, you can barely see daylight between the two

of them.  And as thousands of robots zip around the grid, there are many opportunities for collision.

Three, this system is intended to run with no or minimal human intervention.  Ideally, these robots work 24/7 and there are no collisions that require people to do anything.  They charge themselves and a central control system keeps the robot moving.

If a collision occurs, your Honor, this is not an environment that's intended for human beings and there's an elaborate walker system that a human has to use to go out into the middle if a robot has tipped over in order to put it right side up.  So you want the control system to keep things running as smoothly as possible without human interaction.

So we get to the point of the discussion today, the robot control system and collision avoidance.  And you could imagine, your Honor, numerous ways to control collisions in such a system.  For example, you could have mechanical apparatuses on the robots that act as bumpers, you could place electronic sensors on the robots to detect proximity and apply brakes, or you could use a central control system that does its best to provide instructions that reduce the opportunities for a collision.

But what Ocado invented and disclosed in the '770 Patent does not need mechanical devices on the robots, nor does it need electronic sensors on them, nor is it a control system

that minimizes collision probability.  It is a particular control system that makes collisions virtually impossible and it operates by constantly sending wireless signals to the robots and receiving signals back from them so it can intelligently adapt to conditions on the grid.

And what do I mean by intelligence adaptation?  As the patent says here on slide 7, the actual conditions on the grid might deviate from ideal expected behavior.  Robots go down, robots miss wireless signals, robots slip on the tracks and move more slowly than expected, and robots do sometimes tip over, for example.  And Ocado's control system takes all of this into account, transmitting information back and forth between the robots and the control system so collisions become virtually impossible.

How does the system work?  If you'll bear with me, I want to quickly run through key disclosures in the specification and then I'm going to use animations in order to talk through the concepts.

Starting on slide 8, your Honor, the system first determines routes on the grid for the robots to -- to complete a job.  There are various ways to determine the optimal or preferential path.  It could be the fastest path to the destination, but it doesn't have to be.  For example, it also could be the path that will encounter the least congestion or if a robot's battery is running low, it could be the path that

allows the robot to recharge its battery most efficiently.  And the patent explains various algorithms that could be used for these preferential path determinations.

I'll note, your Honor, the A* algorithm that is listed here in the patent because it is an algorithm that your Honor will hear about a lot as this case moves towards trial.

Slide 9, your Honor.  After preferred routes are determined, the control system reserves paths based on the determined routes and in doing so, it reserves paths such that no two robots will overlap on the same grid space at the same time.

Now, these reservations are not hard reservations in the sense that the robots at this point are told to move along them.  These are reservations holding a planned path for a robot and at least initially making sure that if all goes according to plan, the two robots are not expected to collide.

And slide 10 describes constraints on the reserved paths that the system may use, your Honor, when it's reserving paths for the robots.

Slide 11, your Honor, talks about before any movement commands actually are sent to the robot, the control system does a clearance check.  And this is the intelligent adaptation that I spoke about a moment ago.  The system has planned routes and reserved paths, but the system does not actually operate according to theoretical ideals.

So before the system that Ocado invented tells a robot to move, it checks to make sure that based on all of the current information available about the grid, it is not possible for the robot movement to result in a collision.

And here on slide 12, your Honor, the patent describes that if the system detects the potential for a collision, it will withhold the robot move command and replan the route, the grid spaces that the robot moves across for the robot's particular job.

Before moving on, your Honor, I want to touch upon a preferred embodiment that is particularly important to the claim construction disputes between the parties.  This is described on claim -- in slide 13, your Honor, and it's illustrated here on slide 14.

This preferred embodiment implements the invention with computer code, computer-readable instructions that are loaded onto computer processors, and that system interfaces with other hardware to send signals to robots on the grid and, of course, it can receive signals back from the robots.  And these signals in the preferred embodiment are wireless signals that you see depicted here as the red lightning bolts.

Now we get to the animations, your Honor, where I'd like to try to make sure that we understand foundational concepts before moving into the claim construction disputes.

On slide 15, we see an illustration of what the

claims describe as determining a route such that no two robots occupy a space at the same time.  This is also described in the '770 specification at column 19, lines 10 to 30.

Now, note, your Honor, that this is not the physical grid itself.  This is the control system's digital representation of the grid for the purpose of determining routes and reserving paths for each robot.  And what I've shown here on slide 15 is an illustration of what those reserved paths might look like for four robots.

Now we get to one of the most important parts, your Honor, and I'm -- I've shown this here on slide 16.  Slide 16 depicts the reserved path broken into slices, each of which is a clearance command and each slice a move command can be sent one at a time to cause the robot to move.  This is described in the claims as generating clearance commands to cause robots to travel on, and this is the key language, portions of their pathways.

This is also described in the specification of the '770 Patent at column 18, lines 12 to 35, describing clearance just in time.  And what do we mean by just in time?  The next move command is provided just in time, as the robot completes the move command that is the previous slice of its reserved path.

Now, here, your Honor, is an animation that I think is helpful to unpack these ideas.  You'll recall that we had a

reserved path for Robot A and the reserved path was broken into three slices, three different move commands, command 1, command 2, and command 3.

Now, slide 17 shows the robot on the grid and the slices are sent to the robot one at a time and each slice causes the robot to move along its particular three grid spaces. And this also shows in the animation the concept of just-in-time clearance. The robot was provided the next movement command before it came to a stop from the previous one.

Now, the patent describes different ways that these wireless signals could be sent to the robot and what I've shown on slide 18 is a different embodiment of the invention. Here, all three of the move commands are packaged together and all three of the move commands are provided to the robot at one time. You don't do it one at a time. The robot has command 1, which is a current instruction for execution as soon as the robot receives it and command 2 and command 3 are for execution at a future time as the robot moves through the queue.

This is what the claims describe as instructions for execution at a future time and this is described in the specification at column 19, line 57, through column 20, line 2.

And, your Honor, the specification actually explains why the designer might choose to implement the invention in this particular way. And that is at column 10, lines 33 to 38,

where the specification explains that by implementing the invention in this way, you can reduce the load on your processor. You can choose to send all of this information to the robot at one time therefore minimizing the work that the processor and the control system has to do to send the movement commands to the robot one at a time.

Now, slide 19 shows yet another embodiment of the invention. Here, rather than providing clearance just in time, the clearance commands are designed to indicate permissions. And what do I mean by that? Well, as shown here, a robot receives its packet of movement commands, but they're locked and the robot is not able to execute the movement command until it receives a smaller wireless signal, a permission, a key that unlocks each move command to allow the robot to continue along the reserved path.

This is what dependent claim 2 of the '770 Patent describes as a clearance command that indicates a permission. And this is described in the specification as an optional embodiment at column 18, lines 27 to 30.

Now, your Honor, in the next eight slides, I want to show you how all of this can work together to create an effective collision avoidance system.

So we start on slide 20, where we started when we went down the path with the animations. And we have four reserved paths for four different robots. And we're going to

focus on two reserved paths, one for Robot A and one for Robot B.

Now, as I illustrated previously, the reserved path for Robot A is broken into slices which are clearance commands. The same happens for Robot B, where its different reserved path is broken into slices that represent clearance commands.

Now, if all goes according to plan, the robots will be sent their clearance commands in this illustration one at a time and all will go according to plan. The robots pass each other without collision; Robot A gets to the bananas and Robot B gets to the cream.

Now, where the invention comes into play is when you have nonideal robot behavior. And what I've illustrated here on slide 25 is that Robot B slips, say the track is a little bit wet in response to its first clearance command, so it's moving more slowly than expected. Now, if the system just issued clearance commands one right after another, the system would continue to operate according to the plan at the beginning without taking into account that the actual conditions on the grid weren't as expected.

So how does the invention work? Well, at a high level, your Honor, and as illustrated here on slide 26, when Robot B slips, the system receives signals from the robot indicating that there's a problem. The robot is not where the system expected it to be and before it sends out clearance

command 2 or clearance command 3, it makes the check and it determines that there is potential for a collision and it withholds those clearance commands from Robot B.

What does it do in response?  Well, in response, your Honor, the system plans a new path for Robot B.  So you still get Robot B to the bananas, but you do so with a different series of grid coordinates that will take into account the nonideal behavior that otherwise would have caused a collision with Robot A.  And the revised path is broken into clearance commands as well and those are provided to Robot B one at a time so that it safely gets to the bananas while avoiding a collision.  And this last step that I just described here, your Honor, replanning the path for Robot B, that's described in the specification of the '770 Patent at column 18, lines 19 to 54.

So where are we now?  Well, as AutoStore's expert testified to at deposition, this invention here is about coordinating the movement of tens of thousands or even hundreds of thousands of robots.  And as AutoStore's expert explained, the invention here is attractive because it takes individual known techniques and combines them into a system that works as he saw shown in Ocado's videos that your Honor has seen several times now.

And what he said, going to slide 29, is that you see robots coming very close together without collision, crossing

paths without colliding.  And these are ideas that I work on, he's an academic, that are actually now in the real world.  That's the invention here, your Honor.

So we get to the first dispute, your Honor, and the first dispute is about the term clearance command, which appears in all of the asserted claims of the '770 Patent and the separate term clearance instruction that appears in claim 20 of the '404 Patent, the only asserted claim from the '404 Patent.

And as I mentioned at the outset, I'm going to focus your Honor on the '770 Patent and for this dispute I'm going to focus on the term clearance command.

Now, slide 32 shows the relevant claim language reciting a plurality of clearance commands to cause the plurality of transporting devices to travel on the pathways along portions of the plurality of paths.

Now, what is that, your Honor?  That's what I just showed in the animation, where you have the planned paths broken into slices and slices are provided to the robot one slice at a time to cause that robot to move along its reserved path.

And notably, your Honor, this dispute that I'm talking about right now is the only dispute for the '770 and '404 Patents that is a real claim construction dispute.  All of the other arguments that your Honor will hear today is

AutoStore effectively seeking early summary judgment of invalidity, where AutoStore is arguing that five different terms are hopelessly confusing to a person of skill and indefinite and on that basis they are seeking to invalidate every asserted claim from the '770 Patent and the '404 Patent. They're trying to -- they're shooting for a TKO. They want to take both patents out of the case at -- at markman.

And you recall, your Honor, these are issues on which AutoStore has a clear and convincing evidentiary burden in order to get the Court to invalidity due to indefiniteness.

So, your Honor, slide 34 on the screen shows what the dispute is about. What does Ocado say? Ocado says the claims mean what they say. As recited in the claim, a clearance command is a command for a robot to traverse a portion of a reserved path issued when the clearance module checks that the robot will not collide with another robot.

What does AutoStore say? AutoStore says that we should rewrite the claims and insert a word that doesn't actually appear in the claims, permission.

Now, what is the dispute really all about? That's shown here on slide 36, your Honor. You'll remember that when I showed you the animations, I talked about two different embodiments. One was an embodiment where the clearance commands were sent to the robot one at a time to cause the robot to travel along a portion of the reserved path; another

embodiment is what the specification describes as the clearance module may be used to grant permissions for the robot to continue along a reserved path.  Those are two different embodiments.

And what -- you know, when we get down to business, what is the dispute really about?  They want to knock the first embodiment out of the case and they want to say, well, sure, our control system does what your claims describe, but our system doesn't have data packets that it delivers to the robots as permissions.

And that is what the fight is about.  The fight is about the nature of the wireless signal that is sent from the control system to the robots.  AutoStore is trying to say unless that wireless signal is structured as a permission, we don't infringe the claim.  And that, of course, is not what the claim language says, but that's the practical reality of this dispute.

So we look at slide 37, your Honor, and how is it that a person of skill would understand this claim language?

Well, here on slide 37, Dr. D'Andrea explains that a person of skill would understand the claims to mean what they say and the claims use the term clearance command to refer to commands provided after the system checks to make sure there is no potential for a collision.  That's why the claims use the term clearance command instead of just command.  It describes a

particular command that is provided after the system checks there's no potential for a collision.

And here on slide 38, your Honor, this really should be the end of the dispute. This is AutoStore's expert, Dr. Ioannou, testifying that clearance command is a name that was coined by Ocado, but the claims tell him what a clearance command is, i.e., Ocado's proposed construction. As I say, if both experts are in agreement about how a person of skill would read the claim language, that really should be the end of the dispute.

And here's yet another dispositive point on slide 39, your Honor. The independent claim that we've looked at already talks about clearance commands to cause the robots to travel along portions of their pathways. But dependent claim 2 of the '770 Patent, which narrows independent claim 1 by adding an additional limitation, says wherein the plurality of clearance commands indicate a permission.

Why would the Court construe claim 1 to require a permission when that is what the narrower claim 2 says? It makes no sense.

By way of a somewhat silly, but hopefully helpful analogy, if an independent claim said cola and a dependent claim said Polar cola, why would you construe the independent claims reference to cola to require Polar cola. If the intention was to limit the claim to Polar cola, you knew how to

use that phrase and you said it.  You used the phrase cola in the independent claim because the intention was to have the claim be broader.  And that's exactly what we have here.

Dependent claim 23 first confirms the correctness of Ocado's proposed construction.  This entire clause that I've highlighted in yellow on slide 39 is a disambiguation clause and you would not need a disambiguation clause unless the clearance commands in claim 1 included, or at least could include, travel commands that are provided after the system checks to see if there is potential for a collision.

Claim 23 requires separate travel commands that are provided independent of the collision check.  But, again, this whole phrase that's highlighted in yellow, your Honor, it -- it means nothing if claim 1 clearance commands are limited to permissions.

And the specification as shown on slide 40 also destroys AutoStore's argument.  It says that the clearance module may be, emphasis on may be, configured to issue clearance just in time or may be, emphasis on may be, used to grant permissions to robots to continue along their planned paths.  The permission's embodiment expressly is optional.  Again, your Honor, may be.

And one would think from AutoStore's argument that the specification talks about permissions again and again, but the example that your Honor sees on slide 40, this is the only

example in the specification that refers to permissions.  It doesn't appear anywhere else in the specification.  Throughout the specification, the wireless signals that the control system sends to the robot are referred to as control messages in columns 10 and 11, signals for execution in column 12, instructions or new instructions in column 18, commands in columns 19 and 20, messages, packets, and instruction packets in column 20 as well.

What you see on slide 40 is the sole isolated instance that discusses permissions, and permissions are discussed as an optional implementation of the invention.

So, your Honor, in summary, it simply makes no sense to take the phrase clearance commands where AutoStore's own expert says the claim language tells him what the clearance command is.  It's a command to cause the robot to travel along a portion of the planned pathway and narrow it to be what dependent claim 2 says, that the clearance commands have to indicate permissions.  And this is about an escape hatch to infringement, your Honor, and we respectfully request that the Court reject it.

MR. LOCASCIO:  Good afternoon your, Honor.

THE COURT:  Good afternoon.

MR. LOCASCIO:  Gregg LoCascio from Kirkland & Ellis on behalf of AutoStore.

So I want to walk through our deck on the tech

issues, but I want to sort of start off with just a -- some context here.

Because recall -- your Honor will certainly recall the discussion Mr. Loy had with you on the 101 issues, the patentability issues around the '404 Patent, because at the time this case was filed, there were a series of claims of the '404 Patent that were asserted.  And we just heard from the Ocado side that the '770 is the one that matters and we sort of didn't hear much about '404.

When you think about the context here, the complaint was filed January 17th, 2021.  And if you look at the cover of the '770 Patent, it was filed, no coincidence, January 14th, 2021.

And so to this idea that, well, we're saying all these claims are bunk and that there's indefiniteness abound, what's really happened here is they've got a 2014 disclosure that they contend is the invention of this elaborate system with all sorts of details they now point to to try to get around some of these arguments, but what really happens is they had claims for the first and second and third of those patents that are specific and aren't indefinite at the level these are.  And then they continued to try to see what they could get out of the patent office.

And first they got '404 and then they put in '770, which when you actually look at what the claims require or

cover, they've got terms that either aren't anywhere to be found in the specification or that are indefinite.

So for some context on this, the fact that they've now managed to get a patent out that they filed essentially at the same time they brought this case, okay, is a little telling because they ultimately can only get claims that are supported by the 2014 disclosure or they're invalid.

And so what they're trying to do, we saw this a little bit in some of our earlier discussions, to take what's in the specification, which about two-thirds of Mr. Guzior's slides aren't actually anywhere to be found in the specification. Sort of the example of the robots and the commands they send, none of that comes out of the spec because it ain't there.

What they're really try trying to do now is say, okay, we want this broad coverage. And what they're contending, they say it's an escape hatch infringement. They're saying a move command. A movement command is a clearance command. They want to define clearance command to not just be what the word clearance suggests, but instead a movement command.

So, yes, we have a battle, but the battle is because they're trying to take a term they put in, clearance command, which has a whole section in the specification saying what clearance is, and say that's one type of clearance command, but

it should be broader, a movement command.

So let me walk through some of the spec.  We saw a little bit of it.  Let me show you a couple things you didn't see from Mr. Guzior.

So the overall system here is Figure 2, except Figure 3, kind of important.  They don't want to talk about Figure 3.  Figure 3 shows how this works at a high level.  No specifics, there's no particular algorithm which says this is how you do it.  They just have a long laundry list of here's things people could use and then there's a clearance module, there's a reservation module, there's a movement optimization module, and then there's a module that generates the movement command and scheduling.

And each of these is described in the specification.  First, the movement optimization module determines the best route to design on the path.  The reservation module, which reserves where the robots can go on the grid, okay, that's got a section, that describes how that works, meaning two people can't be reserved in the same place at the same time, for instance.

And then the clearance module.  It provides clearances.  There's multiple times as you go through here a clearance module provides a clearance, clearance being a noun.  Well, what does that mean?  It has a meaning.  We've talked about it.  We'll see it in a second.  But a clearance means you

have permission.  You're allowed to go somewhere.  It doesn't mean go somewhere.  It means you have a clearance for something.

And there's one point that I think I really want to focus on because this distinction between a move command and a clearance command matters.  And it's, as we said, sort of -- that's where the action is.  I think that's Mr. Guzior's term.

I'm going to go to the ELMO for a second.  This is page 36 of the Ocado opening brief.

They cite to the '404 specification, and it says: The specification explains that upon -- let me see if I can get this to work -- upon providing the robot with new instruction, the clearance module controller checks that it will not be possible to collide with another robot.

Cite 38 to 40.  Bookmark that.

But that portion of the specification never mentions, much less requires, a separate movement instruction which then they acknowledge, well, if that was the case, well, that would suggest maybe our permission argument is the right one.

Well, here's 18:38-40 in the '404 Patent.  I have to clear it.

Remember they had pointed you to 38 to 40, and just -- it's a crop photo is what it is.  That's what they point to.  Except the very next line, line 41, and the line 42

that follows it, says:  The clearance module takes things into account, two of which are move commands.

So there's a command that tells a robot to move and it ain't a clearance command.  It's what a clearance module determines if there's clearance based on all sorts of things going on in the grid, including the movement commands that have been issued.

And so not only is it part and parcel, i.e., required of what the clearance module needs to do, it is most certainly mentioned in the very line and line after the portion Ocado would tell you we should only focus on this one piece.  Except that's not how this works.

The idea that there are move commands and then the clearance module either directs them to green light or red light, even their -- one of the slides they sort of glossed over at the end, slide 30, of the presentation you just got from Ocado, sort of summarized the key aspects as they see it of the invention.

And they themselves recognize this red light/green light is a clearance command because you could get a red light, withhold the move command.

So the clearance module, it could grant permission or it could -- that's the green light.  They want to point to this language on the bottom here from column 18 that says may be used to grant permissions, as if that means you may not need

a clearance module.  It's an option.  Except it may give permission, but it also may withhold.

So you could -- the light may be green, the light may be red.  And it may, thus, act as a path resolver.  But clearance is a word that has a meaning and it isn't move.

The movement then comes when the -- if the path has to be rerouted, for instance, well, then, the command generation and scheduling module actually issues the commands.

If we look here, I'm on slide 8, line 9 -- column 19, the quote at the top:  The command generation module -- not the clearance module -- gives instructions for what the robot is supposed to do, such as move to a location, bring a container back, et cetera.

So the claims -- '404 claim 20, it's -- these are system or method claims, depends on the claim at issue.  They're both comprising claims, meaning these are some steps, but not all.  So they've crafted claims that identify certain pieces of this hive activity and the command system, but not all of them.  And the ones in claim 20 are determine a route, reserve a path, provide a clearance instruction.

And, well, what actually happens?  We heard a lot about there's thousands of robots and this is super complicated.  In implementation, it can be, and maybe it's successful all the time, maybe it's not, but the fact of the matter is you have to look at what's claimed.  If they had

claimed a system that had, I don't know, a hundred-plus robots, a thousand-plus robots, well, the only way that claim could possibly ever satisfy the requirements for enablement or written description would be to put a lot of actual detail about how this thing works and how they do it in the disclosure.  Well, they not only didn't have that in 2014, they probably don't want to.

So their claim is plurality of robots.  That's two or more.  So for all the, you know, boasting of how extraordinarily complex this is, that's not what the claim requires.  The claim says you have two robots and let's have route planning and let's have clearances determined.

So what's that look like?  We have similar concepts. My robot on the left wants to go from the bottom left corner to the upper right corner.  The robot on the right needs to go up one and over two.  So first a path is reserved for each of those robots and then clearance instructions can be determined.

So Robot 1 on the right is moving according to his path, but then at some point the red light clearance instruction comes which means, hey, wait, don't go over to the left because that robot's going to be there.

It also bears mention here that the prior art to this is actually AutoStore's and the customer of that prior art was Ocado.  And there's no dispute that at least as of 2012 AutoStore had their hive system with robots on it with a

planner, what's called generation 6 code, that would plan routes, avoid collisions in 2012.

Now, they don't even file their first application in this chain until 2014.  In 2013, they put out announced press releases that they've now acquired one of our systems and, per Ocado, they were looking forward to working with us because we had the skills and resources to design and manage the whole process with this solution.  We had it.  It's prior art.

In a now interesting twist, they've now accused that system that existed before they even filed their patent application as infringing.  We're going to get to that under a host of different reasons -- it's invalid for that, we own it for that, and other defenses -- but the fact of the matter is what they're doing here is they've got now claims that they've continued to try to get, including the one that they first filed essentially when this case began, that have tried to water down or say, hey, clearance, it doesn't actually need to be permission, it could just be a move, because they think then they can now cover what we've done.

So let's talk about the actual language of the claim for clearance instruction.

We see it here.  It's in claim 20 of the '404 Patent, and it's in the '770 Patent.  We've used claim 1 as an example.

Well, they didn't just put a command to move a robot

or a command to tell a robot to travel a certain area.  They chose to use the word clearance in all their claims.  And we've talked about what the battleground is; our view is clearance means something, and it means permission.  Their view is it just means move the robot.

Well, what's clearance's ordinary meaning?  They have not defined it specifically in any lexicon.  They haven't said in the specification, I know clearance usually means permission, but we don't use that, over here we just call it movement.  They certainly haven't done that.  And the ordinary meaning of permission is -- or pardon me, clearance, is permission.

So what have they said?  Did they disclaim it, did they define it anywhere else?  No.

So then you look at the actual claims themselves and say, let's start here.  It gives clearance for the robot to traverse a portion of the path, meaning, okay, you want to go down your instructions from your GPS or drive straight down Main Street, well, we've got a juncture here and there's a red light.

Now, your movement path, your GPS model, says go straight two miles.  You also need -- in your car, hopefully you are saying that's great, but I'm going to stop at lights and pedestrians and other things.  I'm going to continue on the path once I have clearance, but I'm not -- the path direction

itself telling you go in that direction is not a clearance instruction while it's not the ordinary meaning of clearance instruction and the claims actually don't require that.

There are two references in the claims that -- we talk about one, they talk about the other, which we think make this clearer.

Claim 23 actually says, okay, now one of the required components or one of the required elements of the claim in a dependent claim would have travel commands because the claim itself is do these three things, plan a route and generate a route and then get clearance instructions. You can add limitations. One here is travel commands. And they are different from clearance commands.

Per the presentation from Ocado, movement commands are one type of clearance command. Well, then, by gosh, what -- what's a travel command? Certainly nothing in the specification distinguishes a travel command from a movement command and by common reading and language you'd say those are the same thing. A movement command is different from a clearance command. Claim 23.

Claim 2 -- Ocado tries to flip this around on us and say, no, no, claim 2 uses the word permission so, ergo, clearance cannot require permission. That -- it's not right, but it also ignores kind of a key word. They always stop their quotes of claim 2, akin to what we saw in the other instance,

and then we stop after the word permission for the plurality of devices to travel on the pathways.  Literally they chop off in I presume only what's styled as a cost -- a space-saving measure, seven or eight words, that there's one word in claim 2 that's not in claim 1 and it's "only."  The narrowing of claim 2 is -- it now requires the pathways only along the portions of the plurality of paths.

If you look at claim 1, left side of the screen, here, the green light, red light, is around -- along portions of the plurality of paths.  The narrowing in claim 2 says it is only along the portions of the plurality of paths, meaning that you didn't need permission for every single move or every single portion of the path in claim 1; you didn't always have to have traffic lights.  Claim 2 says, no, no, we have to have clearance instructions for every single portion of the path.

The only description in the specification at all of clearance other than using it as a noun is to similarly brand it as a permission.  This embodiment we heard for the first time really during the argument, that no, no, there's a whole different embodiment that's just movement commands.  And Mr. Guzior himself used the phrase "a move command" several times.  Their slides themselves, they refer to the first chunks as move commands.  Other than that, they put the word clearance command on that slide and said that's a clearance command. There is no place in the specification ever that equates those

movement commands as being a clearance command and they're not even generated by the same module on Figure 3, which makes it fairly apparent except they pretend Figure 3 doesn't exist.

They point to this passage which is the one that they crop quote in their brief which said their expert says the new instruction is a clearance instruction.  Okay.  If that's the case, it is based upon checking the move command.  So how can the move command in and of itself be a clearance command. It is not, and it cannot.

They -- they say, well, okay, even if the patent says all those things, your expert agreed that it's a movement command, which he did not.  If you actually look sort of again this pattern, if you look at the actual testimony on this, he says the robot has to be configured to have this capacity to grant permission.  Whether it happens or not is not the question.

And this control tower idea, they also said, well, hey, when you call -- when the pilot talks to the air traffic tower and he has permission to go to 36,000 feet, okay, they say that's somehow him agreeing, no, it can just be movement or movement alone can qualify.  Like, no.  First of all, it's a permission request and the guy still has to pull the stick back and make the plane move before it happens.

And when asked about the actual patent, Dr. Ioannou says, no, it needs to get the green light to be allowed to go

on that path.  That's what the clearance controller does.

You go to the '770 Patent, the clearance commands in '770 are and should be treated the same exact specification.  There are no differences between them.  It's treated the same way as it would be under the '404.  And Dr. Ioannou says the same things about those commands.

The last point worth noting on this is to my point about the arc of what they're trying to do and this -- now it's sort of the claims are getting further and further away from what they actually say they invented, which they actually had from us two years earlier.

The -- they told the patent office that a clearance unit issues permissions.  They told -- in the U.S.; they told the patent office in Europe, these are on the original applications, that it's intrinsic evidence under the law and it binds them here.  They said clearance module selectively grants permissions.  Never did they ever say in any of these filings, as they didn't in the specification, equate what they themselves admit and call in their slides movement commands to be clearance command s.  They're reading the word clearance out and the reason therefore is because they want to say, well, hey, if you have a system that tells the robot to move from A to B, boom, you've got a clearance command.  It's not.  It's not under the ordinary meaning of the claim, the clearance command, and it's certainly not under the disclosures of the

specification.

Unless the Court has questions, I'll try to keep us on time.  Thank you.

THE COURT:  Thank you.  Speaking of on time, before you continue, I know you said you wanted to wrap up by 5:00 and that's fine, but I did make arrangements, based on our last conversation, to be open until 7:00 if we need to be.  So I want you to -- I want you to handle it however you think is best.

MR. LOCASCIO:  Appreciate it, your Honor.  We're not going to leave anything in the tank that we think you need to hear, but at the same time, we're also all cognizant of it's Friday night --

THE COURT:  Yeah, I hear you.

MR. LOCASCIO:  We'll try to get out of here at a reasonable hour.

THE COURT:  I hear you.

MR. LOCASCIO:  Thank you.

MR. GUZIOR:  We do appreciate the time the Court has dedicated to this.  In some patent jurisdictions, you're given ten minutes per claim term.  So we do appreciate it.

THE COURT:  I honestly couldn't do a good job.  Like this, today, has been helpful.  Great.  So -- it takes more time to figure this out, at least for this Court.  So ...

MR. GUZIOR:  So, your Honor, the phrase ships

passing in the night comes to mind and I -- I think we just --

THE COURT:  Talking past each other.

MR. GUZIOR:  Exactly.

THE COURT:  Pretty much every case I handle.

MR. GUZIOR:  This -- this isn't an exception, your Honor.  And I think we just heard argued Section 112, invalidity, written description and enablement, prior art invalidity, that somehow their system is prior art.  And I think we even got to patent prosecution misconduct, that somehow there's something wrong with lawful continuation of patent prosecution before the USPTO.  And, you know, your Honor, when I heard all of that, none of which has anything to do with claim construction, it triggered a memory.

You know, last year I did three trials because I love them.  Hoping to do them again in 2023.

THE COURT:  Sure.

MR. GUZIOR:  And I have one trial where I was doing a cross-examination, a pretty difficult one, of someone who was accused of fraud.  And at the end of my cross-examination, when given the opportunity to explain himself, he started talking about how he and his wife met Anthony Fauci.  And I used it as a teachable moment to my associates.  And I said to my associates, if you didn't commit fraud, you explain why you didn't commit fraud.  If you did commit fraud, you tell stories about your wife.

And -- and with respect, I think what we just heard, running the gambit from accusing us of patent prosecution to 112 prior art invalidity, is consistent with the teachings from the story that I just recalled.  We heard a lot of argument about things that had nothing to do with claim construction.

Now, during my colleague's presentation, I was accused of everything from crop quoting, twice, to boasting, to not wanting to talk about Figure 3.  I actually have no issue with Figure 3.  We can put it on the ELMO and talk about Figure 3 all day.  Figure 3 doesn't say anything about permissions. It doesn't say anything in support of AutoStore's claim construction.

But what you didn't hear from my colleague, your Honor, are two things:  One, you didn't hear that I was wrong, that the word permissions is used only once in the specification and used only in a description of an optional embodiment with the words "may be."  Permission doesn't appear anywhere else.

And I explained to your Honor during my presentation that the wireless signals that are sent from the control system to the robot are described throughout the specification as control messages, signals for execution, messages, packets, commands, and instructions.  Not permissions.  Permissions is used only once in the context of an optional embodiment.  And you didn't hear that I was wrong about that.

Second, you didn't hear that I was misreading the claim language. The claim language says that the clearance command causes a robot to travel along a portion of its pathway; not to give the robot a green light to continue, but it causes a robot to travel along a portion of its pathway.

And, your Honor, why does the patent claim use the phrase clearance command instead of just move command or command? Well, I explained that during my opening presentation. The patent claim uses clearance command to identify commands that are provided after the system checks to make sure that there is no potential for a collision. That is a clearance command. And I explained that that is different from a travel command, as referenced in dependent claim 23, where the travel command could be provided without first checking that there's the potential for a collision. That's described in the specification.

And, your Honor, I think on the subject of crop quotation, your Honor probably recalls this slide in my colleague's presentation. And this slide, AutoStore's slide 404-28, if I understood the argument correctly, AutoStore was representing to the Court that Ocado describes claim language like the claim language your Honor is construing as granting permissions. If I understood the argument correctly, my colleague put up these statements to the European Patent Office on his slide, we saw these before, and he was suggesting to

your Honor that Ocado had described the claims, like the ones before your Honor, as granting permission.

But that's not remotely accurate. These statements were made in a February 28, 2022, letter from Ocado's patent prosecution counsel to the European Patent Office. And at the next -- at the break, your Honor, I'd like to give a copy of that letter to opposing counsel and to the Court's clerk, if that's acceptable, because I think it's important that the Court sees the entire letter in which these statements appeared.

THE COURT:  That's fine.

MR. GUZIOR:  And, your Honor --

THE COURT:  Not right now.  He'll do it when he gets there --

MR. GUZIOR:  Thank you, Ms. Otis.

THE COURT:  When do you want to do that?

MR. GUZIOR:  At the break, if that's okay, your Honor.

THE COURT:  Totally fine.

MR. GUZIOR:  And I'm going to put on the ELMO this letter and I'm going to start on page 5 of 13.

And, your Honor, I -- I've numbered these underlined text portions here to align with what AutoStore had on their slide 404-28.  And you'll recall that this -- this red underlined portion identified as 1 is on the slide talking

about selectively grants permissions; this red underlined text, 2, is the second quotation on the slide talking about granting permissions; and then if we look at 3, this was the third quotation on AutoStore's slide 404-28, talking about granting permissions only after the clearance module first determines that there won't be a collision.

Now, if we look at the top, this is all a description of the presently claimed invention.

Now, I'm getting to the reveal, your Honor.  Now, if we look two pages earlier from the one that truly was crop quoted, what do we see?  Well, the problem for AutoStore, your Honor, is that these are descriptions of claims that were amended and narrowed to recite that the clearance module grants permissions to the transporting devices to continue along their planned paths.

In other words, your Honor, these are claims like dependent claim 2 in the '770 Patent that explicitly refer to permissions.  The claims were narrowed.  And that is the context in which this statement was made.

And so that there is no doubt, to talk about true crop quoting, what AutoStore didn't show you and has never shown you is that there was an attachment to this letter.  And this is the amended claim cite that was submitted with the letter.  And if we look at this, the claim is amended to say that the clearance module grants permissions to the

transporting devices to continue along their planned paths.

It's entirely unsurprising that Ocado said in the statements to the EPO that these claims as amended talk about permissions. This does not remotely support the position that clearance commands, the broader term that is used in independent claim 1 of the '770 Patent, should be construed as limited to permissions. It proves the opposite.

And, your Honor, to try to get ahead of a point that may be coming in surreply, the statement on AutoStore's slide 404-28 to the USPTO is equally unavailing. First, this may not be clear to your Honor, but these statements to the USPTO were not even about the '770 or '404 Patents. They were about a patent, the '141 Patent, in the same family. And if you look at what this statement to the USPTO says, it's consistent with Ocado's claim construction. It says a clearance unit can be used to issue permissions for a transporting device to continue along a planned route once the tolerances have been sufficiently resolved. Can be, just like may be in the specification. And if your Honor looks at the language about resolution of tolerances, this language is talking about a completely different aspect of the technology.

Again, your Honor, AutoStore has no evidence to support its claim construction in the claim language, in the specification, or in the prosecution history. That's all of the intrinsic evidence. And what they did on slide 404-28 is

true crop quoting.  They put this up on the slide so that they could say that they have intrinsic evidence in the prosecution record to support their position --

THE COURT:  Uh-huh.

MR. GUZIOR:  -- but it does no such thing.

Thank you, your Honor.

THE COURT:  Mr. LoCascio, if you want.

MR. LOCASCIO:  I'll take it now with his letter or I'll get the letter and then I can do it.  I can either take his copy or get a copy and respond after we take a break.

THE COURT:  Let's provide it so we can keep it moving.

MR. LOCASCIO:  Yeah.

MR. GUZIOR:  Ms. Otis, I'll give a copy to you at the break.

THE CLERK:  Okay.

MR. GUZIOR:  Thank you.

MR. LOCASCIO:  So I just want to close this piece out to make it abundantly clear.  What's going on is we heard a couple things just now.  We heard first that I didn't dispute that he was wrong.

Let me be abundantly clear for the record.  They're wrong.  The suggestion that you didn't hear us address that permission is only in the disclosure once, correct, permission is in the disclosure once to be a clearance command versus the

zero times that move command is a clearance command in the specification and disclosure.

So we -- we agree on that and the only linkage at all between clearance and either permission or move is to permission, never to move.

The suggestion there's no support in the claims for our position, like, there's a word that's in dispute here and the word is clearance. And it's not defined by Ocado in any different way than its ordinary usage. The ordinary usage of the term is permission. And they've essentially now made clear from their slide deck that they want to capture two versions of clearance, actual clearance or Ocado clearance, which is move, except that's not what the disclosure says and that's inconsistent with the meaning of clearance.

And then on this last point that we just heard -- well, first of all, I will note that the references to the U.S. Patent Office and the European Patent Office were in our briefing and we got zero, crickets, in two briefs from them on this. So it took a while or they thought they could do sort of a drive-by here to respond to that.

The USPTO piece is not, as Mr. Guzior says, a patent in the family, like my cousins in the family. It's the parent application to these. And, better yet, the '770 Patent that they now want to put all their weight on is subject to something called a terminal disclaimer.

A terminal disclaimer means if the scope of what you're claiming now is the same thing and is so related to another one, the patent office says, hey, man, the expiration date there needs to be tied and tethered to this earlier one. And the '770 Patent has on its face, this patent is subject to a terminal disclaimer. We also raised this in our brief with no response. They will not dispute that that is tied to the patent on the left side of slide 28 of our deck. That's the '141 Patent.

And on the right side of the slide, the suggestion that, well, we -- we crop quoted out of oblivion all sorts of stuff, the Court will recognize the passages from the spec and their brief where it never mentions move command, their words, and compare the European Patent Office said based on your disclosure that requires clearance, you can't get a claim unless you amend it to have permission and continue along, which is the language, essentially, of the '404 claim that they don't want to talk about anymore.

And, notably, that portion that we saw, I'm trying to find what Mr. Guzior pointed you to, we didn't crop out words in the same paragraph. We didn't do any of the stuff that we're being accused of. But it says the present invention.

Remember, we've had these discussions before. The present invention is, okay, that's the invention you claim in

your disclosure.  Like you can have all sorts of different claims all you want, but the invention here is red light, green light.  You can keep traversing if you get clearance.  And ultimately in Europe, unlike here, where they sort of pushed this last patent through during the case, in Europe, they were told, hey, you can't have it as a claim unless you make clear that it's permission to continue on the path.

The specification, you'll note, is identical between the two and they claim priority back to that same specification and that's what has to govern on claim construction, the claims that use the terms clearance, the disclosure that doesn't ever equate it to move and actually distinguishes it from movement.

Thank you, your Honor.

THE COURT:  Thank you.

I assume you've said your piece, Mr. Guzior.  You're good on this?

MR. GUZIOR:  Yes.  Thank you, your Honor.  I believe my colleague presents first on the next term.

MR. LOCASCIO:  You are correct.  Thank you.

MR. GUZIOR:  And, your Honor, AutoStore is presenting first on all of the remaining terms because it's invalidity, their burden.

THE COURT:  Understood.  Got to keep reminding me --

MR. GUZIOR:  You know --

THE COURT:  That's why I get paid --

MR. GUZIOR:  If you don't plead your case --

THE COURT:  Absolutely.  I didn't mean anything by that.

Go ahead.

MR. LOCASCIO:  Thank you.

Okay.  Next up, for execution at a future time.  And we have on the Ocado side, don't construe it, it's got ordinary meaning, and on the AutoStore side we say it doesn't actually give us any guidance and, thus, it's indefinite.  And that's how they chose to claim it and these are the consequences thereof.

And so let's look at the language at slide 31.  The clearance instruction is provided for execution by the device at a future time.

Well, the Federal Circuit, this case in northern California, but this case often went to Federal Circuit, there are other cases that all say the same thing, which is, okay, if you're going to say something that's relative or, you know, it -- call it like size-based, you've got to give it some guidance.  There's got to be a boundary on it.  And in that case they said there's a maximum period of time, but they weren't -- there was no definitiveness to that, so it's indefinite.

Well, here's the problem with execution at a future time.  It could cover the smallest of delays, which essentially

is everything in the mechanical world, because once an electrical signal goes, there needs to be a follow-on activity, there's future time there, to something that could be, you know, hours away, weeks away, days away.  There's no specificity.

And Dr. Ioannou walked through this and, to his credit, Dr. D'Andrea a doesn't dispute this as a concept, which is you have the clearance instruction provided, call that time zero.  There's then time 1, which has a delay, a time delay of Delta 1, before that clearance instruction is received, and then there's another time delay, Delta 2, before that clearance instruction can actually be executed.

So the minimal, best case you could possibly do would be that amount of time would have to -- or would elapse between the command being issued and the activity by the robot.

So -- but that is, within the definition of the claim, at a future time.  And if you -- you can't just read it out because the claim language cannot be superfluous, also not a particularly disputed claim or a concept under the law.

So literally reading it, when you read it in the claim, you say, well, what does that mean?  Does that just mean it's a command to execute now but that the moment of execution of it is going to be slightly in the future from when it's issued or is it saying something has to happen first, some period of time has to elapse, before that can take effect.

And Dr. Ioannou, who's, with all -- by all accounts, no dispute, one of skill in the art, says it has to keep some time value, some minimum time value, for that delay and there is no such thing in the claims.

So then we go to specification. And what Ocado tries to do to solve this riddle is say, look, we think this means that it's about controlling the robot's future movement from its current movement and to try to draw some dichotomy between current movements and future movement except they give two examples and the first one is command for the robot at rest to move forward and the other one -- immediately upon receipt.

The other one is, hey, in ten seconds after you get this, the robot should turn left except both of those are within the literal scope of execution at a future time, to the point Dr. D'Andrea and Dr. Ioannou agree on, which is there will be time elapsing between when that command is issued and it is received.

And so it does no good to say we're only talking about the second half because the second half, while it may be a green, maybe in their reading of that language, so is the red part. It's also in the literal scope of the claim.

They don't in the specification limit it. If they wished for this to be the construction, they could have written the specification -- they could have written the claim this way, but they could have written the specification to say

execution at a future time is limited to this kind of prepacking, where they say, okay, we'll send three commands, do them in order, meaning, thus, commands 2 and 3 are going to be done after command 1 is executed.

Except that's a may option. That's an embodiment. There's definitely an embodiment where you could send a move command to move now and there's an embodiment where you could send multiple move commands and tell them to do them in order. Except they don't limit a future time to that embodiment. If it was, okay, then we'd have some guidance. They would have disclaimed the -- the ordinary meaning of execution at a future time. They haven't done that. It's relative.

And so the intrinsic evidence doesn't support their idea because this idea of current instructions and future movements -- again, even this passage they point to, current instructions and current clearance, their own folks agree that's going to happen after it's ultimately transmitted and it is at a future time.

Dr. Ioannou on this walks through the specification, talking about this idea of, okay, even -- there's nothing in the specification that excludes or says things you want to be implemented as soon as they're received are somehow carved out of or distinguished from at a future time. They point to some extrinsic evidence to try to support this. I don't think there's any weight there. We'll see if they want to spend time

on that.  We'll rebut it.  But they're trying to essentially rewrite the claim.

Go to slide 45 for me.

They essentially want --

THE COURT:  Counsel, can you hold up one second?

MR. LOCASCIO:  Of course I can, your Honor.

THE COURT:  I just want to catch up with you in my own notes.  Hold on.

Go ahead.

MR. LOCASCIO:  Sure.  They essentially want to take two different at a future times and say only one of them is what ours covers.  If they wanted to do that, there was a way to do that.  They did not.  They did not disclaim that scope. The law would require them to do that to narrow that beyond its ordinary meaning and it impermissibly narrows the claim.

And so at the end of the day, they chose these words.  And this comes up in every indefiniteness issue.  And I'll say, as you've been reminded already, I'm sure you'll be reminded again, we have the burden on indefiniteness.  And the reason, I'll say, that these claim terms have problems comes back to my first point in that there are -- there's passages in the claim that they've put in there that don't have any guidance or are, in this case, indefinite and we can't find anything in the spec to support them, or they certainly don't have in the spec what supports their construction now.  And I'd

suggest the reasoning for that is because they have earlier patents that are narrowly crafted and far more supported by the specification and the timing of these, which has been designed to get something out that's amorphous enough that you can drop it on top of our product and system that existed before theirs is why these claims are indefinite.

Thank you.

THE COURT:  Thank you.

You know, it's funny.  Just an observation, nothing to do with who prevails on the merits here.  But 90 percent of litigation that I hear in oral arguments or read in briefs, I -- I sort of disfavor -- dislike arguments characterizing the other side's arguments or explaining their motivation for doing it.

But in patent litigation it actually makes sense, doesn't it?  It's kind of part of your business.  I don't mean that in a disparaging way.  But understanding why -- usually in most litigation I don't care why someone's making an argument. I just want to know who's got an argument -- whose argument is better.  But in this particular -- I don't do a lot of this, you know.  I do some, not a lot.  But in this particular field, understanding why people are bringing claims and why they're doing what they're doing is actually a legitimate part of the analysis and both sides seem to recognize that in the way you argue it.

So it's just an observation, neither here nor there, but it's different than a lot of what we do.

Go ahead, Counsel.

MR. GUZIOR:  Yeah.  Thank you, your Honor.

Stemming from the point that your Honor just made, this term that we're talking about affects a single patent claim.  The claim that -- the term that we talked about a moment ago is where they're going for a TKO.

And if your Honor would allow me, I have one sentence more to say on that because I'd be kicking myself all weekend if I didn't say it.

THE COURT:  Of course.

MR. GUZIOR:  Last week, on November 10th, 2022, we received AutoStore's third supplemental preliminary invalidity contentions where they talk about the '770 Patent, and the term clearance command appears in that document more than 65 times.  I think it's 67 or 68 times, a lot of times, where they're talking about the concepts.  Guess how many times the clearance command is described as a permission in AutoStore's document?  It's rhetorical.  The answer is zero.

THE COURT:  Yeah.  I wasn't going to guess, but yeah.

MR. GUZIOR:  And getting to motivations, your Honor, what I always find interesting about patent law is you -- you usually get the truth when the speaker thinks nobody's

listening.  And I would say that AutoStore submitting a 140-plus-page document where they talk about clearance commands 67 times, not once talking about it as a permission, that is deafening.  That is deafening on that first issue.

Now, your Honor, turning to the second issue -- and, again, this -- this impacts a single patent claim, claim 20 from the '404 Patent.

And the claim language talks about providing clearance instructions to a robot for execution at a future time.  The robot receives instructions.  If the robot only receives a current clearance instruction for execution upon receipt, no infringement.  If that's all the robot receives, there is no infringement.

If the robot receives clearance instructions for execution at a time after receipt, then you have infringement.  It's very simple.  And there's nothing unclear about that.  If you only provide the robot current clearance instructions for execution upon receipt, you're on one side of the metes and bounds of the patent claim.  If you provide a robot clearance instructions for execution for a time after receipt, you're on the other side of the metes and bounds.  It's simple.

Now, I do want to note the legal standard here, your Honor, when we -- when we're talking about indefiniteness.  The Supreme Court's *Nautilus* decision is the controlling decision on indefiniteness and the Supreme Court has said that the

patentee only has to inform those skilled in the art about the scope of the invention with reasonable certainty. And the Supreme Court has also explained that certainty takes into account what's reasonable in light of the particular subject matter of the patent. And I'll say it a third time, your Honor. This is AutoStore's clear and convincing evidence burden, where they're effectively asking for you to rule now on an invalidity defense.

And this is a legal principle on slide 46 that I think will become more important as we talk about other indefiniteness arguments, but the Federal Circuit has explained that you don't bend over backwards to interpret claim language in a way that makes it indefinite. So if you have someone saying this claim should be interpreted to mean Y when the claim says X and it's only by construing the claim to mean Y that they put forward an indefiniteness argument, you shouldn't be construing X to mean Y in the first place. That's a legal principle that the Federal Circuit has explained.

Now, here on slide 47, I want to circle back to the animations that we talked about earlier from the technology tutorial. And, again, this is not rocket science. Wireless signal is sent to Robot A and Robot A receives in this embodiment a current clearance command which is command 1 or a current clearance instruction, instruction 1, and it also receives a queue that has command 2 and command 3 in it. And

as I've shown in the red box on slide 47, command 2 and command 3 are prepopulated clearance instructions for execution at a future time.  Again, I think this is very simple.

Slide 48, your Honor.

How would a person of skill understand this claim language?  Here on slide 48, Dr. D'Andrea, who is the father of Amazon Robotics, tells us that a person of skill would understand the claim language as I just showed with reference to our animations.  There is a current instruction for execution upon receipt and subsequent instructions for execution at a future time by the robot.

And on slide 49, Dr. D'Andrea explains that he's not making this up.  It's not coming out of thin air.  It is all firmly grounded in the patent specification.

This term is unique to the '404 Patent, so the citations here on slide 49 are to the specification of the '404 Patent.  The specification describes instruction sets for coordination of future movements, prepopulated instructions to be executed at a future time, sending control messages in anticipation of future movements.  And this is contrasted with current instructions or current clearances.

Again, your Honor, all of this is explained in black and white in the specification and there is a bright-line distinction between current instructions and prepopulated instructions for execution at a future time.

And AutoStore's expert, your Honor, skipping ahead to slide 51, during his deposition, he -- he had no trouble understanding this concept. He said when I deposed him that prepopulated instructions are generated ahead of time to be executed later on. Now, he uses the phrase later on rather than the phrase execution at a future time, but they're substantively identical. Dr. Ioannou, AutoStore's expert, had no difficulty understanding the bright-line distinction between current instructions and execution -- and instructions for execution at a future time.

And jumping ahead to slide 53 -- and, importantly -- and I really believe that what you see on slide 53 is dispositive of this issue. AutoStore's expert gave testimony about his own declaration showing that the claim term at issue is not indefinite.

Paragraph 133 of Dr. Ioannou's declaration reads:

Based on this reasoning, it is my opinion that a person of ordinary skill in the art would interpret the reference to execution at a future time to refer -- I believe it's a typo -- to execution at some unspecified delay between when the clearance instruction is provided and when it is executed.

And when I deposed Dr. Ioannou, I wanted to unpack this. And I said, what did you mean by provided?

He said, when it's -- the signal's transmitted to

the robot.

And I said:  What do you mean by transmitted to the robot?

Because I wanted to nail him down.

And he said:  I believe received by the robot.

So AutoStore's expert is saying that when you're thinking about current instructions and future instructions, you should be thinking about the time point at which the instruction is received by the robot.

So I'm a control system over here.  I send my wireless signal through the ether, it's received by the robot, and then that is the time point where you say what is an instruction for current execution, the robot receives it and it's to execute it, what is an instruction for execution at a future time.  It's in the queue.  It's not the current instruction.

And now I want to jump back to slide 52, where Dr. Ioannou gave the really critical testimony.

And, your Honor, it's really not a secret that lawyers draft these declarations for experts and it's an iterative process, but sometimes the expert doesn't really agree with a lot of the language that ends up in the declaration.

And so I asked Dr. Ioannou, I said:  Well, here in paragraph 133, would the sentence still be accurate, in your

opinion, if the word unspecified were deleted.

An unequivocal yes.

And if you take unspecified out of Dr. Ioannou's testimony, there is nothing indefinite or unclear about his own interpretation of the claim language. You have instructions for execution when they're received by the robot and you have instructions for execution at some delay between when the instruction is received by the robot and when it's executed.

Jumping ahead to slide 55 -- you know, briefly, your Honor, Dr. D'Andrea also pointed out that when the '770 -- that when the '404 Patent was prosecuted before the USPTO, the USPTO examiner actually proposed this execution at a future time language as sufficiently definite.

So Ocado thinks execution at a future time is definite; it's clear from the claim language. Dr. Ioannou, AutoStore's expert, thinks it's clear and the USPTO examiner thought it was crystal clear as well. Only AutoStore, in the context of claim construction, again, to try to invalidate this patent claim summarily, says, oh, this is a hopelessly confusing concept and a person of skill wouldn't understand the language.

Thank you, your Honor.

MR. LOCASCIO: I don't have much.

THE COURT: You know what, though -- Kellie, has it been 90 minutes?

56

THE CLERK:  We started at 1:20.

THE COURT:  Yeah, it is.  I want to give the court reporter a break.

MR. LOCASCIO:  Of course.

THE COURT:  Let's take 15.

THE CLERK:  All rise.

(Recess taken from 2:50 p.m. until 3:10 p.m.)

THE COURT:  Please be seated.  Continue.

What are we on now, route?

MR. LOCASCIO:  I was going to respond with a brief comment on --

THE COURT:  Don't let me knock you off course.

MR. LOCASCIO:  No, that's okay.

So I only have two or three points to respond to Mr. Guzior's points.

The first is he had slide 52, this is from the Ocado deck, and there seems to be belief on the other side that just because he would still say it's true that there's some delay that that somehow means it's not unspecified anymore, which isn't what he admitted at all here.  He said his -- first warning he said is true, which is, yeah, it's some unspecified delay.  And guess what?  That's also true if you take the word unspecified out.  That doesn't all of a sudden mean it is specified or it has any certainty around it.  In some ways, it's just logically breadth to put it that way.

So the second one was -- they skipped slide 54 from their deck because it actually suggests that Dr. Ioannou says it's still a problem.  Because what's the interval?  What's the minimum time?  It's a future time.  It could be 50 milliseconds, it could be a future time like two weeks away.  And he said that, and so they know exactly what he said.  He certainly has not conceded the point, nor does he agree with Ocado.

And the argument, I think several times, from Ocado's counsel is it's hopelessly confusing.  That's not the law.  And we told them as much -- oh, I was doing so well and then I turned off the ELMO.  I think I did.  Let's see if it just takes a second to come back on.

Exhibit 21 to our brief, the law on this is not -- I'll try not to do the same thing a second time.  The law is not if a term is hopelessly confusing.  The standard is whether one skilled in the art can discern the scope with reasonable certainty, meaning it's not that you could craft one up or, as Ocado's lawyer said, like, okay, we're not going to accuse you of infringement if it's implemented upon execution.  You can't stipulate away or explain away the claim language.  The specification could do that.  Counsel can't do that now after the fact to try to save a claim that is not specified with any reasonable certainty.

So that's all I have on that.

And then the -- Mr. Guzior started his discussion on -- and I'm coming back to the issue of clearance command and he made a comment that I need to respond to, which is I think it was -- both spoke volumes and it was deafening that -- that the fact that our infringement or, pardon me, our invalidity response didn't speak about permissions.

And there's a pretty good reason why, because the invalidity contentions respond to something called infringement contentions and the infringement contentions start with Ocado. And guess what they accuse of infringement. Move commands.

And so our invalidity contentions presuppose and expressly say that they are based on their proposed construction, the idea being if this is how you read the claims in your infringement contentions, which they go first, well, here's how those would play out from a validity perspective. So they contend for infringement that no permission is needed. Move command is infringing.

So based on that construction, it's still invalid. And so the idea that our invalidity contentions don't walk through the construction they're fighting against is of no surprise and doesn't say anything to support them.

So that's all I have, your Honor.

THE COURT:  Okay.

MR. LOCASCIO:  And I think we're on route unless you want to --

THE COURT:  That was my thought, but if there's somewhere else you want to go first, that's okay.

MR. GUZIOR:  Your Honor, just a brief surreply on execution at a future time.

Let's assume that what you actually had is AutoStore's Dr. Ioannou and Ocado's Dr. D'Andrea providing dueling expert testimony on whether execution at a future time is definite.  Let's just assume that.  I believe I showed the Court that ultimately at his deposition Dr. Ioannou testified that he could understand the claim language.  But let's assume my colleague's right and Dr. Ioannou and Dr. D'Andrea are actually dueling experts.  Okay?

THE COURT:  Uh-huh.

MR. GUZIOR:  I've mentioned in passing a few times the burden of proof, but I want to put that in very clear perspective.

In order to agree with AutoStore that execution at a future time is indefinite, rendering the claim invalid, your Honor would have to find on the papers that AutoStore's Dr. Ioannou's declaration is so clear and convincing that -- that your Honor can just entirely disregard Dr. D'Andrea's testimony, it's that clear and convincing.  That's what you need to find to rule in AutoStore's favor on invalidity at this juncture.  That's the standard.  It's their clear and convincing evidence burden.

And, your Honor, I respectfully submit the Court actually gave us the option to call live witnesses at the markman hearing because there's a lot of invalidity going on in this markman hearing and AutoStore could have called Dr. D'Andrea to cross him, cross him in front of your Honor; AutoStore could have called Dr. Ioannou to testify before your Honor. This is a burden issue on their side. They did none of that. And I don't think that they come close on the papers to showing by clear and convincing evidence that execution at a future time is indefinite.

Now, briefly, on the point that my colleague made about their invalidity contentions responding to infringement contentions, I -- I don't understand what they're talking about. There are lots of indefiniteness, invalidity arguments being made in this markman hearing that have nothing to do with our infringement contentions. The point that I was making is when AutoStore is talking about the reasons that the claims of the '770 Patent are invalid, they describe the claim technology in great detail, including the clearance commands, and there isn't a whisper, not the faintest whisper, that they believe clearance commands are permissions when they did so.

I believe my colleague will go first on the next term, your Honor.

THE COURT: Okay.

MR. LOCASCIO: Mr. Loy is up.

MR. LOY:  Good morning, your Honor.  Joseph Loy on behalf of AutoStore.  Good to see you again.

THE COURT:  Welcome back.

MR. LOY:  Thank you.  So the next term we'll be arguing, as you know, is the term route.

The -- the basic issue here is that the term route, if you could pull up the slides for me here on the camera, is used in one way in the patent claim, so it's distinct from the term path, and then the two terms are then used interchangeably throughout the specification.  And so what we get here is a conflict on the one hand between two terms and then an irreconcilable difference that renders them indefinite.

We'll take a look at the claim to begin with.  We'll jump to slide 51.  It illustrates the claim here.

This claim 20 of the '404 Patent claims a method for controlling movement of transporting devices and the method comprises a determining step, that is, determining a route for one location on the grid to another location.  And then you reserve a path, which is a distinct word from route, on the grid structure based on the determined route.

And then later it goes on to, as we've just talking earlier in this claim construction hearing, provides a clearance instruction to traverse a portion of the reserved path.

So as you can see here, your Honor, you see two

distinct terms, one is path and the other is route, and the two are used differently in the claim.

Now, the Federal Circuit tells us when we have two terms in a claim that are different from one another, those terms are presumed to have different meanings.  And that's the *Sipco v. Emerson Electric* case at F. Appendix 946 Federal Circuit 2019.

And Ocado, however, argues here that route and path in the claims carry the same meaning, meaning they are allegedly synonymous.  But let's look again briefly at the claim.  It's pretty apparent here.

We have a claimed path in the '404 that is reserved based on the route that was determined.  If that reserve path were synonymous with route, then the distinction between the two would become absolutely meaningless.  And the terms route and path just cannot be the same on the one hand and distinct at the same time on the other.

Now, during the experts' depositions in the markman discovery phase of the case, this conundrum became even more puzzling.  And let's look at what Ocado's expert said.

This issue relates to time dependency, so we have coordinates on a grid, but we also have moments in time at which a robot could be on one of those spaces in the grid.

And when asked at deposition whether or not the claim of the '404 Patent -- '404 Patent is for route

particularly here, not for path, but route, is time-dependent, Dr. D'Andrea said, yes, time-dependent.  He then thanked the questioning attorney and said not exclusively so.

So it's either time-dependent or it's not.  It's baffling.  Which is it?  The answer, if you look, is that path, in fact, is time-dependent because the path, if you look further into claim 20, requires that no two robots can be at the same point in time on the grid such as to avoid what the patent says caused them to overlap at the same time, which is just the bottom of claim 20 there.

So that means that in order to understand what the path is, you must understand at what point in time will the robot be in that coordinate.

Now, Dr. Ioannou, AutoStore's expert, confirmed when he distinguishes between the claims route and path as time-dependent and time-independent, respectfully.

So if we read Dr. Ioannou's testimony, when asked, and the route, if I understand this correctly, would be a time-independent geometric route?

He says yes.

And then the path, as you understand it, introduced as time, it would be time-dependent.

And Dr. Ioannou testified that that is correct.

So now we have that same distinction in the claim where we have one that includes time-dependency and one that

does not.  It's different.  Yet Ocado wants the two to be synonymous.

Now, Ocado's expert, on the other hand, dodged the question.  When asked the same type of question, can you point to anywhere in the patents where route is used in the same way that is time-dependent, he just went back to his fallback position, which is that the two are the same.

So he said -- not addressing route, he said, because route and path are the same and path is time-dependent, therefore, route is also time-dependent.  I mean, look at the claim itself.  No two transporting devices can be the same location at the same time it's obvious that they're time-dependent.

So the question just becomes again, well, which is it; are they time-independent, are they time-dependent, and how can they both be different and the same at the same time.

Take a look also at what Ocado wants to do if you just do substitution of claim words in the claim.  What Ocado would like to do is take reserving a path based on the determined route and strike out the word route and add the word path.  When we do that, you end up with what some call tautological descriptions.  You would reserve a path based on the determined path.  That makes no sense.  It doesn't give anyone of ordinary skill in the art a reasonable understanding of what this means and, therefore, should be indefinite.

Let me jump just briefly to the conclusion here. Because these two claims are, one, interchangeable, and that's undisputed. Both experts agree on that. In the specification, the words are used synonymously.

Then when you get to the claim, claim 20, in the '404 Patent, they're used differently. They're indefinite. And this is just a conventional canon of claim construction.

I know there's been quite a bit of argument on the other side that these are invalidity proceedings. This is precisely the time when the Court addresses the issue of claim construction which the result of an invalid or indefinite claim is invalidity. So we're here at the right time, at the right moment, and presented before the Court is that argument.

THE COURT:  Yup.

MR. LOY:  Thank you.

MR. GUZIOR:  Your Honor, I hope to demonstrate that the words route and path in isolation are not actually relevant to construing Ocado's patent claims. That's what I'm going to try to persuade you of in a moment.

Each word is part of a much longer claim limitation and when each limitation is read as a whole, as the law requires, there's no possibility of confusion.

This is a method claim, meaning it's a series of steps that you take as part of a method. And as shown on slide 58, the first step, the first portion highlighted in yellow, is

you determine a route.  The second step is reserving a path based on the determined route.

Those are two separate things that need to happen, determining a route and reserving a path based on the route, and there is no redundancy or possible confusion because the two limitations are describing entirely different things, determining a route, reserving a path based on the determined route.

But, your Honor, even if we were to focus on the words route and path in isolation, both sides' experts agree that a person of skill would understand perfectly that route and path are interchangeable words that refer to a series of coordinates for a robot to travel.

And I want to start with this very basic point before I get to the point that this might not even matter.

And I want to start at slide 60.  During his deposition, AutoStore's expert had a perfect understanding of the fact that persons of skill use route and path interchangeably.  He says here on slide 60 that in robotics the terms often are used synonymously.

And on slide 61, Ocado's expert, Dr. D'Andrea, agrees.

On slide 62, we see one of several examples of where the specification, consistent with AutoStore's expert and Ocado's expert, uses route and path as interchangeable terms.

Now, to get away from the fact that their expert testified that a person of skill would understand a route and a path to be interchangeable terms that refer to the same thing, AutoStore's presentation tried to muddy the water with a discussion of time-dependence and time-independence.

But as we see on slide 64, AutoStore's expert admitted at deposition that this distinction does not matter because a person of skill uses route and path interchangeably and each term encompasses both time-dependent and time-independent series of grid coordinates for a robot to travel.

So, again, very simply, there is no indefiniteness because a person of skill would have no trouble understanding that the terms route and path, a series of grid coordinates for a robot to travel, is either time-dependent or time-independent.

And, your Honor, I'd like to give you a simple analogy. Imagine you're on a hike and a park ranger says to you, follow this trail about ten miles; when you hit the sign with the yellow triangle, turn right off the path. You wouldn't say, whoa, what path, you said a trail. Right? You would understand perfectly well --

THE COURT: Yeah, the difference between path and trail is a lot different than path and route.

MR. GUZIOR: Well, your Honor, I'd like to persuade

you.  AutoStore's expert testified --

THE COURT:  Your point is in the context of the larger phrase, it doesn't make any difference.  I get it.

MR. GUZIOR:  And, your Honor, I actually do think that AutoStore's expert testified that to people who work in robotics -- remember, all of this is from the perspective of a person of skill.

THE COURT:  Yeah.

MR. GUZIOR:  To people who work in robotics, route and path are as interchangeable as trail and path are to laypeople.

You know, Dr. Ioannou testified in black and white -- and, here, I'll go back.  They use route and they mean path and they use path and they mean route.  So I accept that the words could be used synonymously.

So when it comes to a person of skill in the art's perspective, these two terms are used interchangeably just the same as we would understand as laypeople that the park ranger was referring to the same thing when he said trail and path.

Now, your Honor, I want to respond to two points. The first is on AutoStore's slide 404-52.

THE COURT:  Talk -- I guess what I want to know about is the way -- the way path and route are used in the claim language, like that seems different to me.  No?

MR. GUZIOR:  So, your Honor, I think that gets to

the thing that I told you at the very beginning of my presentation.  And I agree with you.  I said --

THE COURT:  That it doesn't matter.

MR. GUZIOR:  It doesn't matter.  Because when you look at the overall claim limitation, it's a method claim.  And you're talking about taking the step of determining a route, right?  When we're looking at whether they infringe, we're going to look at their control system and the method that that control system performs and it either will or will not take the step of determining a route, a series of grid coordinates.

THE COURT:  Uh-huh.

MR. GUZIOR:  And then the second separate step in the patent claim is that you have to reserve a path based on the determined route.  And "the" is important, your Honor, because "the" doesn't make sense without antecedent basis.  Right?  It has to be referring back to something.

And so the step of reserving the path has to follow the determination of a route.  Because, otherwise, "the determined route" doesn't make any sense.

THE COURT:  Okay.  But I take your -- I take your it-doesn't-matter argument, which isn't crazy, but I take it as a yeah-but argument, which means, yeah, they mean different things, but it doesn't matter.  You're conceding they mean different things in the claim language, the two words.

MR. GUZIOR:  So, your Honor, route and path in the

claims both refer to a series of grid coordinates for a robot to travel. What I'm saying is different is the two limitations.

The first limitation is the step of determining a series of grid coordinates for the robot to travel --

THE COURT: Route.

MR. GUZIOR: Route. The second step is reserving a path based on that determined route.

Now, the claim drafter could have said in a very convoluted way determining a first route, right, and then the second claim limitation could have said determining a second route.

THE COURT: But when you're reserving the path, you're going to travel the path. You're not just setting it out. That's the difference, right? That, to me, is how it plays out.

MR. GUZIOR: But I think that's by virtue of the entire claim limitation. Because it says reserving a path based on the determined route such that no two robots are going to overlap a single grid cell at a given time.

So it's a very different claim limitation. It's talking about taking the determined route, the determined series of grid coordinates, and then doing the additional step of reserving the series of grid coordinates based on the determination, right, only if the system -- and only when the

system does so without having two robots overlap at the same time.

Do you remember my animations where each frame started with green, blue, purple, orange?  That's what we're talking about.  You first have the --

THE COURT:  Yeah.

MR. GUZIOR:  -- optimization step, the A* step.  I told you I'm going to talk about A*.  You know, you have this step of determining what is the optimal or preferential route for the robot to take to complete its job and then what the system does is creates a reservation based on that determined route, making sure that no two robots are going to overlap at the same time.  They're separate steps in the method, your Honor.

And, your Honor, I actually think the *Sipco* case helps understand the logic behind what I'm arguing.  Because in the *Sipco* case, the claim recited a receiver address comprising a scalable address.  That was the claim language.  Okay?

Now, the Patent Trials and Appeals Board said we construe scalable address to be satisfied by a receiver address, but then the problem with construing the claim in that way is that scalable address doesn't mean anything, right?  If scalable address can be a receiver address, then the claim language reads receiver address comprising a receiver address and you would always satisfy the claim limitation when you just

have a receiver address.

That's not the case here. If route and path mean the same thing, the claim limitations -- the first step of the method and the second step of the method -- are still entirely distinct. By recognizing that route and path both refer to a series of grid coordinates for the robot to travel, there's no redundancy because you still need the step of determining the route and reserving the path based on the determined route. They're entirely separate limitations, even if those two words are the same, and *Sipco* actually proves the logic of that point.

Second, your Honor, and this goes to what we've been discussing. AutoStore showed slide 404-58, and the problem with what you see on slide 404-58, and I believe Mr. Loy said this makes no sense, is that this doesn't take into account the order of the claim. Of course it makes no sense to say reserving a path based on the determined path, but that's because of antecedent basis. There is no determined path. The claim describes a determined route and reserving a path based on the determined route.

So this slide 405-58, it doesn't make sense, but not because route and path are synonymous to a person of skill in the art, but because AutoStore is rearranging the order of the claim.

And, your Honor, to hammer home this point, because

I do believe it's important, if we focus on the claim language, we have a first element that is determining a route with the indefinite article "a," and that's a route that takes the robot from one location on the grid to another location on the grid. And that is -- I've put these red dotted lines here and said this is the determined route step of this method.

And if we look at the second limitation, it describes reserving a path, and this is an indefinite article, "a," on the grid-like structure. There's going to be no confusion about whether this is something different or the same as the determined route because this is an indefinite article "a." It's introducing a new concept, the step of reservation.

And then as you continue through the claim language, it says that that path is reserved based on "the" determined route. And antecedent basis is important. Now you're not referring to some undefined, determined route; you're referring to the first different claim limitation. And the point of the first claim limitation is to determine the route, one grid location to another; the point of the second is to reserve the path based on that determined route, the determined route, such that you don't have robots overlapping at any given time.

And, finally, your Honor, a practical point again. They're trying to invalidate this patent claim. You've now heard two arguments of why claim 20 of the '404 Patent should just be invalidated, two different indefiniteness arguments.

And when you look at Dr. Ioannou's declaration and you look at Dr. D'Andrea's declaration, the question is is it so clear and convincing that the Court's going to invalidate the patent claim now.  And I respectfully submit that the answer has to be no.

Thank you, your Honor.

THE COURT:  Thank you.

MR. LOY:  This should be quick, your Honor.

If you would, Mr. Herschkowitz, can you skip to slide 61.

First I want to take on the suggestion that Dr. Ioannou admitted that the terms route and path are used interchangeably generally in robotics, and that's precisely what this specification here did.

But when you get to the claim, although I wouldn't hear Mr. Guzior actually admit that these are different in the claim, it seems they are very different in the claim, yet they are the same in the specification and we see basically an attempt to rewrite this claim.

And it isn't that we're trying to invalidate every claim.  The reality is it's poorly drafted.  And it is not the Court's position here to rewrite the claim for Ocado.  There are processes to do that.  One is get it right on the first shot; two, go back to the patent office and get your claim reissued.

But I want to be very clear about one thing. Dr. Ioannou did not agree as one of ordinary skill in the art that the terms route and path in the claim are used interchangeably. So that point about what -- how they're used in robotics is irrelevant to the question here. In the spec they're used synonymously, we all agree, and in the claim they're used differently.

On that, we will move on to the '770 unless the Court has any questions.

THE COURT: No. '770.

MR. LOY: All right.

Okay. So the first term at issue on the '770 Patent, your Honor, is the term one or more processors in Figure 2, and this particular term appears in claim 1 as an example of the '770 Patent and it is AutoStore's position that the claim should be subject to Section 112(f).

Now, this is a means-plus-function way of drafting claims and we will admit at the outset the word means does not appear in the claims. But you will see, however, that the claims are drafted in such a way that you have one or more processors configured to perform many different functions.

So these are computer-readable, medium-type claims where the computer is performing the various functions. And in this instance, examples of what the computer is supposed to be configured to do is to determine a plurality of paths, generate

plurality of clearance commands, so that the robots can travel on pathways along portions of the paths, also determine that there is a potential for a collision between various devices traveling along the grid.

Another example of the one or more processors configured to functions that are claimed in the claim is claim 29 where, again, you have plurality of paths, clearance commands, and a collision avoidance system.  That repeats -- gets a little more specific when you go to claim 10, for instance, and you have processors configured to determine from one or more missed messages processing time, a clock sync, or transporting device discrepancies that there is a potential for collision.

So it's very specific inputs that would be required, whereas the others are broader.

Now, what does the Court need to do here?  The Court first needs to ask whether or not the claims are written in such a way that they must conform to the Section 112(f) standard or the means-plus-function standard and then at that point when the Court determines that it is, indeed, a means-plus-function term, then we go on to ask the question whether or not the processor as claimed is indefinite, meaning did it provides sufficient structure.  And that's sort of code in this area as structure is used kind of synonymous with an algorithm or step-by-step process to achieve the function that

is claimed in the claim.

So let's just start with the first step, whether or not these claims are, indeed, subject to 112(f) and are means-plus-function claims.

Now, when evaluating whether a claim limitation evokes the means-plus-function limitation, the essential inquiry is whether the words of the claim are understood by a person of ordinary skill in the art to have sufficiently definite meaning. As for the name of the structure that's determined, it must be made by an underlying, just kind of ordinary claim construction processes.

So what we've been doing in every other aspect here is asking yourself what does it mean and you have to look at each element of the claim. And as you will see in these claims, they are extraordinarily -- many of them extraordinarily long and include robust processes that must be done by the processor. It's not just an off-the-shelf processor. You get a memory stick, yeah, the memory stick is a structure and it is capable off the shelf of saving or creating a file to save; or a graphic card which you get off the shelf, it is capable, if you plugged it on a computer, to render graphics or display, which is capable to display images.

These are very specific functions that are claimed here by Ocado, and you've heard Mr. Guzior at the beginning talk about how there's thousands of robots that might be --

maybe hundreds of thousands of robots in some instances that are traveling at 10 miles an hour in close contact with one another.  I don't think anyone can dispute that there's no off-the-shelf processor that allows for that type of movement of robots to occur.

Now, what is the standard that this Court must apply?  It's clearly stated in the *Williamson v. Citrix* online case by the Federal Circuit and really what we're doing here is asking ourselves whether or not the presumption, because means isn't in the claim, can be overcome and how is that.  If the claim term fails to recite sufficiently definite structure or else, in this case, it recites function, like the generating and reserving and avoiding collision without reciting sufficient structure, and that means without giving you the detailed algorithms to perform those steps.

Now, let's compare some of the claims and look at whether or not there's any structure.

So as we just went through, I've illustrated on slide 68, claims 1 and 29.  On the left part of the slide here show you the various functions that are recited, including generating the plurality of clearance commands.  And each one of those, if you look, they're -- there are no structure defined.  In fact, this is the very point of novelty that Ocado argues is the issue that is not contained in the prior art. And it cannot be on the one hand that you are claiming a very

specific or specialized computer, as some of the case law refers to it, that is programmed to do a very specific thing and that thing is not available over the prior art.  And if it's not there, you must provide the actual algorithm to perform that function.

And that's the quid pro quo with the patent office, your Honor, the idea being if you're going to get monopoly power to prevent others from performing or practicing these claims, then you need to explain to the public, in order to get that monopoly power, what it is that achieves that special function on the computer.

We can go through some other claims.  I think you'll see in each instance none of the claims that are at issue here have sufficiently recited structure.

Now let's look to slide 70.

Now, Ocado claims that claim 1 describes physical structure, reciting one or more processors that are connected to a memory device.  Now, it is not AutoStore's position that the claimed memory device is subject to this 112(f) issue. That's precisely because all it's doing is saving information, precisely what a memory device is able to do off the shelf. Contrast that, however, with the one or more processors which is not capable of doing what is claimed by pulling it off the shelf.

If we can look specifically, if you want to take the

'770, if you can hand me this here -- yeah, let's look specifically in the '770 Patent at claim -- sorry, column 2, lines 19 through 27.  Give me just one minute here.

This is in the background of the invention where Ocado is telling the world, telling the patent office, what its novelty is and said:  In contrast to providing systems, it may be advantageous to provide deliberate container placement that may be optimized in the horizontal and vertical domains based on different criteria such as traffic flows, frequency of access, specific container groupings, access time, and it goes on to tell you these various elements that are never explained as to how you would perform this in the patent.

They go on to say there is a need for systems and processes for coordinating and controlling product movement. And then they actually claim that.

If we look to the same spec, '770, at column 10, again here have examples of where in the specification Ocado's describing its robot control system, which in the -- in the figures is labeled 202, and it talks about the configurations of these robots that can be used to avoid collisions, it's optimization of and the movement of past control of activities to perform.  All of this goes on and on.  It says these are complex -- and I'll underline this -- complex algorithms, none of which they provide.

THE COURT:  Hold on a second.  Leave that up.

MR. LOY:  Yup.

THE COURT:  Go ahead.

MR. LOY:  This is in the '770 Patent, your Honor --

THE COURT:  Yeah.

MR. LOY:  -- for the record, 10 -- column 10, lines 38 to 42.  And these are the very calculations of reservations of paths clearance instructions that we've been talking about all day.

Now, Ocado argues that processor is a class of -- of structure that it alone, per se, could meet the requirements of or obviate the need to go to the means-plus-function or 112(f).

Now, if we see that -- if you look to this case, *In Re: Katz*, it's one it cases cited, it's 639 F.3d, 1303, you'll see exceptions to when you see various either processing, receiving, or storing claims and those are not subject to this 112(f) requirement.

And if you look, each of these cases you sort of have to look very deep into what is the claim.  That's precisely what claim construction asks the Court to do.  When the claim is claiming something that is basic, what the thing is meant to do, it's not subject to this requirement.  But that's not the case here.

I think both experts at deposition admitted that you would need specialized programming once you took the processor from a commercially available source.  Dr. D'Andrea, the expert

for Ocado, said additional programming and load -- that you'd have to -- need additional programming to load that on the processor in order to carry out the functions, he agreed.

Now, there are a couple cases I think are important for the Court to focus on.  One is the *GoDaddy* case that was affirmed at the Federal Circuit and then the other is the *St. Isodore* case.  Both of those, you'll see, have examples of when you have claim elements that are very basic in nature.  The issue -- I think the quote here at the bottom, actually, is referring to the *GoDaddy* case, but the issue there was the processors related to off-the-shelf processors again and the question was are there distinct portions of data in this *GoDaddy* case; could two data inputs -- so processors could take in data, but could the processor take in two data points that are distinct from one another and create a third data class, which is not just ordinary processing, but similar to what's here; we have these complex algorithms to take many different inputs, where the robots are going to be, how fast they're traveling, whether there's slippage --

THE COURT:  You've got to slow down for the reporter.

MR. LOY:  Sorry.

Whether they're going for bananas or going for yogurt, we hear it, all of those inputs are going to need to be determined to be able to do the processes that are claimed

here.

Now, Ocado relies on the *VDPP* case pretty heavily in its response. First, the *VDPP* case did not in any way change the precedential *Williams* case that we focused on. The case had very specific factual faults where the defendant did not adduce any evidence that a person of ordinary skill would not have understood the limitation to have had sufficient structure.

And it's worth bearing in mind that the claimed inventions there in *VDPP* were directed to an apparatus that created an illusion of continuous motion. So the idea being you could take the basic functions of storing images and processing images to create a repetitive image that would portray to a user that it could see motion even though they were actually still motion -- or still images being presented.

Now, you want to compare that again to Ocado's claimed inventions where those are, by their very words, complex algorithms.

Ocado also relies heavily on the *Dyfan* case. The *Dyfan* case is a case where the claim is fundamentally different than Ocado's claims at issue in this case. In *Dyfan*, the patents were related to systems of delivering messages, the idea being using a mobile phone, for instance, which you can buy commercially, and it would send a message to your Honor if you were in the neighborhood of some shopping mall and that you

had indicated some otherwise -- an interest in a particular sports fan, for instance.  You could then get an image and say, oh, there's a sale at this sports store.

So the very nature of the claimed invention was routine.  It was using things you could buy and then just taking inputs that could routinely be used by the computing devices.  Again, very different from the complex algorithms at issue here.

Now, once the Court has concluded that the claims at issue are, indeed, subject to 112(f), as we have demonstrated, the next question the Court has to ask -- and we understand this is a multistep process for the Court -- what is the claimed function and what is the corresponding structure.  And the reason that is important is because with 112(f) means-plus-function claims, the claims are limited to the functions disclosed.

So if the function is not disclosed, then the claim is indefinite.  But if it is disclosed and there's something there, then the infringement read is limited to that which is disclosed or its equivalents.

And here, your Honor, we argue that there is no such structure, there's no algorithm, there's no series of steps explained, and, thus, the one or more processor terms are invalid.

Let's go briefly to some expert testimony that shows

that.

Now, let's focus again for a moment. Both of our experts did agree that the recited functions are not generic, they cannot be done by a general purpose computer or the one or more processors that are claimed. In fact, Dr. D'Andrea was asked, now, if someone goes and buys a processor, even one where it already has a real-time operating system on it, that processor in that state would not be able to perform the functions that are recited in claim 1 of the '770, correct? And Dr. Ioannou agreed -- Dr. D'Andrea, pardon me, agreed, yeah, so if you buy an off-the-shelf computer with real-time operating system and you turn it on, it's not going to all of a sudden control all of those robots on a hive, no.

The question went on: All right. So one needs to do additional programming and load that on the processor in order to be able to carry out the function that's recited in claim 1, right?

Again Dr. D'Andrea agreed: It wouldn't be loaded on the processor. It would be in the memory. The program is in the memory and the processor executes commands based on what is in the memory, but I think other than that, there would be a program. It would have to be written.

Now, the question -- it really begs the question did Ocado disclose that program in its specification, and the answer is no.

THE COURT:  What slide is this we're looking at, what number?

MR. LOY:  This is, your Honor, slide -- this is AutoStore slide '770-79.

THE COURT:  Right there at the bottom, right.  Okay.

MR. LOY:  So, now, just to jump for a moment to another Dr. D'Andrea slide, this is AutoStore's slide 770-83.

Question:  Does the specification provide an algorithm for the recited functions?

And it's worth reading these into the record as well.

Does the '404 Patent, column 18, lines 32 to 35 -- and just for the record, the '404 and the '770 do have a shared specification.  So even though we are talking about claims of the '770, these -- these citations in the record do map consistent with one another.

So reading again:  Does the '404 Patent at column 18, lines 32 to 35 give a step-by-step algorithm for the clearance module to check whether a planned path is clear for a robot to traverse?

Unequivocally:  No, it does not in that small segment, no.

Does the expert -- does the excerpt from column 18, lines 39 to 40, give a step-by-step algorithm to check whether it is possible that the two robots can be within the same

portion of the path during some period?

Again, no.

We go on.  Each instance where we asked Dr. D'Andrea, is there a algorithm showing how the clearance unit performs?

No.

Do you show any series of steps how the clearance unit performs the functions recited in claim 1?

No.

That's because they're not there.

Now, with that, your Honor, we will turn the floor, but we do ask that -- all this leaves us is a black box.  We have a patent that claims significant function and Ocado has not lived up to what its duty was to the public, which is to disclose how its patents are performed, what that code should look like; not just saying do it, but tell you how to do it.

MR. GUZIOR:  Your Honor, we're going to be talking about a two-part test and Mr. Loy talked about the two parts of the test for whether the "processors configured to" term is means-plus-function.

And we heard a lot from Mr. Loy about the second step of that test, which is what are the algorithms disclosed in the specification.  Mr. Loy directed the Court to column 10 of the '770 specification at lines 39 to 43 where it talks about complex algorithms to use by the robot control system in

determining optimal paths, calculating optimal locations for containers, and/or determining reservations and/or clearances.

And, your Honor, Mr. Loy talked a lot about testimony from Dr. D'Andrea and Dr. Ioannou, saying that, you know, at least on Dr. Ioannou's part, he doesn't think there are algorithms in the specification.

Now, all of that goes to step two, and we never get to step two if we don't get beyond step one. And this is where the defendant failed in *VDPP*.

A Federal Circuit panel -- and I'll admit to the Court it is a nonprecedential opinion. The Federal Circuit publishes some; it doesn't publish all of its decisions.

But in *VDPP,* a panel said: The defendant only talked about step two. The defendant only talked about the fact that the specification does not disclose sufficient algorithms -- and you'll see this quotation later -- the Federal Circuit panel said the defendant misses the mark.

You know, it doesn't matter whether there are algorithms in the specification if we never get to step two because the step one question is is the claim language itself providing sufficient detail such that a person of skill would understand the description to be structure.

So you heard a lot about complex algorithms, what is and is not in the specification, but it doesn't matter because AutoStore can't get beyond step one. And tangentially, your

Honor, when it comes to those complex algorithms referenced in column 10 at lines 39 and 40 of the '770 specification, the specification does disclose columns of algorithms starting at column 21, line 57 through column 25, line 40, several columns of algorithms that exactly as stated in column 10 speak to the optimization -- of calculating optimal locations for containers and determining optimal pathways.  And those include things like the A* algorithm that I talked about earlier.

But, your Honor, I want to talk about step one.  You know, Mr. Loy wanted to talk only about step two and I want to talk about step one because we never get to step two if we don't get beyond step one.

And where I want to start is on slide 67.

This is a long claim in the '770 Patent.  You see the full text of it here on slide 67.  I believe Mr. Loy called it extraordinarily long because of all of the detail it provides.  And the claim is long because the claim does not simply say a processor configured to move robots, nor does it simply say a processor configured to avoid collisions.

The claim describes in detail how the processor is configured to perform specific operations in the context of the claimed invention.  It tells the person of skill that the computer code on the processor, the computer code that configures the processor, what that code looks like and how it operates.

90

And, Mr. Mayron, could you take us to slide 70, please.

But what is it that AutoStore says, your Honor? Well, AutoStore says that the claim does not recite structure and the processor -- "processors configured to" term in claim 1 purely claims function without structure and, thus, it's means-plus-function.

And as I said at the outset, this is a two-part test. First the Court has to determine that the processors configured to limitation does, indeed, invoke means-plus-function. And only if the answer is yes do we look for algorithms in the specification.

AutoStore's argument, again, and it bears repeating, depends entirely on getting to step two. If your Honor agrees with Ocado at step one, that the claim recites sufficiently detailed structure, AutoStore loses.

Mr. Mayron, slide 71.

So what is the starting point for the analysis? And my colleague glossed over this fairly quickly, but means-plus-function is only a drafting choice. It's not a punishment. It's not anything bad. It's not something that a patentee did to betray their duty to the public as we heard at the end of my colleague's presentation. It's a drafting choice. You can choose to claim function and if you choose to claim function, typically by invoking the word means, you

are limited to the structures that are described in the specification for performing the function.

And because this is a drafting choice, the Federal Circuit has said that if the patentee does not use the word means, the presumption is that it is not means-plus-function.

So where are we starting? We are starting with the presumption that AutoStore's argument is wrong. And in order to overcome the presumption that AutoStore's argument is wrong, AutoStore bears the burden of showing this Court by a preponderance of the evidence that a person of skill would not have understood the "processors configured to" limitation to connote structure in light of the claim as a whole or as the Federal Circuit said it differently, whether a person of skill would recognize the claim as connoting some structure.

Now, your Honor, what is it that you're looking for when you ask whether the claim connotes some structure such that it is not means-plus-function. This is not easy, but the question is how do you know. And I like to think of it this way.

If a person of skill looked at the claim language, would they recognize it as describing something they know? An extreme example, a processor configured to cure the flu, a person of skill might think that's an admirable goal. But knowing the functionalities of a processor and computer code that might be loaded onto it, there is not sufficient

description of structure for a person of skill to recognize what the claim is talking about. What is a processor to cure the flu? It's a black box for the function of curing the flu without any description about how you would do that.

By contrast, a processor configured to receive room temperature data, determine if the temperature is above 78 degrees and send a signal to the air-conditioner if so, that, of course, does not recite the computer code, the complex algorithms that may go onto the processor, but a person of skill would know that the recited operations are within the scope of a processor's functionalities with basic known computer code; namely, collect input data, compare data sets, and generate an output.

And this is very similar to the issue here and I would like to persuade the Court that we are far more like the second example and the cases in which the Federal Circuit has found sufficient structure to avoid means-plus-function, including when the claim described the operation of computer code. To do that, I respectfully submit to your Honor that the Court should have one or both of the following holdings on this extremely important issue.

First, this is not a case where the term processor is being used as a black box for functionality or a substitute for the word means. In AutoStore's opening markman brief at page 40, they say there is no dispute that persons of skill

93

understand what a processor is, and I think we heard our colleague confirm that they do not dispute that point during their presentation today.  All of AutoStore's evidence is directed to step two and they did not provide evidence to carry their burden at step one.

I respectfully submit that the Court should follow the Federal Circuit's 2022 decision in *VDPP* where the defendant did the same and the Court of Appeals reversed a district court's finding that a term was means-plus-function because the defendant did nothing to carry its burden at step one.

Second, even if the Court were to look beyond the evidence issue, and I respectfully submit it should not, there is no dispute that all of the claim language following the term "processor configured to" describes the computer code that would be loaded onto the processor to perform the described operations.

Computer code is structure, and just like the Federal Circuit's 2022 precedential decision in *Dyfan*, the claims here provide a sufficient description of the structure of computer code loaded onto the processor to perform the described operations.

Those are the two holdings I respectfully submit the Court should have and I'm going to try to persuade you on those points.

THE COURT:  Appellate courts usually have internal

rules about when they want to designate opinions as nonprecedential. Is there anything unique about the way the Federal Circuit goes about it?

MR. GUZIOR: So in this particular instance, *Dyfan* and *VDPP* I believe were released on the same day or perhaps 24 hours apart and they chose to designate *Dyfan* as the precedential opinion. Very similar issues in the two cases.

In fact, *Dyfan* was a case where the claim language recited computer code configured to, so even more -- more functional in terms of what the claim was describing. It was -- that's the precedential opinion, *Dyfan*, computer code configured to.

THE COURT: Sure.

MR. GUZIOR: And *VDPP* was processors configured to, just like the language here, and the Federal Circuit decided they would write the more detailed opinion in *Dyfan*. And then the *VDPP* decision basically says --

THE COURT: Piggyback.

MR. GUZIOR: Yeah. We released this at the same time as *Dyfan* and for the reasons in *Dyfan*, we think *VDPP* should go the same way.

THE COURT: Well, you've given me the laser-focused answer on this case. I'm asking more as a practitioner in this field.

You know, I know why the First Circuit does it,

because it's simple and I'm familiar.  Is there anything different about the way the Federal Circuit does it as a rule?

MR. GUZIOR:  No, I don't think so, your Honor.  You know, the panel may decide that the case sets forth precedent.

THE COURT:  Yeah.

MR. GUZIOR:  The panel may decide this is an issue that's very specific to the case, just like in other Courts of Appeals.  So there isn't -- to my knowledge and practice, there isn't a significant difference.

THE COURT:  Do you want to say something about that?

MR. LOCASCIO:  I do, and we can get to the chapter and verse.  We have a host of clerks on this.  My understanding -- I was not a clerk over there.

My understanding of what happens at the Federal Circuit, a panel can issue a decision.  If it is to become precedential, that panel decision is then circulated at the court before it is issued versus a nonprecedential decision; the panel writes their decision, the three judges, it does not get any additional vetting or sort of circulation --

THE COURT:  What's the rough split?  Is there -- is it like -- is it, you know, 90/10, is it 50/50?  I mean, you must read the cases constantly.

MR. GUZIOR:  I'd be surprised if Mr. LoCascio knows. He may know the number.  Otherwise, we can get that for the Court.

THE COURT:  No, no, off the top of your head.

MR. LOCASCIO:  I'd say it's somewhere in the zone of like -- we're in the 40s to 60s, around there.  Like -- it's not like a rarity and it's not a -- the majority.

THE COURT:  So it's much more common than a regular circuit court, at least our circuit.  Yeah.  You know, most of our circuit court opinions are precedential.  Okay.

MR. LOCASCIO:  Because they're factual.

THE COURT:  In the Federal Circuit, how many judges roughly?  I'm guessing 10ish?

MR. LOCASCIO:  It's like 10 or 12.  There's a healthy number of senior judges that sit on panels, but I think calling it as 12 is fair.

THE COURT:  Okay.

MR. GUZIOR:  I'm revealing myself as a trial lawyer, your Honor.

THE COURT:  Yeah.

MR. BEENEY:  There's Rule 36 that they use a lot as well.

MR. GUZIOR:  Yeah, I think Mr. Beeney makes a good point.  You know, the Federal Circuit, in large part, or in very substantial part, uses something called a Rule 36 summary affirmance, where they don't even issue a decision; they just say Rule 36 affirmed.

THE COURT:  Sure.

MR. GUZIOR: But, your Honor, I do think -- I don't want to lose sight of the forest for the trees on this.

*Dyfan* -- you know, precedential, nonprecedential -- *Dyfan* controls the outcome here and that's a precedential decision.

So this isn't a situation where we're coming to the Court and we're saying, well, rely upon a nonprecedential panel opinion because we have sort of the benefit of there was this great precedential decision released the same day as this equally great nonprecedential decision. So you don't really have to -- it's not what weight do I give to a nonprecedential decision.

THE COURT: Please.

MR. BEENEY: May I, your Honor?

THE COURT: You may.

MR. BEENEY: There is a rule about this, which is Rule 32, and it's citable precedent and -- so I think that answers the judge's question.

THE COURT: It's funny. I mean, in our circuit, people are constantly citing nonprecedential opinions as precedent despite the fact that the rule says do not do that.

MR. BEENEY: The rule of the Federal Circuit is just the opposite, your Honor. You can cite it --

THE COURT: Ah.

MR. BEENEY: -- I believe.

And they also say that they issue these nonprecedential opinions, I believe, because they -- it's not a significant advancement of the law.  But that's my understanding.

MR. GUZIOR:  Yeah.  So, your Honor, Rule 32.1, I'll start with (d), Court's Consideration of Nonprecedential Dispositions:

The Court may refer to a nonprecedential disposition in an opinion or order and may look to a nonprecedential disposition for guidance or persuasive reasoning.  It will not give -- but will not give one of its own nonprecedential dispositions the effect of binding precedent.  The Court will not consider nonprecedential dispositions of another court as binding precedent of that court unless the rules of that court so provide.

And then 32.1(c) --

THE COURT:  Slow down.

MR. GUZIOR:  -- says:  Parties are not prohibited or restricted from citing nonprecedential dispositions issued after January 1st, 2007.  This rule does not preclude assertion of claim preclusion, issue preclusion, judicial estoppel, law of the case and the like based on a nonprecedential disposition.

So you're allowed to use it as I think it's consistent with the rules in other circuits as a persuasive

authority.

THE COURT:  Yeah.

MR. GUZIOR:  The Court can look to it as a persuasive authority.  But as I said here --

THE COURT:  Doesn't matter.

MR. GUZIOR:  Doesn't matter.

THE COURT:  Yeah.  I've dragged you into this alley long enough.  You can stop beating me up now.

Just go.  I get it.

I just wanted to -- I just wanted to -- you know, it's an appellate court; bottom line, it's a Court of Appeals.  And I just wanted to see if there's something I should be focused on with this nonprecedential, precedential, but it sounds like it's all fair game --

MR. GUZIOR:  I think so, your Honor.

THE COURT:  -- although not necessary by your likes.  Yeah.  Okay.

MR. GUZIOR:  So, your Honor, I want to start on slide 77.  And between the end of September and the present I've had some advanced thinking about how these slides should have been ordered, so I'm going to bounce around a little to try to be efficient and skip some sections.

And I'm not going to dwell on what's admitted.  AutoStore agrees that at the time of the invention, a person of skill would understand the term processor as it appears in

claim 1 as a definite structure, a computer hardware component. But more relevant, AutoStore's expert admitted during deposition the known functionalities of a processor at the time of the invention.

Slide 77 shows an exhibit that I created with AutoStore's expert during his deposition. The expert explained that a processor has a definite structural component that can receive input data, perform calculations based on the data, execute computer code that can, for example, compare data sets, generate outputs such as commands that cause hardware components to do things, for example in this case, send a signal to cause a robot to move.

And Dr. Ioannou explained that a processor can carry out logical statements, which are also called if-then constructs.

And so there would be no confusion. As you see on slide 78, I asked AutoStore's expert if a person of skill would understand the term processor in the '770 Patent to be referring to a specific hardware component with the functionalities that I just described. And he confirmed that was the case. And on slide 79, he explained that this was the case despite the fact that we were talking about tens or hundreds of thousands of robots.

I believe my colleague said during his opening presentation that a processor couldn't handle tens or hundreds

of thousands of robots, but Dr. Ioannou testified at his deposition that he believed processors could handle this computational load.

THE COURT:  Is there a difference between an off-the-shelf processor, right, or one that requires specialized functions?  Like can you either make me understand that or provide me examples?

MR. GUZIOR:  Yeah, absolutely.

So there -- there is a difference between an off-the-shelf processor and a processor that's running computer code to perform a particular operation.

And if we go back to slide 77 --

THE COURT:  Really?  An off-the-shelf processor doesn't use computer code to -- to conduct an operation?

MR. GUZIOR:  Oh, it does.  But what I'm saying is when you take the processor off the shelf, it obviously doesn't have a particular computer code loaded onto it.

And so the processor has functionalities that are well known.  You can have a sensor that interfaces to give the processor input data, what is the temperature of the room.  The processor itself can take that input data and compare data sets.  It can say what is the temperature relative to what this program that's been loaded onto the processor says the temperature should be.

And so, your Honor, the processor has off-the-shelf

capabilities, but you will write computer code in order to have the processor undertake particularized operations.

But what's relevant here is that what the claims of the '770 Patent describe are all operations that the basic functionalities of a processor could carry out; take data inputs, compare data sets, compare whether robot 1 is going to be in the same grid cell as robot 2 within the same time interval, because then you know that there's going to be an overlap or there isn't going to be an overlap and you can reserve or not reserve the path based on that simple data comparison.  And so the known functionalities of a processor could support exactly what the claims of the '770 Patent describe.

And, Mr. Mayron, could you take us to slide 89, please, jumping forward.

Now, I'm addressing here, your Honor, what I submitted was the first of two holdings that the Court should -- should have on this issue, which is the question of whether AutoStore came forward with sufficient evidence to show at step one that "processor configured to" in these claims is a black box.  It's -- it's just a block box for functionality.

And I just showed you that everybody's on the same page, that a processor in this claim is not a black box; it's a specific hardware component that you can hold in your hand, and it has known functionalities to a person of skill at the time

of the invention, and Dr. Ioannou testified unequivocally that that is what the claims of the '770 Patent are referring to when they say "processors configured to."  It's not a black box.  It's a thing.  He knows what that thing is and he knows what that thing does.

Now, what is the evidence they did offer?  On slide 89 we see an excerpt from Dr. Ioannou's first declaration and he says that AutoStore's counsel asked me to provide my opinion as to whether the '770 Patent specification provides algorithms or methods to program computers to implement the functions recited for the one or more processors.  In my opinion, the specification provides no such algorithms.

But that's step two, right?  The question of whether the specification discloses the algorithms is step two.  So this is irrelevant.

And his surrebuttal declaration didn't fix the problem.  Dr. Ioannou said that he thinks that the specification did not describe the computer code that you would load onto a processor to perform the operations.  This also is irrelevant because it's step two.

Now, your Honor, this gets us to *VDPP*, the nonprecedential decision from 2022, and as I previewed at the outset of my presentation, what happened in *VDPP* is exactly what happened here; the expert skipped ahead to step two and said, I don't think -- and I'll read from the court's decision:

First, defendant emphasizes that the specification fails to disclose structures capable of performing the claimed functions.  According to defendant, because of that lack of disclosure, the claims are invalid as indefinite.  Defendant's argument misses the mark.

And I used that quotation at the start.  I said it was going to come.

Whether the specification discloses adequate corresponding structures for the claimed functions is a question we review at step two.

So on the first holding that I respectfully submitted the Court should have on this issue, it's very straightforward.  It's *VDPP*.  AutoStore decided not to put forward any evidence at step one to show that means-plus-function applied.  They had their expert instead testify that a processor was not a black box.  People of skill in the art understood what that component was and what it did.  There simply is no step one evidence and the argument fails.

But I want to now go to the second point, your Honor, of the two that I mentioned, and for that I want to go back to slide 82, please, Mr. Mayron.

Even setting aside the processor issue, the '770 Patent claim language recites sufficiently detailed structure for computer code that is loaded onto the processor to perform the functions described in the claims.  And, your Honor, if we

start at slide 85, I just want to make sure we're all on the same page about what computer code is.

And what I'm showing, and slide 85 is some of Ocado's source code, some of Ocado's computer code, that has been produced in this litigation. And as you see on slide 85, computer code is structure. The human readable version, called source code, is a set of instructions that cause a processor to perform tasks. You see that on slide 85.

The computer readable version of this, called object code, is a series of zeros and ones that the processor can use to perform the functions that are described in the code.

Computer code is structure, your Honor. You can print it and you can hold it in your hand.

Now, Mr. Mayron, if we could jump back to slide 83, please.

We start with AutoStore's expert again. And, again, AutoStore's expert made Ocado's case. He explained that the processors in claim 1 are executing a computer program written to do the described functions. And that is what he understood "configure to" to mean in the claims.

And, importantly, when asked whether a processor at the time of the invention could perform all of the detailed operations, his answer was an unequivocal yes.

This is his answer: So if the question is could the processor do all these things, yes, I will say there is a

processor that could do that.

And, your Honor, moving forward to slide 86 -- Mr. Mayron, could you take us to 86?

This is Ocado's expert. Dr. D'Andrea was asked about all of the long and detailed claim language that followed "configure to" in the patent claim and he was asked:

So based on the description that we've been talking about, based on what the -- the description that the patent provides, would a person of skill in the art have been able to visualize the structure of the code that would be necessary to perform these operations?

Answer: I believe that they would.

This testimony went unrebutted. Nobody rebutted this. AutoStore's expert didn't say to the contrary. And, again, your Honor, it is AutoStore's burden to show that the claims do not connote structure. I don't know how they possibly could carry that burden in light of Dr. D'Andrea's unrebutted testimony.

Mr. Mayron, slide 96, please.

And the claim language does not stand alone. Slide 96 identifies several citations to the specification that provides further -- further description of the operations performed by the computer code that's loaded onto the processor.

Now, I've provided these citations for the Court at

the bottom here.  All of these citations are to the specification of the '770 Patent and the Federal Circuit's case law tells us that it's acceptable and appropriate to look to the specification for guidance on this issue.

Mr. Mayron, slide 94, please.

And, your Honor, in this respect, our case is indistinguishable from the Federal Circuit's 2022 precedential decision in *Dyfan*.  The Federal Circuit said the computer code with language describing its operation connotes specific structure to avoid means-plus-function treatment.  This is precedential and this is controlling precedent.

And *Dyfan* does not stand alone.  Other cases cited by AutoStore recognize the same concept as shown on slide 95.  And, your Honor, this case has numerous other similarities to *Dyfan*.

First, on slide 97, the Federal Circuit found it relevant that record evidence showed that developers had access to existing software to perform services and functions described in the claims.

Here, Dr. D'Andrea testified that code was available at the time of the invention to perform the operations described in the claims.  And you see his answers, yes, yes, yes, on slide 97 where he is saying that there was code available at the time of the invention to perform these functions.

Similarly, if we look at slide 90 -- if we look at slide 98, AutoStore's expert agreed.  He was asked:

This is something for which you and your colleagues had a software implementation before 2010?

Answer:  Yes, we simulate it.

So, again, Dr. D'Andrea's testimony was unrebutted and, in fact, AutoStore's expert confirmed it.

Slide 99, your Honor, shows another consideration that the Federal Circuit thought was important in *Dyfan*.  The Federal Circuit thought it was important that the operations described in the claims could be performed by software in a software library.

So too here.  Dr. Ioannou, AutoStore's expert, described at length the tool called MATLAB that had a control systems toolbox available from the mid to late 1980s.  And as he said, that is a whole library of tools for control systems.

And if we look forward, your Honor, to our slides 101 and 102, I'm not going to review all of these cases, there are numerous cases similar to *Dyfan*, similar to *VDPP*, that similarly support the conclusion here that "processors configured to," followed by the description of how the processor is configured, connote structure and it is not means-plus-function.

Briefly, your Honor, I want to make a practical point.  Earlier I talked about our colleagues' invalidity

contentions and how often the truth in a patent case is said when the writer thinks nobody is listening. And I think that applies in spades to this issue, too, your Honor.

Recall that the '770 Patent was issued in August of 2021. It was asserted in a complaint before this Court for the first time in October 2021. Now, since October 2021, AutoStore and its counsel have been looking at the claims of the '770 Patent and the "processors configured to" language in particular, but when they gave us their initial claim construction positions in March of 2022 and when they gave us their initial invalidity contentions in March of 2022, they had no trouble understanding the "processors configured to" language as sufficiently definite structure. They did not contend that the "processors configured to" language was means-plus-function, nor did it contend that it was indefinite.

That didn't happen until May and June of 2022, nearly a year after the '770 Patent was first asserted in a complaint that it suddenly occurred to them that they should make the argument that "processors configured to" is means-plus-function and indefinite. But they didn't take that position. They didn't think that when they first read the claims.

And the inconsistencies don't end there. Even today, AutoStore does not contend that the vast majority of "processors configured to" limitations in the claims of the

110

'770 are means-plus-function.

For example, dependent claim 11 shown on slide 105 recites one or more processors configured to determine from the dimensions of the grid-like structure that there is the potential for a collision.

But AutoStore makes no argument to the Court that this is means-plus-function or indefinite.  How can that be? Again, AutoStore's claim construction position with respect to some uses of "processors configured to" is respectfully contrived.

The inconsistencies don't stop there.  Slide 106 shows claim 20 of the '404 Patent, a method claim that we talked about earlier.  Very similar claim language, but AutoStore does not contend that claim 20 of the '404 Patent is governed by 112(6), something called step-plus-function.  How does that make any sense?  How can it be that the "processors configured to" in the '770 Patent and only some of that language is means-plus-function, but nearly identical functionality in claim 20 of '404 is not.  Again, the first of those two arguments is, respectfully, contrived.

And it continues into the '080 Patent, the tote-in-tote patent that your Honor heard about the end of September.

Claim 1 of the tote-in-tote patent describes at least one processor configured to do various tasks.  But

111

AutoStore doesn't contend that this is means-plus-function, nor do they contend that it's indefinite.  But how can that be true, your Honor?  How can it be that in the '080 Patent a description of at least one processor configured to, for example, generates signals to instruct and control a plurality of robots to store storage containers in a system?  That's not means-plus-function, but nearly identical language in some claims of the '770 Patent is.

And, finally, your Honor, I'm not just putting a stick in their eye.  The Federal Circuit has said that these types of inconsistencies are legally relevant.

For example, in the *Samsung* case in 2020, the Federal Circuit observed that the board's treatment, the Patent Trials and Appeals Board's treatment, of the digital processing unit limitation in claim 11 as structural undermines its conclusion that the same term in claim 1 was functional and the subject means-plus-function.

These inconsistencies are rampant and they make no attempt to explain why they're requesting means-plus-function claims -- means-plus-function treatment in some claims but not others.  And it's because none of them are means-plus-function.  Their expert and they understood what a processor was.  They understood the claim to be reciting with sufficient detail the computer code that would be loaded onto that processor and it's not means-plus-function.  And for that reason, your Honor, the

112

claims can't be invalid.

Thank you.

THE COURT:  All right.  Since we're only a couple minutes from a 90-minute mark --

MR. LOY:  I'll try to make it brief, your Honor.

THE COURT:  Well, that's not really my point.

MR. LOCASCIO:  Would you like to take a break now then?

THE COURT:  It's not that I want you to be brief. At all.  Because there's a mouthful there.  He said a lot.

MR. LOY:  Yeah.  Let's --

THE COURT:  Wait a minute.  I'm just trying to figure out the rest of the hearing.

Because you're not going to be out of here by 5:00, it doesn't look like to me, unless there's something I don't understand.  Right?

I mean, are you saying that if you wrap this up in a couple minutes here, it's over?  I don't think so.

MR. LOY:  I think we probably have a little bit beyond 5:00.

MR. LOCASCIO:  Let's take a break.

THE COURT:  Yeah, let's take a break.

Okay.  15.

THE CLERK:  All rise.

MR. BEENEY:  Your Honor, just -- apologies.  Before

we do --

THE COURT:  Off the record.

(Off-the-record discussion.)

(Recess taken at 4:43 p.m.)

114

C E R T I F I C A T E


        I, Liza W. Dubois, do hereby certify that

the foregoing transcript is a true and accurate transcription

of the within proceedings, to the best of my knowledge, skill,

ability and belief.


Submitted: 12/28/22        */s/  Liza W. Dubois*
                           LIZA W. DUBOIS, RMR, CRR